Michael J. Bettinger (SBN 122196)
mbettinger@sidley.com
Irene Yang (SBN 245464)
irene.yang@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Ste. 2000
San Francisco, California  94104
Telephone:  +1 415 772-1200
Facsimile:  +1 415 772-7400

David T. Pritikin (*pro hac vice pending*)
dpritikin@sidley.com
David C. Giardina (*pro hac vice pending*)
dgiardina@sidley.com
Douglas I. Lewis (*pro hac vice pending*)
dlewis@sidley.com
John W. McBride (*pro hac vice pending*)
jwmcbride@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
Telephone:  +1 312 853 7000
Facsimile:  +1 312 853 7036

Attorneys for Plaintiffs
HUAWEI TECHNOLOGIES CO., LTD.
HUAWEI DEVICE USA, INC., and
HUAWEI TECHNOLOGIES USA, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., HUAWEI DEVICE USA, INC., and HUAWEI TECHNOLOGIES USA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.,  and SAMSUNG RESEARCH AMERICA, <br><br> Defendants. | Case No. <br><br> **PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY JUDGMENT, AND PATENT INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Huawei Technologies Co., Ltd. ("Huawei"), Huawei Device USA, Inc. ("Huawei Device"), and Huawei Technologies USA, Inc. ("Huawei Tech. USA") (collectively, "Plaintiffs") allege as follows against Samsung Electronics Co., Ltd. ("Samsung"), Samsung Electronics America, Inc. ("SEA"), and Samsung Research America ("SRA") (collectively, "Defendants"):

## NATURE OF THE ACTION

1.      Huawei holds a substantial portfolio of patents declared essential to critical mobile telecommunications standards, including the ubiquitous 4G Long Term Evolution ("LTE") standard, developed by the Third Generation Partnership Project ("3GPP") and implemented in the United States.  Samsung has also declared patents to be essential to standards developed by 3GPP, including the LTE standard.  Specifically, Huawei and Samsung have made binding commitments to the European Telecommunications Standards Institute ("ETSI")—a 3GPP organizational partner which promulgates standards developed by 3GPP—to license these standard-essential patents ("SEPs") on terms and conditions that are fair, reasonable, and non-discriminatory ("FRAND"). SEPs are particularly powerful patents given the need for all implementers to practice them in order be able to make, use, or sell standard-compliant products.  Given the relative values of the parties' SEP portfolios and the fact that Samsung has substantially larger sales of standard-compliant products than Huawei in the United States and worldwide, any FRAND cross-license between the parties should involve a material payment of royalties from Samsung to Huawei.  Samsung, however, has breached its commitment to license its SEPs to Plaintiffs on FRAND terms by:  (a) failing for over five years to negotiate a FRAND cross-license with Huawei in good faith despite Huawei's consistent good faith efforts to do so; and (b) refusing to license its SEPs to Plaintiffs unless Huawei grants to Defendants a cross-license to Huawei's valuable SEPs without reasonable compensation.  In order to remedy the on-going harm imposed on them by Samsung's breach of its commitment to enter into a SEP cross-license with Plaintiffs on FRAND terms and conditions, Plaintiffs bring this action for breach of contract and declaratory relief.

2.      In addition, because Defendants have persisted in importing, selling, and offering for sale a substantial volume of standard-compliant products that use Huawei's SEP technology without a license, Huawei also brings claims for patent infringement under 35 U.S.C. § 271, *et seq.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE PARTIES**

3.      Plaintiff Huawei is a Chinese company with its principal place of business in Bantian, Longgang District, Shenzhen, People's Republic of China.  Huawei is involved in the design, manufacture, and sale of mobile devices, including smartphones that operate on cellular networks.  Huawei's subsidiaries in the United States include Huawei Device and Huawei Tech. USA.

4.      Plaintiff Huawei Device is a Texas corporation with its principal place of business in Plano, Texas.  Huawei Device distributes, markets, and sells mobile devices, including smartphones that operate on cellular networks in the United States.  Huawei Device operates in the United States through various facilities, including offices at 10180 Telesis Ct., San Diego, California, and 2330 Central Expressway, Santa Clara, California (depicted below) where Huawei Device employees conduct research and development ("R&D") activities.  The R&D teams focus on antenna/radio frequency, power conservation, product testing, compatibility testing, and Android interoperability.



5.      Plaintiff Huawei Tech. USA is a Texas corporation with its principal place of business in Plano, Texas.  Huawei Tech. USA distributes, markets, and sells mobile telecommunications infrastructure equipment to carriers in the United States.

6.      Defendant Samsung is a Korean company with its principal place of business in Suwon, South Korea.  Samsung is comprised of three business divisions, including (1) Consumer

Electronics ("CE"); (2) Information Technology & Mobile Communications ("IM"); and (3) Device Solutions ("DS").  The IM division is responsible for the design, manufacture, and sale of mobile devices, including smartphones that operate on cellular networks in the United States.  According to Samsung, it "is one of the largest manufacturers of wireless communications devices in the world and has long focused on the United States as a critical market for its products."[1]

7.      On information and belief, Samsung operates its IM business division in the United States through a variety of wholly-owned subsidiaries, including defendants SEA and SRA.

8.      On information and belief, defendant SEA is a New York corporation with its principal place of business in Ridgefield Park, New Jersey, and it is a direct or indirect wholly-owned subsidiary of Samsung.  On information and belief, within Samsung's IM business division, SEA operates an office in Mountain View, California, located at 665 Clyde Avenue, as depicted below.  On information and belief, within the IM business division, SEA imports into the United States, and distributes, markets, and sells mobile devices in the United States, including smartphones that operate on cellular networks in the United States.



---

[1] *See In the Matter of Certain Wireless Communications Equipment and Articles Therein*, USITC Inv. No. 337-TA-866, Complaint at ¶ 9 (Dec. 21, 2012).

9.      On information and belief, defendant SRA is a California corporation with its principal place of business in Mountain View, California, and is a direct or indirect wholly-owned subsidiary of Samsung.  SRA is located at 665 Clyde Avenue in Mountain View, California, depicted above.  On information and belief, within Samsung's IM business division, SRA operates a variety of laboratories, including the Mobile Platform and Solutions Lab and the Advanced Processor Lab, both located at Mountain View, California, at 665 Clyde Avenue.  On information and belief, SRA's Mobile Platform and Solutions Lab develops "power, usability, and performance solutions" for "the family of Samsung Android smartphones and tablet devices," including devices that operate on cellular networks in the United States.[2]  On information and belief, SRA's Advanced Processor Lab "focuses on the exploration and design of low energy circuits" and "the R&D of processor and system-level design solutions for traditional and emerging mobile computing applications," including for smartphones that operate on cellular networks in the United States.[3]

10.     Defendants SEA and SRA regularly appear before the United States Federal Communications Commission ("FCC") in Washington, DC, on issues involving telecommunications standards.  For example, in 2015 and 2016, SEA and SRA submitted comments to the FCC in GN Docket No. 14-177, regarding the provision of 5G mobile services in spectrum bands above 24GHz.[4]

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

11.     This is a civil action for breach of contract, declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and patent infringement under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), and 1367.

12.     This Court has subject matter jurisdiction over the breach of contract claim pursuant

---

[2] "Mobile Platform and Solutions," http://www.sra.samsung.com/research/mobile-platform-and-solutions (last visited May 19, 2016).
[3] "Advanced Processor," http://www.sra.samsung.com/research/advanced-processor (last visited May 19, 2016).
[4] *See In the Matter of Use of Spectrum Bands Above 24 GHz For Mobile Radio Services*, GN Dkt. No. 14-177, *Reply Comments of Samsung Electronics America, Inc., and Samsung Research America* (Feb. 18, 2015 and Feb. 26, 2016).

to 28 U.S.C. §§ 1332 and 1367.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  The breach of contract claim forms part of the same case or controversy as the declaratory judgment and patent infringement claims.

13.     This Court has subject matter jurisdiction over the declaratory judgment claim pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and 1367.  An actual case or controversy exists between the parties regarding what constitutes FRAND terms and conditions for a cross-license.  The dispute is definite and concrete and touches the legal relations of the parties, who have adverse legal interests.  The matter in dispute exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  The dispute forms part of the same case or controversy as the breach of contract and patent infringement claims.

14.     This Court has subject matter jurisdiction over the patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).  The patents-at-issue in this action are U.S. Patent Nos. 8,369,278 ("the '278 patent"); 8,416,892 ("the '892 patent"); 8,483,166 ("the '166 patent"); 8,812,848 ("the '848 patent"); 8,644,239 ("the '239 patent"); 8,885,587 ("the '587 patent"); 8,885,583 ("the '583 patent"); 8,639,246 ("the '246 patent"); 8,412,197 ("the '197 patent"); 8,996,003 ("the '003 patent"); and 8,724,613 ("the '613 patent") (collectively, "Asserted Patents").

15.     This Court has personal jurisdiction over Defendants Samsung, SEA, and SRA for at least the following reasons:  (1) Samsung's wholly-owned subsidiary SRA is a California corporation with its principal place of business in California; (2) Samsung's wholly-owned subsidiary SEA maintains offices in California; (3) Samsung, SEA and SRA have designated an agent for service of process in California;[5] and (4) Samsung, SEA and SRA regularly do business or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from products and/or services provided to individuals in California.

16.     Venue is proper in the Northern District of California under 28 U.S.C. §§ 1391(b)-(c) and 1400(b) for at least the following reasons:  (1) Samsung's wholly-owned subsidiary SRA is

---

[5] SEA's and SRA's designated agents for service of process are located at 818 West Seventh Street, Ste. 930, Los Angeles CA  90017.

1   headquartered in this District; (2) Samsung's wholly-owned subsidiary SEA maintains an office in

2   this District; and (3) Samsung, SEA, and SRA regularly do business or solicit business, engage in

3   other persistent courses of conduct, and/or derive substantial revenue from products and/or services

4   provided to individuals in this District.  Pursuant to Local Rule 3-2(c), Intellectual Property Actions

5   are assigned on a district-wide basis.

6                                          **FACTUAL BACKGROUND**

7   **A.      Huawei's Innovation and Patented Technology**

8          17.      Founded in 1987 in Shenzhen, China, Huawei has become a Fortune 500 company

9   and a global leader in the telecommunications industry.  Huawei operates in more than 170

10  countries across the world, providing information and communications technology solutions to over

11  one-third of the world's population.  Huawei and its affiliates develop, manufacture, and sell a

12  diverse range of products, including cellular network infrastructure equipment, mobile phones and

13  tablets, home internet and media devices, and data and cloud storage devices.  Huawei is one of the

14  world's two largest manufacturers of cellular network infrastructure equipment, and ranked among

15  the top three mobile device vendors worldwide in 2015.

16         18.      Huawei is also a leader in research, innovation, and the development of

17  telecommunications technology and standards.  Huawei devotes significant resources to R&D and

18  maintains multiple R&D centers around the world, including in the United States through Huawei

19  Device and other affiliates.  About 45% of Huawei's global workforce—over 79,000 employees in

20  2015—work in R&D.  Huawei's R&D expenditures totaled over $9.18 billion USD in 2015,

21  accounting for 15.1% of its annual revenue.  Much of Huawei's and Huawei Device's R&D

22  activities are devoted to improving cellular network technology and mobile devices.

23         19.      As a result of its investments in innovation and contributions to the industry, Huawei

24  and its affiliates have developed a substantial patent portfolio comprising over 50,300 issued

25  patents across the world.  In 2015, Huawei and its affiliates obtained 1,268 patents issued by the

26  U.S. Patent & Trademark Office, the 23rd most of any company.  The same year, Huawei obtained

27  503 issued patents from the European Patent Office, the 9th most of any company.  For the past two

28  years, Huawei and its affiliates have filed the most international (PCT) patent applications of any

1    company in the world.  In total, Huawei and its affiliates hold over 12,000 issued patents and

2    pending applications in the United States.

3          20.     As detailed in Counts III-XIII below, Defendants have used and continue to use

4    Huawei's patented technology without license.

5    **B.     Cellular Standards and the FRAND Commitment**

6          21.     Many of Huawei's patents, including the Asserted Patents, cover various aspects of

7    industry standards developed by 3GPP through a collaborative process in which ETSI and other

8    international standard-setting organizations ("SSOs") collaborate to create and improve global

9    standards for the telecommunications industry.  3GPP operates as an umbrella SSO that produces

10   and maintains the UMTS and LTE cellular standards (also known as "3GPP standards"), which

11   generally cover the "third" and "fourth" generations of wireless telecommunications technology

12   ("3G" and "4G", respectively).  LTE technology, which evolved from UMTS, aims to increase

13   capacity and speed.  In particular, the LTE standard represents the latest advances in wireless

14   telecommunications technology and is credited with many technical innovations that have greatly

15   enhanced user experience, including a dramatic increase in data throughput and system performance

16   compared to UMTS technology.  LTE mobile devices and infrastructure equipment are commonly

17   "multi-mode," i.e., backwards compatible with older technologies.

18         22.     Cellular standards enable interoperability, i.e., the ability of devices and equipment

19   made by different manufacturers to communicate and work together in a cellular network.  In order

20   for mobile devices and telecommunications infrastructure equipment to be commercially viable in

21   the United States and most of the world, it is essential that such devices and equipment comply with

22   3GPP standards.

23         23.     3GPP maintains and approves standards through a collaborative process in which its

24   members submit technical proposals for establishing or improving aspects of a standard.  These

25   proposals are evaluated, refined, tested, and ultimately approved or rejected by technical

26   committees of 3GPP.  The resulting 3GPP technical specifications are incorporated by ETSI and

27   other SSOs into relevant standards.

28         24.     Once a particular technology is incorporated into a standard, manufacturers of

telecommunications devices and equipment must integrate the technology into their products to comply with the standard.  Because it is common for SSO members to own patents covering the technology they contribute to standards, organizations like ETSI have created policies that seek to ensure those patents will be available for manufacturers to license on FRAND terms and conditions. For example, ETSI's IPR Policy requires members to disclose patents they believe are or may become "essential" to complying with a standard and declare whether they are prepared to grant irrevocable licenses on FRAND terms and conditions.

25.     ETSI's IPR Policy defines "essential" as follows:

> "ESSENTIAL" as applied to IPR [intellectual property right] means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

Exhibit 1 at 42, § 15(6).

26.     ETSI members who disclose their SEPs are thus invited to declare whether they are ready to license them, upon request, to implementers of the 3GPP standards on FRAND terms and conditions.  The declaration forms ETSI members may use to disclose SEPs state:

> To the extent that the IPR(s) disclosed in the attached *IPR Information Statement Annex* are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached *IPR Information Statement Annex*, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1 of the ETSI IPR Policy.

*E.g., id.* at 45.  Many other SSOs require similar commitments from members who disclose patents that are or may become essential to practicing relevant standards.

27.     The ETSI IPR Policy permits ETSI members, as licensors, to condition the grant of FRAND licenses on prospective licensees' agreement to reciprocate, i.e., to be willing to license their own SEPs on what would be FRAND terms and conditions for those SEPs.  Because the value of portfolios may differ, reciprocity does not necessarily require identical or similar royalty rates for two SEP portfolios involved in a cross-license.

28.     The construction, validity, and performance of ETSI declarations are governed by the laws of France.  Such declarations create binding contractual commitments with ETSI as to which other ETSI members and implementers of the 3GPP standards are third-party beneficiaries.

29.     ETSI members who make a FRAND commitment may not refuse to enter into negotiations with any person requesting a patent license or refuse to enter into a license on terms and conditions that are fair, reasonable, and non-discriminatory.  The FRAND requirement is intended to ensure that SEP owners receive appropriate compensation for their intellectual property rights while preventing attempts to extract from implementers more favorable license terms than SEP owners would have obtained had their patents not been declared essential.

30.     Under French law, an ETSI member that has made a FRAND commitment also has a duty to negotiate in good faith to try to reach an agreement for a license.

31.     If an ETSI member who declares SEPs refuses to commit to be prepared to grant licenses on FRAND terms and conditions, ETSI may suspend work on relevant parts of the standard or redesign the standard to render the patents non-essential.

32.     Huawei and its affiliates are members of over 300 SSOs and have forged many industry alliances to promote the development of information and communications technology.  In 2015, Huawei and its affiliates submitted more than 5,400 technical proposals to various standards organizations, with the total number exceeding 43,000.  Huawei and its affiliates have been active participating members of ETSI since 1999 and have made thousands of contributions to 3GPP standards, particularly the latest LTE standard.  Indeed, Huawei has been rising as a leader in terms of approved contributions to the 3GPP standards.  Since 2013, Huawei has had more contributions to 3GPP's LTE standard-setting efforts approved than any other company in the world.

33.     Huawei, on its behalf and on behalf of its affiliates, has disclosed to ETSI over 1,200 patent families that are or may become essential to practicing one or more 3GPP standards, ranking Huawei among the top SEP holders in the world.  Huawei's declarations to ETSI are attached hereto as Exhibits 2.1–2.43.  Huawei, on its behalf and on behalf of its affiliates, has committed to license, and has licensed to multiple companies, its standard-essential patents and those of its affiliates ("Huawei's SEP portfolio") on FRAND terms and conditions according to ETSI's IPR

Policy.  Huawei's undertaking to license its SEP portfolio on FRAND terms and conditions is subject to the condition that those who seek licenses agree to reciprocate.

34.     Huawei's SEP portfolio, particularly as it relates to the latest LTE standard, is among the strongest and most valuable in the industry.  Defendants have not entered into a license to Huawei's SEP portfolio despite Huawei's efforts to license its patents, and receive a license to Samsung's SEPs, on FRAND terms.

**C.     Samsung's FRAND Commitment and SEP Portfolio**

35.     Like Huawei, Samsung is a member of ETSI and has been a member at all times relevant to this action.  As such, Samsung is bound by ETSI's Rules of Procedure, including its IPR Policy.

36.     Samsung has also submitted declarations to ETSI promising to license its SEPs on FRAND terms.  For example, on December 14, 1998, Samsung submitted an initial declaration to ETSI stating the following:

> With regard to the W-CDMA technology being elaborated by ETSI for the UMTS Terrestrial Radio Access (UTRA) FDD mode, SEC is prepared to grant licenses to its essential IPRs on a fair, reasonable, and non-discriminatory basis in accordance with the terms and conditions set forth in Clause 6.1 of the ETSI IPR Policy.

Exhibit 3.1.

37.     Since then, Samsung has submitted to ETSI at least 53 declarations disclosing patents or applications for patents that may be or become essential to 3GPP standards, including the LTE standard, and reaffirming that it and its affiliates are "prepared to grant irrevocable licenses" under those patents "on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy," subject to the requirement that the party seeking a license from Samsung also grant to Samsung a license to its SEPs on FRAND terms.  Samsung's declarations to ETSI are attached hereto as Exhibits 3.1–3.53.  Like Huawei, Samsung's undertaking to license its SEPs on FRAND terms and conditions is subject to the condition that those who seek licenses agree to reciprocate.

38.     On information and belief, Samsung is the owner or co-owner of the patents and applications it has disclosed to ETSI.  Samsung's declared SEPs include United States patents and applications.

39.     At all times relevant to this action, the version of Clause 6.1 of the ETSI IPR Policy applicable to Samsung's declarations stated in relevant part:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:
>
> - MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
>
> - sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
>
> - repair, use, or operate EQUIPMENT; and
>
> - use METHODS.
>
> The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

Exhibit 1 at 36-37, § 6.1.

40.     Samsung's FRAND declarations are binding contractual commitments made to ETSI for the benefit of ETSI, its members, and any implementer of 3GPP standards.  Because Huawei is a member of ETSI and a manufacturer of products that comply with 3GPP standards, and has at all times been willing to reciprocate, Samsung has an obligation to be prepared to grant Huawei and its affiliates, including Huawei Device and Huawei Tech. USA, an irrevocable license on FRAND terms and conditions to practice Samsung's SEPs.

## D.    License Negotiations Between Huawei and Samsung

41.     Huawei and Samsung began negotiating a worldwide cross-license agreement to their respective UMTS and LTE portfolios (including the UMTS and LTE SEPs of their respective affiliates) in August 2011, at which point Samsung acknowledged that it required a license to Huawei's SEP portfolio and was required also to grant a license to Huawei and its affiliates.  In the following years, however, Samsung demonstrated a consistent pattern of delay and bad faith by, for example, refusing for years to (a) engage in meaningful technical discussions of the value of the parties' respective SEP portfolios, (b) respond substantively to Huawei's licensing proposals, or (c) provide information on the terms that it deemed to be FRAND for a cross-license between the

parties.  In contrast, Huawei sought in good faith to advance the parties' licensing negotiation by, for example, (a) persistently seeking meetings and attempting to engage Samsung in discussion; (b) providing several draft license agreements that included proposed payment terms; (c) repeatedly explaining the rationale and methodology behind its royalty proposals; (d) providing exemplary lists of its declared SEPs and detailed claim charts for representative Huawei patents; (e) being prepared and offering to hold technical meetings with Samsung; and (f) recommending that the parties submit their dispute to an arbitral tribunal.

42.     Only in mid-2015 did Samsung, for the first time, provide a specific royalty proposal to Huawei which, without any objective or sound basis, required that Huawei provide Samsung and its affiliates with a license to Huawei's valuable UMTS and LTE SEP portfolio without reasonable compensation as a condition to granting to Huawei and its affiliates a license to Samsung's UMTS and LTE SEPs.  Given the relative value of the parties' SEP portfolios and Samsung's much higher sales of standard-compliant products in the United States and abroad, any objectively FRAND cross-license between the parties should involve a material payment from Samsung to Huawei, but Samsung insists that it will not enter into a cross-license with Huawei unless Huawei surrenders all right to its far more valuable portfolio of SEPs without reasonable compensation.  The consideration that Samsung demands from Huawei and its affiliates for a license to Samsung's SEPs is thus far in excess of what is FRAND.

43.     Huawei has repeatedly explained to Samsung why Huawei's licensing proposal is FRAND, and why Samsung's proposal is not FRAND.  Huawei eventually proposed submitting the parties' dispute to arbitration, but Samsung refused to arbitrate and has refused to revise its offer. Huawei and Samsung have therefore reached an impasse.

44.     Huawei has at all times been willing to reciprocate, i.e., grant to Samsung and its affiliates a license to Huawei's SEP portfolio on FRAND terms and conditions.  Samsung has nonetheless insisted on license terms that are unreasonable and discriminatory.

45.     Samsung has therefore breached its contractual obligation to offer a license to its SEP portfolio on FRAND terms and conditions.  As third-party beneficiaries of Samsung's contractual commitment to ETSI, Huawei and its affiliates, including Huawei Device and Huawei

Tech. USA, have been damaged by Samsung's breach.

46.     In addition, Samsung has failed to negotiate in good faith by, among other actions, unjustifiably and unreasonably delaying negotiations; failing to conduct meaningful licensing discussions; for years refusing to propose specific license terms, including royalty rates; and making an offer inconsistent with its FRAND commitment.

47.     As a result of Samsung's breach of its FRAND commitment and breach of its duty to negotiate in good faith, the parties have not been able to conclude a FRAND cross-license agreement.

48.     Because Samsung and its affiliates, including SEA and SRA, are not licensed under Huawei's SEP portfolio, Defendants infringe, contribute to the infringement of, and/or induce infringement of Huawei's SEPs.

**E.     Defendants' Sales of 3GPP Standard-Compliant Products Without a License from Huawei**

49.     At the same time as Samsung has insisted that Huawei surrender all rights to its valuable SEP portfolio in order to receive a license to Samsung's SEPs, Samsung and its affiliates have earned billions of dollars by selling UMTS and LTE-compliant products that use Huawei's technology.  Those sales have propelled Samsung to be a market leader in the smartphone and tablet markets.  In its 2014 Annual Report, Samsung stated that it "continued to rank No. 1 in the world across all mobile and smartphone markets" with a 24.7% global smartphone market share.[6]

50.     For example, Defendants use, sell, offer to sell, and import numerous smartphones compatible with the LTE standard, as well as tablets and related devices, in(to) the Northern District of California and throughout the United States without a license from Huawei.  Samsung's official website accessible in the Northern District of California and throughout the United States lists over 100 "Cell Phones" that are "Enabled for 4G LTE" as of May 19, 2016.[7]   Defendants'

---

[6] 2014 Samsung Electronics Annual Report, available at http://www.samsung.com/common/aboutsamsung/download/companyreports/2014_E.pdf  (last visited May 19, 2016).

[7] "Cell Phones – Samsung US," http://www.samsung.com/us/mobile/cell-phones/all-products (search criteria: "Enabled for 4G LTE") (last visited May 19, 2016).

LTE-enabled products are designed to operate on U.S. cellular networks with LTE capabilities. Defendants market LTE-capability as a key feature of their products.

51.    Huawei is informed and believes, and thereon alleges, that Defendants' devices designed to operate on LTE networks and which are compliant with all mandatory LTE standards include, but are not limited to, the following models:  Samsung Galaxy S II, S III, S4, S5, S5 mini, S6, S6 edge, S6 edge+, S7, S7 edge, Core Prime, Grand Prime; Samsung Galaxy Note, Note II, Note 3, Note 4, Note 5 and Note Edge; and Samsung Galaxy Tab 2, Tab 3, Tab 4, Tab 7, Tab 8, Tab A, Tab E, Tab S and Tab S2 (hereinafter, "the Accused Products").

52.    As detailed further below, Defendants' Accused Products use technology protected by Huawei's Asserted Patents.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Breach of Contract)

53.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

54.    Subject to the terms and conditions of the ETSI IPR Policy, Samsung has made a contractual commitment to grant to implementers of 3GPP standards, including Huawei, Huawei Device, and Huawei Tech. USA, licenses on terms that are fair, reasonable, and non-discriminatory. Samsung's commitment forms a contract under French law to which Huawei and its affiliates, including Huawei Device and Huawei Tech. USA, are third-party beneficiaries.

55.    Samsung has disclosed to ETSI multiple patents and patent applications, including United States patents and applications, that are or may become essential to practicing 3GPP standards.  Samsung has also represented to Huawei that Samsung owns patents that are, in fact, essential to the 3GPP standards.

56.    Huawei has at all times been willing (and obliged under its own declarations to ETSI) to reciprocate, i.e., to grant to Defendants a license to Huawei's UMTS and LTE SEP portfolio on FRAND terms and conditions.

57.    Samsung breached its contractual obligation to Plaintiffs by failing to offer and be

prepared to grant, and failing to grant, a license to its portfolio of patents essential to 3GPP standards on terms that are fair, reasonable, and non-discriminatory, instead conditioning a license on Huawei granting to Samsung a license to Huawei's valuable SEP portfolio without adequate compensation, thereby demanding consideration from Huawei that is in excess of what is FRAND. Samsung has also breached its contractual obligation by failing to negotiate in good faith.

58.     For its part, Huawei, on behalf of itself and its affiliates, including Huawei Device and Huawei Tech. USA, has negotiated in good faith with Samsung and attempted to reach agreement on FRAND terms and conditions for a cross-license.  Huawei has made an offer for a cross-license on FRAND terms and conditions.  Huawei has also expressed its willingness to enter into a cross-license on FRAND terms and conditions to be determined by an independent third party.  Samsung has rejected both proposals and demanded unfair, unreasonable, and discriminatory terms and conditions, withholding its license unless Huawei accepts such non-FRAND terms and conditions.

59.     As a result of Samsung's contractual breach, Plaintiffs have been injured in their business or property by having expended substantial resources in a fruitless attempt to negotiate in good faith a FRAND cross-license with Samsung, by having been denied access to a license to Samsung's claimed SEPs on FRAND terms, and by having been denied reasonable compensation for Defendants' use of Huawei's SEPs.  Plaintiffs are threatened by the imminent loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

60.     Plaintiffs have suffered and will continue to suffer irreparable injury by reason of Samsung's acts, practices, and conduct alleged above until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment of FRAND Terms and Conditions for a Cross-License)

61.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

62.     Huawei, on behalf of itself and its affiliates, including Huawei Device and Huawei

Tech. USA, has requested a license to Samsung's portfolio of patents essential to the 3GPP standards.  Subject to reciprocity, Samsung has a contractual obligation to grant to Huawei and its affiliates, including Huawei Device and Huawei Tech. USA, a license on fair, reasonable, and non-discriminatory terms and conditions, and Huawei and its affiliates, including Huawei Device and Huawei Tech. USA, are irrevocably entitled to such a license.

63.     Samsung has requested a license to Huawei's portfolio of patents essential to the 3GPP standards.  Subject to reciprocity, Huawei is prepared to grant to Samsung and its affiliates, including SEA and SRA, a license on fair, reasonable, and non-discriminatory terms and conditions, and Samsung, SEA, and SRA are irrevocably entitled to such a license.

64.     Both Huawei and Samsung have expressed their willingness to reciprocate, i.e., grant to each other and their affiliates a license to their respective UMTS and LTE SEP portfolios on what would be FRAND terms and conditions for each portfolio.  As a result, both Huawei and Samsung have an obligation to grant each other a license.

65.     However, there is a definite and concrete dispute between Huawei and Samsung regarding what constitutes a fair, reasonable, and non-discriminatory royalty for a license to each of their respective portfolios of patents essential to the 3GPP standards.

66.     Unless and until FRAND royalty rates for a cross-license to the parties' UMTS and LTE SEP portfolios are determined, Huawei, Huawei Device, and Huawei Tech. USA will continue to be damaged both through their ongoing exposure to potential infringement claims by Samsung and by the denial of royalties that are due to Huawei for Samsung's use of Huawei's UMTS and LTE SEPs.

67.     Plaintiffs are therefore entitled to a declaratory judgment setting forth the FRAND terms and conditions, including royalty rates for each standard, for a cross-license between Huawei and Samsung (and their affiliates) covering their respective UMTS and LTE SEP portfolios.

68.     Plaintiffs are also entitled to a declaration that Plaintiffs have a right to obtain a license to Samsung's patents essential to 3GPP standards under the terms and conditions to be determined by the Court.

**THIRD CAUSE OF ACTION**

**(Infringement of U.S. Patent No. 8,369,278)**

69.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

70.     On February 5, 2013, the United States Patent and Trademark Office duly and legally issued the '278 patent, entitled "Method and Apparatus for Sending Control Signaling." Huawei has owned the '278 patent since it was issued.  A true and correct copy of the '278 patent is attached hereto as Exhibit 4.

71.     The '278 patent improves the downlink receiving rate of mobile devices and enhances system downlink capacity, by reducing the amount of information needed to transmit two necessary parameters (redundancy version and payload size) between a base station and the mobile device.

72.     The use of mandatory portions of the LTE standard infringes the '278 patent.  For example, the LTE standard 3GPP TS 36.213 (including v8.3.0, and all subsequent releases and versions) requires use of control signaling comprising a 5-bit "modulation and coding scheme and redundancy version" field, which indicates transport block size (payload size) when such field is in the range 0 to 28, and which indicates redundancy version when such field is in the range 29 to 31, for example, as specified in the 3GPP TS 36.213 v8.5.0 standard Table 8.6.1-1.  Furthermore, the LTE standard requires that the mobile device send a packet according to the received control signaling to the base station, as shown, for example, in the 3GPP TS 36.213 v8.5.0 standard, Section 8.6 and the 3GPP TS 36.212 standard (including v2.0.0, and all subsequent releases and versions), *e.g.*, v8.8.0, Section 5.3.

73.     On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '278 patent, and, therefore, infringe the '278 patent. For example, the claims of the '278 patent, including but not limited to claims 1 and 7, read on the LTE standard as shown on Exhibit 5 attached hereto.

74.     On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 7 of the '278 patent pursuant to 35 U.S.C. § 271(a), literally or under

the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

75.     On or about July 19, 2013, Huawei notified Samsung that Defendants infringed the '278 patent by providing a list of patents essential to practicing the LTE standards including the '278 patent, and an infringement claim chart for the patent.

76.     On information and belief, Defendants also induce infringement of at least claims 1 and 7 of the '278 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '278 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '278 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '278 patent.  For example, the Accused Products practice the '278 patent when an end user uses his or her device in an ordinary manner, such as to browse the web, to utilize applications that transmit or receive data over the network, to transmit uplink data (photos, documents, etc.), or to receive downlink data (movies, pictures, etc.).  The Samsung Galaxy S7 User Manual, for instance, instructs users how to access and browse the internet, send and receive email, share and back up documents and photos, view and upload videos, send and receive messages, and otherwise engage in activities that require transmission or receipt of data over the network.  *See, e.g.*, Exhibit 6 at 34-41, 48, 55-64.  Defendants knew of the '278 patent and knew or should have known that their products infringed the '278 patent during their ordinary and intended use no later than July 19, 2013.

77.     Defendants' infringement of the '278 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '278 patent, on or about July 19, 2013.  Defendants therefore had knowledge of the '278 patent at least as early as July 19, 2013.  Because this patent was identified by Huawei as essential to the LTE standard,

Defendants likewise knew or should have known that their Accused Products infringed the '278 patent as of July 19, 2013.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

78.     By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '278 patent pursuant to 35 U.S.C. § 271.

## FOURTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,416,892)

79.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

80.     On April 9, 2013, the United States Patent and Trademark Office duly and legally issued the '892 patent, entitled "Method and Apparatus of Transmitting a Random Access Preamble."  Huawei has owned the '892 patent since it was issued.  A true and correct copy of the '892 patent is attached hereto as Exhibit 7.

81.     A mobile device must synchronize itself with an LTE network to transmit data to the network and to avoid interfering with data transmitted by other mobile devices.  The '892 patent discloses an improved synchronization process that involves transmitting "random access preambles" with desirable properties.  Mobile devices also use these random access preambles for other important purposes, such as requesting uplink transmission resources.

82.     The use of mandatory portions of the LTE standard infringe the '892 patent.  For example, the LTE standard 3GPP TS 36.213 (including v1.2.0, and all subsequent releases and versions) requires that a mobile device select and transmit a random access preamble from a defined set.  *See, e.g.*, 3GPP TS 36.213 v8.5.0, Section 6 ("Random access procedure").  For example, the LTE standard 3GPP 36.211 (including v8.1.1, and all subsequent releases and versions) explains

that the set of random access preambles is the same as that specified in claims 1 and 10 of the '892 patent.  *See, e.g.*, 3GPP TS 36.211 v8.5.0, Section 5.7.2 & Table 5.7.2-2.  Indeed, Table 5.7.2-2 of the 3GPP TS 36.211 v8.5.0 standard requires creating the preambles in the same manner and using the exact same set of cyclic shift increments as claimed in the '892 patent:  0, 13, 15, 18, 22, 26, 32, 38, 46, 59, 76, 93, 119, 167, 279, and 419.

83.     On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '892 patent, and, therefore, infringe the '892 patent.  For example, the claims of the '892 patent, including but not limited to claims 1 and 10, read on the LTE standard as shown on Exhibit 8 attached hereto.

84.     On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 10 of the '892 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

85.     On or about July 19, 2013, Huawei notified Samsung that Defendants infringed the '892 patent by providing a list of patents essential to practicing the LTE standards including the '892 patent, and an infringement claim chart for the patent.

86.     On information and belief, Defendants also induce infringement of at least claims 1 and 10 of the '892 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '892 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use its products to practice the methods and use the apparatus of the '892 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '892 patent.  For example, the Accused Products practice the '892 patent when an end user uses his or her device in an ordinary manner, including *inter alia* (a) when a user turns on the device, (b) when the device is in an idle state and a user makes a voice call, receives an incoming call, or triggers a data service, and (c) when a user moves from one cell coverage to another while using a voice or data service.  The Samsung Galaxy S7 User Manual, for instance, instructs users how to turn on the mobile device, make and answer calls, and use data

services.  *See, e.g.*, Exhibit 6 at 2, 7, 24-41, 48, 55-64.  Defendants knew of the '892 patent and knew or should have known that their products infringed the '892 patent during their ordinary and intended use no later than July 19, 2013.

87.    Defendants' infringement of the '892 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '892 patent, on or about July 19, 2013.  Defendants therefore had knowledge of the '892 patent at least as early as July 19, 2013.  Because this patent was identified by Huawei as essential to the LTE standard, Defendants likewise knew or should have known that their Accused Products infringed the '892 patent as of July 19, 2013.   Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

88.    By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '892 patent pursuant to 35 U.S.C. § 271.

## FIFTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,483,166)

89.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

90.    On July 9, 2013, the United States Patent and Trademark Office duly and legally issued the '166 patent, entitled "Method and Apparatus for Accessing Legacy Networks through Temporary ID of Evolved Network."  Huawei has owned the '166 patent since it was issued.  A true and correct copy of the '166 patent is attached hereto as Exhibit 9.

91.     The '166 patent discloses a way for mobile devices to transition from an evolved (*e.g.*, LTE) network to a legacy (*e.g.*, 2G or 3G) network.  The patented solution involves adding certain information to part of an access message to a legacy network, so that the mobile device can obtain services efficiently from the legacy network after the mobile device moves from the evolved network to the legacy network.

92.     The use of mandatory portions of the LTE standard infringes the '166 patent.  For example, the LTE standard 3GPP TS 23.401 (including v1.4.1 and all subsequent releases and versions) describes tracking area update and routing area update procedures, including transitions from an E-UTRAN (*e.g.*, LTE) network to a GERAN/UTRAN (*e.g.*, 2G or 3G) network.  *See, e.g.*, 3GPP TS 23.401 v8.4.0.  The procedures include use of a Globally Unique Temporary Identity (GUTI).  For example, the LTE standard 3GPP TS 23.003 (including v8.2.0 and all subsequent releases and versions) specifies that the GUTI contain Mobility Management Entity (MME) information for identifying the MME such as an MME Code.  *See, e.g.*, 3GPP TS 23.003 v8.3.0, Sections 2.8.2.  For example, a mobile device moving from an E-UTRAN (*e.g.*, LTE) network to a GERAN/UTRAN (*e.g.*, 2G or 3G) network sends an Initial Direct Transfer (IDT) message.  An IDT message contains an Intra Domain NAS Node Selector (IDNNS) field.  *See, e.g.*, 3GPP TS 25.331 (including v.8.10.0 and all subsequent releases and versions), v8.10.0, Sections 8.1.8, 10.2 and 10.3.  The standard further requires that the IDNNS field contains a routing parameter to where the MME Code from the GUTI has been mapped.  *See, e.g.*, 3GPP TS 25.331 v8.10.0, Sections 8.1.8, 10.2, and 10.3.

93.     On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '166 patent, and, therefore, infringe the '166 patent.  For example, the claims of the '166 patent, including but not limited to claims 1 and 12, read on the LTE standard as shown on Exhibit 10 attached hereto.

94.     On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 12 of the '166 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

95.     On or about December 31, 2015, Huawei notified Samsung that Defendants infringe the '166 patent by providing a list of patents essential to practicing the LTE standards including the '166 patent, and an infringement claim chart for the patent.

96.     On information and belief, Defendants also induce infringement of at least claims 1 and 12 of the '166 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '166 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '166 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '166 patent.  For example, the Accused Products practice the '166 patent when an end user uses his or her mobile device in an ordinary manner, including when a user served by an LTE network in the U.S. makes or receives a voice call in a 2G or 3G circuit switched cell, or when a user moves from an LTE coverage area into a 2G or 3G coverage area in an idle state.  The Samsung Galaxy S7 User Manual, for instance, instructs users how to make and answer voice calls, and describes how the device indicates to users when the device is connected to a LTE wireless network.  *See, e.g.*, Exhibit 6 at 14, 27-28.  The Samsung website also advertises that the Galaxy S7 smartphone, for instance, operates on both 3G and LTE networks.[8]  Defendants knew of the '166 patent and knew or should have known that their products infringed the '166 patent during their ordinary and intended use no later than December 31, 2015.

97.     Defendants' infringement of the '166 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '166 patent, on December 31, 2015.  Defendants therefore had knowledge of the '166 patent at least as early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE standard,

---

[8]  *See* "Samsung Galaxy S7 edge," http://www.samsung.com/us/mobile/cell-phones/SM-G935AZDAATT (last visited May 19, 2016).

Defendants likewise knew or should have known that their Accused Products infringed the '166 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

98.     By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '166 patent pursuant to 35 U.S.C. § 271.

### SIXTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,812,848)

99.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

100.     On August 19, 2014, the United States Patent and Trademark Office duly and legally issued the '848 patent, entitled "Method, System and Device for Negotiating Security Capability When Terminal Moves."  Huawei has owned the '848 patent since it was issued.  A true and correct copy of the '848 patent is attached hereto as Exhibit 11.

101.     The '848 patent discloses a way for a mobile device to efficiently negotiate non-access stratum (NAS) security with an LTE network when it moves in idle state from a 2G or 3G network to the LTE network, which helps ensure secure interaction and communication between the mobile device and the LTE network.

102.     The mandatory portions of the LTE standard infringe the '848 patent.  For example, the LTE standard 3GPP TS 33.401 (including v8.2.0, and all subsequent releases and versions) describes security internetworking between LTE and non-LTE networks.  According to the standard's requirements, when a mobile device moves in idle mode from a non-LTE to an LTE network, the mobile device sends a Tracking Area Update (TAU) request to the LTE network that includes the mobile device's security capabilities.  *See, e.g.*, 3GPP TS 33.401 v8.2.0, Sections 3.1,

7.2.4.1, and 9.1.2.  The mobile device then receives from the LTE network a message containing a non-access stratum (NAS) security algorithm selected by the LTE network.  *See, e.g.*, 3GPP TS 33.401 v8.2.0, Section 7.2.4.4.  For example, the LTE standard specifies that the mobile device then generates a root key ("$K_{ASME}$") from an authentication vector-related key ("CK and IK") available at the mobile device, and generates a NAS protection key ("NAS key") for communicating with the LTE network from the root key according to the NAS security algorithm.  *See, e.g.*, 3GPP TS 33.401 v8.2.0, Sections 7.2.1, 7.2.4.4, 9.1.2, A.7, and A.11.

103.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '848 patent, and, therefore, infringe the '848 patent. For example, the claims of the '848 patent, including but not limited to claims 1 and 9, read on the LTE standard as shown on Exhibit 12 attached hereto.

104.    On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 1 of the '848 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

105.    On or about December 31, 2015, Huawei notified Samsung that Defendants infringe the '848 patent by providing a list of patents essential to practicing the LTE standards including the '848 patent, and an infringement claim chart for the patent.

106.    On information and belief, Defendants also induce infringement of at least claims 1 and 9 of the '848 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '848 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '848 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '848 patent.  For example, the Accused Products use the '848 patent when an end user uses his or her mobile device in an ordinary manner, including when the mobile device is in an idle state and the end user moves from a 2G or 3G coverage area to an LTE coverage area.  The Samsung Galaxy S7 User Manual, for instance, describes how the mobile device

indicates to users when the mobile device is connected to a LTE wireless network. *See, e.g.*, Exhibit 6 at 14. The Samsung website also advertises that the Galaxy S7 smartphone, for instance, operates on both 3G and LTE networks.[9] Defendants knew of the '848 patent and knew or should have known that their products infringed the '848 patent during their ordinary and intended use no later than December 31, 2015.

107. Defendants' infringement of the '848 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285. Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios. As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '848 patent, on December 31, 2015. Defendants therefore had knowledge of the '848 patent at least as early as December 31, 2015. Because this patent was identified by Huawei as essential to the LTE standard, Defendants likewise knew or should have known that their Accused Products infringed the '848 patent as of December 31, 2015. Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity. Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

108. By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '848 patent pursuant to 35 U.S.C. § 271.

## SEVENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,644,239)

109. Plaintiffs reallege and incorporate by reference the allegations set forth in the

---

[9] *See* "Samsung Galaxy S7 edge," http://www.samsung.com/us/mobile/cell-phones/SM-G935AZDAATT (last visited May 19, 2016).

1    foregoing paragraphs.

2        110.    On February 4, 2014, the United States Patent and Trademark Office duly and

3    legally issued the '239 patent, entitled "Method and Apparatus for Allocating and Processing

4    Sequences in Communication System."  Huawei has owned the '239 patent since it was issued.  A

5    true and correct copy of the '239 patent is attached hereto as Exhibit 13.

6        111.    The '239 discloses a way to allocate sequences that reduces interference in a

7    communications system.

8        112.    The use of mandatory portions of the LTE standard infringes the '239 patent.  For

9    example, the LTE standard 3GPP TS 36.211 (including v8.2.0, and all subsequent releases and

10   versions) requires processing reference signal sequences.  *See, e.g.*, 3GPP TS 36.211 v8.5.0,

11   Sections 5.5.1, 5.5.1.1, and 5.6.  The LTE standard requires that a mobile device use a "sequence-

12   group number $u$" of a sequence group allocated by the system.  *See, e.g.*, *id.* at Sections 5.5.1,

13   5.5.1.1 and 5.5.1.3.  The LTE standard further requires that the mobile device select n sequences

14   from a candidate sequence collection, such as Zadoff-Chu sequences with a given length, to form

15   sequences in a sub-group i in a sequence group k, such as by selecting sequences from the sequence

16   group k corresponding to a given length of a Zadoff-Chu sequence.  *See, e.g.*, *id.* at Section 5.5.1,

17   5.5.1.1.  The LTE standard also requires that n is a natural number, such as 1, i is a serial number of

18   the subgroup, such as m in the equation for $M_{sc}^{RS}$ in the standard, k is a serial number of the

19   sequence group, such as that provided by the sequence group number $u$+1 in the standard, a value

20   of the basic sequence index $r_i$ in the sub-group i in sequence k according to the formula in the '239

21   patent mathematically equals the value required by the standard, such as the value of $q$, $N_i$ is a

22   length of a sequence in the candidate sequence collection, such as $N_{ZC}^{RS}$ in the standard, and $N_1$ is a

23   length of a reference sub-group sequence, such as 31 in the standard.  *See, e.g.*, *id.* at Sections 5.5.1

24   and 5.5.1.1.  The LTE standard further requires the mobile device to generate corresponding

25   sequences according to the sequences in the formed sub-group, and communicate according to the

26   generated sequences, for example, by generating and communicating according to reference signal

27   sequences, on time frequency resources corresponding to the subgroup i according to mathematical

28   formulas in the standard.  *See, e.g.*, *id.* at Sections 5.1.2, 5.5, 5.5.1, 5.5.1.1, 5.6, and 5.5.2.1.1.

113.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '239 patent, and, therefore, infringe the '239 patent. For example, the claims of the '239 patent, including but not limited to claims 6 and 17, read on the LTE standard as shown on Exhibit 14 attached hereto.

114.    On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 17 of the '239 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

115.    On or about December 31, 2015, Huawei notified Samsung that Defendants infringed the '239 patent by providing a list of patents essential to practicing the LTE standards including the '239 patent, and an infringement claim chart for the patent.

116.    On information and belief, Defendants also induce infringement of at least claims 6 and 17 of the '239 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '239 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '239 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '239 patent.  For example, the Accused Products practice the '239 patent when an end user uses his or her device in an ordinary manner, such as when transmitting to the network.  The Samsung Galaxy S7 User Manual, for instance, instructs users how to access and browse the internet, send and receive email, share and back up documents and photos, view and upload videos, send and receive messages, and otherwise engage in activities that require transmission of data over the network.  *See, e.g.*, Exhibit 6 at 34-41, 48, 55-64.  Defendants knew of the '239 patent and knew or should have known that their products infringed the '239 patent during their ordinary and intended use no later than December 31, 2015.

117.    Defendants' infringement of the '239 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in

substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts,
Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '239 patent,
on or about December 31, 2015.  Defendants therefore had knowledge of the '239 patent at least as
early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE
standard, Defendants likewise knew or should have known that their Accused Products infringed
the '239 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith
licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any
FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-
infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with
one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing
products, falls well below the standards of conduct expected of a reasonable company in the
industry and renders this case exceptional under 35 U.S.C. § 285.

118.    By their actions, Defendants have injured Huawei and are liable to Huawei for
infringement of the '239 patent pursuant to 35 U.S.C. § 271.

### EIGHTH CAUSE OF ACTION

**(Infringement of U.S. Patent No. 8,885,587)**

119.    Plaintiffs reallege and incorporate by reference the allegations set forth in the
foregoing paragraphs.

120.    On November 11, 2014, the United States Patent and Trademark Office duly and
legally issued the '587 patent, entitled "Method, Base station, and User Equipment for Feeding
Back ACK/NACK Information for Carrier Aggregation."  Huawei has owned the '587 patent since
it was issued.  A true and correct copy of the '587 patent is attached hereto as Exhibit 15.

121.    The '587 patent provides a way to provide acknowledgement information in an LTE-
Advanced system using carrier aggregation, that is backwards compatible with an LTE system.

122.    The use of mandatory portions of the LTE standard infringes the '587 patent.  For
example, the LTE standard 3GPP TS 36.213 (including v10.0.0, and all subsequent releases and
versions) requires feeding back Acknowledgement/Negative-acknowledgement (ACK/NACK)
information for carrier aggregation, such as for "more than one configured serving cell," using

Hybrid Automatic Repeat Request (HARQ) feedback procedures.  *See, e.g.*, 3GPP TS 36.213 v10.2.0, Sections 10.1.2.2 and 10.1.3.2.  The LTE standard requires receiving downlink control information (DCI) sent by a base station transmitted by a downlink component carrier, and feeding back ACK/NACK information according to a command indicated by a common field preset in the DCI, such as the Transmitter Power Control (TPC) field.  *See, e.g.*, *id.* at Sections 5.1.2.1, 10.1.2.2, and 10.1.3.2.  Further, the LTE standard requires that the common field is configured as one command according to a type of a downlink component carrier transmitting the DCI, such as the primary (system-linked) or secondary (non-system-linked) cell.  *See, e.g.*, *id.* at Sections 5.1.2.1, 10.1, 10.1.2.2.1, 10.1.2.2.2, 10.1.3.2.1, and 10.1.3.2.2; 3GPP TS 36.300 (including v10.0.0, and all subsequent releases and versions), v10.3.0, Section 7.5.  The LTE standard requires that the common field in the DCI is configured to indicate a TPC command if the DCI is at least one piece of DCI transmitted by a primary (system-linked) cell, and  to indicate an ACK resource indication (ARI) command, such as information used to determine a Physical Uplink Control Channel (PUCCH) resource value, if the DCI is at least one piece of DCI transmitted by a secondary (non-system-linked) cell. *See, e.g.*, *id.*

123.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '587 patent, and, therefore, infringe the '587 patent. For example, the claims of the '587 patent, including but not limited to claims 3 and 9, read on the LTE standard as shown on Exhibit 16 attached hereto.

124.    On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 9 of the '587 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

125.    On or about December 31, 2015, Huawei notified Samsung that Defendants infringed the '587 patent by providing a list of patents essential to practicing the LTE standards including the '587 patent, and an infringement claim chart for the patent.

126.    On information and belief, Defendants also induce infringement of at least claims 3 and 9 of the '587 patent.  Defendants' Accused Products as sold are specifically configured to

infringe Huawei's '587 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '587 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '587 patent.  For example, the Accused Products practice the '587 patent when an end user uses his or her device in an ordinary manner, such as receiving data from a base station using carrier aggregation.  The Samsung Galaxy S7 User Manual, for instance, instructs users how to install a SIM card and power on the device, thereby allowing the device to connect to and communicate with a cellular network.  *See, e.g.*, Exhibit 6 at 2-4, 7, 14.  Defendants knew of the '587 patent and knew or should have known that their products infringed the '587 patent during their ordinary and intended use no later than December 31, 2015.

127.    Defendants' infringement of the '587 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '587 patent, on or about December 31, 2015.  Defendants therefore had knowledge of the '587 patent at least as early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE standard, Defendants likewise knew or should have known that their Accused Products infringed the '587 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

128.    By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '587 patent pursuant to 35 U.S.C. § 271.

## NINTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,885,583)

129.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

130.    On November 11, 2014, the United States Patent and Trademark Office duly and legally issued the '583 patent, entitled "Conditional Uplink Timing Alignment in a Mobile Station Device of a Radio Communication System."  Huawei has owned the '583 patent since it was issued. A true and correct copy of the '583 patent is attached hereto as Exhibit 17.

131.    The '583 patent helps ensure that a mobile device remains properly synchronized with a base station in a communication network.  The '583 patent involves ignoring timing deviation information when the mobile device is in an uplink synchronous state or when it has a currently running timer to prevent the mobile device from executing timing alignment unnecessarily.

132.    The use of mandatory portions of the LTE standard infringes the '583 patent.  For example, the LTE standard 3GPP TS 36.300 (including v8.1.0 and all subsequent releases and versions) requires mobile devices to transmit a random access preamble and receive from a base station a random access response to the random access preamble.  *See, e.g.*, 3GPP TS 36.300 v8.7.0, Section 10.1.5.1.  The LTE standard further requires that the mobile device ignore timing deviation information in the random access response, such as by "ignor[ing] the received Timing Advance Command," if the mobile device is in uplink synchronous status and the timing deviation information and the random access response includes the random access preamble whose preamble identification (ID) was randomly selected by the mobile device.  *See, e.g.*, 3GPP TS 36.300 v8.7.0, Sections 10.1.5.1 and 10.1.2.7; 3GPP TS 36.321 (including v8.2.0, and all subsequent releases and versions), v8.4.0, Section 5.2.  The timing deviation information in the LTE standard does not include a Null value or an indication to ignore the timing deviation information.  *See, e.g.*, 3GPP TS 36.321 v8.4.0, Section 6.2.3; 3GPP TS 36.213 (including v8.4.0 and all subsequent releases and versions), v8.5.0, Section 4.2.3.  The LTE standard also requires performing uplink timing alignment based on timing deviation information, such as by "apply[ing] the Timing Advance

Command" and "start[ing] Time Alignment Timer," in case that, in an uplink asynchronous status, the random access response includes timing deviation information and includes a random access preamble whose preamble identification (ID) was randomly selected by the mobile device. *See, e.g.*, 3GPP TS 36.300 v8.7.0, Sections 10.1.5.1 and 10.1.2.7; 3GPP TS 36.321 v8.4.0, Section 5.2.

133.   On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '583 patent, and, therefore, infringe the '583 patent. For example, the claims of the '583 patent, including but not limited to claims 3 and 7, read on the LTE standard as shown on Exhibit 18 attached hereto.

134.   On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 3 of the '583 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

135.   On or about December 31, 2015, Huawei notified Samsung that Defendants infringed the '583 family of patents by providing a list of patents essential to practicing the LTE standards including patents in the '583 family (such as U.S. Patent Nos. 9,094,909 and 8,089,921), and infringement claim charts for those patents.

136.   On information and belief, Defendants also induce infringement of at least claims 3 and 7 of the '583 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '583 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '583 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '583 patent.  For example, the Accused Products practice the '583 patent when an end user uses his or her device in an ordinary manner, including *inter alia* (a) when the user makes a call; and (b) when the user makes an uplink transmission such as uploading blogs, and small messages, etc.  The Samsung Galaxy S7 User Manual, for instance, instructs users how to make calls, and use uplink data services. *See, e.g.*, Exhibit 6 at 2, 7, 24-41, 48, 55-64.  Defendants knew of patents in the '583 patent family and knew or should have known that their products

infringed the '583 patent during their ordinary and intended use no later than December 31, 2015.

137.     Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

138.     By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '583 patent pursuant to 35 U.S.C. § 271.

## TENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,639,246)

139.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

140.     On January 28, 2014, the United States Patent and Trademark Office duly and legally issued the '246 patent, entitled "Method, Terminal, and System for Cell Reselection." Huawei has owned the '246 patent since it was issued.  A true and correct copy of the '246 patent is attached hereto as Exhibit 19.

141.     Reselecting a cell in a cellular network is an important process that happens, for example, when a mobile device moves from one area to another or when a cell carrier needs to perform load balancing.  The '246 patent discloses a way to perform cell reselection when a mobile device is in an LTE cell and then camps on a cell of a non-LTE system.  The invention involves basing cell reselection on a dedicated priority list from the LTE system before a valid time for the dedicated priority list expires.

142.     The use of mandatory portions of the LTE standard infringes the '246 patent.  For example, the standards 3GPP TS 36.304 (including v8.5.0, and all subsequent releases and

versions) and 3GPP TS 36.331 (including v8.5.0, and all subsequent releases and versions) provide a cell reselection process.  The process includes, when a mobile device (terminal) is in a cell of an LTE system, the mobile device receives a message, such as an *RRCConnectionRelease* message, that includes a dedicated priority list, from the LTE system, such as a *freqPriorityListX* that "provides a cell reselection priority for each frequency, by means of separate lists for each RAT [Radio Access Technology]."  *See, e.g.*, 3GPP TS 36.304 v8.5.0, Section 5.2.4; 3GPP TS 36.331 v8.5.0, Section 6.2.2.  The standard further requires that when the mobile device camps on a cell of a non-LTE system, such as "upon cell (re)selection to UTRA," the mobile device performs cell reselection in accordance with the dedicated priority list before a valid time of the dedicated priority list expires, such as by applying a "remaining validity time."  *See, e.g.*, 3GPP TS 25.304 (including v8.5.0, and all subsequent releases and versions), v8.5.0, Section 5.2.6.1.4a; 3GPP TS 25.331 (including v8.6.0, and all subsequent releases and versions), v8.7.0, Section 13.1.

143.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '246 patent, and, therefore, infringe the '246 patent. For example,  the claims of the '246 patent, including but not limited to claims 1 and 11, read on the LTE standard as shown on Exhibit 20 attached hereto.

144.    On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 11 of the '246 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

145.    On or about December 31, 2015, Huawei notified Samsung that Defendants infringed the '246 patent by providing a list of patents essential to practicing the LTE standard including the '246 patent, and an infringement claim chart for the patent.

146.    On information and belief, Defendants also induce infringement of at least claims 1 and 11 of the '246 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '246 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus

of the '246 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '246 patent.  For example, the Accused Products practice the '246 patent when an end user is using his or her device on an LTE network in an ordinary manner, and the device switches to a non-LTE network, for example, for load balancing purposes or because an LTE network is unavailable, while the device is idle.  The Samsung Galaxy S7 User Manual, for instance, instructs users that the device works on LTE wireless networks.  *See, e.g.*, Exhibit 6 at 14, 27-28.  The Samsung website also advertises that the Galaxy S7 smartphone, for instance, operates on both 3G and LTE networks.[10]  Defendants knew of the '246 patent and knew or should have known that their products infringed the '246 patent during their ordinary and intended use no later than December 31, 2015.

147.    Defendants' infringement of the '246 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '246 patent, on or about December 31, 2015.  Defendants therefore had knowledge of the '246 patent at least as early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE standard, Defendants likewise knew or should have known that their Accused Products infringed the '246 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

148.    By their actions, Defendants have injured Huawei and are liable to Huawei for

---

[10]  *See* "Samsung Galaxy S7 edge," http://www.samsung.com/us/mobile/cell-phones/SM-G935AZDAATT (last visited May 19, 2016).

1    infringement of the '246 patent pursuant to 35 U.S.C. § 271.

2                              **ELEVENTH CAUSE OF ACTION**

3                        **(Infringement of U.S. Patent No. 8,412,197)**

4         149.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

5    foregoing paragraphs.

6         150.    On April 2, 2013, the United States Patent and Trademark Office duly and legally

7    issued the '197 patent, entitled "Method, Terminal, and System for Cell Reselection."  Huawei has

8    owned the '197 patent since it was issued.  A true and correct copy of the '197 patent is attached

9    hereto as Exhibit 21.

10        151.    Reselecting a cell in a cellular network is an important process that happens, for

11   example, when a mobile device moves from one area to another or when a cell carrier needs to

12   perform load balancing.  The '197 patent discloses a way to perform cell reselection when a mobile

13   device is in an LTE cell and then camps on a cell of a non-LTE system.  The '197 patent involves

14   basing cell reselection on a dedicated priority list from the LTE system before a valid time for the

15   dedicated priority list expires.

16        152.    The use of mandatory portions of the LTE standard infringes the '197 patent.  For

17   example, the standards 3GPP TS 36.304 (including v8.5.0, and all subsequent releases and

18   versions) and 3GPP TS 36.331 (including v8.5.0, and all subsequent releases and versions) provide

19   a cell reselection process.  The process includes a mobile device (terminal) obtaining from an LTE

20   system a dedicated priority list, such as a *freqPriorityListX* that "provides a cell reselection priority

21   for each frequency, by means of separate lists for each RAT [Radio Access Technology]," and a

22   valid time of the dedicated priority list, such as given by timer T320 in the LTE standard.  *See, e.g.*,

23   3GPP TS 36.304 v8.5.0, Section 5.2.4; 3GPP TS 36.331 v8.5.0, Section 6.2.2.  The standard further

24   requires the mobile device to perform cell reselection according to the dedicated priority list and the

25   valid time of the dedicated priority list, when the terminal camps on a cell of a non-LTE system,

26   such as "upon cell (re)selection to UTRA."  *See, e.g.*, 3GPP TS 25.304 (including v8.5.0, and all

27   subsequent releases and versions), v8.5.0, Section 5.2.6.1.4a; 3GPP TS 25.331 (including v8.6.0,

28   and all subsequent releases and versions), v8.7.0, Section 13.1.  The standard requires that when the

mobile device camps on a cell of the non-LTE system, such as UTRA, the mobile device performs cell reselection according to the dedicated priority list before the valid time expires, such as by "inherit[ing] the priorities provided by dedicated signalling and the remaining validity time" during "inter-frequency and inter-RAT cell reselection."  *See, e.g.*, *id.*  Moreover, the standard requires that when the mobile device camps on the cell of the non-LTE system, the dedicated priority list is invalid after the valid time expires.  *See, e.g.*, 3GPP TS 25.331 v8.7.0, Sections 13.1, 8.3.3.7, and 10.3.2.7.

153.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '197 patent, and, therefore, infringe the '197 patent. For example, the claims of the '197 patent, including but not limited to claims 1 and 7, read on the LTE standard as shown on Exhibit 22 attached hereto.

154.    On information and belief, Defendants have directly infringed and continue to directly infringe at least claim 7 of the '197 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States the Accused Products, on or after the issuance date of the patent.

155.    On or about December 31, 2015, Huawei notified Samsung that Defendants infringed the '197 patent by providing a list of patents essential to practicing the LTE standard including the '197 patent, and an infringement claim chart for the patent.

156.    On information and belief, Defendants also induce infringement of at least claims 1 and 7 of the '197 patent.  Defendants' Accused Products as sold are specifically configured to infringe Huawei's '197 patent as described above.  Defendants actively instruct their customers on how to use their products, including through product manuals and advertising.  When used as instructed, Defendants' customers use their products to practice the methods and use the apparatus of the '197 patent.  Defendants' customers thereby directly infringe, either literally or under the doctrine of equivalents, the '197 patent.  For example, the Accused Products practice the '197 patent when an end user is using his or her device on an LTE network in an ordinary manner and the device switches to a non-LTE network, for example, for load balancing purposes or because an LTE network is unavailable, while the device is in idle mode.  The Samsung Galaxy S7 User

Manual, for instance, instructs users that the device works on LTE wireless networks. *See, e.g.*, Exhibit 6 at 14, 27-28.  The Samsung website also advertises that the Galaxy S7 smartphone, for instance, operates on both 3G and LTE networks.[11]  Defendants knew of the '197 patent and knew or should have known that their products infringed the '197 patent during their ordinary and intended use no later than December 31, 2015.

157.   Defendants' infringement of the '197 patent has been and continues to be willful, and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts, Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '197 patent, on or about December 31, 2015.  Defendants therefore had knowledge of the '197 patent at least as early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE standard, Defendants likewise knew or should have known that their Accused Products infringed the '197 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

158.   By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '197 patent pursuant to 35 U.S.C. § 271.

## TWELFTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 8,996,003)

159.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs.

---

[11]  *See* "Samsung Galaxy S7 edge," http://www.samsung.com/us/mobile/cell-phones/SM-G935AZDAATT (last visited May 19, 2016).

160.    On March 31, 2015, the United States Patent and Trademark Office duly and legally issued the '003 patent, entitled "Method, Terminal, and System for Cell Reselection."  Huawei has owned the '003 patent since it was issued.  A true and correct copy of the '003 patent is attached hereto as Exhibit 23.

161.    Reselecting a cell in a cellular network is an important process that happens, for example, when a mobile device moves from one area to another or when a cell carrier needs to perform load balancing.  The '003 patent discloses a way to perform cell reselection when a mobile device is in an LTE cell and then camps on a cell of a non-LTE system.  The '003 patent involves basing cell reselection on a dedicated priority list from the LTE system before a valid time for the dedicated priority list expires.

162.    The use of mandatory portions of the LTE standard infringes the '003 patent.  For example, the standards 3GPP TS 36.304 (including v8.5.0, and all subsequent releases and versions) and 3GPP TS 36.331 (including v8.5.0, and all subsequent releases and versions) provide a cell reselection process.  The process includes when a mobile device (terminal) is in a cell of an LTE system, and the mobile device receives a message, such as an *RRCConnectionRelease* message, that includes a dedicated priority list, from the LTE system, such as a *freqPriorityListX* that "provides a cell reselection priority for each frequency, by means of separate lists for each RAT [Radio Access Technology]."  *See, e.g.*, 3GPP TS 36.304 v8.5.0, Section 5.2.4; 3GPP TS 36.331 v8.5.0, Section 6.2.2.  The standard further requires that when the mobile device camps on a cell of a non-LTE system, such as "upon cell (re)selection to UTRA," the mobile device performs cell reselection in accordance with the dedicated priority list before a valid time of the dedicated priority list expires, such as by applying a "remaining validity time."  *See, e.g.*, 3GPP TS 25.304 (including v8.5.0, and all subsequent releases and versions), v8.5.0, Section 5.2.6.1.4a; 3GPP TS 25.331 (including v8.6.0, and all subsequent releases and versions), v8.7.0, Section 13.1.

163.    On information and belief, Defendants' Accused Products use the mandatory portions of the LTE standard covered by the '003 patent, and, therefore, infringe the '003 patent. For example, the claims of the '003 patent, including but not limited to claims 1 and 15, read on the LTE standard as shown on Exhibit 24 attached hereto.

1    164.    On information and belief, Defendants have directly infringed and continue to

2    directly infringe at least claims 1 and 15 of the '003 patent pursuant to 35 U.S.C. § 271(a), literally

3    or under the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the

4    United States the Accused Products, on or after the issuance date of the patent.

5    165.    On or about December 31, 2015, Huawei notified Samsung that Defendants

6    infringed the '003 patent by providing a list of patents essential to practicing the LTE standard

7    including the '003 patent, and an infringement claim chart for the patent.

8    166.    On information and belief, Defendants also induce infringement of at least claims 1

9    and 15 of the '003 patent.  Defendants' Accused Products as sold are specifically configured to

10   infringe Huawei's '003 patent as described above.  Defendants actively instruct their customers on

11   how to use their products, including through product manuals and advertising.  When used as

12   instructed, Defendants' customers use the apparatus of the '003 patent.  Defendants' customers

13   thereby directly infringe, either literally or under the doctrine of equivalents, the '003 patent.  For

14   example, the Accused Products practice the '003 patent when an end user is using his or her device

15   on an LTE network in an ordinary manner and the device switches to a non-LTE network, for

16   example for load balancing purposes or because an LTE network is unavailable, while the device is

17   in idle mode.  The Samsung Galaxy S7 User Manual, for instance, instructs users that the device

18   works on LTE wireless networks.  *See, e.g.*, Exhibit 6 at 14, 27-28.  The Samsung website also

19   advertises that the Galaxy S7 smartphone, for instance, operates on both 3G and LTE networks.[12]

20   Defendants knew of the '003 patent and knew or should have known that their products infringed

21   the '003 patent during their ordinary and intended use no later than December 31, 2015.

22   167.    Defendants' infringement of the '003 patent has been and continues to be willful,

23   and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five

24   years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in

25   substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts,

26   Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '003 patent,

---

[12]  *See* "Samsung Galaxy S7 edge," http://www.samsung.com/us/mobile/cell-phones/SM-G935AZDAATT (last visited May 19, 2016).

27

28

on or about December 31, 2015.  Defendants therefore had knowledge of the '003 patent at least as

early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE

standard, Defendants likewise knew or should have known that their Accused Products infringed

the '003 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith

licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any

FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-

infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with

one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing

products, falls well below the standards of conduct expected of a reasonable company in the

industry and renders this case exceptional under 35 U.S.C. § 285.

168.    By their actions, Defendants have injured Huawei and are liable to Huawei for

infringement of the '003 patent pursuant to 35 U.S.C. § 271.

**THIRTEENTH CAUSE OF ACTION**

**(Infringement of U.S. Patent No. 8,724,613)**

169.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs.

170.    On May 13, 2014, the United States Patent and Trademark Office duly and legally

issued the '613 patent, entitled "Method and Device for Service Time Division Multiplexing."

Huawei has owned the '613 patent since it was issued.  A true and correct copy of the '613 patent is

attached hereto as Exhibit 25.

171.    The '613 patent provides a way for a mobile device to know when to expect

transmission of various services from base stations, so that the mobile device can avoid wasting

power and improve efficiency.

172.    The use of mandatory portions of the LTE standard infringes the '613 patent.  For

example, the LTE standard 3GPP TS 36.331 (including v8.3.0, and all subsequent releases and

versions) provides a method for a mobile device to receive a service sent by a base station.  The

method includes the service being sent in one or more subframes that are designated as specific

subframes, such as "MBSFN [multicast-broadcast single-frequency network] subframes."  *See, e.g.*,

1     3GPP TS 36.331 v8.4.0, Sections 5.2, 6.3 and 6.3.2.  The LTE standard further requires that the

2     specific subframes are selected from one or more radio frames that are designated as specific radio

3     frames, such as selecting "MBSFN  subframes" using "subframeAllocation."  *See, e.g.*, *id.*  In

4     addition, the LTE standard requires that the specific radio frames are selected from a time unit, such

5     as using "radioFrameAllocationPeriod" and "radioFrameAllocationOffset" information.  *See, e.g.*,

6     *id.*  Moreover, the LTE standard requires that the time unit comprises $2^M$ radio frames, where each

7     of the radio frames containing a number R of subframes that can be allocated to carry the service,

8     where R is a natural number, and M is a nonnegative integer, such as described in a

9     *RadioResourceConfigCommon* information element and frequency division duplex (FDD) and time

10     division duplex (TDD) mapping.  *See, e.g.*, *id.*  The LTE standard requires that the mobile device

11     receive position information of the specific radio frames in the time unit, such as

12     "radioframeAllocationPeriod" information, and position information of the specific subframes in

13     the specific radio frame, such as "subframeAllocation" information, on a transport channel mapped

14     to a physical shared data channel, such as a downlink shared channel (DL-SCH) mapped to a

15     physical downlink shared channel (PDSCH).  *See, e.g.*, 3GPP TS 36.331 v8.4.0, Sections 6.3, 6.3.2,

16     and 5.2; 3GPP TS 36.212 (including v1.0.0 and all subsequent releases and versions), v8.5.0,

17     Section 4.2; 3GPP TS 36.321 (including v1.1.0 and all subsequent releases and versions), v8.4.0,

18     Section 4.5.3.2.  The LTE standard requires that the position information of the specific radio

19     frames in the time unit is represented by an interval between two specific radio frames in the time

20     unit, wherein the interval is $2^m$, and $0 \leq m \leq M$, such as described in the "radioframeAllocationPeriod"

21     information.  *See, e.g.*, *id.*

22          173.    On information and belief, Defendants' Accused Products use the mandatory

23     portions of the LTE standard covered by the '613 patent, and, therefore, infringe the '613 patent.

24     For example, the claims of the '613 patent, including but not limited to claims 1 and 5, read on the

25     LTE standard as shown on Exhibit 26 attached hereto.

26          174.    On information and belief, Defendants have directly infringed and continue to

27     directly infringe at least claim 5 of the '613 patent pursuant to 35 U.S.C. § 271(a), literally or under

28     the doctrine of equivalents, by using, selling, offering to sell, and importing in(to) the United States

1   the Accused Products, on or after the issuance date of the patent.

2        175.    On or about December 31, 2015, Huawei notified Samsung that Defendants

3   infringed the '613 patent by providing a list of patents essential to practicing the LTE standards

4   including the '613 patent, and an infringement claim chart for the patent.

5        176.    On information and belief, Defendants also induce infringement of at least claims 1

6   and 5 of the '613 patent.  Defendants' Accused Products as sold are specifically configured to

7   infringe Huawei's '613 patent as described above.  Defendants actively instruct their customers on

8   how to use their products, including through product manuals and advertising.  When used as

9   instructed, Defendants' customers use their products to practice the methods and use the apparatus

10  of the '613 patent.  Defendants' customers thereby directly infringe, either literally or under the

11  doctrine of equivalents, the '613 patent.  For example, the Accused Products practice the '613

12  patent when an end user uses his or her device to receive content via LTE Multimedia Broadcast

13  Multicast Services (eMBMS), such as by watching sports broadcasts (e.g., the Super Bowl)

14  transmitted using eMBMS.[13]  Defendants knew of the '613 patent and knew or should have known

15  that their products infringed the '613 patent during their ordinary and intended use no later than

16  December 31, 2015.

17       177.    Defendants' infringement of the '613 patent has been and continues to be willful,

18  and Defendants' conduct renders this case exceptional under 35 U.S.C. § 285.  Over the last five

19  years, Huawei has attempted to engage Samsung, on its behalf and on behalf of its affiliates, in

20  substantive licensing discussions related to the parties' SEP portfolios.  As part of these efforts,

21  Huawei provided Samsung with a list of exemplary Huawei LTE SEPs, including the '613 patent,

22  on or about December 31, 2015.  Defendants therefore had knowledge of the '613 patent at least as

23  early as December 31, 2015.  Because this patent was identified by Huawei as essential to the LTE

24  standard, Defendants likewise knew or should have known that their Accused Products infringed

25  the '613 patent as of December 31, 2015.  Samsung has nevertheless failed to engage in good faith

26  licensing discussions, on its behalf or on behalf of its affiliates, and has failed to provide any

27  ─────────────
    [13] "Smart eMBMS," http://www.samsung.com/global/business/networks/smart-media-
28  networks/smart-media-networks/smart-embms (last visited May 19, 2016).

FRAND counter-proposal to Huawei's proposals or any analysis purporting to show non-infringement or invalidity.  Samsung's dilatory tactics and failure to negotiate in good faith with one of the world's leading holders of LTE SEPs, while selling billions of dollars worth of infringing products, falls well below the standards of conduct expected of a reasonable company in the industry and renders this case exceptional under 35 U.S.C. § 285.

178.    By their actions, Defendants have injured Huawei and are liable to Huawei for infringement of the '613 patent pursuant to 35 U.S.C. § 271.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants as follows:

A.    Adjudge and decree that Samsung is liable for breach of contract;

B.    Declare the FRAND terms and conditions, including royalty rates for UMTS and LTE standards respectively, for a cross-license between Huawei and Samsung (and their affiliates) covering their respective portfolios of patents essential to 3GPP standards;

C.    Declare that Plaintiffs have a right to obtain a license to Samsung's patents essential to 3GPP standards under the terms and conditions to be determined by the Court;

D.    Enjoin Samsung from further demanding license terms and conditions that are not consistent with its FRAND commitments to ETSI;

E.    Enjoin Samsung from seeking injunctive relief against Plaintiffs (including their affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to 3GPP standards;

F.    Award damages for breach of contract that Plaintiffs prove at trial, including, as appropriate, exemplary damages, expenses, costs, and attorneys' fees under applicable laws;

G.    Adjudge and decree that Defendants have infringed each of the Asserted Patents;

H.    Adjudge and decree that Defendants' infringement has been willful;

I.    Award damages adequate to compensate Huawei for the patent infringement that has occurred, together with interest and costs;

J.    Award an ongoing royalty for Defendants' post-verdict infringement, payable on

each product or service offered by Defendants that is found to infringe one or more of the patents asserted herein, and on all future products and services that are not colorably different from those found to infringe;

  K. Award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

  L. Find that this is an exceptional case and award to Plaintiffs their costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

  M. Such other relief, including other monetary and equitable relief, as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

  Plaintiffs demand a jury trial on all claims and issues so triable.

Dated: May 24, 2016       SIDLEY AUSTIN LLP

           By: _/s/ Michael J. Bettinger_____

            Michael J. Bettinger (SBN 122196)
            *mbettinger@sidley.com*
            Irene Yang (SBN 245464)
            *irene.yang@sidley.com*
            SIDLEY AUSTIN LLP
            555 California Street, Ste. 2000
            San Francisco, California  94104
            Telephone:  +1 415 772-1200
            Facsimile:  +1 415 772-7400

            David T. Pritikin (*pro hac vice pending*)
            *dpritikin@sidley.com*
            David C. Giardina (*pro hac vice pending*)
            *dgiardina@sidley.com*
            Douglas I. Lewis (*pro hac vice pending*)
            *dlewis@sidley.com*
            John W. McBride (*pro hac vice pending*)
            *jwmcbride@sidley.com*
            SIDLEY AUSTIN LLP
            One South Dearborn
            Chicago, Illinois  60603
            Telephone:  +1 312 853 7000
            Facsimile:  +1 312 853 7036

            ATTORNEYS FOR PLAINTIFFS