Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
HUAWEI TECHNOLOGIES CO., LTD.;  )
HUAWEI DEVICE USA, INC.; and    )
HUAWEI TECHNOLOGIES USA, INC.,  )
                                )
                                )
            Plaintiffs,         )
                                )
  VS.                           )    NO. C 16-02787 WHO
                                )
SAMSUNG ELECTRONICS CO., LTD.,  )
and SAMSUNG ELECTRONICS         )
AMERICA, INC.,                  )
                                )
            Defendants.         )
_____)
```

San Francisco, California
Wednesday, April 19, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

            SIDLEY AUSTIN LLP
            555 California Street - Suite 2000
            San Francisco, California  94104
        BY:  **IRENE I. YANG, ATTORNEY AT LAW**
             **MICHAEL J. BETTINGER, ATTORNEY AT LAW**

            SIDLEY AUSTIN LLP
            1001 Page Mill Road - Building 1
            Palo Alto, California  94304
        BY:  **NATHAN A. GREENBLATT, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Defendants:

3                      QUINN, EMANUEL, URQUHART, OLIVER
                         & SULLIVAN LLP

4                      555 Twin Dolphin Dr. - 5th Floor
                      Redwood Shores, California  94065

5              BY:   **KEVIN P.B. JOHNSON, ATTORNEY AT LAW**

6                      QUINN, EMANUEL, URQUHART, OLIVER
                         & SULLIVAN LLP

7                      50 California Street - 22nd Floor
                      San Francisco, California  94111

8              BY:   **CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
                    **IMAN LORDGOOEI, ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Wednesday - April 19, 2017**</u>                              <u>**3:12 p.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3                            **---oOo---**

4        **THE CLERK:**  Calling Civil Matter 16-2787, Huawei

5    Technologies Company Limited, et al., versus Samsung Electronic

6    Company Limited, et al.

7        Counsel, please come forward and state your appearance.

8        **MS. YANG:**  Good afternoon, Your Honor.  Irene Yang for

9    plaintiff Huawei, and with me are Mike Bettinger and Nate

10   Greenblatt.

11       **THE COURT:**  Good afternoon.

12       **MR. JOHNSON:**  Good afternoon, Your Honor.  Kevin

13   Johnson from Quinn Emmanuel on behalf of Samsung, and with me

14   are Charlie Verhoeven and Iman Lordgooei.

15       **THE COURT:**  Welcome.

16       All right.  So we have two things that I want to do.  One

17   is the motion to amend, and then I want to talk about the joint

18   statement and figure that one out, and I have some other case

19   managey-like questions to ask when we get there.

20       So with the motion to amend, so, first of all, I do

21   believe that the rationale of the patent local rules require

22   conception dates.  I don't think that Samsung was particularly

23   diligent since it had the documents in its possession, but I

24   don't see any prejudice on Huawei's behalf.

25       And in this situation, there was -- it seems like there

1  was ongoing communication between the parties and work to try

2  to get the conception date and the documents up.  It's not, to

3  me, a similar situation to the *Thought v. Oracle* matter where

4  the disclosures came two years later and really did affect what

5  was going on in the litigation.

6       So given that ongoing effort, I don't see the gamesmanship

7  and the problem.  So I'm interested, Ms. Yang, in your

8  explanation, but at the moment I'm not inclined to grant the

9  motion -- or I am inclined to grant the motion to amend.

10        **MS. YANG:**  Sure.

11       So, Your Honor, just to lay out the framework, as numerous

12  cases have held, as the *Thought v. Oracle* case held, as the

13  *Harvatek* and other cases have held, good cause requires, first,

14  diligence; and, second, if diligence has been shown, then you

15  look to what the prejudice is to the nonmoving party.

16       So here our position is Samsung has not shown diligence.

17  The burden is on Samsung to show that they have been diligent.

18  They asserted these patents back in August.  The infringement

19  contentions were due at the end of October.  As you noted,

20  there was back and forth about whether conception dates were

21  required.  Our position was they were required.

22       And so in December, Samsung gave a conception date for the

23  '105 patent, and in January, on January 10th, Samsung gave a

24  conception date for the '827 patent.  That was 10 days before

25  the invalidity contentions were due; and so, as a result, from

Huawei's perspective, we thought, *You know, this is before the*
*invalidity contentions are due.  We have the opportunity to*
*take this into account as we're doing the prior art search,*
*doing our analysis, so we'll agree to this.*

So invalidity contentions go in on the 20th.  Three, three
and a half weeks later we get this request to amend the
conception date.

And so, as Your Honor noted, you know, the question is
could -- from what we can tell, it appears that Samsung did
have these documents in their possession.  The only evidence
that they've submitted about -- you know, as an explanation for
their diligence is two sentences in an attorney declaration
saying that there were documents from archival resources,
including some associated with a prior litigation, different
counsel of record were located and made available after the
infringement contentions.

But there's no discussion about, you know, whether there
was any diligence in looking for these documents between August
and October.  Samsung didn't tell us that they thought there
were these archives that might exist and they were looking for
documents.  There's no explanation about why these documents
weren't available before, you know, when the search was
started.  Basically we have no information about it.

But at the end of the day, what it comes down to for us
is, on the diligence, you know, that the timeline -- and we're

1   not necessarily saying that there was nefarious intent here

2   with the timing or anything, but the way the timing works

3   out --

4        **THE COURT:**  There would be no purpose.  There would be

5   no purpose to it.  The problem that I have with your position,

6   if I find that they're marginally diligent, they were looking

7   for the information, and the starting point was that they had

8   to comply with what you were asking, which happens to be my

9   somewhat minority position on conception dates, and they end up

10  finding some documents after January 20th, or whenever that

11  date was.  And what I'm wondering is how that hurts the

12  litigation or hurts Huawei.

13       **MS. YANG:**  Right.  So, in addition to kind of the --

14  you know, what other cases in this district have found about

15  the purpose of the patent rules here and flipping the order of

16  events, there's a couple bases on which Huawei has been

17  prejudiced.

18       So, first, you know, we've already spent the resources,

19  the time, the attorney time, the client time, money, conducting

20  prior art searches in reliance of the dates that they've

21  provided.  They gave us -- on January 10th, they gave us a

22  conception date that -- for one of the patents, and we just

23  accepted it and, you know, we conducted our search with that.

24  So --

25       **THE COURT:**  But these dates, they're so close in time.

1    And this is my own ignorance.  I don't really understand how

2    your process works, but how would your process be different?

3         **MS. YANG:**  Well, so the reason that it is prejudicial

4    is, by moving those dates just a few -- even, you know, five to

5    seven days, it knocks out a number of prior art references that

6    we have put in; right?

7         And so we've already spent this time, we've had this

8    analysis.  These are prior art references that, you know, prior

9    to this change in the date, that under 102(a) were clearly

10   prior art -- the dates, you know, were earlier than the

11   asserted conception date -- and now as a result, you know,

12   we're going to have to do extra discovery to -- third-party

13   discovery to have to go and figure out under, *Okay.  Well,*

14   *maybe 102(g)(2), when was this third-party prior art actually*

15   *invented.*

16        You know, we have to do this whole additional factual

17   analysis that we wouldn't have had to do before that because,

18   you know, before that, it was clear.  The date is what it is.

19        The other thing is -- that I wanted to bring up is this

20   conception document that they've asserted for the '105 patent,

21   and that's the one that we are not able to see.  That's the one

22   that they put on the privilege log, and so we're in this

23   position now where I would say we're extra-prejudiced on this

24   one because they're trying to use this document that is on

25   their privilege log that we can't see.  So as a result, we

1  can't challenge it, and that would knock out some of our prior

2  art references.

3       **THE COURT:**  Well, I am sympathetic on that, so I'll

4  look forward to hearing Mr. Johnson.

5       But is there anything else?  I agree.  You're going to

6  have to know what that document is at some point --

7       **MS. YANG:**  Right.

8       **THE COURT:**  -- so that you can defend your case.

9       **MS. YANG:**  Right.

10      **THE COURT:**  All right.  So, Mr. Johnson, tell me why I

11 should think that you were diligent and then take on the other

12 issues, and then tell me when you're going to let Huawei know

13 what the prior art reference is that you've referenced on the

14 confidential -- the --

15      **MR. JOHNSON:**  The document on the privilege log?

16      **THE COURT:**  On the log, yeah.

17      **MR. JOHNSON:**  Let me start with the diligence factors,

18 because I think, Your Honor, we have a different view.  We

19 believe we were diligent as we moved forward.

20      And I've prepared some slides, but just in the interest of

21 time and trying to move this along, I'm just going to refer to

22 the dates because I don't think there's any real dispute as to

23 the dates.

24      You know --

25      **THE COURT:**  Yeah, I actually have the dates in front

1    of me.

2         **MR. JOHNSON:**  Right.

3         So we -- you know, Huawei -- there was some meet and

4    confer -- as Your Honor suggested, there was meet and confer

5    back and forth about whether conception dates were required.

6    We had a different view.  I understand Your Honor's view.  We

7    ultimately agreed to provide those dates, and we provided those

8    dates on December 2nd.

9         And, you know, this is -- this is a big case with lots of

10   patents as you know, and I'm sure we're going to talk about a

11   little bit later, and these patents were involved in other

12   litigation where there were other counsel involved in that

13   other litigation as well.

14        And so, you know, we were sifting through, continuing to

15   look through a lot of documents over time, and a lot of these

16   documents are -- some of them are in English, some of them are

17   in Korean.  I mean, it's a long process to work through all of

18   these, and we continued to look after we provided those dates

19   on December 2nd.

20        And we first learned of this evidence in January of 2017;

21   and as soon as we learned about it, we reached out to Huawei,

22   or shortly thereafter, and talked about, you know, our desire

23   to supplement our contentions at that point; and there was some

24   further meet and conferring of -- you know, between the parties

25   on that.  And we actually sent them, they didn't ask for it,

but we sent them a draft of our supplemental contentions on
February 15th, and then we identified the documents after that
point.

And I can -- and one more, you know, is basically from
their inventor's notes that we think support or corroborate an
earlier conception date, and another document is a privilege
document that we're going to have to come to terms with how
we -- you know, whether we -- how we can rely upon that for
purposes of conception.  We think that we can.

But, you know, this argument over whether these documents
are sufficiently, you know, described in a summary judgment
motion is different than trying to establish a right.  You
know, the burden here is whether we have good cause to move
forward with amending the contentions.  And so challenging --
challenging whether those documents are sufficient to actually
constitute early conception dates, that's, frankly, I think,
for another day and would be challenged through either a
summary judgment motion or some more merits in the case.

That's -- and that's what the cases -- that's what the
*Roche* case talks about and also the *General Atomics* case.  You
know, the good cause requirement does not require the Court to
analyze the strength of the plaintiffs' infringement
contentions; and that's what I believe Huawei's counsel is sort
of getting into now, is whether those documents actually
sufficiently move the conception dates, you know, a few days

1    earlier.

2         So we believe that we were diligent, but I think,

3    Your Honor, you know, from our standpoint, no matter what the

4    record is on the diligence, frankly, there is no prejudice in

5    this case.

6         And, you know, here no depositions have occurred.  They

7    haven't -- no depositions have been scheduled yet.  They

8    haven't taken the depositions or noticed the depositions of any

9    of the inventors to ask what these documents are yet.  I mean,

10   that's all coming.

11        There's no specific date yet for the close of discovery as

12   well.  You know, there's some dispute about that -- or

13   discussion about that and when that's going to happen.  We're

14   not talking about moving conception dates two years earlier or

15   six years earlier like a lot of -- some of the cases talk

16   about.  You know, we're talking about four days and seven days

17   respectively.  We are amenable to allowing them to supplement

18   their contentions.

19        And I think what's also, you know, interesting is we're

20   not hearing that by moving it a few days, that the prior art is

21   no longer going to be prior art.  It may -- instead of being

22   102(a) prior art, it now may qualify as 102(g) prior art and

23   that they're going to have to take some third-party discovery,

24   which, again, they haven't noticed any third-party discovery or

25   started that process yet anyway.

1        And at the end of the day, you know, there's still -- even

2   with these new dates, Huawei has charted nine references that

3   predate even these earlier conception dates; nine references

4   for the '827 patent and 14 references for the '105 patent.

5        So, you know, doing another search, I'm not -- just in my

6   experience over all the cases over the years, you know, parsing

7   the conception dates, you know, doing a search, whether you

8   move it for four or five days I don't think is going to yield

9   different results.

10       But, in any event, the fact that they have so many

11  references already charted that predate these even, you know,

12  four- and seven-day moves on the conception dates I don't think

13  reflects any prejudice here when I hear a little bit about, you

14  know, money for searches and, you know, again, in the grand

15  scheme of things with all of the disputes all over the world

16  between these parties.

17       The cases talk a lot about getting to the right result on

18  validity.  You know, in the Samsung -- we provided a quote from

19  the *Apple/Samsung* case that invalidity claims should, you know,

20  stand or fall regardless of another party's theory of claim or

21  scope.  And so we amended our conception dates because we

22  believe those are the correct dates.  When we learned about the

23  information, that's what we did and started that process with

24  them.

25            **THE COURT:**  All right.  Anything else, Ms. Yang?

1          **MS. YANG:**  Just a couple items.

2      So I know that the Court is aware of this, but as counsel

3  said, this is a huge dispute.  It's a worldwide dispute and

4  that, I think is --

5          **THE COURT:**  I remember.

6          **MS. YANG:**  You know, our position on this is that the

7  FRAND issues are the ones that should be resolved first, so

8  I'll just leave it at that.

9      A couple of things just in response.  So, one, counsel

10 said that they had learned of the evidence in January of 2017

11 of the existence of these archives.  This is the first time

12 that I, at least, have heard of that.

13         **MR. JOHNSON:**  I don't mean to interrupt, but not the

14 archives.  We learned of the documents.  We knew about the

15 archives, and I think that's in our papers.  We knew about the

16 archives.  We searched the archives, but then we found

17 additional documents that were not part of those archives.

18     Sorry.

19         **MS. YANG:**  I see.

20     So, in any event, the archives that had these documents

21 apparently.  I mean, you know, we didn't find out until

22 February 15th that the archives exist.  So I would submit that

23 that -- that Samsung hasn't met their burden on diligence.

24     And as to the argument about whether -- you know, that we

25 shouldn't have to look at the content of the documents at this

1    point, that that is for later, which I think is going to the

2    futility argument that Huawei raised, it's not just a futility

3    issue, as I mentioned, especially for that document that's on

4    the privilege log.  That's a prejudice issue as well.

5         And the last point is on the point that, you know, that we

6    haven't said that maybe we've lost prior art as a result of

7    this because we can just go from 102(a) to 102(g)(2).  I mean,

8    you know, at this point we don't know if we've lost prior art

9    because we've gone from a situation where we have references

10   where on the dates we know that it's prior art, it's clearly

11   prior art, to now having to go out and take third-party

12   discovery to try to establish that it is, in fact, prior art.

13        So it may be that it turns out there is prior -- you know,

14   that we have lost some prior art.  It may be -- just standing

15   here right now I don't know having not done that discovery.

16        But, you know, having to do third-party discovery, having

17   to do third-party discovery for potentially foreign inventors,

18   having to go through the Hague Convention, it's a process.

19   It's not just something that can be done, you know, within two

20   weeks or even 30 days necessarily.  So I don't know that

21   just -- that just supplementing -- you know, having some extra

22   time to supplement our invalidity contentions really cures the

23   prejudice to us of losing these prior art references.

24            **THE COURT:**  Just so that I understand, you're

25   speculating that there may be some need to do something with

```
 1   respect to prior art that would require the third-party

 2   depositions?

 3            MS. YANG:  So at this point as it stands with the

 4   information we have, we have lost four prior art references by

 5   these change in dates, and so what we don't know is whether we

 6   may be able to rehab them through third-party discovery --

 7            THE COURT:  I see what you're saying.

 8            MS. YANG:  -- but right now we don't have them.

 9            THE COURT:  All right.  I see what you're saying.

10       All right.  Submitted?

11            MR. JOHNSON:  Thank you, Your Honor.

12            MS. YANG:  Thank you, Your Honor.

13            THE COURT:  All right.  So let's go on to the joint

14   statement.

15            MS. YANG:  Sure.  And Mike Bettinger will handle that

16   for Huawei.

17            THE COURT:  Fine.

18            MR. BETTINGER:  Thank you.

19            MR. JOHNSON:  And Mr. Verhoeven will be taking over.

20            THE COURT:  Welcome.

21            MR. VERHOEVEN:  Thank you, Your Honor.

22            MR. BETTINGER:  Thanks for having us.

23            THE COURT:  So I have one sort of overarching

24   question, which will then help me get back to everything else,

25   which is how we're going to get this case into a manageable
```

1    shape for trial.  I'm very interested in that topic, and which

2    probably means that a few months ago I should have limited the

3    number of asserted claims and prior art references, which I

4    didn't do.

5        So tell me -- help me out on where you are at the moment.

6    How many asserted claims are there?  How many prior art

7    references are there?

8            **MR. BETTINGER:**  There's more than 150 terms at issue

9    between the two patents that have been identified for

10   construction.  Under Your Honor's rules, each side has chosen

11   five.  So 10 of the 150 terms that were identified --

12           **THE COURT:**  Yeah.  No, I'm very happy about that.

13           **MR. BETTINGER:**  -- are at issue.

14           **THE COURT:**  I'm actually interested in the claims and

15   prior art references.  What's the volume of --

16           **MR. BETTINGER:**  There's over 200 claims at issue; and

17   I don't have the number of prior art references, but with 20

18   patents, my guess would be well over 200 prior art references.

19           **MR. VERHOEVEN:**  Your Honor, if I might.  We're the

20   defendant.  We have counterclaims.  We have asserted patents in

21   response basically to the patents that have been asserted

22   against us.  We would be completely amenable to reducing --

23   working with them and reducing the number of patents in this

24   case.

25       As we all know, we're not going to be trying 20 patents

1    and, you know, we're happy to cut them down on both sides,

2    claims and counterclaims, in a reciprocal manner to something

3    that would be manageable.

4        I don't have a recommendation.  I can't tell you what to

5    do, but I certainly would be happy to work with the other side

6    to get this down to, you know, a fraction of the number of

7    patents, something that could actually be tried.

8        And by the same token, the number of terms as provided for

9    by the local rules makes imminent sense.  It doesn't make sense

10   to try and construe 150 terms.  It makes sense to force the

11   parties to decide what matters.  And right now you've got a

12   list of 10 terms that the parties have said are dispositive one

13   way or the other.  So you've got the important terms.

14       It looks to me like the parties have picked one term from

15   each different patent, so there's 10 different patents already

16   set up for a *Markman* hearing.

17       My suggestion would be to keep that train going -- you can

18   bet your bottom dollar they picked their best patents for those

19   terms -- and go and either order the parties to reduce the

20   number of patents or order the parties to meet and confer and

21   limit the number of claims that can be asserted.  You know, in

22   Texas they do I think it's 10.  That would force the parties to

23   make some decisions here.

24       We're perfectly happy to reduce.  And we need to defend

25   ourselves and 10 patents were asserted against us, Your Honor,

1    and we're a large company and think that we're much more

2    innovative and much earlier than the plaintiff in this case,

3    and we want to -- so we have to defend ourselves, but that

4    doesn't mean we have to have some unreasonable, unmanageable

5    case.

6         And if the plaintiff Huawei is willing to make its case a

7    reasonable size, I can tell you that we would follow suit.

8              THE COURT:  Okay.

9              MR. BETTINGER:  Your Honor, this brings us back to the

10   discussion we had early on at the first case management

11   conference.

12             THE COURT:  You want to do FRAND first.

13             MR. BETTINGER:  Well, wait.  But this is a FRAND case.

14   You can't really limit the patents.  They're standard essential

15   patents.  So if you take three, what are you going to do?  Take

16   another three and another three?

17        And so when both parties have come to the table and said,

18   *We agree you have FRAND patents and we need a license,* both

19   parties have said that, that's why courts will, in order to

20   manage a situation like this, will get to the point of, *Okay,*

21   *let's figure out the FRAND rate.*  We don't have to get into the

22   individual patents that way.  Both sides have acknowledged the

23   other side has valid standard essential patents that you need

24   to license.  There is no dispute in this record on that.

25        And so the management of the case, which I think

1    Your Honor heard plenty of argument on and kind of, *Well, I'm*
2    *going to go this route for now and see,* it's maybe becoming
3    more clear as you go down the road we've chosen, there is no
4    end in sight.  Because if you limit the claims, the other party
5    is entitled to continue bringing standard essential patents.

6        And it's admitted they're essential.  Samsung does not
7    say, *No, you know, we don't need a license to those.*  They've
8    already told us we need a license.  We said, *We need a license*
9    *to yours.*  *Let's figure out the rate.*  If we can get to that
10   point of figuring out the rate, this case goes away.

11       And it's -- there's Ninth Circuit authority for it.  We
12   saw how Judge Robart did it out of the Western District of
13   Washington.  We've seen how it was done in the *Nvidia* case in
14   Chicago where courts will, in order to resolve this case in a
15   manageable way, just say, *Look, parties, you both agree you*
16   *need a license.*  *Let's figure out what the rate will be.*

17       And then that discovery is very focused.  Look at the
18   portfolios for both parties.  What is the relative value of
19   the -- you hear from experts as to the relative value of those
20   portfolios, and you get to a rate and the case goes away.

21           **THE COURT:**  All right.  But we don't have all those
22   other -- the worldwide patents that are here.  We've got a
23   slice of what is a dispute that's going on in how many
24   different courts or jurisdictions around the world?

25           **MR. BETTINGER:**  Right, but the Court --

1          THE COURT:  There's a lot.

2          MR. BETTINGER:  There is, but there has to be a --

3      there had to be some nexus.  So there are patents that have

4      been asserted, but the Court can certainly determine worldwide

5      rates -- it's been done in a number of cases -- and impose

6      those on the parties because it does go to an overall

7      portfolio.  And that's what you're looking at.

8          If the Court wants to just look at U.S. patents, that can

9      be done as well.  It seems more efficient and I believe at the

10     end of the day the parties would agree you may as well just do

11     worldwide rates if we're going to have a Court that would

12     decide that.

13         MR. VERHOEVEN:  May I respond?

14         THE COURT:  Yeah.  Go ahead.

15         MR. VERHOEVEN:  So it seems like every time we get up

16     to talk about case schedule, we hear the same argument.

17     Your Honor already heard --

18         THE COURT:  It's not a bad argument, though.

19         MR. VERHOEVEN:  Well, Your Honor, again, as Your Honor

20     noted when we argued it when it was noticed instead of having

21     been brought up with no notice, it would be insanity for these

22     parties to have a judge set all the terms on a complex

23     worldwide 10-year license, or however many years it is, with

24     different products in different jurisdictions, terms -- this is

25     not just set a rate and the parties have agreed to everything

1    else.   This is we don't have anything.   We don't have an

2    agreement.   We don't have a template.

3         If you look at the cases, in the Robart case, that was

4    stipulated.   The parties stipulated to it.   In the case with

5    *Nokia* that they referred to -- I'm going off the top of my head

6    here because we don't have briefing -- that was an extension

7    agreement.   So all the terms were in place.

8         There's no way that we would expect a jury, much less this

9    Court, to learn all these different technologies, make

10   assessments of what their value is, make assessments of what

11   the different patents are one versus the other and decide.

12        As I said before, Your Honor, one of the things -- the

13   reason why it is quintessentially a private-party negotiation

14   and not a court-ordered contract is because the parties have to

15   make business judgments.   They have to say, *Where do I think*

16   *it's going to go?  Where do I think the market is going to go?*

17   And they decide on different terms depending on their picks and

18   their predictions.

19        And they have to decide on the term of the entire

20   agreement, and that may be based on their judgment of what the

21   life cycle of certain technology is going to be.   And they

22   could be wrong or they could be right.   That's business.   It's

23   not for the Court to make those business judgments, and it

24   would be totally inappropriate to do that.

25        It would also be -- we would be in no man's land because

1   these cases they cited have not been these circumstances here.

2   There have been cases that were manageable or the parties said,

3   *Okay.  We're going to stipulate.  Let's do this one issue*,

4   presumably because that's the only issue they really had.  But

5   here we don't have that, Your Honor.

6      Let's not forget that they're essentially asking to put

7   the cart before the horse as Your Honor noted.  I mean, a

8   license is a remedy.  First you have to prove that the patents

9   are valid, you have to prove that they're infringed, and you

10   have to prove that they're standard essential patents.

11      Now --

12      **THE COURT:**  So let me cut you off because I'm not

13   going to be making that determination -- remaking that

14   determination right now.  I am -- we're going to continue down

15   the road that we've started.  I am going to be thinking about

16   how -- what is the smartest way ultimately to try this case.

17      So with respect to that, I know you want to say something

18   but I want to say something first.

19      **MR. BETTINGER:**  Well, I hope -- no, I don't need to

20   say anything.

21      **THE COURT:**  Okay.  Then I'll give you an opportunity.

22      **MR. BETTINGER:**  Sure.

23      **THE COURT:**  But it seems to me two things.  One is

24   that for the claim construction, I'm doing 10 terms and I'm

25   doing it as we set it out, and you've laid out your most -- I

1    assume your most important terms that you want to get a read on

2    anyway.  So we're going to do that.

3        But I do want you to reduce claims and prior art

4    references.  And so in the -- some wise people had and

5    rejected -- taken away the notion of starting off with 10 terms

6    per patent, 32 for -- 10 claims per patent with a total of 32

7    and 12 prior art references per patent, a total of 40, and then

8    reducing that to a final election.

9        You guys are familiar with that formula.  I don't know

10   whether that's wise or unwise with respect to this, but I want

11   a case that I'm going to be able to try in a couple of weeks.

12   That's what I want.

13           MR. VERHOEVEN:  Understood, Your Honor.  And, of

14   course, there are templates for this.  The Eastern District of

15   Texas has a procedure.  I don't know if that's what you're

16   reading from.  There's other procedures that are available.

17           THE COURT:  So what I want you to do is to sit down

18   with each other and say, *Okay.  Assume that this judge is going

19   to make us try the case the way that he set it out.*  I'm not

20   going to do FRAND first.  We're just going to do this case

21   that's in front of us.  What is the most efficient way that we

22   can try the case in two weeks?

23           MR. VERHOEVEN:  Understood, Your Honor.

24           THE COURT:  Or thereabouts.

25           MR. BETTINGER:  So if you don't do FRAND, how would

1  you envision doing damages?

2          **THE COURT:**  Well, you're not going to be trying --

3  we're not going to be trying 20 patents.  Can you imagine -- I

4  mean, you guys have experience and I've had experience with

5  Mr. Johnson, who's a wonderful trial lawyer, but you can't get

6  the -- keep a jury's interest in what you're talking about for

7  more than a couple of weeks.  It's very complicated, and you

8  should know better than anybody else how to simplify this.

9          But if you can't -- so I want you to try to do that.  If

10 you can't do it within two weeks -- why don't you in two weeks

11 give me your proposal on how you're going to reduce claims and

12 try the case without doing FRAND first.  Just you can footnote

13 that you think it's a terrible idea, but give me otherwise your

14 best idea.

15         And then either you've agreed or I'll try and sort it out,

16 but we've really -- I've got to get this shaped up, and I

17 should have done it before but we're going to do it now.  Okay?

18         **MR. VERHOEVEN:**  Thank you, Your Honor.

19     I did have one housekeeping matter that I've also spoken

20 to counsel about.

21         **THE COURT:**  Okay.

22         **MR. VERHOEVEN:**  Both Mr. Johnson and myself have had

23 dates set by other courts that conflict now with the July 21st

24 date for the *Markman*.

25         **THE COURT:**  Okay.

1      **MR. VERHOEVEN:**  And so if it is acceptable to the

2  Court, we'd like to move that slightly.  I did notice that

3  Your Honor is dark from the 24th, the following Monday, until

4  the 4th of August.

5      **THE COURT:**  Yes, that's true.

6      **MR. VERHOEVEN:**  All right.  So perhaps August 11th

7  with the caveat that, of course, counsel needs to check with --

8      **MR. BETTINGER:**  I was just approached in the hallway

9  before the hearing and amenable to looking into it.

10      **THE COURT:**  Okay.  The 11th does work for me, so just

11  figure out whether that works for you; and if that doesn't, the

12  dates that it appears I'm dark, I definitely will be hiking up

13  in the Sierra somewhere so I will not be here.

14      **MR. BETTINGER:**  All right.

15      **MR. VERHOEVEN:**  Thank you, Your Honor.

16      **MR. BETTINGER:**  Thank you.

17      **THE COURT:**  Is there anything else that we need,

18  Mr. Johnson?

19              (Counsel conferring.)

20      **MR. VERHOEVEN:**  Oh, I should -- Mr. Johnson correctly

21  reminded me.  Just so you know, Your Honor, you have a tutorial

22  on the 14th of July.  I'm not sure if that's going to be too

23  far away from the *Markman* hearing.

24      **THE COURT:**  You don't think I'll be able to remember?

25      **MR. VERHOEVEN:**  Well, no, I'm not saying that.

1          THE COURT:  It's possible actually.

2          MR. VERHOEVEN:  I just wanted to point that out.

3          THE COURT:  Yeah.

4          MR. VERHOEVEN:  We're perfectly happy keeping it on

5   that date.  We're available on that date.

6          THE COURT:  So, then, check out the 7th for the

7   tutorial, August 7th.  Just do it with your clients.  And if

8   that doesn't work, then we can figure something out.

9      I don't -- are you -- is the 21st a one-day event for the

10  two of you or is it a trial?

11         MR. VERHOEVEN:  I have an ITC trial, a two-week trial,

12  at least that's what the ALJ says, that will take me out until

13  the first week in August.

14         THE COURT:  So starting on the 17th, basically?

15         MR. VERHOEVEN:  It starts -- it starts -- I'm trying

16  to remember off the top of my head.  I think it starts the

17  Monday after the 21st, but I have to be there to prepare for

18  trial on the 21st, Your Honor.

19      And then the first week in August I understand you're

20  dark, so --

21         THE COURT:  Okay.  All right.  Well, so -- and you can

22  propose -- if those dates -- if the 7th and 11th of August

23  don't work, just get together proposed dates and then I'll tell

24  you whether they work or not.

25         MR. BETTINGER:  All right.

1          **MR. VERHOEVEN:**  Thank you, Your Honor.

2          **MR. BETTINGER:**  Thank you for your time, Your Honor.

3          **THE COURT:**  Thank you very much.

4              (Proceedings adjourned at 3:46 p.m.)

5                      ---oOo---

6

7

8                  <u>**CERTIFICATE OF REPORTER**</u>

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Friday, April 21, 2017

13

14

15

16   _____

17       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                 U.S. Court Reporter

18

19

20

21

22

23

24

25