Pages 1 - 102

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

HUAWEI TECHNOLOGIES CO., LTD., )
HUAWEI DEVICE USA, INC., and   )
HUAWEI TECHNOLOGIES USA, INC., )
                               )
     Plaintiffs/Counterclaim    )
     Defendants,                )
                               )
  vs.                          )   **No. C 16-2787 WHO**
                               )
SAMSUNG ELECTRONICS CO., LTD,  )
SAMSUNG ELECTRONICS AMERICA,   )
INC.,                          )
                               )
     Defendants/Counterclaim    )
     Plaintiffs,                )
                               )
       and                    )
                               )
SAMSUNG RESEARCH AMERICA, INC.,)
                               )
     Defendant,                 )
                               )
  vs.                          )
                               )
HISILICON TECHNOLOGIES CO.,    )
LTD.,                          )
                               )
     Counterclaim-Defendant.    )
_____)  San Francisco, California
                           Friday, August 18, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

(Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, CSR #5812, RPR, CRR
                Official Reporter - U.S. District Court

1    **APPEARANCES (CONTINUED):**

2    For Plaintiffs:
                          SIDLEY AUSTIN LLP
3                         555 California Street
                          San Francisco, California  94104
4                    BY:  **MICHAEL BETTINGER**
                          **HELEN YANG**
5                         **ATTORNEYS AT LAW**

6                         SIDLEY AUSTIN LLP
                          One South Dearborn
7                         Chicago, Illinois 60603
                     BY:  **DOUGLAS LEWIS**
8                         **JOHN W. McBRIDE**
                          **ATTORNEYS AT LAW**

9
     For Defendants:
10                        QUINN, EMANUEL, URQUHART & SULLIVAN
                          777 6th Street, NW, 11th Floor
11                        Washington, DC 20001
                     BY:  **ALAN LEE WHITEHURST**
12                        **MARISSA R. DUCCA**
                          **ATTORNEYS AT LAW**
13
                          QUINN EMANUEL URQUHART & SULLIVAN, LLP
14                        50 California Street, 22nd Floor
                          San Francisco, California 94111
15                   BY:  **CHARLES KRAMER VERHOEVEN**
                          **BRIAN E. MACK**
16                        **ATTORNEYS AT LAW**

17                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          555 Twin Dolphin Drive, 5th Floor
18                        Redwood Shores, California  94065
                     BY:  **RAY R. ZADO, ATTORNEY AT LAW**
19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Friday - August 19, 2017**                              **8:39 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  We're here in case number 16-2787, Huawei |
| 5 | Technologies versus Samsung Electronics Company. |
| 6 | Counsel, please come forward and state your appearance. |
| 7 | **MR. BETTINGER:**  Good morning, Your Honor.  Mike |
| 8 | Bettinger, along with my colleagues Doug Lewis, John McBride, |
| 9 | and Irene Yang, on behalf of Huawei. |
| 10 | **THE COURT:**  Welcome. |
| 11 | **MR. VERHOEVEN:**  Also in attendance are a number of the |
| 12 | Huawei engineers and personnel. |
| 13 | **THE COURT:**  Thank you. |
| 14 | **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles |
| 15 | Verhoeven on behalf of Samsung.  And with me are my colleagues |
| 16 | Alan Whitehurst, Ray Zado, Marissa Ducca, and Brian Mack. |
| 17 | **THE COURT:**  Welcome. |
| 18 | **MR. VERHOEVEN:**  And we also have a number of |
| 19 | representatives from our client here today too. |
| 20 | **THE COURT:**  Excellent.  Welcome. |
| 21 | All right.  So you have my tentative.  Does everybody just |
| 22 | accept it? |
| 23 | (Laughter) |
| 24 | **THE COURT:**  No?  All right. |
| 25 | **MR. BETTINGER:**  For the most part, yes. |

1          **THE COURT:**  All right.  Well, let's start with

2    Mr. Bettinger.  Why don't you go ahead and argue the claims

3    that you're -- or the terms that you're concerned about.

4          **MR. BETTINGER:**  Okay.

5          **THE COURT:**  Is that going to throw your argument in

6    some way?

7          **MR. BETTINGER:**  I didn't know if you wanted to take

8    them in the order of your tentative ruling.  But we can do it

9    that way.

10         **THE COURT:**  No, I'm happy to do it.

11         **MR. VERHOEVEN:**  The parties had arranged for a

12   structure where 45/45/45/45, because we didn't want to run out

13   of time to fit into the -- or less.

14         **THE COURT:**  Or less.  Okay.

15         **MR. VERHOEVEN:**  Or less.

16         **THE COURT:**  Okay.  Good.

17         **MR. BETTINGER:**  We're not going to need 45.

18         **MR. VERHOEVEN:**  So the way we had agreed to is they

19   would go on their what we call offensive patents, their patents

20   asserted against Samsung, and then we would respond.  And then

21   we would go first on our patents asserted against Huawei, and

22   they would respond.

23         **THE COURT:**  But now you have a tentative.

24         Well, if you have a system that you think is the best

25   system, if you've agreed on that, that's fine, and present it

```
 1    that way.  Otherwise, we can go claim by claim or -- I was
 2    thinking what you would do is argue the ones that you're
 3    concerned about.
 4              MR. BETTINGER:  Yes.
 5              MR. LEWIS:  Yes.
 6              MR. BETTINGER:  That will be our plan.
 7              THE COURT:  That would make sense to me.
 8         So, Mr. Verhoeven, why don't we start with number 1.
 9              MR. VERHOEVEN:  Okay.  We have slides, Your Honor.
10              THE COURT:  Great.
11         And let me just say on number 1, Mr. Bettinger may have
12    more work than he thinks because I -- I think I agree with
13    Samsung's argument that either payload size or the redundancy
14    version needs to go forward; but not both at the same time.  So
15    then I agree with that.
16         I didn't see why it was necessary -- I think that's what
17    the term says.  And so I didn't see why I needed to add
18    anything further.
19              MR. VERHOEVEN:  Could we go to the first two slides.
20         The reason we believe that at least we should have some
21    guidance from the Court on how to interpret those plain words
22    is because we think there's a dispute about the interpretation.
23         And so here I just have 02 Micro, which is the seminal
24    case on this issue, where both parties are saying, yeah, it has
25    its plain meaning, but they disagree about what that meaning
```

1   is.

2       And so, you know, here it says the purpose of claim

3   construction is to determine the meaning and scope of the

4   patent claims asserted to be infringed.  And when the parties

5   raise an actual dispute regarding the proper scope of those

6   claims, the Court should resolve that.

7       And so I've had situations, Your Honor, where even after

8   *Markman* a dispute didn't become apparent until trial.

9       But the parties were arguing that this claim had meant

10  different things.  And it had previously been just plain and

11  ordinary meaning.  And the judge didn't resolve it as a matter

12  of law.  And the Federal Circuit reversed it under *02 Micro*

13  because it's the judge's job to resolve the disputes about what

14  the claims mean.

15      So that's why we -- you know, I agree with you.  We

16  interpret the words to mean what you just said.  And we're fine

17  with not changing any of those words.  But we -- we urge the

18  interpretation of those words that we -- just as you just said

19  them.

20      And if the order you issue just says plain and ordinary

21  meaning, but clarifies that that's what the plain and ordinary

22  meaning at least requires, that's fine with us.  We just want

23  to get the dispute resolved so we're not arguing in front of

24  the jury.

25          **THE COURT:**  All right.  So Mr. Bettinger or whoever is

1  going to take this on.

2        **MR. LEWIS:**  Your Honor, good morning.  Douglas Lewis.

3  We also have a slide presentation --

4        **THE COURT:**  Okay.

5        **MR. LEWIS:**  -- which if I could hand up.

6     Your Honor, if I may provide one to your law clerk as

7  well.

8        **THE COURT:**  Sure.  Yes, please.

9        **MR. LEWIS:**  So, Your Honor, let me just address, you

10  know, head on your concern that you indicated a moment ago.

11     The issue here with the claim is the actual language of

12  the claim "dynamically indicative."  And while that requires

13  the dynamically indicative of being one or the other, it

14  doesn't restrict a default value of RV.  And that's really the

15  dispute.

16     The patent throughout the specification talks about a

17  default value of RV.  In addition, there's a dependent claim

18  talking about a default value of RV.  I'll explain in my

19  presentation how that fits into the claim language and how that

20  can't be excluded both because of the specification and also

21  the claim language itself.

22     So Samsung's construction would exclude an RV.  They're

23  saying the field has to indicate only one of the two parameters

24  at a given time.  The specification, however, says the opposite

25  when it talks about the RV value, which is implicitly part of

1  the payload size when that's transmitted.  That's throughout

2  the patent.

3      And I'll show you this slide.  This is cited in our brief.

4  There are literally, you know -- I guess I didn't count how

5  many there are.

6          **THE COURT:**  Lots.

7          **MR. LEWIS:**  -- lots of places where the default value

8  of RV is talked about.  Also the dependent claim, both Q and 8,

9  talk default value.

10     So default value of RV has to be fit into the scheme of

11  these patents.  That part is clear.  The question is how does

12  it do that.

13     Well, the key language is, it doesn't say the field

14  indicates one or the other, payload size or RV.  It says

15  dynamically indicative.  And when they put this claim language

16  in, they knew what they were trying to cover.  And they did

17  this very carefully.

18     So, Your Honor, this is the chart I created for the

19  tutorial from the language of the patent.  I want to just go

20  back to that because I think it's helpful to understand this.

21     At the top is all of the language in the -- in the claim

22  that's relevant to this dispute.  Just so you don't wonder why

23  there's a 10 there, it was the subject of a certificate of

24  correction and it's actually deleted.  So I'm going to leave

25  the X up there but explain why I put an X there.

1    So in this table we have two parts.  There's the 0 through

2  3 part, which is, in the claim, the second predetermined range.

3  And that's dynamically indicative of RV only.  Why?  Well, RV

4  changes during that part.  There is no payload size, and so

5  it's not dynamically indicative of that.

6    More interesting is the bottom part, which is the first

7  predetermined range in the claim.  And at that part of the

8  numbers, which is 4 through 63 in this example, it's

9  dynamically indicative of payload size.

10    So you're providing information about payload size that

11  the receiver didn't already know, so you're explicitly, perhaps

12  would be the way to put it, providing payload size.  So you're

13  dynamically indicating payload size.  The payload size is

14  changing; it's dynamic.  That's what's happening in the first

15  predetermined range.

16    However, at that point you're also providing the receiver

17  the knowledge, the information that you should use a default

18  RV.  So it's implicitly part of the payload size, the

19  indication to use a default RV.  It's not explicitly there.

20  And that's why you have the language "dynamically indicative."

21    Samsung's construction really eliminates the word

22  "dynamically."  And obviously you can't do that.  There's lots

23  of law on that.  That's an easy one.

24    RV is the same.  It's constant throughout this first

25  predetermined range.  It's not dynamically indicative of RV, so

1    it is -- consistent with the claim, it's dynamically indicative

2    of only one of RV or payload size.

3         But RV, as a default, has to be part of the scheme because

4    that's in the spec.  And it's because it's known from the

5    payload size.  Samsung is trying to eliminate that.  And the

6    reason is this:  This is a table, I think it's in our brief,

7    from the standard.  And obviously you don't construe claims

8    based on the accused product, but this gives us context about

9    why we're having this argument.

10        Just to sort of clear things up, the field is the leftmost

11   portion.  That's the number that you're getting.  This is the

12   payload size.  That's the redundancy version.

13        In this table, it's dynamically indicative of payload size

14   from 0 to 28 because those are -- that's the information that's

15   actually being explicitly transmitted.

16        The last three states, 29 through 31, are dynamically

17   indicative of RV because those are changing at that point.

18        Now, in this first range up here, 0 to 28, this table

19   shows the RV value.  So it shows what the receiver knows, the

20   default.  It's not being transmitted because the dynamically

21   indicative information is only the payload size.

22        But this just shows what the receiver knows when that

23   receiver gets that payload size.  So it's not dynamically

24   indicative of RV.  As you can see, RV is constant.  It's the

25   default, 0.

1    So what you have in this range is being dynamically

2    indicative of only one payload size, not RV.  But RV is, of

3    course, the default.  There's just no dispute that the patent

4    appreciates that, understands that, and the claim covers that.

5    So what we have is really a backdoor attempt by Samsung to

6    eliminate this default RV that the patent talks about the

7    claims do cover explicitly claimed in the dependent claim,

8    dependent to the same claim that the dynamically indicative

9    language is in, not a different claim.  It's a different claim

10   but not a different family of claims.

11   And so the question really to Samsung is the one I have up

12   here, which is they admit that the receiver may be

13   preprogrammed to apply a default value for RV when the payload

14   size is transmitted.  And then they say that the default value

15   itself is not included in the control signaling.

16   But how would the receiver ever know that?  The receiver

17   knows it because the receiver knows, when it gets the payload

18   size, to use a default RV.  So that payload size, while it has

19   a dynamically indicative payload size, has a not dynamically

20   indicative constant pre-known default RV.  And that's, like I

21   said, part of the patent and part of this word "dynamically."

22   So we didn't think any of this needed construction because

23   that's what the claim says, "dynamically indicative."  As I

24   showed, it's only dynamically indicative of one or the other,

25   never both, either in the example in the patent or, for that

```
 1   matter, what we're accusing.
 2        What we propose as an alternative was just to make it
 3   clear that the default RV was in the picture.  Otherwise, we
 4   didn't think this needed any construction.
 5             THE COURT:  Thank you.
 6             MR. LEWIS:  With that, I'll --
 7             THE COURT:  All right.  Mr. Verhoeven.
 8             MR. VERHOEVEN:   Thank you, Your Honor.
 9        Before I get to even the claim language and the
10   interpretation, let's just take a step back and ask ourselves,
11   what's the problem and solution of this patent?
12        The problem was, as stated in the specification, that
13   you're using bits unnecessarily where, for example, you're just
14   repeating the RV over and over and over again when you don't
15   need to.  Or you're repeating the payload size over and over
16   when you don't need to.
17        And the solution is use less bits and alternate.  So you
18   use the payload size when you need payload size, and you use
19   the RV version when you need the RV version.  That's the whole
20   point of the patent.
21        So the argument that the claims will encompass
22   transmitting both of them is contrary to the entire patent, the
23   entire purpose of the patent.  But let's go into -- let's go
24   into the details.
25        Now, Your Honor will remember this from the tutorial.  So
```

1   what we're talking about in this patent is you have a data

2   packet that comes along and you have these control signals.

3   And the control signals, among other things they provide is

4   payload size in the RV version.  And that's generally what

5   this -- what the background is for this technology.

6       Here we have the claim.  Now, in claim construction the

7   first place you start, when you try to interpret the words or

8   the meaning of the claims, is the words of the claim.

9       And so here, if you look at the claim itself, you'll see

10  that it requires that the signal, this signal we're talking

11  about, be either the payload size or the RV version within a

12  specific field.

13      So let's go through this.  So, first of all, it says

14  dynamically indicative of one of payload size or a redundancy

15  version.  So that clearly says just what I said.

16      But then when you put -- when you put it in context --

17  I've added this light blue here.  And you'll see the field

18  includes N bits.  A state of the field is indicated by all of

19  the N bits of the field.  The field is dynamically indicative

20  of one of a payload size or a redundancy version through the

21  state of the field.

22      So the state is payload or RV.  And it says right there

23  that the field is indicated by all bits.  So you can't have

24  other bits that indicate something else.

25          **THE COURT:**  So what does "dynamically indicative" mean

1    then?

2        **MR. VERHOEVEN:**  What it means is between payload size

3    or redundancy version.  That's what's dynamically changing.

4    And I'll show you when we get to the specification.

5        But in -- and this thing about it being in the specific

6    field is very important to understand when you're addressing

7    their argument about the default value.  And that's why I'm

8    focusing in on it, Your Honor.

9        And then you see, furthermore, in the claims they say,

10   wherein the payload size is indicated through a first state.

11   So we know that the -- of the field.  So we know that that

12   means that all the bits in that first state of the field

13   indicate payload size.

14       And then it says, and the RV is indicated through a second

15   state of the field.  So that means all bits in that field

16   indicate only RV.

17       So the claim language itself makes it very clear that it's

18   either payload or it's RV; it's not both.

19       And then, if you go to the specification, you'll see

20   consistently throughout the specification that it's talking

21   about payload or RV within one field.

22       So if you look at 201, or Figure 2, 201, the transmitter

23   indicates payload size or RV through different states of one

24   field in the control signaling.  The transmitter sends payload

25   size or RV on the field.

1     And I'm not going to read all of these, but that's what

2   these other portions of the spec also -- payload size or RV in

3   the field repeatedly and consistently throughout the claim.

4     Here's a specific -- more specific portion of the

5   specification that illustrates what we're talking about.

6     So the first -- the first part of this paragraph says,

7   "For ease of identification" -- and for the record this is

8   column 5, line 9 through 17 on slide 9.  "For ease of

9   identification, in a 6-bit field, 4 states whose foremost upper

10  bits are all 0s can indicate 4 different RVs."  And then they

11  say, "That is, the 4 states" -- and they list the codes --

12  "indicate RV1 through RV4."

13    And so below we have an illustration of this.  You have a

14  6-bit common field.  And on the what I would call rows in this

15  chart are the states.  And the columns are the bits.  And

16  you're using all the bits.  But the code -- those are the codes

17  that specifically indicate the redundancy version in the field.

18    And the spec goes on and says, "Accordingly the remaining

19  60 states (any bit in the 4 foremost upper bits of the

20  remaining non-zero) indicate 60 different payload sizes."

21    And so from 4 to 64 in this example, you use all the bits

22  to show that it's payload size.  Now, let's -- so the spec

23  supports the claim.  The claim obviously says it's either/or.

24    And let's look at the prosecution history.

25    So, as I mentioned in the tutorial, Your Honor, Samsung

has a patent, the Kim patent, that was very, very close to this
patent and its prior art to this patent by, I think, a couple,
three years.  And the examiner rejected this patent based on
Kim.

And so this is -- slide 10 here is page 3 of a response to
an office action rejecting the patent, dated May 9th, 2012.
And it says, Kim at best discloses a HARQ controller that uses
NDI and the common field together to indicate a RV or -- and
those codes there, let's just say they're payload size.

However, according to Kim, the number of bits in the
common field indicative of the RV is distinct from the number
of bits in the common field indicative of the payload size.
The disclosure of Kim is, therefore, clearly different from the
present invention as defined in dependent claim 1.

Then they have a picture, and they show that for the RV
they simply don't use -- there's no -- there's nothing in the
bits.  Whereas, with payload size they -- they use all of the 6
bits.

And whether that's a distinction that is patentable, Your
Honor, we'll get to later in the case.  But this is their
distinction.  They say, Our patent uses every bit on both
states.  Their patent only uses part of the bits on the RV
state.

And they say, for example, claim 1 -- that's the '278
claim 1 and prosecution -- requires that both the payload size

1    and the RV are indicated through states of a field where each

2    of the states is indicated by all the N bits of the field.  In

3    contrast, Kim only uses some bits, but not all bits, of the

4    common field.

5         So if you're using "all bits of the common field" to

6    indicate one state, then it can't be both at the same time,

7    which is our point.

8         And this is repeated again in another response to an

9    office action, dated December 28, 2011.  This is slide 11.  And

10   we're showing page 10 of that response.  And they just repeat

11   the same thing you just -- we just saw.

12        The payload size and RV of amended claim 1 -- that's their

13   claim -- are indicated through the same number of bits and the

14   same bits, i.e. all N bits of the field.

15        And then it says, a state of a field is indicated by all N

16   bits of a field where an N is a positive energy greater than 1,

17   wherein the field is dynamically indicative of one of payload

18   size or redundancy version through the state of the field.

19        So the field and the fact that it requires all bits

20   removes any question about whether or not dynamically

21   indicative of one or the other could mean both.  It can't.

22        So one more thing on the specification.  You saw a

23   citation to 25 cites in the specification where default values

24   is mentioned.  I'm just going to walk you through one example.

25   But this is consistent throughout.

1    There's a number of charts that look similar to this chart

2    here.  This is *Markman* slide 13.

3    We're looking at Figure 3 on the right of the '278 patent.

4    And on the left we're looking at column 6, lines 16 through 37.

5    But you could do this with Figure 5, Figure 6, all the

6    different figures.  Little more complicated, so I'm using the

7    simple one.

8    But what this is talking about is, it's walking through

9    the process.  So it's talking about a state on a specific field

10   in the control signaling.  And this is when the packet is

11   initially -- you see right above it, it says this is the

12   initial packet when you're starting the communication.

13   In the initial packet, the state on a specific field in a

14   control signaling is used to indicate the payload size, comma.

15   An important comma.  And then it says, and the default value of

16   the RV applies.  And if you look at the picture, payload size

17   is included in this arrow going to the terminal; RV default

18   value is not.

19   The fact is, the way that works is, in a separate signal

20   entirely the base station tells the UE, the terminal or the

21   phone, whatever you want to call it, this is going to be your

22   default value for these communications.

23   And so they don't need to send it every time.  It just

24   gets sent on a separate signal.  And it's only used when

25   there's a new payload size in all the embodiments in this

1    patent.  So here what's being sent is just the payload size.

2    The RV value is already existent on both the base station and

3    the terminal.

4         Then what happens is it -- I'm going to skip over some of

5    these words, but the terminal doesn't get the packet.  Remember

6    we talked about that in the tutorial.  So it sends a NACK

7    saying it didn't receive the packet.  And so there's another

8    transmission.  This is step 303 in the specification.

9         And here it says, a state on the specific field.  You

10   notice it says the same words up above, "a state on a specific

11   field."  Careful to use those words.  A state on the specific

12   field indicates RV1.  Then it goes -- then it goes back and

13   there's an acknowledgment that they received it.

14        And then we have a next transmission of a new packet.  And

15   so it goes back to the initial communication.  And then, again,

16   it uses the RV value.  But the state on the specific field

17   being transmitted is just the payload size.

18        And there's other examples, if you walk through them, that

19   have more back and forth.

20        So, for example, if there's more -- if there's a circle of

21   more NACKs, it would be different RV codes, like we talked

22   about, but it wouldn't have the payload size in it.  It would

23   just be the RV.  But then when you have a new -- when it says

24   accepted and you have a new one coming, then it goes back to

25   payload size.  It alternates back and forth but never sends the

1    RV value and the payload size in the specific field that

2    they're talking about.  And that's why RV is not put on the

3    arrow.

4         All right.  I want to talk really briefly about the chart

5    that counsel for plaintiffs showed Your Honor.  This is their

6    infringement case, Your Honor.  So they're trying to argue

7    claim construction off the -- that they say is the infringing

8    technology.  This is from the 3GPP technical specification.

9    That's what it is.  And they put it in their brief.

10        And what we need to see here that's important is, as you

11   read this, the states of the field in the common field are the

12   MCS index.  It's called joint encoding.

13        It's completely different technology, where you take a

14   code and you perform a bunch of algorithms on it and you can

15   generate a bunch of different things.  Called joint encoding.

16   And in this example it generates three pieces of information.

17        But what you see is -- let's just pretend it's not

18   doing -- doing it.  Let's just pretend it's sending it on a

19   field.  Let's pretend that this whole -- the rows are just one

20   field, which isn't true in actuality.  But let's just pretend

21   it because that's what they're trying to say.

22        What do you see?  Well, you do see that the payload,

23   TBX -- TBS is sent and the redundancy is sent.  But look at

24   rows 1 through 28.  What does the redundancy say?  Says the

25   same thing over and over and over again.  Well, that's the

1    problem that this patent is trying to address.

2        So you know-- and, indeed, the patent itself says that's

3    the problem.  So in the background section of the patent

4    here -- and this is slide 15, column 13 through -- column 3,

5    lines 14 through 26, that is, in the prior art, when the packet

6    is transmitted initially and retransmitted, the control

7    signaling needs to indicate both the RV and the payload size.

8        And the RV indicated by the control signal in the case of

9    initially transmitting the packet and the payload size

10   indicating by the control signaling in the case of

11   retransmitting of the packet are information not required to be

12   indicated, which leads to a waste of physical resources.

13   That's the problem.

14       And what they've done is they have the default values, and

15   they only need to send one or the other.  So if it's a new

16   communication, they send the payload size.  And if they don't

17   receive it, they send only the RV versions because the payload

18   size is going to be the same.

19       And that's -- that's what they claim as an invention.  So

20   the interpretation that plaintiffs want to make is that the

21   reason there's a dispute is they're saying that the redundancy

22   version is being sent together in the specific field with the

23   payload size information.  And that's simply not correct.

24       And I have no problem with just relying on the plain words

25   of the claim.  But it shouldn't be -- they shouldn't be allowed

1    to interpret it to remove the entire point of the patent.

2              **THE COURT:**  All right.

3              **MR. VERHOEVEN:**  Thank you, Your Honor.

4              **THE COURT:**  Thank you.

5         Mr. Lewis, do you want to have one --

6              **MR. LEWIS:**  I have two very quick points, Your Honor.

7              **THE COURT:**  Okay.

8              **MR. LEWIS:**  First of all, it's wrong that the base

9    station tells the UE a default value in separate signal as

10   counsel said.  There's nowhere in the patent that says that.

11   There just isn't.

12        So the final thing I want to say is this:  Counsel's

13   presentation would have been no different if the claim did not

14   have the term "dynamically" in it.  If it just said indicative

15   of payload size or RV he could have given that same

16   presentation.  And that's telling, Your Honor.

17        That's all I have.

18             **THE COURT:**  All right.  Thank you.

19        All right.  Let's go on to term 2.

20             **MR. VERHOEVEN:**  Do you want me to start first on that

21   one?

22             **THE COURT:**  Anybody who is concerned about the

23   construction.

24             **MR. LEWIS:**  Your Honor, we said we were fine with the

25   combination on '239, which is what you tentatively indicated.

1          **THE COURT:**  All right.

2      Do remember that there are ten of these?

3          **MR. VERHOEVEN:**  There are what?

4          **THE COURT:**  There are ten terms that we're going

5    through.

6          **MR. VERHOEVEN:**  Yes, I'll try to be faster.

7      On the '239, this is the patent, you'll remember from the

8    tutorial, where you have a big group that's a region k.  And

9    then you have subgroups within the k that are -- you try to --

10   on the interfaces between the subgroups here, like subgroup 1

11   and 3, you try to have the sequences to have a low correlation.

12     And there's something on my screen but not on yours.

13     Okay.  So the parties have reached agreement on -- there's

14   two issues here.  The parties have reached agreement on the

15   first one which, is whether k needs to be a constant in the

16   claim.  So there's no dispute about that.

17     So the only live dispute that's left is whether or not the

18   word "allocated" modifies "sequence group" or "a group

19   number k."  So that's the live dispute.

20     So if you go to the claim language -- here it is in claim

21   6.  This is slide 23.  And this is where it appears in the

22   claim, "obtaining, by a cell or base station or a user

23   equipment, a group number k of a sequence group allocated by

24   the system."

25     And what the plaintiff wants to say is "allocated by the

system" modifies "a group number k."

And what we argue is "allocated by the system" modifies "sequence group."  And we contend, just by plain English, that that's the proper way to interpret that claim.

When you start with the claim -- so looking just at the claim, I'm going to pull up *Strunk and White*, I remember from law school.

And, you know, it says, "Modifiers should come, if possible, next to the words they modify."  And what's the modifier?  "Allocated by the system."

**THE COURT:**  I don't think anybody who has ever written a patent paid attention to *Strunk and White*.

(Laughter)

**THE COURT:**  But I may be wrong.

**MR. VERHOEVEN:**  That's a good point, Your Honor.

But plain English, when you're modifying a noun, you --

**THE COURT:**  I understand.

**MR. VERHOEVEN:**  The modifier is -- you want to put the modifier right next to the noun, not to a noun that's two back.

And so we argue that the -- just the plain English reading of this is that "allocated by the system" is modifying or restricting the noun "sequence group" and not "a group number k."

And, you know, for example, you wouldn't need to change the words of the claim for our interpretation.  But the way

1    Huawei interprets it, basically to make it clear, you'd have to

2    rewrite the claim, the group number k of a sequence group.  The

3    group number k allocated by the system would be the clear way

4    to say what they're saying.  The clear way to say what we're

5    saying is what the claim says.

6         Now, there may be some ambiguity.  They say there's

7    ambiguity.  What do you do if there's ambiguity in the claim?

8    You look to the specification.

9         The specification, Your Honor, says "allocating" many,

10   many times.  Maybe over 20 times it uses the word "allocated."

11   "allocating" or "allocated."

12        Not once in the specification does that word -- is that

13   word used to modify "a group number k."  Every single time it's

14   modifying the sequence group.

15        So I'll show you.  And there's a whole bunch of these.

16   I'm not going to read them all.

17        But this is slide 26, column 5, 46 through 51, "allocated

18   sequence group."

19        Column 52, 29 through 45, "the sequence groups are

20   allocated among the cells."

21        Column 5, 37 through 40, "the sequence groups are

22   allocated among the cells."

23        Column 5, 46 through 56, "the allocated sequence group."

24        Column 5, 60 through 66, "the system allocates sequence

25   groups."

1   It goes on, on slide 2.  I'm not going to read them all --

2    **THE COURT:**  Thank you.

3   (Laughter)

4    **MR. VERHOEVEN:**  -- but there's a bunch of references

5 that are all consistent with that.

6   And then -- so I've got three slides worth of quotes.  In

7 every one of those the word "allocated" or "allocating" is

8 modifying "sequence group."  And not once in the claim is that

9 word "allocation," "allocated," "allocating" used to modify the

10 "group k."

11   So to the extent there's ambiguity in the claim itself,

12 the specification makes clear that the allocated -- the verb

13 "allocating" is modifying or restricting the phrase "sequence

14 group," not the prior noun "group k."

15   So that's basically our argument.  The only thing I'll

16 say, in addition to that is, if you look at the papers with

17 Huawei's argument, the only thing they rely on is the claim

18 language.  They refer to the specification without citation in

19 one sentence in their reply brief.  But they don't.  They

20 ignore the specification.  And their argument is simply an

21 English language argument.

22   And they admit -- so on page 8 of their opening brief,

23 this is slide 29, opening brief at page 8, "Due to the nature

24 of the English language, it could be argued that 'allocated by

25 the system' modifies either 'a sequence group' or 'group

```
 1    number k.'"
 2         And in their reply brief, again at page 4, a grammatically
 3    correct English sentence could theoretically do both, is what
 4    they're saying.  But their only support for their
 5    interpretation is to point to the same phrase that they said
 6    was ambiguous.  That's their argument.
 7         Our argument is we think it's clear.  But if it is
 8    ambiguous, the specification shows which of the two meanings it
 9    should be.
10         Thank you, Your Honor.
11              THE COURT:  Thank you.
12              MR. LEWIS:  Your Honor, so we are relying on the claim
13    language, which is generally what we're supposed to do on claim
14    construction.  But there's more claim language than counsel has
15    shown, that I have on the screen here.
16         The fact -- obviously not the whole claim, but I have the
17    part that's -- that's at issue here, "group number k of the
18    sequence group," but also the part a little bit later in the
19    claim that explains the k is the serial number of the sequence
20    group.
21         So what this is saying is that there's a relationship
22    between the group number k in the sequence group that is -- and
23    I have a little thing on my screen.  Hopefully not on yours.
24              THE COURT:  No.
25              MR. LEWIS:  It's showing that there's a relationship
```

between what's being allocated by the system and the group

number k, because the k identifies the sequence group.  And,

therefore, it is -- the k, that is, is what's coming from the

system.  And the k is then used to identify the sequence group.

In a couple specific points in response to counsel's

points, first of all, on slide -- I think it was 24, he shows

*Strunk and White*.  And while I agree with Your Honor that most

patent prosecutors don't pay a lot of attention to that book,

or any grammar book, it also says "if possible"; right.

And the language here has both the "of a system group" and

the "allocated by the system," both modifying "a group

number k."  Well, it's not possible to have them both next to

the term.  And that's why it is written the way it is.

Your Honor, unless you have any questions on this patent,

I have nothing further.

**THE COURT:**  What do you do about those 30 references

of "allocated" that Mr. Verhoeven pointed out in the

specification?

**MR. LEWIS:**  Oh, in the specification.

Your Honor, I don't think that those are inconsistent.

You know, I went through them quickly.  And I was trying to

think about what I have said here, and so I didn't look at each

of them that he pointed to.

But the ones I remember, from having read this patent more

than a few times, track the claim language.  And, you know,

some read almost exactly the same, or grammatically sentences

are different, obtained is in a different point than in the

claim.  But they basically say the same thing.

The claim, in my recollection of the patent, does not

use -- does not have anything in it that's inconsistent with

our construction.  I don't think it does because I think they

would have made a lot more than citing 30 things at you if they

had something that supported them.

I mean, when we had support for the last patent, I blew

out the one I wanted to talk about.  I talked about it, and

said there's others too.  I didn't throw others at you and not

get specific about any of them.

Without having a moment to look at them specifically,

that's all I have.

**THE COURT:**  Thank you.

**MR. LEWIS:**  Thank you, Your Honor.

**THE COURT:**  All right.  Let's go on to number 3.

**MR. VERHOEVEN:**  I'll be really short on this one, Your

Honor.

**THE COURT:**  Okay.

**MR. VERHOEVEN:**  This is the '613 patent.  And the

phrase at issue is "receiving, by a user equipment, a service

sent by the base station."

Actually using the other side's slides, Your Honor.

Should probably use mine.

1     But the issue is, what does "receiving a service" mean?

2     And can we switch it?  Yeah, we got it.

3     And so let me get on the right one.  I'll just go off the

4  screen.

5     Here it is, right there.  That's the phrase in the long,

6  long claim.

7     I want to note one thing, Your Honor, that's really

8  important about this patent for today but also throughout the

9  case.

10     Look at the way this claim is written.  And all the claims

11  are written like this.  They're accusing a mobile phone of

12  infringement based on this claim.

13     The only thing that happens on the mobile phone on this

14  claim are the things in yellow.  Receiving a service sent by a

15  base station and receiving position information of the specific

16  radio frames, et cetera.

17     All the stuff about how it's organized and how it's --

18  what the radio frames are and R number of subframes, all that

19  stuff is not done by the -- is not -- in the claim itself, is

20  not done by the handset.

21     So it's like you have a -- you have cable.  And you

22  subscribe to -- you don't subscribe to HBO because it's too

23  expensive, but you subscribe to the regular stuff.  You still

24  receive all of the HBO information.  But do you receive the

25  service?  No.

1    You know, and would it be fair to say you infringe because

2    somebody spams you with an -- offering an infringing service

3    and you don't use it?  That's what we have with this patent.

4    For the vast majority of the accused devices, they simply

5    don't use the service.  And that's the reason we have, I admit,

6    kind of weird proposed claim construction.  We're trying to get

7    at that notion.

8    And I kind of think the plain language should be fine for

9    that.  What I want to make clear -- and I've read the other

10   side's briefs, and I think they have the same interpretation I

11   do, so maybe we're fine on this.

12   But what I want to make clear is, the codes around the

13   content, for example, the timing codes, the codes around the

14   package of the content, those are not the service.  The service

15   is the content.  We all know and we talk about TV, what's the

16   content.  It's the actual video that you see.

17   And that's the only thing I want to make clear here.  And

18   if you look at -- this is slide 8.  I'm looking at their

19   briefs.  And I hope there's no dispute on this, because in

20   their opening brief, at page 12, 7 through 9, they refer to the

21   position information, the timing information.  And they say

22   this position information is about the service, not the service

23   itself.

24   That's exactly what we want the understanding to be.  And

25   in their reply brief at 8, lines 22 through 26, the language

```
 1    that it does quote regarding the UE obtaining service data,

 2    suggested the term receiving a service encompassed receiving

 3    data about the service such as information related to the

 4    service.

 5         And they say that's inappropriate.  We agree.  What we

 6    want to make clear is the information that's not in the content

 7    cannot be included in the service.  So if you get pinged and

 8    there's a code, and some low level on the computer opens a

 9    package, that not receiving the service.  Receiving the service

10    is watching the video, or whatever the content is that's being

11    delivered, is actually implemented.

12         And if that's clear, we have agreement on that, then we

13    can just go with plain, ordinary meaning.

14              THE COURT:  Okay.

15              MR. McBRIDE:  Your Honor, unfortunately, we don't have

16    agreement on that.  But I think I can be pretty brief.

17         You know, I think maybe the most important thing is

18    perhaps counsel misread the argument that they put up in slide

19    8.

20         Your Honor, just to jump into this, slide 28, the

21    patent -- the specification of the patent explains the service

22    system divided into these two categories, unicast and

23    multimedia broadcast multicast services.

24         And it says that the unicast service refers to point to

25    point, where you have one person, and the other is one -- one
```

1   sender sending to multiple people.  There's no limitation on

2   what that data is.

3       Now, we agree, and as we said in our brief, we're not

4   saying that the position information is the service.  But

5   Samsung's trying to -- the expression my grandfather used was,

6   give you a pig in a poke.

7       They're trying to say, well, it's not an index, it's not a

8   representation.  It has to be the value.

9       I don't know what any of that means.  And I think, as

10  counsel suggested, there is some weirdness here.  They can't

11  tell us.  It can't be a code, it can't be a something.  I don't

12  know what that is.

13      The patent is pretty clear that a service is data sent

14  from one -- from one sender to a receiver or multiple

15  receivers.  And there's just no basis to limit a service to the

16  value of a service or to the content of say, you know, HBO.

17  There's not basis in the spec or in the claims for that.

18          **THE COURT:**  But you don't walk away from the

19  statements that are made in your briefs?

20          **MR. McBRIDE:**  No, no.  But I do think -- we agree that

21  position information is not -- is not the -- is not the

22  service.

23      But the second point that counsel put on their slide 8, we

24  were saying that -- that the specification actually says that

25  there could be service information and that that would be part

1    of the service.  It's not just, say, you know, the pictures

2    that make up the Super Bowl.  It's a lot of stuff that makes up

3    the service.

4         That's all, Your Honor.

5              THE COURT:  All right.  Thank you.

6         All right.  Number 4.

7              MR. VERHOEVEN:  Appear to be on the losing side of all

8    these tentative rulings, Your Honor.

9              THE COURT:  I think the poles shift as you get further

10   to the west.

11             MR. VERHOEVEN:  Let's see, which one are we on?

12        All right.  So, Your Honor's, ruling on this phrase, "a

13   first P-TMSI in an access message" is ordinary meaning, on this

14   one I think we do need clarification and a construction

15   because -- well, I'll explain why.

16        First of all, as Your Honor will recall from the tutorial,

17   this is talking about moving from an LTE network to a 3G

18   network.  And so the user sends the signal; goes to the core

19   network gateway; brings back -- this is LTE, so it brings back

20   an MME ID.

21        And then the user goes to the legacy network, which uses

22   different codes, and sends up its address package.  And base

23   station opens it up, gets a P-TMSI, which is familiar to the 3G

24   station.  And then it opens that, and these instructions are

25   routed back to the legacy or the LTE MME1.  That, in a

1   nutshell, is what the patent is saying is new.

2        So here's the phrase in context of the claim.  And the

3   claim talks about a receiver obtains a temporary I.D.  And then

4   the MME information, which is the important information for the

5   temporary ID, is an MME information adding module.  And it adds

6   the MME information to the temporary ID.

7        And the temporary ID is this P-TMSI.  And remember from

8   the tutorial we showed the code going into the larger P-TMSI

9   thing.  That's what that is.  And it says it's in an access

10  message.

11       So here are the issues with this.  First, do the claims

12  and specification distinguish between a first and second TSMI?

13  I think it's undisputed the answer is yes.

14       Second question, do the claims in the specification

15  identify a location for the first TSMI?  And that's what we

16  have in our briefs.  But I think we can state it more

17  specifically.  It's, do the claims and specification show that

18  it can't be in the NAS?  And I'll get to that, the NAS.

19       And the dispute here, to be really specific, is that the

20  plaintiff says that this first P-TMSI -- not the second, but

21  first one, and you can only have only one, that that can be in

22  the NAS.

23       So let's go to the -- explain what we're talking about.

24  So in the specification, Figure 9, this is an access message

25  called an RRC message.  So it contains all the stuff on the

1   inside.  And this is undisputed.

2       The box around -- the red box there is, as described, the

3   P-TMSI message.  That's the first P-TMSI message.

4       Then we have this NAS message.  That's a different part of

5   the access message.  It's different codes, different part.

6       And within that, the patent says you can have a second

7   TSMI, right there.  And you can see it indicated in there, the

8   actual specification.  So that's what we're talking about.

9       So the dispute is, can the first TSMI, the one that is

10  shown in red, be the only P-TMSI and be located in the NAS

11  message?  And we think the answer is no, it can't.  And let me

12  explain why.

13      The specification -- this is column 11, line 17 through

14  33 -- provides some guidance on this.  It says the P-TMSI

15  information is placed in the access message, RRC message.  And

16  then it says, in addition, the NAS message in the access

17  message carries P-TMSI information.  This is the first and

18  second P-TMSIs.  That is two P-TMSIs.  The -- then it goes on

19  to say what the two P-TMSIs do.

20      So with respect to the first P-TMSI, it says a RAN node

21  such as -- and it lists a couple of base station nodes -- finds

22  the corresponding SGSN -- and that's the core gateway; you have

23  those different core gateways -- according to the NRI.  And

24  that's information in the P-TMSI.

25      So the RAN node base station finds the corresponding --

1  the SGSN that corresponds to the NRI information which is in

2  the first P-TMSI.  It uses that -- it opens up the package and

3  uses that information in the first P-TMSI in order to route the

4  communication to the appropriate SGSN.  That's what that's

5  saying.

6      Now, let's look at what the second P-TMSI does.  The RAN

7  node, such as just the base station, does not parse the P-TMSI

8  information in the NAS message.  It does not open the NAS

9  message.  That's what it means.

10     So the -- if the P-TMSI is in the NAS message, the

11 invention won't work.  It has to be a P-TMSI that can be

12 opened.

13     And why do we have a NAS message, and why would it have a

14 P-TMSI in it?  Well, I think I have -- here you go.  Slide 17

15 answers that question.  And this is column 10, line 65 through

16 67.

17     So the address message goes up.  It's at the base station.

18 And it says, if no corresponding SGSN exists -- so it's opened

19 the envelope, it's pulled out the NRI from the P-TMSI the

20 identification, and it doesn't match anything.  So it says, if

21 no corresponding SGSN exists, the old network selects a new

22 SGSN.  Just picks one.  And then the UE sends the P-TMSI

23 information carried in the NAS message to the new SGSN.  And

24 then that SGSN opens the NAS message.

25     So the NAS message is there if the first P-TMSI doesn't

work.  So it's a backup.  But the first base station doesn't

open that ever.  It's -- it gets routed to a different one.

     And so this brings me back to the claim.  So now I'm back

on the claim, page 14.  The phrase is "a first P-TMSI in an

access message."  And our argument, Your Honor, is that can't

be located in the NAS portion of that access message.  If it

is, it would render this invention inoperable.

     There's no description of how you would do this invention

in a specification if the P-TMSI was in the NAS message.  And

you can't interpret claims so that they would be inoperable.

Or you shouldn't.  That would render the patent invalid, if it

was inoperable.

     So what we're saying is that claim 12, standing alone,

given the specification, that that first P-TMSI -- there can be

other P-TMSIs in claim 12.  It's a comprising claim.  But the

first one cannot be in the NAS message.  It has to be somewhere

else in that access message.

     And, you know, the words you use to say that, we're

flexible.  You know, we tried to come up with the words to say

that.  It's kind of a complicated concept.  But that's how this

should be interpreted, we argue.

     Now, the defendants will argue that the dependent claims

show that the -- well, first, they argue that it doesn't say it

needs to be -- it can't be in the NAS.  So we're limiting it.

And I've explained why I think that it's appropriate.

1    Another argument they make is what they call claim

2  differentiation.  And they cite to a couple of dependent

3  claims.  And let's just go through those.

4    First, let's start with claim 17.  It adds "wherein the

5  MME information adding module is further configured to add the

6  MME information to a second P-TMSI and a routing area identity

7  of the NAS message."

8    So this one is claiming the second P-TMSI in the NAS

9  message.  And they're saying, well, because it's saying that,

10  claim 12 has to encompass that.

11    And what we're saying is, no, claim 12 by itself needs to

12  be interpreted in an operable manner.  And it's a comprising

13  claim.  So you could have a whole bunch of additional

14  restrictions on it because it's a comprising claim.

15    So you can add -- so what 17 is doing is, it's actually

16  narrowing claim 12 by requiring a second TSMI that's in the NAS

17  message.  You could have a second TSMI somewhere else under

18  claim 12, but the first TSMI has to be not in the NAS.

19    So that doesn't show that claim 12 needs to be interpreted

20  such that the first TSMI could be in the NAS message.  It

21  doesn't.  And the same thing with dependent claim 16.

22    I have a bunch more slides, but I don't have a bunch more

23  time.  So unless Your Honor has any questions, I'll sit down.

24        **THE COURT:**  Okay.  Thank you.

25      **MR. McBRIDE:**  Your Honor, I think Samsung is trying to

```
 1   make this far more complicated than it needs to be.  I think
 2   it's just one legal error after another.
 3        They're trying to limit the claim to one embodiment
 4   disclosed in the specification.  They're trying to import
 5   limitations from dependent claims back up into independent
 6   claims.  And I think all you really need to do is -- I'm going
 7   to skip through a bunch of stuff here -- is to look at the
 8   claim.
 9        Claims 1 and 12 are the asserted independent claims.  And
10   they say that you need to add -- the UE needs to add MME
11   information to a first P-TMSI.
12        The case law is clear.  First, second, those don't refer
13   to locations.  They're just used to distinguish between
14   different things.
15        So we're not saying that the first is the second.  We're
16   saying that there is a first, and there may be dependent claims
17   that require a second.  But for claim 12, the claim that's
18   asserted, all you need is one P-TSMI.  If we look in an access
19   message and we find a P-TMSI, then, you know, you've satisfied
20   that element of the claim.
21        I show here on slide 38 there's an embodiment that talks
22   about how you can have one P-TMSI in an access message.  The
23   figure that they're enamored of, Figure 9, shows two P-TMSIs.
24        Now I'm on slide 40, Your Honor.  You can have a lot of
25   P-TMSIs.  They can be in any different part of the message, but
```

1  I've highlighted in orange here.  Any one of these things

2  highlighted in orange could be considered a first P-TMSI and

3  would satisfy -- satisfy this element of claim 12 that we're

4  discussing.

5      Let me just flip through here.  As I said, Your Honor, I

6  think Samsung is making a number of errors.  And I think -- and

7  I think they may even have the arguments backwards a little.

8      We're not arguing that the dependent claims or claim

9  differentiation means that because the second P-TMSI can be in

10  a NAS, the first P-TMSI must also be able to be in a NAS.  I

11  think that was actually an argument they made that we're

12  rejecting.

13      Our point is simply, the claim says you can have a first

14  P-TMSI in an access message.  That P-TMSI can be anywhere.

15      They had some arguments about how maybe this would render

16  the invention inoperable.  That's simply not the case, Your

17  Honor.  I mean, the best way to see that is to look at our

18  infringement contentions where we lay out a theory just along

19  these lines.  I won't get into that.  But I think that's --

20  that's all I have.

21          **THE COURT:**  Great.  Thank you.

22          **MR. VERHOEVEN:**  Okay.  Last one for the defense for

23  Huawei's patents is the -- here we go -- cell reselection.

24  This is the dedicated priority list, Your Honor.

25          **THE COURT:**  Yes.

1          **MR. VERHOEVEN:**  Can we go to slide 7, please.

2      So let me start by saying that the Court has proposed a

3  construction for the phrase "an isolation dedicated priority

4  list."

5      We're okay with that phrase "an isolation" as long as

6  there's no dispute as that when you plug it into all the

7  dependent claims there's a requirement that that priority list

8  includes at least two radio access technologies.

9      So if you look at claim 1, Your Honor, you'll see

10  there's -- there's the phrase to be construed.  And then you

11  add -- color code this.  You can see they're referring to two

12  different radio access technologies.

13      And what our argument is, is that "dedicated priority

14  list" in this claim, because of all these put together, must

15  have at least two radio access technologies.

16      So if you take the words "dedicated priority list" out in

17  isolation, and don't put it in the claim, we agree with Your

18  Honor's construction.  But if you plug it into the claim and

19  read it in the context of the claim, the claim as a whole will

20  require that that priority list has at least two radio access

21  technologies.

22      So it talks about a dedicated priority list, then the

23  dedicated priority list from a long-term evolution LTE system.

24  The dedicated priority list, that's the same list, that

25  includes the nonLTE system.

1          So one priority list has two radio access technologies in

2     it.  And that's -- as long as that's clear and there's no

3     dispute about that we're fine with Your Honor's proposed

4     construction.

5          But if they're going to say that Your Honor's

6     interpretation makes it such that this dedicated priority list

7     could not even include -- or could exist with just one radio

8     access technology, then we have a dispute about the meanings of

9     the claim.

10              THE COURT:  All right.

11              MS. YANG:  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MS. YANG:  I think where we should begin is where

14    counsel just left off, where I think counsel is misreading the

15    claim language.

16         If we can turn to the claim language, it does not state

17    anywhere that the dedicated priority list itself must have at

18    least two RATs, an LTE and a nonLTE.

19         If you look at the claim, what it's talking about is

20    you're saying the UE is in an LTE system.  So that's the

21    context of the claim, sitting in an LTE system.  It gets a

22    dedicated priority list.  And then if it happens to go to a

23    nonLTE system it takes that list with it, as we discussed at

24    the tech tutorial last week.

25         So the concept of the dedicated priority list is separate

```
 1   from this concept of where you would use it and how you would
 2   use it.
 3        And so I think there's just maybe a fundamental misreading
 4   of the claims and what a dedicated priority list is as opposed
 5   to what is this, you know, LTE versus nonLTE context that it's
 6   used in these claims.
 7        So going to the Court's tentative construction, starting
 8   there, Huawei's position continues to be that no construction
 9   is necessary.  But if the Court wishes to construe the claim,
10   we're okay with most of the proposed construction.
11        We agree that a priority list is a list for a specific
12   terminal.  I don't think there's actually a dispute between the
13   parties on that.
14        And we agree with the Court.  We think the Court is
15   correct that that dedicated priority list can include different
16   frequencies or it could have different radio access
17   technologies or whatever, but it's not limited to different
18   radio access technologies the way Samsung's proposed
19   construction would have.
20        And just as one example of, you know, why we agree, it's
21   this disclosure in the specification that discusses the
22   different priority levels.  But I'm not going to belabor that
23   because we do agree with Your Honor.
24        Unless you have questions specifically related to that
25   portion of the construction, I'm just going to move on.
```

1          **THE COURT:**  Go ahead.

2          **MS. YANG:**  Okay.  So, all right.  The portion of the

3     proposed construction that we believe is not -- is not correct

4     and is not supported by the specification is this listed in

5     order of priority portion.

6          And so specifically -- let me get to the right slide.

7          So this is the specific limitation that Samsung has

8     proposed to read in.  And, in fact, the specification does not

9     ever require that the priorities be listed in order of

10    priority.

11         What you have in the specification is over and over again

12    there are disclosures that say, well, the dedicated priority

13    list that's delivered may indicate a certain priority.

14         Here, the one I pulled up for example, is GERAN has

15    priority over UMTS, has priority over LTE.  There's a number of

16    other cites.  We've just listed them for reference.  But they

17    all use this language of "may indicate" or "indicate" is the

18    priority.

19         So the patent is not saying that that GERAN over UMTS over

20    LTE is what the dedicated priority list actually looks like.

21    What it's saying is that the takeaway or the conclusion you

22    receive when you look at that dedicated priority list is you

23    understand, based on that, that this is the priority that is to

24    be followed, and so however it's actually implemented.

25         So it's -- you know, you could reach the same conclusion

1    in differently ways.  And it's kind of like, just to get away

2    from, kind of, the -- the telecommunication context into

3    something that makes a little more sense, you know, say that

4    you've got a whole bunch of people, you've got -- they're in

5    some sort of race, right.  Someone wins gold, bronze, silver.

6    But, you know, later on there's some list of the winners.  And

7    they're just listed alphabetically.

8         So maybe the first person alphabetically actually won

9    bronze; the second person alphabetically actually won gold; the

10   third person alphabetically actually won silver.  But when one

11   looks at that list, they understand that, in reality, the

12   person who won gold, you know, is number one, right, and the

13   person who won silver is number two, even if they're not listed

14   in that order.

15        And so coming back to this example it's a similar thing.

16   The dedicated priority list is not limited by the specification

17   to look a certain way.

18        The priorities don't have to be listed in any particular

19   order in the specification.  It's just when you understand it,

20   when you look at it, then you understand what it means.  And

21   that's what this "indicate what the priority is" or "may

22   indicate what the priority is" refers to.

23        And one other --

24              THE COURT:  What does "dedicated" mean?

25              MS. YANG:  So dedicated is the portion -- that was

where we were discussing the difference between, like, a
dedicated priority list and a public priority list.

So dedicated is where the priority list goes to a specific
user equipment or a specific mobile device or something.  So
like, you know, if I'm -- if I'm a UE and you're a UE, we would
each get our own dedicated list.

**THE COURT:**  Okay.

**MS. YANG:**  And so going back to where I was before,
basically if you -- if you add this limitation of "listed in
order of priority" to the construction for this term, what you
end up is, you would end up reading out these disclosures that
just say that the priority is indicated.

And, in fact, this specification says, as Your Honor has
noted, that, a priority may refer to different things like
frequency or RATs.  And it goes on to say that the priority
list may include the priority levels.

And this is just kind of a common sense argument also, but
if the priority list was already listed in order of priority,
then there would be no reason to have priority levels
associated with the frequencies or RATs.  You would just read
the list and you would know what it is.

And so, finally, this is -- just a point on extrinsic
evidence that Samsung had listed as part of this claim
construction exercise.  They pointed to a couple -- to some
3GPP documents, version 8.5.0 and earlier, so we've just pulled

that out.

And in that extrinsic evidence, as well, it's clear that the priorities just need to be identified with an integer from 0 to 7.  There's no requirement that it be listed in order from 0 to 7.  And there's an earlier version that has that same thing, just has to be identified by an integer from 0 to 7.

So Huawei's view is we would be fine with the list for the specific terminal that includes different frequencies, frequency bands or radio access technologies.  We think that listed in order of priority is actually contrary to the specification and would end up reading out a number of disclosures from the specification.

If Your Honor believes that it's important to have some recognition of the priority order, we could work on language. But, you know, I think we would be okay with something like that the priority is identified or the priority order is identified.  You know, we're okay with that concept.  We think that is correct, that there's a concept of a priority that's associated with the different items in the list, but just that it's incorrect to require that they be listed in order of priority.

**THE COURT:**  Okay.  Thank you.

**MR. VERHOEVEN:**  Your Honor, I thought we might have agreement.  I wasn't sure, so I didn't present a full-blown argument.  Can I have just a brief response?

1          **THE COURT:**  Yes, go ahead.

2          **MR. VERHOEVEN:**  Thank you.

3      Can we go to slide 4.

4      Once again, the interpretation of putting that in the

5  claim, even though the claim talks about the priority list --

6  every independent claim talks about the priority list having

7  these two different RATs, they're interpreting it as not

8  requiring two different radio access technologies.  And that

9  reads out the invention.

10     So going back to the tutorial -- going back, these are

11  slides from the tutorial.  The whole point of this invention is

12  you just tell reselection when the mobile device moves from one

13  radio access technology to another.

14     And the whole point of the invention is that you get a

15  dedicated -- the innovation is you get a dedicated listing that

16  prioritizes the different radio access technologies, so that it

17  goes to the phone, the phone has instructions, if it goes to a

18  different radio access technology, on what it should do.

19     And so the person goes to a different radio access

20  technology.  This is the GERAN system.  That's a TDMA-based

21  system.  And the person tries to send a signal out, and they

22  compare that to their priority list.  And they compare it --

23  then you remember they -- so they go to GERAN first because

24  GERAN is on the priority list first.

25     So that's why they pick GERAN.  Then they do that thing we

1   talked about in the tutorial to compare the signal requirements

2   are met.  And they're not.

3       So then what does the phone do?  It goes to the next radio

4   access technology on its priority list and does the same thing.

5   Measures the signal to see if the criteria is met.  No?  Then

6   it goes to the next radio access technology on its list.

7       So it's an iterative process where the cell phone has a --

8   has instructions to see -- to -- you know.  And so the most

9   likely one they put first.  The second most likely they put

10  second.  And the phone just pings until it gets the right one.

11  And that's the whole point of the invention.

12      So to construe the claim as not requiring more than one

13  radio access technology in the radio access technology list or

14  the dedicated priority list would be to destroy what they're

15  claiming as their invention.

16      So we've got to take a step back and look at the big

17  picture here.  I already -- go to slide 10.

18      I already made my argument based on this, but just to

19  refresh, claim construction you look at the text of the claims

20  first.  Every independent claim refers to two different radio

21  access technologies and one dedicated priority list.

22          THE COURT:  You did make this argument.

23          MR. VERHOEVEN:  Yeah.

24      And then, really briefly, every embodiment in the

25  specification, Your Honor, every single one -- and I've got

them on the screen, talks about a priority list of different

radio access technologies.

    And they put up one that says the word "may," but there's

a whole bunch of them that don't say the word "may."  And you

can see there's more here.

    And, as Your Honor knows, if a patent repeatedly and

consistently characterizes a claim a particular way in the

specification, it's proper to construe that claim in accordance

with that description.

    And I think that's all I have, Your Honor.

        **THE COURT:**  All right.  Thank you.

    Okay.  We're going to go on to the Samsung patents.

Before we do that, I think we'll take a 5- to 10-minute break.

Whenever the court reporter is ready to go, we'll be going

again.

    (Recess taken from 9:59 to 10:06 a.m.)

        **THE COURT:**  All right.  So now we're into Samsung's

patents.  And let's go to the first one or the sixth one,

whichever you want to call it.

        **MR. LEWIS:**  Your Honor, we'll start with the '130.

        **THE COURT:**  Okay.

        **MR. LEWIS:**  Just really fast.

    We have been talking to Samsung.  I think fundamentally

the parties are in agreement what this means.  A middle symbol

is sort of meaningless when you have an odd number of symbols.

1    That's easy.  The issue was, well, what if there's an even?  I

2    think the parties agree that an even number of symbols has a

3    middle.

4        There's been a problem with Samsung actually trying to

5    agree to language.  We did some negotiating.  We proposed

6    what's on this slide to just say both slots with an odd or even

7    number of symbols have a middle symbol in the slot.

8        Samsung wanted to put in some examples.  They put in some

9    examples that I believe track their infringement case.  We

10   said, well, we prefer no examples, and we'd like this.  And

11   they said, well, we want examples.  And I said, well, fine,

12   let's put in the examples from a piece of prior art that we

13   like, which is why we want this construction too.  They said,

14   oh, no, no, we only want ours.  And, therefore, we had no

15   agreement.

16       So generally, you know, we think middle symbol in the slot

17   really -- you know, the parties -- neither party is going to be

18   able to run away from that because of the position we've taken

19   in the briefs, that an even number has a middle.

20       The issue I'm concerned about is the jury.  Because if we

21   don't give them any construction and we just say no

22   construction, what are they going to do on their own?

23       I put four children on this slide.  I have four children.

24   I'm not sure which one of mine is green.  But the question is,

25   with four children do I have a middle child?

1    And I picture that juror hearing all the testimony about a

2 middle thinking, you know, an even number doesn't have a

3 middle, four children, there's no middle child, and deciding

4 that our -- you know, that our invalidity case didn't show this

5 piece of art with an even number of symbols was the same as the

6 claim.

7    And so what we would like is a clarification for the jury

8 so that that juror understands what everybody, I think, agrees,

9 that even when you have an even number you have a middle.  And

10 that's what we ask Your Honor to do.

11    **THE COURT:**  Okay.

12    **MR. WHITEHURST:**  Your Honor, I'm not -- Alan

13 Whitehurst for Samsung.

14    I'm not going to spend a lot of time on this claim term

15 either.  We have no objection to the Court's tentative ruling.

16 I think this claim term is a perfect example of you just know

17 it when you see it.

18    As Mr. Lewis mentioned, we did try to reach a compromise.

19 And there's more to the story than what he told you, but the

20 long and short of it is it's harder than you think to come up

21 with a construction.  And, as we said in our brief time and

22 time again, you can't do any better than the claim language

23 itself.

24    Same way in my family, except I have three.  We have a

25 middle child.  But when they pile into the car nobody wants the

1  middle seat.

2      We use the analogy of airline seats; there's more than one

3  middle seat.  But people know what a middle seat is.  Same

4  thing for at a movie theater.

5      And that's why we agree with your tentative ruling and

6  don't believe any construction is necessary.  It's just one of

7  those terms that you know it when you see it.

8          **THE COURT:**  All right.  On to number two.

9          **MR. WHITEHURST:**  I believe I can stay at the podium

10 because I will be addressing that term next.

11     And if we could please put up slide 40.  The problem that

12 we have with the Court's tentative ruling for the '726 patent

13 is, it's not reflecting the ordinary meaning of the claim

14 terms.

15     When you look at the claim language on the left, when you

16 look at what it says, it's talking about allocating an ID using

17 these three variables.

18     There is no way to get to Huawei's construction from the

19 ordinary meaning without reading in limitations from the

20 specification.  And we believe that's wrong here for several

21 reasons.

22     If we go to the next slide, you'll see that the Federal

23 Circuit has told us time and time again that you don't read in

24 limitations from the specification unless one of two things

25 occurs: lexicography or disavowal.

1    And these are high bars.  The federal Circuit says you

2  don't depart from the ordinary meaning unless it is clear,

3  unmistakable from the patent that they intended to depart from

4  the ordinary meaning for something else.  And that just doesn't

5  happen in the '726 patent.  In fact, it's the opposite.

6    When we look at the '726 patent, we're going to see that

7  they say Equation 3 is an example.  You don't have to use

8  Equation 3.

9    And that's why we have dependent claims, like claim 4,

10  that are directed to Equation 3, or something like it.

11    **THE COURT:**  So are there other examples that actually

12  could be used to calculate?

13    **MR. WHITEHURST:**  If we go to the next slide, yes.

14    I know that there's a lot in Huawei's briefs about

15  disparaging the other embodiments.  We're not looking at

16  embodiments 1, 3 or 4.

17    But when you look at embodiment 2, it's broader than just

18  Equation 3.  It's talking about Equation 2.  It says you can

19  use Equation 2, a function of i, n, and t, to calculate this

20  ID.  It's not until you get later in embodiment 2 that you get

21  to Equation 3.

22    And as I explained during the tutorial, I mean, there are

23  other ways you could do it with the ceiling function, the floor

24  functions.  And these would have been understood by one skilled

25  in the art.

1       But when you tell those skilled in the art, calculate it

2  using i, n, and t, that was the invention.  You are calculating

3  it using i, n, and t.  Nothing more needed to be said.

4       Now, when patents are written for techies you can provide

5  additional examples.  And that's exactly what occurred in

6  embodiment 2.

7       They started out embodiment 2 saying calculate the ID

8  using i, n, and t.  That was it.  They didn't need to say

9  anything more.  That's what you see in equation 2.

10      But they went on.  They gave those skilled in the art

11  additional knowledge.  And they gave them an additional

12  example, which is the Equation 3.

13      I want to dig into the specification because I really do

14  think it's key to this question whether it's proper to take the

15  ordinary meaning, forget about the ordinary meaning and read in

16  limitations.

17      If we can go to the next slide, please.

18      You'll see that they say Equation 2 calculates an ID.  One

19  reading this patent is put on notice that their invention was

20  calculating the ID using i, n, and t.  That's it.  You don't

21  have to go beyond that, but they did.

22      But just because they added additional information to the

23  patent, because they educated those skilled in the art to

24  provide an additional example, doesn't mean they should pay a

25  price now that they lose the benefit of their original

 1   invention, which was Equation 2, which was calculating use i,

 2   n, and t.

 3       And you can see here on the highlighted language, in

 4   yellow, that this was their invention.  They're not saying, oh,

 5   here's Equation 2, but we're going to get to the calculation

 6   part later.  They say the exact opposite.  They say Equation 2

 7   is doing the calculating.

 8       Now, if we go to the next screen, this gets back to the

 9   Federal Circuit case law that I previously mentioned.

10       Did this patent cross that bar, that high bar that they

11   acted as a lexicographer or disavowal?  You will see patents

12   where they say, "You shall use Equation 3."  That is not this

13   case.

14       If you look here, not only do they not cross over the bar

15   but they went the exact opposite direction.  They've got

16   language here that says, for example, "can be."

17       And, yes, they provided additional information.  But now

18   you're punishing the inventors for providing additional

19   information and taking away their original invention, which was

20   the i, n, and t.

21       Now, if we go to the next slide, I mean, this is the

22   point.  When you put it side-by-side, the claims that we're

23   looking at, claim 1 -- and I forget the other claim number, but

24   when we look at the independent claims, they're directed to

25   Equation 2.

1    Yes, the patent has additional dependent claims that are

2    directed to Equation 3, but they're just additional proof that

3    Equation 3 should not be read into the broader independent

4    claims.

5    If we can go to the next slide, please.

6    Now, in their briefs Huawei does rely on undisclosed

7    extrinsic evidence.  And, as you know, we object to that

8    evidence because it was not previously disclosed to us.  And we

9    believe it was improperly used and should be ignored.

10   But if you look at the extrinsic evidence that they're

11   relying on, their expert is saying that only Equation 3

12   calculates an ID.

13   Well, this flies in the face of the patent that we just

14   looked at.  They said Equation 2 calculates the ID.  And that's

15   what you're doing.  You're using i, n, and t to calculate the

16   ID.

17   And if we go to the next screen, this is consistent with

18   what the patent says.  It says Equation 2 calculates an ID.

19   And if we look at the ordinary meaning, which we're

20   supposed to preserve in the claim, it's saying that

21   calculate -- if we can go to the next slide, please -- is to

22   determine by mathematical process.

23   And that's what the claim was directed to, to determine by

24   a mathematical process the HARQ ID using i, n, and t.

25   They provide an additional example, but their invention,

1    what we see in the independent claim, is broader.

2        I mean, we see this all the time with a genus and a

3    species.  You have the broader genus in the independent claim

4    which is the broader concept of the calculating the ID using

5    these three variables.  And then we see more of the specifics

6    in the dependent claim.

7        Now I want to turn to a slightly different issue, but it's

8    further proof of why Huawei's claim construction is wrong.  And

9    I believe we should now be on slide -- I have one additional

10   slide I want to provide the Court.  This is on slide 49.

11       We disagree that Equation 3 is the only embodiment.  As

12   I've just said, we believe Equation 2 is the broader

13   embodiment.  Equation 3 is an additional example.

14       But even if Huawei was correct that Equation 3 was the

15   only embodiment, the Federal Circuit has still said, even if

16   Equation 3 is the only embodiment, you still don't import that

17   limitation into the claims unless there was clear disavowal and

18   the patent says that they are departing from the ordinary

19   meaning.

20       In fact, I heard Huawei's counsel earlier this morning

21   argue for the '166 patent that even if it's the only

22   embodiment, you don't drag it into the claims.  And that would

23   apply here for the '726 patent.

24       Now, if we turn to slide 50, I want to go through the

25   dependent claims to just show additional reasons why Huawei's

1    construction is wrong.

2         Their construction not only renders the dependent claim

3    superfluous, but it even goes farther.  It reaches this bizarre

4    result where the independent claim would be narrower than the

5    dependent claim.

6         And hopefully you will bear with me.  I'll try to go

7    through this quickly.  It does get a little complicated, but I

8    want to show how this all works.

9         If we could go to slide 51, please.

10        You'll see on the left the independent claim.  You'll see

11   on the right the dependent claim.  Highlighted on the left is

12   the claim language -- part of the claim language at issue,

13   "calculating a HARQ process ID identifier."

14        And this is the limitation that Huawei wants to import

15   into the claim.  They want to disregard the ordinary meaning

16   and import this claim limitation in.

17        Well, if you see, they are actually importing Equation 3

18   using the MOD function, which we discussed during the tutorial,

19   and the ceiling function.

20        Well, if you look at the dependent claim, you'll see that

21   there's "s modulo n."  That's the same thing as MOD[s,n].

22        So these are limitations that are already in the dependent

23   claim.  If Samsung had intended for these limitations to be in

24   the independent claim, they certainly could have included them.

25        And then you see that they're importing this limitation,

1   s ceiling[t/i].

2       Well, when you look at the dependent claim, it also

3   mentions S.  But it's silent about whether you use the ceiling

4   or the floor, rounding up some other way to get to this whole

5   number, this integer S.

6       But if we go to the next slide, you'll see that the

7   ceiling function is not what's important.

8       When you look at dependent claim 4, you could use ceiling,

9   you could use the floor, you could round up.  The whole point

10  is that you're getting this whole number integer S.  And that's

11  why dependent claim 4 is silent about whether you use the

12  ceiling function or not.

13      If we could go to the next slide, slide 53.  If you go

14  back to the dependent claim 4, you'll see exactly what I'm

15  talking about here.  S is an integer derived from T divided by

16  I.  But the claim is silent whether you use the ceiling

17  function, the floor function or something else.  It just says

18  that you're getting this integer S.

19      So to bring this point full circle, if we go to the next

20  slide, you'll see that if Huawei's construction is inserted

21  into claim 1, it's specifying getting this integer S using the

22  ceiling function while the dependent claim covers both the

23  ceiling and the floor functions.  The independent claim would

24  be narrower than the dependent claim.

25      So if we go to my final slide, you'll see here Huawei's

construction violates the doctrine of claim differentiation on two grounds.

Not only is it importing limitations from the dependent claim, but it's making the independent claim narrower than the dependent claim.  And that flies in the face of the cannons of claim construction where the independent claims are supposed to be broader.

**THE COURT:**  Thank you.

**MR. WHITEHURST:**  Thank you.

**MR. BETTINGER:**  Thank you, Your Honor.

Can we go to slide 71, please, of Huawei's presentation.

This is Equation 2, that counsel was referring to.  That's not an equation; that's a function.

As you can see at the top there, we've highlighted in yellow, F1 has three variables; "i" which is interval, "n" which is the number of persistent resources, and "t" which is time.

Doesn't tell you what to do with those variables.  Doesn't give you equation.  It's the equivalent of X, Y and Z.

If you want a calculation, you need to know, what do I do with those variables?  Do I multiply X times Y plus Z?  Do I divide?  What do I do?

That's what Equation 3 does.  It takes those three variables and tells you, here's how you do the calculation.

And that's why we focused on Equation 3, because that is

1    the only equation what -- this function here, identified in 2,

2    doesn't give you anything.  That's why you need Equation 3, to

3    say, hey, great, you've told me use these three variables.

4    What do I do with them?  And so there's that equation that's

5    set out, MOD[s,n].

6          And if we could go to slide 77, please.

7          Important to note in the patent, Your Honor, is that

8    MOD[s,n] is a calculation for a HARQ process index.  It's not

9    the identifier itself.  It's the index.

10         So modulus is the remainder of.  So if you put S over N,

11   divide it, and whatever your remainder is that's what a

12   MOD[s,n] would be.  And that gives you an index.  The patent

13   goes on to explain, you use that index to then identify or

14   relate to an HARQ ID itself.

15         So the index is a critical part.  But as the patent goes

16   on to explain, at slide -- if you could go to slide 80, please,

17   of our presentation, the UE calculates a HARQ process index

18   using Equation 3 to be applied to a HARQ packet using

19   Equation 3, and then checks that process identifier indicated

20   by the index.

21         So there's another step involved.  After you've calculated

22   the index with Equation 3, you then have to relate it back to

23   the HARQ ID.

24         And that's what Equation 3 explains.  Equation 2 doesn't.

25   It just identifies those variables.  That's the -- that is the

1    equation that's in the patent.  And that's the one Your Honor

2    has identified in the tentative.

3        If we could go to slide 82.  And the patent, at column 9,

4    4 through 10, and then again at 19 through 30, explains how

5    once you've calculated that HARQ index using Equation 3, how

6    you then relate it to the HARQ identifier.  And that's

7    explained.  So that's part of the process of calculating the

8    HARQ ID that's the subject of the claim construction.

9        Why do I mention that?  Because when you get to claim 4,

10   which counsel referred to, it's not asserted in this case.  And

11   there's a reason claim 4 is not asserted: because they

12   misclaimed it.

13       If we could go to slide 83.

14       It says, a HARQ process ID equals s modulo n.  But we know

15   that s modulo n would be the same as the remainder of s over n.

16   And we know from Equation 3 that that simply gives you an

17   index.  It does not provide you with the entire HARQ process

18   ID.  It only gives you that index.

19       So the reason this claim has not been asserted is it was

20   misclaimed.  That only provides you with a HARQ process

21   identifier.

22       Equation 3, that Your Honor has identified correctly,

23   says, hey, look, this is the equation for the identifier, the

24   index, and then you relate it back to an identifier.

25       And so with that, we believe that you're right, that is

```
 1   the only equation that's identified in the patent for
 2   calculating the HARQ process ID is Equation 3.
 3              THE COURT:  All right.
 4         MR. BETTINGER:  Thank you, Your Honor.
 5              THE COURT:  Thank you.
 6         MR. WHITEHURST:  If I may make one final point on
 7   this.
 8              THE COURT:  Go ahead, Mr. Whitehurst.
 9         MR. WHITEHURST:  If we could put slide 71 back up,
10   please.
11      We're getting into semantics here about whether Equation 2
12   calculates.  I mean, under the definition that we just saw,
13   this is calculating the HARQ process identifier based on i, n,
14   and t.
15      Now, the fact that they put a parentheses Equation 2,
16   you're punishing the inventors for coming up and saying that
17   this is how you get the HARQ process ID.
18      Their invention was getting the HARQ process ID using the
19   i, n, and t.  That was their invention.
20      Now we're getting into this argument about calculating
21   semantics so that we can drag in an additional limitation from
22   Equation 3.
23              THE COURT:  Well, how do you use it to calculate
24   anything?
25         MR. WHITEHURST:  Well, I think we're jumping ahead of
```

1    the --

2              **THE COURT:**  That may be right.

3              **MR. WHITEHURST:**  We are.

4         What you're hearing here is an enablement argument in

5    disguise.  But we don't use enablement arguments that they may

6    raise down the road to guide claim construction.

7         I mean, if they are going to argue that one skilled in the

8    art reading this patent couldn't figure out how to get the HARQ

9    process from i, n, and t, that's a completely separate

10   question.  That's something that we can decide down the road.

11        But just because you and I, standing here reading this

12   patent cold, may not know how to get the HARQ process from i,

13   n, and t is not the test.  It's whether one skilled in the art,

14   people that have studied this, have Ph.Ds, that know this

15   technology.

16        Neither you nor I are the ones to decide this question.

17   This is something that if they want to bring a 112 enablement

18   challenge, they should be free to.  But just because you and I

19   may not know how to get the ID from the i, n, and t doesn't

20   mean that we then drag in Equation 3.  And that's the point

21   that I want to make.

22        When we construe claims, we construe them in light of the

23   specification.  And the specification tells us that Equation 2

24   calculates the HARQ ID using i, n, and t.

25        Now, if Huawei's counsel wants to argue the patent doesn't

tell you how to do it, they couldn't figure out, that's an

enablement challenge.  But that's not something that we should

confuse with claim construction today.  And that's just the

final point that I wanted to make, Your Honor.

**THE COURT:**  Okay.  Thank you.

**MR. WHITEHURST:**  Thank you very much.

**THE COURT:**  All right.  Term 3.

**MR. ZADO:**  Good morning, Your Honor.

And so turning to the '825 patent, which relates to

initiating communications on a shared channel, the term is

"predetermined delay duration."

And I don't believe there's any dispute between the

parties that the claim itself, the claim language itself,

includes a restriction on where the delay duration has to come

from, much less it has to come from a node B.

In connection with what would be an ordinary meaning of

the word "predetermined," which is really the term we're

discussing here today, as reflected in the dictionary

definitions, the ordinary meaning is going to be determined

beforehand.  That's just commonly used.

What we're really -- for example, if you look in a

dictionary, you're not going to see "node B" in a dictionary

definition.

What we're really looking at here is, does the

specification impose a limitation on the claim such that you

1    have to read "predetermined" in a way that's not consistent

2    with that ordinary meaning.

3        And so I'm going to jump, right now, into the

4    specification.

5        So if we could jump to slide 68.

6        So, again, when we're interpreting the terms of the claim,

7    you have to start with the plain and ordinary meaning.  And the

8    standard for departing from that is a pretty exacting one.

9        And to be either a lexicographer or to have a clear

10   disavowal of claim scope, in particular the issue that we're

11   dealing with here is disavowal.  That's what Huawei is

12   asserting has taken place.

13       Disavowal requires that the specification makes clear that

14   the invention does not include a particular feature.  And, in

15   particular, the *Hill-Rom* case, which is referred to on this

16   slide, states that the way you make this intention clear is by

17   using words or expressions of manifest exclusion or

18   restriction.

19       And we'd submit that that simply isn't present in the '825

20   patent specification; that there's no intent to either define

21   or disavow the meaning of "predetermined."

22       So just looking generally at the summary of the invention,

23   we can see that the embodiments that are described there, they

24   simply refer to "a delay duration."  And then the UE waits for

25   that delay duration in order to assist in preventing collisions

1    here.  There's no reference to where the delay duration needs

2    to come from.  And the abstract is consistent with that.

3        Now, when the -- the specification actually talks about

4    the issue of collisions and how to address that, the

5    specification uses the term "predefined delay duration."

6        So "predefined" analogous to predetermined.  But, again,

7    there's no reference to a node B or the system information

8    coming from some other source.  I'm sorry, there's no reference

9    to the delay duration coming from some other source.

10       And so what we're left with is, Huawei's attempt to limit

11   "predetermined" is really based on this one passage in the

12   specification I'm going to focus on here.

13       And the passage on its face says it's an exemplary

14   embodiment.  More particularly, it's even further removed from

15   being an embodiment.  It's an exemplary implementation of an

16   exemplary embodiment.

17       And so in this exemplary implementation of an exemplary

18   embodiment, the '825 patent notes that, if the T value is set

19   to what it calls an excessively small value, this can cause

20   problems because the valid period would expire too early.  And,

21   more particularly, it takes a little while for the Node B,

22   after it receives the initial uplink message, to process that

23   message and include in the response message what's called "per

24   packet control information."

25       So one obvious way to avoid this problem is simply don't

1  have a delay duration that's excessively small.  And, in fact,

2  if you want to maximize the ability of preventing collisions,

3  in accordance with the '825 patent teachings, you don't want to

4  have this small T value.  Put another way, the longer the T

5  value, the more likely you are able to prevent collisions.

6       And I'll just jump back to slide 70 briefly.  I apologize.

7  This isn't highlighted here, Your Honor.

8       But the specification actually talks about that in the

9  context of the solutions that are provided for addressing the

10 issue of collision.

11      And the way the specification describes it is the goal of

12 decreasing the time in which operation error can occur.  So

13 that's -- you see -- for example, you see it in the fourth line

14 of this passage and also towards the bottom of the passage as

15 well.

16      And the way you accomplish that is you simply have a

17 longer T value so that you're not having collisions during that

18 period of time.

19      And I'm happy to walk you very quickly through the

20 animation you may recall, Your Honor, from the tutorial.

21      So in this version of the -- in this version that you can

22 see, we've waited a delay duration T.  And because the UE2 is

23 still in its delay duration, when the response message to the

24 first UE comes in, it's not monitoring the control channel, so

25 there's not going to be a collision.

1      Now, assume, for example, I cut the delay duration here in

2   half, so that the delay duration T for the second UE -- and

3   somewhere around the middle of the slide here.

4      If I have that kind of a short delay duration, what's

5   going to happen is that the UE is going to start monitoring

6   control channel again.  And when that first response message

7   that's first to go to the first UE comes in, we're having a

8   collision again.  So we're actually causing a problem that the

9   patent is teaching you to avoid.

10      So all this tells you is that what we're really talking

11   about here is an edge case.  So it's an exemplary

12   implementation of an exemplary embodiment where you're deciding

13   to wait for this excessively small predetermined delay

14   duration.

15      And so the '825 patent teaches that if you're going to do

16   this, one of the things that you can do is you can have

17   different T and P values on a cell-by-cell basis.

18   Specifically, it uses the word "can"; not "it must" or "it's

19   necessary."

20      And the reason you would do that is because then you can

21   take into account the processing capabilities of various Node

22   Bs.  So if you do make that decision, which you don't have to,

23   to determine the T and P values on a cell-by-cell basis, you

24   can do that by, for example, including that in the system

25   information that's sent from the Node B to the UE.

1    So to summarize, we're not seeing words of manifest

2    exclusion here.  What we're seeing is you have an exemplary

3    implementation, an exemplary embodiment, an edge case with an

4    excessively small T value.  And then in that case you can take

5    the steps of having the T and P values determined on a

6    cell-by-cell basis.  But if you don't, then there's no need to

7    include it in the system information.

8    Now, I focused on this particular passage because that

9    outlines what I think is the rationale behind Huawei's proposed

10   construction.

11   There are other embodiments discussed in the

12   specification, where it also refers to the T and P values being

13   included in the system information from the Node B.  I'm not

14   going to walk through those now, but I'll just represent, and

15   you can look in our papers, that all of those are specifically

16   referred to as exemplary embodiments on their face.

17   Maybe departing a little bit from some of the way our --

18   the colleagues' order, I'd like to talk a little bit about the

19   two cases that Huawei relies on because I think they're

20   instructive, showing why there is no kind of disclaimer here.

21   And in the first case that Huawei relies on, the *GE*

22   *Lighting Solutions* case, this actually has the exact opposite

23   holding that Huawei is proposing.

24   Specifically, in *GE Lighting*, the Court found that the

25   structure that you're attempting to read in as a limitation

1    into the claim, because it was consistently referred to in the

2    specification as an exemplary embodiment, it was inappropriate

3    to do that.

4         And that's the case we have here.  The idea of the T and P

5    values being included in the system and information is also

6    referred to as being exemplary.

7         And the second case they cite is the *Toro* case.  And

8    that's inapposite.  Specifically, in *Toro* the specification

9    specifically referred to advantages of the present invention,

10   not an embodiment like we have in this case.  There's no such

11   statement in the '825 patent of the importance of a feature to

12   the invention.

13        And just to briefly set the context, in the *Toro* case the

14   claim limitation at issue was this said "cover including means

15   for increasing the pressure."  And specifically -- or, more

16   generally, the claim is directed to a vacuum blower.  A device

17   like you use in your yard.  So one mode it's a vacuum, one mode

18   it's a blower.  And one of the things you can do is adjust the

19   air pressure.

20        And so the question the Court was facing was whether the

21   means for increasing the pressure had to be physically

22   connected or attached to the cover.

23        And the Court first looked at dictionary definitions and

24   found them somewhat instructive but didn't really resolve the

25   question that was before the Court.  So they turned to the

1    specification to help inform that decision.

2         And what we have here now is, I've put the '528 and '825

3    specification side-by-side because I think it helps illustrate

4    why the Court in *Toro* reached that conclusion, but that doesn't

5    apply in this case.

6         So specifically, in the '528 patent specification, they

7    refer to the combined vacuum blower of the present invention

8    has these advantages.  And then it lists the advantages in the

9    context of the present invention.

10        And specifically in the passage the Court relied on, it

11   refers to the air inlet cover -- I'm sorry, it refers to the

12   means for limiting the pressure.  This flow restriction ring is

13   actually part of the air from the cover on which it was needed.

14   And that's how the advantage of the invention is accomplished.

15        So -- and you can see that because this entire passage is

16   premised on the advantage of the invention, the Court felt that

17   that was appropriate to read that as a limitation.

18        But here we don't have that language.  We don't have

19   something saying this is important to the invention.  We don't

20   have a characterization of the present invention.  We just have

21   these exemplary implementations of the embodiments.

22        And Courts actually have rejected this reading of *Toro*

23   that Huawei is advancing here.

24        So last question is, does Huawei's construction raise any

25   claim differentiation issues?  We think it does and would

counsel against finding a requirement that the predetermined

delay duration has to be included in the system information

from the Node B.

    **THE COURT:**  If you want to slow down just a little

bit.

    **MR. ZADO:**  I apologize, Your Honor.

So starting with claim 1, claim 1 simply recites that the

UE will receive system information.  And the system information

includes information about the temporary IDs, which we talked

about in the tutorial.  There's no reference to inclusion of

the T or P values in connection with the system information.

And then in the body of the claim, when it talks about the

predetermined delay duration, it just says that the UE waits a

predetermined delay duration.  There's no requirement with

respect to where that has to come from.

So if you look at claim 2, which depends from claim 1,

claim 2 recites that information indicative of the valid period

is acquired from the system information.

So now claim 2 actually talks about this "information

indicative," which could be the T value or the P value, and

specifically tells you the length of the valid period.  And the

T value tells you when the valid period begins, because it

begins when the delay duration ends.

So claim 2 encompasses this idea of the system information

including the T or P values.  But in Huawei's construction,

1    this limitation has now been imported into claim 1, because

2    claim 1 actually has to be read to include, in the system

3    information, the T and P value.  The T value in particular,

4    but, by the same logic, the T and P values.  And that would

5    simply subsume claim 2 and run afoul of claim differentiation.

6         And so unless you had any particular questions, Your

7    Honor.

8              **THE COURT:**  Great.  Thank you.

9              **MR. BETTINGER:**  Thank you, Your Honor.

10        If we could go to slide 89, please.

11        Your Honor, hearing that argument, they're just trying to

12   walk away from their patent.

13        At a basic level, this is that collision delay.  You have

14   these temporary IDs are sent down from the base station.  And

15   if they come at the same time, one might get it -- two UEs

16   might get it at the same time, so you introduce this delay.

17   And that, in theory, should help that maybe there won't be a

18   collision.  That's the context of this.

19        And that temporary ID and the delay period and the valid

20   period are all sent down from the base station.  And if we look

21   at slide 89, which is the same language counsel, I believe, had

22   up on the screen, it explains why.

23        T -- if we look at what's underlined there in red and

24   highlighted -- and just for note, T is the delay period, and P

25   is the valid period.  So there's a delay T and a valid period

P.

"Therefore, T and P" -- and I believe, it should say "are closely related."  I think this is how the patent reads -- "are closely related to the processing capability of the Node B" -- which is the base station -- "can have different values on a cell-by-cell basis."

So you have all these cells out there.  And each one, maybe it's only this large, maybe it's big, maybe there's other interference.  So it has its own T and P values.  And the patent tells you, it has to.

As a result, the next sentence then says, the T and P values are included in system information -- which everyone agrees comes from the base station -- to be transmitted on the cell-by-cell basis.

So when you get the temporary ID, you also get your delay duration and your valid period because it's going to be dependent on the cell.  And that's what the patent tells us.  Tells us that repeatedly.

As we pointed out in our brief, if you look at the description -- if we could go to slide 93, Figure 7.  The T and P values from system information broadcast from a Node B of the current cell.  It says "current cell" because when you move to a new cell you have to get new values.

Same thing with reference to figures 8, figures 9, Figure 11 and Figure 12 has that same language.  You're going

1    to get separate T and P values from the current cell because

2    those values are going to change by cell.  So it does need to

3    come from the base station.  It's set out in -- in the patent,

4    that's the only way it can be done.

5         With respect to the claim differentiation argument that

6    counsel made -- if we could go to slide 98.

7         As I understand their argument here, it's, well, if it had

8    to come from the base station, then why would you put it in a

9    dependent claim?

10        Two points.

11        First of all -- and this is talking about the valid

12   period, not the duration.  The second and more important is,

13   it's a limitation on the valid period.  It's acquiring

14   information indicative of the valid period.

15        So that's a further limitation on the valid period.  But

16   we would submit these dependent claims confirm our position

17   because it reiterates that that valid period is coming from the

18   system information in the current cell.  So that, in fact,

19   those claims don't -- are somehow differentiators, they're

20   confirming our position.

21             THE COURT:  All right.

22             MR. BETTINGER:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24        Let's go on to number 4.

25             MR. LEWIS:  This is the '195 patent.

1      So I think, fundamentally, Samsung makes two errors here.

2  First, the claims say nothing about a subset or restricting the

3  channels.

4      Second, the claims say nothing about a monitoring set.

5  They talk about a set of control channel candidates, which the

6  specification defines and uses in the way Huawei suggests

7  construing this term.

8      Essentially, Samsung wants to rewrite these terms, these

9  claims, to fix what errors they made in writing them, to make

10 them somehow consistent with the invention.  However, claims

11 must be construed based on their terms, not on what Samsung

12 wished it had written.

13     Real quickly, looking at the figures 5A in the

14 specification, this clearly says a control channel candidate

15 set, which tracks the claim term that says control channel

16 candidates, is all the control channels.  The green going up

17 and down are each of the control channels.

18     And specification distinguishes between that and the

19 monitoring set, which again doesn't appear in the claim.  And

20 that's just the control channels that are selected, the subset

21 for this particular UE.

22     And to confirm that, there's another figure that shows

23 absolutely the same thing.  And that gets us to some law which

24 points out that when the specification, which is a dictionary

25 for the claims, tells you something, you use that construction,

in the construction of the term when it appears in the claim.

Here we have the claim language itself.  And I think this is somewhat helpful because it tells us a few things that I mentioned earlier.

First of all -- and this slide is actually not in the printout.  I added it this morning, Your Honor.  I apologize.

There's nothing in here about selecting a subset.  It just says you're determining a set of control channel candidates. Doesn't say what they are.  Tells you some characteristics of the control channel candidates, and then tells you to monitor at least one of them.

There's nothing about any subset in here.  And there's also no monitoring set in here.  It's a set of control channel candidates which tracks the control channel candidate set in figures 5A and 5B that I just had up a moment ago.

Samsung actually acknowledges this.

If I could actually ask that Samsung slide 100 be put up. I'm going first.  I didn't want to have to come back for no reason, so I saw their slides.  100.

So it says there, the claims are directed to the monitoring set.

No, they're not.  It doesn't say that.

Additionally -- if I could go to 96 of yours, yes.

Here it says, the '195 invention restricts the number of control channels the terminal has to monitor.  Well, the claim

1    doesn't say that.  Samsung wants the claim to say that.

2         We can go back to mine now.  Thank you.

3         So, basically, I think what happened here is the claim

4    drafter kind of messed up and meant to say "monitoring set."

5    Said "set of control channel candidates."

6         The monitoring set has the meaning of the subset and the

7    ones that the UE would monitor.  And it is the restricted set.

8    But that's not in the claim.  But the term that actually is in

9    the claim means, as our construction proposes, the systemwide

10   set of control channels.

11        The law is clear that you don't rewrite a claim in

12   construction, even if you get a nonsensical result, which is

13   basically Samsung's point.

14        The monitoring set is something different than the control

15   channel set.  Right.

16        And the quote here on the top of this slide, I think it's

17   the first time I've actually quoted a case in the title of a

18   slide, but I couldn't resist.

19        Construe the claim, the Federal Circuit says, as written,

20   not as the patentees wish they had written it.

21        That is basically the issue with the '195 patent.  Samsung

22   argues that the identifier -- they spend a lot of time in their

23   brief, and they're going to do it in their slides, talking

24   about the identifier and how the identifier never allows you to

25   select the control channel candidate set in the patent.

1    Well, that's true.  But it still says "control channel

2   candidate set" in the claim, not "monitoring set."  And the

3   patent spec never uses "control channel candidate set" to mean

4   the subset.  And there's a couple of cases here talking, again,

5   about not redoing claims.

6    So to end, I'd just like to bring up my old friend, Figure

7   5a, here and point out that Samsung claimed the bottom, "the

8   control channel candidate set."  They wished they'd claimed

9   "the monitoring set."

10    Somebody messed up.  That's not Huawei's problem.  It's a

11   claim that just maybe can't be enforced.  That's, again,

12   Samsung's problem.  And it's not for the Court to fix that for

13   Samsung.

14    Thank you, Your Honor.

15        **THE COURT:**  Thank you.

16        **MR. WHITEHURST:**  Alan Whitehurst for Samsung.

17    If I could pull up slide 86, please.  Just to be clear,

18   Your Honor, the drafter of that claim did not mess up.

19    Huawei's argument that you just heard is based on two

20   theories.  One, that there's nothing in the claim about

21   limiting.  That's not true.

22    Second, that they said there's nothing in the claim about

23   monitoring.  Again, this isn't true.

24    And I just want to direct your attention to claim 9, which

25   is one of the claims at issue.

1    You heard Counsel say there's nothing in the claim about

2  limiting.  Well, if you look at the language that's highlighted

3  on blue, "based on an identifier of the terminal," this is how

4  you do the limiting that counsel just said is not in the claim.

5    As we discussed during the tutorial, it would be very

6  inefficient for the phone to scan all of the available control

7  channels.  That's why the phone uses the terminal to limit

8  exactly what counsel just told you is missing from the claim.

9    Second point I'd like to make is, counsel said there's

10  nothing in the claim about monitoring.  Again, not true.

11    If you can direct your attention to the bottom part of the

12  claim, you'll see it's monitoring at least one control channel

13  candidate belonging to the set of control channel candidates.

14    So in the top half of the claim you see the limiting.  In

15  the bottom half of the claim you see monitoring.

16    What are you monitoring?  You're monitoring that smaller

17  set that we discussed in the tutorial.  This is the whole point

18  of the invention.

19    Now, the crazy thing we're seeing with this term is,

20  Huawei wants you to ignore the face of the claim, what I just

21  walked you through.  They want you to take the claim, read on

22  something that's completely inconsistent with the

23  specification, and then read the claim on what the patent

24  describes as prior art.

25    They want the set of control channel candidates to be

1    everything.  That's the opposite of the invention.

2        I have a number of slides here I can go through if it

3    would help the Court.  We can go to slide 92.  I'll go through

4    these quickly.  I think I can make the point.

5        I mean, is Huawei's construction inconsistent with

6    surrounding claim language?  We just saw that.  Yes.

7        They're telling you that it's all available control

8    channels.  They're ignoring the rest of the claim, when we just

9    saw that the set of control channels is based on the ID.  All

10   available control channels, not based on the ID.  The smaller

11   set, which we've explained in our briefs is the set of control

12   channels, is based on the ID of the terminal.

13       Again, the specification, I hinted at this during the

14   tutorial, when we look at how the patent describes the

15   invention, it's about restricting the number of control

16   channels that the terminal has to monitor.

17       How does it do this?  It uses the terminal's ID.  We see

18   this in the patent over and over again, where it's talking

19   about restricting, limiting, and then monitoring that

20   restricted set.

21       We see it in column 7, in Figure 7.  We see it again in

22   column 8, in Figure 9.  And we see it again in column 6, in

23   Figure 5A.

24       Now, I don't want to belabor this point, but the claims

25   are directed to the monitoring set, the exact opposite of what

1    you just heard Huawei's counsel.

2         You'll see, when you compare this figure with 5A, you're

3    taking the terminal, the ID of the terminal, to get this

4    smaller set, and then you're monitoring.  And we see the

5    antecedent basis, this smaller set that you just got.

6         Now, Huawei's construction is based on this misreading of

7    Figure 5A, that the language "control channel candidate set" is

8    referring to the bottom of Figure 5A.

9         But they're missing the point.  There's a big control

10   channel candidate set that's all of the channels.  And there's

11   a small control channel candidate set.  That's the set that's

12   been limited based on the terminal's ID.  And these claims are

13   directed to that latter set, that monitoring set that you've

14   got from using the terminal's ID, to reduce it so you can save

15   battery power and processing power.

16        I have a whole nother set of slides.  I don't know that I

17   need to go through them.

18        But it would be crazy to take these claims, ignore the

19   invention in the patent, then read them on the prior art in

20   something that Huawei argues in its invalidity contentions

21   isn't even described in the patent.

22        They're trying to ignore the claim language and then read

23   them on something that's completely contradictory to the patent

24   itself.  And that would run afoul of the basic cannons of claim

25   construction that you construe the claims to be consist --

1        **THE COURT:**  I understand.  Thank you.

2        **MR. WHITEHURST:**  Thank you, Your Honor.

3        **MR. LEWIS:**  Your Honor, if I may have a moment?

4        **THE COURT:**  You may have a moment.

5        **MR. LEWIS:**  So counsel said a couple of things that I

6   said weren't correct.  I just wanted to address that.

7        I didn't say there was no monitoring in the claim.  I very

8   distinctly, I believe, tried to say there was no monitoring set

9   in the claim.  And, indeed, there is not.

10        As far as the limiting, there is actually -- again, he's

11   relying again on this terminal ID and ignoring the meaning of

12   the set of control channel candidates.  But, again, he's

13   assuming that there's limiting.  Not that the determining

14   doesn't give you the entire set of all the available channels,

15   which is actually what the language in the claim says, if you

16   read it as the specification, for example, Figure 5A tells you

17   to read it.

18        And, finally, the specification actually does talk about

19   monitoring all the available channels in the system.  And that

20   would be in column 2, roughly lines 49 through 55.

21        **THE COURT:**  Great.  Thank you.

22        All right.  On to the fifth and final term.

23        **MS. YANG:**  Number ten.

24        So this is just -- for context reminder, this is the

25   patent that is directed to that active period of a UE in the

1    LTE system, where if there are more packets of information

2    coming down for it, there's different timers that are used to

3    keep the UE awake.

4        So there's three parts to this argument.  First, Huawei's

5    position is the preamble needs to be construed, that the

6    preamble is limiting.  Second, that once the preamble is

7    limiting, it's indefinite.  And, third, that it needs to be

8    construed.

9        And, I believe, in connection with the Huawei patents,

10   Counsel for Samsung cited the *02 Micro* case as kind of the

11   seminal case that says if there's a dispute over the claim

12   construction, you've got to construe that because otherwise

13   you'll probably end up construing it down the line.  So let's

14   just do it now.

15       So the term here, "controlling an active time period

16   during a DRX operation," appears in the preamble of both

17   independent claim 1 and independent claim 7.

18       And so it doesn't -- so if we look at the language of the

19   claims, it's clear that the preamble is what the '588 patent is

20   really directed to.

21       It's the part of the claims that talks about -- and it's

22   the only part of the claims that talk specifically about this

23   concept of controlling that active time period during a DRX

24   operation.  And that's what the '588 patent is directed to.  So

25   without that preamble, it's unclear what the context is for the

1    rest of the claims.

2         And it's the sort of thing where I think if the jury were

3    to look at it, and they were told, oh, you can ignore the

4    preamble, looking at that it's not clear that that's -- you

5    know, that that's starting a first timer, starting a second

6    timer, restarting a second timer, that that specifically has to

7    do with the DRX operation and this active time period during

8    the DRX operation.

9         So here, during prosecution of the application that led to

10   this patent, the patentee added this language "controlling an

11   active time period" to the preambles of the independent claims.

12   And they were claims 23 and 29 that correspond to 1 and 7 here.

13        And during prosecution, the patentee noted that the claims

14   were -- were directed to -- or that the examiner had objected

15   to the claims because they were directed to performing a DRX

16   operation but not reciting any limitation related to a DRX

17   operation.

18        And so the patentee amended claims 23 and 29, as suggested

19   by the examiner, to recite this controlling and active time

20   period language.  And then the applicant went on to say that

21   these amendments further clarify -- the preamble at the bottom

22   there, "these amendments further clarify that the controlling

23   of the active time period is part of the DRX operation."

24        They made other representations about this present

25   invention in the preamble during prosecution.  They described

1   to the Patent Office that the present invention is directed to

2   reducing power consumption during a DRX operation.  Again,

3   that's the context of the preamble of these claims.

4       And then the patentee distinguished the prior art

5   reference *Ohta* as not controlling an active period.  And this

6   is that same amendment in which the patentee had amended the

7   preambles of these independent claims.

8       And *Invitrogen vs. Biocrest*, which we cited in our

9   briefing, says that a preamble is limiting when it's used in

10  the prosecution to overcome prior art.

11      So if we look at the specification of the patent, as well,

12  it clearly says that what the present invention is related to

13  is this performance of the DRX operation.  And so without the

14  preamble, the present invention of the '588 patent, as

15  described in the specification, is not found in those

16  independent claims.

17      So the first -- so Huawei's first position is that the

18  preamble is limiting.

19      So going on to the second position, for the most part, I'm

20  just going to rely on our briefing on this point.  Just a

21  couple points to make.

22      One is, under the *Nautilus vs. Biosig* case, 134 S.Ct.

23  2120, a claim must inform those skilled in the art about the

24  scope of the invention with reasonable certainty.  Otherwise,

25  it is invalid under 112-2.

1        And so here the claim, as it's written, this "controlling

2   an active time period during a DRX operation" and then the

3   claim goes on to talk about starting the first and the second

4   and restarting the second timer, that claim as written has no

5   end period for the active time period.

6        And so Huawei's position is just it doesn't make -- it

7   doesn't make sense to one of skill in the art that you would

8   control an active time period if there's never any ending to

9   it.  You're just starting and restarting.  But that's

10  meaningless if you don't have some sort of end to the time

11  period.  But, as I said, for the most part we're just going to

12  rely on briefing on this point.

13       So then the third piece is that Huawei's proposed

14  alternative construction is consistent with the intrinsic

15  evidence.  And it's really the way that the preamble can be

16  interpreted to be meaningful and not be indefinite.

17       And so this is -- these claims are directed to the

18  embodiment depicted as Figure 6 in the '588 patent.  I don't

19  think there's any dispute over that.

20       And Figure 6 shows that timer 1, as described in the claim

21  as this "T(MINIMUM_ACTIVE)" which is shown in the box labeled

22  615, its start coincides with the start of the active period,

23  which is right before it, in 610.

24       And then at 627, you see that second timer

25  "T(activeperiod end)" starting or restarting.

1     And then in 630, the second timer expires.  And I did want

2  to point out there that one thing that seems, you know,

3  probably not coincidental, because you can pick what your

4  variables are named, is that the second timer is called

5  "active_period_end," thus indicating an end of the active

6  period.

7     And then it's only when that second timer expires in 630

8  that you would go on -- that your active period will be over

9  and you can go into sleep mode.

10    And the applicant clarified during prosecution, as well,

11  that this is the first timer and the second timer that they

12  were talking about.

13    So the key to Huawei's proposed alternative construction

14  is really that concept that I mentioned earlier, about being

15  able to end the active time period.

16    And so what is disclosed here in the intrinsic evidence

17  that -- that the active time period is sort of identified or

18  it's governed or, you know, dependent on or something -- you

19  can use different words -- but it's identified with that start

20  of the first timer and the end of the second timer.

21    So, of course, claim construction is an art.  It's not a

22  hard-and-fast science, even though it would make a lot of

23  things easier if it were.  So, you know, I think we could offer

24  suggestions for wording, or the Court can certainly do so.

25    But the idea, the crux of what Huawei's position is, is

1   that it's only during an active period where the start of a

2   first timer indicates the start of the active period, and the

3   end of a second timer indicates the end of the active period.

4   That's what we're really trying to get at.

5       And just a couple of points, quickly, on that.

6       So during prosecution of the parent application -- and,

7   Allen, if we could go to that slide showing that

8   September 23rd, 2011 amendment.

9       Apologize.  This one did not make it into the book of --

10  this one -- the book of slides.

11      But during prosecution of this parent application, the

12  patentee said consistently that the UE is monitoring control

13  data via a shared control channel during the time period from

14  the time period the first timer starts to the time the second

15  timer expires.  So, again, it's that second timer expiration

16  that signals the active period is over.

17      And Samsung's expert agrees with this principle.  In a

18  declaration that he put in, in response -- in Samsung's reply

19  brief, he says that since the second timer is used to terminate

20  the active period, that that means it controls it.  So

21  that's -- that's the crux of the alternative construction that

22  Huawei proposes.

23      Just really quickly, claims 4 and 10, our position is that

24  does have different scope from claims 1 and 7.  The way it's

25  written, claims 4 and 10, you know, it specifically requires

1  that the first and second timer -- excuse me, that it requires

2  the first or second timer to be running.

3      Our position, as I've been discussing, is that it's that

4  end of the second timer that really signals the end of the

5  active period.

6      So there's more slides here, but unless you have

7  questions.

8              THE COURT:  Great.  Thank you, Ms. Yang.

9              MR. ZADO:  I just heard counsel for Huawei indicate

10  that the preamble should be found to be limiting because the

11  preamble, in this instance, provides context for the claimed

12  invention as set forth in the body of the claim.

13      However, that's exactly a circumstance where preambles

14  have been found not to be limiting.  And, particularly, if I

15  could direct your attention to the *Textron Innovations* case,

16  which we cited in our briefing, the Court there held that when

17  the preamble simply recites the general context of which the

18  improvement is found in the body of the claim, that's not

19  limiting.

20      Now, the second issue that counsel for Huawei pointed to,

21  as to why the preamble should be limiting, is with respect to

22  the amendment made in connection with the *Ohta* reference and

23  the general amendment to the preamble.

24      So if we could -- so starting with the amendment that

25  added that language to the preamble, of controlling an active

time period, as counsel for Huawei noted, this was simply to

further clarify that -- the controlling of the active time

period as part of the DRX operation.

     And, again, that's a circumstance where simply a

clarifying amendment made to a preamble doesn't render the

preamble limiting.

     Again, we have a couple of cases here, including the

*Marrin* case and *Textron* case again.

     For example, in the *Textron* case there was a particular

term "improvement," that was replaced with the term

"replacement."  And that was just intended to define the

principle use of the invention, similar to here, the principle

use is in the context of the DRX operation.  But that doesn't

import a limitation of the claim.

     Now, turning to the amendment made in connection with the

*Ohta* reference, those arguments and that amendment wasn't

directed to the preamble.  Rather, what the amendment was

directed to was the operation of the timers that are recited in

the body of the claim.

     And here's where I would like to maybe refer to -- pull up

Exhibit 6 and go to page 7.

     And if you could highlight the box on the second to last

paragraph on page 7, starting "independent claims 23 and 29."

     So this is the passage that sets up the entire discussion

of *Ohta*.  And what the patentee or applicant was arguing here

1    is that the claims 23 and 29 are directly controlling the

2    active time period by reciting the UE first starts the first

3    timer and the UE then starts the second timer, then restarts

4    the second timer.  So it's the recitation of the operation of

5    those timers that actually controls the active period.

6         And then if you can now go to page 9, please.  And then

7    you can see -- if we can highlight the second paragraph, "While

8    *Ohta*."

9         So this is now where the applicant takes that description

10   of the timers and compares it to *Ohta*.  And particularly what

11   the applicant is pointing out here is that the counters that

12   were disclosed in *Ohta* were different than the timers that are

13   recited in the body of what were then claims 23 and 29 in the

14   application.

15        Now, if you can go back to the page as a whole.

16        And so when -- when the patentee is referring to the

17   operation of these counters in connection with the active time

18   periods, it's specifically referring to the idea that the

19   timers in the -- in the claims 23 and 29 of what was the parent

20   to the '588 patent, those timers do control the active time

21   period; whereas, the timers that are the counters that are set

22   forth in *Ohta* do not.

23        So, again, the argument is being made directly with

24   respect to the timers and the counters that are part of the

25   body of the claim.

1          And if we can go back to the presentation, please.

2          And so then when the applicant summarizes the argument,

3     the applicant states that, what *Ohta* fails to teach or suggest

4     is that starting the UE with the first timer or starting or

5     restarting the UE in the second timer, which are again elements

6     in the body of the claim, not the preamble.

7          And then if you look at the applicant's reason or the

8     examiner's reasons for allowance, which came in the next office

9     action, they specifically pointed to the amendment in the --

10    that was made in the body of the then pending claims with

11    respect to restarting the second timer, as that was what

12    allowed the claim.

13         So the examiner understood that argument over *Ohta* to be

14    directed to the concept of how the timers worked, and not the

15    preamble.

16         So the next issue that counsel for Huawei raised is that

17    the claims are indefinite, assuming that the preambles are

18    limiting.

19         So just, first, if the preambles are not limiting, I think

20    we can all agree that that doesn't render the claims

21    indefinite.

22         But even if the preambles were limiting, one of ordinary

23    skill in the art would still find that the preambles inform

24    those of skill in the art about the scope of the invention.

25    That's the key.

1       If you look at the terms that are actually used in the

2  preamble -- so, for example, "controlling an active time

3  period" -- these are ordinary terms that anyone of ordinary

4  skill in the art would understand.

5       So what -- what Huawei's argument really boils down to is

6  starting and restarting of a timer doesn't control anything;

7  therefore, we have to read all of these limitation into the

8  claim.  And that's simply -- that's not correct.  And it also

9  isn't supported by the case law on which they rely.

10      So looking at the specification, for example, in the

11  abstract and in the summary of the invention, the patent

12  specifically states that starting and restarting the timers

13  controls the active time period.  So we actually have

14  disclosure in the patent specification that tells you that.

15      So what -- really, what Huawei's argument is, it's an

16  enablement argument.  They're arguing that these passages in

17  the specification that tell you, you control timers -- you can

18  control the active time period by starting and restarting

19  timers, that doesn't enable the invention.  That's not enough.

20      And I also wanted to point to, there was one example in

21  the file history as well.  Yes.  Again, it's in the file

22  history.  Again, it confirms that it's the starting or

23  restarting the timers controls the active time period.  So

24  that's directly contradictory to what Huawei's position is as

25  to why the claims should be indefinite.

1    And so I don't think we need to walk through the operation

2    of the first and second timers.  I think we relatively agree on

3    how they operate.  But I think there's one aspect that counsel

4    for Huawei glossed over in their description.

5        If we could take a look at slide 111 of Huawei's

6    presentation.

7        And here Huawei notes that the principle of the invention

8    is that, for example, timer 2 is used to extend the active

9    time, i.e. by restarting the second timer, which is explicitly

10   reciting the body of the claim, you're controlling the active

11   period.

12       Now we can turn to the presentation.  And if we can turn

13   to slide 133.

14       Now, this is what I would like to do is try and address

15   the proposed construction that Huawei offers.  The starting and

16   restarting the timers can only take place between the starting

17   the first timer and ending of the second timer.

18       And that's not consistent with the language of the claims,

19   which doesn't recite a specific endpoint for the timers.  But,

20   more particularly, it would also read out this preferred

21   embodiment that's recited in connection with method 1 of Figure

22   6.

23       And specifically in this embodiment -- and I'll point to

24   the figure here to help illustrate it -- you can see that in

25   step 630, in green at the bottom of the figure, the yes -- the

1   yes at the left-hand side of that figure indicates the second

2   timer has now expired.  So the second timer is over.  But after

3   step 630, you then move to step 640.  And in step 640 you have

4   to complete the process of the HARQ packets.  And during that

5   period of time, the Huawei UE receiver would have to stay

6   active in order to continue to receive those packets.

7        And then only after that HARQ processing is completed and

8   all those HARQ -- all those HARQ retransmitted packets have

9   been received, which is in step 640, can you then enter sleep

10  mode, which is in step 635.

11       And the sleep mode is where the receiver turns off and

12  you're no longer in active mode.  So it's clear that, as

13  illustrated in connection with this method, we have this period

14  of time where the receiver has to stay active.

15       Now I'd like to address, briefly, the comment that was

16  made in connection with the 9/28/2011 amendment in their

17  presentation.

18       And specifically counsel for Huawei referred to that

19  amendment as reading in some additional limitations on the

20  invention that needed to be incorporated into the claim.

21       And if we could go to -- oh, I apologize.  This isn't in

22  the presentation they've given us.  So I believe it might have

23  been slide 130 in their presentation.

24       So you see in the context of this second timer governing

25  the end of the active period, they're trying to read in some

1    limitation from the description in the argument in the

2    9/28/2011 amendment.

3        Now, critically, the language that we're construing here

4    wasn't in the claims when this argument was made.  The language

5    "controlling an active time period" was actually added in the

6    May 2012 amendment which took place later.

7        So it doesn't make sense that this -- this argument as to

8    how the claims should be construed should apply to that

9    language in the preamble.

10       Now, if we could briefly turn to their slide 131.  I'm

11   sorry, 131 of theirs, please.

12           **MR. BETTINGER:**  We don't have it.

13       **MR. ZADO:**  Then just to talk through it, in the slide

14   where they specifically referred to the testimony of

15   Dr. Valenti, Samsung's expert, in terms of how he describes how

16   the second timer controls the active time period.

17   Unfortunately, what you got was just a snippet of that

18   description, where it only talks about -- it's here in slide

19   129.

20       So you just get a snippet where he talks about the active

21   period, because the second timer is used to terminate the

22   active period, one of the ordinary skill in the art understands

23   it controls the active period.  That's one way that it does it.

24   But Dr. Valenti's testimony wasn't limited to that.

25       And if we could turn to slide 129 of our presentation.

1    It's a little difficult to read, but you can see this is

2  actually Dr. Valenti's full testimony in context.  He's

3  actually responding to one point that was being raised by

4  Huawei's expert, Dr. Akl.

5    Specifically, what Dr. Valenti also testified is that you

6  control the active time period not just because of the ending

7  of the second timer, the expiration of the second timer, but

8  simply by starting and restarting the second timer.  Each of

9  those instances prevents you from entering sleep mode.  That's

10 when the second timer is running.  So that controls the active

11 time period.

12   And so unless Your Honor has any further questions, that's

13 all I have.

14       **THE COURT:**  Thank you.

15   Ms. Yang, did you have anything further that you wanted to

16 add?

17       **MS. YANG:**  No, Your Honor.

18       **THE COURT:**  All right.

19   All right.  Thank you, all, very much.  Your argument was

20 illuminating, somewhat.

21   (Laughter)

22       **THE COURT:**  And I appreciate it.

23   So as soon as I can, I will get out a claim construction

24 order, and I'll set a case management conference, and we'll

25 figure out how to wrap everything up.

1        Thanks very much.

2        (Counsel thank the Court.)

3        (At 11:22 a.m. the proceedings were adjourned.)

4                    -   -   -   -

5

6                  **CERTIFICATE OF REPORTER**

7        I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled matter.

9

10  DATE:   Friday, August 25, 2017

11

12

13                    _Katherine Sullivan_

14   _____

15      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 U.S. Court Reporter
16

17

18

19

20

21

22

23

24

25