QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

Attorneys for Samsung Electronics Co., Ltd.,
Samsung Electronics America, Inc., and
Samsung Research America, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>Defendants.<br><hr>SAMSUNG ELECTRONICS CO., LTD. &<br>SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>HUAWEI TECHNOLOGIES CO., LTD.,<br>HUAWEI DEVICE USA, INC., HUAWEI<br>TECHNOLOGIES USA, INC., & HISILICON<br>TECHNOLOGIES CO., LTD.<br><br>Counterclaim-Defendants. | CASE NO.  16-cv-02787-WHO<br><br>**SAMSUNG'S MOTION TO ENJOIN HUAWEI FROM ENFORCING THE INJUNCTION ISSUED BY THE INTERMEDIATE PEOPLE'S COURT OF SHENZHEN**<br><br>**Hearing Date: March 14, 2018**<br>**Time: 2:00 p.m.**<br>**Place: Courtroom 2, 17th Floor**<br>**Judge: Hon. William H. Orrick**<br><br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

TO PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS HUAWEI TECHNOLOGIES CO., LTD., HUAWEI DEVICE USA, INC., HUAWEI TECHNOLOGIES USA, INC., AND HISILICON TECHNOLOGIES CO., LTD., AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on March 14, 2018 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William H. Orrick, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants and Counterclaim-Plaintiffs Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Research America, Inc. (collectively "Samsung") respectfully request that this Court enjoin Huawei Technologies Co., Ltd., Huawei Device USA, Inc., Huawei Technologies USA, Inc., and HiSilicon Technologies Co., Ltd. (collectively "Huawei") from taking steps to enforce, anywhere, the injunction issued by the Intermediate People's Court of Shenzhen, China against Samsung on January 11, 2018.

This motion is based on this notice of motion and supporting memorandum of points and authorities, the supporting declarations of Dr. Song Lianbing, Guanbin Xie, and Tong Wang, the accompanying exhibits, reply briefing in further support of this motion and supporting declarations and accompanying exhibits, as well as other written or oral argument that Samsung may present to the Court.

DATED:  February 1, 2018              Respectfully submitted,

                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

                                      By   /s/ Charles K. Verhoeven
                                          Charles K. Verhoeven
                                          Kevin P.B. Johnson
                                          Victoria F. Maroulis
                                          Thomas D. Pease
                                          David A. Perlson

                                          *Attorneys for Samsung Electronics Co., Ltd.,*
                                          *Samsung Electronics America, Inc., and*
                                          *Samsung Research America, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................4

I.      STANDARD-SETTING ORGANIZATIONS AND SEP "HOLD UP" ..............................4

II.     HUAWEI AND SAMSUNG'S FRAND COMMITMENTS AND
        NEGOTIATIONS ........................................................................................................6

III.    HUAWEI'S GLOBAL LITIGATION OFFENSIVE AGAINST SAMSUNG ...................8

IV.     SAMSUNG'S EXTENSIVE MANUFACTURING OPERATIONS IN CHINA ..............10

ARGUMENT ........................................................................................................11

I.      APPLICABLE LEGAL STANDARD ..........................................................................11

        A.      The Court Has the Power to Issue Antisuit Injunctions under *Microsoft* ................11

II.     THE PARTIES AND ISSUES ARE FUNCTIONALLY THE SAME ...............................12

        A.      The Parties Are Functionally the Same ........................................................12

        B.      The Issues Are Functionally the Same ........................................................12

III.    HUAWEI HAS THE POWER TO ENFORCE THE SHENZHEN INJUNCTION ............15

IV.     THIS COURT IS UNIQUELY SITUATED TO RESOLVE THE GLOBAL
        FRAND ISSUES OF THE PARTIES' COMPLIANCE WITH THEIR
        LICENSING OBLIGATIONS AND THE AVAILABILITY OF INJUNCTIVE
        RELIEF ........................................................................................................16

V.      MULTIPLE *UNTERWESER* FACTORS APPLY ........................................................17

        A.      Huawei's Enforcement of Injunctions in China Violates U.S. Antitrust Law
                and Will Frustrate Both U.S. Policy and the Policies of This Court ........................18

        B.      Huawei's Chinese Injunction Actions Are Vexatious and Oppressive ..................19

        C.      Huawei's Chinese Actions Prejudice Multiple Equitable Considerations ..............20

                1.      The Chinese Actions Permit Huawei to Circumvent U.S. Law and
                        Risk Injuring Consumers and the Marketplace ........................................20

                2.      Huawei's Chinese Actions Could Result in Inconsistent Rulings or a
                        Race to Judgment ........................................................................20

VI.     THE REQUESTED INJUNCTION HAS NO ADVERSE IMPACT ON COMITY ..........21

CONCLUSION ........................................................................................................22

# TABLE OF AUTHORITIES

**Page**

Cases

*Albemarle Corp. v. AstraZeneca UK Ltd.*,
    No. Civ. A. 5:08-1085-MBC, 2009 WL 902348 (D.S.C. Mar. 31, 2009) ........................ 21

*Apple Inc. v. Qualcomm Inc.*,
    No. 3:17-cv-00108-GPC-MDD, 2017 WL 3966944 (S.D. Cal. Sep. 7, 2017) .................. 17

*Apple, Inc. v. Motorola Mobility, Inc.*,
    No. 11-CV-178-BBC, 2012 WL 5416941 (W.D. Wis. Oct. 29, 2012) ............................... 5

*Apple Inc. and NeXT Software, Inc. v. Motorola, Inc.*,
    Nos. 2012-1548, 2012-1549, Dkt. No. 104 (Fed. Cir. Dec. 14, 2012) ............................... 5

*Applied Med. Distribution Corp. v. Surgical Co. BV*,
    587 F.3d 909 (9th Cir. 2009) ................................................................................... 12, 21

*E. & J. Gallo Winery v. Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006) ..................................................................... 11, 12, 17, 21

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ....................................................................................................... 21

*InterDigital Tech. Corp. v. Pegatron Corp.*,
    No. 15-CV-02584-LHK, 2015 WL 3958257 (N.D. Cal. June 29, 2015) ............... 12, 13, 21

*InterDigital Commc'ns, Inc. v. Huawei Tech. Co., Ltd.*,
    No. 1:13-cv-00008-RGA, Dkt. 17 (D. Del. Feb. 11, 2013) ............................................ 18

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ..................................................................................... 19

*Microsoft Corp. v. Motorola, Inc.*,
    871 F. Supp. 2d 1089 (W.D. Wash. 2012),
    *aff'd*, 696 F.3d 872 (9th Cir. 2012) ................................. 1, 11, 12, 13, 14, 16, 17, 19, 20, 21

*Microsoft Corp. v. Motorola, Inc.*,
    795 F.3d 1024 (9th Cir. 2015) ....................................................................................... 5

*In the Matter of Motorola Mobility LLC and Google Inc.*,
    F.T.C. File No. 121-0120, Dkt. No. C-4410 (July 23, 2013) ........................................ 5

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,
    361 F.3d 11 (1st Cir. 2004) .............................................................................. 11, 18, 19

*Realtek Semiconductor Corp. v. LSI Corp.*,
    946 F. Supp. 2d 998 (N.D. Cal. 2013) ..................................................................... 5, 6

*Seattle Totems Hockey Club, Inc. v. National Hockey League*,
    652 F.2d 852 (9th Cir. 1981) ....................................................................................... 21

*TCL Comm'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 (C.D. Cal. June 29, 2015) ............................. 16

*TCL Comm'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. 8:14-cv-00341-JVS-DFM, 2016 WL 6562075 (C.D. Cal. Aug. 9, 2016)..................... 6

*Unwired Planet International Ltd. v. Huawei Technologies Co., Ltd.*,
    [2017] EWHC 711 (Pat) ........................................................................................ 16, 17

*Zynga, Inc. v. Vostu USA, Inc.*,
    No. 11-cv-02959-EJD, 2011 WL 3516164 (N.D. Cal. Aug. 11, 2011) ............................ 18

<u>Additional Authorities</u>

American National Standards Institute, *United States Standards Strategy* (2005) .......................... 4

German Institute for Standardization, *Economic benefits of standardization* (2000) ...................... 4

Impacts of Standards Users Group, *Study Into the Impact of Standardization* (2002) ................... 4

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*,
    90 Cal. L. Rev. 1889 (2002) ................................................................................................. 6

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*,
    85 Tex. L. Rev. 1991 (2007) ................................................................................................ 4

Jeffrey I.D. Lewis, *What Is "FRAND" All About?: The Licensing of Patents Essential to
    an Accepted Standard* (June 11, 2014) ............................................................................... 6

Peter Swann, *The Economics of Standardization* (2000) ................................................................ 4

1

## INTRODUCTION

2       Samsung moves to enjoin Huawei from enforcing an injunction order recently issued in

3 China on standard-essential patents ("SEPs") that are the subject of this action.  On January 11,

4 2018, the Intermediate People's Court of Shenzhen ("Shenzhen Court") issued an order enjoining

5 Samsung's manufacture and sale in China of 4G LTE standardized smartphones.  The Shenzhen

6 Court based this order on two Chinese patents that Huawei declared essential to 3GPP cellular

7 telecommunications standards.  These patents are included in the worldwide portfolios of SEPs that

8 are the subject of the competing breach of contract claims before this Court; in fact, they are also

9 counterparts to two U.S. patents that Huawei asserts here.  Huawei agreed to license these SEPs on

10 fair, reasonable, and non-discriminatory ("FRAND") terms to companies like Samsung that

11 implement these telecommunications standards.  Huawei's enforcement of this injunction order

12 violates U.S. antitrust law forbidding patent "hold up," is contrary to its FRAND licensing

13 obligations, and threatens a major disruption to U.S. commerce.

14       If Huawei is permitted to enforce the Shenzhen injunction, it will frustrate this Court's ability

15 to adjudicate the FRAND contract issues, including the propriety of injunctive relief on the parties'

16 SEPs, that Huawei chose to put before ***this Court*** when it asked the Court to decide whether the

17 parties satisfied their FRAND licensing obligations.  In these circumstances, the Ninth Circuit

18 specifically endorses the use of antisuit injunctions to bar SEP owners from enforcing foreign

19 injunction orders during the pendency of U.S. FRAND proceedings.  *Microsoft Corp. v. Motorola,*

20 *Inc.*, 696 F.3d 872, 889 (9th Cir. 2012) (affirming district court's holding that U.S. breach of

21 FRAND obligations action "is dispositive of whether a German court may issue an injunction . . .

22 for infringement of the European patents.").  Because this action will decide whether Huawei and/or

23 Samsung are entitled to injunctive relief on their SEPs, it is "dispositive" of the Shenzhen action.

24 *Id.*  Accordingly, the Court should enjoin Huawei from enforcing the Shenzhen injunction order

25 until the FRAND and antitrust claims presented here have been resolved.

26       Huawei's hometown injunction actions are part of a coordinated strategy to force Samsung

27 to accept onerous non-FRAND terms for a cross-license to the parties' worldwide 3G and 4G SEP

28 portfolios.  Huawei chose to initiate that strategy in this Court.  Its complaint, filed May 24, 2016,

alleges Samsung infringes eleven Huawei SEPs and seeks a declaratory judgment that Samsung breached its contractual obligations to license Huawei's worldwide portfolio of patents on FRAND terms and conditions.   Huawei also seeks a declaratory judgment setting the terms of a global FRAND cross license and an injunction prohibiting Samsung from seeking injunctions against Huawei anywhere in the world:

> ***Enjoin Samsung*** from seeking injunctive relief against Plaintiffs (including their affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to 3GPP standards

Dkt. 1 ("Compl.") at Prayer for Relief, E.  Samsung, in turn, has asserted its own counterclaims for breach of contract, as well as antitrust violation of Section 2 of the Sherman Act, and has asked the Court to bar Huawei from seeking injunctive relief on its SEPs.  Dkt. 91 (Samsung's Answer and Am. Countercls.) at 79-115.

When Huawei filed this contract action asking the Court to enjoin Samsung from seeking injunctions against Huawei anywhere in the world, Huawei failed to disclose it was in the process of filing ***eight individual SEP-based injunction actions*** against Samsung in Huawei's home district of Shenzhen.  Each such action presents two issues:  (1) whether the asserted SEP is infringed; and (2) if so, whether to issue an injunction.  Although Huawei could have sought damages, the sole relief it seeks in the Shenzhen SEP actions are injunctions against Samsung's manufacture and sale of smartphones.  Those actions have proceeded more quickly than this one.  On January 11, 2018, the Shenzhen Court entered judgment in two of the cases, concluding Samsung infringes two Chinese SEPs and that its licensing conduct with respect to those patents was at fault.  The Court issued an injunction order against Samsung's manufacture, sale, and offering for sale of smartphones in China, a major manufacturing hub not only for the phones Samsung sells in China but for those sold here and around the world.  Because Samsung has now appealed the order to the Guangdong High Court, that order is temporarily stayed, but will go into effect if and when it is affirmed; although it is difficult to ascertain how long the appeal will take, it could conclude within months.

Samsung has litigated in China in the hopes that the Shenzhen Court would not enter an injunction until the worldwide FRAND claims that Huawei first presented here had been fully litigated.  With the injunction order having been issued, a dangerous probability now exists that

Huawei's hometown SEP actions might ultimately undermine this Court's ability to decide the broader FRAND and antitrust claims presented here.  Samsung therefore brings the present motion.

Huawei makes no secret of its improper motive for seeking injunctive relief in China on SEPs that are the subject of the broader global contract claims in this action.  As Huawei's Head of Global Intellectual Property, Ding Jianxin, openly acknowledged last year, Huawei is using the threat of injunctions in China as a "bargaining chip" to obtain royalties from Samsung:

> Perhaps judges are quite reluctant to hear injunction cases because of its staggering impact on the market. . . Even if injunction order were to be enforced, does Huawei really want to kick Samsung out of China? Is it possible? Of course not. . . .At the end of the day, your purpose is to get the royalties in return, while using legal action as a ***bargaining chip***.

Ex. 1 (Speech of Ding Jianxin at 2016 China Competition Policy Forum) (certified translation).  Mr. Ding is correct.  The threat of an injunction against Samsung's manufacture and sale of 4G LTE phones in China, including many of the 4G LTE phones it sells in the United States, is a significant bargaining chip; one that Huawei's voluntary FRAND commitments were supposed to foreclose. The anticompetitive "impact" of enforcement of the Shenzhen Court's injunction would be staggering, both here and in China.  Samsung manufactures ██████████████████████ in China, ███████████████ of which are exported to the United States and sold to U.S. customers. If Huawei is permitted to enforce the Shenzhen Court's injunction, Samsung will face a critical business risk that could force an abrupt end to this litigation as Samsung would likely have no choice but to accept the onerous terms from which Huawei has refused to waver.

Huawei chose to present the global contract issues arising from the parties' SEP licensing dispute to this Court for resolution.  It should not be permitted to use the improper threat of injunctions in China based on patents that are encompassed by this action to derail that process. This Court should issue an antisuit injunction against Huawei's enforcement of the injunctions in China until such time as this Court has resolved the antitrust and breach of contract issues presented by the parties' competing FRAND claims.  If this Court ultimately decides that Huawei is entitled to seek injunctive relief in China, Huawei can seek to enforce the Shenzhen injunctions at that time. In the meantime, if Huawei wishes to seek damages for alleged infringement of its Chinese patents—relief that to date it has not sought—or to press forward with its recently filed action asking

1   a Chinese court to set the terms and conditions for a FRAND royalty limited to the parties' Chinese

2   SEPs—it remains free to do so.

3                          **FACTUAL BACKGROUND**

4   **I.      STANDARD-SETTING ORGANIZATIONS AND SEP "HOLD UP"**

5          The development and implementation of technological standards have reaped numerous

6   benefits for consumers, businesses, and society as a whole.  Ex. 2 (American National Standards

7   Institute, *United States Standards Strategy* (2005)) at 3-4; Ex. 3 (Impacts of Standards Users Group,

8   *Study Into the Impact of Standardization* (2002)) at i-vii.  Standardization benefits consumers by

9   maximizing the interoperability, compatibility, safety, repeatability, and quality of products and

10  services.  Ex. 4 (ETSI, *Why we need standards*, available at http://www.etsi.org/standards/why-we-

11  need-standards); Ex. 5 (European Committee for Standardization, *Bring benefits to society*,

12  available at https://www.cen.eu/about/RoleEurope/Society/Pages/default.aspx).  It also has many

13  pro-competitive benefits, including decreased barriers to entry, reduced costs, streamlined laws and

14  regulations, and increased competition in an industry.  Ex. 6 (Peter Swann, *The Economics of*

15  *Standardization* (2000)) at 16-21; Ex. 7 (German Institute for Standardization, *Economic benefits*

16  *of standardization* (2000)).  Nearly every industry, ranging from telecommunications to agriculture,

17  has benefited from standard setting.  Ex. 3 at 2-4

18         Along with its advantages, standardization also carries the risk of patent "hold up."  Ex. 8

19  (Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991, 2016-

20  17 (2007)).  When a patented technology is essential to practice a technological standard, the owner

21  of the patent may attempt to "hold up" implementers of the standard through the threat of an

22  injunction for infringement.  *Id.*  If unchecked, patent "hold up" can result in patentees extracting

23  royalties far in excess of the value of their patents, drastically increasing costs for implementers,

24  and destroying competition.  *See id.*  United States investigative and enforcement bodies, including

25  the U.S. Department of Justice, the Federal Trade Commission, and the United States Patent &

26  Trademark Office, have all recognized the dangers of patent "hold up," and have specifically

27  identified injunctive relief for SEPs as abusive and anticompetitive:

28

- The United States Department of Justice, Antitrust Division and the United States Patent & Trademark Office issued a joint policy statement in 2013 recognizing that an SEP holder subject to voluntary F/RAND commitments could use the threat of injunctive relief "to pressure an implementer of a standard to **accept more onerous licensing terms than the patent holder would be entitled to receive consistent with the F/RAND commitment**—in essence concluding that the patent holder had sought to reclaim some of its enhanced market power over firms that relied on the assurance that F/RAND-encumbered patents included in the standard would be available on reasonable licensing terms under the SDO's policy." Ex. 9 at 6 (emphasis added).

- The DOJ and USPTO elaborated "[s]uch an order may **harm competition and consumers** by degrading one of the tools SDOs employ to mitigate the threat of such opportunistic actions by the holders of F/RAND-encumbered patents that are essential to their standards." *Id.* (emphasis added).

- The United States Federal Trade Commission has also taken a strong stand against the indiscriminate use of injunctions for SEPs, noting in an amicus brief submitted to the Federal Circuit in *Apple v. Motorola* that "a royalty negotiation that occurs under the threat of an injunction may be heavily weighted in favor of the patentee in a way that is in tension with the RAND commitment." Ex. 10, *Apple Inc. and NeXT Software, Inc. v. Motorola, Inc.*, Nos. 2012-1548, 2012-1549, Dkt. No. 104 at 6 (Fed. Cir. Dec. 14, 2012).

- The Commission further noted a FRAND commitment means that the patentee "implicitly acknowledged that a royalty is adequate compensation for a license to use that patent," further counseling against the award of an injunction. *Id.* at 9.

- The Commission further concluded in an enforcement action that Motorola breached its FRAND obligations "by seeking to enjoin and exclude implementers of its SEPs" from practicing the relevant standards. Ex. 11, Complaint, *In the Matter of Motorola Mobility LLC and Google Inc.*, F.T.C. File No. 121-0120, Dkt. No. C-4410 at 5 (July 23, 2013).

- The Federal Trade Commission has also commented on the risks of injunctive relief on SEPs, describing the dangers of giving "SEP owner[s] the bargaining power to extract licensing terms that reflect the profits from potential lost sales, which can be extraordinarily high for an implementer if there is no feasible design-around alternative." Ex. 12, FTC Chairwoman Edith Ramirez, *Standard-Essential Patents and Licensing: An Antitrust Enforcement Perspective, 8th Annual Global Antitrust Enforcement Symposium* (Sept. 10, 2014) at 7.

United States appellate and district courts have also reached consensus that injunctive relief should generally be unavailable as a remedy for infringement of SEPs. *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1046 (9th Cir. 2015) (pursuit of injunctions during pendency of suit to determine RAND rates for patents suggested "the real motivation was to induce Microsoft to agree to a license at a higher-than-RAND rate"); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC, 2012 WL 5416941, at *15 (W.D. Wis. Oct. 29, 2012) ("from a policy and economic standpoint, it makes sense that in most situations owners of declared-essential patents that have made licensing commitments to standards-setting organizations should be precluded from obtaining an injunction or exclusionary order that would bar a company from practicing the patents"); *Realtek*

*Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1009 (N.D. Cal. 2013) (granting antisuit injunction to bar enforcement of injunctive relief on SEP because "the act of seeking injunctive relief" on SEPs is "is inherently inconsistent" with a FRAND commitment, which "implies a promise not to seek injunctive relief either domestically (as is the case here) ***or abroad***") (emphasis added); *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, No. 8:14-cv-00341-JVS-DFM, 2016 WL 6562075, at *4 (C.D. Cal. Aug. 9, 2016) (denying summary judgment for no breach of FRAND because "initiating infringement lawsuits and pursuing injunctive relief can constitute something more than the more innocent conduct of merely making offers that are not, themselves, FRAND").

To minimize the danger of patent "hold up," standard-setting organizations require participants in the standard-setting process, including companies like Huawei and Samsung, to follow specific licensing policies.  Ex. 13 (Jeffrey I.D. Lewis, *What Is "FRAND" All About?: The Licensing of Patents Essential to an Accepted Standard* (June 11, 2014), available at https://cardozo.yu.edu/what-%E2%80%9Cfrand%E2%80%9D-all-about-licensing-patents-essential-accepted-standard) at 2-3; *see also* Ex. 14 (Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889, 1902-03, 1906 (2002)).  In exchange for allowing their patented technologies to be incorporated into standards, participants are typically required to agree to make their SEPs available to implementers on fair, reasonable, and non-discriminatory ("FRAND") terms.  Ex. 13 at 2-3.  This availability of FRAND licenses is designed to mitigate the threat of patent "hold up" and encourage participation in a standard.  *Id.*  When standard-setting participants fail to comply with their FRAND obligations, their conduct threatens participation in a standard and all of its benefits to the consumer and society, and thereby invites anticompetitive and contractual scrutiny.  *See id.* at 3-5; Ex. 14 at 1914, 1927.

## II.   HUAWEI AND SAMSUNG'S FRAND COMMITMENTS AND NEGOTIATIONS

This case involves the patent licensing policy of ETSI, a European organization that sets global wireless telecommunications standards, including those used in 3G and 4G networks.  Ex. 15 (ETSI, *Mobile Communications*, available at http://www.etsi.org/technologies-clusters/technologies/mobile).  ETSI seeks to balance the public's need for standards against the

1   rights of patent owners to be compensated for the use of their technology in the implementation of

2   standards.  Dkt. 1-1 ("ETSI IPR Policy") §§ 3.1-2.  ETSI requires its members to disclose patents

3   that might be essential to a standard, *id.* § 4.1, and irrevocably undertake in writing that they are

4   prepared to license such patents on FRAND terms.  *Id.* § 6.1.

5       Over time, both Samsung and Huawei have signed ETSI undertakings for numerous U.S.

6   and foreign patents that they believe might be essential to 3G and 4G standards.  Dkt. 91-14, -18, -

7   23-26, -29, -34 (Samsung's Licensing Declarations (Exhibits 14, 23-26, 29, and 34 to Samsung's

8   Answer and Am. Countercls.)); Dkt. 59-1-9 (Huawei's Licensing Declarations (Exhibits 2.1–2.43

9   to Huawei's Compl.)).   And both parties agree they must be willing to license any patents

10  determined to be essential on FRAND terms.  Compl. ¶ 63 (Huawei admits Samsung is "irrevocably

11  entitled" to a FRAND license to Huawei's essential patents); Dkt. 91 (Samsung's Answer and Am.

12  Countercls) ¶ 29 ("Samsung admits that ETSI members who are subject to a commitment to offer

13  licenses on FRAND terms and conditions are obligated not to refuse to enter a license for declared,

14  essential patents that is fair, reasonable, and non-discriminatory.").

15      Unlike Huawei, Samsung has not preemptively asserted its patents in an attempt to shut out

16  competitors or extract licensing revenue.  Samsung has always been willing to enter into cross

17  licenses with other companies that own patents, including direct competitors, *see, e.g.*, Ex. 16 (Nokia

18  press release, *Nokia and Samsung expand their intellectual property cross license* (July 13, 2016));

19  Ex. 17 (Samsung press release, *Samsung and Google Sign Global Patent License Agreement* (Jan.

20  27, 2014)).  Samsung prefers to compete in the marketplace by offering cutting-edge products that

21  customers want to buy.

22      In August 2011, at Huawei's request, the parties began negotiating a worldwide cross license

23  for their respective 3G and 4G patent portfolios.  Ex. 18 (Mar. 2, 2015 Huawei letter).  They

24  regularly met in person for four-and-a-half years, but could not agree on even the most basic license

25  preconditions.  *See, e.g.*, Ex. 19 (slides from Mar. 2012 meeting); Ex. 20 (email referencing June

26  29, 2012 meeting); Ex. 21 (email scheduling June 25, 2013 meeting); Ex. 22 (email referencing

27  Sept. 24-25, 2013 meeting); Ex. 23 (email referencing Feb. 24, 2014 meeting); Ex. 24 (email

28  scheduling Feb. 13, 2015 meeting); Ex. 25 (email referencing Apr. 15, 2015 meeting); Ex. 26 (email

referencing May 20, 2015 meeting); Ex. 27 (slides from Aug. 12, 2015 meeting); Ex. 28 (email referencing Sept. 8, 2015 meeting); Ex. 29 (email scheduling Nov. 23, 2015 meeting).  Over time, Huawei's views on the desired license structure and scope have been a moving target, varying wildly, although its royalty demands have been inflexible.  Ex. 19 (Huawei's Mar. 2012 license presentation ███████████████████████████████████████████████ at 10; Ex. 30 (Huawei's Apr. 7, 2013 draft license agreement ████████████████████████████████████████████ ████████████) at 2-6; Ex. 31 (Huawei's Aug. 2014 draft license agreement ██████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████) at 992; Ex. 32 (Huawei's Dec. 31, 2015 ██████████████████████████████████ ████████████████████████████████████████████ . ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████

Huawei has rejected Samsung's offers and shirked compromise in the hope it might acquire leverage to establish its announced ████████████████████████ . Ex. 19 at 10.  After making trivial concessions over the parties' long history of negotiations, Huawei abruptly ended the negotiations and filed this suit and the Chinese injunction actions.  To date, Huawei has never identified a single party that pays its desired standard rate or even articulated how it arrived at that rate.

## III.   HUAWEI'S GLOBAL LITIGATION OFFENSIVE AGAINST SAMSUNG

Huawei filed this action on May 24, 2016, asserting infringement of 11 Huawei SEPs and alleging Samsung breached "its commitment to enter into a SEP cross-license with Plaintiffs on FRAND terms and conditions."  Compl. ¶¶ 1, 4.  Huawei also seeks a judgment setting the terms and conditions for a global FRAND cross license under the parties' respective worldwide portfolios of essential 3G and 4G patents, and an order enjoining Samsung from "seeking injunctive relief

against Huawei (including affiliates) in any jurisdiction with respect to any alleged infringement of

any patent essential to 3GPP standards."  Compl. at Prayer for Relief, E.[1]

On May 25, 2016, Huawei secretly initiated *eleven* separate actions in various courts across

China, including *ten* in the Shenzhen Intermediate Court where Huawei is based, of which *eight*

involve 3G and 4G SEPs that are the subject of the sweeping declaratory judgment claims Huawei

asserts here—including direct counterparts to patents-in-suit.[2]  *See* Declaration of Guanbin Xie

("Xie Decl.") ¶¶ 3, 11.  To date, Huawei has not formally explained why it filed the Chinese

injunction actions, other than to state there is no *per se* rule against injunctions on SEPs.  *See* Dkt.

67 ("Joint CMC Statement") at 3.[3]

Two of Huawei's Shenzhen actions have moved more quickly than this action, culminating

in the Shenzhen Court's January 11, 2018 injunction order.  Ex. 36 (Jan. 11, 2018 Shenzhen Court

Civil Judgment) (certified translation).   The Shenzhen Court found that Samsung's Chinese

affiliates infringe Chinese Patent Nos. 201010137731.2 and 201110269715.3[4] (*id.* at 209), found

that Samsung ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ (*id.*), and entered an injunction prohibiting Samsung's Chinese affiliates

---

[1]  Samsung, in turn, has counterclaimed for infringement of nine declared-essential Samsung patents, breach of contract based on Huawei's failure to comply with its own FRAND licensing obligations, and monopolization in violation of Section 2 of the Sherman Act.  Dkt. 91 (Samsung's Answer and Am. Countercls.) ¶ 1.

[2]  Huawei has also filed an action asking a Chinese court to determine a rate for a cross-license under the Chinese SEPs within the worldwide portfolios at issue here.  Xie Decl. ¶ 22.  This motion is limited to the two Shenzhen actions in which the Court has issued an injunction order.  Samsung does not seek to enjoin the non-SEP actions and, for now, does not seek to enjoin the Chinese rate setting action or even the other SEP-based injunction actions.  In the event a Chinese court issues an additional injunction order on SEPs, Samsung will evaluate its options, including filing one or more additional motions like this one to enjoin the enforcement of such an order.

[3]  To fully respond to Huawei's Chinese actions, Samsung filed defensive infringement actions against Huawei in Beijing IP Court, stating that ███████████████████████████████████ ██████████████████████████████████████  Ex. 35 (July 13, 2016 Samsung letter) at 2.

[4]  Both patents found infringed are Huawei SEPs that are direct counterparts to two of the Huawei patents asserted here, U.S. Patent Nos. 8,369,278 and 8,885,587.

1   from any further infringement of those two patents.  *Id.* at 209-10.  Samsung believes the order is

2   fundamentally flawed, and it filed its notice of appeal on January 26, 2018.  Xie Decl. ¶ 8.

3   **IV.   SAMSUNG'S EXTENSIVE MANUFACTURING OPERATIONS IN CHINA**

4          Samsung is a leader in the smartphone market, serving consumers across the globe, including

5   in North America, Europe, Asia, Central and South America, and Africa.  Declaration of Tong Wang

6   ("Wang Decl.") ¶ 4.  To meet the global demand for Samsung smartphones, Samsung has

7   established major manufacturing hubs in Huizhou and Tianjin, China.  *Id.* ¶ 5.  At a production

8   capacity of ███████████████████, China is the second largest production hub for

9   Samsung's major smartphones.  *Id.*  Samsung has invested ███████████ into construction and

10  maintenance of its production facilities in China, and has ████████ employees working full time in

11  these facilities.  *Id.*  At these sites, Samsung manufactured █████████████ in 2015 and 2016

12  combined that it supplied to consumers worldwide.  *Id.* ¶ 6.

13         Of the units manufactured in China in 2015 and 2016 (the latest years in which annual data

14  is available), █████████████████████ were imported into the United States,

15  and that █████████████████████  *Id.*  In addition to manufacturing, China is one of

16  the largest handset markets for Samsung.  *Id.* ¶ 7.  In 2015, Samsung sold ████████████

17  units of LTE devices in China for a total revenue of ███████████ which accounted for

18  ████████████████ of Samsung's worldwide sales.  *Id.*  In 2016, Samsung sold ██████████

19  units of LTE devices in China for a total revenue of ██████████, equivalent to ████████

20  of Samsung's worldwide sales.  *Id.*

21         The Shenzhen Court's injunction threatens severe harm to Samsung and the U.S. smartphone

22  market.  *See id.* ¶¶ 8-10.  If Huawei is allowed to enforce the injunction, it will interrupt Samsung's

23  manufacturing, marketing, and sales operations in China, ████████████████████

24  ████████  *Id.* ¶ 8.  This harm would also extend far beyond China.  *Id.* ¶ 9.  ██████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

1    ██████████████████████████  *Id.*  As a result, Samsung's manufacturing and

2 deliveries to the United States and other major markets could be delayed, harming Samsung's sales,

3 reputation, and ability to compete in the market.  *Id.*  Given the intense competition Samsung faces

4 in the global smartphone industry from both established and rising companies like Apple, Huawei,

5 LG, Oppo, and Xiaomi, it would be difficult for Samsung to regain the consumer loyalty and

6 reputation it would lose from delays and interruptions in its Chinese operations.  *Id.* ¶ 10.

7 **ARGUMENT**

8 **I.      APPLICABLE LEGAL STANDARD**

9      **A.      The Court Has the Power to Issue Antisuit Injunctions under *Microsoft***

10      A district court may enjoin a party from prosecuting a foreign action.  *Microsoft*, 696 F.3d

11 at 880-81.  "Courts derive the ability to enter an anti-suit injunction from their equitable powers.

12 Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a

13 foreign court in circumstances that are unjust."  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446

14 F.3d 984, 989 (9th Cir. 2006).

15      Antisuit injunctions are appropriate when a party's foreign actions "frustrate[] this court's

16 ability to adjudicate issues properly before it" or when "[w]ithout the issuance of an anti-suit

17 injunction, the integrity of the action before this court will be lessened."  *Microsoft Corp. v.*

18 *Motorola, Inc.*, 871 F. Supp. 2d 1089, 1100 (W.D. Wash. 2012), *aff'd*, 696 F.3d 872 (9th Cir. 2012).

19 The Ninth Circuit emphasizes that district courts have "a duty to protect" their "legitimately

20 conferred jurisdiction to the extent necessary to provide full justice to litigants."  *Gallo*, 446 F.3d at

21 995.  In *Microsoft*, the Ninth Circuit affirmed the district court's issuance of an antisuit injunction

22 to protect its ability to resolve a global FRAND licensing dispute.  The district court had enjoined

23 Motorola from pursuing claims in Germany that were motivated by an attempt to "pressure"

24 Microsoft to enter into an unfair license "before the [domestic] litigation is complete." *Microsoft*,

25 696 F.3d at 886.  Samsung seeks the same kind of limited relief.

26      The Ninth Circuit applies a three-part inquiry as part of its "liberal approach" to granting

27 antisuit injunction motions.  *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361

28 F.3d 11, 17 (1st Cir. 2004) (the Fifth and Ninth Circuits follow the "liberal approach").  First, the

1   Court determines "whether or not the parties and the issues are the same in both the domestic and

2   foreign actions, and whether or not the first action is dispositive of the action to be enjoined."

3   *Microsoft*, 696 F.3d at 881 (quoting *Gallo*, 446 F.3d at 991).  Second, the Court determines "whether

4   at least one of the so-called '*Unterweser* factors' applies."  *Id.*  And third, it assesses "whether the

5   injunction's impact on comity is tolerable."  *Id.*  An antisuit injunction, if granted, "enjoins the

6   claimant, not the foreign court." *Gallo*, 446 F.3d at 989.

7   **II.   THE PARTIES AND ISSUES ARE FUNCTIONALLY THE SAME**

8           **A.      The Parties Are Functionally the Same**

9           The parties to Huawei's actions here and in China are the same for purposes of an antisuit

10  injunction because both involve Huawei, Samsung, and their respective affiliates.  "Perfect identity

11  of parties is not required . . . .  Rather, it suffices that the parties be affiliated in such a way that their

12  interests coincide."  *Microsoft*, 871 F. Supp. 2d at 1098.  Here, it is undisputed that (i) Huawei

13  Technologies Co., Ltd., Samsung Electronics Co., Ltd., and certain subsidiaries or affiliates of each

14  are the parties to this action and (ii) Huawei Technologies Co., Ltd. and certain Chinese subsidiaries

15  or affiliates of Samsung Electronics Co., Ltd. are the parties to Huawei's foreign actions.  *Compare*

16  Compl. at 1, *with* Xie Decl. ¶ 3.  The parties are therefore functionally the same.  *See Microsoft*, 871

17  F. Supp. 2d at 1098.

18          **B.      The Issues Are Functionally the Same**

19          The primary issue in the Shenzhen cases—the availability of injunctive relief on Huawei's

20  FRAND-encumbered Chinese SEPs—is also at issue here in the context of the global SEP portfolios

21  of which the two Chinese SEPs in question are a part.  Each party acknowledges it has contractual

22  FRAND obligations for its global portfolio of telecommunications SEPs, contends it has complied

23  with those obligations and that the other party has not, and has asked this Court to bar the other party

24  from obtaining injunctive relief anywhere in the world on those SEPs.  In the circumstances

25  presented here, functional identity of issues under the Ninth Circuit's standard is easily met.  *Applied*

26  *Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 914-15 (9th Cir. 2009) (treating a Belgian

27  statutory claim as functionally the same as a breach of contract claim); *InterDigital Tech. Corp. v.*

28  *Pegatron Corp.*, No. 15-CV-02584-LHK, 2015 WL 3958257, at *5 (N.D. Cal. June 29, 2015)

(finding that the alleged violations of Taiwanese antitrust laws "arise out of the parties' obligations pursuant to the [Agreement]").

The Ninth Circuit's *Microsoft* decision, which involved highly similar facts, is instructive. *Microsoft*, 696 F.3d at 883.  Motorola had sent a series of pre-litigation letters offering Microsoft a license under a worldwide portfolio of SEPs on terms Microsoft considered too high to be RAND[5]. In response, Microsoft filed a declaratory judgment action in the Western District of Washington asserting Motorola breached its contractual obligation to license the patents on RAND terms.  With the case pending, Motorola sought injunctions in Germany based on infringement of European SEPs that fell within the portfolios being litigated in the Washington action.  *Id.* at 879.  The German court issued an order finding infringement and confirming an injunction would issue after appellate review.  Three weeks before review of the injunction was complete, Microsoft moved for an antisuit injunction to bar Motorola from enforcing the German injunction.  *Id.* at 880.  Microsoft asserted the antisuit injunction was warranted because the U.S. district court's resolution of the contract claims would decide the question of the availability of injunctive relief and thereby ultimately dispose of the German action.  Ex. 37 (Microsoft's Mot. for TRO and PI, Mar. 28, 2012, Dkt. 210) at 21 ("[The requested injunction] will bar injunctive relief . . . ."); *see also* Ex. 38 (Microsoft's Reply in Supp. of Mot. for TRO and PI, Apr. 9, 2012, Dkt. 257) at 11.  The district court agreed.

Rejecting Motorola's argument that the issues were not the same because a U.S. action could not resolve a dispute involving the infringement of German patents under German law, the district court concluded the U.S. breach of contract claims squarely presented the key overlapping issue of whether injunctive relief was an appropriate remedy for infringement of Motorola's SEPs and therefore could fully resolve the German action.  *Microsoft*, 871 F. Supp. 2d at 1099; Ex. 39 (Def.'s Opp'n to Microsoft's Mot. for TRO and PI, Apr. 6, 2012, Dkt. 244) at 14-18.  The Ninth Circuit affirmed, agreeing the state contract claims would "resolve" the German action because Motorola

---

[5] The IEEE standard-setting organization requires licensing of SEPs on a "reasonable and non-discriminatory" or RAND basis.  For purposes of this motion, there is no meaningful difference between RAND and FRAND.

1    was obligated to license the asserted European patents on RAND terms and they fell within the

2    worldwide license offer at the heart of the contract claim. *Microsoft*, 696 F.3d at 883.

3         The Shenzhen injunction actions indisputably implicate the same contractual question of the

4    availability of injunctive relief for FRAND-encumbered SEPs that Huawei asked this Court to

5    resolve.  Huawei asserts Samsung breached its contractual obligations by failing to engage in good

6    faith license negotiations, rejecting alleged FRAND offers, and allegedly failing to offer FRAND

7    terms for a license to its worldwide 3G and 4G SEP portfolios.[6]  As a remedy for the asserted breach,

8    Huawei asks the Court to bar Samsung from obtaining injunctive relief ***anywhere in the world*** on

9    those patents.  Samsung, in turn, asserts its own competing breach of contract claim, as well as an

10   antitrust claim, based on Huawei's efforts to engage in patent "hold up" through its licensing

11   conduct and its improper preemptive resort to injunction actions in Shenzhen.  Dkt. 91 (Samsung's

12   Answer and Am. Countercls.) ¶¶ 260-546.  Accordingly, this action will necessarily resolve the

13   fundamental issue presented in the Shenzhen injunction action, namely, whether injunctive relief is

14   appropriate for alleged infringement of SEPs that are subject to contractual FRAND licensing

15   obligations.[7]

16        Huawei underscored the centrality of the parties' FRAND licensing obligations and related

17   claims by raising them in the first paragraph of its complaint:

18        Huawei and Samsung have made ***binding commitments*** to the European
     Telecommunications Standards Institute ("ETSI")—a 3GPP organizational partner
19        which promulgates standards developed by 3GPP—***to license these standard-
     essential patents ("SEPs") on terms and conditions that are fair, reasonable, and
20        non-discriminatory ("FRAND")***.

21   Dkt. 59 ¶ 1 (emphasis added).  Throughout the Complaint and in other submissions to the Court,

22   Huawei has consistently highlighted the importance of the Court's resolution of the contractual

23

24   _____

25        [6]  Huawei even asks the Court to set the terms of a worldwide FRAND license with Samsung
     that would encompass Huawei's Chinese SEPs.
26        [7]  The timing of the instant antisuit motion also closely parallels *Microsoft*.  Microsoft, like
27   Samsung, filed its motion for antisuit injunction after the foreign court's injunction order, but before
     appellate review of the injunction made the injunction enforceable.  *Microsoft*, 696 F.3d at 880;
28   Song Decl. ¶ 7.

1    FRAND claims, asserting that the parties' FRAND dispute is "at the *core* of this lawsuit."  Dkt. 84

2    (Huawei's Br. in Supp. of Request to Bifurcate or Phase Trials) at 2.

3         That the Chinese SEPs asserted by Huawei in its Shenzhen injunction actions all fall within

4    the global portfolios of SEPs at issue here cannot be disputed.  *See* Xie Decl. ¶ 3.  Indeed, each of

5    those patents is listed in the Letters of Assurance Huawei attached to its Complaint.  Dkt. 59-1-9

6    (Huawei's Licensing Declarations (Exhibits 2.1–2.43 to Huawei's Compl.)).  Moreover, the two

7    patents on which the Shenzhen injunction order is based are direct counterparts to two of the Huawei

8    patents asserted here, U.S. Patent Nos. 8,369,278 and 8,885,587.  Xie Decl. ¶¶ 4, 7.  As a predicate

9    for its requests for injunctive relief, Huawei asked the Shenzhen Court to resolve whether its

10   licensing efforts with respect to its Chinese SEPs were FRAND, and whether Samsung refused

11   FRAND offers and breached its own FRAND obligations.  *See id.* ¶ 5.  Indeed, the Shenzhen Court

12   addresses these issues in its injunction order.  Ex. 36 (Jan. 11, 2018 Shenzhen Court Civil Judgment)

13   (certified translation) at 209.  Huawei has even admitted that this case will be dispositive of the

14   Chinese actions, stating in its repeated bifurcation requests that a determination of FRAND issues

15   here would likely "moot" patent infringement claims that have been "asserted here and abroad,"

16   Dkt. 84 at 1, 5, and assuring the Court that once the Court or an arbitrator resolved FRAND issues

17   Huawei could comfortably "stay all other proceedings (including those in China)."  Dkt. 67 at 5.

18   Thus, adjudication of FRAND, antitrust, and licensing issues in this action, and resolution of the

19   parties' global licensing and antitrust claims, requires this Court to address issues functionally

20   identical to those being litigated in China.

21   **III.    HUAWEI HAS THE POWER TO ENFORCE THE SHENZHEN INJUNCTION**

22        The Shenzhen Court's injunction order will not be enforced until after the conclusion of the

23   appeal.  Ex. 36 at 209-10; Declaration of Dr. Song Lianbing ("Song Decl.") ¶ 7.  The injunction

24   order specifically provides that █████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ████████████████████████   Ex. 36 at 209; Xie Decl. ¶ 7.

27        On January 26, 2018, Samsung filed a notice of appeal of the Shenzhen Court's judgment.

28   Xie Decl. ¶ 8.  That appeal will give the Guangdong High People's Court ("Guangdong High

Court") the opportunity to review *de novo* the procedural and substantive determinations made by the Shenzhen Court.  Song Decl. ¶ 8.  The parties can submit additional evidence during the appeal, and the Guangdong High Court may hold an additional evidentiary hearing.  *Id.*  The appeal is expected to conclude within months.  *Id.* ¶ 9.  Huawei can withdraw its lawsuits against Samsung at any time during the appeal to the Guangdong High Court.  *Id.*  Alternately, Huawei can request a stay of the appeal pending resolution of its claims before this Court, and the Guangdong High Court can grant such a stay in its discretion.  *Id.*

## IV.   THIS COURT IS UNIQUELY SITUATED TO RESOLVE THE GLOBAL FRAND ISSUES OF THE PARTIES' COMPLIANCE WITH THEIR LICENSING OBLIGATIONS AND THE AVAILABILITY OF INJUNCTIVE RELIEF

This Court, not the Chinese courts, should be first to determine the central overlapping issue of the parties' compliance with their FRAND obligations and the availability of injunctive relief given the global nature of the parties' FRAND dispute and Huawei's decision to initiate proceedings here.  Indeed, because Samsung manufactures a significant portion of its worldwide supply of smartphones in China (Wang Decl. ¶¶ 5-6), the enforcement of a Chinese injunction based on Chinese SEPs included in worldwide SEP portfolios being litigated here could compel an abrupt settlement of this action.

Courts around the world have recognized the propriety of resolving contractual FRAND issues between two parties first, rather than in a piecemeal fashion on individual SEPs.  In *Microsoft*, the Ninth Circuit affirmed the district court's grant of an antisuit injunction where the district court's determination of whether Motorola's worldwide SEP portfolio license offer was FRAND would resolve requests for injunctions in foreign patent actions involving individual SEPs within that portfolio.  *Microsoft*, 696 F.3d at 883.  In *TCL Communication Technology Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, another FRAND licensing dispute, the court similarly granted an antisuit injunction to prevent either party from pursuing foreign patent claims on individual SEPs that were the subject of the court's global FRAND determination because "the [domestic] FRAND action should resolve [the parties'] global licensing dispute." Ex. 40, No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 at 5 (C.D. Cal. June 29, 2015).  Similarly, in *Unwired Planet International Ltd. v. Huawei Technologies Co., Ltd.*, the UK High Court of Justice recognized that global cellular SEP licenses

1    are common in the industry and have economic efficiencies, and found that a global cellular SEP

2    license was consistent with FRAND licensing obligations. Ex. 41, [2017] EWHC 711 (Pat) at [543-

3    44].

4            Here, the parties' claims, first initiated by Huawei, ask this Court to adjudicate the gateway

5    issue of whether the parties have complied with—or breached—their respective FRAND obligations

6    and, if so, whether as a result of such breach, either party may obtain injunctive relief anywhere in

7    the world on their SEPs.  Huawei has even asked this Court to resolve what the FRAND contract

8    requires between these two parties, consistent with the parties' negotiations for a cross license to

9    their worldwide cellular SEP portfolios.  Samsung, in turn, has joined the dispute asserting its own

10   contractual FRAND counterclaims and an antitrust counterclaim based on related conduct.  Given

11   both parties' decision to make this action the centerpiece for their worldwide contractual FRAND

12   dispute, this Court should issue the antisuit injunction to resolve the fundamental contractual

13   questions the parties have presented, rather than allowing them to be decided piecemeal in Chinese

14   courts based on subsets of the SEPs at issue here.[8]

15   **V.      MULTIPLE *UNTERWESER* FACTORS APPLY**

16           Multiple *Unterweser* factors support the requested antisuit injunction.  Huawei's Chinese

17   actions will frustrate U.S. antitrust law, are vexatious and oppressive, and prejudice multiple

18   equitable considerations.  Any one of these factors alone "may justify a foreign anti-suit injunction."

19   *Microsoft*, 696 F.3d at 882 n.9 (quoting *Gallo*, 446 F.3d at 991).

20

21   _____

22       [8]  The recent denial of an antisuit injunction in *Apple Inc. v. Qualcomm Inc.*, No. 3:17-cv-00108-
     GPC-MDD, 2017 WL 3966944 (S.D. Cal. Sep. 7, 2017) is distinguishable.  There, Qualcomm
23   sought an antisuit injunction barring Apple from proceeding with a wide range of actions in the
     United Kingdom, China, Taiwan, and Japan without regard to injunction orders.  *Id.* at *4-5 ("The
24   motion seeks to enjoin Apple from pursuing all of the claims in all of the foreign actions and from
     filing any other foreign action during the pendency of the U.S. action.").  In contrast, Samsung's
25   present motion is narrowly tailored to the specific injunction order issued by the Shenzhen Court on
     two Chinese patents.  Although Huawei is pursuing other SEP and non-SEP actions in China, as
26   well as a rate-setting action before the Guangdong High People's Court, Samsung is not moving to
     enjoin any of those actions at the present time.  In the event an initial injunction order issues on
27   other Chinese SEPs, Samsung will likely move for antisuit injunctions at that time if this case is still
     pending.
28

**A.      Huawei's Enforcement of Injunctions in China Violates U.S. Antitrust Law and Will Frustrate Both U.S. Policy and the Policies of This Court**

Pursuing injunctive relief against a willing manufacturer is anticompetitive, inconsistent with contractual FRAND obligations, and risks harming downstream consumers.  Huawei pointed these risks out in recent litigation in which *it faced* the prospect of injunctive relief on SEPs:

> [A] *consensus* is rapidly emerging among regulatory bodies and the federal courts that, when there is a dispute as to the FRAND rate for declared-essential patents, the accused infringer must be given the opportunity to accept a FRAND rate determined by a court or arbitrator, and that opportunity must be given ***before*** *the patentholder can seek injunctive relief*.

Ex. 42, *InterDigital Commc'ns, Inc. v. Huawei Tech. Co., Ltd.*, No. 1:13-cv-00008-RGA, Dkt. 17 at 1 (D. Del. Feb. 11, 2013) (Huawei's Op. Br. in Supp. of Mot. for Expedited Disc. and Expedited Trial on FRAND Countercls.) (emphasis added).[9]  Huawei is correct a "consensus" has emerged, and is now firmly established in the U.S., that using requests for injunctive relief as a bargaining tool for SEP licensing is improper.  *See supra* Factual Background § I; Exs. 8-14.  Huawei itself— *in this action*—not only acknowledges, but invokes that consensus as it requests that Samsung be enjoined from seeking an injunction in any foreign action for infringement of an SEP.  Compl. at Prayer for Relief, E.

Huawei's attempt to enforce the Shenzhen Court's injunction will also frustrate general domestic policies of this forum against anticompetitive conduct and breaches of contract.  "[O]ne clear policy that all federal courts recognize—even those which have been loath to interfere with foreign proceedings—is the need to protect the court's own jurisdiction." *Zynga, Inc. v. Vostu USA, Inc.*, No. 11-cv-02959-EJD, 2011 WL 3516164, at *3 (N.D. Cal. Aug. 11, 2011).  Courts have therefore repeatedly found foreign litigation to frustrate domestic policy when defendants seek to use the foreign litigation to evade contractual obligations or compliance with U.S. law.  *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004) ("Where, as here, a party institutes a foreign action in a blatant attempt to evade the rightful authority of the

---

[9]      In that same brief, Huawei argued, just as Samsung does here, that the SEP holder was ignoring these recent decisions to pursue the "leverage to force a non-FRAND license rate on Huawei." *Id.*

forum court, the need for an antisuit injunction crests."); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984) ("Injunctions are most often necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum.").

Huawei's pursuit of injunctions on its SEPs in China is a blatant attempt to renege on its contractual FRAND commitments.  By pursuing and attempting to enforce the Shenzhen injunctions, Huawei seeks to substantiate and wield its holdup power against willing licenses, like Samsung, whose ability to compete in China and worldwide depends on its sales and manufacturing activities there.  Huawei's enforcement of such an injunction will further its wrongful scheme in contravention of this forum's specific public policies against injunctive relief on SEPs and general policies against breach of contracts and anticompetitive conduct.  Only an antisuit injunction can rectify this conduct.

### B.      Huawei's Chinese Injunction Actions Are Vexatious and Oppressive

Huawei's Chinese injunction actions raise serious concerns of forum shopping and duplicative and vexatious litigation.  Its motives in pursuing injunctive relief only from the Chinese courts—not this Court—are clear:  injunctive relief is rarely if ever warranted in U.S. cases involving SEPs and thus Huawei necessarily recognizes that the threat of a U.S. injunction will fail to provide the desired licensing leverage.  The Chinese injunction actions, in contrast, as Huawei's own Vice President, Ding Jianxin, explained in October 2016 at the 2016 China Competition Policy Forum, serve Huawei's purposes by allowing it "to get the royalties in return, while using legal action as a ***bargaining chip***."  Ex. 1 (Speech of Ding Jianxin at 2016 China Competition Policy Forum) (certified translation).

This resort to improper injunction-based licensing leverage is precisely the type of conduct *Microsoft* found to justify the grant of an antisuit injunction.  *Microsoft*, 696 F.3d at 886.  There, the Ninth Circuit affirmed the district court's finding that defendant's invoking of foreign litigation seeking injunctive relief on a subset of its SEPs already at issue in the U.S., and doing so "before [the U.S.] court could adjudicate that precise issue, i.e., the propriety of injunctive relief for infringement of standard-essential patents," raises concerns of forum shopping and duplicative and

vexatious litigation.  *Id.* (citing district court opinion) (internal quotations omitted).  Huawei's forum shopping is unmistakable.   As in *Microsoft*, Huawei's actions are nothing but "a procedural maneuver designed to harass [Samsung] with the threat of an injunction removing its products from a significant [] market and so to interfere with the court's ability to decide the contractual [and antitrust] questions" properly placed before it.  *Id.* at 886.

### C.   Huawei's Chinese Actions Prejudice Multiple Equitable Considerations

#### 1.   The Chinese Actions Permit Huawei to Circumvent U.S. Law and Risk Injuring Consumers and the Marketplace

Absent an antisuit injunction, Huawei will be able to make an end run around the U.S. antitrust and contract laws by enforcing an injunction that was granted without any deference to the U.S. laws.   Huawei's enforcement of the injunction will inflict serious harm on Samsung's smartphone business in China and worldwide, Wang Decl. ¶¶ 8-10, thus "compromising [this Court's] ability to reach a just result in the case before it free of external pressure on [Samsung] to enter into a 'holdup' settlement before the litigation is complete."  *Microsoft*, 696 F.3d at 886 (quoting district court opinion).  Furthermore, Huawei's wrongful actions will injure consumers and the marketplace.  *See* Wang Decl. ¶ 10.  Having represented to this Court that these issues are "at the core of this lawsuit" (Huawei's Br. in Supp. of Req. to Bifurcate or Phase Trials at 5 (Dkt. 84)) and invoked this Court's power to issue remedies on a global basis, Huawei's litigation tactics in China should not now be allowed to deprive this Court of that opportunity.

#### 2.   Huawei's Chinese Actions Could Result in Inconsistent Rulings or a Race to Judgment

Huawei's eight lawsuits across China on individual SEPs—culminating in the Shenzhen Court's injunction order—create a risk of inconsistent judgments that further supports the requested antisuit injunction.  On one hand, Huawei has asked this Court to determine whether the parties have breached their FRAND obligations, to determine whether injunctive relief is available, and even to set the terms and conditions of a worldwide SEP cross license permitting each party to make use of the other's patented technologies.  On the other hand, at Huawei's request, the Shenzhen Court has issued an injunction that will serve to prohibit Samsung from using a subset of these same rights.

1   Huawei's enforcement of this injunction, and further pursuit of injunctions before other Chinese

2   courts, will only intensify the risk of inconsistent judgments between this Court and the Chinese

3   courts, placing Samsung "in an impossible position of attempting to alter its behavior in an attempt

4   to satisfy conflicting rulings." *Albemarle Corp. v. AstraZeneca UK Ltd.*, No. Civ. A. 5:08-1085-

5   MBC, 2009 WL 902348, at *7 (D.S.C. Mar. 31, 2009).  Huawei's duplicative lawsuits raise related

6   concerns that it is engaged in an improper "race to judgment." *Seattle Totems Hockey Club, Inc. v.*

7   *National Hockey League*, 652 F.2d 852, 856 (9th Cir. 1981).  By placing the same global FRAND

8   questions before this Court and several Chinese courts, Huawei can test the waters in each court and

9   then race to judgment in whichever jurisdiction it believes to be most sympathetic to its cause.

10  **VI.   THE REQUESTED INJUNCTION HAS NO ADVERSE IMPACT ON COMITY**

11          The last step in determining whether an antisuit injunction is warranted is to assess whether

12  the injunction's "impact on comity is tolerable." *Gallo*, 446 F.3d at 991.  "Comity is 'the recognition

13  which one nation allows within its territory to the legislative, executive or judicial acts of another

14  nation, having due regard both to international duty and convenience.'"  *Id.* at 994 (quoting *Hilton*

15  *v. Guyot*, 159 U.S. 113, 164 (1895)).  The Ninth Circuit has held repeatedly that private contractual

16  disputes have little, if any, impact on comity.  *See, e.g.*, *Microsoft*, 696 F.3d at 887 ("[C]omity is

17  less likely to be threatened in the context of a private contractual dispute than in a dispute implicating

18  public international law or government litigants.").  In contrast, the Ninth Circuit has recognized

19  that allowing a private party to proceed with duplicative lawsuits in multiple jurisdictions may itself

20  have an intolerable impact on comity.  *See Applied Med.*, 587 F.3d at 921; *Gallo*, 446 F.3d at 994.

21  The presence of antitrust claims does not change that result.  *See InterDigital*, 2015 WL 3958257,

22  at *8.

23          Here, the requested antisuit injunction would have no impact on comity.  This is a private

24  commercial dispute between two corporations, and does not implicate any foreign governments.

25  Huawei has asked this Court to resolve a global dispute concerning the parties' FRAND licensing

26  obligations and their ability to obtain injunctive relief on SEPs, which will obviate the SEP

27  injunction actions Huawei has launched across China.  Samsung does not ask the Court to bar any

28  of the Chinese courts from taking any specific actions, but rather asks only that the Court restrain

1  Huawei from taking further actions—namely enforcing an injunction order—that would undermine

2  this Court's ability to resolve the gateway FRAND questions the parties have presented.  Huawei

3  would remain free to seek damages for infringement of the Chinese patents while this action is

4  pending.  Comity is simply not offended by this Court's exercise of jurisdiction over, and protection

5  of, this private contractual dispute.

6  <u>**CONCLUSION**</u>

7          For the reasons set forth herein, Samsung respectfully requests this Court to grant its

8  motion for an injunction, and enter an order barring Huawei from enforcing injunctive relief it has

9  obtained in China during the pendency of the proceedings here in California.

10

11  DATED:  February 1, 2018                    Respectfully submitted,

12                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
13

14                                              By   */s/ Charles K. Verhoeven*
                                                     Charles K. Verhoeven
15                                                   Kevin P.B. Johnson
                                                     Victoria F. Maroulis
16                                                   Thomas D. Pease
                                                     David A. Perlson
17

18                                              *Attorneys for Samsung Electronics Co., Ltd.,*
                                                *Samsung Electronics America, Inc., and*
19                                              *Samsung Research America, Inc.*

20

21

22

23

24

25

26

27

28

1

**<u>ATTESTATION</u>**

2

     I, Victoria F. Maroulis, am the ECF user whose ID and password are being used to file the

3

above Motion.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that Charles K. Verhoeven

4

has concurred in the aforementioned filing.

5

6

                           */s/ Victoria F. Maroulis*

7

                           Victoria F. Maroulis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28