# EXHIBIT 1

## CERTIFICATION OF TRANSLATION ACCURACY

I certify that this Chinese to English translation of the 6-pager interview portion of the Chinese language document entitled "**Talk of Huawei's Jianxin Ding S-816 Samsung China**" is an accurate and complete rendering of the contents of the source document to the best of my knowledge and ability. I further certify that I am a qualified professional translator familiar with both languages with more than ten years of experience in Chinese to English translation of various legal, technical and business documents submitted to various courts in the United States.

Date: march 23, 2017

*[signature]*
Ling Lau, Translator

## Ding Jianxin from Huawei:
## Why China has more mobile phone infringement cases than the US?

Sina Finance — Ding Jianxin, Vice President of Huawei Technologies Co., Ltd, attended and addressed the 2016 China Competition Policy Forum held on 27th-28th October in Beijing. Answering the question on why China has more mobile phone infringement cases than the US, Ding Jianxin stated that at present 60% of shipments across the mobile phone industry came from China. If Apple products manufactured in China were to be included, this number might be 80%, signaling the migration of cellular phone industry from the Western countries to China. It will inevitably lead to more patent disputes, and at the same time, pricing power disputes will also increase.

**(Start of the interview)**

Verbatim transcript of the interview:

Ding: First, I'd like to thank Mr. Sheng for giving my company an opportunity like this to share our views and opinions. I listened to today's morning session where several judges, including Chief Judge Chi Su (President of Beijing IP Court), discussed an increasing number of anti-monopoly IP cases facing China. I think that we will see more and more of such cases. Let me shortly explain why.

For starters, let's take a look at the intersection of our IP industry over the course of past decade or two. The industry we are in, it is known as ICT, representing information, communications and internet. IP protection model has changed quite a lot when compared to 20 to 30 years ago. As a result, many changes occurred in the judiciary as prompted by the changes in the industry as the judiciary attempted to keep up with these changes.

So what has changed? Some 200 or 300 years ago, patent was like monopolistic power whereby an invention was protected. But with the advancement of science and technology, globalization of trade, especially the spread of internet technology, the number of those still insisting on the monopoly right is actually decreasing. Few companies in the world would say you cannot use their patents. From the onset of these changes, IP rights have been protected through licensing agreements. IP holders receive license fees in return for their innovative research and development. So, the former

monopolistic power has shifted to pricing power. Today, the number of disputes is on the rise, but we see fewer cases of injunction. Perhaps judges are quite reluctant to hear injunction cases because of its staggering impact on the market. Sure enough, the core issue is price; 90% or even 99% of the patent disputes are about price. Even if injunction order were to be enforced, does Huawei really want to kick Samsung out of China? Is it possible? Of course not. And is it possible for Apple to kick Samsung out of the US? No. That being said, when faced with potential licensees who are negotiating in bad faith, unwilling to pay fair royalties, you may want to file an injunction order with the court. At the end of the day, your purpose is to get the royalties in return, while using legal action as a bargaining chip. This is how things have changed over time.

Secondly, Huawei is a large company. On the one hand, our sales revenue was more than 60 billion RMB this year; and we are using a lot of intellectual properties from other companies. On the other hand, after years of home-grown research and development, we now have lots of our own intellectual properties and are arguably the industry leader in China. So, Huawei is well-balanced in its IP portfolio. We pay other companies royalties and we do not want to overpay; at the same time, we're starting to license more of our own IPs to others. Now we are trying to figure out how to balance these competing interests regarding the power of IP protection? In the first place, intellectual property must be protected. If not, once it gets publicized on the internet and available to anyone, and there are no penalties for IP infringements, or if, in some extreme cases, there does not even exist deterrence of relying upon injunctive order, who would be willing to cover the cost of research and development?

However, we must oppose rigid approach to IP protection. What does this mean? As we all know, many intellectual properties such as patents have a 20-year life cycle. There are some other intellectual properties known as Standard-Essential Patents. Today I dare predict that in 10 years of time, we would see the emergence of many other types of patents, other than just SEPs. The computer software and instruction and integrated circuit technologies are neither copyright nor patent right; and they have no life cycle. Recently, we faced a challenge in my company when we tried to integrate a third-party IP for wafer development. The IPR holder demanded that insofar as we used it, we should pay perpetual royalties. But we are here talking about an instruction set. Let me explain the concept of it. It is sort of like English language we speak nowadays, meaning that as long as it is integrated, it will be used forever; for example, Intel's x86 computer language instruction set is still in use all over the world. We can imagine it's

like a guy who learned how to speak English 100 or even 200 years ago, once the person learned the language, he can sort of speak it forever if there is no restriction. So there must be some sort of constraints applicable to the protection of IP pricing power. So, even though our judicial or law enforcement agencies may be reluctant to get involved in such cases, they may have to get involved to address this issue.

Let me give you another example, we have always complained about gas prices, but the number of complaints have fallen in the past two years. Why? Because the gas prices have been adjusted at least every several months. However, for some of the intellectual properties, their prices remain the same as they were 10 or 20 years ago. No wonder many companies now complain. We oftentimes ask how we can tell if these prices are reasonable. Of course, at times, we look to various judicial tools, but at some other times, it's quite obvious. Before I came here, I checked some data: in the aviation industry, Boeing has only one competitor, Airbus. For such a mature and high-tech industry with little competition, their profit margin last year was merely 8.1% and around 6% to 7% in the prior years. This is a normal profit margin for a leading and mature high-tech industry with little competition. Meanwhile, we cannot criticize Apple for its 30% profit margin, because this represents a number in the initial stage of a growth industry. We have some parameters to gauge what an unreasonable pricing is.

So, we cannot merely wait until we can ideally rely on China's judicial system to gradually bring about some standards and norms regarding pricing including competition, patent and licensing transactions of IP disputes and controversies through the representative cases Chief Judge Chi Su talked about. We surely need to defend our patent rights and protect the fruits of our research and development. But when we already hold such patent rights and desire to license them, we also need rules and standards governing these activities. As we can see, major multinational companies have many disputes over a wide range of patents. At the end of the day, there are winners and losers. You look at the big picture, you will see that the controversies revolve around pricing, the final pricing and the relevant actions of opposing parties. Since the principle of good faith dealing is important to all commercial activities, the patentee bears the obligation to notify, substantiate its assertion, and give its counterparty an opportunity to offer an acceptable price.

If you are the user of a patent, you need to make good faith efforts to negotiate and make a genuine offer which basically reflects the value of the patent. These standards, I think, should be gradually established through judicial cases. Of course, there may be

an interesting scenario where the patent holder asks for what he deems as a reasonable price, but the patent user might say the price is too high and is inclined to pay less. The difference between the offered and counteroffered prices maybe 1% or 0.3%. Then what should they do? They all made their best efforts dealing in good faith, especially the patent patent user trying very hard to meet the price. Will the patent user prevail? What should the judge do now? There are two solutions. The first is the judge's power to engage in discovery, although unlike the US, there isn't any discovery procedure in China. The judge can exercise his investigative power to seek evidence that some patent users are not in a position to discover. This would help judge to hear such cases. The other is judicial pricing power. When disputes cannot be settled through mediation or negotiation, the judge can make relatively impartial and active adjudication on the basis of so-called asymmetric business information unavailable to both parties. I think these two solutions can resolve complicated IP cases.

Finally, let me recap what I have just said. First, there must exist some deterrent judicial remedies such as injunction so as to protect IPs. Of course, such deterrence is not only available for the patent users but also for the patent holders. Today the patent holders can seek general and punitive damages. Going forward, when the opposing parties have established expectations, they would play to a common set of rules of the game. Just as Judge Song said, only 7% of the cases went to trial, almost 90% cases were settled out of court. This is the way to go because the role of judicial system is to establish standards and set expectations so the market can run itself.

Next, IP protection should be aligned with changes and advancements of the industries and iterative nature of technologies. The judicial system should protect and reward innovation. But how big should the reward be? If one creates IP through research and development, I think that the reward should be double, triple or even quintuple of his input to incentivize him to continue with his efforts. That said, if what he is working on has nothing to do with research and development, he just keeps profiteering from his past efforts, such reward should be stopped. So, the pricing of IP is intended to promote research and development rather than allowing the patent holders of outdated, decade-old technologies continue to profit.

Thirdly, the number of disputes over mobile phones in China is indeed increasing. Answering the question from Judge Song this morning that China has more infringement cases than the US. I think the reason is that 60% shipments of mobile phones in this industry come from China. I's here talking only about the self-branded

mobile phones. If we include Apple products manufactured in China, the number would be 80%. The whole industry has already been relocated to China. This will certainly lead to more disputes and pricing power disputes. In the western industrial countries, though the pricing systems and rules were established some 10 to 20 years ago, they can still keep up with and follow the general trajectory of industrial and technological advances. How well will they operate in China market now? Will China adapt to it when technology advances so rapidly in today's world? In fact, China is in a critical stage to think and decide how to balance the rights and interests between the IP holders and IP users, how to determine good faith versus bad faith, and how to set a price that can really promote innovation rather than over-protect. We need to develop such regulations and standards. These are some of thoughts and observations based on our experiences.

Thank you!

(End of the interview)