Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

Huawei Technologies Co, Ltd,   )
et al,                          )
                                )
          Plaintiffs,           )
                                )
    VS.                         )    NO. 16-CV-2787
                                )
Samsung Electronics Co, Ltd,    )
et al,                          )
                                )
          Defendants.           )
_____)
                                San Francisco, California
                                Wednesday, March 14, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          SIDLEY AUSTIN, LLP
                         One South Dearborn
                         Chicago, IL   60603
                   BY:   **MR. DAVID T. PRITIKIN**
                         **MR. MICHAEL BETTINGER**
                         **MR. NATHANIEL LOVE**
                         **MS. IRENE YANG**

For Defendants:          QUINN EMANUEL
                         50 California Street, 22nd Floor
                         San Francisco, CA   94111
                   BY:   **MR. CHARLES K. VERHOEVEN**
                         **MR. SAM STAKE**
                         **MR. THOMAS PEASE**
                         **MS. VICTORIA F. MAROULIS**


                         ZEINEDDIN PLLC
                         1717 K. Street, NW, Suite 900
                         Washington, DC   20006
                   BY:   **MR. R. PAUL ZEINEDDIN**

Reported By:             Vicki Eastvold, RMR, CRR

1    **Wednesday - March 14, 2018**

2                    **P R O C E E D I N G S**

3                        **---oOo---**

4

5        **THE CLERK:**  Calling civil matter 16-CR-2787, Huawei

6    Technologies Company, Limited, et al, versus Samsung

7    Electronics Company, Limited, et al.  Counsel, please come

8    forward and state your appearance.

9        **MR. PRITIKIN:**  Good afternoon, Your Honor.  David

10   Pritikin on behalf of Huawei.  And with me is Michael

11   Bettinger, Matt Love and Irene Yang.

12       **THE COURT:**  Good afternoon.

13       **MR. VERHOEVEN:**  Good afternoon, Your Honor.  Charles

14   Verhoeven, Quinn Emanuel, on behalf of Samsung.  And with me is

15   Victoria Maroulis, Sam Stake and Thomas Pease.  We also have a

16   number of people from Samsung in attendance today (indicating).

17       **THE COURT:**  Wonderful.  Glad you're here.  Welcome.

18       All right.  Please sit down.  Finished my four-month long

19   trial and I had some bandwidth to go back and take a look at

20   this case.  And so I want to be corrected on things that I

21   don't quite get before I get to the motion which I think is

22   actually simpler.  I think what's harder is what happens at the

23   end of the day.

24       But so as I understand it, the trial in this case is going

25   to include whether each of the patents is valid, enforceable,

1    infringed and essential.

2           MR. VERHOEVEN:  Correct.

3           THE COURT:  And then we'll get to whether either party

4    breached its FRAND commitments.

5           MR. VERHOEVEN:  Correct.

6           THE COURT:  And then we get to what the remedies are;

7    whether there's injunctive relief or not, certainly.  And then

8    the question that I'll have, and it's not totally germane to --

9    it's somewhat germane to this motion but not totally -- to the

10   question of damages and how that works, if at all.

11       But so that's the shape of my mind going into this motion.

12   It does seem to me that the *Gallo* test applies.  And that the

13   parties are the same.  The issues are essentially the same,

14   which is is Huawei entitled to an injunction or not.  And the

15   Chinese patents, as I understand it, are substantially similar

16   to the ones here.  And the issue of contract interpretation

17   with the FRAND commitments is here before me.

18       With respect to the *Unterweser* factors, U.S. courts hold

19   that owners of declared essential patents that have made

20   commitment to SSO's should be precluded from getting injunctive

21   relief.  There are exceptions to that, but that's something

22   that I think I need to make the determination on rather than a

23   foreign court.

24       I don't think what Huawei's done is particularly

25   vexatious, but I do think that the decision in Shenzhen would

```
1    frustrate my ability to adjudicate the issue.

2          And given the timing, I'm not sure -- I don't see a

3    significant impact on comity.  We're going to go to trial in

4    December.  And the Chinese case is on appeal.  And the

5    injunction as to Huawei is opposed to the court.  So that's the

6    way that I'm looking at this motion.  So I'm inclined to grant

7    it.

8          But Mr. Pritikin, go ahead and untangle me if I'm tangled

9    up somewhere.

10         MR. PRITIKIN:  Well, I think I can, Your Honor.  I

11   will try.  I have a slide --

12         THE COURT:  I'm shocked.  Seems like I can never get

13   away from any patent motion at all without a slide deck.

14         MR. PRITIKIN:  I tried to keep this one as skinny as

15   possible.  I'm not going to go through them all, Your Honor.

16         But I think the point of confusion here -- and I think

17   it's generated in part by the reply brief that was filed -- is

18   the nature of what is happening in China.  And I'd like to

19   focus on that because that's central to the question of whether

20   an anti-suit injunction would be appropriate and it

21   differentiates this from the *Microsoft* case.  So I want to

22   start with that.

23         And in the deck that I gave you we can turn to slide

24   three.  And it was a little hard to piece all of this together,

25   I'll grant you that, from the briefs the Court had.  But I
```

1    tried to put together a timeline so the Court would understand

2    what was happening in Shenzhen.

3         As you can see on the top there, Huawei filed its

4    complaint in May of 2016.  And Samsung filed its own complaints

5    just a couple of months afterward.  And they're the same thing.

6    They were suing on Chinese patents seeking only injunctive

7    relief in China.  And then the lawsuit that is the basis of the

8    anti-suit injunction motion before the Court was filed in this

9    court in August of 2016, after these Chinese cases seeking

10   injunctions were already in the works and in progress.

11        And there are a couple of points that are noteworthy here.

12        First, the Chinese patent cases, while the Chinese patents

13   are counterparts of the U.S. patents, they're not the same.

14   You cannot enforce a Chinese patent in the United States or

15   vice versa.  And so China is the only place one can get relief

16   on a Chinese patent.  And it's very common in patent litigation

17   for parties to assert the foreign counterparts in foreign

18   countries because that's the only remedy that exists.

19        Second, the fact that Samsung itself brought its patent

20   cases in China before counterclaiming in this court, seeking an

21   injunction there, confirms the propriety of seeking those

22   injunctions in China.

23        Both parties did it.  They did it without reservation.

24   They sought it.  And, in fact, while the first of the cases,

25   the two of the Huawei patent cases have gone to trial,

1   similarly one of the Samsung cases has gone to trial in China.

2   We're awaiting the decision.  It hasn't been decided yet.  But

3   the FRAND issues were presented there.

4       And so that's the lay of the land in terms of the timing

5   on it.

6       Now, if we go to the next slide, the U.S. -- this lawsuit,

7   and the Chinese case were filed simultaneously.  And there's a

8   lot of confusion generated in their briefs where they say first

9   filed, first filed, later filed.  Not so.  The cases were filed

10  at the same time.  China's a day ahead of us and that's why

11  there are different dates.  May 25 versus May 24.  But these

12  cases were filed at the same time.  Not like *Microsoft* where

13  somebody months later did an end run around the U.S. case.

14      If we go to the next slide, slide five, and this is an

15  important point and it's getting to the heart of the issue.

16  And that is that the FRAND issues were submitted to the court

17  in Shenzhen.  And Samsung acknowledged that in its opening

18  brief, and I've quoted that on the slide here.  That Huawei

19  asked the Shenzhen court to resolve whether its licensing

20  efforts with respect to its Chinese SEP's were FRAND.  Huawei

21  was up front about this.  They told the court, We want an

22  injunction, but we have to have complied with FRAND to do it

23  and we're putting that issue before you.

24      And I think that Samsung understood that that was fatal to

25  the anti-suit injunction here because that issue was put to the

1    foreign court, the question of compliance with FRAND.  Unlike

2    *Microsoft* where Motorola had gone off to Germany and it

3    procured an injunction in a circumstance where the FRAND issues

4    could not be tested as a predicate to issuing an injunction

5    there.  Just the opposite in this case.

6        And they backtracked on that in their reply brief, which

7    is quoted below here, where they said the court had no reason

8    in China to conduct a rigorous FRAND analysis because Huawei

9    did not ask for one.  Well, these statements are directly

10   inconsistent.  They got it right the first time.

11       So what happened in China?  If we go to slide six -- now,

12   they made the statement throughout their briefs, and it was

13   repeated over and over and over again, that the Chinese court

14   had not ruled on the FRAND issues.  And this is very important

15   because it bears on all the *Gallo* factors whether it's

16   vexatious litigation on comity.

17       In truth, the Shenzhen court did conduct a thorough and

18   searching and detailed FRAND analysis before issuing the

19   injunction.

20       On slide six what I've included here is just sort of an

21   overview of what is in that opinion.  209 pages.  210 pages.

22   They supplied it to the court, a translation of it, and it's in

23   the record here.  And when one goes through it one can see

24   contrary to the representations that were made by Samsung that

25   the court didn't consider FRAND and just blindly issued this

1  injunction as it happened in Germany in the *Microsoft* case, not

2  so.

3      In this case there was a very thorough analysis of it, of

4  all aspects of FRAND, before the court issued the injunction in

5  China.

6      On slide seven I've summarized the type of evidence that

7  was in the record.  There was fact testimony.  There was expert

8  testimony.  Samsung actually got leave from the court to call

9  fact witnesses to testify about the negotiations.  In the end

10  they decided not to call them and they relied on experts.  But

11  they put in long expert declarations on the FRAND issues.  Then

12  most importantly, and this bears on the present motion, on

13  slides eight and nine the court made findings as to compliance

14  with FRAND.

15      And so on slide eight I pulled out the quotes from the

16  court's opinion with respect to Huawei's conduct.  And that

17  Huawei had complied with FRAND, which is a predicate for

18  issuing an injunction on SEP's.  That's the issue they say,

19  Well, it wasn't decided; we have to have our day in court in

20  the United States.  They had their day in court in China, and

21  the court concluded before issuing the injunction that Huawei

22  had complied.

23      Now, they said in their brief that these findings are

24  nebulous.  They're not nebulous at all.  All you have to do is

25  pick up the 210-page opinion and read it.  They're detailed,

```
 1   they're thorough, they're precise.

 2        They said the court never analyzed Huawei's offers to see

 3   if they complied with FRAND.  Not true.  If you look at it, it

 4   says the quotations made by Huawei as the holder of SEP's to

 5   Samsung, including the license rate and license fee of each

 6   phone had complied with FRAND principles.  These are in the

 7   conclusions after the court has analyzed all of the evidence.

 8        And they looked at the kinds of things the courts look at

 9   in the United States in analyzing FRAND.  They look at

10   comparable licenses, they look at percentage of the standard

11   essential patents that the companies had.  All of the same kind

12   of evidence that U.S. courts look at in deciding it.

13        If we turn to slide nine, the findings with respect to

14   Samsung were scathing.  The court found that Samsung has

15   obvious fault and obviously went against FRAND principles.

16   They found that they seriously delayed the negotiations and

17   clearly violated FRAND principles.  They found that Samsung's

18   subjective fault of maliciously delaying the negotiations in

19   violation of FRAND principles.  And in the conclusions they

20   found that they obviously deviated from the relative portfolio

21   strengths of them.  And then the last sentence there is where

22   it is summed up.

23        What did they do?  They say it's nebulous.  It's not

24   nebulous.  It's clear and precise.  They say it's a hometown

25   court.  Well, no dispute that, of course.  Huawei is a Chinese
```

1    company.  But there's nothing in the record to suggest that

2    this wasn't a fair proceeding that was held over there.  And

3    the complaint they have at the end of the day is that they

4    lost.

5         The court concluded that they had violated their FRAND

6    obligations, that Huawei had complied with them, which is the

7    predicate.  It is the absolute predicate for getting an

8    injunction.

9         Now, contrary to what they've said, under U.S. law -- and

10   this is recited in our briefs in a number of places, but the --

11   and I've got it on one of the slides here -- but the -- under

12   U.S. law, there is no bar to getting an injunction on standard

13   essential patents if you've complied with the FRAND obligations

14   against an unwilling licensee, which is precisely what the

15   court in China found before issuing that injunction.

16        Now, why is this so important to the anti-suit injunction

17   motion?  It's because it cuts across the board and undermines

18   all of the *Gallo* factors that they're relying on here.

19        In terms of the posturing of the two cases, the issue has

20   been put before the Chinese court and decided.  And all they

21   want -- this is a collateral attack on the judgment of the

22   court.  This is not an anti-suit injunction.  They don't like

23   it.  They were unhappy with the result.  They'll take their

24   appeal over there, maybe they'll win and maybe they won't.  But

25   if you get an unfavorable decision in a fair proceeding, one

1    that they're not complaining about, the remedy you have is to

2    appeal it to the local court.  It's not collaterally to come in

3    and say, Oh, we want the chance to litigate that again in the

4    United States and maybe we'll get something that is more to our

5    liking there.

6        That is not what the *Gallo* test and that's not what the

7    *Unterweser* factors go to.

8            **THE COURT:**  Should I not care at all about Samsung's

9    argument that if the injunction goes forward it's going to have

10   to shut down its plant and it's going to be put in this

11   untenable negotiating position?  Is that just tough crackers

12   because a court in China made that determination?

13           **MR. PRITIKIN:**  The Court has to look at irreparable

14   injury.  I'll grant you that.  But that's not irreparable

15   injury that they're facing there.  Because they have an easy

16   way to avoid that.  It's very easy.  It's in their control.

17       First, they lost the case.  When you lose a lawsuit there

18   are consequences to it.  And, I mean, if it's not a

19   fundamentally unfair case, I mean, that's what happens when you

20   lose the case over there.

21       But beyond that, they know that if they either would make

22   FRAND offers -- and they aren't.  This is classic holdout where

23   they just years and years it's rope-a-dope where they just come

24   at us, come at us.  Okay, sue us on a patent.  We don't care.

25   We'll lose a patent.  So what.  We'll pay you small damages on

1    the patent we lose on.  And then they never want to enter into

2    a license agreement.

3        And Huawei said, What we want is a cross-license on FRAND

4    terms both ways.  And we're not going to dictate it.  So very

5    easy for them to avoid the consequences of this.  All they have

6    to do is say, Fine, we'll let a third-party, a neutral, a true

7    neutral third-party, set the FRAND rates both ways.

8        There's not going to be an injunction that would go into

9    effect.  We said we're not going to enforce an injunction.  But

10   this is more of the holdout strategy.  If they can fend off any

11   day of reckoning and force Huawei to litigate patent by patent

12   knowing that the results on any individual patent aren't going

13   to move the needle very much, they're never going to enter into

14   a cross-license with Huawei.  And they know that at the end of

15   the day they're going to be -- very likely they're going to be

16   the payor because their volume of products is so much greater

17   than ours.

18        **THE COURT:**  So now I want to make you deviate a little

19   bit from this argument to the thing that I've been thinking

20   about, Mr. Verhoeven.  I know you're going to have a reaction

21   to this, but --

22        In this case, I framed -- I framed the case the way that I

23   understand it.  When I get to the infringed patents, the

24   potentially infringed patents, and I get to the remedy, I'm

25   going to be -- in other patent cases I've had experts come and

1    say, you know, There is no way that these companies would enter

2    into a license for one patent.  They would demand a worldwide

3    patent.  They would demand -- you know, and isn't that -- you

4    know, Mr. Bettinger's been arguing from the first time I met

5    him that this --

6            **MR. VERHOEVEN:**  Verhoeven.

7            **THE COURT:**  What?

8            **MR. VERHOEVEN:**  Verhoeven.

9            **THE COURT:**  Bettinger.

10           **MR. VERHOEVEN:**  Oh, I'm sorry.

11           **THE COURT:**  That that's what I needed to do in this

12   case, and wanted to bifurcate the issues so that I'd do that

13   first.

14       I agreed with Samsung that I needed to look at the patents

15   first.  But at the end of the day, aren't I going to have to

16   deal with that as a damages issue anyway?  And if that's true,

17   is there really great harm to Huawei's position if you wait

18   until the trial of this case?

19           **MR. PRITIKIN:**  Yeah, well there is harm, Your Honor.

20   Because there are patent rights in China that have been fully

21   and fairly litigated.  And the FRAND defenses have been

22   adjudicated.  So it's not as though that's never been heard.

23   So there is harm in not allowing that to go forward.  And it's

24   a tremendous comity problem unlike *Microsoft* where there had

25   been an unfair proceeding over there in Germany.

1    But to come back to the landscape for this case.  Let me
2  address that.
3    First, I think you're right in terms of the individual
4  patents, and I think we've been saying that from the beginning.
5  Both sides have asserted patents in this case.  And there are
6  limits.  I mean, there are only going to be five claims, so
7  let's say five patents that go to trial.  They both have
8  portfolios with very large numbers of them.
9    The damages on an individual patent typically don't amount
10  to a great deal in the scheme of things with companies of this
11  size.  And that's -- I don't want to say it's inconsequential,
12  but isn't really where the fight is on the damages for the
13  individual patents.  It's on the rights to practice them.  If
14  somebody is adjudicated to be, as Samsung was in China, an
15  unwilling licensee and someone who's violated their FRAND
16  commitments, the Court in the United States, just as in China,
17  would have the power to issue an injunction against them which
18  presumably then would lead to a negotiation of a global
19  license.
20    As far as how this case would play out, the damages as
21  such would be the damages on the individual patents.  Now,
22  there are claims both ways for breach of the FRAND obligations,
23  and presumably there could be damages that would arise from
24  that.
25    We have asked the Court in a declaratory judgment action

```
 1    to set a FRAND rate and, you know, we'd be fine with the Court
 2    setting a FRAND rate for the United States, I mean, that would
 3    -- clearly that is within the power and authority of the Court
 4    to do it under the contract.  They say you can't do it.
 5        And so, I mean, it's more rope-a-dope.  Because their view
 6    of the world is all we can do in this courtroom is adjudicate
 7    these five patents, and then we go home, and then years later
 8    we go on.  There's no license and no resolution and no
 9    conclusion to any of this.
10        And our view all along has been that if this Court would
11    at least in the declaratory judgment action set a rate in the
12    United States for the value of these portfolios, we would have
13    that in front of us.  It would be a basis for concluding the
14    case.  And we know that Judge Selna set the rate in a case
15    recently; in the *TCL* case that got a lot of notoriety.  Judge
16    Robart did it in the *Microsoft* case.  Of course, in the
17    *Microsoft* case, Microsoft had committed to accept that rate and
18    the parties agreed to it.  That's the other reason why it was
19    so egregious that Motorola had gone off and tried to do an
20    independent run around the court.
21        Here there's nothing of the sort.  All we have on their
22    side, as I say, is rope-a-dope.  Don't issue the injunction,
23    don't set a rate for the United States court --
24            THE COURT:  They've been very consistent.
25            MR. PRITIKIN:  Well, it has and it hasn't.  Because
```

1    I've got a slide here that contrasts that with the positions in

2    the current motion which are not entirely consistent.  Now they

3    have a little more expanded view of what Your Honor can do.

4         **THE COURT:**  I get the irony.  So let's close it up

5    because I don't think I can keep Mr. Verhoeven from talking for

6    much longer.

7         **MR. PRITIKIN:**  So, I mean, the bottom line for us,

8    Your Honor, is that we do not believe that the *Gallo* test is

9    met here.  This case is very different from *Microsoft*.  And

10   fundamentally the fact those FRAND issues were decided in China

11   is an important point of distinction and one that raises, we

12   think, very, very serious comity issues.  Because they are

13   asking this Court to essentially nullify a ruling they didn't

14   like and they got in China.

15        And it's a pretty drastic step for a court to take.  You

16   know, is the court of appeals over there going to affirm?  I

17   don't know.  I think so.  I mean, I would hope so.  But right

18   now, you know, they've acquiesced in this procedure.  They

19   brought their own patent injunction actions in China and

20   they've tried them and they're waiting for their decision on

21   it.  So hard-pressed for them to say there's something

22   fundamentally wrong with that and run in now and try to nullify

23   it after they get a decision they don't like.

24        **THE COURT:**  Thank you.

25        Mr. Verhoeven.

1          **MR. VERHOEVEN:**  Thank you, Your Honor.  I'll to keep

2     this brief.  What you just heard in part was classic holdup and

3     coercion.  What you just heard counsel say is, Oh, these

4     injunctions, shutting down your manufacturing facilities, all

5     these terrible things that they don't really dispute will

6     happen because it's an SEP patent, which means by definition

7     you need it to practice the protocol to make phones.  They've

8     got an injunction on two out of thousands.  And they say -- and

9     you asked him, Well, what's the -- well, what about this harm?

10    What was their answer?  All they need to do is agree to our

11    terms.  All they need to do is agree that a third-party can

12    decide all of this stuff.

13         That's classic admitted coercion.  That's what's going on

14    in this case.  Both sides have asked Your Honor to decide

15    issues that would be dispositive with respect to FRAND, with

16    respect to breach of contract issues, that go to the heart of

17    whether an injunction's appropriate.

18         The U.S. counterparts to these patents are at issue in

19    this case.  But yet they proceed with wanting to enforce this

20    injunction.  And they say in their brief, opposition at page

21    two.  "All Samsung needs to do to end all the patent cases is

22    agree to a third-party, be it an arbitration panel or this

23    Court, will set true FRAND rights for both sides portfolios."

24         Well, we have a dispute about that.

25          **THE COURT:**  Well, you've had a dispute for a long time

1    that your client doesn't seem to be wrestling to the -- trying

2    to wrestle to the ground.  And instead we have these 25

3    lawsuits in the United States and China.

4        How is this going to -- where does this end,

5    Mr. Verhoeven?

6            **MR. VERHOEVEN:**  Well, let me just address -- it ends

7    with this case with this Court's decision.  And the Court has

8    put it all together in a trial, which is the right thing to do.

9    And it will get all resolved in December.  Maybe some

10   post-trial remedy motions.

11       But, you know, there was -- we were tainted here by

12   saying, Well, you filed injunction actions in China, too.

13   Well, we did that defensively because of what had happened

14   already, which is their filing injunction actions in China.  We

15   needed something to defend ourselves.  We said on the face of

16   those complaints that we're only doing it defensively.  And if

17   -- if -- you know, they will agree not to enjoin us then we'll

18   drop the whole thing.

19       And I'm here -- I'll represent to you, Your Honor, if you

20   grant this anti-suit injunction motion we will not attempt to

21   enforce any injunction we might get in China before this case

22   is finally resolved.  That's not why we're doing it in China.

23   We're not trying to extort anything.  We're trying to save

24   ourselves from extortion by getting some sort of leverage if,

25   in fact, this injunction motion was -- anti-suit injunction

```
 1   motion was denied and we're facing the prospect of having to

 2   shut down all of our manufacturing facilities in China.  We

 3   have no choice.

 4        But the notion that we're doing the same thing they're

 5   doing, and that we're trying to extort them or -- that's a

 6   strong word -- to coerce them, Your Honor -- is simply not

 7   true.  And I think my representation takes care of that.  We

 8   will not endeavor to enforce an injunction in China if you

 9   grant this motion until there's a final ruling in this court.

10        So we heard a lot about the FRAND was decided in China

11   and, therefore, it -- you shouldn't -- you should defer to

12   China.  Well, first of all, that's a circular argument.  I

13   disagree whether it was fairly decided or not; but it's a

14   circular argument.

15        They asked this Court, and we asked this Court on

16   declaratory relief, to rule on whether there's a breach of

17   contract violation of FRAND.  Both parties agreed on the choice

18   of law, by the way.  Law that was not applied in China.  And so

19   what they're coming back and saying is you should -- they even

20   say you're collaterally estopped.  They're saying you should

21   not rule -- you should not enjoin them and allow sort of

22   inconsistent rulings of the same thing, when they've come here

23   and asked for this ruling from this Court.  And their

24   justification is, Well, China ruled.  And, therefore, they're

25   justified in doing coercion.  And holdup.
```

1      That doesn't carry any water.  The Chinese court system,

2  as Your Honor I'm sure knows, is antithetical to the

3  United States judicial system.  It's an inquisitorial judicial

4  system where the judge is -- *sua sponte* will ask for witnesses,

5  ask for things, be the investigator.  And there's no due

6  process requirements like they are in this country.  The judge

7  goes and will talk to one side without the other side being

8  allowed to be there.  There's all kinds of differences.

9      I'm not casting aspersions on the Chinese system, I'm just

10  saying it's completely different from the U.S. system.  Our

11  system is an adversarial system.  It's set up in a completely

12  different manner.  We have a right to a jury trial in this

13  country.  We have a right to have counsel present at all times

14  in this country, which was not the case in the Chinese action.

15      So there's -- the notion that there's a full and fair

16  FRAND determination is factually incorrect.  In fact, the

17  Chinese order didn't even analyze and address the relative

18  value of the portfolios.

19      They talked about it in their -- in their summary of what

20  happened, but they made no findings about any of that stuff.

21  All they did was say, Samsung's a bad company.  Therefore,

22  they're not -- they violated FRAND.  It's completely different

23  than what the U.S. courts have done in these sorts of

24  situations in the analysis the U.S. courts have done.

25      So I'll also note that there wasn't a cause of action for

breach of contract in China.  The only relief sought in these
Chinese actions, these two patents, was an injunction.  That's
it.  And the court issued its injunction.  That was the remedy.

Now, let's talk about FRAND for a second, all right?
Under ETSI, which is a governing doctrine here, your FRAND
obligation applies to each IPR.  Each patent.  And before you
get an injunction on even an individual patent, you have to
show that you made a FRAND offer.  It's a duty on the part of
the patentee.  The patentee doesn't make a FRAND offer on that
IPR, then under U.S. policy and U.S. case law they can't get an
injunction.

Well, what happened in China on these two patents?  Suit
was filed before any offer on the two patents was made.
Period.  To this date, no offer has been made on those two
patents.  Period.

The only relief sought in China was an injunction.  They
didn't even seek a FRAND damages amount.  So if we're going
talk about FRAND in the course of conduct of the parties and
we're looking at China, under the U.S. analysis per se not
FRAND what they're doing.  They didn't even offer to say, Hey,
we'll -- look, we've got these potential injunctions, we're
asking for injunctions, pay us X.  Which they're required to
do.

And then they're saying, Well, the court made a big FRAND
determination.  All the court did was to look at parties'

offers back and forth on a global license.  Made no findings
about the relative strengths of the portfolios or all the other
factors that a court here would do.  And simply said, Ah, you
know, they're not FRAND because they're evil.

And one of the things that I found telling -- if I could
find it, Your Honor -- is in its ruling on January 11 where
they issued the injunction the court states, quote -- this is
the Chinese court -- "Considering that the patent in this case
is a 4G SEP, the issue of ceasing infringement is different
from that of a non-SEP.  After the court's decision to order
the defendants to cease their infringement goes into effect,
Huawei and Samsung can still conduct cross-licensing
negotiations with respect to standard essential patents."

They've adopted the coercive strategy that Huawei is
engaged in.  They've acknowledged if they issued an injunction
it's going to kill the whole product because these are SEP's.
They've said, We're going to issue the injunction, and maybe
you guys should talk about it, something bigger, some big
global license.

Well, that is an adoption by the Chinese court of holdup,
of coercion.  So the notion that there's a full and fair
opportunity for us in China is simply not justified, not
correct.  The notion that we are attempting to do the same
thing in China is not correct.

And if you look at the admitted statements, the express

1    statements, repeatedly in the brief -- and I can go through --

2    there's six places in their opposition where they say, All you

3    need to do is agree to what we want to do.  All you need to do

4    is agree to a third-party setting a whole license.

5        And as you know from the very first hearing, Your Honor,

6    when I came up and said that doesn't make any sense, these

7    agreements are ten years long, people have to make business

8    judgments about what technology is going to be important and

9    what technology is not going to be important.  And I went on

10   and on about that.  And I believe Your Honor responded that you

11   thought it was silly for the parties to try and use the courts

12   to negotiate these sorts of --

13       **THE COURT:**  I don't think I said that.  But I think I

14   said that I needed to deal with the patents that were in front

15   of me.  But I still have -- I still have my question.  Which is

16   at the end of this trial, what's your view about remedies?  How

17   this case all ends.  And how you get some certainty with

18   respect to the amounts that may be owed with respect to this

19   patent.  How is that going to happen?

20       **MR. VERHOEVEN:**  Well, number one, what Your Honor said

21   previously I 100 percent agree with.  The counterparts are in

22   this case of those two patents.  Your Honor's going to do an

23   analysis, or the jury, of the prerequisites to remedy which

24   need to happen first.  Got to put the horse in front of the

25   cart, not the cart in front of the horse.  And breach of

1  contract based on these negotiations both parties have sought

2  declaratory relief on, Your Honor.  There's going to be a jury

3  ruling on that.  And then you're going to get to the issue of

4  remedy.

5     Now, it could be that remedy is moot.  The jury could say,

6  Neither side was FRAND.  Go home.  Or the jury could say, Both

7  sides were FRAND and acting in good faith.  Both sides were

8  FRAND and acting in good faith.  Then we know that injunctions

9  aren't appropriate, right?  At least on the patents we're

10  looking at in this case.

11     And I think that all of those sorts of rulings will

12  resolve this case, will resolve whether injunctions are

13  appropriate in China or not.  Again, we're not asking this

14  Court to say whether injunctions in China are appropriate or

15  not.  We're asking this Court to rule on what Huawei asked the

16  Court to do, what we asked the Court to do, in a fair way that

17  doesn't get frustrated by coercive holdup by enforcement of

18  these Chinese injunctions.

19     And this is a temporary request.  It's like an injunction

20  request that would end at final judgment in this case; or at

21  some other point if the Court decides it's at the point where

22  it can modify or vacate what it said.  But it's not a long-term

23  request.  We're not asking to even stay China or anything.

24  They can keep going.  They take their appeal.  They do whatever

25  they want.  We're asking as a private party given what they've

```
1    done in this jurisdiction and what they've asked for in this
2    jurisdiction, that the Court order that they not take actions
3    to shut down our plants until after the December trial.
4        And it's not a huge request.
5        THE COURT:  There is something to Mr. Pritikin's
6    argument that people who lose cases face results as a result of
7    losing cases.  So these -- all of these cases -- both sides
8    have embarked on a litigation strategy that your clients
9    obviously think is consistent with their best interest.  It
10   doesn't seem to me that it is.  But that's -- I don't get to
11   make those calls.
12       MR. VERHOEVEN:  We did not initiate litigation, Your
13   Honor.
14       THE COURT:  There is a strategy that you have with
15   respect to -- both sides do.
16       So, anyway, I appreciate your argument, Mr. Verhoeven.
17       MR. PRITIKIN:  May I respond briefly to these points?
18   I'll just take them one by one.
19       The argument that this is classic holdup?  Wrong.  Holdup
20   is where you take my terms or I'll enjoin you.  Not our
21   position.  Our position is you can, sure, make us a FRAND
22   offer.  We think ours is FRAND, but we'll submit it to a
23   third-party to decide.  That isn't holdup.  No court has ever
24   characterized anything like that as holdup.
25       Second.  How does this case end?  It doesn't under their
```

1    view.  It just doesn't end.  I mean, there's no result of this

2    case that will result in a determination of even the United

3    States portfolio.  Their view is all the Court has the power to

4    do is decide these patents one by one.  In fact, if -- I'm not

5    going to pull it up now, but Your Honor can look at our slide

6    13 where we quote language that they -- previous statements

7    they've made to the court where they've said, You can't even

8    determine the breach of FRAND unless you first adjudicate

9    patent by patent whether the patent is valid and infringed and

10   essential and the like.  Then it goes -- it's a path to

11   nowhere.

12        Third, they -- we have put before this Court a claim for

13   breach of their FRAND obligation.  And we did that because

14   that's going to be a predicate to getting injunctions in the

15   United States.  So we did have to put that issue before the

16   Court in order to get an injunction here.

17        Mr. Verhoeven went on and on about a lack of due process.

18   None of that is in the record.  There is nothing in the record

19   here to suggest there is anything flawed with the Chinese

20   proceedings.

21        And then he made statements about how -- I mean, I kind of

22   wonder if people have actually read the opinion.  I mean,

23   statements that they never evaluated the portfolio strength.

24   And I would refer Mr. Verhoeven and the Court to pages 104 to

25   120 where there's a detailed analysis of the portfolio

1    strengths as assessed by various third parties.  And it goes
2    through it in considerable detail.
3       And then the final point he made was that we've never made
4    an offer on the two patents that are in the Chinese case and
5    that it's somehow per se a violation of U.S. antitrust law or
6    FRAND principles not to have done that.
7       There's nothing in the law like that.  What the law
8    requires is that you have to give them a chance to take a FRAND
9    license to your portfolio, which we've done, and it's
10   documented in here that the offer complied with FRAND.  There's
11   no law that one has to give an offer specifically on the
12   individual patents.  I mean, they've never done it with respect
13   to the individual patents in this court.
14      And so, you know, we submit that what ought to happen here
15   is that these legal actions have consequences; the parties are
16   going to battle it out.  It's in their control.  They can put
17   an end to it by finding a way to have a third-party set these
18   royalties.  Let's have a third-party set the royalty outside
19   the U.S.  We'll agree to it.  Any neutral third-party.  Let's
20   have a third-party do it in the United States.  This Court
21   could do it.  And that would be the end of the matter.  It
22   would cut through it.  We may not like the results then.  Third
23   party may think our patents aren't as good as we think they
24   are.  But that's not holdup.  That is fundamental fairness and
25   that's the way these disputes get resolved.  Lots of precedence

1   for it.

2           **THE COURT:**  Mr. Verhoeven, last word?

3           **MR. VERHOEVEN:**  Three points.  Number one, the

4   statement was made that the law requires that you offer a

5   portfolio license or the law -- he characterized the law as

6   talking about an aggregate license and offering an aggregate

7   license.

8       There's no law that says that at all.  The law talks about

9   specific IPRs.  And ETSI talks about specific IPRs and your

10  duty to give a FRAND offer.  I'm not saying that the parties in

11  real life don't talk about aggregate portfolios; but the

12  statement was made that under the law all you have to do is

13  make an aggregate portfolio offer, and if you don't like it

14  then you can pick a patent, a single patent, or two patents,

15  and shut down the other side's whole manufacturing system on

16  the grounds that you made an aggregate license offer but didn't

17  even make an offer on the two patents you're suing on.  The law

18  is dead to the contrary.

19      Number two, they're saying there's no holdup.  What

20  counsel said to you is, They can either take our offer or --

21  which is holdup -- or they can agree to this disputed issue

22  that you're going to resolve that a third-party --

23          **THE COURT:**  What they're saying, Mr. Verhoeven, is

24  consistent with what they've said from the beginning.  Which is

25  they think that Samsung is non-negotiating with them in good

faith.  And so they want to have a process that you would --
that Samsung would agree to that was a neutral process instead
of having just -- having somebody who doesn't want to do what
they want to do.

Holdup, I think, is something different.  I understand
what your point is.  But they're not trying to cram -- what
they're trying to cram down your throat is some sort of level
table where you negotiate in good faith and reach a resolution.
And if you can't do that, have somebody adjudicate it for you
because it's a waste of time, and courts, and resources to keep
doing what you're doing.  That's what they're saying.

MR. VERHOEVEN:  Well, that's what they're saying.  But
for all the reasons I said in the very first hearing, there's
significant prejudice for us to have some third-party, who's a
layperson, who hasn't been practicing in the industry, set all
these complicated terms.  And we, from the beginning of this
case, said we don't want to do it.  Your Honor's going to
decide, because they've put it in front of Your Honor, who wins
on that.

And my point is by enforcing these injunctions and saying,
We'll drop them if you just agree to it, they're frustrating
the adjudicatory process before Your Honor for Your Honor to
decide that instead of us having to raise a white flag and say
--

THE COURT:  Not the only thing that's frustrating me.

1   What's your third point?

2           **MR. VERHOEVEN:**  I think that was it, Your Honor.

3           **THE COURT:**  Okay.  All right.  Well, thank you for

4   your argument.  I think this is a really interesting issue.

5   And you've obviously -- this case will undoubtedly produce lots

6   of brain damage before it's all done.

7       But thank you for being here and I'll see you again.

8           **MR. PRITIKIN:**  Thank you, Your Honor.

9           **MR. VERHOEVEN:**  Thank you, Your Honor.

10                          ---oOo---

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:  March 16, 2018.

8

9

10                      //Vicki Eastvold
     _____
11        Vicki Eastvold, RMR, CRR, U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25