# EXHIBIT 11
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4             Case No. 16-cv-02787-WHO

 5   _____

 6   HUAWEI TECHNOLOGIES CO., LTD.,              )
     HUAWEI DEVICE USA, INC., and HUAWEI         )
 7   TECHNOLOGIES USA, INC.,                     )
                     Plaintiffs/Counterclaim     )
 8                   Defendants,                 )

 9        v.                                     )

10   SAMSUNG ELECTRONICS CO., LTD., SAMSUNG      )
     ELECTRONICS AMERICA, INC.,                  )
11                   Defendants/Counterclaim     )
                     Plaintiffs,                 )
12        v.                                     )

13   SAMSUNG RESEARCH AMERICA, INC.,             )
                     Defendant,                  )
14        v.                                     )

15   HISILICON TECHNOLOGIES CO., LTD.,           )
                     Counterclaim Defendant.     )
16   _____ )

17

18

19          *** HIGHLY CONFIDENTIAL ***

20         DEPOSITION OF CHARLES JACKSON

21               Washington, D.C.

22               June 13, 2018

23

24   Reported by: Mary Ann Payonk

25   Job No: 143456

HIGHLY CONFIDENTIAL

Page 2

1

2

3

4                    June 13, 2018

5                    9:00 a.m.

6

7        Deposition of CHARLES L. JACKSON, held

8  at the law offices of Quinn Emanuel Urquhart &

9  Sullivan, LLP, 1300 I Street N.W., Suite 900,

10  Washington, D.C., pursuant to Notice before

11  Mary Ann Payonk, Shorthand Reporter and Notary

12  Public of the District of Columbia,

13  Commonwealth of Virginia, and State of New

14  York.

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 3

```
1    APPEARANCES:

2    ON BEHALF OF SAMSUNG:

3            THOMAS PEASE, ESQUIRE

4            DAVID LeRAY, ESQUIRE

5            QUINN EMANUEL URQUHART & SULLIVAN

6            51 Madison Avenue

7            New York, NY 10010

8

9    ON BEHALF OF HUAWEI:

10           NATHAN GREENBLATT, ESQUIRE

11           SIDLEY AUSTIN

12           Building One

13           1001 Page Mill Road

14           Palo Alto, CA 94304

15

16   ALSO PRESENT:

17           Christopher Parker, Legal Video

18   Specialist

19           R. Paul Zeineddin, Zeineddin PLLC

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL

Page 98

1    submitting voices to Sidley in connection with

2    this case?

3        A.    No, I don't.   Again, that's something

4    I definitely have records on.

5        Q.    Do you know how many hours you've

6    billed to date on this case?

7        A.    No, I don't.

8        Q.    Do you know the approximate number of

9    hours?

10       A.    I mean, this is a very rough guess,

11   don't hold it to me, but probably in the

12   neighborhood of 400 plus.

13       Q.    And that's in connection with the

14   three reports we've looked at?

15       A.    Yes.

16       Q.    I may have asked you this earlier,

17   but I can't remember.   Have you had any

18   involvement in the Chinese cases between the

19   parties?

20       A.    I mean, I don't always know how --

21   what people do with reports after you do them,

22   but not to my knowledge.   But, you know, I

23   don't know if this report -- one of reports has

24   been used in that litigation or something like

25   that, but I have no knowledge of such things.

HIGHLY CONFIDENTIAL

Page 110

1    contributions for several different firms; is

2    that correct?

3         A.   Yes.

4         Q.   And so Huawei, for example, has,

5    according to your calculations, 3,926

6    contributions to LTE?

7         A.   That's correct.

8         Q.   And now on page 122 of your report --

9    and I can give you a separate printout of that

10   too.

11        A.   Okay.

12        Q.   You set forth some of the results of

13   the analysis that you and Dr. Ding and Concur

14   IP did; is that right?

15        A.   That is correct.

16        Q.   And so in the far right columns, you

17   refer to deemed-issued and active patents for a

18   number of different jurisdictions; correct?

19        A.   Correct.

20        Q.   And so under U.S. -- excuse me.  Then

21   you've broken it up by 2G, 3G, and 4G; correct?

22        A.   Correct.

23        Q.   And so for the U.S. we can look and

24   see that Huawei has 170 deemed essential 4G or

25   LTE patents; is that right?

HIGHLY CONFIDENTIAL

Page 111

1        A.    That's correct.

2        Q.    And so if you wanted to figure out

3    the ratio or the relationship between Huawei's

4    contributions and the number of actual

5    essential patents it has, you could do that

6    simply by dividing the 3,926 contributions by

7    the 170 patents, for example; right?

8        A.    Well, yeah.  Well, I mean, some of

9    those contributions, I'm trying to remember the

10   exact time frame of Signals research, but

11   memory tells me it runs up to the beginning of

12   2017.  Some of those contributions may be

13   associated with patents that are -- have been

14   applied for but have yet to issue and -- and,

15   you know, that are in the pipeline so you -- I

16   think you need an adjustment for that, but --

17       Q.    Although that's true of all the

18   companies for which you've identified

19   contributions in patents; right?

20       A.    Well, you have to look at the time

21   pattern of the contributions, but yes, recent

22   contributions are more likely to be associated

23   with yet-to-be-issued patents than older

24   contributions.

25       Q.    And so if I take the 3,926

HIGHLY CONFIDENTIAL

Page 124

1    every firm and that -- and that the proportion

2    applies equally to different firms for patents

3    outside their home country.  You're trying --

4    you're trying to just make too much of that one

5    sentence and not -- not look at the context,

6    you know, that's -- I was trying to describe a

7    general principle that the number of

8    contributions is the sign of a -- a company's

9    R&D investment in the field, and -- and it's

10   something you can take into account when you're

11   trying to analyze a portfolio.

12        Q.   Yeah, but if I understand you

13   correctly, when you say "roughly proportional,"

14   I mean, that could be almost any relationship

15   then; correct?

16           The fact that you have a certain

17   number of accepted contributions doesn't really

18   imply any specific number of U.S. essential

19   patents; right?

20        A.   I mean, I didn't try to estimate the

21   constant of proportionality, I just -- I think

22   that, you know, you really should read that --

23   that ratio in the context of the preceding

24   paragraphs and look, you know, at SEPs -- I

25   mean, I'm sorry, that contributions, accepted

HIGHLY CONFIDENTIAL

Page 125

1  contributions are a sign of the firm's

2  intellectual capital and investment in

3  inventive activity and developing the design,

4  and that's become the 3GPP standard and that

5  that -- that intellectual effort will be

6  reflected in patents.

7       Q.   Right, because there's definitely no

8  mathematical constant of proportionality that

9  would link an approved -- a number of approved

10 or accepted contributions to actual essential

11 U.S. SEPs; right?

12      A.   I didn't try to --

13           MR. GREENBLATT:  I'm sorry,

14      objection, form.

15      A.   I mean, I didn't -- I didn't try to

16 estimate such quantity and there isn't such

17 quantity presented in my report, I mean, so

18 I -- I mean, you can -- you can read what I

19 wrote about -- about that association, but

20 seems to me I tried to clearly communicate why

21 I think contributions give you some insight

22 into a firm's overall position.

23      Q.   When you say "overall position," you

24 mean the firm's inventive activities in a field

25 with respect to research and development, not

HIGHLY CONFIDENTIAL

Page 131

1      Q.    InterDigital has 91 accepted

2    contributions for LTE; right?

3      A.    That's what it says.

4      Q.    And then you concluded that

5    InterDigital has 111 actual essential patents

6    in the U.S --

7      A.    Yes.

8      Q.    -- from LTE.  So InterDigital

9    actually has more LTE essential patents than it

10   does contributions.

11     A.    Yes.

12     Q.    And so if you wanted to take approved

13   contributions for L -- for InterDigital, you

14   know, and divide by some number to get to the

15   number of actual essential patents, you'd never

16   get there because they actually have more

17   essential patents than contributions rather

18   than Huawei, which has 23 times as many

19   contributions as essential patents; right?

20           MR. GREENBLATT:  Objection, form.

21     A.    I mean, yeah, I mean, your -- your

22   description of the numbers I believe is

23   correct.

24     Q.    Am I not correct that for each of

25   these companies here there's going to be a -- a

HIGHLY CONFIDENTIAL

1          So at the outset of this case, you

2    received a call from Mike Bettinger asking you

3    to oversee the development of a patent

4    landscape study; is that right?

5         A.   Well, I'd sort of summarized in

6    several phone calls and, you know, discussions.

7    And I think they had to go back and talk to

8    Huawei.  And I don't know if they had multiple

9    candidates or not, but it was a decision

10   process.  Didn't occur in one phone call.  It

11   was probably two, three weeks, maybe more.

12        Q.   Well, once you did get retained, what

13   did you do next?  Like, what were the first

14   steps you took as part of your role as a

15   retained expert for Huawei in this case?

16        A.   I don't recall the exact sequence,

17   but my recollection is perhaps even before I

18   was retained, I did some searches on the web

19   for landscape studies.  I think I found some on

20   E websites, WIPO websites.  I read some of

21   those.  And relatively early in the process, I

22   received several of the landscape studies that

23   I reviewed here, and I think it was slightly

24   later that I got the early drafts of the

25   protocol that would -- Concur was going to use,

HIGHLY CONFIDENTIAL

Page 136

1    had some conversations with Dr. Ding.

2              I really should check my files to be

3    sure about this.  Ultimately, I believe late

4    October, early November, I -- I went to Delhi

5    and met with the Concur team to get to know

6    them and get them to explain to me their

7    processes.

8         Q.   Is that 2017?

9         A.   Yes, yes.

10        Q.   Before you go on, you said Delhi.

11   Talking about Delhi, India?

12        A.   Yes.

13        Q.   For a second, I thought you said you

14   went to a deli.

15        A.   Went to a deli?  Anyway, my

16   recollection is I first read these landscape

17   report -- studies and perhaps wrote something

18   up, you know, sort of a very rough first draft

19   of some of the material I first report and then

20   got more into the essentiality analysis.

21        Q.   And who put together the early draft

22   of the protocol that Concur was going to

23   follow?

24        A.   I'm not sure.  I mean, I don't know

25   whether it's something that Concur drafted as

HIGHLY CONFIDENTIAL

1    an example of the -- the practice that they'd

2    used in the past, or perhaps Ding, Dr. Kakaes.

3    And when I got it, I made a few edits and

4    rearranged it.  And I can't remember

5    specifically if I added any steps or not.  I

6    certainly reworded some of it.

7         Q.   When you're talking about the

8    protocol, is that document attached as -- the

9    protocol for determining essentiality attached

10   as appendix C?

11        A.   That is correct.

12        Q.   If I direct your attention to

13   appendix C, this is an essentiality analyst

14   analysis protocol?

15        A.   Yes.

16        Q.   And so you received the initial draft

17   of this from someone, that had been put

18   together, and then you made some edits to it?

19        A.   Yes, I mean, and I think I may have

20   reorganized a step or two.  I just -- it's been

21   a while so I don't recall the details.

22        Q.   And so am I correct that as part of

23   this protocol, patents of a particular patent

24   family were -- were to be reviewed in the

25   following order:  U.S.-issued patents followed

HIGHLY CONFIDENTIAL

Page 144

1        A.   Well, I mean, that's -- I mean, I

2   just read it in -- in -- in my report, but

3   basically, they downloaded the -- they

4   downloaded the ETSI declaration file, they used

5   that to identify families and used the families

6   to identify family members and then created the

7   census table.  They could match those patents

8   that had been analyzed earlier with patents in

9   the -- in -- in that new census table and they

10  could identify those unmatched patents that

11  needed essentiality analysis and analyze -- you

12  know, and do the essentiality analysis for --

13  for those patents.

14       Q.   And that work you just referred to,

15  the downloading of the ETSI declaration files

16  and using that information to update the

17  census, were you involved in that in any way?

18       A.   On the census?  I mean, I looked at

19  the -- at the results, the process was

20  described to me, but I didn't -- I -- I didn't

21  do any of the steps.  And unlike the

22  essentiality review, they didn't -- I think

23  didn't have anything in that process that they

24  felt required guidance.

25       Q.   And so for the -- at least for the

HIGHLY CONFIDENTIAL

Page 150

1    escalated essentiality determinations that they

2    found difficult, and Dr. Ding and I would

3    review them.  We had monthly -- I mean, weekly

4    phone calls.  But I don't recall any escalation

5    of the UE/nonUE cases.

6         Q.   So you had one meeting in Delhi;

7    correct?  Or did you go back there?

8         A.   Well, two days of meetings.

9         Q.   Okay.  So two days of meetings on one

10   occasion in October-November, 2017.  And then

11   what kind of interaction did you have with the

12   Concur IP team -- team after that?

13        A.   I would pose questions to them by

14   email, get responses back.  We'd get -- I'd get

15   drafts of the incomplete database.  They would

16   typically, Thursday or Friday, email cases that

17   they wanted to escalate and then we'd have a

18   phone call Monday morning.  Yeah, Monday

19   morning to discuss the resolution of those

20   cases.  I mean, it's kind of hard because you

21   had to be able to get people in California

22   and -- and Delhi on the phone at the same time.

23        Q.   Who were the people in California?

24        A.   Dr. Ding was there, and counsel would

25   be on the line.

HIGHLY CONFIDENTIAL

Page 151

1      Q.   And then when you said "escalate,"
2   did you and Dr. Ding divvy up the issues that
3   were escalated, or did you both look at each
4   issue?
5      A.   We both would do it.  And usually we
6   got the same answer.  If we didn't get the same
7   answer we would reresearch the problem until we
8   had unanimity or -- or discuss it.
9      Q.   And for how long did these Monday
10  calls go on?  For how many weeks?
11     A.   I'd -- I'd just have to look at -- at
12  my records.  They went on until the process was
13  done.  I can't remember quite when they
14  started, whether it was November, December.  I
15  can't remember when they started, but they went
16  on to the very end.
17     Q.   And when was the very end?  When the
18  report was due or sometime before that?
19     A.   Well, it was less before it than --
20  than we thought it was going to be, I think.  I
21  want to say it was late -- up until late March
22  or something like that, maybe one in April.
23     Q.   And these calls began after the
24  November 2017 meetings in Delhi?
25     A.   That's my recollection, yes.

HIGHLY CONFIDENTIAL

Page 154

1    other standards, defining quantities, things

2    like that.

3         Q.   So what was the total number of

4    patents that were included in the Concur IP

5    database?

6         A.   Patents or publications?

7         Q.   What do you mean by publications in

8    that sense?

9         A.   Applications.

10        Q.   Oh, I see.

11        A.   Or, I mean, there are applications

12   and they were issued -- granted patents, and

13   the database has each.

14        Q.   Well, how many total patents and

15   applications were there?

16        A.   In the census database, I don't -- I

17   mean, I think my report mentions exact number,

18   but I want to say it's about 160,000.

19        Q.   And of those, how many were escalated

20   for you and Dr. Ding to review?

21        A.   Not all of -- not all -- I mean, not

22   all of those were evaluated for essentiality.

23   It was only a -- a defined subset that was

24   evaluated for essentiality.  Applications that

25   didn't -- that were in families that had no

HIGHLY CONFIDENTIAL

Page 155

1   issued patents would not be evaluated.

2   Families that were dead, that is, all patents

3   and applications were expired, would not be

4   examined.  So the number of them that were

5   examined was much smaller than 160,000.  I want

6   to say we got two or three cases a week.

7   Maybe -- maybe one week there were as many as

8   eight.

9        Q.   All right.  Let me direct your

10  attention to page 101 of Jackson Exhibit 1.

11       A.   All right.

12       Q.   So there I see a reference to, at the

13  end of that first paragraph, a total of 256

14  companies had provided 2,180 declarations

15  listing 221,104 patents.

16            Do you see that?

17       A.   Yes.

18       Q.   So is that the total number of

19  patent/publications that are in the database,

20  221 --

21       A.   No.

22       Q.   -- 104?

23       A.    No.  That's the -- that's what's in

24  the ETSI database, but that includes non3GPP

25  standard.  That would include things like DECT

HIGHLY CONFIDENTIAL

Page 157

1   and that analysis would continue either until

2   the family had been exhausted or the -- the

3   English, U.S., EP, and then Chinese in

4   translation had been exhausted, or a -- a -- a

5   claim was found to be essential.

6        Q.   And so the essentiality analysis that

7   was done for these 12,787 patents, that would

8   have been done in the first instance by Sachin

9   Sinha and his group?

10       A.   Yes.

11       Q.   Then each week, they would escalate

12   two to three cases, in some cases, more than

13   that, for you and Dr. Ding to look at?

14       A.   Yes.

15       Q.   So approximately how many in total

16   patents did you and Dr. Ding look at through

17   this escalation process?

18       A.   Well, I didn't keep a running total,

19   so I -- whatever number I gave you -- I'm

20   uncomfortable giving any number but, you know,

21   if you'll accept this imprecise, I'd say in the

22   ballpark of 100.

23       Q.   And then for the patents that were

24   subject to the essentiality analysis that you

25   did that were not escalated, did you do any

HIGHLY CONFIDENTIAL

Page 158

1    kind of spot checking to see whether their

2    analysis was right?

3         A.   Yes, I did, just, I mean, not very

4    systematically, but I just -- I mean, one day I

5    just sat down and I started going through,

6    picking them sort of randomly and looking at

7    the claim, looking at their comments, looking

8    at the answer they got, either why they thought

9    it wasn't essential or why they thought it was.

10   And just, as I say, it wasn't essential -- it

11   wasn't systematic, but it was enough to

12   convince me that -- that they had a pretty good

13   batting average.  I don't recall coming across

14   cases that I disputed.

15        Q.   And what were you looking at, the

16   Excel spreadsheet or something else?

17        A.   I was looking at the Excel

18   spreadsheet.  It had -- the Excel spreadsheet

19   contains their determination, their reasoning

20   for the determination, the text of the claim

21   they analyzed, a pointer to the standard

22   that -- that -- that they compared the claim

23   to.

24        Q.   And approximately how many -- as part

25   of that spot-check you did that day,

HIGHLY CONFIDENTIAL

Page 160

1    finding of noninfringement because it's sort of

2    hard to prove a negative concept.

3              I think to get an understanding of

4    the sort of ab initio analysis process, the

5    escalation is a better examination of that.

6    And certainly some of those took me multiple

7    hours to determine.  Dr. Ding and I make jokes

8    about how they were harassing us by their

9    choice of -- they did not escalate any easy

10   cases.

11        Q.   Okay.  So there were two types of

12   analysis you would do.  You would do the patent

13   cases they escalated to you and Dr. Ding, and

14   then there was other -- the other instance you

15   mentioned where you sat down one day and were

16   just kind of spot checking; right?

17        A.   Uh-huh.

18        Q.   So when you did the spot checking,

19   did you find any determinations that had been

20   made by Sachin Sinha and his group that were --

21   you disagreed with?

22        A.   I don't recall doing -- I don't

23   recall that.

24        Q.   And I may have asked you this but I'm

25   now confused on the answer.  When you did the

HIGHLY CONFIDENTIAL

Page 161

1    spot checking, approximately how many patents

2    did you look at?

3         A.   I don't recall exactly.  Probably in

4    the neighborhood of 20, but I'm not sure.

5         Q.   And that was over the course of a

6    couple hours?

7         A.   Afternoon.

8         Q.   Okay.  And in terms of the patents

9    that were escalated to you and Dr. Ding,

10   approximately how much time did you spend per

11   patent in reviewing those issues?

12        A.   It was highly variable.  I remember

13   one that, I -- I mean, I just immediately knew

14   looking at it that it was essential, but it

15   was -- it was an example of what I told you

16   about where the -- the -- the declared portion

17   of the standard sort of indirectly referred to

18   another standard that had a clean -- clean

19   element, and I happened to -- not too long

20   before, I was reading a book on LTE and it

21   described this process and -- and so I knew --

22   I knew why this -- you know, Concord asked

23   about this one claim element, said they

24   couldn't find it, and I -- I knew it was

25   present in the standard although it turned out

HIGHLY CONFIDENTIAL

Page 176

1  again that would have been done by the Concur

2  IP analyst without your involvement?

3      A.  I mean, the initial review.  Yes.  I

4  mean, this was where the escalation comes in.

5      Q.  Okay.  Are you aware of any instances

6  in which Concur IP changed the essentiality

7  determination that had previously been made

8  under Professor Kakaes's supervision as part of

9  the work it did in -- in this case?

10     A.  No, I'm not.  I didn't try to

11  identify those cases.

12     Q.  Would you have been able to identify

13  those cases?

14     A.  I believe I have a version of

15  Dr. Kakaes' database so I probably could have

16  set up an -- an automated process to do that.

17     Q.  And I may have asked you this before.

18  Did the version that you oversaw contain

19  different columns and fields than the version

20  that Professor Kakaes?

21     A.  I think he did, and my answer was I'm

22  not sure.  I looked only very briefly at the

23  Kakaes data sheet.  I don't think I had any

24  questions that I needed to review it for to

25  answer so I -- I just looked at it to know what

HIGHLY CONFIDENTIAL

Page 177

1    was there, but I -- I didn't look at it in

2    detail.

3         Q.   Do you know whether Concur IP went

4    back and reviewed any of the data that had been

5    previously vetted as part of the Kakaes

6    database?

7         A.   Well, I -- I mean, there were

8    obviously applications that were to become

9    issued patents, patents that would have expired

10   and things like that so fields had to be

11   updated.  I'm -- I'm not aware of whether they

12   went back and reviewed and updated the

13   essentiality determinations.

14        Q.   Does the current version of the

15   Concur IP database that you oversaw reflect

16   which patents were escalated for review by you

17   and Dr. Ding?

18        A.   I don't think so, no.

19        Q.   Again, I may have asked you this, and

20   if I did, I'm sorry.  Do you know which

21   particular litigation or arbitration the Kakaes

22   database was used in?

23        A.   No, in the sense of being able to

24   tell you or know in the sense of knowing where

25   in my files I could find it.  Off the top of my

HIGHLY CONFIDENTIAL

Page 178

1   head, I -- I believe it's something called TCL,

2   but --

3       Q.   TCL versus Ericsson?

4       A.   I don't know.  I'm just not confident

5   to -- to give you that answer without checking

6   the files.

7       Q.   Now, am I correct that the people at

8   Concur IP had previously done these

9   essentiality studies when they were part of

10  Thompson Reuters?

11      A.   Similar studies, yeah.  I mean, they

12  got substantial experience in this.

13      Q.   Was the Kakaes database that you have

14  in your possession done by the analysts when

15  they were at Concur IP or Thompson Reuters or

16  both or --

17      A.   I don't know.

18      Q.   And then step 3 on page 111 talks

19  about documenting the process and the

20  conclusions; is that right?

21      A.   Yes.

22      Q.   And it says that for each patent

23  analyzed, the analyst records in the database a

24  representative UE claim, a representative nonUE

25  claim, a characterization of the claims as

HIGHLY CONFIDENTIAL

Page 184

1    there, but then they narrow the -- the larger

2    database down to what they ultimately report to

3    us.

4         Q.   Let me ask you this.  Of the 158 or

5    so -- 158,000 or so entries in the current

6    version of the database, how many of those

7    entries came unchanged from the Kakaes

8    database?

9         A.   I -- I just -- I'd have to -- I mean,

10   I -- I'd have to go back and do an audit.  I

11   mean, the -- the -- my understanding of the

12   process, it's a little bit different than that.

13             The Kakaes, you know, database really

14   is post essentiality analysis.  And my

15   understanding was that they basically got the

16   ETSI declaration, generated a census from that,

17   and -- and then matched the output of the

18   census with the prior data to fill in those

19   fields.  But I can't give you the details of

20   that process.

21             I mean, obviously there have been a

22   bunch of changes to the patents that were in

23   the earlier database.  I mean, some expired,

24   others went from applications to patents.

25        Q.   But for those that didn't expire or

HIGHLY CONFIDENTIAL

Page 185

1    change from an application to a patent, how
2    many then -- for how many of those patents did
3    the information in the Kakaes database just get
4    shifted over to your database?
5         A.   I -- I believe that for the ones that
6    were, you know, existing and weren't -- really
7    unchanged since the Kakaes database that the
8    essentiality determination was copied over and
9    reused.
10        Q.   And so before, you directed me to
11   table 10, which showed that there were a total
12   of 12,787 patents that were subject to
13   essentiality analysis.
14        A.   Yes.
15        Q.   Of those 12,787, how many were simply
16   copied over from the Kakaes database?
17        A.   I don't know.  I -- we could probably
18   go out and determine it, but I have not done
19   so.
20        Q.   Would you say 80 percent or higher?
21   Lower?
22        A.   I'd have to -- I haven't done that
23   analysis so I can't give you a number.
24        Q.   Just to be clear, if the Kakaes
25   database reflected an essentiality

HIGHLY CONFIDENTIAL

Page 186

1   determination for a particular patent and that

2   patent was still relevant to your analysis, in

3   other words, not expired or, you know, to be

4   removed for some reason, that essentiality

5   analysis was simply copied over?

6       A.   I believe that to be the case, yes.

7       Q.   Okay.  Now, from the Concur IP

8   database, am I correct you can filter that data

9   in many different ways?

10      A.   Yes.

11      Q.   And by filter, I mean using like

12  Excel spreadsheet functions.

13      A.   Right, right.  That's what I --

14  that's what I took you to mean, yes.

15      Q.   And so you can filter, for example,

16  to see how many essential patents a particular

17  company has in the U.S. versus some other

18  geographic region?

19      A.   Yes.  There's a -- a field in the --

20  in the database for the jurisdiction issuing

21  the patent so you could ask for patents -- you

22  can identify patents or family by jurisdiction

23  or multiple jurisdictions.

24      Q.   And I take it you can also filter by

25  patents that are directed to UE or handsets