# EXHIBIT 9

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
Limited, and TCT Mobile (US) Inc.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*,<br><br>　　　　　Defendants.<br>_____<br><br>TELEFONAKTIEBOLAGET LM ERICSSON *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD. *et al.*,<br><br>　　　　　Defendants. | Case No. SACV14−00341 JVS (DFMx)<br>Consolidated with CV15-02370<br><br>**PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. IR. ING. RUDI BEKKERS**<br><br><br>Place: Courtroom 10C<br>Before Hon. James V. Selna<br><br>Discovery Cut-Off: May 23, 2016<br>Pre-Trial Conf.: Jan. 30, 2017<br>Trial: Feb. 14, 2017 |

| | | |
|---|---|---|
| 1 | I. | EXPERT QUALIFICATIONS ........................................................................ 1 |
| 2 | II. | SUMMARY OF TESTIMONY ....................................................................... 5 |
| 3 | III. | MOBILE STANDARDS DEVELOPMENT ................................................ 10 |
| 4 | IV. | THE INTERSECTION BETWEEN PATENTS AND STANDARDS ......... 13 |
| 5 | | A. Risks of Standardizing Patented Technologies ................................... 13 |
| 6 | |    1. Licenses unavailable ................................................................ 13 |
| 7 | |    2. Patent hold-up .......................................................................... 14 |
| 8 | |    3. Cumulative licensing fee too high ........................................... 14 |
| 9 | |    4. Discrimination against certain implementers .......................... 14 |
| 10 | | B. Implications of the Above Risks .......................................................... 15 |
| 11 | V. | THE ETSI IPR POLICY ............................................................................... 16 |
| 12-13 | | A. The ETSI Rules of Procedure Require Disclosure of Essential IPRs and a FRAND Commitment from IPR Owners, But Leave Dispute Resolution to the Parties or Courts. ................................................................................ 17 |
| 14 | | B. ETSI Dynamics and Voting Regarding the IPR Policy ....................... 19 |
| 15 | | C. Context, Rationale, Substance, and Adoption of the 1993 ETSI IPR Policy 20 |
| 16 | |    1. Context and rationale of the 1993 ETSI IPR Policy ................ 20 |
| 17 | |    2. Substance of the 1993 ETSI IPR Policy .................................. 23 |
| 18 | |    3. Adoption of the 1993 ETSI IPR Policy ................................... 24 |
| 19 | | D. Context, Rationale, Substance, and Adoption of the 1994 ETSI IPR Policy 24 |
| 20 | |    1. Context and rationale of the 1994 ETSI IPR Policy ................ 24 |
| 21 | |    2. Substance and adoption of the 1994 ETSI IPR Policy ............ 25 |
| 22 | VI. | CONTRIBUTION COUNTING ................................................................... 27 |
| 23 | | A. "Approved Contributions": How ETSI and 3GPP Track Input to Technical Standards ............................................................................. 27 |
| 24 | | B. Ericsson's Use of Contribution Counting ............................................ 28 |
| 25-26 | | C. The Origins of Contribution Counting and the Theory of Using It to Attempt to Justify Royalty Rates ....................................................................... 29 |
| 27-28 | | D. The Contribution-Counting Reports Ericsson Relies on Do Not Claim That, or Show How, Approved Contributions Correlate to Essential Patents. ... 32 |

E.  Ericsson's Key Assumption that Approved Contributions Correlate to Actual Patents Is Unreliable for Many Reasons. ...................................................34

    1.  Contributions are not patents and need not be patentable. .........................34

    2.  Approved contributions are often trivial. .....................................................35

    3.  Contribution-counting studies do not discount for expired or lapsed patents. ............................................................................................................37

    4.  Contribution-counting studies do not consider whether once-owned patents were transferred to others. ..............................................................................37

    5.  Contributions may cover technologies patented by others. .........................38

    6.  Multiple contributions may relate to the same underlying technology. ......39

    7.  Value distribution is not necessarily equal between multiple submitters. ..40

    8.  The value distribution of inventions, contributions, and patents is highly skewed. ............................................................................................................40

    9.  Contribution-counting studies cover only some parts of the full 3GPP standards. .........................................................................................................41

    10. Contribution-counting studies count optional parts of the standard, which are non-essential by definition. .....................................................................42

F.  Contribution Counting Invites Opportunistic Behaviors. ...............................42

    1.  Devoting resources to increase contribution statistics without regard to whether contributions are patentable. ............................................................42

    2.  Making contributions designed to inflate contribution statistics. ................44

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ...........................47

existing licenses on account of subsequent developments, whereas the latter is exclusively focused the rights of prospective licensees. Notwithstanding the decision to not implement the "most favoured licensee" provision, ETSI's IPR Policy has always contained a non-discrimination obligation as part of the FRAND promise. Indeed, the 1994 Policy reconfirmed that each member owning Essential IPRs had to be prepared to give an "undertaking in writing that it is prepared to grant irrevocable licences … on fair, reasonable and non-discriminatory terms and conditions." This basic FRAND promise of the 1994 Policy remains in place to date.

## VI. CONTRIBUTION COUNTING

61. Ericsson has advocated in favor of measuring the relative numerical and/or technical share of its standard-essential patents against that of other standard-essential patent owners using a method called "approved contribution counting," or "contribution counting" for short. In this section, I explain what contribution counting is, how Ericsson created it (and hired others in an effort to promulgate it), and why it is wrong to use contribution counting to measure the size or relative technical merit of a standard-essential patent portfolio compared to others within the industry.

### A. "Approved Contributions": How ETSI and 3GPP Track Input to Technical Standards

62. Firms or individuals participating in the standardization process can propose specific technologies and solutions, and submit a technical document describing the proposal. Within 3GPP, such a proposal is generally known as a "contribution." (Ex. 312 at 13.) If the proposal is incorporated into a draft standard, 3GPP labels it an "approved" contribution. (*Id.* at 13–14.) Contribution counting essentially involves sorting, counting, and comparing how many approved contributions each participating company has made to the ETSI/3GPP standardization work.

## B. Ericsson's Use of Contribution Counting

63. I understand Ericsson has cited contribution-counting studies as a basis "for how [it] determined the rates and terms it offered TCL for [a license to] Ericsson's patents . . . ." (Ex. 102 (Dec. 11, 2015 Responses to TCL's Interrogatory No. 11) at 5, 9, 10).) In particular, Ericsson has indicated that it "ties its rates to the patented technical value it provides is [*sic*] by performing an aggregation analysis on the accepted technical contributions to the standard," and that "[b]y measuring its accepted technical contributions to the standards in question, Ericsson correlates its rates to the value of the patented technology it has contributed to the industry." (*Id* at 9.) As the European Commission-supported NORMAPME organization later explained, Ericsson's position was not without self-interest: not taking the actual technical benefit of patents into account, but merely using a numerical proportional distribution of the total aggregated licensing proposal would specifically be beneficial to Ericsson and the other firms that proposed and lobbied for it (Nokia and Motorola). (Ex. 1066.)

64. From the information I reviewed in connection with my analysis in this case, I have developed an understanding of how Ericsson appears to use contribution counting in practice, particularly when negotiating licenses to its portfolio of 2G, 3G, and 4G patents. For example, when asked how Ericsson represents its proportional share of standard-essential patents on 2G, 3G and 4G technologies in negotiations with prospective licensees, Ericsson company witness Gustav Brismark answered that "what we have been presenting are results based on Signals Research studies which presents what you could call an impact on the standard, who got their technologies accepted into the standard specification." (Dep. of Gustav Brismark, 12/18/15, pp. 94:22–95:1.) Along these lines, a 2013 Ericsson sales presentation titled "LTE Patent Landscape and Ericsson Position" claims that "[t]he number of adopted contributions . . . gives an indication of who will own most essential patents when the technology is standardized," and that

-28- Case No. SACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. IR. ING. RUDI BEKKERS

1  "minutes from standardisation workgroups" and contributions are "[c]orrelated to
2  essential patent strength." (Ex. 1084 at 4, 6.) Ericsson claims to have a "[s]trong
3  ability of patenting our 3GPP solutions" such that "[w]e estimate [we] have 25% of
4  all LTE essential patents." (*Id.* at 12.) Finally, Ericsson boasts in this presentation
5  that "recent external studies show Ericsson's strong position in the LTE patent
6  landscape," and that this result is "100% audited by Signals Research." (*Id.* at 7–8.)
7  Ericsson presumably references "external studies" in licensing negotiations to
8  suggest that contribution counting is not biased in its favor or unreliable.

9    65. In my opinion the above way in which Ericsson is using contribution
10 counting as a metric for its proportional share of standard-essential patents is not
11 supported by reliable evidence or assumptions. In addition, after explaining how
12 Ericsson itself created the contribution counting method it relies on, I then address
13 the most relevant problems with Ericsson's reliance on contribution counting.

14    **C.**    **The Origins of Contribution Counting and the Theory of Using It**
15            **to Attempt to Justify Royalty Rates**

16    66. The evidence I reviewed and analyzed in this case indicates that
17 Ericsson developed contribution counting to "counter" third-party studies reporting
18 that Ericsson owned a lower share of essential patents than Ericsson apparently
19 believed was accurate, and wished to portray in its licensing negotiations. Prior to
20 Ericsson developing the method of contribution counting, several other methods
21 were traditionally used to attempt to understand different stakeholder's relative
22 ownership of 3G and/or LTE standard-essential patents. They included counting the
23 number of ETSI declarations (*e.g.*, as in a 2009 report by ABI Research) and
24 substantively analyzing the technical merits of declared-essential patents (*e.g.*, as in
25 2009 and 2010 reports by Fairfield Resources International, 2011 and 2012 reports
26 by Cyber Creative Institute, and 2012 reports by Article One Partners and iRunway).
27 These studies are summarized in the table below:
28

| Year | Source | Exhibit | Ericsson's Reported Share of Patents |
|---|---|---|---|
| 2009 | ABI Research | Ex. 1039 at 53 | 3% (4G) |
| 2009 | Fairfield Resources Int'l | Ex. 1043 | 18.4% (3G) |
| 2010 | Fairfield Resources Int'l | Ex. 1042 | 13.3% (4G) |
| 2011 | Jefferies LLC | Ex. 1044 | 2% (4G) |
| 2011 2012 | Cyber Creative Institute | Ex. 1040; Ex. 1041; Ex. 1035 | Declined from 9% in 2011 to 5.8% in 2012 (4G) |
| 2012 | Article One Partners | Ex. 1175 | 8% (4G) |
| 2012 | iRunway | Ex. 1036 | 1.97% (4G) |

Table 1 (PDX 21).

67. According to internal Ericsson emails, Ericsson's employees found Ericsson's reported share of 4G patents to be frustratingly low when ABI Research ("ABI") reported in 2009 that Ericsson owned 3% of declared-essential 4G SEPs. Reacting to that report, one Ericsson employee exclaimed, "I've been needing some details about Ericsson's expected share of the LTE patents and articles like this aren't helpful!" (Ex. 1080 at 2.) Regarding a related news article, other Ericsson employees remarked, "Ericsson is not listed at all, so we are pushed on the defense by Qualcomm. I don't like that."; "The Qualcomm promotion machine seems to continue to tell colored (untrue!) stories about Qualcomm's Nr 1 position in LTE/IPR ...."; "As [another employee] points out, this is not good. [¶] Is there any way we can counter this (with actual data)? Customers will definitely ask and right now Ericsson has an unjustifiable (or at least unquantified) answer!" (Ex. 1081 at

1–3.)

68. Ericsson's "counter" to this dilemma for its licensing program was to conduct an internal contribution-counting "study," and then have a third party—Signals—replicate Ericsson's work and report the results as being independently audited. A December 4, 2009 Ericsson memorandum titled "Comments on the [2009] ABI report 'LTE and WiMAX Intellectual Landscapes,'" written by Ericsson employee Björn Gudmundson and for an audience that included Signals, illustrates that Ericsson recognized counting approved contributions as a way of showing Ericsson to be "in the lead" relative to some measureable criteria: "We clearly have the highest number of 'important' contributions to the LTE standard. Many companies are measuring [the] number of contributions to 3GPP. A consequence of that is that there is inflation in number of input contributions. Still, Ericsson is in the lead. Looking at important (approved) contributions, we are even more in the lead." (Ex. 1580 at 7.)

69. Shortly after Ericsson prepared this analysis, and presumably shortly after it shared the analysis with Signals, Signals issued the first in a series of reports regarding contribution counting. The Signals reports, issued from 2010 to 2015, each disclose being prepared "on behalf of Ericsson," or "for Ericsson." (Ex. 1084 at 7–8; Ex. 1176 (2010); Ex. 1077 (Nov. 2014); Ex. 305 (Dec. 2014); Ex. 1045 (2015).)

70. It is misleading to suggest that the Signals reports amounted to an independent third-party audit. Instead, Mr. Brismark explained that "[t]he Signals report was commissioned by Ericsson"—*i.e.*, it was paid for by Ericsson—and that "[t]he first version was something which really was done after Ericsson itself had conducted a[n] approved contribution study." (Dep. of Gustav Brismark, 12/18/15, pp. 96:14–24.) He further explained, "[i]t was more in order to have a third party be able to follow that basic principle and so it would be an objective study in that sense. [¶] The actual methodology was first developed by Ericsson." (*Id.*)

Presumably, this is why the cover page of each Signals report says it was "developed for Ericsson." According to Mr. Brismark, Signals was to follow the preferred "approved contribution" methodology that Ericsson developed. This approach did not require Signals to "vet the accuracy of Ericsson's hypothesis that counting approved technical contributions is a reliable way of assessing the number of standard-essential patents owned by companies." (*Id.* at 98:12–99:11.)

71. Additional evidence shows that Ericsson exercised complete discretion over the Signals reports, and retained complete veto power over what, if anything, Signals published. According to an agreement governing Ericsson's working relationship with Signals, Signals would provide a preliminary draft/outline for Ericsson to review, and Signals would "refrain[] from publishing specific results" without Ericsson's approval. (Ex. 1083 at 4.) In my understanding of the term, an "independent audit" does not allow for the supposedly audited party to veto the auditor's findings like this, and, more importantly, this procedure does not appear designed to, and did not, lead to a reliable contribution-counting method or study.

72. Based on the above evidence, it is my opinion that contribution counting originated with Ericsson as a way to counter patent-based studies which reported that Ericsson owned a lower proportionate share of standard-essential patents than Ericsson preferred. To my knowledge, the notion that there is a reliable correlation between approved contributions and ownership of standard-essential patents has never been independently or academically vetted, replicated, or audited. The idea of using contribution counting to attempt to approximate proportionate share of essential-patent ownership should be viewed with great care and skepticism.

    **D.    The Contribution-Counting Reports Ericsson Relies on Do Not Claim That, or Show How, Approved Contributions Correlate to Essential Patents.**

73. Ericsson's contribution-counting methodology rests on the fundamental