# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

HUAWEI TECHNOLOGIES CO., LTD.,
HUAWEI DEVICE USA, INC., and HUAWEI
TECHNOLOGIES USA, INC.

        Plaintiffs / Counterclaim-
        Defendants,

   v.

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA,
INC.,

        Defendants / Counterclaim-
        Plaintiffs,

   and

SAMSUNG RESEARCH AMERICA,

        Defendant,

   v.

HISILICON TECHNOLOGIES CO., LTD.,

        Counterclaim-Defendant.

Case No. 16-cv-02787-WHO

**REBUTTAL EXPERT REPORT OF JACQUES DELISLE**

**May 25, 2018**

# TABLE OF CONTENTS

I.  Background and Qualifications ....................................................................................... 1

II.  Case Background, Assignment, and Summary of Opinions ................................. 4

III.  The Samsung-Huawei Litigation in Shenzhen ................................................. 10

IV.  Civil Procedure in Chinese Law ....................................................................... 21

V.  Chinese Courts and the Lack of Indicators of Bias / Decisions Contrary to Law ........... 26

    A.  The Quality of Chinese Courts Generally ............................................... 26

    B.  The Quality of the Courts in Shenzhen and Similar Jurisdictions ...................... 31

    C.  The Quality of Intellectual Property Chambers / Tribunals ................................ 35

    D.  Adjudication and Intellectual Property Rights Protection .................................. 39

    E.  "Protectionism" and Bias ....................................................................... 42

        1.  "Local Protectionism" in Shenzhen ........................................... 43

        2.  National / General Protectionism in China ................................. 47

### I.      Background and Qualifications

1.  I am the Stephen A. Cozen Professor of Law, Professor of Political Science, Director of the Center for East Asian Studies, Deputy Director of the Center for the Study of Contemporary China, and Co-Director of the Center for Asian Law at the University of Pennsylvania.

2.  My research, writing, and teaching for more than thirty years have focused on contemporary Chinese law and Chinese politics and policy. My research has included work on Chinese courts and judicial processes, Chinese tort law and other issues of civil law and economic law, the role of law in China's economic development policies, China's approach to private and public international law, the rule of law in China, and China's foreign relations.

3.  I specialized in Chinese law and Chinese politics while earning my J.D. at Harvard Law School and in the Ph.D. program in the Government Department at Harvard University. I also focused partly on Chinese politics and policy at the Woodrow Wilson School at Princeton University, where I received an A.B.

4.  I have published scholarship on these subjects in law journals, international affairs journals, edited volumes and other media. I regularly conduct research on law, politics and domestic and foreign policy in contemporary China, and I regularly monitor new laws and legal, political, and economic developments in China.

5.  At the University of Pennsylvania (and as a visiting professor at other leading universities in East Asia and elsewhere), I teach courses and supervise law, social science, and business graduate students' theses and doctoral dissertations focusing on legal, political and economic reform in contemporary China and China's external legal relations and foreign relations. I am a member of the faculty graduate group and have taught in the core curriculum of the Lauder Program at the Wharton School, a program that awards a joint M.B.A.-M.A. degree in

regional studies, including in Chinese studies. In addition to the China-focused work described above, I also conduct research and have published in the fields of international law, comparative law, tort law, and international law-related aspects of United States law. I have taught Torts at Penn since 1994 and a course on the common law of torts and contracts for civil lawyers at Waseda University in Tokyo. I also regularly teach courses on public international law, comparative law and politics, and international relations. I have been an honorary professor at Renmin University Law School, and I am an inaugural member of the global law faculty of Peking University Law School, both of which are among China's top few law schools.

6. I have served as a consultant, advisor or lecturer for programs on United States and international law for Chinese lawyers, and programs supported by the United States government, major private foundations and international organizations to provide advice to People's Republic of China (PRC) legislation-drafters and government officials, primarily in the fields of civil and economic law (including torts, property, company law, foreign investment and intellectual property) and legal controls of government regulation (including administrative procedure law). I also have conducted substantial research and scholarship on foreign legal advice and assistance programs (including those focusing on economic law and rule-of-law reforms) targeting China and other transitional post-socialist states.

7. I am a member of the National Committee on United States-China Relations. I am a senior fellow and director of the Asia Program at the Foreign Policy Research Institute, where I oversee, and contribute to, lecture series, conferences, and publications on issues that include law, politics, economics and policy in the greater Chinese region. I have twice been vice chair of the Pacific Rim Interest Group of the American Society of International Law. I am a

member of the International Academy of Comparative Law. I contribute to scholarly and

policy-related programs on contemporary Chinese law and politics for such organizations. I

regularly serve as a peer-reviewer for major United States and East Asian scholarly journals

and presses in fields relevant to my scholarship, and for major United States and foreign

providers of funding for academic research on the law and politics of the PRC. I serve on the

editorial boards of several journals in my fields of specialization and as the co-editor of a

series of books on Chinese law.

8.  Before joining the faculty at Penn, I did substantial work on issues of Chinese law and

country conditions and aspects of China's external relations in my capacity as an attorney-

advisor in the Office of Legal Counsel in the Department of Justice and in association with

leading U.S.-based international law firms.

9.  I have served as an expert witness and consultant on matters of Chinese law, policies and

practices in litigation in United States federal and state courts, arbitration proceedings and

proceedings before federal agencies in many cases over more than fifteen years. The issues

on which I have opined include those related to *forum non conveniens* (including the

availability and adequacy of Chinese law and a Chinese forum) and bases for the

enforcement of, or deference to, Chinese court decisions by U.S. courts, Chinese tort law,

intellectual property law and contract law, Chinese civil procedure law and judicial process,

Chinese law on choice of law and transnational judicial proceedings, Chinese laws, policies

and practices concerning foreign investment and foreign companies' participation in the

Chinese economy, and China's economic development policies and industrial policy.

10. I have conducted extensive research in residence in China. Since 1986, I have traveled

regularly to China and on several occasions been a visiting scholar or visiting researcher at

major research universities in the region. I have frequent, extended discussions with PRC lawyers, judges, legal academics, social scientists, government officials and ordinary Chinese citizens in China and elsewhere. I read Chinese and speak Mandarin, the standard national dialect of Chinese. Much of my research is conducted in that language.

11. I also have undertaken extensive research outside of the PRC on matters relating to Chinese law, politics and economics. In that capacity, I have reviewed documentary evidence and conducted many interviews of lawyers who advise and represent non-PRC clients who conduct business in China, non-PRC business people who conduct business in China, and government officials and foundations, industry organizations, and other non-profit officers who have been involved in promoting or monitoring economic and legal reform in China.

12. A copy of my CV is attached as Exhibit A to this report. I am being compensated for my work in this litigation at a rate of $800 per hour. No part of my compensation depends on the outcome of this litigation or the opinions expressed in my report.

## II.    Case Background, Assignment, and Summary of Opinions

13. I understand that the global dispute between Samsung and Huawei entails litigations that were filed simultaneously—or nearly simultaneously (given the time zone difference, they were filed on consecutive days)—in courts in the United States and in China in late May 2016.[1] From that time forward, the two parties have filed a total of 42 patent infringement suits—22 by Samsung and 20 by Huawei (with each suit involving a single patent)—and Huawei has filed one rate-setting and royalty payment suit, in various Chinese courts.[2] Two

---

[1] *See* Dkt. 235, (Public) Samsung's Motion to Enjoin Huawei from Enforcing the Injunction Issued by the Intermediate People's Court of Shenzhen, Declaration of Guanbin Xie ¶¶ 3, 6.

[2] *See* Dkt. 283, Declaration of Bin Wang ¶ 2.

of the cases filed in China have proceeded more quickly than the United States litigation.

These cases have resulted in two judgments—which I will refer to as the 816 and 840

decisions (following the judgment numbers assigned by the Chinese court)—by the

Intermediate People's Court of Shenzhen ("Shenzhen Court") finding that Samsung infringed

two of Huawei's standards-essential patents (SEPs), and ordering injunctive relief against

Samsung's manufacture and sale of 4G LTE devices.[3]

14. I understand that Huawei has committed to license those two patents on fair, reasonable, and

non-discriminatory (FRAND) terms.  I understand that, "[a]s a predicate for its request for

injunctive relief, Huawei asked the Shenzhen Court to resolve whether its licensing efforts

---

[3] *See* Dkt. 235, (Public) Samsung's Motion to Enjoin Huawei from Enforcing the Injunction
Issued by the Intermediate People's Court of Shenzhen, at 1, 9.  I have reviewed public versions
of the 816 and 840 decisions issued by the courts.  I have more closely reviewed the 840
decision.  The 816 decision appears to be substantively very similar (although it addresses a
different patent).  I understand that this assessment of that the two opinions are substantively
very similar is also the view of Bin Wang, Senior Legal Counsel of the IP Litigation Department
at Huawei Technologies Co., Ltd., whom I understand to be intimately familiar with the 816 and
840 opinions and the underlying litigation. Dkt. 283, Declaration of Bin Wang ¶ 12 n.1. I have
been provided with what I have been informed is an English translation of the public version of
the 840 decision, provided by Samsung for use in this litigation. *Id.* My opinions are based on the
original language text of the public version of 840 decision (and, where so indicated, the public
version of the 816 decision).  For the convenience of this Court, I will use and cite to the pages
of the English translation provided by Samsung, indicating any areas where I have found that the
translation does not accurately or fully capture the meaning of the original language.  I further
understand that Samsung has appealed the Shenzhen Court's rulings in the 816 and 840 cases to
the Guangdong High People's Court. *Id.* ¶ 9.

with respect to its Chinese SEPs were FRAND, and whether Samsung refused FRAND offers and breached its own FRAND obligations."[4,5]

15. In reaching its conclusions, the Shenzhen Court found that Huawei "had no obvious fault in the negotiation process [with Samsung] and complied with FRAND principles, while during the SEP cross licensing negotiations between Samsung and Huawei . . . Samsung, had obvious faults with respect to procedure and substance and didn't comply with FRAND principles."[6]

16. I understand that in the U.S. proceedings, Samsung's experts have opined regarding the conditions under which the pursuit of injunctive relief for infringement of SEPs would be consistent with (or alternatively, in violation of) a party's FRAND obligations or U.S. competition law.  I further understand that Samsung and its experts have asserted that Huawei's pursuit of injunctive relief in the Chinese courts was a violation of its FRAND obligations and was anticompetitive, possibly in violation of U.S. antitrust law.[7]  Samsung's experts thereby seem at least implicitly to claim that the Chinese court did not, or that the Shenzhen Court or Chinese courts generally lack the capability to, assess fairly whether

---

[4] The quoted language is Samsung's characterization of the proceedings in the Shenzhen Court. Similarly, the Shenzhen Court states that the cases involved "two issues: one concerns FRAND, and the other concerns ascertainment and finding of facts with respect to technology." Dkt. 283, 840 Decision at 177.  I note that the Shenzhen Court appears to have considered the parties' global FRAND obligations, not only FRAND obligations as they applied to Chinese SEPs. *See, e.g.*, *id.* at 198 ("As the case involved the evaluation in SEP strength of both parties around the world . . . .").

[5] Dkt. 235, (Public) Samsung's Motion to Enjoin Huawei from Enforcing the Injunction Issued by the Intermediate People's Court of Shenzhen, at 15.

[6] 840 Decision at 209.

[7] I understand Samsung has also pursued injunctive relief against Huawei in China based on alleged infringement of Samsung's Chinese SEPs.  *See* Dkt. 283, Declaration of Bin Wang ¶ 3.

Huawei's seeking injunctive relief as a remedy for Samsung's alleged infringement was appropriate under the circumstances.

17. In light of the importance of the Chinese injunction proceedings to the positions that I understand have been articulated by Samsung's experts, I have been retained by counsel for Huawei to provide an overview of the Chinese court system, including courts that handle patent disputes of the type at issue in the 840 and 816 decisions, and an analysis of the judgment from the Shenzhen Court in the 840 and 816 decisions, including the Court's assessment of the evidence presented by both parties, the procedure followed and the law applied by the Shenzhen Court in adjudicating the cases and rendering its judgments, the Court's legal analysis and findings, and other relevant features of the opinion.

18. The text of the 840 decision indicates that the court considered in great detail evidence and arguments (including expert evidence) presented by both parties, and each side's challenges to the other side's arguments and evidence.[8]  The court offered extensive statements of its reasons for making its findings and judgments.  In stating the legal bases for its judgments, the court referred to relevant Chinese laws.  The text of the judgments appears fully consistent with the proper, or at least not-improper, application of relevant Chinese procedural and substantive law.

19. I do not see indications that the proceedings were secret.  Plaintiffs' claims in a civil suit in China are generally served by the court, not the opposing party, and such service occurs promptly after a case is filed and accepted.  I am aware of nothing to suggest that this is not

---

[8] This part of my analysis is based primarily on a review of the opinion in case 840.  As noted earlier, a less detailed review of case 816 indicates (and the Declaration of Bin Wang states) that the two opinions are highly similar.  To the extent that they are so similar, my analysis of case 840 extends to case 816.

what occurred in cases 840 and 816.  The Court's issuing public versions of its lengthy opinions detailing the proceedings and the evidence presented and considered, and the extensive coverage of the decisions in official and prominent Chinese media, further indicate a lack of secrecy.

20. As later sections of this report address in more detail,  extensive assessments by scholars, international organizations, U.S. courts, and other observers of the contemporary Chinese legal system generally and, more specifically, of courts of the type that adjudicated the 840 and 816 cases and that would adjudicate many of the other claims between Huawei and Samsung, are not consistent with a claim that the courts relevant here have not, or are incapable of, adjudicating the cases between Huawei and Samsung fairly and according to law.  These courts handling these types of cases are generally recognized to provide among the highest quality forums in China (including for resolving civil disputes between Chinese and foreign, or foreign-owned, parties).

21. The Chinese legal system and the specific Chinese courts or types of Chinese courts most relevant here have been found (by respected observers) to provide a relatively high level of rule of law and (by U.S. courts) to provide adequate forums for the resolution of commercial and other civil law disputes.

22. Chinese courts generally, and the Shenzhen Intermediate People's Court and Guangdong High People's Court in particular, cannot be assumed to be biased in favor of Huawei, nor is there any indication in the materials that I have reviewed that the Shenzhen Court was biased in cases 840 and 816. Any "localist" bias is less likely to be present in the context of cases of a type similar to the Samsung-Huawei litigations in Shenzhen, that is:

A. cases adjudicated in an economically highly developed, diversified, and internationally integrated part of China with a rich and sophisticated legal environment and highly educated judges;

B. cases adjudicated by an intermediate or higher level (rather than a basic-level) Chinese court and, specifically, a specialized intellectual property chamber within such a court or, in those jurisdictions where they exist (a group that now includes Shenzhen, Beijing, and Xi'an), a specialized intellectual property tribunal;

C. cases involving commercial matters and, specifically, intellectual property, rather than questions implicating human rights or political matters;

D. cases involving a foreign (or closely foreign-linked) party, including one with the scale and type of economic presence and importance in China that Samsung enjoys, and that achieve a high public profile.

23. In sum, there is no reason to conclude that the Shenzhen Intermediate People's Court and the Guangdong High People's Court (or other Chinese courts in which the cases between Huawei and Samsung have been brought) are incapable of adjudicating fairly, or that the Shenzhen Intermediate People's Court did not, in cases 840 and 816, adjudicate fairly the questions at issue in those cases.  Nor is there reason to conclude that the Shenzhen People's Court did or would, or that the Guangdong High People's Court would or will, grant Huawei an injunctive remedy for Samsung's infringement of Huawei's standard-essential patents absent the determination requested by Huawei that its licensing efforts with respect to its SEPs were FRAND and that Samsung refused FRAND offers and breached its own FRAND obligations.

24. In developing the opinions set forth in this report, I have relied on the materials set forth in Appendix B attached to this report, as well as background knowledge and information acquired in my years of experience with Chinese law, legal sources, and scholarship and commentary on those subjects.  My consideration of such information is consistent with the practices of experienced professionals in my field.  The opinions and conclusions contained in this report are based on the information that has been made available to me to date and are therefore subject to change based on newly available information or further developments in, or relevant to, this case.

## III.   The Samsung-Huawei Litigation in Shenzhen

25. As noted above, in the 840 case Huawei sought and received injunctive relief against Samsung for infringement of one of Huawei's Chinese SEPs. The case related to both infringement and validity of the patent rights at issue, and the FRAND licensing terms and conduct of Huawei and Samsung during negotiations for a cross-license of their respective SEP portfolios.  The 816 case is, in these respects as in many others, similar.  The discussion that follows focuses primarily on the 840 decision. Both cases were heard by the same three-judge panel of the Shenzhen Intermediate People's Court intellectual property tribunal.[9] In

---

[9] The captions for the two cases state that the judgments were issued by the Intermediate People's Court for Shenzhen, in Guangdong province.  The captions do not explicitly indicate that the cases were decided by the specialized intellectual property unit within the court.  The captions use the abbreviation for the much wider category "civil"—in some respects similar to the civil vs. criminal distinction in captions in U.S. court cases.  A civil case involving intellectual property issues of the type at issue in this case and adjudicated by an intellectual property chamber properly would be captioned in this way.

Confirmation that the 840 and 816 cases were adjudicated by a specialized intellectual property tribunal is supported by the fact that the Shenzhen Intermediate People's Court has had such a tribunal (and has had an intellectual property chamber), and that this would be the appropriate forum for cases of the type that includes the 840 and 816 cases.  That the 840 and 816 opinions were issued by the intellectual property tribunal is confirmed by reporting on the two cases—

both cases, as I understand it, Samsung appealed to the Guangdong High People's Court.[10]
The Guangdong High People's Court is the proper court for such appeals.

26. The Shenzhen Intermediate People's Court and, specifically its intellectual property chamber
or tribunal, would have had proper jurisdiction over the 840 and 816 cases, given the parties
and the nature of the claims as they are indicated in the Shenzhen Court's opinions and as I
understand them to be. Cases involving intellectual property issues and seeking civil
remedies are properly heard in a court's intellectual property chamber in those intermediate
or high courts that have such chambers, or in an intellectual property tribunal in those, more
select, courts that have such tribunals. "Major" civil cases—including intellectual property
rights cases—that involve "foreign elements" are adjudicated in the first instance by
intermediate level people's courts in the relevant jurisdiction. Major cases are those in which
there is a foreign element (often a foreign party but sometimes a foreign-related subject
matter) and the amount in dispute is large, the issues are complex, or the number of parties
without a Chinese domicile is large. Cases that have a "major impact" within the jurisdiction
(including those without a foreign-related element) also are to be brought in the intermediate

_____

including an article in the official newspaper *Legal Daily* [*Fazhi Ribao*] and an article in a
prominent Chinese periodical specializing in intellectual property rights—that clearly states that
the cases were decided by the intellectual property tribunal at the intermediate people's court
level in Shenzhen. Two sources specifically note that these were the first cases decided by the
new intellectual property tribunal in Shenzhen. *See* "Shenzhen Intellectual Property Tribunal
Adjudicates Two Cases of Standard Essential Patents Disputes," *Legal Daily*
http://www.legaldaily.com.cn/index/content/2018-01/12/content_7446750.htm?node=20908;
"Huawei v. Samsung Verdict, Full Version," *China Intellectual Property*, Mar. 21, 2018,
available at http://www.chinaipmagazine.com/news-show.asp?21934.html (describing the case
as one of international significance); "Huawei v. Samsung Patent Infringement Dispute—Victory
in the Court of First Instance," *Sina Justice News*, Jan. 11, 2018, available at
http://news.sina.com.cn/sf/news/ajjj/2018-01-11/doc-ifyqnick5793034.shtml (describing the
court's decisions as a showcase of Chinese court's capabilities and rule of law).

[10] Dkt. 283, Declaration of Bin Wang ¶ 9.

level people's court.[11]  Shenzhen also appears to be among the proper jurisdictions in which this type of case could be brought.  Intellectual property rights cases, particularly those involving infringement, are generally subject to the rules governing tort cases. Relevant Chinese law provides that the appropriate forum is a people's court in the jurisdiction where the tortious act, or the consequence/injury due to the tortious act, occurs, or the place of the defendant's domicile (in the case of a legal person, its principal place of business or the location of its principal business office).[12]  Civil cases brought at the intermediate people's court level are generally tried by three-judge panels, with the judges drawn from the staff of the relevant chamber (in these cases, the intellectual property chamber or the intellectual property tribunal).

27. The Shenzhen Court's opinion and a Declaration from Huawei's senior counsel, Bin Wang, indicate that the Shenzhen Court provided the parties with extensive process and opportunities to address the issues in the case, including technical questions, patent infringement, and FRAND questions.  This process reportedly included the following. The court held many days (at least 30) of trial proceedings.[13] The parties, through counsel,

---

[11] Civil Procedure Law, art. 18; Supreme People's Court. Interpretation on the Application of the Civil Procedure Law, arts. 1, 2, 275 (2015)) ("Civil Procedure Law Interpretation").

[12] Civil Procedure Law, arts. 21, 28 (court in place of infringing act in tort case or defendant's domicile has jurisdiction), cf. art. 265 (jurisdiction in tort cases involving foreign parties without domicile in China); Civil Procedure Law Interpretation, arts. 43 (domicile of legal person), 24 (place of tort means place of tortious act or place of consequence/injury); 306 (people's court authority to take jurisdiction over case that could be filed in China and in a foreign jurisdiction).

At least one of the defendants in the 840 case appears to have its corporate domicile in Shenzhen. Samsung (China) appears to have its corporate domicile in Beijing, which would make Beijing's intermediate people's court (and its intellectual property tribunal) a proper court for possible claims by Huawei against Samsung.

[13] Dkt. 283, Declaration of Bin Wang ¶ 10.  I understand that the Shenzhen Court held 18 days of trial for hearing the 816 and 840 cases, and an additional 12 days of trial for two of the cases filed by Samsung, which have not yet received decisions.

offered extensive opinions, arguments, and evidence, and made written submissions during and after trial.[14]  Huawei offered the live testimony of at least one witness. Samsung had the opportunity to, but did not present the live testimony of at least two witnesses.[15]  Both parties also offered multiple expert witnesses, who were permitted to testify or submit opinions in writing.[16]

28. The Shenzhen Court's opinion in the 840 case runs 366 pages in the original Chinese version[17] (238 pages in the English translation) and extensively reviews and evaluates the positions argued and evidence presented by the parties. The Shenzhen Court's opinion explicitly does the following:

> a.  Summarizes extensive and voluminous documentary evidence considered by the Court, including records of the parties specific to the case and to the parties' broader business operations and practices, statements by fact witnesses, reports by expert witnesses, information concerning other relevant legal proceedings, and various publicly available sources, addressing various patent, SEP, and FRAND-related issues (including the parties' negotiations with one another and dealings with other firms in the industry), and other issues, and the cross-examination of such evidence by the opposing party;[18]

---

[14] Dkt. 283, 840 Decision at 5-22; Declaration of Bin Wang ¶ 11.

[15] Dkt. 283, Declaration of Bin Wang ¶ 11.

[16] Dkt. 283, Declaration of Bin Wang ¶ 12; 840 Decision at 11-12, 20, 108, 111-113, 115-120, 176.

[17] The Court's similar opinion in case 816 is 353 pages.

[18] 840 Decision at 5-23, Declaration of Bin Wang ¶¶ 13-14.  Both sources summarize the groups of evidence presented by the parties, including 16 groups offered by Huawei concerning FRAND issues and 10 groups of evidence offered by Samsung concerning FRAND issues, and the cross-examination and arguments by the opposing party concerning such evidence.

b.  Makes extensive and detailed findings of fact concerning at least 15 rounds of negotiations between the parties concerning the licensing of SEPs and related matters over the course of over approximately five years;[19]

c.  Makes extensive and detailed findings of fact concerning license offers (including detailed accounts of the proposed contractual terms) made by the parties—in total,  six offers made by Huawei to Samsung, and one offer made by Samsung to Huawei, before the litigation in China began;[20]

d.  Makes extensive findings of fact and provides a detailed summary of the negotiations between the parties after Huawei filed suit, and of the mediation process organized by the Shenzhen Court to attempt to resolve the licensing dispute between Samsung and Huawei;[21]

e.  Makes extensive findings of fact and provides detailed consideration of evidence (including several research reports, expert reports, and evidence concerning the parties' own practices) and arguments presented by the parties related to issues such as SEP patent strength, portfolio strength, cumulative royalty rates in the telecommunications industry, and license agreements involving the parties (with third parties);[22] and

f.  Makes extensive findings of fact and provides a detailed consideration of the evidence and arguments regarding infringement of the patent-in-suit, and

---

[19] 840 Decision at 31-66. Some of the evidence concerning negotiations is also described in the summary of evidence. 840 Decision at 5-23.

[20] 840 Decision at 66-90.

[21] 840 Decision at 90-100, 100-104.

[22] 840 Decision at 104-122.

related defenses (and rejects the defenses put forward by Samsung, thereby supporting Huawei's claim for infringement).[23]

29. After this lengthy discussion of the evidence and presentation of facts described above, the court made several legal and additional supporting factual findings to support its ultimate ruling in Huawei's favor.  Primarily, these findings addressed whether the parties' conduct during negotiations had complied with their respective FRAND obligations.  The relevant findings included:

   a. Samsung, improperly and unreasonably [*buheli de*] and in violation of FRAND rules [*weifanle…FRAND guize*], insisted [*jianchi*] on bundling [*dabao kunbang*] SEPs and non-SEPs, which seriously delayed negotiations;[24]

   b. Samsung never responded adequately to Huawei's SEP claim charts, which seriously delayed negotiations and violated FRAND principles [*yuanze*];[25]

   c. Samsung was improperly passive [*xiaoji xiedai*] in making offers, and neither actively [*jiji*] made an offer for its SEPs nor actively made counter-offers to Huawei, which established that Samsung was at fault [*zhuguan guocuo*] in "maliciously delaying the negotiations" [*eyi tuoyan tanpan*] in violation of FRAND principles;[26]

   d. Samsung improperly [*wu zhengdang*] rejected Huawei's efforts to seek to arbitrate the cross-licensing dispute; this showed that Samsung was at fault for

---

[23] 840 Decision at 122-177.

[24] 840 Decision at 178-180.

[25] 840 Decision at 180-185.

[26] 840 Decision at 185-186.

maliciously delaying the negotiations in obvious [*mingxian*] violation of

FRAND principles;[27]

  e. Samsung failed to make a substantive mediation proposal during the court-

organized process for negotiating over cross-licensing; this established that

Samsung was at fault for obviously maliciously delaying the negotiations;[28]

and

  f. Although Huawei committed some errors in the negotiations such that it was

somewhat "at fault" [*guocuo*], it was not "obviously at fault" [*meiyou*

*mingxian guocuo*];  Huawei's actions had no significant impact on the

negotiations [*meiyou....zhongdai yingxiang*], and Huawei did not violate

FRAND principles [*meiyou weifan FRAND yuanze*] in SEP cross-license

negotiations with Samsung.[29]

30. The Shenzhen Court then considered the parties' offers made over the course of negotiations,

and whether those offers and the parties' negotiating behavior indicated fault (or not) and had

complied (or not) with their respective FRAND obligations.[30]  The Shenzhen Court found

that, with respect to the offers exchanged by the parties during negotiations, the

offers/quotations [*baojia*] Huawei made to Samsung based on Huawei's own SEP strength

[*ziji....de shili*] had complied with [*fuhe*] FRAND principles, but the one offer Samsung

---

[27] 840 Decision at 186-189.

[28] 840 Decision at 189-190.

[29] 840 Decision at 190-191.

[30] 840 Decision at 191-205.

made to Huawei based on the SEP strength of both parties [*shuangfang…de shili*], had not complied with [*bu fuhe*] FRAND principles.[31]   The Court's reasons included:

    a.  "In this case, Huawei claimed that it had equivalent strength of SEPs to Samsung around the world, and the strength of SEPs in China was higher than Samsung. According to the facts ascertained by this Court, including the number of the approved 4G proposals adopted by 3GPP, the number of 3G and 4G essential patents claimed by ETSI and the assessment of the necessary of 3G and 4G SEPs declared by the third party, Huawei's claim on the strength of SEPs could be proved, and this Court accepts this claim";[32]

    b.  Huawei's offers were made "according to its strength of global SEPs, the cumulative license fees of SEPs and 3G and 4G fields, and the marketing information of Samsung's phones.  The quotations were made within the reasonable range according to the strength of SEPs owned by Huawei, which did not obviously deviate from Huawei's strength of SEPs.  Samsung, as the offeree, still had some bargaining room and space; therefore, this Court believes that Huawei's quotations mentioned above had complied with FRAND principles";[33] and

    c.  "Samsung's quotation obviously deviated from SEP strength of Huawei and Samsung, and obviously did not comply with the FRAND principles . . . it was made according to the rate in the litigation of Huawei to IDC, and the rate

---

[31] 840 Decision at 199.

[32] 840 Decision at 197.

[33] 840 Decision at 202-203.

determined by the decision of this litigation was the SEP rate that Huawei shall pay to IDC in China, rather than the global rate," which the court found was "not comparable" [*bu juyou kebixing*].[34]

31. Regarding patent infringement issues, the Shenzhen Court concluded that Samsung "executed the involved patented technologies of the plaintiff in China without permission, infringing the patent right of the plaintiff," and rejected Samsung's defenses.[35]

32. The Shenzhen Court found in Huawei's favor and ordered the Samsung defendants to cease their infringing behavior—a remedy that is the equivalent of an injunction in the United States.[36]  In reaching this decision, the Court relied on, and applied, several provisions of Chinese law (citing them only briefly, as is typical in Chinese court decisions).[37]

33. The Court cited article 7 of the General Provisions of Civil Law, which provides that all parties shall conduct their civil law activities in accordance with principles of fairness [*gongping*] and reasonableness [*heli*].  The General Provisions are newly adopted, but language similar to that in article 7 has been invoked in earlier Chinese litigation in FRAND cases, in light of its similarity to FRAND principles and obligations of "fairness" and "reasonableness."

34. The Court also cited and relied upon article 11(1) of the Patent Law, which prohibits the exploitation (defined to include manufacturing, use, sale, or import in the context of production or business operations) of another's patent without license/permission [*xuke*] from

---

[34] 840 Decision at 204-205.

[35] 840 Decision at 205-208.

[36] 840 Decision at 209-210.  The court describes the remedy sought by Huawei as "injunctive relief" [*jinling jiuji*]. 840 Decision at 209.

[37] The opinion in the 816 case relies—and cites in similar fashion—the same provisions of Chinese law.

the patent right holder.  The Court further cited and relied upon articles 6 and 15 of the Tort

Liability Law, which provide that a party who is "at fault" [*guocuo*] for infringing [*qinhai*]

another's civil law right or interest [*minshi quanyi*] shall bear liability, and that one method

for bearing liability is a "cessation of infringement" [*tingzhi qinhai*] (as ordered by the

court).[38]  As indicated earlier, intellectual property rights, including patent rights, are civil

law rights in Chinese law, and infringements of intellectual property rights are generally

treated as torts.[39]

35. These legal provisions relied upon by the Shenzhen Court are among the relevant

provisions—and the principal relevant provisions—that a Chinese court properly would

apply under Chinese law to address claims of the type made by Huawei in the case 840

litigation.  The process followed by the court is also consistent with article 60 of the Patent

Law, which contemplates negotiation or mediation before proceeding to litigation.

36. The Shenzhen Court's recitation of evidence received, its consideration of that evidence, its

lengthy findings of fact, its findings of law as applied to fact, its citation of relevant law as

the basis for its decision, and its order to the parties (directing cessation of infringement)

include a few features that are relevant to note here.  First, the structure, style, and content of

the opinion are consistent with the legal rules and norms for Chinese court opinions.  Second,

---

[38] Further confirmation that an injunction is among the legally appropriate remedies where the
facts are found to be as alleged by Huawei, or as found by the Shenzhen Court in the 840 case,
can be found in article 66 of the Patent Law.  This article provides for the equivalent of a
preliminary injunction or emergency restraining order—distinct from the type of injunction
issued after adjudication on the merits, as in case 840—where, before the merits of the parties'
claims of infringement can be litigated, the plaintiff or other interested party can show that
(absent such an order), the purported patent rights-holder's lawful rights and interests will be
irreparably harmed.

[39] *See also* Patent Law, article 60 (describing process for seeking remedy for unlicensed
exploitation of a patent).

this is an unusually extensive opinion (running 366 pages in the original Chinese version, with the opinion in the 816 case being nearly the same length).  As this suggests, the opinion indicates extensive opportunities for the parties to present, and cross-examine, evidence and arguments, and an exhaustive review by the Court of the arguments and evidence presented by the parties.  Third, as suggested in the preceding paragraph (and although I have not conducted, or been asked to conduct, a detailed assessment of the opinion's consistency with Chinese law), there is nothing obviously or facially inconsistent with relevant Chinese law. There is nothing in the form or substance of the opinion that suggests impropriety.

37. As to the remedy, injunctions are often granted in intellectual property rights infringement cases in China (and, as was noted above, are proper, lawful remedies).  It is not clear that the injunction issued by the Shenzhen Court in the 840 case will be enforced against Samsung. As I understand it, the injunction has not yet been enforced.  The Shenzhen Court's opinion specifically states—indeed, it seems to urge—the parties to continue negotiation with an eye to reaching mutually acceptable cross-licensing agreements.  If they do so, and Huawei consents, the Court states that its decision ordering cessation of infringement will not be enforced.

38. Moreover, as I understand it, Samsung has appealed the Shenzhen Intermediate Court's decisions in both the 816 decision and the 840 decision to the Guangdong High People's Court, and those appeals are pending.  Under Chinese law, the Guangdong High People's Court is the proper court to hear such an appeal.  An appeal of this type results in the equivalent of a trial *de novo* (a "trial in the second instance," in a more literal translation of

the relevant Chinese term). [40]  And it is common in Chinese judicial practice not to

implement a lower court judgment while an appeal is pending.

## IV.    Civil Procedure in Chinese Law

39. As indicated in the preceding section of this report, the Shenzhen Court provided extensive

opportunities for the parties to submit and cross-examine evidence, both factual and expert,

and to present (and challenge) legal arguments, and the Court undertook in its opinion an

extensive examination, consideration, and rulings concerning that evidence and those

arguments.  As set forth in the Court's opinions, this was not a cursory or truncated process.

As also indicated in the preceding section of this report, the Court's opinions describe a

process that is consistent with relevant Chinese civil procedure laws.

40. Relevant Chinese civil procedure laws prescribe an elaborate process that does, in some

respects, differ from U.S. civil procedure.  In an intellectual property case, as in other civil

litigation in a Chinese court, a case begins with the filing of a complaint with the court by the

plaintiff (in a number of copies equivalent to the number of defendants). [41]  There is no

requirement that the plaintiff give notice to the defendant at this time, although I have been

informed by counsel that it is undisputed that Huawei provided Samsung with notice that

complaints had been filed in China on the day its U.S. litigation was filed.

41. The Chinese court must then determine (ordinarily within a week) whether the complaint

satisfies the requirements for the court's accepting the case (which entails a review of the

adequacy of the complaint and issues akin to subject matter jurisdiction, personal

---

[40] Civil Procedure Law, arts. 164-176.

[41] Civil Procedure Law, arts. 119-121.

jurisdiction, venue, etc.).[42]  The court is to issue a notice that the case has been accepted

within five days after accepting the case.[43]  As this suggests, courts—not plaintiffs—serve

complaints on defendants.  A defendant ordinarily has fifteen days after receiving the

complaint and the notice from the court, to file its response or statement of defense.  (For

foreign defendants with no domicile in the PRC, this period is extended to thirty days.)

Parties have at least thirty days from the receipt of the notice of the claim to gather and

submit evidence and the court has authority to grant extensions when a party encounters

"genuine difficulty."[44]

42. A case is assigned typically to a three-judge panel.[45]  Like other non-common law systems

(including democratic, rule-of-law states in Europe and East Asia), China does not use a jury

system in civil cases.  The panel of judges is drawn from the relevant subject matter-

specialized chamber of the court (in an intellectual property case, an intellectual property

tribunal or chamber or, in courts that do not have such a chamber, a civil law chamber). PRC

law directs the court to decide the case impartially, according to law, on the basis of the facts

presented and without interference from any "administrative organ, social organization or

individual."[46]

43. There are differences between the procedures of adjudication, including methods for

obtaining, introducing and handling evidence, under PRC law, on one hand, and the

discovery process and adjudication at trial in United States law, on the other, that in

---

[42] Civil Procedure Law, arts. 123, 126.

[43] Civil Procedure Law, arts. 5, 84-85, 125, 268.

[44] Supreme People Court, Several Provisions on Evidence in Civil Litigation, arts. 32-36 (2001) ("Evidence Provisions"); Civil Procedure Law Interpretation Opinions, art. 111.

[45] Civil Procedure Law, art. 39.

[46] See Civil Procedure Law, arts. 6-8, 43-44, 142.

significant part reflect structural differences between civil law and common law legal

systems.  As is characteristic of civil law systems, adjudication in China involves a more

central or directive role for the court (and a lesser role for the parties and their counsel) in

acquiring and examining evidence and other aspects of trial than is typical in the American or

common law-style adversarial system (although recent reforms in China have begun to move

more toward an adversarial system).[47]

44. Discovery and the litigation process more generally are more court-dependent and court-

driven and less party-driven and party-controlled than in the U.S. and other common law

systems.[48]  Much of the negotiation and settlement discussion that occurs long before trial

among the parties with little or no court involvement in the U.S. takes place under court

supervision and with potentially high levels of court involvement in the PRC.[49]  Adjudication

in China, as in civil law systems traditionally, depends relatively more on documentary

evidence (including notarized statements) and relatively less on in-person testimony and

cross-examination than is typically the case in common law jurisdictions.  Evidence

submitted to a court in China generally is not—and is not required to be—provided directly

---

[47] Some of these reforms were effected through the Evidence Provisions. Some are reflected in
amendments to the Civil Procedure Law.  See also Wei Luo, The Civil Procedure Law and Court
Rules of the People's Republic of China (2006).

[48] See Civil Procedure Law, arts. 63-81 (roles of parties and court in acquiring, verifying, and
admitting evidence); see generally Mo Zhang and Paul J. Zwier, "Burden of Proof:
Developments in Modern Chinese Evidence Rules," 10 Tulsa J. Comp. & Int'l L. 419 (2002-
2003); Margaret Y.K. Woo and Yaxin Wang, "Civil Justice in China: An Empirical Study of
Courts in Three Provinces," 53 Am. J. Comp. L. 911 (2005).

[49] See also Civil Procedure Law, arts. 93-99 (concerning court-supervised mediation, a process
that typically precedes adjudication and the authority of the court to require parties and non-
parties to cooperate).

by one party to the opposing party. Submission to the court by one party and access through the court by the opposing party is the usual method.[50]

45. Chinese laws and courts impose obligations on parties and witnesses to provide, and offer means for acquiring, relevant evidence.[51]  The Civil Procedure Law gives parties the rights to "collect and provide evidence," to "consult material relevant to their case" and to "copy relevant material and legal documents."[52]  Parties and non-parties have a legal duty to provide testimonial evidence and to comply with court orders to provide evidence of any type.[53]  If a party is unable "for objective reasons" to obtain evidence, it may seek the court's assistance and the court "shall collect and examine" such evidence.[54]  The Civil Procedure Law gives the court power to order the production of such evidence on its own initiative from parties and non-parties.[55]  The court also may, on its own initiative or at the request of a party, order measures (including seizure or copying of evidence) to preserve evidence that is at risk of being lost, stolen, destroyed or difficult to obtain at a later date.[56]  The court also may appoint investigators to acquire evidence from parties and non-parties.[57]   Courts have

---

[50] See Civil Procedure Law, art. 49.

[51] On the issues concerning evidence in litigation discussed here, see generally Civil Procedure Law, ch. 6; Evidence Provisions; Supreme People's Court, Civil Procedure Law Interpretation, arts. 90-124.

[52] Civil Procedure Law, art. 49.

[53] Civil Procedure Law, arts. 65, 67, 72, 73.

[54] Civil Procedure Law, art. 64.

[55] Civil Procedure Law, arts. 64, 67.

[56] Civil Procedure Law, art. 81.

[57] Civil Procedure Law, arts. 64, 67.

the legal authority to punish failure to comply with obligations to provide or assist in the provision of evidence.[58]

46. Parties have rights to question witnesses and challenge evidence (as well as to present evidence).[59]   Chinese court decisions that I have reviewed routinely include extensive recitations of evidence the courts have received, parties' assessments and cross-examination of such evidence, and the court's evaluation of such evidence and the reasoned application of the law to such evidence.   Chinese law directs that evidence shall be subjected to cross-examination, and evidence (including testimony) not available for cross-examination is not to be taken as determinative.[60]   Chinese law also provides for the introduction of evidence from expert witnesses.

47. As noted above, a party may appeal a judgment by a trial court to the next higher-level court. As also noted above, I understand that Samsung has appealed both the 816 and 840 cases to the Guangdong High People's Court (the proper court for such an appeal) for what amounts to a trial *de novo* (a "trial in the second instance").   Successful appeal rates have been lower in intellectual property cases than in civil cases as a whole—a pattern that may reflect the higher quality of the courts in which a large share of intellectual property cases in China are litigated in the first instance.[61]   After a judgment has become final, the Civil Procedure Law also allows a party to petition a higher level court to seek, and permits a higher level court to

---

[58] Civil Procedure Law, arts. 114-117.

[59] Civil Procedure Law, arts. 68, 139; Evidence Provisions, arts. 47-61.

[60] Civil Procedure Law, art, 68; Civil Procedure Law Interpretation, art. 103; Evidence Provisions, arts.  47, 55.

[61] Supreme People's Court, Intellectual Property Protection by Chinese Courts in 2009.

order on its own initiative, review and retrial of a case, including where serious procedural,

evidentiary or legal errors are found.[62]

## V.      Chinese Courts and the Lack of Indicators of Bias / Decisions Contrary to Law

48. The preceding section of this report has addressed the proceedings in the Shenzhen

Intermediate People's Court adjudicating infringement claims and FRAND disputes between

Huawei and Samsung, as well a discussion of typical procedure in Chinese civil litigation.  In

many respects, what happened in the Shenzhen Court is, of course, the indicator of fairness,

lawfulness, lack of bias, and so on, that is likely most relevant to the litigation before this

Court.  This section of this report addresses the quality of Chinese courts at more general

level.

### A.      The Quality of Chinese Courts Generally

49. China has made impressive efforts and achieved significant accomplishments in building a

legal and judicial system.  Since the beginning of the Reform Era in 1978, China has placed

building a legal system, ruling the country through law, and establishing the "rule of law"

high on the political and programmatic agenda.  The Chinese regime has invested vast

material resources in building laws, legal institutions and courts over the last third of a

century.[63]

---

[62] Civil Procedure Law, arts. 198-207; Civil Procedure Law Interpretation, ch. 18.

[63] *See generally* Jacques deLisle, "China's Legal System" *Politics in China*, 224-253 (William
A. Joseph 2d ed. 2014); Jacques deLisle, "Chasing the God of Wealth while Evading the
Goddess of Democracy: Development, Democracy and Law in Reform-Era China," *Democracy
and Development: New Perspectives on an Old Debate* 252-293 (Sunder Ramaswamy and
Jeffrey Cason, eds. 2003); Randall Peerenboom, *China's Long March toward the Rule of Law*,
chs. 3, 6, 7 (2002); Ann Seidman, Robert B. Seidman and Janice Payne, *Legislative Drafting For
Market Reform: Some Lessons from China* (1997).  For an overview of lawmaking patterns, see
Zhu Jingwen and Han Dayuan, eds. *Research Report on the Socialist Legal System with Chinese
Characteristics*, vol. 1 (Singapore: Enrich, 2013).

50. Each year around ten million complainants—both Chinese and foreigners—use the Chinese judiciary for redress, seeking and obtaining resolution of their civil claims in Chinese courts. More than half of civil cases are contract cases.  Intellectual property cases comprise a rapidly growing share—now well over 130,000 per year.

51. China receives comparatively high marks in the prominent and widely cited World Bank "Rule of Law" index.  In the most recent ratings, China scores at the 46th percentile globally, not far below the international median.  China ranks around the median for countries in its "upper middle income" group (which, as a whole, are at the 49th percentile globally), commensurate with its per capita income ranking at slightly below the upper middle income average.[64]  The World Bank Index derives its measurements from the "perceptions of the extent to which agents have confidence in and abide by the rules of society" including the perceptions of "individuals or domestic firms with first-hand knowledge," "country analysts at the major multilateral development agencies" with "in-depth experience" and others with "extensive experience in the countries they are rating."[65]  The World Bank's rankings are a composite of measures of different aspects of the rule of law.  China fares far better with sources that are more relevant to law related to the economy, commercial matters, civil law and "political risk."[66] United States courts on many occasions have found China to provide

---

[64] *World Bank, Worldwide Governance Indicators*, available at
http://info.worldbank.org/governance/wgi

[65] Daniel Kaufmann, Aart Kraay & Massimo Mastruzzi, *The Worldwide Governance Indicators: Methodology and Analytical Issues*, 6-9, 20 (Sept. 2010), available at
http://documents.worldbank.org/curated/en/630421468336563314/The-worldwide-governance-indicators-methodology-and-analytical-issues

[66] See *Worldwide Governance Indicators - Country Data Report for China 1996-2014*, available at http://documents.worldbank.org/curated/en/794961468198529176/pdf/105428-WP-PUBLIC-China.pdf (summarizing China's scores / rankings on the component elements or sources of the World Bank's "rule of law" index, with links to those underlying sources).

an adequate forum for the resolution of civil disputes. For example, United States courts on

numerous occasions have granted *forum non conveniens* motions dismissing lawsuits in favor

of transfer to Chinese courts in recent years, or have concluded that China provides an

adequate alternative forum despite finding that private or public interest factors in a

particular case weighed against dismissing the U.S. case in favor of proceedings in China.[67]

---

[67] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 435 (2007) (District Court
granted *forum non conveniens* motion and had dismissed to China; Supreme Court reversed
Third Circuit reversal of District Court, describing the case as "a textbook case for immediate
*forum non conveniens* dismissal" and noting the District Court's "well-considered *forum non
conveniens* appraisal"); *Feng Zhen Lu v. Air China Int'l Corp.*, No. CV 92-1254, 1992 WL
453646, at *1-2 (E.D.N.Y. Dec. 16, 1992) (granting *forum non conveniens* motion, finding "[i]t
plainly appears that China is an adequate forum" despite plaintiff's "claim that Chinese courts
will favor Air China because of the government's financial interest in that entity"); *China
Gezhouba United Indus. v. Robinson Helicopter Co.*, No. YC022805 (Cal. Super. Ct. Oct. 18,
1995), *aff'd* No. B098870 (Cal. Ct. App. July 7, 1997) (finding China to provide an adequate
forum and granting *forum non conveniens* motion); *Marshall Commodities Ltd. v. People's Ins.
Co. of China*, No. 94 CIV. 9061 LMM, 1996 WL 684219 (S.D.N.Y. 1996) (noting that parties
accepted that China provided adequate forum but denying *forum non conveniens* motion on basis
of private and public interest factors); *S. Megga Telecommc'ns. Ltd. v. Lucent Techs., Inc.*, No.
96-357-SLR, 1997 WL 86413 (D. Del. Feb. 14, 1997) (granting *forum non conveniens* motion
made by a non-Chinese party in case where opposing party was relatively closely linked to the
Chinese state—a joint venture partly owned by "a Chinese government corporation" and "a
wholly-owned subsidiary of . . .an agency of the Chinese government"); *China Tire Holdings
Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1111 n.4 (N.D. Ohio 2000) and *Orion
Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1139 (9th Cir. 2001) (lower court in
*Orion Tire* granted *forum non conveniens* motion; appellate court vacated lower court's decision
but stated that, given the basis of its ruling, "it would be inappropriate for us to review at this
juncture . . . *forum non conveniens* issues"; *China Tire Holdings* court dismissed the case before
it on claim preclusion grounds but stated it "would adopt the [*Orion Tire*] district court's
reasoning and independently dismiss the plaintiff's claims on the ground of *forum non
conveniens*"); *In re Compania Naviera Joanna S.A.*, 531 F. Supp. 2d 680 (D.S.C. 2007) (finding
that China provided an "adequate" forum and granting *forum non conveniens* motion made by a
non-Chinese party in case where opposing party was relatively closely linked to the Chinese
state); *S&D Trading Academy v. AAFIS*, 494 F. Supp. 2d 558, 571 (S.D. Tex. 2007) (finding
China to provide adequate alternative forum; rejecting *forum non conveniens* motion on basis of
private and public interest factors); *2002 Irrevocable Tr. for Richard C. Hvizdak v. Huntington
Nat'l Bank*, No. 2:08-CV-556-FtM-99DNF, 2008 WL 5110778, at *6 (M.D. Fla. Dec. 1, 2008)
(finding that "China is an adequate forum" and that "both the [defendant's expert's] affidavit"
and "the case law are sufficient to establish" the "fairness of Chinese courts" as required for
granting a *forum non conveniens* motion, but denying the motion based on assessment of private
and public interest factors); *Zhang Guimei v. General Electric*, No. B201016 (Cal. Ct. App. Feb.
26, 2009) (affirming trial court finding that China provides an adequate forum and granting

*forum non conveniens* motion, even in a case where moving parties included a large state-linked airline; trial court found that plaintiffs' evidence contesting adequacy of a Chinese forum "pales compared to the strong evidence that Plaintiffs will receive fundamental justice in China"); *Group Danone v. Zhong*, No. BC372121 (Cal. Super. Ct. Feb. 27, 2009) at 26 (finding China to provide a "suitable" forum and granting, in part, defendants' *forum non conveniens* motion despite plaintiffs' expert's claim that, given defendants' affiliate's "prominence and links to the Chinese Communist Party (CCP), the national government and local government, and given the current state of the Chinese judiciary, there is a real and significant danger that powerful extrajudicial influence will be exerted on any Chinese court" adjudicating a case involving defendants and a foreign plaintiff); *CYBERsitter v. China*, No. CV-10-38-JST (SHx), 2010 WL 4909958, at *4-5 (C.D. Cal. Nov. 18, 2010) (stating that "[plaintiff's expert's] declaration, and therefore [plaintiff's] concerns are speculative and fail to convince the Court that China would not provide an adequate alternative forum" in a case involving a PRC state defendant; denying *forum non conveniens* motion on basis of assessment of public and private interest factors); *Huang v. Advanced Battery Techs., Inc.*, No. 09 CV 8297(HB), 2010 WL 2143669 (S.D.N.Y. May 26, 2010) (granting *forum non conveniens* motion and finding China to provide an adequate forum; noting court's decision might have been different "if this were a civil liberties lawsuit rather than a contract case"); *Huang v. Advanced Battery Techs.*, No. 09 CV 8297(HB), 2011 WL 813600 (S.D.N.Y. Mar. 8, 2011) (finding plaintiff failed to take steps available under Chinese law that likely would have led to Chinese court's acceptance of his case, and rejecting plaintiff's plea to reinstate the case after Chinese court declined to accept the case); *Tang v. Synutra Int'l, Inc.*, Civil Action No. DKC 09-0088, 2010 WL 1375373, at **6, 10 (D. Md. Mar. 29, 2010), *aff'd* 656 F.3d 242, 251 (4th Cir. 2011) (District Court granting *forum non conveniens* motion, finding that Chinese courts were open to plaintiffs and "[e]ven if the Chinese courts were not open to Plaintiffs, another remedy is undisputedly available to them, namely, the [state-created] compensation program"; Court of Appeals finding that "evidence supports the district court's finding that Plaintiffs may seek a remedy in China's courts if they so elect . . . . [T]he district court did not abuse its discretion by finding that China's courts are in fact available to hear Plaintiffs' claims."); *Chattery Int'l, Inc. v. JoLida, Inc.*, Civil No. WDQ-10- 2236, 2012 WL 1454158 (D. Md. Apr. 24, 2012) (finding China to provide adequate forum; denying *forum non conveniens* motion on basis of public and private interest factors); *Innovation First Int'l, Inc. v. Zuru, Inc.*, 513 F. App'x. 386 (5th Cir. 2013) (affirming District Court's *forum non conveniens* dismissal and finding that China provided adequate forum); *Sullivan v. Starwood Hotels & Resorts*, 949 F. Supp. 2d 324 (D. Mass. 2013) (defendant failed to provide evidence that China was an adequate and available forum); *Masimo v. Mindray DS USA, Inc.*, No. SACV 12-02206-CJC(JPRx), 2013 WL 12129654 (C.D. Cal. Jul. 17, 2013) (finding China to provide adequate forum; denying *forum non conveniens* motion on basis of public and private interest factors); *Nalco Co. v. Chen*, No. 12C9931, 2013 WL 4501425 (N.D. Ill. Aug 22, 2013) (finding China to provide adequate forum; denying *forum non conveniens* motion on basis of public and private interest factors); *Jacobs Vehicle Systems, Inc. v. Yang*, No. 1:12-CV-00181, 2013 WL 4833058 (M.D.N.C. Sept. 10, 2013) (finding China to provide adequate forum; denying *forum non conveniens* motion on basis of public and private interest factors); *RF Micro Devices v. Xiang* No. 1:12-CV-967, 2013 WL 5462295 (M.D.N.C. Sept. 30, 2013) (defendant failed to provide evidence that China was an adequate and available forum); *Warner Tech. & Inv. Corp. v. Hou*, Civil Action No. 13-7415(MAS)(DEA) 2014 WL 7409978 (D.N.J. Dec. 31, 2014) (finding China to provide an adequate forum and granting *forum non conveniens* dismissal); *In re Montage Technology Group Ltd Securities Litigation*, 78 F. Supp. 3d 1215 (N.D. Cal. 2015)

52. United States courts in recent years have also given effect, or accorded comity, to final judgments from Chinese courts.[68]  Such motions have been granted in several cases despite vigorous opposition and expert testimony from parties opposing *forum non conveniens* motions, including on the basis that a Chinese-based litigant had a relationship with the

---

(finding China not to be an adequate forum because defendant failed to show that Chinese securities laws reached extraterritorial behavior at issue in the case); *Nibrutech Ltd v. Jang*, No. Co 14-3091 PJH, 2015 WL 831465 (N.D. Cal. Feb. 23, 2015) (finding China to provide an adequate forum and granting *forum non conveniens* dismissal); *Zhao and Cui v. Ye,* No. 3:14-cv-00157-MO, 2015 WL 2170124 (D. Or. May 6, 2015) (finding China to provide an adequate forum, where Chinese court first rejected then accepted case filed following court's prior *forum non conveniens* dismissal); *Holzman v. Xin*, No. 12-cv-8405, 2015 WL 5544357 (S.D.N.Y. Sept. 18, 2015) (finding China to provide an adequate forum, citing *CYBERsitter*, and granting *forum non* dismissal); *Jiangsu Hongyuan Pharm. Co. v. DI Global Logistics Inc.*, 159 F. Supp. 3d 1316 (S.D. Fla. 2016) (finding China to provide an adequate forum, citing *CYBERsitter*, and granting *forum non conveniens* dismissal); *Crescendo Maritime Co. v. Bank of Commc'ns*, 15 Civ. 4481 (JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) (finding China to provide an adequate forum but denying *forum non conveniens* motion on grounds of public and private interest factors and deference to plaintiff's choice of forum); *Xiaoguang Zheng v. Soufun Holdings*, No. 1:15-CV-1690, 2016 WL 1626951 (N.D. Ohio Apr. 25, 2016) (China an adequate forum, granting *forum non conveniens* dismissal).

[68] *Hubei Gezhouba Sanlian Indus. Co. v. Robinson Helicopter Co.*, No. 2:06-cv-01798-FMC-SSx, 2009 WL 2190187, at *6 (C.D. Cal. 2009), *aff'd* 425 F. App'x 580, 2011 WL 1130451 (9th Cir. 2011) (defendant had not shown "that the PRC court system is one which does not provide impartial tribunals or procedures compatible with the requirements of due process of law"); *Folex Golf Indus. v. China Shipbuilding Indus. Corp.*, No. CV09-2248-R, 2013 WL 1953628, at *4 (C.D. Cal. 2013), *rev'd on other grounds Folex Golf Indus. v. O-TA Precision Indus.*, 603 F. App'x. 576 (9th Cir. 2015) (noting "U.S. courts consistently acknowledge the adequacy of due process in the PRC judicial system"). I was an expert witness for the prevailing party in both of these cases and submitted declarations analyzing the Chinese court opinion, as I also did in the *Zhang Guimei, CYBERSitter*, and *Danone* cases.

Chinese government.[69] (Huawei is owned by shareholders, specifically by employees of Huawei, and thus does not have an ownership relationship with the state.)[70]

### B.      The Quality of the Courts in Shenzhen and Similar Jurisdictions

53. The preceding subsection of this report primarily has addressed Chinese courts in general. "Disaggregating" the analysis to focus on more specific types of courts—and types of legal and factual issues— provides a clearer, and more positive, picture of those aspects of China's laws and courts that are most relevant to litigation between Samsung and Huawei.

54. The courts that have heard, or will hear, all or almost all of the SEP-related cases filed between Huawei and Samsung in China are substantially above the national average (or "generic") Chinese courts that are considered by macro rule-of-law metrics (such as the World Bank's) or, often, by U.S. courts in the context of *forum non conveniens* and similar motions.

---

[69] Cases in which U.S. courts have denied *forum non conveniens* motions seeking dismissal to China on adequate forum grounds almost always base their decision not on an affirmative determination that China does not provide an adequate and available forum but, rather, on the moving party's failure to introduce adequate evidence, or any evidence that China provides such a forum.

I am aware of only two cases in which a U.S. court has affirmatively found China not to provide an adequate alternative forum despite the moving party's having contested the issue and offered much evidence about the quality of Chinese courts and adjudication. And one of those findings was based not on the general inadequacy of Chinese courts or their failure to provide fair justice but, rather, on Chinese law's not providing a remedy for plaintiff's alleged harms because plaintiff's claims were based on activities outside of China and thus beyond the apparent reach of relevant Chinese securities laws (which, unlike China's Antimonopoly Law and like most Chinese regulatory laws, did not purport to reach extraterritorially).

[70] *See, e.g.*, Huawei: Corporate Governance Overview, www.huawei.com/en/about-huawei/corporate-governance; Demetri Sevastopulo, "Huawei Pulls Back the Curtain on Ownership Details," *Financial Times*, Feb. 27, 2014, available at https://www.ft.com/content/469bde20-9eaf-11e3-8663-00144feab7de.

55.    Although the tribunal in China that likely would adjudicate a plaintiff's claims often is not

clear from U.S. court opinions in *forum non conveniens* and other cases where the quality of

Chinese courts is at issue, in some of the cases in which U.S. courts found China to provide

an adequate forum, the Chinese court likely to have jurisdiction was in Shenzhen, the

jurisdiction in which the 840 and 816 cases between Samsung and Huawei (described above)

were litigated.[71]   In other cases, it likely would have been Beijing (where almost all of the

SEP suits between Huawei and Samsung not filed in Shenzhen are pending) or Shanghai,

Guangzhou, or another jurisdiction that is in relevant respects similar to Shenzhen.[72]

56.    The Shenzhen Intermediate People's Court, and specifically its intellectual property tribunal

that adjudicated the 816 and 840 cases between Samsung and Huawei, is considered to be

among the best courts in China. The same is true of Beijing (the other court where Huawei

filed its SEP-related actions), its intermediate-level court, and its intellectual property

specialized court, as well as the higher courts for those jurisdictions.   Shenzhen and Beijing

are both among China's most developed and wealthiest areas. It is widely accepted that

courts in more developed regions, such as Shenzhen, the province in which it (and the High

People's Court that will hear Samsung's appeals from the Shenzhen Intermediate Court) is

located (Guangdong), and Beijing, generally provide fairer and higher quality justice to

litigants.[73]

---

[71] *See, e.g.*, *Hvizdak, Huang.*

[72] Dkt. 283, Declaration of Bin Wang ¶¶ 5-6. I understand that the cases other than 840 and 816 are currently pending and have not yet resulted in final judgments and written opinions.

[73] For example, studies that focus on litigation in Shanghai—one of China's most developed and legally sophisticated jurisdictions and in these respects similar to Shenzhen and Beijing—find (comparatively and, often, absolutely) low rates of attempts, or successful attempts, to influence outcomes, high levels of court competence, and high levels of litigant satisfaction with the fairness of the outcomes in civil cases. *See* Mei Ying Gechlik, "Judicial Reform in China:

57. Higher level courts—including the Shenzhen Intermediate People's Court and Guangdong High People's Court and their same-level counterparts in Beijing—generally are accepted as providing among the best and fairest justice in China. The higher quality of intermediate level courts (compared to basic level courts) is frequently cited as a reason why Chinese law vests higher courts with original jurisdiction over particularly important categories of cases, including significant cases involving foreign parties and intellectual property cases. The pattern of higher quality justice in higher level courts has been especially noted in the context of intellectual property-related litigation.[74]

---

Lessons from Shanghai," 19 *Colum. J. Asian L.* 97 (2005) (attempt to influence court outcome improperly occurs at rates under 1%); Minxin Pei, Zhang Guoyan, Pei Fei, and Chen Lixin, *Judicial Independence in China* (Randall Peerenboom, ed. 2010) (large majority of winning parties, although minority of losing parties, believe the outcome was consistent with the facts and the law and did not reflect improper influence); Minxin Pei, Zhang Guoyan, Pei Fei, and Chen Lixin, *China's Evolving Legal System*, Carnegie Endowment for International Peace Issue Brief, Feb. 2009, available at http://carnegieendowment.org/files/China_Legal_System_Full_Text2.pdf ("[a]t least in Shanghai, the system is far from perfect, yet the majority of litigants are satisfied to have a legal recourse that may help resolve commercial disputes and protect their legitimate rights" and "only 8% of litigants who lost their case thought that it was due to preferential treatment").

[74] Donald C. Clarke, "Private Enforcement of Intellectual Property Rights in China," *NBR Analysis*, vol. 10, no. 2, 38 (Apr. 1999) ("[T]he higher up in the court hierarchy a plaintiff with a meritorious case can start, the better his chances"); Zhong Jianhua and Yu Guanghua, "Establishing Truth from Facts: Has the Chinese Civil Process Achieved this Goal?" 13 J. Transnat'l L. & Pol'y 393, 418 (2003-2004) (assignment of jurisdiction over major cases involving foreigners exclusively to high people's courts and to intermediate courts in China's most developed areas reflects regime conclusion that the quality of basic level court judges and intermediate court judges elsewhere is lower); Jerome A. Cohen, "Reforming China's Civil Procedure: Judging the Courts," 45 Am. J. Comp. L. 793, 801 (1997) ("'[C]onnections'" are "less likely" to affect the outcome of a case where foreign litigants are involved, because the PRC government, in order to encourage foreign trade and investment, wishes PRC courts to develop a reputation for reliability. . . ."); Randall Peerenboom, *China Modernizes* 199 (2007) (basic-level courts as major source of the "problems of judicial corruption and competence"); Ryan Ong, "Tackling Intellectual Property Infringement in China," *China Business Review*, Mar.-Apr. 2009 (higher quality judges and adjudication in Beijing; Beijing Number One Intermediate Court "widely viewed as the best in China").

To the considerable extent that fairness in adjudication likely depends on quality and competence of judges, the widespread recognition that there are higher quality judges on higher level courts

58. Several factors are recognized as contributing to this pattern of higher quality adjudication in higher-level courts. Judges on higher level courts in more developed areas generally are better educated, have more experience in legal and judicial work, and enjoy higher prestige. Competence, status, and sense of professional role and identity are plausibly associated with higher quality justice and stiffer resistance to influence that could produce legally improper outcomes. Educational credentials (including field of specialty and quality of institution) are important factors in hiring for desirable judicial jobs such as those on higher courts in more developed areas. Because a disproportionate share of judges in a jurisdiction are likely to have graduated from universities in the same localities or to have moved from elite universities to opportunities in large affluent coastal cities, judges in Shenzhen, Guangzhou (the seat of the provincial high court of Guangdong), Beijing, and similar places are more likely to have graduated from some of China's strongest institutions of higher learning and legal education.

59. Guangdong (the province in which Shenzhen is located and the province of the High People's Court that will hear the appeals in the Samsung-Huawei cases that have been decided to date), is one of the five provincial jurisdictions in China with the highest number of lawyers per capita. So, too, is Beijing, which is second to Shenzhen in the number of Huawei-Samsung cases filed. The city of Shenzhen has a density of lawyers much higher than does the province of Guangdong as a whole. The five top provincial-level jurisdictions have nearly twenty times the number of lawyers per capita as do the bottom five. Per capita

---

in richer areas is probative. *See* Cohen, "Reforming China's Civil Procedure," 793, 796 ("As a general matter, the higher the court, the better the qualifications of the judicial personnel" and judges who handle economic cases "tend to have more training, experience and specialized knowledge"). My research, interviews, and numerous less-formal conversations with lawyers, judges and legal scholars in China are consistent with these views.

earnings for lawyers in different parts of China and the number and scale of offices of

China's leading law firms and foreign law firms—which are exceptionally high in Shenzhen

and Beijing and far higher in Shenzhen, Guangdong, Beijing, and similar places than in the

country as a whole—underscore that the inequality is qualitative as well as quantitative.[75] As

a result, courts in Shenzhen, higher-level courts in Guangdong, and courts in Beijing operate

in a comparatively rich and advanced legal environment.

### C.   The Quality of Intellectual Property Chambers / Tribunals

60. In many courts, including at the intermediate people's court level in Shenzhen (where

Huawei and Samsung filed 16 of the 27 total SEP actions between the parties), Beijing (9

SEP actions), and Xi'an (2 SEP actions, both filed by Samsung),[76] and at the high people's

court level where appeals from those courts would be taken, there have long been specialized

intellectual property chambers for handling IP-related civil disputes.[77]  In all three of these

Chinese jurisdictions (Beijing, Shenzhen, and Xi'an), there are now specialized intellectual

property tribunals—entities that, compared to the older intellectual property chambers, have

still higher status, more specialized judges, stronger mandates, geographically wider (often

---

[75] Zhu, Jingwen, *China Law Development Report 2012: China Legal Workers' Professionalization* (ed. 2013) (Zhongguo Falu Fazhang Baogao 2012: Zhongguo Falu Gongzuozhe de Zhiyehua).

[76] Dkt. 283, Declaration of Bin Wang ¶ 5.

[77] Supreme People's Court, National Judicial Work Report for 2015 (2016); Supreme People's Court, Judicial Protection of Intellectual Property Rights in China's Courts (2015) (usually referred to as the "White Paper" on Judicial Protection of IPR); State Intellectual Property Office, Intellectual Property Rights Protection in China (2015) § 3.1; Supreme People's Court, National Judicial Work Report for 2017 (2018) (reporting that Chinese courts adjudicated nearly 700,000 intellectual property cases in preceding five years); *see also* Outline of Judicial Protection of Intellectual Property in China (2016-2020).

multi-provincial) jurisdiction, and generally positive reputations.[78]  Media reports of the 840 and 816 decisions characterize, and celebrate, them as the first decisions issued by the Shenzhen Intermediate People's Court's then-new intellectual property tribunal.

61. Intellectual property chambers or tribunals—such as the one in the Shenzhen Intermediate People's Court that adjudicated the 840 and 816 cases—are recognized as being of among the highest quality and fairest courts in China. Intellectual property chambers, and intellectual property tribunals, exist at the intermediate and higher court levels. The perceived quality of intellectual property chambers and tribunals in intermediate and higher courts in the developed areas (such as Shenzhen and Guangdong) where foreigners do business was a motivation for giving such entities original jurisdiction over significant cases involving foreigners.

62. Among intermediate and higher level courts in China's most developed areas, judges in the intellectual property chambers and tribunals on average have especially high educational levels. Intellectual property courts in advanced areas such as Shenzhen, Guangdong, and Beijing have far higher percentages of judges with advanced degrees in law and in technical subjects. The Supreme People's Court's frequent White Papers on judicial protection of

---

[78] Beijing was among the first jurisdictions to have a full-fledged intellectual property court, and Xi'an among the most recent (the first established outside China's major coastal cities, in 2018). For positive assessments, see Paul Ranjard and Zhu Zhigang, "Chiba's IP Courts, One Year On," Managing Intellectual Property, Mar. 16, 2016, available at www.managingip.com/Article/3538234/Chinas-IP-Courts-one-year-on.html; John Butcher, "Specialized IP Court Launched in China's Silicon Valley," Bloomberg Law, Jan. 5, 2018, available at https://www.bna.com/specialized-ip-court-n73014473861/.

intellectual property rights detail and emphasize extensive specialized training and education that intellectual property court judges receive.[79]

63. Because the scope of intellectual property chambers'—and the newer intellectual property tribunals'—jurisdiction is relatively narrow (especially compared to the wide range of laws handled by the civil chambers of people's courts), judges in the intellectual property chambers or tribunals are likely to have comparatively great depth of experience with the laws they are likely to apply in a given case. Intellectual property court judges also receive extensive and intensive guidance from previously decided cases—much more than do Chinese judges as a whole. Voluminous posting of cases (including a database with tens of thousands of decisions), rising use of precedent-like cases, and regular issuance of selected model or exemplary cases by the Supreme People's Court are extensive and are more common and more developed in IP than in other fields of law. The U.S. government has acknowledged and praised such moves.[80]  The quality of these intellectual property courts is also recognized by foreign observers, including knowledgeable U.S. sources. For example,

---

[79] Supreme People's Court, *Intellectual Property Rights Protection by Chinese Courts*, including reports for 2009, 2011, 2012, 2015; *see also* Outline of Judicial Protection of Intellectual Property in China (2016-2020).

[80] Notice of the General Office of the Supreme People's Court on Issuing Ten Cases Concerning Judicial Protection of Intellectual Property Rights, Ten Innovative Cases and Fifty Typical Cases Heard by Chinese Courts in 2012; Jiang Huiling and Yang Yi, "Beijing Intellectual Property Court: Innovative Practices in Using Precedents to Guide Adjudication Work," *Legal System Daily* Law Institute, Apr. 7, 2016, available at http://www.ccpit-patent.com.cn/zh-hans/node/3135; Supreme People's Court, Intellectual Property Rights Protection by Chinese Courts (annual); State Intellectual Property Office, Intellectual Property Rights Protection in China § IV (2015) (describing intellectual property court capacity building measures); *see also* Shenping Yang, "Patent Enforcement in China," *Landslide* vol. 4, No. 2 (American Bar Association, 2011) (describing publicization to IP judges of illustrative cases); U.S.-China Joint Fact Sheet on the 26th U.S.-China Joint Commission on Commerce and Trade, December 2015, available at https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2015/December/US-China-Joint-Fact-Sheet-26th-JCCT ("The United States welcomes that the Supreme People's Court has established a database for searching intellectual property-related court decisions.").

the American academic co-director of a U.S.-China intellectual property institute in China opined that "[t]he very good news is that intellectual property cases" are among the categories most amenable to fair resolution in Chinese courts.[81]

64. Foreign analysts describe the intellectual property division of the Intermediate Court in Beijing—another forum hearing disputes between Huawei and Samsung[82]—as "widely viewed as the best in China in terms of experience and expertise" in the field and as attracting a large portion of filings by foreign plaintiffs.[83] The intellectual property division in the Shenzhen court has a strong reputation for competence as well, consistent with its overall similarity to its counterpart in Beijing and the experience and expertise born of its especially dense and rich docket of complex intellectual property cases.

65. The Shenzhen Intermediate People's Court and its intellectual property tribunal, which decided the 840 and 816 cases between Huawei and Samsung, would likely have the characteristics one would expect from the foregoing account. The information available concerning the judges who served on the panels for the 840 and 816 case is illustrative.

66. One of the judges, Zhu Jianjun, is the deputy chief of the intellectual property division of the Shenzhen Intermediate People's Court. He holds a Masters in civil and commercial law from the Southwest University of Politics and Law, which is one of China's top university-level institutes specializing in law and commonly ranked in the top ten among law schools

---

[81] William O. Hennessey, "Protection of Intellectual Property in China (30 Years and More)," 46 Hous. L. Rev. 1257, 1295 (2009); cf. Naigen Zhang, "Intellectual Property Law Enforcement in China," 8 Fordham Intell. Prop. Media & Ent. L.J. 63 (1997).

[82] Huawei and Samsung  parties have filed 9 SEP infringement suits (7 of which remain pending) in the Beijing Court. *See* Dkt. 283, Declaration of Bin Wang, ¶¶ 5, 8.

[83] Ong, "Tackling Intellectual Property Infringement in China"; Kristina Sepetys and Alan Cox, *Intellectual Property Rights Protection in China: Trends in Litigation and Economic Damages* 10 (NERA Economic Consulting, 2009).

nationally. He also holds a Doctorate in the same field from Wuhan University Law School, a top-five law school in China. He held a Postdoctoral fellowship in intellectual property law at the East China University of Politics and Law, which is an institution that ranks among the top three such law-specialized university-level institutes in China and that is one of China's top ten to fifteen law schools. During a leave from the court, he served as deputy dean of Shenzhen University Law School.  He has published dozens of articles, including in prominent journals such as *Renmin Sifa* (People's Justice) and *Zhishi Caichan* (Intellectual Property), as well as four books in the IP field.  He reportedly has adjudicated over 1500 cases, including 100 complex cases.  Ten of his decisions have been selected for the prestigious designation of one of the annual "top ten" intellectual property decisions by Chinese courts.[84]  The presiding judge on the panel for the 816 and 840 cases, Hu Zhiguang, is a vice president—that is, one of the top-ranking judges—on the Shenzhen Court.

### D.     Adjudication and Intellectual Property Rights Protection

67. Intellectual property cases, of the type that includes the Huawei-Samsung litigation, receive comparatively high marks for quality of adjudication in China.  As noted earlier, the docket of intellectual property cases in Chinese courts has been rising significantly and is expected to increase substantially (which is one of the factors prompting the establishment of separate, specialized intellectual property tribunals in several major economic centers, including

---

[84] Xiao Bo, "Being a Guardian of the Rule of Law for the Innovation Economy," *People's Court Report*, Apr. 19, 2018, available at http://rmfyb.chinacourt.org/paper/html/2018-04/19/content_137981.htm?div=-1; "Three Judges in Guangdong Awarded as National Adjudication Work Experts," *Southern Metropolitan Daily*, Apr. 13, 2018, available at https://m.mp.oeeee.com/a/BAAFRD00002018041375107.html; "Zhu Jianjun: New Issues in Intellectual Property Judicial Practice," available at http://webplus3.ecupl.edu.cn/_s2/05/30/c65a1328/page.psp (bio for lecture series at East China University of Political Science and Law).

Beijing and Shenzhen).  This reflects the judgment by many parties, both Chinese and
foreign, that intellectual property cases are worthwhile to bring in Chinese courts.  I
understand that more than half of the intellectual property cases in China between Huawei
and Samsung have been filed by Samsung.[85]

68. The discussion in the preceding subsection of this report concerning the comparatively high
quality and observers' evaluation of Chinese courts' intellectual property chambers and
tribunals implies, and reflects, the comparatively high quality and perceived quality of
adjudication of intellectual property cases.

69. A positive assessment of Chinese courts' handling of intellectual property cases is also
suggested by U.S. courts' decisions.  Many of the cases in which U.S. courts have found
Chinese law and courts adequate involved issues that were questions of Chinese contract
law[86] or intellectual property law[87] or, in at least one case, antitrust law[88]—areas of law that I
understand are at issue in, or relatively closely related to those that are at issue in, the
litigation between Samsung and Huawei in China.[89]

70. As the foregoing reflects, China has made substantial, and growing, commitments to
protecting intellectual property rights through law and courts, and has had strong reasons to
do so.  As China pursued its quest for WTO membership and, beginning in 2001, incurred

---

[85] *See* Dkt. 283, Declaration of Bing Wang ¶ 5.

[86] *S. Megga Telecoms, Huang, Marhsall Commodities,* and *S&D Trading.* Other cases that
alleged fraud and other tort claims had underling contract issues, including *Sinochem, Compania
Naviera* and *Group Danone.*

[87] IP issues were involved in *S&D Trading, Group Danone, CYBERsitter, Chattery Int'l,* and
*Innovation First.*

[88] *S. Megga Telecoms.*

[89] *See generally* Dkt. 283, Declaration of Bin Wang.

the obligations of WTO membership, China had to reform its relevant laws and practices to conform to international standards, including those relating to intellectual property and specifically the TRIPS agreement. The U.S., the EU, other developed states and the business communities that influence such states' policies toward economic relations with China were sufficiently convinced of China's progress and commitments in these areas that they supported China's accession. Since China entered the WTO more than a decade and a half ago, it has faced—as it knew it would—monitoring by the WTO and fellow members, and scrutiny by the WTO's highly court-like dispute resolution process that covers TRIPS-based duties to provide adequate, international standard-meeting protection for foreign intellectual property and broader WTO obligations such as the imperative to provide "national treatment" (which requires that none of a state's trade-related laws, broadly defined, discriminate against foreigners) and adequate "judicial review" of trade-related administrative decisions. Unlike almost all other international legal regimes, the WTO has effective means by which parties can lodge a complaint about another member's noncompliance with its obligations. WTO procedures for adjudicating complaints are generally seen as fair and effective, with winners receiving a binding decision that the losing party ordinarily implements (rather than face retaliatory measures that would be authorized by the WTO and accepted as legitimate internationally). Chinese authorities are acutely aware of these possibilities, as several WTO complaints have been initiated in recent years against China, some with successful outcomes for complaining parties. Bilateral monitoring and threats of sanctions from the U.S. and others reinforce WTO rules and institutions.  China's intellectual property rights laws and regulations (with the partial exception of the law of trade secrets) are generally acknowledged to conform to international standards and the international legal obligations

41

that China has undertaken. China has been a member of the Patent Cooperation Treaty regime since 1994.

71. As is discussed more fully in a later subsection of this report, during the last decade, China's national economic policies have placed a high priority on intellectual property-intensive industries, including information technology and "innovation-driven development" more generally.  It is plausible, and generally accepted, that such policies would benefit from, and likely depend upon, protection of intellectual property rights.  China's President Xi Jinping recently declared in a much-reported speech to a national financial conference that China would "step up efforts to punish illegal infringement of intellectual property rights."[90]

72. Informed foreign observers have offered positive assessments. The U.S. Chamber of Commerce's International IP Index reflects an increasingly positive assessment of China's intellectual property protection, ranking it slightly below median among the countries assessed (27th out of 45—a limited sample in which the higher-ranking countries are mostly economically highly developed and in which most lower-income countries were not included).[91]

### E.    "Protectionism" and Bias

73. Huawei, a large, international company, is headquartered in Shenzhen and has significant business operations in Shenzhen and China generally.  Nevertheless, for reasons set forth in this section of this report, Huawei's apparent importance does not imply, in the cases

---

[90] Xi Jinping: Creating a Stable, Fair, and Transparent Business Environment, and Accelerating Construction of a New, Open Economic System, July 17, 2017, www.xinhuanet.com/politcs/2017-07/17/c_1121333722.htm.

[91] U.S. Chamber of Commerce, The Roots of Innovation: U.S. Chamber International IP Index, www.theglobalipcenter.com/wp-content/uploads/2017/02/GIPC_IP_Index_2017_Report.pdf, 19, 40-42.

between Huawei and Samsung, bias or unfair advantage in favor of Huawei, for the reasons I

discuss below.

### 1. "Local Protectionism" in Shenzhen

74. Local protectionism in China—meaning bias by local courts in favor of entities with a

significant relationship with, or importance to, the local area and its government—is

generally understood to be less of a problem in courts of the type that adjudicated the

disputes in the 840 and 816 cases between Samsung and Huawei, that will hear Samsung's

appeal in those cases, and that would hear the cases between Huawei and Samsung still

pending in Shenzhen. The Shenzhen Court's higher levels of court funding, and better

educated, more professional, and more specialized judges provide resources for resisting

local protectionist pressures.  The foregoing discussion of the quality of the courts that heard

the 840 and 816 cases, and other Chinese courts that share their relevant characteristics (in

terms of level of court, location, intellectual property specialization, and so on), in part

reflects lesser concerns about local protectionism.  As one scholar reports in the specific

context of an analysis of intellectual property cases in China, "lawyers and court officials

have suggested that local protectionism is much less of a problem in intermediate level and

high level (provincial level) courts, where the corresponding level of government has a much

more tenuous connection with local finances."[92]  Recent judicial reforms in China have

focused, in part, on further reducing courts' dependence on same-level governments for

finance, thereby ameliorating further a principal source of local protectionism.

75. Although Huawei is a very large and important enterprise in Shenzhen, orchestrating judicial

bias toward even very substantial local companies is less important to the interests of local

---

[92] Clarke, "Private Enforcement of Intellectual Property Rights in China" 38.

party and state officials when the company that would benefit is not a dominant enterprise upon which the local economy depends. Such "company towns" do exist in many places in China, but Shenzhen is not one of them. Huawei is a big fish but it is in a big pond in Shenzhen (and, given its national and international scope of operations, Huawei is only partly in that pond). Huawei's reported global revenues (much of it from operations outside Shenzhen) are $75 billion annually as of 2016,[93] and it has nearly 180,000 employees (many not in Shenzhen).[94] But Shenzhen's GDP is $284 billion,[95] and it has a population of over ten million. Many of China's largest high tech and manufacturing companies are based there, including ZTE (a rival telecommunications company which has been an opponent in litigation against Huawei), Oppo (a rival handset manufacturer), and automaker BYD. Huawei is still less significant in Guangdong's economy, which has a GDP of over $1.1 trillion—four times the size of the GDP of Shenzhen, larger than the GDP of Indonesia or Mexico, and almost the size of Spain.[96]  In addition to the manufacturing sector that includes Huawei, ZTE, and the like, Shenzhen has large financial services and logistics sectors. Shenzhen's economy is deeply integrated with neighboring Hong Kong. Nearly 200 Fortune

---

[93] Huawei, Corporate Information, available at http://www.huawei.com/us/about-huawei.

[94] Huawei 2016 Annual Report, 2, available at http://www-file.huawei.com/-/media/CORPORATE/PDF/annual-report/AnnualReport2016_en.pdf.

[95] China Daily, Shenzhen GDP up 9%, ranks fourth in mainland cities, January 24, 2017, available at http://www.chinadaily.com.cn/business/2017-01/24/content_28041580.htm.

[96] "Guangdong Economy Remains Biggest, Chongqing Leads Growth," *China Daily* Feb. 2, 2017; "Top 10 Largest Provincial Economies in China, 2015, Mar. 9, 2016, available at http://www.china.org.cn/top10/2016-03/09/content_37968366.htm.

500 companies operate in Shenzhen. Shenzhen receives several billion in inbound foreign investment each year.[97]

76. As this implies, Shenzhen's economic interests and, in turn, the political interests of party and state authorities in Shenzhen, cannot be simply assimilated to Huawei's economic interest—in some Chinese version of "What's good for General Motors is good for the country." Among other things, taking steps that would encourage a reputation of sweeping unfairness toward foreigners or foreign-owned firms in Shenzhen's courts would be in significant tension with—and in fact contrary to—the interests of Shenzhen, a region of China that was founded (at the dawn of China's reform era) on attracting foreign investment and providing a foreigner-friendly business environment, and has continued on that path for nearly 40 years.[98]

77. The Huawei-Samsung litigation in cases 840 and 816—and more generally—has additional features that make the prospects for local protectionism significantly lower than Samsung appears to suggest.  Such cases face an unusually high degree of scrutiny by the media, both domestically and internationally, and, in turn, higher authorities in China.  This variously reflects the relatively dense and open media markets in Shenzhen and Guangzhou (the seat of

---

[97] See generally http://www.sz.gov.cn/. Translation of some information is available at http://english.sz.gov.cn/; "Multinationals to Invest RMB $180b in Shenzhen," Dongguan Today, May 15, 2013, available at http://www.dongguantoday.com/news/guangdong/201305/t20130516_2044635.shtml; Brookings-JP Morgan Chase Global Cities Initiative, *Shenzhen*.

[98] Shenzhen was established in 1979 as one of China's first four Special Economic Zones and has been by far the most successful of them. Having been given the authority to adopt special laws to attract foreign participation in its economy and the policy mandate to do so, Shenzhen has since thrived and grown from a poor rural area to become one of China's largest and most prosperous cities with an economy that still depends very heavily on foreign investment and exports.

the provincial high court), the relatively high level of attention that major intellectual

property cases attract (because of their economic importance, especially in the Shenzhen and

Guangdong region and, as a result, the large and developed specialized media that focus on

intellectual property issues), and the relatively large presence of foreign (including Hong

Kong) media in the region (reflecting the region's international economic importance and its

proximity to Hong Kong).

78.  Notably, the 840 and 816 cases have drawn substantial attention from Chinese[99] and

foreign[100] media and legal commentators.   As the examples cited in the footnotes to this

---

[99] Fan Feifei, "Huawei Wins in Samsung Patent Dispute," *China Daily*, Jan. 12, 2018, available at http://www.chinadaily.com.cn/a/201801/12/WS5a57f91da3102c394518ea8f.html; Dragon Wang and Austin Chang, "Huawei v. Samsung—An Insight from the Shenzhen Intermediate Court on Finding on Infringement on Standard Essential Patent," Apr. 25, 2018, available at http://www.beijingeastip.com/type-news/huawei-v-samsung-insight-shenzhen-intermediate-court-finding-infringement-standard-essential-patent/; "Huawei v. Samsung Verdict, Full Version," *China Intellectual Property*, Mar. 21, 2018, available at http://www.chinaipmagazine.com/news-show.asp?21934.html (describing the case as one of international significance); "Huawei v. Samsung Patent Infringement Dispute—Victory in the Court of First Instance," *Sina Justice News*, Jan. 11, 2018, available at http://news.sina.com.cn/sf/news/ajjj/2018-01-11/doc-ifyqnick5793034.shtml (describing the court's decisions as a showcase of Chinese court's capabilities and rule of law); "Huawei v. Samsung—Huawei Wins," *Sohu*, Jan 12, 2018, available at http://www.sohu.com/a/216255713_99927285;

[100] "Huawei Wins China Patent Lawsuit Against Rival Samsung," *U.S. News & World Report*, Jan. 11, 2018, available at https://www.usnews.com/news/business/articles/2018-01-11/huawei-wins-china-patent-lawsuit-against-rival-samsung; "Huawei Wins Injunction Against Samsung," *Patent Lawyer*, Mar. 26, 2018, available at https://patentlawyermagazine.com/huawei-wins-injunction-against-samsung/; Andrew Orlowski, "Huawei Wins Patent Injunction Against Samsung in China," *The Register,* Mar. 26, 2018, available at https://www.theregister.co.uk/2018/03/26/huawei_wins_samsung_ip_injunction_in_china/; Emma Lee, "Huawei Wins Another Patent Battle Against Samsung in China," technode, available at  https://technode.com/2018/01/11/huawei-wins-another-patent-battle-samsung-china/; Jacob Schindler, "Full Judgment in Huawei v. Samsung Details Why Shenzhen Court Hit Korean Company with SEP Injunction," IAM, Apr. 3, 2018, available at http://www.iam-media.com/blog/detail.aspx?g=31514eba-a4cf-4861-b0c2-1210e49ccb7c; Yang Li, Christine Yiu, and Richard Vary, "Shenzhen Court Issues Written Judgment in Huawei v. Samsung Case," Bird & Bird, Mar. 26, 2018, available at https://www.twobirds.com/en/news/articles/2018/global/shenzhen-court-issues-written-judgment-in-huawei-v-samsung-case; Steve Brachmann, "Samsung Liable for Infringing Huawei

paragraph show, much of the foreign coverage has been favorable. Chinese media reports

have held out the cases as exemplary and as a positive debut for the new intellectual property

courts. The Shenzhen Court chose to release a lightly redacted version of its opinions, which

were also posted on a major and well-known, official website of Chinese court decisions,

thereby subjecting the Court's decision to intensive analysis by expert, as well as lay,

analysts at home and abroad.[101] These phenomena all point to a notably positive, widely

held view of the quality and propriety of the Shenzhen Court's rulings in cases 840 and 816.

79. The publicity and scrutiny that cases like the Samsung-Huawei litigation in Shenzhen

receive—and that the 840 and 816 cases have received—increase the risk that local

protectionism and kindred forms of bias will be exposed, that higher level courts or state

authorities will react, and, in turn, that an adjudicating court will be deterred from engaging

in such conduct.

## 2.    National / General Protectionism in China

80. Although the Samsung defendants in the Huawei-Samsung litigation (in cases 840 and 816

and quite possibly other pending cases as well) appear to be Chinese legal persons, they also

appear to be subsidiaries of Samsung, which is a foreign (that is, non-Chinese) firm.

Nevertheless, Chinese courts or the Chinese government writ large are not more likely to

exhibit "national" or "general" protectionism than are the intermediate level courts to exhibit

"local protectionism," which is addressed in the immediately preceding subsection of this

report.

---

Patents After Maliciously Delaying Negotiations," IP Watchdog, Jan. 16, 2018, available at
http://www.ipwatchdog.com/2018/01/16/samsung-liable-infringing-huawei-patents/id=92265/.

[101] http://tingshen.court.gov.cn/live/1759564.

81. Academic studies variously have found that foreign intellectual property litigants win appeals more often than native Chinese parties do, and are, based on comparative measures such as win rates and success in obtaining injunctions, treated quite fairly.[102] Such findings undermine assertions that foreigners are systematically discriminated against in intellectual property cases that involve Chinese opposing parties.  Even China's state-owned enterprises— a category often presumed to include the most likely beneficiaries of nationalist bias or protectionism (a category that does not include Huawei)—are far from functionally immune to civil suits and adverse judgments in China, including in cases where plaintiffs are not Chinese nationals. State-owned and state-linked enterprises lose civil cases as defendants, including intellectual property, contract, and tort cases. Although I know of no precise statistics, such losses are not regarded as extraordinary events.

82. Cases in which U.S. courts have found Chinese courts to provide an adequate forum (for the purposes of *forum non conveniens* motions), or have enforced or deferred to rulings by Chinese courts (after applying legal standards that consider the adequacy and/or fairness of the process in Chinese courts), almost always involve a Chinese party and a foreign party on opposite sides, with the Chinese party seeking to send the case to a Chinese court or invoking a Chinese court judgment in which the Chinese party prevailed. In these cases—some of which were highly contested on issues of quality and fairness of Chinese courts—the U.S.

---

[102] Mei Y. Gechlik, *Protecting Intellectual Property in Chinese Courts: An Analysis of Recent Patent Judgments*, 15 (Carnegie Endowment for International Peace, January 2007) (foreign plaintiffs prevail at a higher rate (one-third) than do Chinese plaintiffs (one-quarter)); Rongjie Lan, "Are Intellectual Property Litigants Treated Fairer in China's Courts? An Empirical Study of Two Sample Courts," *Indiana University Center for Chinese Politics and Business Working Paper No. 16* (2012); Brian J. Love, Christian Helmers, and Markus Eberhardt, "Patent Litigation in China: Protecting Rights or the Local Economy?" 18 Vand. J. Ent & Tech. L. 713 (2016).

courts have not found the prospect, or parties' claims, of anti-foreigner bias in Chinese courts to be convincing or compelling. This has been so even when a Chinese party has been an enterprise or entity closely linked to the Chinese state.[103]

83. The relatively limited economic importance of Huawei in the scale of Shenzhen's economy—or Guangdong's (discussed in the preceding subsection of this report)—is all the clearer at the national level. As with Shenzhen's local interests (or Guangdong's provincial interests), so, too, the national interests that might be implicated in cases such as the Samsung-Huawei lawsuits are not in simple and full alignment with Huawei's interests.

84. Moreover, Samsung (although foreign) is an economically important company in China, and one that provides economic benefits that are valued by Chinese authorities on a scale that is not dwarfed by Huawei's.  In 2011, Samsung was reportedly the largest foreign investor in China.  In 2018, it announced it was establishing a new $7 billion chip manufacturing plant in Xi'an.  Samsung reportedly has 60,000 employees—one fourth of its global workforce—in China.  Samsung's sales in China exceed $30 billion annually, making China Samsung's largest and fastest growing foreign market.[104]

---

[103] See, for example, *Sinochem, Lu v. Air China, Marshall Commodities*, *Compania Naviera, Zhang Guimei, Group Danone, CYBERsitter* (discussed in footnote 67 above).

[104] Michael J. Enright, "Samsung's Contribution to China through FDI: (2017), available at https://s3-ap-southeast-1.amazonaws.com/hinrichfoundation-images/wp-content/uploads/2017/11/Hinrich-Foundation-FDI-in-China-Samsung-Case-Study-9.5.17.pdf; Codrut Nistor, "Samsung Starts Building US$7 Billion Chip Line in China," Notebookcheck, Mar. 29, 2018, available at https://www.notebookcheck.net/Samsung-starts-building-a-US-7-billion-chip-line-in-China.293162.0.html; Yoon Yung Sil, "Samsung Electronic Shows Greatest Growth in China," *Business Korea*, Aug. 18, 2017, available at http://www.businesskorea.co.kr/news/articleView.html?idxno=19015.

85. Chinese authorities at the national level (and to a significant degree at lower levels in Guangdong and Shenzhen as well) have motivations that are complex and that include reasons not to encourage or create a reputation for unfair and inadequate judicial processes to protect intellectual property (including foreign-owned intellectual property). Since the late 1970s and especially since the early 1990s, China's (like Shenzhen's and Guangdong's) economic growth, rapid industrialization and technological transformation have been achieved through extensive reliance on foreign investment, which has, in turn, relied on providing an attractive environment for foreign investors who bring technology and capital to China. Extensive energy and resources have been devoted to the development of relevant laws, as well as judicial and administrative institutions to implement and enforce them.

86. China's national strategy for growth and development increasingly relies on intellectual property, and this creates an imperative to reduce the likelihood of judicial bias in intellectual property cases. Leadership strategies and the state's industrial policies embrace an agenda of moving to higher value-added and intellectual property-intensive industries. Telecommunications equipment and related sectors have been prominent in this effort. China's recently completed Twelfth Five-Year Plan placed a very high priority on innovation, research and development, high technology and information technology. The currently operative Thirteenth Five-Year Plan especially emphasized "innovation-driven development" (*chuangxin fazhan*), and calls for relying on innovation to move China into higher value-added industries, establish China as a global center for innovation and technology, and make China an "innovation nation" by 2020. Further developing the information technology sector and improving the quality and quantity of patents are among

the more specific near-term priorities.[105] Since assuming the presidency in early 2013, Xi

Jinping has stressed the importance of China's "innovation strategy" in science and

technology-related fields.[106] These policies have received extensive emphasis in numerous

and detailed government policy documents focusing on IPR protection, including many

policy documents and white papers issued by the State Intellectual Property Office, the

Supreme People's Court, the State Council (China's highest executive body) and others.

87.  As these policy commitments and significant efforts toward strengthening intellectual

property protection and enforcement across China should make clear, local or national

protectionism favoring companies such as Huawei in the enforcement of intellectual property

rights would undermine the pursuit and achievement of important goals articulated and

pursued by top leaders and key state institutions.[107]

---

[105] Twelfth Five Year Plan (2011-2015), §§ 1.2 (innovation), 1.4 (research and development, science and technology), 3.10.1 (information technology), 3.10.13 (informatization), 4.15.3 (hi technology services); Thirteenth Five Year Plan §§ 1, 6 (2016-2020).

[106] For a brief English language summary of one set of remarks in this vein, see "Xi Urges to Effectively Implement Innovation Strategy," (July 30, 2013), available at http://www.chinaipr.gov.cn/newsarticle/news/headlines/201307/1766651_1.html.

[107] Admittedly, as foreign governments, media, industry groups, academic studies, and Chinese leaders, officials, and observers have noted, China does continue to have certain weaknesses in intellectual property protection, despite the prominent and serious commitments and the extensive investment of resources described above.  Intellectual property protection issues have been among the subject matters of WTO complaints lodged against China.

However, the types of intellectual property and rights at issue in the Samsung-Huawei litigation are, in key respects, not similar to those that have been the significant sources of concern.  I understand that the SEP technology at issue pertains to cellular standards that have been implemented globally for many years, and Samsung and Huawei are contractually obligated to license these patents to one another on FRAND terms and conditions.  Moreover, unlike in many of the areas of intellectual property that have caused concern and friction in China's external relations, the SEP technology at issue between Huawei and Samsung is, as I understand it, more reciprocal.  That is, both Huawei and Samsung are licensing technology to each other (in other words, this is not a one-way transfer from a foreign firm or its subsidiaries to a Chinese firm).  Hence, Huawei, like Samsung, has valuable SEPs that might be put at risk through retaliatory

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


      Executed on May 25, 2018 in Philadelphia.


                                                  _____
                                                  Jacques deLisle

---

action abroad (including by foreign courts) if China's courts were seen as selectively protecting
Huawei's SEPs and not Samsung's.

# **EXHIBIT A**

**Jacques deLisle**

University of Pennsylvania Law School
3501 Sansom Street
Philadelphia, PA 19104-6204
(215) 898-5781
Fax: (215) 573-2025
jdelisle@law.upenn.edu

## EMPLOYMENT:

Stephen A. Cozen Professor of Law, 2006-, Professor of Law, 1999-2006, Assistant Professor of
Law, 1994-99,
    Professor of Political Science, 2010-
    Director, Center for East Asian Studies, 2009-, Member of CEAS Faculty, 1996-
    Deputy Director, Center for the Study of Contemporary China, 2012-
    Co-Director, Center for Asian Law, 2014-

    *Research Interests*: Law and politics of China, legal reform in China, law and economic
    and political change in China, China and international law, international status of Taiwan,
    cross-Strait and Mainland-Hong Kong relations, comparative and international law,
    China's foreign relations

    *Courses*:
    Chinese Law; Law and Economic Reform in Contemporary China (seminar); Law and
    the Economy in China (seminar); China and International Law (seminar); China and
    International Human Rights; China and International Human Rights Law; International
    Law; Torts;
    International Law and International Relations (Lauder M.B.A.-M.A. Program, University
        of Pennsylvania)
    China in an Era of Transition, Reform and Globalization (Organizational Dynamics
        Program, University of Pennsylvania)
    China and International Law (National University of Singapore)
    Law and Economy in China (Tel Aviv University)
    Government and Politics of the PRC; External Politics of the PRC (Universidad de
        Aveiro, Portugal)
    The Common Law of Civil Obligations; The U.S. Structural Constitution (Waseda
        University, Tokyo)

    Visiting Professor, Universidad de Aveiro (Portugal, short-term, 1999-2002), National
    University of Singapore (summer 2004), Waseda University (summer 2007), Tel Aviv
    University (spring 2014); Visiting Scholar, University of Hong Kong Law School (May
    2012)

Director, Asia Program, Foreign Policy Research Institute, 2002-, Senior Fellow, 1999-

Attorney-Adviser, Office of Legal Counsel, United States Department of Justice, 1992-94

Law Clerk to Stephen G. Breyer, United States Court of Appeals for the First Circuit, 1991-92

**EDUCATION:**

Harvard Law School, J.D. *magna cum laude*, 1990

Harvard Graduate School of Arts and Sciences, Department of Government, Ph.D. program
    (ABD)

Princeton University, A.B. *summa cum laude*, Phi Beta Kappa, 1982
    Major: Woodrow Wilson School of Public and International Affairs

**PUBLICATIONS:**

*Taiwan's Quest for International Status and Security in the Tsai Era* in MATURATION OF A MINI-
    DRAGON: SEVENTY YEARS OF THE REPUBLIC OF CHINA ON TAIWAN (Hans Stockton and
    Yao-Yuan Yeh, eds., Lynne Rienner, forthcoming 2018)

*Introduction: Washington-Taipei Relations at a Crossroads,* THE CHINA REVIEW (with Lin Gang,
    forthcoming 2018)

*United States-Taiwan Relations: Tsai's Presidency and Washington's Policy,* THE CHINA
    REVIEW (forthcoming 2018)

*Authoritarian Legality in East Asia: What, Why, and Whither?* in AUTHORITARIAN LEGALITY IN
    EAST ASIA (Weitseng Chen and Hualing Fu, eds. forthcoming 2018)

*The Path of Administrative Law in China* (with Neysun Mahboubi) in UNIVERSITY OF
    PENNSYLVANIA ASIAN LAW REVIEW (forthcoming 2018)

*Inspecting Implementation and Accruing Authority: The National People's Congress Standing
    Committee and Zhifa Jiancha* (with Lin Yan) in UNIVERSITY OF PENNSYLVANIA ASIAN
    LAW REVIEW (forthcoming 2018)

*"All the World's a Stage": Taiwan's Human Rights Performance and Playing to International
    Norms* in INTERNATIONAL HUMAN RIGHTS PERFORMANCE: TAIWAN IN THE REGIONAL
    AND INTERNATIONAL CONTEXTS (Jerome Cohen and Chang-fa Lo, eds. forthcoming
    2018)

*China's Rise, the U.S. and the WTO: Perspectives from International Relations Theory*, 2018
    UNIVERSITY OF ILLINOIS LAW REVIEW 57-71 (2018) (a response to Gregory Shaffer and
    Henry Gao, *China's Rise: How it Took on the U.S. at the WTO*)

*How International is International Law? (Remarks on Implications of a Rising China)* 111 ASIL PROCEEDINGS 75-78 (2018)

*Political Implications of the July 2016 Arbitration Decision in the Philippines-PRC Case Concerning the South China Sea: the United States, China, and International Law* in ASIAN YEARBOOK OF INTERNATIONAL LAW, vol. 21 (2015, published 2017) 49-82

*China's Maritime Disputes in the South and East China Seas: What Role for International Law?* in CHINA'S GLOBAL ENGAGEMENT: COOPERATION, COMPETITION, AND INFLUENCE IN THE 21ST CENTURY (Jacques deLisle and Avery Goldstein, eds. 2017) 235-290

*Democracy and Constitutionalism in China's Shadow: Sunflowers in Taiwan and Umbrellas in Hong Kong* in LAW AND POLITICS OF THE TAIWAN SUNFLOWER AND HONG KONG UMBRELLA MOVEMENTS (Brian Christopher Jones, ed., 2017) 205-231

*From Accepting to Challenging the Law of the Sea?: China and the South China Sea Disputes* in LEGAL THOUGHTS BETWEEN THE EAST AND THE WEST IN THE MULTILEVEL LEGAL ORDER: A LIBER AMICORUM IN HONOR OF PROFESSOR HERBERT H.P. MA (Lo Chang-fa, ed., 2016) 255-276

*Law in the China Model 2.0: Legality, Developmentalism and Leninism under Xi Jinping* in JOURNAL OF CONTEMPORARY CHINA, vol. 26, no. 103, 68-84 (2016)

*Taiwan in the Tsai Era* (with June Teufel Dreyer) ORBIS, vol. 60, no. 4, 465-472 (Fall 2016)

*Taiwan's Quest for International Space: Ma's Legacy, Tsai's Options, China's Choices, and U.S. Policy*, ORBIS, vol. 60, no. 4, 550-574 (Fall 2016)

*International Law in the Obama Administration's Pivot to Asia: The China Seas Disputes, the Trans-Pacific Partnership, Rivalry with the PRC, and Status Quo Legal Norms in U.S. Foreign Policy* in 48 CASE WESTERN RESERVE JOURNAL OF INTERNATIONAL LAW 143-176 (2016)

*Introduction: The Internet, Social Media and a Changing China* 1-27 in THE INTERNET, SOCIAL MEDIA AND A CHANGING CHINA (Jacques deLisle, Avery Goldstein and Guobin Yang, eds., 2016)

THE BEST OF FPRI'S ESSAYS ON ASIA (editor, FPRI E-Book, 2016, http://www.fpri.org/articles/2016/01/best-fpris-essays-asia-2005-2015)

*Xi Jinping's Impact on China's Legal Development: Domestic and International*, ASAN FORUM, vol. 3, no. 5, 42-63 (September-October 2015) http://www.theasanforum.org/xi-jinpings-impact-on-chinas-legal-development-domestic-and-international/

*The Rule of Law with Xi-Era Characteristics: Law for Economic Reform, Anticorruption and Illiberal Politics*, in Roundtable: The Future of "Rule According to Law" in China, ASIA POLICY (National Bureau of Asian Research), no. 20, 23-29 (July 2015)

*Review of Chinese Contemporary Perspectives on International Law by Xue Hanqin*, 108 AMERICAN JOURNAL OF INTERNATIONAL LAW 850-56 (2015)

*China's Challenges: Reform Era Legacies and the Road Ahead* (with Avery Goldstein) in CHINA'S CHALLENGES 1-24 (Jacques deLisle and Avery Goldstein, eds., 2014)

*Law and Democracy in China: A Complicated Relationship* in DEMOCRATIZATION IN CHINA, KOREA AND SOUTHEAST ASIA?: LOCAL AND NATIONAL PERSPECTIVES 126-140 (Shelley Rigger, Lynn White and Kate Zhou, eds. 2014)

*China's Legal System* in POLITICS IN CHINA: AN INTRODUCTION 224-253 (2nd edition, William A. Joseph, ed. 2014)

*Law and the Economy* in HANDBOOK OF THE CHINESE ECONOMY 255-279 (Gregory Chow and Dwight Perkins, eds., 2014)

*Introduction: Taiwan at the Crossroads* (with Jean-Pierre Cabestan) in POLITICAL CHANGES IN TAIWAN UNDER MA YING-JEOU: PARTISAN CONFLICT, POLICY CHOICES, EXTERNAL CONSTRAINS AND SECURITY CHALLENGES 1-12 (Jean-Pierre Cabestan and Jacques deLisle, eds., 2014)

*Taiwan and Soft Power: Competing with China and Seeking Security* in POLITICAL CHANGES IN TAIWAN UNDER MA YING-JEOU: PARTISAN CONFLICT, POLICY CHOICES, EXTERNAL CONSTRAINS AND SECURITY CHALLENGES 265-295 (Jean-Pierre Cabestan and Jacques deLisle, eds., 2014)

*China's Changing Approach to Sovereignty in International Law?: Lessons from Territorial Disputes and Human Rights* in 107 AMERICAN SOCIETY OF INTERNATIONAL LAW PROCEEDINGS 348-352 (2014)

*Damages Remedies for Infringement of Human Rights under U.S. Law* in AMERICAN JOURNAL OF COMPARATIVE LAW (SUPP.) 457-490 (2014)
also published (with revisions) in DAMAGES FOR VIOLATIONS OF HUMAN RIGHTS—A COMPARATIVE STUDY OF DOMESTIC LEGAL SYSTEMS (Ewa Bagińska, ed., Springer Verlag, 2016)

*Comment on Shi Hexing, "The People's Congress System and China's Constitutional Development* in CHINA'S POLITICAL DEVELOPMENT 120-130, 134-135 (Kenneth Lieberthal and Yu Keping, eds., 2014). Chinese version: *Comment on Shi Hexing's Essay of "The People's Congress System and the Development of Constitutionalism in China*" in CHINA'S POLITICAL DEVELOPMENT: FROM THE VIEW OF AMERICAN AND CHINESE SCHOLARS 120-130 (Yu Keping and Kenneth Lieberthal, eds. 2014)

*From Economic Development to What—and Why?* in RETHINKING LAW AND DEVELOPMENT: THE CHINESE EXPERIENCE 107-145 (Yu Guanghua, ed. 2013)

*Troubled Waters: China's Claims and the South China Sea,* ORBIS, vol. 56 no. 4, 608-642 (Autumn 2012)

*A Common Law-like Civil Law and a Public Face for Private Law: China's Tort Law in Comparative Perspective* in TOWARDS A CHINESE CIVIL CODE 353-394 (Chen Lei and C.H. (Remco) van Rhee, eds., 2012)

*Law and China's Development Model* in IN SEARCH OF CHINA'S DEVELOPMENT MODEL: BEYOND THE BEIJING CONSENSUS 147-165 (Philip Hsu, Yushan Wu and Suisheng Zhao, eds. 2011)

*The Internationalization of Law and its Implications for Legal Education: Lessons from Interactions between the United States and China* in CROSS STRAIT / FOUR REGION: LAW DEVELOPMENTS IN TAIWAN, CHINA, HONG KONG AND MACAU vol. 1, 1-30 (Dennis T.C. Tang and Chi Chung, eds. 2011)

*Soft Power in a Hard Place: China, Taiwan, Cross-Strait Competition and U.S. Policy* ORBIS vol. 54 no. 4, 493-524 (2010)

*Security First?: Patterns and Lessons from China's Use of Law to Address National Security Threats* 4 JOURNAL OF NATIONAL SECURITY LAW & POLICY 397-436 (2010)

*Consumer Protection in Transnational Contexts (U.S. Law)* (with E. Trujillo) 58 AMERICAN JOURNAL OF COMPARATIVE LAW (SUPP.) 135-164 (2010), alternative version in CONSUMER PROTECTION IN INTERNATIONAL PRIVATE RELATIONSHIPS 509-546 (Diego P. Frenando Arroyo ed. 2010)

*Exceptional Powers in an Exceptional State: Emergency Powers Law in China* in EMERGENCY POWERS LAW IN ASIA 342-390 (Victor V. Ramraj and Arun K. Thiruvengadam, eds. 2010)

*The Other China Trade Deficit: Export Safety Problems and Responses* in IMPORT SAFETY: REGULATORY GOVERNANCE IN THE GLOBAL ECONOMY 22-49 (Cary Coglianese, David Zaring, and Adam Finkel, eds. 2010)

*After the Gold Rush: The Beijing Olympics and China's Evolving International Roles,* ORBIS vol. 52, no. 3, 179-204 (2009)

*Development without Democratization? China, Law and the East Asian Model* in DEMOCRATIZATIONS: COMPARISONS, CONFRONTATIONS AND CONTRASTS 197-232 (Jose V. Ciprut, ed. 2009)

*Vicious Cycles and Virtuous Circles: International Contexts, Taiwanese Democracy and Cross-Strait Relations* in CROSS-STRAIT AT THE TURNING POINT 373-424 (I Yuan, ed. 2009)

*International Contexts and Domestic Pushback* in POLITICAL CHANGE IN CHINA: COMPARISONS WITH TAIWAN 185-211 (Bruce Gilley and Larry Diamond, eds,. 2008)

*'One World, Different Dreams': Assessing the Struggle to Define the Beijing Olympics* in OWNING THE OLYMPICS: NARRATIVES OF THE NEW CHINA 17-66 (Monroe E. Price and Daniel Dayan, eds., 2008)

*Legalization without Democratization in China under Hu Jintao* in CHINA'S CHANGING POLITICAL LANDSCAPE: PROSPECTS FOR DEMOCRACY 185-211 (Cheng Li, ed. 2008)

*Traps, Gaps and Law: Prospects and Challenges for China's Reforms* in IS CHINA TRAPPED IN TRANSITION? IMPLICATIONS FOR FUTURE REFORMS (Oxford Foundation for Law, Justice and Society, 2007)

*Legislating the Cross-Strait Status Quo?: China's Anti-Secession Law, Taiwan's Constitutional Reform, and the U.S.'s Taiwan Relations Act* in ECONOMIC INTEGRATION, DEMOCRATIZATION AND NATIONAL SECURITY IN EAST ASIA 101-138 (Peter C.Y. Chow, ed. 2007)

*Eroding, Not Attacking, the "One China Policy": Participating in International Regimes without State Membership, Choosing Symbolic Struggles with Substantive Content, and Getting Help from U.S. Law* in RESHAPING THE TAIWAN STRAIT 111-145 (John Tkacik, Jr., ed. 2007)

*Free Trade Areas in East Asia: Legal and Economic Liberalism and the Interest-Based Politics of U.S., PRC and Taiwan Participation* in FREE TRADE AND EAST ASIA (Jacques deLisle, ed., Foreign Policy Research Institute, 2007)

*Pressing Engagement: Uneven Human Rights Progress in China, Modest Successes of American Policy, and the Absence of Better Options* (Carnegie Endowment for International Peace, "China Debates" series, 2007)

*Navigating a Dangerous Strait: Assessing Responsibility, Defining Interests and Prescribing Tactics in Relations among Taiwan, China and the International Community* TAIWAN JOURNAL OF DEMOCRACY vol. 2, no. 1 123-130 (review essay 2006)

*China under Hu Jintao: Introduction* (with T.J. Cheng and Deborah Brown) in CHINA UNDER HU JINTAO: OPPORTUNITIES, DANGERS AND DILEMMAS, 1-25, 229-292 (Jacques deLisle, T.J. Cheng and Deborah Brown, eds. 2006)

*China and the WTO: Evolving Agendas of Economic Openness, Domestic Reform and Challenges of the Post-Accession Era* in CHINA UNDER HU JINTAO: OPPORTUNITIES, DANGERS AND DILEMMAS, 1-25, 229-292 (Jacques deLisle, T.J. Cheng and Deborah Brown, eds. 2006)

*Atypical Pneumonia and Ambivalent Law and Politics: SARS and the Response to SARS in China*
      77 TEMPLE LAW REVIEW 193-245 (2004)

*Reforming / Replacing the ROC Constitution: Implications for Taiwan's State(-like) Status and
      U.S. Policy*, WOODROW WILSON INTERNATIONAL CENTER ASIA PROGRAM SPECIAL
      REPORT 12-18 (November 2004)

*Democratization and Its Limits in Greater China*, ORBIS, vol. 48, no. 2, 193-203 (2004)

*The Common Law of Causation in Tort and Questions of Policy and Institutions in the
      Development of Chinese Tort Law*, FAZHI CANKAO [LEGAL MATERIALS JOURNAL] 2004,
      no. 5, Democracy and the Legal System Press, under the National People's Congress,
      People's Republic of China) 122-124 (in Chinese 2004)

*SARS and the Pathologies of Globalization and Transition in Greater China*, ORBIS, vol. 47, no.
      4, 587-604 (2003) (conference volume on Asia's Shifting Strategic Landscape)

*Human Rights, Civil Wrongs and International Politics: A 'Sinical' Look at the Use of U.S.
      Litigation to Address Abuses Abroad*, 52 DEPAUL LAW REVIEW 473-561 (2003)
      (conference volume on American Civil Justice in a Global Context)

*Chasing the God of Wealth while Evading the Goddess of Democracy: Development, Democracy
      and Law in Reform-Era China,* in DEVELOPMENT AND DEMOCRACY: NEW PERSPECTIVES
      ON AN OLD DEBATE 252-293 (Sunder Ramaswamy & Jeffrey W. Cason, eds., 2003)

*The China-Taiwan Relationship: Law's Spectral Answers to the Cross-Strait Sovereignty
      Question*, ORBIS, vol. 46, no. 4, 733-752 (2002) (conference volume on sovereignty and
      cross-Strait relations)

*The Roles of Law in the War on Terrorism,* ORBIS, vol. 46, no. 2, 301-320 (2002)

*Humanitarian Intervention: Legality, Morality, and the Good Samaritan*, ORBIS, vol. 45, no. 3,
      535-556 (2001)

*The Rule of Law and the Roles of Law in China* (review essay of *The Limits of the Rule of Law
      in China*) in SINO-PLATONIC PAPERS, Reviews IX, October 2000, 1-21

*China's Approach to International Law: A Historical Perspective*, 94 AMERICAN SOCIETY OF
      INTERNATIONAL LAW PROCEEDINGS 267-275 (2000)

*The Chinese Puzzle of Taiwan's Status*, ORBIS, vol. 44, no. 1, 35-62 (2000)

*The P.R.C.'s Population and Family Planning Policies:  Legal Issues and Social Consequences
      in the Mainland and the United States* in LIANG-AN SHE-HUI PIEN-CH'IEN-CHUNG CHIA-
      T'ING YÜ-CH'I HSIANG-KUAN WEN-T'I HSÜEH-SHU YEN-CHIU T'AN-HUI HUI-I LUN-WEN-
      CHI 239-260 (Fu-jen Ta-hsüeh She-hui Wen-hua Yen-chiu Chung-hsin, 1999)

*The Taiwan Question*, SINO-AMERICAN RELATIONS, Winter 1999, 22-28

*Lex Americana?: United States Legal Assistance, American Legal Models, and Legal Change in the Post-Communist World and Beyond*, 20 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 179-308 (1999)

*The East Asian Debate on International Human Rights: Domestic Approaches and Attitudes in the Absence of Regional Commitments*, 92  AMERICAN SOCIETY OF INTERNATIONAL LAW PROCEEDINGS 64-66 (1998) (co-author)

*Sovereignty Resumed: China's Conception of Law for Hong Kong, and its Implications for the SAR and US-PRC Relations*, HARVARD ASIA QUARTERLY 21-27 (Summer 1998)

*Political Alchemy, the Long Transition and Law's Promised Empire: How July 1, 1997 Matters -- and Doesn't Matter -- in Hong Kong's Return to China*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 69-131 (1997) (symposium issue on Hong Kong=s transition from British colony to Chinese Special Administrative Region)

*Hong Kong's Endgame and the Rule of Law (I): The Struggle over Institutions and Values in the Transition to Chinese Rule*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 195-254 (1997) (with Kevin P. Lane)

*Hong Kong's Endgame and the Rule of Law (II): The Battle over "the People" and the Business Community in the Transition to Chinese Rule*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 811-1047 (1997) (with Kevin P. Lane)

*Cooking the Rice without Cooking the Goose: The Rule of Law, the Battle over Business, and the Quest for Prosperity in Hong Kong After 1997* (with Kevin P. Lane) in HONG KONG UNDER CHINESE RULE: THE ECONOMIC AND POLITICAL IMPLICATIONS OF REVERSION 31-70 (Warren I. Cohen & Zhao Li, eds., Cambridge University Press, 1997)

*Of Chinese Walls, Battering Rams and Building Permits: Five Lessons about International Economic Law from Sino-U.S. Trade and Investment Relations*, 17 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 513-532 (1996)

*Disquiet on the Eastern Front: Liberal Agendas, Domestic Legal Orders, and the Role of International Law after the Cold War and amid Resurgent Cultural Identities*, 18 FORDHAM INTERNATIONAL LAW JOURNAL 1725-1741 (1995) (symposium issue on the roles of international law in the twenty-first century)

*Massacre in Beijing: The Events of 3-4 June and their Aftermath* (Ad Hoc Study Group on Human Rights in China, and International League for Human Rights, 1989) (co-author)

*China's Foreign Economic Contract Law and Technology Import Regulations*, 27 HARVARD

INTERNATIONAL LAW JOURNAL 275-283 (1986)

**OTHER WRITINGS AND COMMENTARY:**

Op-eds/commentary/essays for newspapers and other media, including *The Asian Wall Street Journal*, *The Philadelphia Inquirer*, *Foreign Policy Research Institute E-notes, China Online*, *Asia Times, Free China Journal*, *The American, The Asan Forum, Global Times, Nikkei Weekly, AACS Newsletter,* and *The Penn Law Journal*; titles include:

Red State China: Why China (Sort of) Likes Trump

The South China Sea Arbitration Decision: China Fought the Law and Law Won…Or Did It?

Why President Ma Ying-jeou's Day Trip to Taiping Island was Such a Big Deal

Taiwan's 2016 Elections and Cross-Strait Relations

Mr. Xi Meets Mr. Ma for a Singapore Fling

Blurring Borders: National, Subnational, and Regional Orders in East Asia—An FPRI Conference Report

Reflections on the Umbrella Movement

Two Sessions Work Advances Rule of Law

Legal Reform Promised in China Though the Party is Still the Law

China and International Law/Norms: A US Perspective

China and the World: The View from Salzburg, Then and Now

Energy, Environment and Security in Asia—An FPRI Conference Report

Contested Terrain: China's Periphery and International Relations in Asia—An FPRI Conference Report

Taiwan's 2012 Presidential and Legislative Elections: Winners, Losers, And Implications

9/11 and U.S.-China Relations (10 Years After)

Politics and Governance in the People's Republic of China

Strait Ahead? China's Fifth Generation Leaders and Beijing's Taiwan Policy

Taiwan: Sovereignty and Participation in International Organizations

Dragon and (Legal) Eagle: International Law and American Interests in U.S.-China Relations beyond the Hu-Obama Summit

A Tale of Two Summits: Hu Jintao in Washington, Wen Jiabao in New Delhi and U.S.-China-India Relations

The Elephant in the Room: Summitry and China's Challenging Relations with Great Powers in Asia

Taiwan: Elections at Home, Economic Relations with the Mainland and U.S.-China-Taiwan Relations (An FPRI Symposium Report)

Regional Security in East Asia (An FPRI Conference Report)

What's Happened to Democracy in China?: Elections, Law and Reform (An FPRI Symposium Report)

Power in East Asia (An FPRI Conference Report)

Hu, Obama and U.S.-China Economic and Legal Relations: Structural Issues the Summit Will Not Address but Should Not Ignore

China Policy under Obama

The U.S. Elections and America's Role in East Asia: Views from the Region— An FPRI Roundtable Report

China is a Rising Star, but Unusually Weak and Poor

Elections, Political Transitions and Foreign Policy in East Asia: An FPRI Conference Report

China's Legal Encounter with the West

Taiwan under President Ma Ying-jeou: A Horse of a Different Color? – Democracy and Distrust in Taiwan

Taiwan under President Ma Ying-jeou: Changing Horses in the Middle of the Strait? – Taiwan's External Relations

Playing for Keeps (The Beijing 2008 Olympics)

Kind of Blue?: Implications of Taiwan's 2008 Elections

China Rising: Assessing China's Economic and Military Power—An FPRI Conference Report

Into Africa: China's Quest for Resources and Influence

Free Trade Areas: Legal Aspects and the Politics of U.S., PRC and Taiwan Participation

Free Trade Areas in East Asia: An FPRI Symposium Report

Constitutional Change and Foreign Policy in East Asia: An FPRI Conference Report

Taiwan's Democracy and Lessons from Yet Another Election

Party Politics and Foreign Policy in East Asia: An FPRI Conference Report

China after Jiang: Two Strengths and Five Unresolved Issues

The Aftermath of Taiwan's Presidential Election: An FPRI Symposium Report

Fifteen Years after Tiananmen: Persistence, Memory and Change in China

Democracy and Its Limits in Greater China: An FPRI Conference Report

Asia's Shifting Strategic Landscape: An FPRI Conference Report

Illegal? Yes; Lawless? Not So Fast: The U.S., International Law and Iraq

Sinical Voters?: Elections in Greater China

Bless and Keep the S.A.R. . . . Far Away From Us: Taiwan's Hong Kong Phobia, Five Years On

Humanitarian Intervention: The International Law and Morality of Force and Rescue

Varieties of Sovereignty and Cross-Strait Relations: A Conference Report

Politics, Law and Resentment on the China Coast

U.S. Policy toward Taiwan: Sustaining the Status Quo

The [2000 Presidential] Election, Sausages and Foreign Policy

Foreign Affairs, Federalism and Well-Meaning-Mischief: The Constitutional Infirmity of Massachusetts's Burma Law

A Progression of Reform [for Law in China]: Not Revolution but Evolution

Fifty Years after the Revolution [in China]

Who's Afraid of Falun Gong?

Appeal of Falun Gong Puts Strain on Beijing

The Taiwan Question

Chinese Law: A Middle Path for the Middle Kingdom

Impeachment: It's Political Not Judicial

Hong Kong's Legal Crisis (with Kevin P. Lane)

Commentary/interviews for television, radio, newspapers and magazines in the United States, East Asia and Europe

**FELLOWSHIPS AND AWARDS:**

Global Law Faculty, Peking University, 2018-

Honorary Guest Professor, Renmin University Law School (Peking), 2014-17

Taipei Economic and Cultural Office research grant, 2008 (for research in Taiwan on cross-Strait relations)

Salzburg Seminar: Faculty (China as a Superpower Session), 2012, Senior Fellow, (Asian Law Session), 2002, Fellow, (Freeman Foundation Symposia ΑEast Asia-United States: A Search for Common Values@), 1998, 1999, 2000, Fellow (U.S. Foreign Policy toward Asia) 1995

University of Pennsylvania Center for East Asian Studies, U.S. Department of Education National Resource Center Course Development Grant (for two linked courses: Public International Law, and China and International Law), 1999

University of Pennsylvania Center for East Asian Studies, U.S. Department of Education National Resource Center Conference Grant, 1998, 2004

University of Pennsylvania Research Foundation, 1996-97

Dissertation Fellowship, Institute for the Study of World Politics, 1990-91

NCR Foundation Fellowship, Harvard University Council on East Asian Studies (for dissertation field research in China), 1990

Kukin Scholar, Harvard Academy for International and Area Studies, Harvard University (for research combining regional studies and a social science discipline), 1986-88

Sears Prize, Harvard Law School (awarded to the two students receiving the highest averages in work of the second year of law school), 1986

Graduate School of Arts and Sciences Fellow, Harvard University (awarded for academic merit to ten students, throughout the Graduate School of Arts and Sciences, who have completed departmental Ph.D. qualifying exams), 1986-87

Foreign Language and Area Studies Fellowship, Harvard University (for study at Harvard Law School), 1989-90; (for study at the Chinese Language School, Middlebury College), 1985

**OTHER EXPERIENCE / PROFESSIONAL ACTIVITIES / SERVICE:**

Consultant, expert witness on issues of P.R.C. and Hong Kong law and government policies, in litigation in federal and state courts, arbitration proceedings, and proceedings before federal agencies, 1996-

Senior Fellow, Foreign Policy Research Institute, 1999-; Director of the Asia Program, 2002-

Member, National Committee on United States-China Relations, 2001-

American Society of Comparative Law, Board of Directors, 1996-

Associate Member, International Academy of Comparative Law, 2006-

Board of Editors, ORBIS, 2004-

Editorial Advisory Board, JOURNAL OF CONTEMPORARY CHINA, 2007-

Editorial Board, FRONTIERS OF LAW IN CHINA, 2010-

Editorial Board, CHINA (TAIWAN) YEARBOOK OF INTERNATIONAL LAW, 2014-

Editorial Advisory Board, ASIAN JOURNAL OF COMPARATIVE LAW, 2016-

Co-editor, series on Chinese and Comparative Law, Brill / Nijhoff publishers

Vice Chair, Pacific Rim Interest Group, American Society of International Law, 2003-05, 2012-13

Member, U.S. Delegation, U.S.-China Rule of Law Experts Dialogue, 2013, 2015

Consultant, Asia Foundation Rule of Law in China Project on Administrative Law, 2000

Tsinghua University / Temple University Law School Program Series of Conferences on Law Reform, 2002-2004

Member, Advisory Council, International Council on Intellectual Property Rights (China), American International Education Foundation, 2004-2006

Fellow, Institute for Corean-American Studies, 1999-

Board of Advisors, Russian American Institute for Law and Economics, 2000-2004

Consultant, Russian American Institute for Law and Economics (report on U.S. legal advice and assistance programs in Russia and elsewhere), 2000-2004

Council for International Educational Exchange, Fulbright Senior Scholars Awards, peer review awards panel (China, Taiwan, Hong Kong), 2000-2002; distinguished chair awards panel (law), 2003-

University Grants Committee (Hong Kong), Research Grants Council, peer reviewer, 1998-;

Member, Humanities and Social Sciences Panel, 2007-2013

External Review Panel, University of Hong Kong Law Faculty, 2015, 2017

Research Assessment Exercise Panel Member, all law faculties in Hong Kong, 2014

External Examiner, Administrative and Constitutional Law, City University of Hong Kong, 2005-2015

Academic Advisory Board, Tsinghua University / Temple University School of Law Masters of Law Program in Beijing, 1997-

Lecturer, programs on American, comparative, and international law for Chinese lawyers, 1995-

Ad Hoc Study Group on Human Rights in China (report and brief on Tiananmen Incident of June, 1989, and its aftermath, presented jointly with the International League for Human Rights to the principal human rights subcommission of the United Nations), 1989

Harvard International Law Journal, Articles Editor (including special issue on legal reforms in China) 1987

Harvard University, Teaching Fellow, 1985-1992
Courses: The Chinese Cultural Revolution; Government and Politics of China; China After Mao: A New Revolution? (Institute of Politics seminar, Kennedy School of Government); International Organizations; Modern Political Ideologies

Peking University, Department of International Politics, Visiting Researcher, 1990, 1991

Chinese University of Hong Kong, Universities Service Centre, Research Affiliate, 1989, 1991

Summer Associate, Paul, Weiss, Rifkind, Wharton & Garrison (New York, 1986), Baker & McKenzie (New York, 1984), Townley & Updike (New York, 1983)

Matsushita Electric Industrial Corporation, Osaka, Japan (program for foreign students of business and economics), 1981

**LANGUAGES:** Chinese (Mandarin), French

**Jacques deLisle,**
**Description of Expert Witness / Consultant Work**

***PanOptis v. Huawei*** (federal court, Texas, 2017)

Expert witness for defendant in anti-suit injunction motion re: defendant's suit against plaintiff in Chinese courts
(expert opinion)

*Issues of Chinese law:*
Quality of courts and adjudication processes, decisions in related litigation
Litigation process, civil procedure, service of process

***Cargill, Archer Daniels Midland v. Syngenta*** (state court, various jurisdicitons, 2016-]
[experts not yet disclosed, state and federal court, various jurisdictions, 2016-]

Expert witness for U.S. trading company in suit against U.S. GMO company
(expert opinions / declaration; deposition testimony)

*Issues of Chinese Law:*
Regulation of GMO products and imports
Customs, quarantine, and inspection law
Regulation of international trade
Contract law, including choice of law and fraud in conrtact
Statutory / regulatory interpretation
Administrative / regulatory processes

***Cao v. Chen and Chen*** (trial court, British Columbia, Canada, 2016-)

Expert witness for defendant in proceeding concerning deference to Chinese court judgment in divorce case
(expert opinion)

*Issues of Chinese Law:*
Quality of Chinese courts generally, decisions in related litigation
Civil procedure, finality of judgments
Marriage law

***International Commercial Arbitration concerning contract between Chinese state-linked company and foreign company*** (experts not disclosed, 2015-2017)

Expert witness for non-Chinese party to contract and investment dispute in energy sector (informal advice; expert reports)

*Issues of Chinese Law:*
Statute of limitations

Contract law and contract interpretation
Unjust enrichment
Tort law (and interaction with contract law)
Foreign investment law
Administrative law
Res judicata / collateral estoppel
Regulation of natural resources industries
Regulation of state-owned enterprises

***Dandong Old Northeast Agricultural & Animal Husbandry*** *v. Hu, Gallo, Columbia Grain Trading, Inc.* (federal court, New York, 2016)
Litigation concerning contract and tort claims among U.S. and Chinese company and employee of both

Expert witness for U.S. company asserting res judicata effect of judgment in China on claims arising from same facts (draft expert witness in support of Rule 11 motion; not filed)

*Issues of Chinese Law:*
Quality and legality of judgments issues by Chinese courts
Relationship between tort and contract claims
Transnational contracts
Fiduciary duties of company officers
Res judicata / collateral estoppel / finality of judgments
Effect of settlement of case, withdrawal of case
Statute of limitations

***U.S.*** *v. Qiu Gengmin* (federal court, New Jersey, 2016)
Prosecution of Chinese national for fraud in connection with contract between Chinese and foreign companies for construction and export of ship)

Expert witness for prosecution (expert opinion, testimony, other advice)

*Issues of Chinese Law:*
Contract law
(including validity, good faith obligations, interpretation, effect of change of law)
Guarantee law
Criminal law
Value added tax / export tax rebate law

*Angel Cano Martinez Corp. v.* **Administrative Committee of Wujin High Technology Industrial Zone** (ICC Arbitration, 2015)

Expert witness for Chinese local government entity (expert report)

*Issues of Chinese Law:*

2

Choice of law
Foreign investment law (including enterprise approval, registration and licensing)
Land/ real estate law

***Tang Energy Group, Ltd. et al. vs. CATIC USA, Inc.*** AVIC International USA, Inc. *et al*
(International Centre for Dispute Resolution, 2015)
Arbitration concerning Chinese-foreign commercial contract and investment dispute and
amenability of parent company to arbitration for actions of subsidiary

Expert witness for defendant U.S. company owned by PRC company (expert
declaration, deposition and hearing testimony, other advice)

*Issues of Chinese Law:*
Relationship between state-owned Chinese parent companies and wholly and partly
owned subsidiaries
Relationship between Chinese Communist Party and Chinese state and state-owned
companies
Corporate governance and related issues

***American Pacific Industries v.*** Xuzhou Xugong Tyre Co. (state court, California, 2014-
2015)
Litigation concerning contract for transnational production / marketing / sales; *forum non*
*conveniens* motion

Expert witness for defendant Chinese manufacturing company (expert opinions /
declarations, other advice)

*Issues of Chinese Law:*
Contract interpretation / contract law
Quality of Chinese courts and justice / adequacy of Chinese forum and law
Choice of law

***InteDigital et al.*** Huawei *et al.* (International Court of Arbitration, International Chamber
of Commerce, 2014-2015) and ***Certain Wireless Devices with 3G/4G Capabilities and***
***Components Thereof*** (International Trade Commission, 2013-5) (related proceedings)
Administrative proceedings to exclude products from U.S. entry / sales and
Arbitration over royalty rate for products incorporating standard essential patents

Expert witness for major Chinese corporate party (expert opinions / declarations,
deposition testimony, arbitration hearing testimony)

*Issues of Chinese Law:*
Contract law, including formation, interpretation, pre-contractual duties
Anti-Monopoly Law
Patent Law
Intellectual property law and policy
Damage remedies in contract, patent, antitrust

Quality of Chinese courts and justice / adequacy of Chinese forum and law
Evaluation of Chinese court decisions in related contract and antitrust proceedings
Choice of law
Bases for according deference to Chinese court findings in U.S. proceedings

***Global Materials Technologies v. <mark>Dazheng Metal Fire Co.</mark>*** (federal court, Illinois, 2014)
Litigation concerning trade secrets issues and related litigation in Chinese courts

Expert witness for Chinese company (expert opinion / declaration)

*Issues of Chinese Law:*
Res judicata / preclusion
Trade secrets law

***King.com v. <mark>6 Waves LLC</mark>*** (federal court, California, 2013-2014)
Litigation concerning software intellectual property rights; *forum non conveniens* motion

Expert witness for defendant non-Chinese company in software copyright
infringement case (expert opinions / declarations)

Quality of Chinese courts and justice / adequacy of Chinese forum and law
Intellectual property law (generally and specifically concerning software)
Civil procedure
Choice of law and choice of forum

# EXHIBIT B

<u>**Exhibit B - Materials Considered**</u>

**<u>Court Papers:</u>**

Dkt. 235, Samsung's Motion to Enjoin Huawei from Enforcing the Injunction Issued by the Intermediate People's Court of Shenzhen (Public version)

Dkt. 235, Declaration of Guanbin Xie (Public version)

Dkt. 254, 3/14/2018 Hearing Transcript

Dkt. 283, Declaration of Bin Wang (Public version)

Dkt. 283, Shenzhen Court Decision (Public, English translation) ("840 Decision")

Shenzhen Court Decisions regarding 816 and 840 patents (Public, Chinese versions)

**<u>Court Rules:</u>**

Civil Procedure Law of the People's Republic of China

General Rules of Civil Law of the People's Republic of China

Interpretations of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China

Patent Law of the People's Republic of China

Provisions of the Supreme People's Court on Evidence in Civil Proceedings

**<u>Publications:</u>**

"Guangdong Economy Remains Biggest, Chongqing Leads Growth," *China Daily*, Feb. 2, 2017, available at http://www.chinadaily.com.cn/regional/2017-02/07/content_28128610.htm

"Huawei v. Samsung Patent Infringement Dispute—Victory in the Court of First Instance," *Sina Justice News*, Jan. 11, 2018, available at http://news.sina.com.cn/sf/news/ajjj/2018-01-11/doc-ifyqnick5793034.shtml

"Huawei v. Samsung Patent Infringement Dispute—Victory in the Court of First Instance," *Sina Justice News*, Jan. 11, 2018, available at http://news.sina.com.cn/sf/news/ajjj/2018-01-11/doc-ifyqnick5793034.shtml

"Huawei v. Samsung Verdict, Full Version," *China Intellectual Property*, Mar. 21, 2018, available at http://www.chinaipmagazine.com/news-show.asp?21934.html

"Huawei v. Samsung Verdict, Full Version," *China Intellectual Property*, Mar. 21, 2018, available at http://www.chinaipmagazine.com/news-show.asp?21934.html

"Huawei v. Samsung—Huawei Wins," *Sohu*, Jan 12, 2018, available at http://www.sohu.com/a/216255713_99927285

"Huawei Wins China Patent Lawsuit Against Rival Samsung," *U.S. News & World Report*, Jan. 11, 2018, available at https://www.usnews.com/news/business/articles/2018-01-11/huawei-wins-china-patent-lawsuit-against-rival-samsung

"Huawei Wins Injunction Against Samsung," *Patent Lawyer*, Mar. 26, 2018, available at https://patentlawyermagazine.com/huawei-wins-injunction-against-samsung/

"Multinationals to Invest RMB $180b in Shenzhen," *Dongguan Today*, May 15, 2013, available at http://www.dongguantoday.com/news/guangdong/201305/t20130516_2044635.shtml

"Shenzhen Intellectual Property Tribunal Adjudicates Two Cases of Standard Essential Patents Disputes," *Legal Daily*, Jan. 12, 2018, available at http://www.legaldaily.com.cn/index/content/2018-01/12/content_7446750.htm?node=20908

"Three Judges in Guangdong Awarded as National Adjudication Work Experts," *Southern Metropolitan Daily*, Apr. 13, 2018, available at https://m.mp.oeeee.com/a/BAAFRD00002018041375107.html

"Xi Urges to Effectively Implement Innovation Strategy," (July 30, 2013), available at http://www.chinaipr.gov.cn/article/centralgovernment/201307/1766649.html

"Zhu Jianjun: New Issues in Intellectual Property Judicial Practice," available at http://webplus3.ecupl.edu.cn/_s2/05/30/c65a1328/page.psp

Andrew Orlowski, "Huawei Wins Patent Injunction Against Samsung in China," *The Register,* Mar. 26, 2018, available at https://www.theregister.co.uk/2018/03/26/huawei_wins_samsung_ip_injunction_in_china/

Ann Seidman, Robert B. Seidman and Janice Payne, *Legislative Drafting For Market Reform: Some Lessons from China* (1997)

Brian J. Love, Christian Helmers, and Markus Eberhardt, "Patent Litigation in China: Protecting Rights or the Local Economy?" 18 *Vand. J. Ent & Tech. L.* 713 (2016)

Brookings-JP Morgan Chase Global Cities Initiative, *Shenzhen*

Codrut Nistor, "Samsung Starts Building US$7 Billion Chip Line in China," Notebookcheck, Mar. 29, 2018, available at https://www.notebookcheck.net/Samsung-starts-building-a-US-7-billion-chip-line-in-China.293162.0.html

2

Daniel Kaufmann, Aart Kraay & Massimo Mastruzzi, *The Worldwide Governance Indicators: Methodology and Analytical Issues* (Sept. 2010), available at http://documents.worldbank.org/curated/en/630421468336563314/The-worldwide-governance-indicators-methodology-and-analytical-issues

Demetri Sevastopulo, "Huawei Pulls Back the Curtain on Ownership Details," *Financial Times*, Feb. 27, 2014, available at https://www.ft.com/content/469bde20-9eaf-11e3-8663-00144feab7de

Donald C. Clarke, "Private Enforcement of Intellectual Property Rights in China," *Nat'l Bureau of Asian Research Analysis,* vol. 10, no. 2 (Apr. 1999)

Dragon Wang and Austin Chang, "Huawei v. Samsung—An Insight from the Shenzhen Intermediate Court on Finding on Infringement on Standard Essential Patent," Apr. 25, 2018, available at http://www.beijingeastip.com/type-news/huawei-v-samsung-insight-shenzhen-intermediate-court-finding-infringement-standard-essential-patent/

Emma Lee, "Huawei Wins Another Patent Battle Against Samsung in China," technode, available at https://technode.com/2018/01/11/huawei-wins-another-patent-battle-samsung-china/

Fan Feifei, "Huawei Wins in Samsung Patent Dispute," *China Daily*, Jan. 12, 2018, available at http://www.chinadaily.com.cn/a/201801/12/WS5a57f91da3102c394518ea8f.html

Huawei 2016 Annual Report, available at http://www-file.huawei.com/-/media/CORPORATE/PDF/annual-report/AnnualReport2016_en.pdf

Huawei, Corporate Information, available at http://www.huawei.com/us/about-huawei

Jacob Schindler, "Full Judgment in Huawei v. Samsung Details Why Shenzhen Court Hit Korean Company with SEP Injunction," IAM, Apr. 3, 2018, available at http://www.iam-media.com/blog/detail.aspx?g=31514eba-a4cf-4861-b0c2-1210e49ccb7c

Jacques deLisle, "Chasing the God of Wealth while Evading the Goddess of Democracy: Development, Democracy and Law in Reform-Era China," *Democracy and Development: New Perspectives on an Old Debate* (Sunder Ramaswamy and Jeffrey Cason, eds. 2003)

Jacques deLisle, "China's Legal System" *Politics in China* (William A. Joseph 2d ed. 2014), available at https://valeriaribeiroufabc.files.wordpress.com/2017/07/william-a-joseph-politics-in-china-an-introduction-second-edition.pdf

Jerome A. Cohen, "Reforming China's Civil Procedure: Judging the Courts," 45 Am. J. Comp. L. 793 (1997)

Jiang Huiling and Yang Yi, "Beijing Intellectual Property Court: Innovative Practice of Guiding Judicial Work System with Precedent Judgment," *CCPIT Patent and Trademark Law Office*, Apr. 7, 2016, available at http://www.ccpit-patent.com.cn/zh-hans/node/3135

John Butcher, "Specialized IP Court Launched in China's Silicon Valley," Bloomberg Law, Jan. 5, 2018, available at https://www.bna.com/specialized-ip-court-n73014473861/

3

Kristina Sepetys and Alan Cox, *Intellectual Property Rights Protection in China: Trends in Litigation and Economic Damages* (NERA Economic Consulting, 2009)

Margaret Y.K. Woo and Yaxin Wang, "Civil Justice in China: An Empirical Study of Courts in Three Provinces" 53 Am. J. Comp. L. 911 (2005)

Mei Y. Gechlik, *Protecting Intellectual Property in Chinese Courts: An Analysis of Recent Patent Judgments* (Carnegie Endowment for International Peace, January 2007)

Mei Ying Gechlik, "Judicial Reform in China: Lessons from Shanghai," 19 Colum. J. Asian L. 97 (2005)

Michael J. Enright, "Samsung's Contribution to China through FDI: (2017), available at https://s3-ap-southeast-1.amazonaws.com/hinrichfoundation-images/wp-content/uploads/2017/11/Hinrich-Foundation-FDI-in-China-Samsung-Case-Study-9.5.17.pdf

Minxin Pei, Zhang Guoyan, Pei Fei, and Chen Lixin, "China's Evolving Legal System," *Carnegie Endowment for International Peace Issue Brief* (Feb. 2009), available at http://carnegieendowment.org/files/China_Legal_System_Full_Text2.pdf

Minxin Pei, Zhang Guoyan, Pei Fei, and Chen Lixin, *Judicial Independence in China: Lessons for Global Rule of Law Promotion*, Cambridge Univ. Press (Randall Peerenboom ed., 2010)

Mo Zhang and Paul J. Zwier, "Burden of Proof: Developments in Modern Chinese Evidence Rules," 10 Tulsa J. Comp. & Int'l L. 419 (2002-2003)

Naigen Zhang, "Intellectual Property Law Enforcement in China," 8 Fordham Intell. Prop. Media & Ent. L.J. 63 (1997)

Notice of the General Office of the Supreme People's Court on Issuing Ten Cases Concerning Judicial Protection of Intellectual Property Rights, Ten Innovative Cases and Fifty Typical Cases Heard by Chinese Courts in 2012, No. 44, Apr. 15, 2013

Paul Ranjard and Zhu Zhigang, "China's IP Courts, One Year On," Managing Intellectual Property, Mar. 16, 2016, available at www.managingip.com/Article/3538234/Chinas-IP-Courts-one-year-on.html

Randall Peerenboom, *China Modernizes: Threat to the West or Model for the Rest?*, Oxford Univ. Press (2007)

Randall Peerenboom, *China's Long March toward the Rule of Law*, chs. 3, 6, 7 (2002)

Rongjie Lan, "Are Intellectual Property Litigants Treated Fairer in China's Courts? An Empirical Study of Two Sample Courts," *Indiana University Center for Chinese Politics and Business Working Paper No. 16* (2012)

Ryan Ong, "Tackling Intellectual Property Infringement in China," *China Business Review*, Mar. 2009, available at http://www.chinabusinessreview.com/tackling-intellectual-property-infringement-in-china/

Shenping Yang, "Patent Enforcement in China," *Landslide*, vol. 4, no. 2 (American Bar Association 2011)

Shenzhen Government Online, available at http://www.sz.gov.cn/, and http://english.sz.gov.cn/

State Intellectual Property Office, Intellectual Property Rights Protection in China (2015)

Steve Brachmann, "Samsung Liable for Infringing Huawei Patents After Maliciously Delaying Negotiations," IP Watchdog, Jan. 16, 2018, available at http://www.ipwatchdog.com/2018/01/16/samsung-liable-infringing-huawei-patents/id=92265/

Supreme People's Court, Intellectual Property Protection by Chinese Courts in 2009 (Beijing, Apr. 2010), available at http://www.afdip.com/index.php?ac=article&at=read&did=2042

Supreme People's Court, Intellectual Property Rights Protection by Chinese Courts (annual) – 2009, 2011, 2012, 2015

Supreme People's Court, Judicial Protection of Intellectual Property Rights in China's Courts (2015)

Supreme People's Court, National Judicial Work Report for 2015 (2016)

Supreme People's Court, National Judicial Work Report for 2017 (2018)

Thirteenth Five-Year Plan (2016-2020) §§ 1, 6

Tingshen Court, Live feed of court proceedings, http://tingshen.court.gov.cn/live/1759564

Twelfth Five-Year Plan (2011-2015) §§ 1.2, 1.4, 3.10.1, 3.10.13, 4.15.3

U.S. Chamber of Commerce, The Roots of Innovation: U.S. Chamber International IP Index, www.theglobalipcenter.com/wp-content/uploads/2017/02/GIPC_IP_Index_2017_Report.pdf

U.S.-China Joint Fact Sheet on the 26th U.S.-China Joint Commission on Commerce and Trade, December 2015, https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2015/December/US-China-Joint-Fact-Sheet-26th-JCCT

Wei Luo, The Civil Procedure Law and Court Rules of the People's Republic of China (2006)

William O. Hennessey, "Protection of Intellectual Property in China (30 Years and More)," 46 Hous. L. Rev. 1257 (2009)

*World Bank, Worldwide Governance Indicators*, available at http://info.worldbank.org/governance/wgi

*Worldwide Governance Indicators - Country Data Report for China 1996-2014*, available at http://documents.worldbank.org/curated/en/794961468198529176/pdf/105428-WP-PUBLIC-China.pdf

Xi Jinping: Creating a Stable, Fair, and Transparent Business Environment, and Accelerating Construction of a New, Open Economic System, July 17, 2017, www.xinhuanet.com/politcs/2017-07/17/c_1121333722.htm

Xiao Bo, "Being a Guardian of the Rule of Law for the Innovation Economy," *People's Court Report*, Apr. 19, 2018, available at http://rmfyb.chinacourt.org/paper/html/2018-04/19/content_137981.htm?div=-1

Xinhua, "Shenzhen GDP up 9%, ranks fourth in mainland cities," *China Daily*, January 24, 2017, available at http://www.chinadaily.com.cn/business/2017-01/24/content_28041580.htm

Yang Li, Christine Yiu, and Richard Vary, "Shenzhen Court Issues Written Judgment in Huawei v. Samsung Case," Bird & Bird, Mar. 26, 2018, available at https://www.twobirds.com/en/news/articles/2018/global/shenzhen-court-issues-written-judgment-in-huawei-v-samsung-case

Yoon Yung Sil, "Samsung Electronic Shows Greatest Growth in China," *Business Korea*, Aug. 18, 2017, available at http://www.businesskorea.co.kr/news/articleView.html?idxno=19015

Zhang Junmian, "Top 10 Largest Provincial Economies in China, 2015, *China.org.cn*, Mar. 9, 2016, available at http://www.china.org.cn/top10/2016-03/09/content_37968366.htm

Zhong Jianhua and Yu Guanghua, "Establishing Truth from Facts: Has the Chinese Civil Process Achieved this Goal?" 13 J. Transnat'l L. & Pol'y 393 (2003-2004)

Zhu Jingwen and Han Dayuan, *Research Report on the Socialist Legal System with Chinese Characteristics*, vol. 1 (Singapore: Enrich, ed. 2013)

Zhu, Jingwen, "China Law Development Report 2012: China Legal Workers' Professionalization," *Frontiers of Law in China*, vol. 8, no. 4 (Dec. 2013)