# EXHIBIT 21

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| HUAWEI TECHNOLOGIES, CO., LTD. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO. LTD., et al.,<br><br>Defendants. | Case No. 16-cv-02787-WHO<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| SAMSUNG ELECTRONICS CO., LTD, &<br>SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>HUAWEI TECHNOLOGIES, CO., LTD,<br>HUAWEI DEVICE USA, INC., HUAWI<br>TECHNOLOGIES USA, INC., & HISILICON<br>TECHNOLOGIES CO., LTD.,<br><br>Counterclaim-Defendants. | |

# REPORT OF JEAN-SÉBASTIEN BORGHETTI

April 27, 2018

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1. I am a professor of private law at Panthéon-Assas (Paris II) University, in France, where I have been on the faculty since 2009, and where I teach French contract law and comparative contract law. Before my present appointment, I was a professor at the University of Nantes.

2. In 2009-2010, I was a member of a working group set up by the French Ministry of Justice to draft a reform of the French Civil Code on the subject of contract law. I am also a member of various academic groups involved in codification projects in the field of the law of obligations, both on the French and European levels.

3. I have published widely in the field of French contract law. My curriculum vitae includes a list of all of my publications and describes my background and experience in more detail.

4. I have been retained by Samsung to prepare a report evaluating the rights and obligations under French law of members of the European Telecommunications Standards Institute ("ETSI") that have declared that their patents may be essential to practicing an ETSI standard. I am being compensated for the time spent preparing this report and testifying at the rate of 600 € per hour.

5. Based on my expert knowledge of French contract law, I was asked to answer the following questions:

    I.  **Do Huawei's declarations to ETSI that it is prepared to grant a license to its patents on FRAND terms impose on Huawei any legally enforceable obligation under French Law?**

6. They certainly do. As discussed in more detail below, the intention to create a legally enforceable obligation is clear, both in the ETSI Intellectual Property Rights Policy ("ETSI IPR Policy") and in Huawei IPR licensing declarations ("the Declarations").

    II. **What is the nature of the obligation?**

7. In the Declarations, Huawei stated that it was prepared "to grant irrevocable licenses (…) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy," i.e., on fair, reasonable and non-discriminatory ("FRAND") terms and conditions. Since granting such licenses means concluding license contracts, readiness to grant a license necessarily implies a commitment to accomplish such steps as may be necessary to make the conclusion of such contracts possible. In a business context where the conclusion of contracts can only be the result of negotiations, to negotiate is obviously one of these steps. By making the Declarations, Huawei thus undertook an obligation to negotiate with standards implementers with a view to conclude a license under FRAND terms and conditions.

8. It is well established in French law that negotiations must be carried out in good faith, even when the parties have not formally undertaken to do so. The rule is now explicitly set out in the "new" *code civil*, which came into force in France on October 1st, 2016, and fully restates French general contract law. Article 1104 of the new *code civil* provides: "Contracts must be negotiated, formed and performed in good faith. | This

2

9. provision is a matter of public policy." And article 1112, 1st par., adds on: "The commencement, continuation and breaking-off of precontractual negotiations are free from control. They must mandatorily satisfy the requirements of good faith."

9. The provisions of the new *code civil* only apply to contracts entered into as of October 1st, 2016, or to negotiations entered into or carried over as of that date. It is undisputed, however, that articles 1104 and 1112 of the new *code civil* are mere restatements of the rule that had previously been recognized by case law, in the absence of any provision on the negotiation of contract in the old *code civil* (F. Terré, Ph. Simler & Y. Lequette, *Droit des obligations*, 11th edition, 2013, no. 185).

10. Given the general duty to negotiate in good faith that exists in French law, a formal undertaking to negotiate at a minimum creates an obligation to negotiate in good faith. Indeed, in the context of French law, it is difficult to understand how a party could undertake to negotiate other than in good faith. The obligation to negotiate undertaken by Huawei in the Declarations is thus necessarily an obligation to negotiate in good faith.

11. I therefore am of the opinion that, under French law, the Declarations impose on Huawei, as a patent holder, an obligation to negotiate in good faith towards a license on FRAND terms and conditions with standards implementers who desire a license.

### III. What is the source of the obligation?

12. There are several legal mechanisms that can account for the Declarations' creating the obligation to negotiate in good faith: (1) *accord de principe*; (2) *stipulation pour autrui*; and (3) *engagement unilatéral*. My opinion is that *engagement unilatéral* is the mechanism that is most consistent with the purpose of the ETSI IPR Policy, as well as the purpose and language of the Declarations, but regardless of the precise mechanism, it is clear that under French law the Declarations create an obligation to negotiate in good faith.

*First mechanism:* accord de principe

13. The first mechanism that can account for the creation of the obligation is *accord de principe* (agreement in principle). There is no official definition in French law for *accord de principe*, which is mentioned neither in the old nor in the new *code civil*, but it is generally regarded as an agreement between two parties, whereby they agree to carry out negotiations in good faith with a view to concluding a contract (B. Fages, *Droit des obligations*, 7th edition, 2017, no. 45; J. Flour, J.-L. Aubert & E. Savaux, *Droit civil. Les obligations; 1. L'acte juridique*, 16th ed., 2014, no. 149; see e.g. Cour de cassation, chambre commerciale, 10 January 2012, no. 10-26149). In the present case, the Declarations as such cannot actually create an *accord de principe*, since they are purely unilateral, whereas an *accord de principe* is necessarily bilateral. The Declarations, however, can be understood as an offer to enter into an *accord de principe*. Viewed in that manner, an *accord de principe* is concluded, and the obligation to negotiate in good faith materializes, when a potential licensee expresses its intention to negotiate a license, and thus accepts the offer to enter the *accord de principe*.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*Second mechanism:* stipulation pour autrui

14.  The second mechanism that can account for the creation of the obligation is the *stipulation pour autrui* (stipulation for the benefit of third parties). *Stipulation pour autrui* used to be mentioned at article 1121 of the old *code civil* and is now regulated at articles 1205 to 1209 of the new *code civil*. The new provisions are much more detailed than the former article 1121, but it is undisputed that they are only intended to restate rules and solutions that had been developed by case law on the basis of that article. One can therefore turn to these provisions to know what the conditions and effects of a *stipulation pour autrui* are under French law, regardless of whether it was agreed upon before or after the entry into force of the new *code civil*.

15.  *Stipulation pour autrui* is the legal mechanism whereby the parties to a contract create a right in a third party against one or the other of them, called the promisor. As article 1205 of the new *code civil* puts it: "A person may make a stipulation for another person. | One of the parties to a contract (the 'stipulator') may require a promise from the other party (the 'promisor') to accomplish an act of performance for the benefit of a third party (the 'beneficiary'). The third party may be a future person but must be exactly identified or must be able to be determined at the time of the performance of the promise." As is made clear by this article, it is enough that the beneficiary of the stipulation can be identified at the time when the promisor must fulfill his obligation.

16.  In the present case, the Declarations can be understood as creating an agreement between Huawei and ETSI, consisting in a *stipulation pour autrui* whereby Huawei in effect promises to negotiate in good faith towards a license on FRAND terms with standards implementers who desire a license. Huawei is thus the promisor, and potential licensees are the beneficiaries of this promise (see, discussing the possibility of an obligation to negotiate arising from a *stipulation pour autrui*, M. Mignot, Stipulation pour autrui, in *JurisClasseur Civil Code*, Art. 1205 à 1209, 2016, no. 84-85).

*Third mechanism:* engagement unilateral

17.  The third mechanism that can account for the creation of the obligation is *engagement unilatéral* (unilateral undertaking). In an *engagement unilatéral*, an obligation is created when one party (the debtor) unilaterally decides to undertake a commitment to the other party (the creditor). The consent of the other party is not necessary to create the obligation. *Engagement unilatéral* was not mentioned as a source of obligations by the old *code civil,* and French law previously was reluctant to admit that someone could bind himself through such an undertaking, especially as it was regarded as dangerous for potential debtors. The law has evolved, however, and it is now undisputed that *engagements unilatéraux* do exist in French law and that they are apt to create obligations.

18.  This was recognized quite some time before the recent reform of French contract law (F. Terré, Ph. Simler & Y. Lequette, *op. cit.*, no. 54; J. Flour, J.-L. Aubert & E. Savaux, *op. cit.*, no. 501), both in the *code civil* itself (art. 1589-1) and in case law, with several cases in which French courts have accepted that an *engagement unilatéral* may be valid and create a binding obligation on the person who subscribed the undertaking, especially in the field of business law (J.-L. Aubert & S. Gaudemet, Engagement unilatéral de volonté, in *Répertoire de droit civil*, 2018, no. 37-40). The new *code civil* has confirmed that *engagement unilatéral* can be a source of obligations. As a matter of

4

fact, article 1100 of the new *code civil* sets out that obligations arise out of juridical acts and other sources, and article 1100-1 goes on providing: "Juridical acts are manifestations of will intended to produce legal effects. They may be based on agreement or unilateral." The combination of these two articles makes clear that a unilateral manifestation of will, i.e. an *engagement unilatéral*, can be a source of obligations.

19. Admittedly, the new *code civil* does not give many indications as to when an *engagement unilatéral* can create a valid obligation. The situation here, however, is precisely the type of case in which such an *engagement* makes sense. The patent holder is a professional and there is no risk that, by making such *engagement unilatéral* as may be contained in the Declarations, it will commit itself to something unreasonable, dangerous or beyond its expectations (for a recent example in which the existence of an *engagement unilatéral* has been recognized in the context of contractual negotiations, see Cour de cassation, Première chambre civile, 28 November 2012, no. 11-20674). I therefore regard the present case as one in which French law could and should recognize the existence of a valid *engagement unilatéral*. Understood as such, the Declarations create an obligation on Huawei to negotiate in good faith towards a license on FRAND terms with standards implementers who desire a license.

*Conclusion*

20. There are thus three mechanisms that can account for how the Declarations create an obligation to negotiate in good faith towards a license on FRAND terms. My opinion is that *engagement unilatéral* is the one that is most consistent with the purpose of the ETSI IPR Policy and the Declarations. Whichever analysis is favored, however, the Declarations did create an obligation for Huawei to negotiate in good faith with Samsung, a potential licensee and standards implementer, towards a license on FRAND terms.

**IV. What must a party do to comply with the obligation to negotiate in good faith?**

21. French law offers no precise and exhaustive description of the substance of the duty or obligation to negotiate in good faith. The new *code civil*, in particular, has solemnly confirmed the existence of this duty (art. 1104 and 1112), but gives no precision as to its substance. It is generally agreed that good faith compels the parties to be honest in their dealings with one another (see e.g. F. Terré, Ph. Simler & Y. Lequette, *op. cit.*, no. 185; Ph. Malaurie, L. Aynès & Ph. Stoffel-Munck, *Les obligations*, 9th edition, 2017, no. 464), but it is hard to be any more precise, since the substance of the obligation to negotiate in good faith largely depends on the particulars of any given case, on the exact circumstances in which the negotiations take place, and even on the stage which the negotiations have reached.

22. In the present case, the substance of Huawei's duty to negotiate in good faith is determined first by the Declarations.

23. The Declarations are manifestations of will and therefore qualify under French law as *actes juridiques* ("juridical acts"). Although the *code civil* gives no firm rule on how to interpret *actes juridiques*, it is not disputed that the intention of the person(s) who issued the *acte juridique* is the starting point of any interpretation (see e.g. Ph. Malaurie, L.

Aynès & Ph. Stoffel-Munck, *op. cit.*, no. 772). In the present case, the ETSI IPR Policy and the ETSI Guide on Intellectual Property Rights ("ETSI Guide on IPR") also shed light on the intention of the author of the Declarations.

24. A decisive element here is that the patent holder did not simply agree to negotiate in good faith, but did so by stating that it was prepared "to grant irrevocable licenses (…) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy," i.e. on FRAND terms and conditions. The obligation to negotiate in good faith is therefore oriented towards the conclusion not just of a contract, as is normally the case in any negotiating process, but of a contract whose terms and conditions are FRAND. This is something that must be taken into account when assessing the exact substance of the obligation to negotiate in good faith in the present case.

25. The substance of the obligation additionally depends on the point reached by the negotiations. If the patent holder initiates negotiations with a potential licensee, and if the other party proves to be cooperative and demonstrates its own good faith, the patent holder must at some point during the negotiations make an offer for the conclusion of a license contract under terms and conditions that are FRAND.

26. The obligation to negotiate in good faith subscribed by Huawei in the Declarations therefore requires Huawei to make or accept, at some point in the negotiations, an offer to conclude a license agreement under FRAND terms and conditions, provided the potential licensee has itself negotiated in good faith.

27. In case of a dispute, it is of course ultimately for the judge to determine what a party must do or should have done to comply with the obligation to negotiate in good faith, and it is the judge who will decide if there has been a breach.

28. In view of what has just been said, however, it is possible to say that, in the present case, Huawei would breach its obligation to negotiate in good faith (i) if its behavior revealed its unwillingness to license its patents at all, (ii) if its behavior revealed its unwillingness to license its patents on FRAND terms and conditions, or (iii) if it was manifestly not honest in the course of the negotiations.

### V.   Is it a breach to insist on exorbitant licensing fees?

29. Negotiations following an ETSI declaration must be carried out in good faith and with a view to concluding a license contract under FRAND terms and conditions. In this context, insisting on an exorbitant licensing demand, or a series of such demands, is a breach of the obligation to negotiate in good faith to the extent that it reveals and demonstrates an unwillingness to reach a license on FRAND terms and conditions.

### VI.   Is it a breach to insist on a portfolio license rate without explaining how the offered rate complies with fair, reasonable, and non-discriminatory obligations?

30. As has already been said (see *supra* no. 21 *et seq.*), the substance of the obligation to negotiate in good faith largely depends on the particulars of any given case, on the exact circumstances in which the negotiations take place, and even on the stage which the negotiations have reached. It cannot be denied, however, that an ETSI declaration creates legitimate expectations for a potential licensee that it will be able to conclude a

license under FRAND terms and conditions. If the negotiations between the patent holder and the potential licensee come to a point where the patent holder makes an offer, the potential licensee must thus be able to check that the offered rate complies with FRAND obligations.

31. Depending on the characteristics of the parties to the negotiations, there might be cases where the offeree is in a position to assess whether the rate it has been offered is indeed FRAND. If this is not the case, however, then the patent holder making the offer must provide elements explaining why the rate offered is FRAND. Should the patent holder refuse to do so, it would in effect set an unnecessary obstacle on the way towards concluding a license under FRAND terms and conditions, and would thus breach it obligation to negotiate in good faith.

32. It should be mentioned at this point that in its Huawei v ZTE opinion (see *infra* no. 48), the European Court of Justice (ECJ) noted that, "in the absence of a public standard licensing agreement, and where licensing agreements already concluded with other competitors are not made public, the proprietor of the SEP is better placed to check whether its offer complies with the condition of non-discrimination than is the alleged infringer" (pt 64). While the ECJ opinion is not binding on a court interpreting French contract law (see *infra* no. 48), this point is definitely persuasive and is a further reason to consider that a patent holder who has made an ETSI declaration must explain how the rate it offers complies with FRAND obligations.

33. This is confirmed by article 1112-1 of the new *code civil*, which deals with the information that must be provided by one party to the other in the course of the negotiations. According to the first paragraph of article 1112-1: "The party who knows information which is of decisive importance for the consent of the other, must inform him of it where the latter legitimately does not know the information or relies on the contracting party." Paragraph 3 of that same article further provides: "Information is of decisive importance if it has a direct and necessary relationship with the content of the contract or the status of the parties." In the case of negotiations towards the conclusion of a license on FRAND terms, it makes no doubt that information enabling to assess whether an offered rate complies with FRAND obligations is of decisive importance for the consent of the offeree.

34. Admittedly, the second paragraph of article 1112-1 provides: "However, this duty to inform does not apply to an assessment of the value of the act of performance." This means that, as a rule, one party does not have to inform the other party as to the value of the promise it intends to make. The patent holder who has issued an ETSI declaration has voluntarily limited its freedom to set the price of a license, however, since it has declared its readiness to grant a license on FRAND terms and conditions. It therefore cannot rely on article 1112-1, par. 2, of the new *code civil* to refuse to explain how the offered rate complies with FRAND obligations.

35. While the elements showing that the offered rate complies with FRAND obligations are undoubtedly decisive in the sense of article 1112-1, par. 1, of the new *code civil*, this same provision sets out that they must be provided to the other party only insofar as the latter legitimately does not know the information or relies on the contracting party. Whether a potential licensee legitimately does not know the information cannot be decided in the abstract. It depends on the respective situations of the parties and on the information which they have.

36. An ETSI declaration, however, can be regarded as creating a legitimate reliance in the potential licensee that the other party, which subscribed the declaration, will provide the elements explaining how the offered rate complies with FRAND obligations. As a matter of fact, a negotiation towards a license of FRAND terms and conditions following an ETSI declaration is not an ordinary negotiation, where there are no predefined limitations on the terms and conditions the parties may agree on. Quite to the contrary, a negotiation following an ETSI declaration is towards a license on FRAND terms and conditions, and the potential licensee is therefore entitled to expect that the patent holder will offer a rate that complies with FRAND obligations, if the negotiations come to the point where such an offer is made. But the potential licensee cannot just rely on the patent holder's word that the offered rate is indeed FRAND. It needs some elements to assess if this is true, and the patent holder's ETSI declaration results in its legitimately relying that the patent holder will provide these elements.

37. Paragraph 4 of article 1112-1 of the new *code civil* further provides: "A person who claims that information was due to him has the burden of proving that the other party had the duty to provide it, and that other party has the burden of proving that it has provided it." Once we accept that the patent holder has the duty to explain why the rate it offers is FRAND, this text makes it clear that the burden of proof rests on the patent holder, which has to demonstrate that it has discharged its obligation to provide the potential licensee with the explanatory elements needed. This is actually an application of the general rule on the burden of proof, set out at article 1353 of the new *code civil* (formerly art. 1315 of the old *code civil*): "A person who claims performance of an obligation must prove it. | Conversely, a person who claims to have been discharged must establish satisfaction or circumstances which have resulted in the extinction of the obligation." Besides, it should be noted that article 1112-1, par. 5, of the new *code civil* explicitly provides that the parties can neither limit nor exclude the information duty set out in the previous paragraphs.

38. In the context of a negotiation in good faith towards a license on FRAND terms and conditions, it is therefore a breach to insist on a license rate without explaining how the offered rate complies with FRAND obligations. The fact that the proposed license rate concerns a whole portfolio does not alter that conclusion. It might indeed make the explanation even more necessary, in so far as the characteristics of the rate may be more difficult to assess for the offeree when a great number of licenses are bundled up together.

### VII. Is it a breach to seek an injunction against a willing licensee in the middle of negotiations before the parties had reached an impasse?

39. Seeking an injunction may constitute a breach of the duty to negotiate in good faith when it shows that the patent holder is trying to coerce the potential licensee into concluding a license contract under terms and conditions that are not FRAND. Generally, it is a breach of the FRAND commitment for a patent holder to seek an injunction when the patent holder has acted in bad faith.

40. That said, seeking an injunction is not necessarily a breach of the obligation to negotiate in good faith. Whether it is a breach in a particular case depends on the particular facts and circumstances of the negotiations, including the stage of negotiations and the negotiating history of the parties.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**VIII.    What is the protocol set forth in the Huawei v ZTE opinion that allows a SEP owner to pursue injunctive relief?**

41.  The Huawei v ZTE opinion by the European Court of Justice (ECJ) sets forth a five-step protocol controlling the possibility for a standard essential patent (SEP) owner to pursue injunctive relief without breaching the prohibition of abuse of dominant position set out in article 102 of the Treaty on the Functioning of the European Union (TFEU), in the case where the SEP owner holds such a position.

42.  The first step of the protocol set forth by the ECJ is that the SEP owner must alert the alleged infringer of the infringement complained about by designating the specific SEPs that have been infringed and specifying the way in which those SEPs have been infringed.

43.  It is then for the alleged infringer to take the second step, by expressing its willingness to conclude a licensing agreement on FRAND terms for the noticed patents.

44.  The SEP owner must then take the third step and present to the alleged infringer a specific, written offer for a license on FRAND terms for the noticed patents, in accordance with the undertaking given to the standardization body, specifying, in particular, the amount of the royalty and the way in which that royalty is to be calculated.

45.  The fourth step is again the alleged infringer's, who must diligently respond to that offer, in accordance with recognized commercial practices in the field and in good faith, a point, says the Court, "which must be established on the basis of objective factors and which implies, in particular, that there are no delaying tactics." If the alleged infringer refuses the offer made by the SEP owner, then it must submit to the latter, promptly and in writing, a specific counter-offer that corresponds to FRAND terms.

46.  It the SEP owner rejects this counter-offer, then it is again for the alleged infringer to take a further step. It must, from the point at which its counter-offer is rejected, provide appropriate security, in accordance with recognized commercial practices in the field, for example by providing a bank guarantee or by placing the amounts necessary on deposit. The calculation of that security must include, inter alia, the number of the past acts of use of the SEPs, and the alleged infringer must be able to render an account in respect of those acts of use.

47.  If those five steps are taken, then the SEP owner will not be allowed to pursue injunctive relief. Moreover, even if an alleged infringer fails to take steps four and five, the SEP owner will still be barred from pursuing injunctive relief if it has failed to follow steps one and three. These steps set forth three requirements: (1) the SEP owner must provide specific notice of which SEPs are infringed (2) the SEP owner must explain the way in which those SEPs are infringed to the alleged infringer and (3) the SEP owner must make a specific, written offer on FRAND terms for the specific noticed SEPs. Failure to meet any of these requirements should prevent a SEP owner from pursuing injunctive relief.

### IX. Is the Huawei v ZTE opinion persuasive authority for a tribunal applying French contract law?

48. It must be made clear at the outset that the Huawei v ZTE opinion by the ECJ is not a binding authority for a tribunal applying French contract law. The obvious reason why it is so is that the ECJ only has jurisdiction to give preliminary rulings on the interpretation of the European Union Treaties and on the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union (art. 267 TFEU). It therefore has no jurisdiction to interpret other acts, and especially private acts such as contracts or unilateral undertakings. The Huawei v ZTE opinion has to do first of all with abuses of dominant position as prohibited by article 102 TFEU and determines the steps which a SEP owner must take before it can pursue injunctive relief.

49. Yet, it would be normal for a French court to take into account the ECJ opinion when interpreting an ETSI declaration. Generally speaking, national courts in the European Union increasingly pay attention to opinions from other national courts or the ECJ, even they are not bound to do so, in order to avoid unnecessary divergences between the laws of the Member States. An opinion of the ECJ in particular carries substantial weight, even if it is not binding, and it is certainly authority which a French attorney would put forward and which a French court would take into consideration.

50. One French case presents an example where a French court chose to follow the ECJ opinion in Huawei v ZTE even though it was technically not bound to do so. In that case, decided by the Marseilles commercial court of first instance (*tribunal de commerce de Marseille*, 20 September 2016, no. 2016F01637), the court explicitly relied on the Huawei v ZTE opinion to decide that an intellectual property rights broker had acted lawfully when threatening injunctive relief. The court held the broker did so because it had followed the procedure set forth in Huawei v ZTE.

51. In its decision, the French court expressly cites points 60 and 63 of the ECJ opinion: "'60. Accordingly, the proprietor of an SEP which considers that that SEP is the subject of an infringement cannot, without infringing Article 102 TFEU, bring an action for a prohibitory injunction or for the recall of products against the alleged infringer without notice or prior consultation with the alleged infringer, even if the SEP has already been used by the alleged infringer. (…) 63. (…) it is for the proprietor of the SEP to present to that alleged infringer a specific, written offer for a license on FRAND terms, in accordance with the undertaking given to the standardization body, specifying, in particular, the amount of the royalty and the way in which that royalty is to be calculated.'" The court then goes on immediately to say: "this same opinion provides that, if it seeks to have the use of SEPs by a third party prohibited, the SEP owner must first of all give notice to that third party by giving him the list of the patents concerned, by explaining to him to what extent these patents are used in the standard concerned, so that conformity to the standard entails the use of the patents, by offering him a license for these patents on justified financial terms."

52. Because the broker had followed the requirements set forth in the first step of the Huawei v ZTE protocol, the French court held that the broker was not at fault for sending a letter threatening injunctive relief. This decision illustrates that the Huawei v ZTE opinion is at least persuasive authority for a French tribunal analyzing the behavior of a SEP owner.

### X.   Is it a breach to not revise an offer after the underlying portfolio of patents substantially changes?

53.   The FRAND commitment requires patent holders purporting to make a FRAND offer to provide a reasoned basis for the terms of the offer. This will often include the number of patents involved, the quality of patents involved, the sales of the infringer and other factors.

54.   It is possible that, during the course of negotiations, the underlying portfolio on which the FRAND offer was based will change significantly. For example, the patent holder may transfer a substantial number of patents out of the portfolio; or it may acquire a net set of patents from a third party; or some of the patents in the portfolio may be deemed invalid by a court of law.

55.   Good faith requires that the patent holder should inform the potential licensee of any significant change in the portfolio during the course of negotiations. Such information is also required under article 1112-1, par. 1 & 3, of the new *code civil*, which governs the information duties of the parties in the course of negotiations (see *supra* no. 33). Besides, if the significant change occurs after a FRAND offer has been made, good faith requires that the patent holder either should revise its offer, or that it should explain why the offer remains FRAND despite that change.

### XI.   Is it a breach to seek an injunction against a potential licensee for specific patents when the pre-injunction offer was only on a portfolio "bundle" basis?

56.   As discussed above, seeking an injunction may not be consistent with FRAND principles. This is particularly the case when the patent holder did not offer to license only the patents for which the patent holder now seeks an injunction. There is obviously a chance that the patent holder may be presenting a coercive bundled offer that violates FRAND principles by leveraging the threat of injunctive relief for a few patents to induce a potential licensee to sign a license to a broad-based portfolio.

57.   It may happen, for example, that a patent holder will make an offer to license its whole portfolio of patents, but the potential licensee will reject this offer, even though the offer may be made on FRAND terms and conditions, because the potential licensee is using only a small fraction of these patents. In such a case, if the patent holder would like to pursue injunctive relief, FRAND principles require that the patent holder should make a genuine FRAND offer on the specific patents for which it seeks injunctive relief, or that it should explain and give good reasons why the offer it is making covers more patents than those for which it is seeking injunctive relief.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| | |
|---|---|
| April 27, 2018 | |
| Date | Jean-Sébastien Borghetti |

12

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## MATERIAL CONSIDERED

- ETSI Intellectual Property Rights Policy (Nov. 30, 2011)
- ETSI Guide on Intellectual Property Rights ( Nov. 30, 2011)
- ETSI IPR Information Statement and Licensing Declaration Form
- European Cour of Justice, 16 July 2015, case C-170/13,  *Huawei Technologies Co. Ltd v ZTE Corp., ZTE Deutschland GmbH*
- Tribunal de commerce de Marseille, 20 September 2016, case no. 2016F01637, *Société WIKO S.A.S. c. Société SISVEL UK LTD*
- Huawei's Public Complaint
- ETSI Declarations and Contributions of Huawei (filed in support of Huawei's Complaint)
- Samsung's Motion To Enjoin Huawei To Enforce The Injunction Issues By The Intermediate People's Court In Shenzen
- Huawei' Opposition To Samsung's Motion To Enjoin Huawei To Enforce The Injunction Issues By The Intermediate People's Court In Shenzen
- Samsung's Reply In Support Of Samsung's Motion To Enjoin Huawei To Enforce The Injunction Issues By The Intermediate People's Court In Shenzen
- Other Materials and Sources Cited Herein
- Other Publicly Available Cases and Information