# EXHIBIT 22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

HUAWEI TECHNOLOGIES CO., LTD.,
HUAWEI DEVICE USA, INC., and HUAWEI
TECHNOLOGIES USA, INC.

        Plaintiffs / Counterclaim-
        Defendants,

   v.

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA,
INC.,

        Defendants / Counterclaim-
        Plaintiffs,

   and

SAMSUNG RESEARCH AMERICA,

        Defendant,

   v.

HISILICON TECHNOLOGIES CO., LTD.,

        Counterclaim-Defendant.

Case No. 16-cv-02787-WHO

**REBUTTAL EXPERT REPORT OF PROFESSOR JACQUES RAYNARD**

**May 25, 2018**

## I.      Background and Qualifications

1.      My name is Jacques Raynard. Since 1993, I have been a Professor of Law at Montpellier University, College of Law.  Before my present appointment, I was Professor of Law at Lyon University.  I also teach regularly at the Center for International Studies in Intellectual Property at Strasbourg University.  I teach industrial property law (with a focus on patent rights) and French contract law at both the undergraduate and graduate levels.  I have published widely in the fields of patent law and French contract law. I am Director and writer of the monthly chronicles "Patents" published by the French review "Propriete industrielle" Jurisclasseur-LexisNexis.  I participate frequently in academic and professional symposia on patent law.  In January 2018, I managed a professional symposium regarding the "WIPO arbitration center and ETSI FRAND licenses" in Paris.

2.      As set forth below, this declaration is based upon my expert knowledge of French industrial property law, specifically the law regarding patent rights, and French contract law.

3.      My curriculum vitae is attached hereto as Exhibit A.  I am being compensated for my work in this litigation at a rate of €500 per hour.  No part of my compensation depends on the outcome of this litigation or the opinions expressed in my report.

## II.     Case Background & Assignment

4.      I understand that the current dispute between Samsung and Huawei entails litigation regarding patents that have been declared to be standard essential to 3GPP and ETSI cellular standards.  I understand that both Huawei and Samsung contend that they possess substantial portfolios of such patents, and have irrevocably committed to ETSI, under the terms of that organization's intellectual property rights policy, that they will license those patents on

fair, reasonable, and non-discriminatory (FRAND) terms, subject to reciprocity.  I understand that the ETSI IPR policy states that it is to be governed by French law.

5.      I understand that Samsung has, in the opening round of expert reports for this litigation, submitted the report of Jean-Sebastien Borghetti, who provided his opinions on the "rights and obligations under French law of members of the European Telecommunications Standards Institute ("ETSI") that have declared their patents may be essential to practicing an ETSI standard," as well as responses to certain questions posed in his report.[1]

6.      I have been retained by counsel for Huawei to provide a response to certain of the opinions offered by Prof. Borghetti regarding his interpretations of the requirements of the ETSI IPR policy under French law.  My failure to respond to any particular opinion offered by Prof. Borghetti should not be taken as my agreement with it.

7.      The sources I have considered when developing my opinions in this matter are disclosed in this rebuttal report and the attached Appendix B.  My consideration of such information is consistent with the practices of experienced professionals in my field.  The opinions and conclusions contained in this report are based on the information that has been made available to me to date and are therefore subject to change based on newly available information or further developments in, or relevant to, this case.

**III.   Opinions on the Requirements of the ETSI IPR Policy Under French Law**

8.      Below I provide my opinion in response to several questions posed to me by counsel for Huawei regarding the requirements of French law.

---

[1] Expert Report of Jean-Sebastien Borghetti (April 27, 2018) ("Borghetti Report"), ¶ 4.

***Question 1: What is the relationship between the French legal regime governing patent licenses and the ETSI undertaking to be prepared to grant licenses to essential patents on FRAND terms?***

9.      In order to understand the obligations flowing from the ETSI undertaking, it is helpful to understand the legal framework and requirements applicable to patent licenses, which are treated somewhat differently from other contracts, under French law. According to French case law, endorsed by scholars, a patent license is analyzed as a lease contract.[2]

10.      A patent license contract is also regulated by special provisions contained in the French Intellectual Property Code.  Specifically, Article L. 613-8, last paragraph, of the French Intellectual Property Code provides: "*The acts referred to in the first two paragraphs which comprise assignment or license shall be executed in writing, on pain of nullity*."[3] This means that patent license agreements can only be formed in writing.  Regarding the formation of a contract generally, French civil law usually follows the principle of *consensualism* (that is, a contract is formed by the mere meeting of the wills of the parties), but French law also knows some formal contracts, the formation of which are subject to certain formalities. This is the case for a patent license. A formal writing is not a condition of proof but a form requirement in absence of which the contract does not exist, despite the intent of the parties (form requires *ad validitatem*).

11.      Under French law, a patent license contract is also considered as an *intuitus personae* contract.[4]  The doctrine of *intuitus personae* is somewhat difficult to define with

---

[2] *See* J-J. Burst, *Breveté et licencié: leurs relations dans la licence volontaire,* Litec, 1970; JM. Mousseron, *Traité des brevets, Litec,* 1984, § 37 s., *having the same opinion in* Ph. Malaurie, L. Aynès, Ph. Stoffel-Munck, *Les contrats spéciaux*, Litec, 8th ed., Défrénois 2016, §161; J. Raynard and J-B. Seube, *Contrats spéciaux*, Lexis Nexis, 9th éd., 2016, § 320.

[3] The French language version reads: "*Les actes comportant une transmission ou une licence, visés aux deux premiers alinéas, sont constatés par écrit, à peine de nullité.*"

[4] *See* Fr. Pollaud-Dullian, *La propriété industrielle*, Economica, 2010, §695; J. Raynard et al., *Droit de la propriété Industrielle*, Lexis Nexis, 2016, § 734.

precision, but it rests on the principle that the identity of the counter-party is an essential feature of the contract. The critical features of the counter-party can rest on objective (linked with special ability of the contractor) or subjective (particular confidence in the contractor) factors, but the doctrine of *intuitus personae* means that in the context of a license, the licensee's specific identity is considered essential to the will of the licensor to grant the license.

12.     Nothing in the ETSI undertaking under French law can interfere with these critical principles.  Although the degree to which *intuitus personae* is applicable can be debated after an ETSI undertaking has been signed and submitted, nothing in the ETSI IPR Policy justifies or requires that the doctrine of *intuitus personae* be ignored for purposes of a FRAND license to patents subject to the ETSI undertaking.

***Question 2: Do you agree with Professor Borghetti's opinion that a patent owner's declaration to ETSI indicating that it is prepared to grant a license to its patents on FRAND terms imposes a legally enforceable obligation on that party under French law?***

13.     Yes, although the ETSI undertaking cannot itself be viewed as creating an enforceable *license* agreement because it leaves critical terms that are essential to the formation of a license agreement to be determined (including the price and identity of the licensee), the obligation of a patentee who has executed an ETSI declaration stating that it is prepared to grant a license to its essential patents on "fair, reasonable, and non-discriminatory" ("FRAND") terms is to negotiate in good faith with those who would be interested in obtaining such a license of the patent(s) (commonly referred to as standards implementers).  This obligation on the part of a party who has executed an ETSI undertaking to be prepared to grant a license on FRAND terms and conditions is enforceable by implementers that seek such a license for the purpose of implementing the relevant standards.  I understand that this is common ground between Professor Borghetti and me.

4

14.     The legal purpose of the ETSI undertaking is to limit the freedom of SEP holders to refuse to enter into negotiations, or to condition a license on the acceptance of non-FRAND terms and conditions. In my opinion, the patentee's obligation is primarily restrictive in nature, rather than affirmative. The patentee who has made an ETSI declaration is not generally bound to affirmatively do something. There is no precise object to the obligation. But the patentee is prohibited from refusing to enter into negotiations with those who are seeking a FRAND license. This type of obligation is referred in French civil law as an 'obligation not to do something' (*obligation de ne pas faire*).

***Question 3: Do you agree with Professor Borghetti's opinions concerning the nature and source of such obligations?***

15.     Professor Borghetti proposes several legal theories to explain enforceable effect of ETSI undertakings, but he favors interpretation of the undertaking as an *engagement unilateral*.[5]  In the past, French civil law did not generally acknowledge this mechanism, but the French Civil Code was amended by the Ordonnance of 10 February 2016. Article 1101-1 of the amended Civil Code now provides that "*Legal acts are expressions of will intended to produce legal effects. They can be conventional or unilateral*."[6]  This new provision of the Civil Code may support the interpretation of a patentee's ETSI declaration as an *engagement unilateral de volonté* to enter into negotiation towards a license on FRAND terms. However, this new provision of the Ordonnance is enforceable only after 1 October 2016; in my view, it is not

---

[5] Borghetti Report, ¶ 20.

[6] Article 1100-1 Civil Code (the French language version reads: "*Les actes juridiques sont des manifestations de volonté destinées à produire des effets de droit. Ils peuvent être conventionnels ou unilatéraux.*").

entirely certain that an ETSI declaration given before this date could be deemed such a binding *engagement unilateral de volonté.*

16.     As Professor Borghetti notes, another interpretation of the ETSI undertaking is as an "*accord de principe,*"[7] which is an agreement with the sole effect of obliging parties to enter into negotiation.[8]  While such an agreement to negotiate typically requires the consent (meeting of the wills) of the two parties, I tend to think that the doctrine of *"accord de principe"* best explains the nature of an SEP holder's commitment under ETSI declaration as an obligation of a patentee who has published an ETSI declaration to negotiate in good faith with those who are interested in getting a license for the purpose of implementing the relevant standard.

### *Question 4: What must a party do to comply with the obligation to negotiate in good faith under French Law?*

17.     In the past under French law, the obligation to negotiate in good faith was only defined in the case law. The Ordonnance of 10 February 2016, however, altered the French Civil Code to add a special sub-section dedicated to the issue of good faith generally.

18.     The fundamental rule is stated by article 1112 of the French Civil Code, which provides that although parties have freedom in the process of initiating, conducting, and even breaking off negotiations, "[t]he requirement of good faith must be satisfied."[9] Fundamentally, this provision reflects the principle of freedom of contract, which is the foundation of French contract law.

---

[7] Borghetti Report, ¶ 13.

[8] *See* Cour de Cassation, Soc., JCP G, 1958, II, n° 10868, note J. Carbonnier (24 mars 1958)

[9] The French language version reads: "*L'initiative, le déroulement et la rupture des négociations précontractuelles sont libres. Ils doivent impérativement satisfaire aux exigences de la bonne foi.*"

19.     French doctrine emphasizes – and has always "*been very strongly concerned*" with – freedom in the period and process of negotiation.[10]  This focus on maintaining the freedom of parties in the process of negotiation frames the behavior expected of such parties. Ultimately, the emphasis of freedom in the context of negotiation means that the obligation to negotiate in good faith does not impose any specific or rigid set of requirements:  multiple paths are consistent with good faith negotiations.  As Professor Borghetti notes "*the obligation to negotiate in good faith largely depends on the particulars of any given case.*"[11]  As discussed in more detail below, it is for this fundamental reason that I view many of Professor Borghetti's suggestions that the duty to negotiate in good faith imposes specific requirements in the context of the negotiation of a license pursuant to the ETSI undertaking to be unsupported.

***Question 5: Does a party breach its obligation to negotiate in good faith by making an initial offer or offers that are above the level at which it expects to conclude an agreement?***

20.     The answer is no.  This question touches on the concept of the "fair price" ("*juste prix*") under French contract law, and its relationship to the requirement of negotiating in good faith.  I first address this question according to the general principles of French contract law, and then assess whether anything in the ETSI undertaking requires a departure from these general principles.

21.     As a general matter, the requirement of negotiating in good faith under French law does not restrict a party's ability to make an initial offer or offers with an eye towards further negotiation. Commenting on new provisions of the French civil code about negotiations, and

---

[10] O. Deshayes, Th. Genicon, Y. Laithier, *Réforme du droit des contrats du régime général et de la preuve des obligations, Lexis Nexis, 2016 (*hereinafter "Deshayes"*),* at 74 (the French language version reads: "*la jurisprudence a toujours manifesté un attachement très fort à la liberté à ce stade.*").

[11] Borghetti Report, ¶¶ 21, 30.

regarding French case law, some authors who specialize in civil law have stated: "*the unfolding of the negotiations means that everyone can lead the discussion as they see fit and make the proposals which alone appear to him to be relevant in particular without having to make* <u>*altruistic*</u> *proposals (there is there a limit that even principle of good faith could not allow to overcome).*"[12]  More clearly, other French *civilistes* authors write: "*the duty of good faith does not oblige one to protect the interests of others to the detriment of his own.*"[13]

22.     Clearly, in a general context, negotiating in good faith does not prevent a party from attempting to strike a "good deal."  Particularly, this doctrine applies to the issue of price, which is often one of the most sensitive issues in the contract.  A famous case illustrating this issue is the *Baldus* case, in which the French *Cour de cassation* ruled expressly that, despite a duty to contract in good faith, the buyer of old photos did not have to inform the seller of their value.[14]

23.     The reason for this policy is simple.  French civil law has always refused to impose a general doctrine of fair price.  Rather, French civil law has always considered that the issue of price is highly subjective and depends fundamentally on the sole intent of the parties and of their agreement.  As explained in a French treatise of civil law, the "*requirement of contractual justice has not been received because of the threat it poses to the security of*

---

[12] Deshayes at 75 (the French language version reads: "*le déroulement libre des négociations signifie que chacun peut mener la discussion comme bon lui semble et faire les propositions qui seules lui paraissent pertinentes notamment sans avoir à faire de propositions altruistes (il y a là une limite que même le principe de bonne foi ne pourrait permettre de franchir)*").

[13] Ph. Malaurie, L. Aynès, Ph. Stoffel-Munck, *Droit des Obligations*, Defrénois, 2016, n°459, p. 257 (the French language version reads : "*le devoir de bonne foi n'oblige pas à protéger les intérêts d'autrui au détriment des siens*").

[14] Cour de Cassation, Civ. I, n° 98-11381 (3 mai 2000).

*transactions*," so the "*French civil code is in compliance with a tradition of subjective determination of price*."[15]  French case law is in strict respect of this doctrine, as illustrated by the following quote from the *Cour de Cassation*: "*As Mrs. D. had given the disputed acts an agreement devoid of vice, those acts were valid even if the price was lower than the value of the thing*."[16]

24.     The ETSI undertaking does not alter the obligations of the parties with respect to their initial offers. The ETSI IPR Policy, and specifically the FRAND requirement, do not necessarily dictate a single objective price to the license contract, certainly not without significant clarification of the specific other terms to be agreed to between the two relevant parties.  It is explicitly contemplated that FRAND licenses entered into pursuant to the ETSI undertaking are to be the product of bilateral negotiations.  Given that expectation, it is not inconsistent with the ETSI undertaking or obligation of good faith for either party (the patent holder or the implementer) to begin negotiations in a fashion that allows it to maintain bargaining room, but ultimately the obligation to negotiate in good faith requires the parties to engage constructively in an attempt to bridge their differences and reach an agreement on FRAND terms, of which there can be no assurance.

***Question 6: Does French law impose any specific obligation on the part of a patent holder to explain why an offered rate is fair, reasonable, and non-discriminatory?***

25.     The answer is no.  My answer relies primarily on three legal grounds.

---

[15] Fr. Zenati & Th. Revet, *Droit civil, Contrats*, PUF, 2014, §§ 110-111, p. 212.

[16] *See* Cour de Cassation. Civ. I, n° 86-13513 (13 avril 1988); Cour de Cassation. Com., n° 09-10219 (7 avril 2010); Cour de Cassation. Com., n° 10-28787 (13 décembre 2011); Cour de Cassation. Civ. I, n° 01-10271 (7 décembre 2004).

26.     First, as noted earlier, a patent license is considered to be a lease contract.[17]
Consequently, a patent license is regulated by the legal regulation relating to the lease of things
in the French Civil Code[18] and special articles in the French Intellectual Property Code.[19]  The
French Civil Code, which sets forth the lessor's obligations in Article 1719 *et seq.*, does not
impose any general duty to disclose information on the lessor.  Indeed, the lessor has to deliver
the thing leased to the lessee, to maintain the thing in a state that permits the use for which it was
leased, and to secure to the lessee a peaceful enjoyment for the duration of the lease.[20]  An
obligation of disclosure is not imposed on the licensor by the French Intellectual Property Code,
either. There is a formal difference with the Civil Code regulation for sale contracts, which, by
contrast, does provide a special obligation of disclosure, which is borne by the seller.[21]  The
explanation for this difference is straightforward:  a sale contract produces a definitive effect
which transfers ownership to the buyer, whereas the lease continues its effects over time, and
lessor has an obligation to maintain the thing in a state and a duty of warranty.  So it is not
possible to rely on the special regulation of lease contract or license to identify a duty of
disclosure on the part of a patent holder as licensor.

27.     Second, if we consider general provision of French Civil Code, Article 1112-1,
which has been introduced by the reform of 2016, it imposes what we refer to as a "*duty of
information*" providing that "*the party who knows an information which is of a decisive*

---

[17] *See above* ¶ 9.

[18] *See* French Civil Code, Article 1713 s.

[19] *See* French Intellectual Property Code, Article L. 613-8.

[20] *See* French Civil Code, Articles 1719 *et seq.*

[21] *See* French Civil Code, Article 1602 (in addition, many special provisions further develop the
obligation).

*importance for the consent of the other party must inform him of this where the latter is legitimately ignorant of this information or relies on his contracting party.*"[22]  Paragraph 3 of the same text adds: "*Information is of decisive importance if it has a direct and necessary relationship with the content of the contract or status of the parties.*"[23]  However, the duty to inform imposed by Article 1112-1 is subject to a critical limitation; Paragraph 2 states expressly "*Nevertheless, this duty of information does not apply on the assessment of the value of the performance.*"[24]

28.     My colleague, Professor Borghetti, relies on Article 1112-1 to justify a duty to inform on the part of the patent holder as licensor, particularly about the basis for offered rates of the license.[25]  However, it is recognized that the duty to inform imposed by Article 1112-1 applies only when four conditions are met:  (1) the party on whom the duty of disclosure is to be imposed is in possession of the information; (2) the information in question must be decisive for the consent of the counter-party; (3) the counter-party must legitimately lack the information or must rely on his contracting party; and (4) the information cannot concern the value of the contractual performance.[26]  Regarding the present case, two of these requirement are relevant and undermine the notion that a patent holder that has made an ETSI undertaking has any

---

[22] French Civil Code, Article 1112-1 (the French language version reads:  "Celle des parties qui connaît une information dont l'importance est déterminante pour le consentement de l'autre doit l'en informer dès lors que, légitimement, cette dernière ignore cette information ou fait confiance à son cocontractant.").

[23] French Civil Code, Article 1112-3 (the French language version reads:  "Ont une importance déterminante les informations qui ont un lien direct et nécessaire avec le contenu du contrat ou la qualité des parties.").

[24] French Civil Code, Article 1112-2 (the French language version reads:  "*Néanmoins, ce devoir d'information ne porte pas sur l'estimation de la valeur de la prestation.*").

[25]  Borghetti Report, ¶¶ 30-38.

[26] *See* Deshayes at 80-83.

11

obligation under French contract law to provide any particular explanation of the basis for any offer it has made, as I explain below.

29.     The third requirement noted above for the imposition of a duty to inform is very important:  information is due to the one who was legitimately ignorant or lacking the information.  In this way, French law takes into account the skill and ability of the parties.[27] French "*civilistes*" authors point out that the duty of information is connected with an "*unbalanced*" position of the parties regarding their skill and knowledge about the contract. Actually the principle is that each party has the duty to inform itself, and it is for the "*unbalanced*" contract in which the weakness of one party contrasts with the skill of the other (a professional – customer/consumer relationship, for example) that "*the duty to inform himself is replaced by the right to be informed by the contracting partner*."[28]  In the case of a patent license concluded between two worldwide companies, such as Huawei and Samsung, it is unlikely that there would be such an imbalance in the skill and knowledge of the parties justifying the imposition of a duty to inform.

30.     The fourth requirement for imposing a duty of information is even more critical to the question at hand:  the duty to inform expressly does not extend to matters relating to the value of the performance.  "*There is a firm and clear limit [to the duty of information]. This explains that assessment of the value of goods and services is by principle a risk which each party takes in charge*."[29]  This limit complies with the French doctrine of contractual price,

---

[27] *See* Deshayes at 82.

[28] *See* Fr. Zenati et Th. Revet, *Droit civil, Contrats*, PUF, 2014, § 61, p. 141 (French language version reads "*le devoir de s'informer remplacé par le droit d'être informé par l'autre*").

[29] *See* Deshayes at 83 ( French language version reads: *Linformation ne doit pas porter sur la valeur de la prestation"il y a là une limite ferme et precise (.). celà explique que l'évaluation des biens et des service soit par nature un risqué à la charge de chacun"*).

which has always refused to adopt a notion of an objective fair price and has always considered that the issue of price remains subjective and depends of the sole intent of the parties and of their agreement.[30]

31.     Indeed, even for a non-negotiated contract/contract of adhesion (*contrat d'adhésion*), as to which the French Civil Code voids any unfair clause that causes a significant imbalance in the parties' rights and obligations, Article 1171 of the Civil Code states that the "*assessment of significant imbalance does not apply to either the object of contract or to the adequacy of price.*"[31]

32.     Therefore, I see no basis to conclude that a general ETSI undertaking could have so radical an effect as to eradicate the French conception of contractual price as to which there can be no duty to inform; on this issue I disagree strongly with my colleague Prof. Borghetti's conclusion.[32]

33.     My conclusion that French contract law imposes no duty on the part of a patent holder to provide any particular level of explanation of the manner in which it ascertained or derived the price terms it has offered is reinforced by the fact that Professor Borghetti offers no standard by which the adequacy of such an explanation can be judged.  There may, of course, be practical limitations on the ability of a patent holder subject to an ETSI undertaking to explain fully the basis for its offer.  Indeed, in French practice, it is widely acknowledged that license agreements in competitive technological industries, such as telecommunications industry, are highly confidential and, therefore, the parties are typically unable to disclose information that

---

[30] *See above* ¶¶ 20-24.

[31] The French language version reads: "*L'appréciation du déséquilibre significatif ne porte ni sur l'objet principal du contrat ni sur l'adéquation du prix à la prestation.*"

[32] *See* Borghetti Report, ¶ 34.

would show that the rates offered are consistent with their prior license agreements.  Of course, if the parties disagree on this point, they may resort to adjudication of the dispute by a third party, where confidentiality concerns can be more easily addressed.  In this context, the willingness of a party to engage in such a third party adjudication in order to overcome confidentiality concerns is suggestive of that party's good faith.

34.     Finally, although, as I explain below, the European Court of Justice's decision in Case C-170/13 (*Huawei v. ZTE*) is not binding and directly related to the interpretation of the duty of good faith under French law. I note that my position regarding the absence of a duty to explain price terms offered is consistent with the ECJ's directive that an SEP holder should, if it wishes to avoid potential liability under European competition law in later seeking injunctive relief, specify "the amount of the royalty and the way in which that royalty is to be calculated."[33] Obviously, for an offer to be effective, it must specify the price and the manner in which the price would be charged going forward.  This does not suggest, however, that any particular level of justification for or explanation of how the rate was developed is required.

***Question 7: As a matter of contract, does the ETSI FRAND undertaking prohibit a party from seeking injunctive relief to halt infringement of its standard essential patents?***

35.     The answer is no.  The mere effect of an ETSI FRAND undertaking is to compel the patent holder to negotiate in good faith with an implementer of the patented technology.[34] According French law, if negotiations are not successful, the use of the patented technology without the patentee's authorization constitutes a violation of the patentee's rights.  Any violation of the rights of the owner of a patent constitutes an infringement that paves the way to

---

[33] *Huawei v. ZTE*, European Court of Justice (ECJ), Case No. C- 170/13 (16 July 2015), at ¶ 63.

[34] *See above* ¶ 16.

injunctive relief.[35]  To conclude that the ETSI FRAND undertaking forecloses the availability of injunctive relief would be to give it the effect of a license, which as I have said, is not consistent with French law.  The European Court of Justice (ECJ) decision in the *Huawei v. ZTE* case is consistent with this analysis.  Regarding European competition law, and its prohibition of abuse of a dominant position, ECJ allowed a patent holder, who had signed an ETSI declaration, to bring an action for infringement seeking an injunction prohibiting the infringement of its patent in a situation where negotiations failed.[36]

36.     Although I understand that consideration was previously given to including provisions regarding the availability of injunctions in the ETSI IPR Policy, no such provisions have ever been adopted and the ETSI IPR Policy says nothing on the subject.  Thus, the ETSI IPR Policy leaves the availability of injunctive relief exclusively to the discretion of the relevant national courts.  Pursuant to the ETSI IPR Guide, ETSI members are invited to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner or in the frame of a mediation process.  If this process fails: "*It should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes*."[37]  This means that each relevant national court, which retains its own jurisdiction, is the only entity that is entitled to decide in what circumstances a remedy like injunctive relief should be available.[38]  Likewise, each national court decides what national law has to be applied to assess infringement of the patent,

---

[35] *See* French Intellectual Property Code, Articles L. 615-1, L. 615-3.

[36] *See below* ¶¶38-46.

[37] ETSI IPR Guide, § 4.3.

[38] It goes without saying that patents issued by a particular country generally can only be litigated within that specific country.

likely the law of the country for which protection is claimed.[39]  The ETSI FRAND undertaking has nothing to do with these questions.  French law governs the assessment of the effect of the ETSI declaration,[40] and so on the process of formation of the FRAND license with negotiations steps; however, the infringement of a patent and whether it is appropriate to issue injunctions to cease infringement are governed by the law of the patent-issuing country or region.

**Question 8: Under French Law, is it a breach of the ETSI FRAND licensing commitment to seek injunctive relief on specific patents when the pre-injunction offers were made only on a standard essential patent portfolio basis?**

37.     As noted above, the ETSI undertaking and ETSI IPR Policy do not address, and therefore impose no limitations on, the circumstances in which a patent holder may seek injunctive relief in connection with infringement of its standard essential patents.  Accordingly, there is no basis in the ETSI undertaking or French contract law to impose an obligation that a pre-suit offer limited to the specific patents later asserted, as opposed to a portfolio of the patent holder's standard essential patents that includes the asserted patents (e.g., the patent holder's portfolio of patents essential to a particular relevant standard), must have been made.  I note in this regard that portfolio licensing is both common and permissible under French law.[41]

---

[39] This is the case for European national courts. *See* Article 8 of Regulation No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations - Rome II ("*The law applicable to a non-contractual obligation arising from an infringement of an intellectual property right shall be the law of the country for which protection is claimed.*").

[40] *See* ETSI IPR Policy, Article 12.

[41] See *Cour d'appel de Paris, 4ᵉ ch., 13 avril 1959, Sarl Ent. Besson c. Gasse, Annales PI., 1959, p.228 - Me Mathely*, an authorized patent lawyer, stated about payment of royalties in portfolio licensing: *"If several patents are licensed, and if it is not stipulated that the royalty is divisible, it continues to be due in full, even when one of the patents has expired"* (*P. MATHÉLY, Le Nouveau droit français des brevets d'invention, Ed. JNA, 1991, p.335*).

***Question 9: What role, if any, does the protocol set forth in the ECJ's decision in* Huawei v. ZTE *play in interpreting compliance with the obligation to negotiate in good faith under French law?***

38.     The protocol set forth by the European Court of Justice (ECJ) in the case C-170/13 (*Huawei v. ZTE*) suggests a way of negotiating in good faith, but cannot be considered as a binding framework for negotiating a FRAND license, or definitely establishing compliance (or lack thereof) with contractual obligations under the ETSI undertaking pursuant to French law.

39.     At the outset, it must be said that an ECJ decision applying European competition law is not binding on a national court applying French contract law.  I agree fully with my colleague Prof. Borghetti on this issue.[42]

40.     In the *Huawei v. ZTE* matter, the ECJ addressed questions posed by a German tribunal directed to whether an action for infringement seeking an injunction prohibiting that infringement brought by the proprietor of an SEP, having signed an ETSI declaration, against the alleged infringer of that SEP — which requested the conclusion of a licensing agreement — is to be characterized as an 'abuse of a dominant position' within the meaning of Article 102 of the Treaty on the Functioning of the European Union (TFEU), and, accordingly, whether such an action must be dismissed.

41.     The ECJ concluded: "the proprietor of a patent essential to a standard established by a standardisation body, which has given an irrevocable undertaking to that body to grant a licence to third parties on fair, reasonable and non-discriminatory ('FRAND') terms, does not abuse its dominant position . . . by bringing an action for infringement seeking an injunction

---

[42] *See* Borghetti Report, ¶ 48.

prohibiting the infringement of its patent or seeking the recall of products for the manufacture of which that patent has been used."[43]

42.     Therefore,  the main purpose of the decision was to decide, solely under European competition law, if the patentee who is negotiating a FRAND license, after having made an ETSI undertaking, is still allowed to seek an injunction for infringement of his patents if the parties do not reach an agreement. And the answer was yes.

43.     It is undisputable that ECJ has full jurisdiction regarding the assessment of European competition law regulations.

44.     In its decision, ECJ imposed a prerequisite to the SEP holder's action: both parties have to negotiate in good faith toward entering the FRAND license.  In this way, the ECJ is setting up a process of negotiation in good faith characterized by a dialog between SEP holder and implementer, with different required steps.  However, this decision cannot be interpreted to impose a mandatory process of negotiation as a matter of French contract law.

45.     It is especially important to note that the ECJ does not have the ability to regulate the negotiation of the contract, and particularly to settle when a negotiation is in good faith. Indeed, the civil law of contract regulation is not within the legal scope of European law.  ETSI is a private organisation, not a European official institution; ETSI rules are not European regulations.  Therefore, the legal effect of the ETSI undertaking is not governed by European law but by the national law of France.[44]  As we have seen, the ETSI IPR Guide invites ETSI members to resolve any dispute related to the application of the IPR Policy bilaterally in a

---

[43] *Huawei v. ZTE*, European Court of Justice (ECJ), Case No. C- 170/13 (16 July 2015) (statement of ruling).

[44] *See* ETSI IPR Policy, Article 12.

friendly manner or in the frame of a mediation process; if this process fails: "*It should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes*."[45]  This means that ECJ has no jurisdiction to apply the French law of contract, and therefore cannot set a mandatory framework for negotiation in good faith of a FRAND license in the context of the ETSI undertaking under French law. Nor does ECJ have jurisdiction to rule on the validity of patents or assess their essential character (unlike the national judges of the particular patents declared to ETSI).[46]  To be clear, solely the national judges have full jurisdiction to rule and to apply the French law of contract to assess conditions of negotiations between patentee and user. It is also clear that a national judge, applying French law, can deem that parties have negotiated in good faith according to French rules and French case law, even if the patentee, or both parties, do not follow the framework and the different steps suggested by ECJ in the *Huawei v. ZTE* case.[47]

46.     In this context the protocol set forth by the ECJ in the *Huawei v. ZTE* case suggests a way of negotiating in good faith but cannot be considered as a binding framework, with mandatory steps, for an SEP holder and implementer who seek to negotiate a FRAND license covered by the ETSI undertaking under French law.

---

[45] ETSI IPR Guide, Section 4.3.

[46] *See Core Wireless Licensing v. LG Electronics France*, TGI Paris, Soc., (17 avril 2015) (where the Tribunal ruled that patents were not 'essentials').

[47] J. Raynard, *Propriété industrielle*, (Décembre 2015), n° 12, chronique « Brevets », n° 20. Also, J. Raynard and others *Droit de la Propriété industrielle*, Lexis nexis, 2016, n° 730, p. 422: what the Court of Justice does "is quite wrong, whereas the rules of the ETSI IPR Policy are subject to French law" ("lexercice [de la Cour de Justice] est tout a fait malvenu, aors même que les règles de l'ETSI IPR Policy sont soumises à la loi française").

***Question 10:  Do you agree with Professor Borghetti's conclusion that good faith requires the patent holder inform the potential licensee of any significant change in its portfolio during the course of negotiations?***

47.      The answer is no.  There are several important factors that one would need to consider before one could conclude that any duty to inform regarding changes in a patent holder's portfolio might arise during the course of negotiations.

48.      First, one would need to consider the status of the negotiations at the time of any change in the patent holder's portfolio occurred, including whether the parties are actively negotiating at that time.  In defining the contractual negotiation regime, the French academic scholars indicate: "This is the exploratory period during which the future contractors exchange their points of view, formulate and discuss the proposals they make to each other in order to determine the content of the contract".[48]  Indeed rules of negotiation assume that parties are talking about the contract into which they want both to enter. The assessment of good faith is linked to the behaviour of parties: if there is no actives exchanges between parties, there is no negotiation. One party cannot wait and impose to the other an active obligation to give information whose scope is not precisely defined.  Thus, a patent holder would not be expected to inform a potential licensee of changes to its portfolio to the extent that the parties are not in active negotiations.  Likewise, if the parties are in litigation over their licensing dispute at the time of a patent transfer, as opposed to engaged in the kind of bilateral negotiations contemplated by the ETSI IPR Policy, one would expect that such information, to the extent relevant at all,

---

[48] F. Terre, Ph. Simler, Y. Lequette, *Droit civil*, Les obligations, Dalloz, 2009, n°184, p.190 (French language version reads:"*La négociation contractuelle: On désigne ainsi la période exploratoire durant laquelle les futurs contractants échangent leurs points de vue, formulent et discutent les propositions qu'ils se font mutuellement afin de déterminer le contenu du contrat (.)*")

would be conveyed under the auspices of the relevant court rules and proceedings rather than in the context of negotiation that presumably have broken down.

49.     Second, one would need to consider the extent to which the changes in the patent holder's overall portfolio affect or relate to the specific portfolios or patents that are the subject of the parties' active license negotiations. To the extent that the changes in question do not relate to the portfolio or patents that have been the subject of the parties' negotiations, no such duty to inform can arise.

50.     Third, one would need to consider the significance of the change in the patent holder's portfolio in the context of the parties' negotiations.  According to the Civil Code, the duty of inform concerns only "*information which is of decisive importance for the consent of the other*". [49]  Commenting this legal provision French academic scholars note the restrictive terms used by the Code and indicate "*the information debtor does not have to tell everything, obviously*". [50]  As a result, the French *Cour de cassation* ruled that franchisor did not breach his duty to inform his franchisee because circumstances, and franchisee's behaviour, revealed that "*information on the local market did not belong to the elements that appear to determine the consent of the other (franchisee)*". [51]  This means that the scope of the duty to inform is strictly restricted to the elements that appear to determine the consent of the other.  In the case at stake, if, for example, the parties' negotiations have not centered on the specific patents or the precise number of patents in the parties' portfolios, changes in number or identify of the constituent

---

[49] Article 1112-1 Civil code: "*une information dont l'importance est déterminante pour le consentement de l'autre*").

[50] Deshayes at 81.

[51] Cour de Cassation, Com., n° 14-15701 (5 janvier 2016) *(French language version reads: "l'information sur le marché local n'était pas un élément essentiel et déterminant pour M. X...").*

patents may be of no real significance.  Likewise, if the changes do not materially affect the scope

and overall value of the rights to be conveyed via the license under consideration, information

concerning those changes would not be deemed *decisive* within the meaning of the new Art.

1112-1, discussed above.

51.     Fourth, as discussed in Paragraph 29 above, one would also need to consider the

skills and abilities of the parties involved before concluding that one owes the other a duty to

inform.  In this regard, it is important to note that the portfolios of firms like Huawei and

Samsung are constantly changing, both through organic growth (the receipt of newly-issued

patents), expirations, and patent acquisitions and divestitures.  This is to be expected and is well-

known to sophisticated parties.  If such parties are involved negotiations, they would be expected

to ascertain the information in this regard they deem important through their own efforts without

imposition of a duty on either party to volunteer related information to the other.  In this respect

one would also consider the extent to which information concerning the changes in a patent

holder's portfolio is likely to be publicly-available via, for example, recordation of patent

assignments with the relevant patent authorities like the U.S. Patent & Trademark Office.

52.     Finally, as to Professor Borghetti's related suggestion that, if a significant change

in a patent holder's portfolio takes place after an offer has been made, good faith requires patent

holder to change its offer or explain why no change is required,[52] I disagree.  Whether a party

should update its offer would depend critically on the context (the nature of the change in

portfolio, the status of the parties' negotiations, etc.) and the patent holder's view of the effect of

the change on the value of the subject portfolio.  In any event, for the reasons set forth in

Paragraphs 30-31 above, a patent holder is under no obligation under French contract law to

---

[52] *See* Borghetti Report, ¶ 55.

provide any level of explanation or justification for the price terms it offers regardless of whether there have been intervening changes in its portfolio.

***Question 11: Is it permissible under French Law or the obligation to negotiate in good faith for a patent holder to insist that a cross license cover both standard essential and non-standard essential patents when the other party has expressed a desire to limit the license to SEPs?***

53.     As an initial matter, it is clear that parties have the freedom to license both SEPs and non-SEPs together if they mutually agree to such an approach.  The ETSI undertaking does not prohibit expressly such practice, which is common in the field of communication technologies.

54.     A second situation, very different, is the one where a SEP holder who has made an ETSI declaration demands, against the counter-party's wishes, either that the counter-party take a license to the SEP holder's non-SEPs or that it grant to the SEP holder a license to all of the counter-party's patents (including non-SEPs) as a condition for granting a license to the SEP holder's essential patents.  Such situations raise concerns under competition law, and the practices are not clearly absolved by the principle of freedom of contract.  Indeed, such requirements involve potential duress which may vitiate the consent of the implementer.  In the context of essential patents, this behavior could fall within the scope of article 1143 of the Civil Code: "There is also duress where one contracting party exploits the other's state of dependence on him and obtains an undertaking to which the latter would not have agreed in the absence of such constraint, and gains from it a manifestly excessive advantage." [53]

55.     I therefore conclude that an SEP holder cannot, consistent with its obligation of good faith, impose such requirements of licensing non-SEPs to his consent to grant a license to the patent holder's SEPs which are subject to an ETSI FRAND undertaking.

---

[53] French Civil Code, Article 1143.

Executed on May 25, 2018.

_____
Jacques Raynard

# **<u>Appendix A</u>**

# CURRICULUM VITAE

**Jacques RAYNARD**

Born on March 21 1961 in Montpellier , France

Address : 39 rue de l'Université, 34000 Montpellier
Married, 4 children

*Professeur Agrégé* (Tenured University Professor) at the *Faculté de Droit (Law* School) of the University of Montpellier (Private Law and Criminal Sciences) National competitive Examination passed in 1991.

*Professor at the CEIPI* (Center for International Studies in Intellectual Property) University Strasbourg, France.

*Doctor Honoris Causa* of the University of Heidelberg (2005)

*Visiting Scholar at Queen Mary Colle*ge – London 2009/2010

### Academic track record

| | |
|---|---|
| 1993- Present | Professor at University of Montpellier (F) |
| 1991-1993 | Professor at the University of Lyon (F) |
| 1991 | *'Agrégation' (national Competitive examination)* in Private Law and Criminal Sciences |
| 1989 | PhD in Law - Laureate of the *Académie Française* – VIARD award |
| 1984 | Loubers award (best student Phd academic record at the Law School of Montpellier). |
| 1983 | Laureate of the Law School of Montpellier. |

## ACADEMIC AND UNIVERSITY ACTIVITIES

1. **Teaching**

   - Classes in civil law; business law and intellectual property (patents) at the law School of Montpellier mainly to first and second year students and fifth year students;

- Classes at the Center for international Studies in Intellectual Property of the University Robert Schuman in Strasbourg

> *Class on Transfer Contracts techniques (contracts of exploitation of IP rights)

> *Class on "Employees inventions"

## 2. Research

### 2.1 Publications

**a) Books**

- *Manuel de Droit de la propriété industrielle, brevets, marques, dessins et modèles*, Litec, en collaboration avec E. Py et P. Treffigny, 2016, 1ère éd.

- *Manuel de Droit civil - Contrats spéciaux*, Litec, en collaboration avec JB-Seube, 8ème éd. 2015 (500 pages environ).

- *Trente ans de Droit de la distribution*, Dir. ouvrage collectif, Litec, coll. Actualités Droit de l'Entreprise, 2007.

- *Technique contractuelle*, 4ème éd. 2010, avec P. Mousseron et J.-B. Seube (1.000 pages environ)

- *Manuel de Droit du commerce international*, en collaboration avec JM. Mousseron†, Professeur à la Faculté de Droit de Montpellier, R. Fabre, Maître de conférences à la Faculté de Droit de Montpellier, J.L. Pierre, Professeur associé à la Faculté de Droit de Lyon III, Litec, 3ème éd. 2003 (500 pages).

- *Manuel de Travaux dirigés de droit des Obligations*, en collaboration avec P.H. Antonmattéi, Professeur à la Faculté de Droit de Montpellier, Litec, 4ème éd. 2003 (avec la collaboration de J.-B. Seube, Pr. à la Réunion). Le manuel a ensuite été réédité par J-B.SEube, P.Puig et Cl. Mouly.

- *Grands arrêts du Droit des affaires*, Paris, Sirey, 1993, 2ème éd. 1995 (ouvrage collectif publié sous la direction de D. Vidal, J. Mestre et E. Putman, rédaction de la rubrique *« Propriétés incorporelles »*).

- Thesis *« Droit d'auteur et conflits de lois – Copyright and conflict of laws »* (essai sur la nature juridique du droit d'auteur), Paris, Litec, 1990 (743 pages).

**b) Journals**

- Director and writer of the monthly chronicles *"Brevets Patents"* Published by the French review *"Propriete industrielle"* Jurisclasseur-LexisNexis.

- Writer in the annual Journal *"Brevets et savoir faire industriels"* Patents and industrial *"Know-how"* published by the *"Dalloz"*.

2

- Writer of the bi-annual journal "*Technique Contractuelle*" published by Jurisclasseur Periodique ed. Entreprise et Affaires

- Periodic participation in ' *Dossiers Brevetrs*' published by "Ecole du Droit de l'Entreprise" under the Direction of JMM then co-directorship with ch Le Stanc of the journal renamed ' *Dossiers de PI*' until 2002 when it gave place to Revue "*Propriété Industrielle*"

**c) Recent articles only**

. Periodic publications over patent case law in the '*Revue de propriété industrielle'*, national review published by Lexis Nexis (annual chronicle over patent case law).

. *Régime des inventions de salariés : l'employeur et son ayant cause, JCP éd. G., n° 13, 26 Mars 2018, 351,* sur Cass.com., 31 janvier 2018, n°16-13262.

. *L'obligation contractuelle de payer des redevances au titre d'une exploitation qui n'est pas couverte par le brevet : Propr. industr. 2016, étude 23,* à propos de CJUE 7 juill. 2016, aff. C-567/14

. *L'incidence de l'annulation du brevet sur le jugement de condamnation définitif antérieur, JCP G 2012, n° 15, p. 728,* à propos de Cass. Assemblée plénière, arrêt, 17 févr. 2012, n° 10-24282.

. *Les secrets d'affaires de l'entreprise : à propos de la proposition de directive sur la protection des savoir-faire et informations commerciales non divulguées,* Etude publiée aux mélanges Michel Germain, LexisNexis et LGDJ, 2016, p. 713s.

. *De l'originalité de la licence de brevet en tant que louage de choses/ The Originality of the Patent License as Lease Contract,* published in Le droit de la propriété intellectuelle dans un monde globalisé, Mélanges J.Schmidt, lexis Nexis, 2013, p. 267.

. *Aspects civilistes des contrats de tranfert de techniques/ Civil Law Aspects of Technology Transfer Contracts,* published in Les contrats de la propriété intellectuelle, Dalloz 2013.

· *Retour sur le savoir-faire non breveté/Back on the unpatented know-how,* study published in « Mélanges G.Bonnet », Litec, 2010.

· *L'exclusivité du juge du titre,* rapport colloque Lyon, juin 2009 Droit international privé et propriété intellectuelle, Dir. C. Nourissat et E.Treppoz, 2010.

**2.2 PhD thesis supervision-main thesis presented:**

● « *International circulation of goods subject to intellectual property rights* », thesis presented by Mlle Sophie Verville to a jury co-managed with pr. A. Prujner, in front of University of Laval (Québec), mai 2012.

● *The Copyright Licence,* thesis presented by M. Alexis Boisson, in December 2014 to a jury co professors Alain Bénabent, André Lucas, Thierry Revet and Christian le Stanc, obtained with honours and congratulations of the jury, nominated for a thesis award and publication.

3

- *" Contract Resolution Through Unilateral Denunciation"* thesis presented by Ms Aurélie BRES in December 2008 to a jury co professors Denis Mazeaud, Thierry Revet and Didier Ferrier, obtained with honours and congratulations of the jury, nominated for a thesis award and publication.

- *"Contract For Communication Of un-patented Know-how"* thesis presented by Ms Dania FAHS - December 2007 to a jury composed of professors Jean-Christophe Galloux, Hervé lécuyer, and Christian Le Stanc with honours and jury congratulations.

- *"International Judiciary and Arbitration Litigation Over Patents"* thesis presented by Ms Anne-Catherine CHIARINI in November 2005 to a jury of professors Jacques Azema, Eric Loquin, Yves REboul, sylvaine Perruzetto and Christian Le Stanc with honours and congratulations of the jury and publication in the Bibliothèque du Droit de l'entreprise – prefaced by J. Raynard; and recipient of the prize Cercle Montesquieu in 2007.

- The *" appellation d'origine controlé"' AOC labeling* thesis presented by  Ms Sévenine CAUSSE at the Law School of Reims to a jury composed of professors Jacques Azema, Michel Menjucq, Yves Reboul with honours and jury congratulations.

- *"The Electronic Signature"* thesis presented by Mr Pascal AGOSTI in May 2003 to a jury composed of professors Jérôme Huet, Jean DEvèze, Eric Caprioli with honours and jury congratulations.

- *" Relation Between the Artwork and Its Material Support"* presented by Ms Laurence BREUKER in 2001 to a jury of professors Christophe Caron, Christian Le Stanc, Michel Vivant with honours and jury congratulations;

- *" The Links Between The Author and His/her Artwork"* presented by Ms Claire DELEBECQUE-NEIRAC in December 1999 to a jury of professors Jean-marc Mousseron, André Lucas, Yves Reboul, Michel Vivant;

- *"Reservation of Audiovisual Artwork"* presented by Ms Christine HUGON at the Law School of Montpellier in 1993 to a jury of Professsors P. Sirineli, JM Mousseron, Christian Le Stanc, and Michel Vivant with honours and congratulation of the jury , recipient of the thesis award of the Law School in 1992/1993 and published by the bibliothèque Droit de l'entreprise, book 31, recipient of a grant from the national Education Ministry.

Participation to various jurys of PhD thesis partilularly in IP and contract Law.

## 2.3 Symposiums and contributions

Contribution to various academic symposiums on Intellectual property and contract law

*Examples*

**Grenoble CUERPI**

- November 2003 : Uniqueness or Plurality of Intellectual Properties

  – November 2004: Employees Creations and inventions

  – November 2007: Arbitration and IP Rights.

**Université Lyon III**

June 2009 : " Intellectual Property and International Private Law" dir. Scientifique C. Nourissat et E.Treppoz

**Strasbourg CEIPI**

- Avril 2010: Towards An European Patent Court - symposium managed by the CEIPI; Strasbourg, Parlement Européen,

- February 2011:  Intellectual Property Enforcement in Europe: Acquis and Future Plans, meeting managed by CEIPI - EIPIN « Constructing European IP : Achievements and New Perspectives » - Strasbourg, Parlement Européen, 25 février 2011

**Université PARIS**

 - Décember 2010, *Contractual Prerogatives*, Revue des Contrats - Annual Symposium.

**FNDE**

  – Director and regular contribution to one-day symposiums organized by the FNDE (national Foundation for Company law relative to annual French and European case-law relative to patents, Distribution Law, IP Law and contractual Techniques attended by professionals, attorneys and judges).


  **2. 4: Scientific directorship**

  – Directorship of the *Bibliothèque  de Droit de l'Entreprise*  collection of French thesis in private law and business law ( over 70 titles published)


  **4.   Administrative and pedagogical activities**

  – Following professors Jean Marc Mousseron and Jean Jacques Daigre, I have been the President of the FNDE which rallies 11 French Law School centers of Business Law counseling (DJCE) and organizes substantial professional education courses in area of Intellectual Property.

**5.  Missions abroad**

-   Beyrouth, Lebanon – February 1995 – teaching classes in Contract Law at the La Sagesse law School

-   Rome, Italy , IDLI Institute – 12-hour class on 'Transfer of techniques contracts' to French-speaking  lawyers of developing countries ( 1992, 1993, 1994, 1997, 1998…).

-   Quebec, Canada -September 1995 '*The Contractual Negotiation*' symposium of University of Montpellier and university of Laval.

-   Canton, Republic of China November 1996, Lecture on *Transfer of  Techniques Contracts* organized by the Chinese patent Office and the French National Institute of Intellectual Property.

-   Tunis, Tunisia, class teaching on '*Transfer of  Techniques contracts*' and lecture on the Evolution of French Contract Law at the Université Sciences Sociales et juridiques of Tunis in March 1997, March 1998, April 1999.

-   London, UK Visiting Professor at Queen Mary College, academic year 2009/2010

6.  **Non Academic Activities**: regular activity as expert in the field of industrial property and as arbitrator.

7.  **Languages :** English

6

Identities person or entity from whom I have received compensation or funding for professional services, including in connection with a litigation, during the preceding five years.

VERON ET ASSOCIES : janvier 2018
BIGBEN INTERACTIVE SA : février 2018
Société CHAVANOZ Industries : mai 2018

HUAWEI TECHNOLOGIES Co Ltd : janvier 2017 et mai 2015
Cabinet SCHERTENLEIB : avril 2017
DE PARDIEU BROCAS MAFFEI : juillet 2017
As arbitrator : Système U Sud c. SAS La Carbonnière, SA Marisand, SAS Karist : septembre 2016 et septembre 2017
Arbitrage as arbitrator : Soc. NAIM MARKET c. SAS Ed Franchise : avril 2016

Société HOLDING GRADEL-HG: janvier 2015
SOCIETE AFNOR: juillet 2015
Arbitrage as arbitrator : MAM Babyartikel Gmbh, Knokin baby Gmbh, Bamed Gmbh / CILAG: juillet 2015
Procédure arbitrage as arbitrator : Aune-Dynalis/Lefebvre : janvier et septembre 2015
Arbitrage as arbitrator ITM  ENTREPRISES c. soc. OZAGORA et Giorgio : novembre 2015
As arbitrator Société ERTECO / Société HAGECO : novembre 2015

Procédure arbitrage as arbitrator  VALEA/ITM : avril 2014
Arbitrage Laboratoires as arbitrator : Polivé SAS / MAM Babyartikel Gmbh, Knokin baby Gmbh, Bamed Gmbh : mai 2014
BODUM : août 2014 / avril 2015)
Arbitrage soc. ITM c. FRENIL DISTRIBUTION et M. Michel DUNOYER : septembre 2014
VERON & ASSOCIES : décembre 2014

RHODIA OPERATIONS : mars 2013
BAYER CropScience LP : octobre 2013
As arbitrator Arbitrage Soc. Lamotte Distribution c. Société Amidis & Cie : octobre 2013
Arbitrage as arbitrator Danone v. Mme Desamparados Fuster Soler, etc., octobre 2013
Arbitrage as arbitrator SAS VIVELYS : décembre 2013

Pr. Jacques Raynard

# **<u>Appendix B</u>**

**<u>Appendix B - Materials Considered</u>**

**<u>Court Papers:</u>**

Cour de Cassation, Civ. I, n° 86-13513 (13 avril 1988)

Cour de Cassation, Com., n° 09-10219 (7 avril 2010)

Cour de Cassation, Com., n° 10-28787 (13 décembre 2011)

Cour de Cassation, Civ. I, n° 01-10271 (7 décembre 2004)

Cour de Cassation, Civ. I, n° 98-11381 (3 mai 2000)

Cour de Cassation, Com., n° 14-15701 (5 janvier 2016)

Cour d'appel de Paris, 4ᵉ ch., Sarl Ent. Besson c. Gasse, Annales PI., 1959 (13 avril 1959)

Cour de Cassation, Soc., JCP 1958, II, n° 10868, note J. Carbonnier (24 mars 1958)

*Core Wireless Licensing v. LG Electronics France*, TGI Paris, Soc., n° 14-14124 (17 avril 2015)

*Huawei v. ZTE*, European Court of Justice (ECJ), Case No. C- 170/13 (16 July 2015)


**<u>Court Rules:</u>**

French Intellectual Property Code, Articles L. 613-8, L. 615-1, L. 615-3

French Civil Code, Articles 1100-1, 1112, 1143, 1171, 1602, 1713, 1719

Article 1112 of Ordonnance n ° 2016-131 of February 10th, 2016 on the reform of the law of the contracts, the general regime and the proof of the obligations, available at https://www.legifrance.gouv.fr/eli/ordonnance/2016/2/10/JUSC1522466R/jo/texte

Article 8 of Regulation No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations - Rome II

Article 102 of the Treaty on the Functioning of the European Union (TFEU) by the German tribunal


**<u>Publications:</u>**

ETSI IPR Guide, Section 4.3

ETSI IPR Policy, Article 12

Fr. Pollaud-Dullian, *La propriété industrielle*, Economica, 2010

Fr. Zenati et Th. Revet, *Droit civil, Contrats*, PUF, 2014

J. Raynard et al., *Droit de la propriété Industrielle*, Lexis Nexis, 2016

J. Raynard and J-B. Seube, *Contrats spéciaux*, Lexis Nexis, 9th éd., 2016

J. Raynard, *Propriété industrielle*, n° 12, chronique « Brevets », n° 20, Décembre 2015

F. Terre, Ph. Simler, Y. Lequette, *Droit civil*, *Les obligations*, Dalloz, 2009, n°184, 2013

J-J. Burst, *Breveté et licencié: leurs relations dans la licence volontaire,* Litec, 1970

JM. Mousseron, *Traité des brevets, Litec*, 1984

O. Deshayes, Th. Genicon, Y. Laithier, *Réforme du droit des contrats du régime général et de la preuve des obligations*, Lexis Nexis, 2016

Ph. Malaurie, L. Aynès, Ph. Stoffel-Munck, *Droit des Obligations*, Defrénois, 2016, n° 459

Ph. Malaurie, L. Aynès, Ph. Stoffel-Munck, *Les contrats spéciaux*, Litec, 8th ed., Defrénois, 2016