# EXHIBIT 3

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| HUAWEI TECHNOLOGIES, CO., LTD. et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO. LTD., et al.,<br><br>  Defendants.<br><br>SAMSUNG ELECTRONICS CO., LTD, &<br>SAMSUNG ELECTRONICS AMERICA, INC.<br><br>  Counterclaim-Plaintiffs,<br><br>v.<br><br>HUAWEI TECHNOLOGIES, CO., LTD,<br>HUAWEI DEVICE USA, INC., HUAWEI<br>TECHNOLOGIES USA, INC., & HISILICON<br>TECHNOLOGIES CO., LTD.,<br><br>  Counterclaim-Defendants. | Case No. 16-cv-02787-WHO |

**REBUTTAL EXPERT REPORT OF JERRY A. HAUSMAN**
May 25, 2018

****HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY****

tools for over 100 years which allow for this quantification.  In my first report I estimate that the consumer surplus loss from an injunction following from the hold-up problem could be ███████████████████.[41]  Dr. Padilla never compares this type of economic welfare loss to consumers to the potential loss from hold-outs, nor does he take it into account in his discussion of FRAND royalty rates.

14. Dr. Padilla states: "injunctive relief is certainly consistent with FRAND where the patent holder has acted consistently with its FRAND licensing obligations but the putative licensee has not demonstrated a willingness to take a license on FRAND terms."[42]  In this case significant doubt exists regarding whether Huawei made FRAND offers to Samsung ███████████████████████ under the non-discrimination provision of FRAND, as I discussed above.  However, I believe that Dr. Padilla misunderstands the basis for injunctive relief.  Above I quoted Dr. Padilla's statement that "[i]n general, economists seek to achieve outcomes that maximise the economic welfare of society (the benefits that consumers and producers obtain from engaging in economic activities)."[43]  Thus, according to this logic the desirability of an injunction should be evaluated based on whether it will increase the economic welfare of society and not based solely on the nature of the negotiations between Huawei and Samsung.  Considering only Huawei and Samsung in this regard omits the tens of millions of consumers in the U.S. and the billions of consumers worldwide who purchase cell phones and who use them for cellular calls, messages, and connecting to the internet.  Thus, I

---

[41] I performed this type of consumer surplus calculations in my published academic works over 20 years ago, and it is widely recognized in the academic literature.
[42] Padilla Report, ¶5.1.
[43] Padilla Report, ¶3.22.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

disagree with Dr. Padilla's approach of focusing on the nature of the Huawei-Samsung negotiations. Instead, analysis of a possible injunction should be based on economic welfare, which is similar to the Supreme Court's use of the "public interest" as one of the factors that should determine whether an injunction should be granted, as I discussed in my first report.

15. In ¶5.5 of his report Dr. Padilla claims that limiting the availability of injunctions can harm consumer welfare by reducing incentives for innovation. But Dr. Padilla ignores that injunctions also affect consumer welfare because an injunction is equivalent to a tax on consumers who prefer to buy the product that is subject to an injunction. Indeed, in my academic research (and in U.S. ITC proceedings) I have developed this approach and used it in the same manner as I did my first report.[44] It is well known that taxes distort competition and economic behavior. The distortion to competition and economic welfare caused by the injunction "tax" can be quantified using the economic tool of consumer surplus. In my first report I find that this loss of consumer surplus would be ██████████████ ██████████████ ██████████████████[45] ███████████████████████ ███████████████████████████████████████████.[46] ████████

---

[44] J. Hausman, "Valuation and the Effect of Regulation on New Services in Telecommunications," *Brookings Papers on Economic Activity: Microeconomics*, 1997, pp. 1-38; J. Hausman, "Cellular Telephone, New Products and the CPI," *Journal of Business and Economic Statistics* 17, 1999, pp. 188-194; J. Hausman, "Mobile Telephone," in *Handbook of Telecommunications Economics*, eds. M. Cave et al., 2002; J. Hausman, "Sources of Bias and Solutions to Bias in the CPI," *Journal of Economic Perspectives* 17, 2003, pp. 23-44.
[45] Hausman Report, ¶36.
[46] I did not include this amount in my first report because some of this incremental profit would be gained by competing firms.

14
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

entire royalty stack cannot be challenged in a single proceeding since many different SEP holders are involved. Many of the patents may be valid and infringed, but the aggregate royalty rate may still be "too high." I do not find Dr. Padilla's proposed solution to be realistic from an economic point of view.

 

                                                          Jerry Allen Hausman
                                                                May 25, 2018

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**