Michael J. Bettinger (SBN 122196)
mbettinger@sidley.com
Irene Yang (SBN 245464)
irene.yang@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
(415) 772-1200 – Telephone
(415) 772-7400 – Facsimile

David T. Pritikin (*Pro Hac Vice*)
dpritikin@sidley.com
David C. Giardina (*Pro Hac Vice*)
dgiardina@sidley.com
Douglas I. Lewis (*Pro Hac Vice*)
dilewis@sidley.com
John W. McBride (*Pro Hac Vice*)
jwmcbride@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000 – Telephone
(312) 853-7036 – Facsimile

*Attorneys for Huawei Technologies Co., Ltd.,
Huawei Device USA, Inc., Huawei Technologies
USA, Inc., and HiSilicon Technologies Co. Ltd.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO., LTD., HUAWEI DEVICE USA, INC., and HUAWEI TECHNOLOGIES USA, INC., <br><br> Plaintiffs / Counterclaim-Defendants, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendants / Counterclaim-Plaintiffs, <br><br> and <br><br> SAMSUNG RESEARCH AMERICA, <br><br> Defendant, <br> v. <br><br> HISILICON TECHNOLOGIES CO., LTD., <br><br> Counterclaim-Defendant. | Case No. 16-cv-02787-WHO <br><br> **HUAWEI'S OPPOSITION TO SAMSUNG'S MOTION TO PARTIALLY EXCLUDE THE REPORT AND TESTIMONY OF JORGE PADILLA, MICHAEL J. LASINSKI, AND CHARLES L. JACKSON AND TO STRIKE THE REBUTTAL OPINIONS OF JACQUES DELISLE AND ZHI DING** <br><br> Hearing Date: August 8, 2018 <br> Time: 2:00 PM <br> Judge: Hon. William H. Orrick <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1

**Table of Contents**

2   I.   INTRODUCTION. ..............................................................................................1

3   II.  APPLICABLE LAW. ........................................................................................3

4   III. ARGUMENT. ....................................................................................................3

5       A.   Mr. Lasinski's Analysis of the Huawei-Apple License Is Supported and
6            Reliable. ................................................................................................3

7       B.   Mr. Lasinski and Dr. Padilla Do Not Opine On French Law. ................7

8       C.   Mr. Lasinski and Dr. Padilla Do Not Inappropriately Summarize Negotiations .....8

9       D.   Dr. Padilla Does Not Improperly "Bolster" Mr. Lasinski's Testimony. ...............11

10      E.   The Court Should Deny Samsung's Motion to Exclude Dr. Jackson's Report. ....12

11           1.   Samsung's argument based on Dr. Jackson's involvement is baseless..........12

12           2.   Dr. Jackson's patent database is reliable. ......................................................13

13           3.   Samsung's request for relief with respect to Dr. Jackson overreaches. .........15

14      F.   Mr. Lasinski's "Indicators of Portfolio Strength" Are Reliable And His
             Analysis Using Those Indicators Is Admissible. ....................................16

15           1.   Mr. Lasinksi's approach to assessing relative portfolio strength. .................16

16           2.   Mr. Lasinski's use of "Approved Contributions" is reliable........................18

17           3.   Mr. Lasinski's use of "Global Deemed SEPs" is reliable. ...........................22

18      G.   Dr. deLisle's Report Is Proper Rebuttal To The Positions Taken By
19           Samsung's Experts in their Opening Reports. ........................................24

20  IV.  CONCLUSION.................................................................................................25

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc.v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014)................................................................................................6

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
   No. C 13-03248 WHA, 2015 WL 138168 (N.D. Cal. Jan. 9, 2015)....................................5

*Clausen v. M/V New Carissa*,
   339 F.3d 1049 (9th Cir. 2003) .............................................................................................21

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...........................................................................3, 5, 12, 14, 16

*Eveler v. Ford Motor Co*,
   No. 16-14776, 2017 WL 3382460 (E.D. La. Aug. 7, 2017)..........................................15

*GPNE Corp. v. Apple, Inc.*,
   No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. April 16, 2014) ....................16

*In re Imperial Credit Industries, Inc. Securities Litigation*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ................................................................................6

*Interwoven Inc. v. Vertical Computer Systems*,
   No. CV 10-04645 RS, 2013 WL 3786633 (N.D. Cal. July 18, 2013)........................ 5-6

*Matthew Enter., Inc. v. Chrysler Grp., LLC*,
   No. 13-cv-04236-BLF, 2016 WL 4272430 (N.D. Cal. Aug. 3, 2016) ..........................25

*Mesfun v. Hagos*,
   No. CV 03-02182 MMM (RNBx), 2005 WL 5956612 (C.D. Cal. Feb. 16, 2005) ........6

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003)............................................................................................3

*Microsoft Corp. v. Motorola, Inc.*,
   No. C10-1823JLR, 2013 WL 4008822 (W.D. Wash. Aug. 5, 2013) ...........................10

*Monsanto Co. v. David*,
   516 F.3d 1009 (Fed. Cir. 2008)..........................................................................................12

*Moussouris v. Microsoft Corp.*,
   No. C15-1483JLR, 2018 WL 2124019 (W.D. Wash. Apr. 25, 2018) ...........................3

*Nelson v. Matrixx Initiatives*,
   No. C 09-02904 WHA,, 2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) ........................6

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
   LLC, 716 F. Supp. 2d 220 (S.D.N.Y. 2010) ................................................................15

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .....................................................................................3

*S.E.C. v. Leslie*,
   No. 5:07-CV-03444-JF, 2010 WL 2991038 (N.D. Cal. Jul. 29, 2010) ......................12

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) .............................................................................12, 14

*Speicher v. Union Pac. R.R.*,
   No. C07-5524-RBL, 2009 WL 250026 (W.D. Wash. Feb. 2, 2009)
   (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)) ...........................3

*TCL Commc'ns. Tech Holdings Ltd. v. Telefonaktenbologet LM Ericsson*,
   No. CV 15-02370 JVS, 2016 WL 6662727 (C.D. Cal. July 7, 2016) ...................13, 15

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
   No. 14-cv-00341-JVS (DFMx), 2017 WL 6611635
   (C.D. Cal. Dec. 21, 2017) ............................................................. 8, 15, 16, 20-21

*United States v. Sandoval-Mendoza*,
   472 F.3d 645 (9th Cir. 2006) .....................................................................................5

**Statutes**

Sherman Act....................................................................................................................11

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(A) ...........................................................................................13

Fed. R. Evid. 702 .........................................................................................................3, 7

Rule of Evidence 703…................................................................................................5, 12

1  Plaintiffs Huawei Technologies Co., Ltd., Huawei Device USA, Inc. and Huawei

2  Technologies USA, Inc. (collectively, "Huawei") hereby oppose Samsung's Motion to Partially

3  Exclude the Report and Testimony of Jorge Padilla, Michael J. Lasinski, and Charles L. Jackson and

4  to Strike the Rebuttal Opinions of Jacques deLisle and Zhi Ding (ECF No. 331-2, hereafter "Mot.").

5  **I.     INTRODUCTION.**

6  Samsung's motion seeks to skew the trial in its favor by excluding the well-supported and

7  reliable testimony of Huawei's expert witnesses whose qualifications it does not contest.  In

8  attempting to reach this end, Samsung consistently mischaracterizes the experts' opinions and the

9  bases for them, and ignores that its own experts have offered parallel opinions on virtually all of the

10  topics Samsung now claims are inappropriate subjects for expert testimony.  At best, Samsung's

11  supposed criticisms of Huawei's experts' go to weight, not admissibility.

12  *First,* in seeking to exclude the testimony of Huawei's licensing expert, Michael J. Lasinski,

13  that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

14  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

15  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Samsung mischaracterizes Mr. Lasinski's central opinion on

16  the subject.  Mr. Lasinski does not opine that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

17  ▆▆▆     Instead, he opines that, if the facts are as he understands them to be (based on substantial

18  evidence), ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

19  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

20  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

21  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Samsung may cross-

22  examine Huawei's witnesses on that topic at trial, but contesting a factual issue is not grounds for

23  peremptorily excluding Mr. Lasinski's opinions about the ▆▆▆▆▆▆▆ .

24  *Second*, Samsung mischaracterizes the opinions of Mr. Lasinski and Huawei economics

25  expert, Dr. Jorge Padilla, in suggesting that they have inappropriately opined on the meaning of the

26  FRAND commitment under French law.  Neither has or intends to offer any such opinions.  They

27  merely recount their understanding of the economic interpretation of "reasonable" and "non-

28  discriminatory" in the FRAND context, citing many of the same sources relied upon by Samsung's

experts on the same subject.  Likewise, their discussions of the parties' negotiation history is both reliable and appropriate subject matter for expert testimony given their areas of expertise and the complexities of this case.  Indeed, Samsung's experts include parallel discussions in their reports.

*Third,* Samsung's suggestion that Dr. Padilla's opinions are offered to "improperly bolster" Mr. Lasinski's reports is wrong.  Dr. Padilla opines on the economic framework for assessing FRAND issues that inform Mr. Lasinski's work, but he does inappropriately vouch for Mr. Lasinski.

*Fourth*, Samsung's claim that Dr. Jackson's essentiality database is unreliable is factually and legally baseless.  As an initial matter, the law is clear that Dr. Jackson could properly rely on the database even if it was prepared without his involvement.  But, here, Dr. Jackson (and another testifying expert, Dr. Zhi Ding) were involved in overseeing the database's preparation and can defend its overall reliability, which Samsung has not undermined in any way.

*Fifth*, Samsung's objection to Mr. Lasinski's approach to measuring SEP portfolio strength rests on a misperception of the purpose for which that measure is principally used – that is, to measure *relative* (rather than absolute) portfolio strength for purposes of analyzing comparable license agreements – and it ignores both the evidentiary support for Mr. Lasinski's approach and the statistical analysis that was done to establish its reliability.  Mr. Lasinski's measure of relative portfolio strength accounts for both a firm's number of contributions that were approved for incorporation into the relevant standards (which is highly correlated to a firm's SEP holdings) and the number of patent families judged to be essential that include coverage in the three key worldwide jurisdictions—the U.S., Europe, and China, where a very high percentage of smartphones are sold and made.  The approach is analytically sound and produces consistent and logical results.

*Finally,* Samsung's objection to the rebuttal report of Dr. Jacques deLisle is unfounded.  Dr. deLisle's report explains the Shenzhen court proceedings that led to the issuance of injunctive relief in Huawei's favor, and responds directly to claims by Samsung's experts that Huawei's injunction actions in China will permit it to extract supra-FRAND royalties from Samsung.[1]

---

[1] Samsung's objection (Mot. 22) to the portions of the rebuttal report of Dr. Zhi Ding in which he compares Huawei's asserted patents to those of ████████████, is also unfounded.  Dr. Ding offered these opinions in the expectation Samsung's expert Dr. Leonard would use the same methodology based on the supposed value of ████████████ patents to value Huawei's asserted patents in his

## II. APPLICABLE LAW.

Fed. R. Evid. 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).[2]   A district court "is given as much discretion in *how* it determines if testimony is reliable as it is given in determining *whether* testimony is reliable." *Speicher v. Union Pac. R.R.*, No. C07-5524-RBL, 2009 WL 250026, at *3 (W.D. Wash. Feb. 2, 2009) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  In determining reliability, a court should attempt to "rule not on the correctness of the expert's conclusions but on the soundness of the methodology." *Moussouris v. Microsoft Corp.*¸ No. C15-1483JLR, 2018 WL 2124019, at *6 (W.D. Wash. Apr. 25, 2018).

Ultimately, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 . . . the expert may testify and the jury decides how much weigh to give that testimony." *Id.* at 564-65 (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).

## III. ARGUMENT.

### A. Mr. Lasinski's Analysis of the ████████████ Is Supported and Reliable.

---

rebuttal report that he used to value Samsung's asserted patents in his opening report.  Dr. Leonard did not do so, and so long as Samsung does not seek at trial to argue that the ████████████ patents should be used as a benchmark for valuing Huawei's patents, Huawei does not intend to elicit testimony from Dr. Ding on that subject.

[2] In patent cases, a court's decision to admit expert testimony under *Daubert* is governed by the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

3

1

2

3

4

5        In light of this context, Mr. Lasinski—who, as part of his analysis, reviewed the parties'

6    potentially comparable licenses—determined that

7                                 then it is incomparable

8                          Samsung contests the factual basis for Mr. Lasinski's opinion, and has

9    attempted to mischaracterize the

10

11        What's more, Samsung improperly seeks to strike not only the portions of Mr. Lasinski's

12   report that relate to                    , but also Mr. Lasinski's analysis of ***other, unrelated*** license

13   agreements.  Mot. 7.  Samsung's motion should be rejected for at least the following reasons.

14        *First*, Samsung's criticism of Mr. Lasinski's analysis is directed not to his conclusion that

15

16                     , but rather to the contested factual issue of whether such an expectation existed.

17   Clearly, Mr. Lasinski is not in a position to decide contested issues of fact, and he does not attempt

18   to do so.  However, there is nothing objectionable or unreliable about Mr. Lasinski's analysis of the

19   [3]

20

21

22                                                 ECF No. 331-4 (Dec'l of
     Sam Stake in Support of Samsung's Motion to Partially Exclude the Testimony of Jorge Padilla,
23   Michael J. Lasinski, and Charles L. Jackson and Strike the Rebuttal Opinions of Jacques deLisle and
     Zhi Ding) (hereafter "Stake") Ex. 1 ¶ 143 n.342.  For example, the court in *TCL v. Ericsson* found
24   that an appropriate 4G aggregate rate would be in the range of 6-10%, and Samsung's own expert,
     Dr. Gregory Leonard, contends ***in this case*** that the appropriate aggregate rate for 4G is 5%.  Stake
25   Ex. 1 ¶ 20; Stake Ex. 5 ¶ 5.

26

27

28



1  agreement based on his understanding of contested factual issues. *Biotechnology Value Fund, L.P.*

2  *v. Celera Corp.*, No. C 13-03248 WHA, 2015 WL 138168 at *3 (N.D. Cal. Jan. 9, 2015) (experts

3  can provide opinions based on assumptions of how the jury will decide contested factual issues.

4  Samsung's attempt to resolve a factual dispute via a *Daubert* motion is improper. *Sandoval-*

5  *Mendoza*, 472 F.3d at 654 (the district judge is "a gatekeeper, not a fact finder").

6      *Second,* Samsung misleadingly implies that the sole basis for Mr. Lasinski's understanding

7  was ███████████████████████████████████ Mot. 6:14-18. In fact, there is

8  substantial record support indicating that ████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ██████████████ Mr. Lasinski appropriately relied upon each of these sources to inform his

17 understanding of ████████████████ *See* Stake Ex. 1 ¶¶ 135-143; Stake Ex. 4 ¶ 22 n.40; Stake Ex.

18 5 ¶¶ 38-39. ████████████████████████████████████████████

19 ███████████████████████████ ; given this, Mr. Lasinski's reliance on discussions with ████

20 ████ to inform his opinions was in no way improper.[6] Rule 703 "does not predicate admissibility

21 [4] *See, e.g.*, Dec'l of Leif Peterson in Support of Huawei's Opposition to Samsung's Motion to
22 Partially Exclude the Report and Testimony of Jorge Padilla, Michael J. Lasinski, and Charles L.
   Jackson and to Strike the Rebuttal Opinions of Jacques deLisle and Zhi Ding ("Peterson
23 Declaration"), Ex. 1 at 219:16-221:15, 232:2-242:17. Hereafter, exhibits to the Peterson Declaration
   will be denoted simply as "Ex." and exhibits to the Stake declaration will be denoted as "Stake Ex."
24 [5] Samsung badly mischaracterizes ████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████ *See, e.g.*, Ex. 2 at 18:20-19:21,
27 92:6-24, 104:5-105:11, 121:14-122:13, 123:11-124:10.
   [6] In support for its motion to exclude Mr. Lasinski's opinions, Samsung cites to *Interwoven Inc. v.*
28 *Vertical Computer Systems* (Mot. 7 n.6), but that case *denied* a motion to strike expert testimony,

5

on the source of the facts or data or, in particular, on whether the source is employed by either of the

parties." *Apple Inc.v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) (*overruled on other*

*grounds by Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015) ("[T]he potential for

bias is an inherent concern . . . addressed by the weight given the expert's testimony, not its

admissibility"). In fact, in *Apple v. Motorola*, the Federal Circuit held that it was "reasonable, and

quite common" for an expert to confer with a party's employees if the information needed was

within their knowledge. *Id.* at 1322; *see also Interwoven*, 2013 WL 3786633 at *9 (holding that

where an expert relied on conversations with an employee to inform his opinion, the employee's

"status as an officer of [the retaining party] does not necessarily taint the source of information" and

any concerns should be addressed via cross-examination).[7]

     *Third,* Mr. Lasinski's reliance on the information described above is well within the scope of

what other qualified experts in the field of FRAND licensing would rely upon. ████████████████

█████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████[8]

reasoning that experts are "permitted to rely on hearsay evidence in coming to their conclusions, so
long as an expert in the field would reasonably rely on that information," and that "[i]t is for a jury
to decide whether [an expert] acted reasonably in relying on [a non-expert]'s assessment." No. CV
10-04645 RS, 2013 WL 3786633, at *7 (N.D. Cal. July 18, 2013).
[7] Samsung's citations to *In re Imperial Credit Industries, Inc. Securities Litigation* and *Mesfun v.
Hagos* (Mot. 7-8) are misleading insofar as both cases dealt with the scenario—inapplicable here—
of an expert relying upon the opinion of another expert that did not testify. *Imperial*, 252 F. Supp.
2d 1005, 1012-13 (C.D. Cal. 2003); *Mesfun*, No. CV 03-02182 MMM (RNBx), 2005 WL 5956612,
at *18 (C.D. Cal. Feb. 16, 2005). Neither case stands for the proposition that experts may not rely
upon discussions with percipient witnesses as to factual matters. Likewise, in *Nelson v. Matrixx
Initiatives* (another of the cases cited by Samsung), the expert's opinion was faulted for an
"[u]nexplained selective use of the facts" that were not "supported by the record." No. C 09-02904
WHA, 2012 WL 3627399, at *10 (N.D. Cal. Aug. 21, 2012). Here, Mr. Lasinski's opinion as to the
████████████ is both explained and supported by multiple sources in the evidentiary record.
Samsung's discussion of New York law is inapposite. Mot. 6-7. ████████████████████████
████████████████████████████████████████████████████████████████████████ ████████
████████████████████████████████████████████████████████████████████████ ████████
████████████████████████████████████████████████████████████████████████████████

1      *Finally*, Samsung's effort to use its unfounded criticisms of Mr. Lasinski's analysis of the

2  ████████████ to exclude his analysis of **_all_** license agreements (Mot. 7) is entirely unjustified.

3  Samsung has made no attempt to show (and indeed cannot show) that Mr. Lasinski's thorough

4  analysis of the many license agreements he examines is objectionable under Rule 702. *See*

5  *Interwoven*, 2013 WL 3786633, at *11 (holding that "motions to strike are generally disfavored" and

6  where the expert's analysis "indicate[s he] underwent a thorough analysis of the factors involved in

7  connection with each license agreement … [a]ny concern as to the degree of comparability between

8  an existing and hypothetical license may be addressed through cross-examination").[9]

9      **B.**    **Mr. Lasinski and Dr. Padilla Do Not Opine On French Law.**

10      Samsung incorrectly claims that Mr. Lasinski and another Huawei expert, economist Jorge

11  Padilla, "venture outside of their expertise, analyzing issues of French law." Mot. 2:9-10. In fact,

12  neither does so. Mr. Lasinski merely states his general understanding of the meaning of the terms

13  "reasonable" and "non-discriminatory" in the FRAND context, a subject on which Samsung's

14  French law expert admits French law is silent.[10] Stake Ex. 1 ¶¶ 69-75. Mr. Lasinski expresses

15  precisely the same understanding of what "reasonable" means in the FRAND context that

16  Samsung's expert, Dr. Leonard, offers under the guise of explaining the "Economic Framework for

17  Determining FRAND Royalties." *Compare* Stake Ex. 1 ¶ 70 (stating an understanding that FRAND

18  limits patent holders to economic value of patented technology apart from value resulting from

19  incorporation in the standard and citing *Microsoft v. Motorola*) *to* Stake Ex. 8 ¶ 30 (same).

20  Likewise, Mr. Lasinski expresses the same general understanding of the meaning of "non-

21  discriminatory," based on the same authority, as Samsung's other economic expert, Dr. Hausman.

22  *Compare* Stake Ex. 1 ¶ 75 (stating non-discrimination means similarly situated firms should be

23  treated similarly and citing an article by D. Carlton and A. Shampine) *to* Ex. 8 ¶ 7 (same).[11]

24  ──────────────
[9]

25  ████████████████████████████████████████████████

26     Samsung's French law expert, Jean-Sebastian Borghetti, offers no guidance as to the meaning of reasonable or non-discriminatory under French law, and acknowledged they are not defined under

27  the French Civil Code and are principally economic issues. Ex. 6 at 42:24-44:22. Huawei's expert expressed the same general view. Ex. 7 at 50:9-51:17, 57:3-24.

28  [11] Dr. Leonard offers a similar definition of non-discrimination which, "[i]n the context of this case,"

Dr. Padilla likewise does not purport to interpret FRAND as a matter of French law, but rather offers the same kind of economic interpretation of FRAND principles that Drs. Leonard and Hausman offer. *Compare* Stake Ex. 2 ¶¶ 3.22-3.35 *to* Stake Ex. 8 ¶¶ 23-33, 99 and Ex. 8 ¶¶ 7, 10 n.35. Samsung's claim that Dr. Padilla failed to offer any support for his opinion that for a difference in license terms to be discriminatory it must be of sufficient magnitude to affect competition (Mot. 7-8) is mistaken. As Dr. Padilla explained, it is broadly recognized that the non-discrimination obligation does not require that firms receive identical terms. Indeed, the court in *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson* recently concluded that the drafters of the ETSI IPR Policy "did not intend non-discriminatory to ensure the exact same treatment or identical license terms for all licensees to the same portfolio of essential patents" and held that "no single rate that is necessarily FRAND, and different rates offered to different licensees may well be FRAND." No. 14-cv-00341-JVS (DFMx), 2017 WL 6611635 at *55 (C.D. Cal. Dec. 21, 2017) (internal quotations omitted). The issue thus becomes what level of difference is required to establish impermissible discrimination. Consistent with the underlying purpose of FRAND commitments to prevent distortion of competition in the markets for standard-compliant products, Dr. Padilla opines that the difference must be of sufficient magnitude to harm downstream competition among similarly situated licensees.[12] Stake Ex. 2 ¶ 3.35; Stake Ex. 6 ¶¶ 3-4. Far from being unsupported, this interpretation is consistent with the treatment of discrimination under competition law, and is supported by a seminal article on the economics of SEPs authored by William Baumol and Daniel Swanson in the *Antitrust Law Journal* in 2005. Stake Ex. 6 ¶ 4; Ex. 9 at 171:5-16. Dr. Leonard repeatedly cites the same article. *See* Stake Ex. 8 ¶¶ 30 n.28, 72 n.85.

**C.    Mr. Lasinski and Dr. Padilla Do Not Inappropriately Summarize Negotiations**

Samsung's claim that Mr. Lasinski and Dr. Padilla inappropriately summarize the parties' negotiation history and speculate on witnesses' state of mind (Mot. 9) are misplaced. Mr. Lasinski

---

he interprets to "mean[] that the royalties that a company *receives* for its SEPs should be proportional, after accounting for differences in portfolio quality, to the royalties that it *pays* to other SEP holders." *See, e.g.*, Stake Ex. 8 ¶ 99.

[12] Dr. Padilla's position is consistent with *TCL*, where the court held that "harm to the competitor firm offered discriminatory rates is sufficient" for a FRAND violation. 2017 WL6611635 at *49.

1   merely recites the terms of the parties' offers over time, the details of which are not seriously

2   disputed, and analyzes them in relation to comparable agreements.  Stake Ex. 1 ¶¶ 81, 155-81.  Dr.

3   Leonard provides a similar (albeit less neutral[13]) chronology in a section of his opening report

4   entitled "Negotiations Between the Parties."  Stake Ex. 8 ¶¶ 151-157.  Dr. Hausman's report

5   includes an even more argumentative section entitled "Huawei's Inconsistent Negotiation Positions,"

6   in which he criticizes Huawei for allegedly making it "difficult for Samsung as a prospective

7   licensee to understand what was being offered on what terms" and concludes based on his "review[]

8   of the negotiation history between the parties" that Samsung did not unreasonably delay

9   negotiations.  Ex. 10 ¶¶ 20-32.  Given that this dispute centers, in large part, on the parties' offers, it

10  is hardly improper for Mr. Lasinski to summarize the terms which are the focus of his analysis.

11      Dr. Padilla's report includes a more complete recitation of his understanding of the parties'

12  negotiation positions, which he analyzes through an economic lens to assess whether Huawei's

13  conduct is consistent with a strategy of patent hold-up (as Samsung's experts claim) and whether

14  Samsung's conduct is consistent with a strategy of patent hold-out (where a putative licensee refuses

15  to pay a FRAND royalty or delays negotiations in an attempt to force the SEP holder to take less-

16  than-FRAND terms).  Stake Ex. 2 ¶¶ 6.1-6.16.  The phenomenon of patent hold-up and hold-out are

17  well recognized and debated in economics. Stake Ex. 2 ¶¶ 3.8-3.16; Stake Ex. 3 ¶ 5.12 & n.40.

18      Dr. Padilla also considers his understanding of each party's negotiation conduct to assess

19  whether it is consistent with (1) a willing or unwilling licensor of their own SEPs and (2) a willing or

20  unwilling licensee of the other parties' SEPs.  Stake Ex. 2 ¶¶ 3.8-3.16.  The willing/unwilling

21  terminology has been frequently used in describing the conditions under which injunctive relief on

22  SEPs may be appropriate.[14]  In analyzing the parties' willingness or unwillingness, Dr. Padilla has

23  not attempted to divine their states of mind (Ex. 9 at 103:20 ("I cannot read Samsung's mind")), but

24  has examined objective indicia of constructive negotiation behavior, i.e., whether they have: (1)

25  made an SEP licensing proposal; (2) responded to the counterparty with a revised proposal in a

26  _____

    [13] Notably, in forming his opinions, Dr. Leonard failed to review a single deposition of a Samsung

27  witness.  Ex. 5 at 74:8-13, 77:1-23.
    [14] See, e.g., Ex. 15 at 6 (Google-Motorola consent decree with the FTC regarding enforcement of

28  SEPs); Ex. 14 ¶¶ 66-69, 122-23 (Samsung Commitment to European Commission); Ex. 16 ¶ 71
    (Ohlhausen, *The Exclusive Role of Competition in the Standard-Setting Antitrust Debate*).

timely fashion; and (3) made adjustments to proposals following receipt of new information such that there is some convergence in the offers of the two parties.  Stake Ex. 2 ¶ 6.2.  This framework is based on extensive economic literature relating to bargaining theory.  Ex. 9 at 27:6-28:5.  Dr. Padilla concludes that, given the facts as he understands them, Samsung's conduct is consistent with patent hold-out and with it being an unwilling licensee and unwilling licensor.  Stake Ex. 2 ¶¶ 6.3-6.8.  Conversely, he concludes Huawei's conduct is not consistent with patent hold-up (as Samsung's experts claim) and is consistent with it being a willing licensor and licensee.  *Id.* ¶¶ 6.9-6.16.

Given the nature of this case, Dr. Padilla's testimony is both appropriate and admissible.  An expert witness may testify about ultimate issues of fact, but "cannot give an opinion as to her legal conclusion—i.e. an opinion on an ultimate issue of law."  *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *11 (W.D. Wash. Aug. 5, 2013) (quotation omitted).  Dr. Padilla is not offering opinions on ultimate issues of law, but even if the terminology he uses were deemed legal in some sense, his testimony would be permissible as it will undoubtedly be helpful to jury in understanding and applying the unfamiliar concepts at issue here.  *Id.* at *12 ("[I]n a more complicated case or a case dealing with a concept less familiar to ordinary jurors, expert testimony on an ultimate issue may be useful for 'guiding the trier of fact through a complicated morass of obscure terms and concepts.'") (quoting *United States v. Duncan*, 42 F.3d 97, 101-02 (2d Cir. 1994)).  Indeed, in closely analogous circumstances, the court in *Microsoft* permitted expert testimony that a SEP holder's licensing offers were made in "good faith."  *Id.* at *19.  The court noted the case (like this one) was "complicated" and that "the jury [would] be asked to hear, among other things, evidence regarding offer letters of patent portfolios, industry royalty rates and ranges determined by analysis of those patent portfolios, and the legal framework surrounding RAND licensing both domestic and abroad."  *Id.*  There, the court found that the expert's opinions, which (like the challenged opinions of Dr. Padilla) "piece[d] together the evidence heard by the jury into an opinion on the issue of good faith, [would] assist the trier of fact in reaching its own decision on the issue of good faith" and were therefore admissible.  *Id.*  So too with Dr. Padilla's opinions.[15]

---

[15] Dr. Padilla's challenged testimony stands in contrast to the testimony of Samsung's experts, Mr. Davies and Dr. Hausman, which cross the line from opining on ultimate issues of fact to offering

Finally, while both Mr. Lasinski and Dr. Padilla discuss aspects of the parties' negotiations (as do Samsung's experts), it is not Huawei's intention to use its experts' testimony as a substitute for necessary fact witness testimony on underlying facts.  Although Samsung fails to identify any inaccuracy in Mr. Lasinski's description of the offers exchanged between the parties or Mr. Padilla's neutral recitation of negotiation history (based almost entirely on Samsung's own admissions), Samsung will be free to challenge Mr. Lasinski and Dr. Padilla on cross-examination.

### D.   Dr. Padilla Does Not Improperly "Bolster" Mr. Lasinski's Testimony.

Samsung seeks to strike two portions in Dr. Padilla's rebuttal reports where he comments on methodologies Mr. Lasinski has employed to perform his analysis.  Mot. 10-11.  There is nothing improper about these opinions.  Dr. Padilla is neither acting as a "mouthpiece of a scientist of a different specialty" nor providing "expert testimony that is needlessly cumulative or that simply bolsters" another expert's testimony.  *Id.*  Instead, Dr. Padilla offers an economist's perspective on the correct approaches to two tasks: analyzing comparable licenses and assessing patent portfolio strength.  Stake Ex. 3 ¶¶ 2.4, 2.8, 3.9, 4.5.  Dr. Padilla laid out an economic framework for analyzing comparable licenses in his opening report and, in his rebuttal report, criticized Dr. Leonard's failure to analyze a comprehensive set of license agreements in reaching the conclusion that Huawei's offer to Samsung was not FRAND. *Id.* ¶¶ 2.1-2.3, 3.5-3.7.  In doing so, Dr. Padilla merely observed (accurately) that Mr. Lasinski's approach to analyzing comparables was more in line with the economic framework for assessing FRAND royalties Dr. Padilla set forth in his opening report.  *Id.* ¶¶ 2.4, 3.9.  With respect to portfolio strength, after reviewing various available metrics, Dr. Padilla noted that economic "research has shown that several of these different approaches can be used simultaneously and in combination to more effectively measure patent value," *id.* ¶ 4.5, which he further noted is consistent with Mr. Lasinski's approach of considering a combination of patent and contribution data.  In offering these opinions, Dr. Padilla is not vouching for Mr. Lasinski's conclusions, but rather bringing to bear his economic expertise on Mr. Lasinski's methodologies.

---

unfounded interpretations of the law and legal conclusions.  *See* ECF No. 327-6; Stake Ex. 18 ¶ 27 (opining that pursuit of an injunction for infringement of an SEP as to which there were ex ante alternatives "would be a violation of antitrust regulations"); Ex. 10 ¶ 56 (opining that obtaining higher royalties through seeking an injunction is "a violation of Section 2" of the Sherman Act").

**E.     The Court Should Deny Samsung's Motion to Exclude Dr. Jackson's Report.**

Samsung moves to exclude "Dr. Jackson's report, and the use of the Concur IP database by Huawei," "along with any opinions proffered by Mr. Lasinski and Dr. Ding who rely on Concur IP's essentiality determinations." Mot. 11-14. Samsung's motion lacks merit for the following reasons.

**1.     Samsung's argument based on Dr. Jackson's involvement is baseless.**

Samsung's argument that testimony stemming from the Concur IP database should be excluded because Dr. Jackson did not personally construct it, *see* Mot. 11-14, is without merit.  The Supreme Court observed that "[u]nlike an ordinary witness … an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge." *Daubert*, 509 U.S. at 592.  The Ninth Circuit has made clear that the fact that an expert's opinions "are based on data collected by others is *immaterial*." *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1141-42 (9th Cir. 1997) (emphasis added).  In fact, the Ninth Circuit has rejected the argument Samsung makes here: that an expert's "testimony is scientifically unreliable as a matter of law because he did not personally do any of the work upon which his opinions are based, he did not submit any portion of his opinions for peer review, and the tests upon which his opinions are based were undertaken solely for the purpose of litigation." *Id.*[16]

Samsung also accuses Dr. Jackson of acting as the "mouthpiece" for another expert, Dr. Apostolos Kakaes, Mot. 13-14, but Samsung has not identified any opinions of Dr. Kakaes that Dr. Jackson is allegedly parroting.  The Concur IP database is not an opinion; it is data that Dr. Jackson may properly rely upon in forming his opinions even if Dr. Jackson lacked involvement in its collection. *See Southland*, 108 F.3d at 1141-42.  Equally important, Dr. Jackson's expert reports show that he offers his own opinions based on his own analysis.  For instance, he carefully analyzes the methodology used to construct the database, assesses its reliability, compares the database to others in the field (including patent data collected by Dr. Leonard), assesses different patent portfolio

---

[16] Other courts reach the same conclusion.  *See, e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703…"); *S.E.C. v. Leslie*, No. 5:07-CV-03444-JF, 2010 WL 2991038, at *9 (N.D. Cal. Jul. 29, 2010) ("An expert opinion may be based on data collected by others.").

valuation metrics, and draws conclusions based on the data.  *See* Stake Ex. 7 at 23-123; Ex. 11 pp. 4-26.  Not once does Dr. Jackson parrot opinions by Dr. Kakaes.[17],[18]

###     2.    Dr. Jackson's patent database is reliable.

Samsung argues that Dr. Jackson's patent database is unreliable because it did not have sufficient quality control and has "murky" origins.  Mot. 14.  But Samsung never presents a full picture of the database's preparation, and provides no legal support for its oblique criticisms based on two memory lapses by Dr. Jackson about inconsequential details during his 7-hour deposition.  Contrary to Samsung's claim, Dr. Jackson's patent database is reliable, was carefully prepared, and provides exactly the type of information courts have heavily relied upon for FRAND determinations.

Dr. Jackson explains in detail his expert report each step taken to prepare the patent database.  *See* Stake Ex. 7 at 99-113.  In brief, a team of professionals from Concur IP with engineering degrees and experience in preparing patent landscaping studies prepared a "census" of all patents that had been declared to ETSI as essential to 2G, 3G, and 4G wireless standards.  The census step was "primarily a database organization, clean-up, and cross-referencing task" that involved downloading ETSI declarations from the official ETSI IPR Online Database and organizing them in a single spreadsheet.  *See* Stake Ex. 7 at 100-01.  The second step involved comparing the patents declared as essential to the LTE standards to assess whether the declaration of essentiality was well-founded.  *Id.* at 110-13.  The Concur IP team was not informed about the identify of either party in this case.  While not legally required, Drs. Jackson and Ding were extensively involved in preparation of the database.  They reviewed and edited Concur IP's database-preparation protocol, Dr. Jackson personally met with the Concur IP team in India for several days to discuss the project,

---

[17] Samsung's allegation that Huawei is trying to shield Dr. Kakaes or Concur IP from cross-examination is equally baseless.  Mot. 13.  Samsung never sought to depose Dr. Kakaes or any Concur IP professionals, despite being aware of their involvement.  Stake Ex. 7 at 1, 111.  By contrast, in the *TCL* case, Ericsson sought to depose Concur IP individuals during the discovery period, and was permitted to do so.  *TCL Commc'ns. Tech Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. CV 15-02370 JVS, 2016 WL 6662727, at *1 (C.D. Cal. July 7, 2016).  It is not Huawei's obligation to force Samsung to notice depositions, or to ask individuals who will not testify to prepare reports.  Fed. R. Civ. P. 26(a)(2)(A) (expert reports required for trial witnesses).  Accordingly, the only "shield" preventing cross-examination here has been Samsung's inaction.
[18] Samsung's suggestion that Dr. Kakaes "not appear[ing] here" as an expert is improper, *see* Mot. 13, has no basis.  Dr. Kakaes could not serve as an expert here due to a conflict.

1   they prepared a classification scheme used in the database, gave feedback and troubleshooting on

2   weekly calls, reviewed difficult patents escalated for their advice, and spent dozens of hours

3   analyzing the quality of the database and potential errors.  *Id.* at 108, 110, 112-13; Ex. 11 pp. 4-5.

4   The result is a database that provides useful information about the 3GPP patent landscape that both

5   Huawei's and Samsung's experts have relied upon in this case.[19]

6          Samsung does not contend that the database or Dr. Jackson's opinions about it are not the

7   result of reliable principles and methods, other than contending that Drs. Jackson and Ding provided

8   "minimal quality control" in preparing the database.  Mot. 14.  Samsung identifies no legal authority

9   that requires a study prepared by qualified professionals, such as the Concur IP team, to have ***any***

10  oversight by other qualified professionals.  To the contrary, the legal authority cited above shows

11  that such oversight is not required.  *See Southland*, 108 F.3d at 1141–42 (rejecting argument that

12  "testimony is scientifically unreliable as a matter of law because [the testifying expert] did not

13  personally do any of the work upon which his opinions are based").  Even if such oversight were

14  required, Samsung cites no authority establishing that the extensive oversight Drs. Jackson and Ding

15  provided is insufficient.  At best, Samsung's challenge goes to the weight of the evidence, not its

16  admissibility.[20]  *Daubert*, 509 U.S. at 596.

17         Furthermore, Samsung does not identify any information about the database that it was

18  unable to discover from Dr. Jackson's reports and deposition, other than two inconsequential details

19  Dr. Jackson did not remember.  Mot. 12.  It is irrelevant that Dr. Jackson could not remember who

20  prepared the *first draft* of the essentiality review protocol.  Samsung does not identify any fault in

21  the *final* protocol used to prepare the database, which Dr. Jackson reviewed carefully and found to

22  be appropriate.  It is also irrelevant which litigation the Kakaes database was initially used in.  The

23

24  [19] Dr. Leonard initially attempted to prepare a similar database and relied upon it in his opening
    report, but the database suffered from a variety of glaring flaws, and so Dr. Leonard switched to
25  relying on Dr. Jackson's database for purposes of his rebuttal report.  *See* Ex. 11 at 5-19 (describing
    flaws in Dr. Leonard's database); Stake Ex. 12 ¶ 8 n.3.
26  [20] Samsung also states that the court should "consider the known or potential rate of error."  Mot. 14.
    Dr. Jackson addressed this issue his reports.  *See* Stake Ex. 7 p. 113.  Further, the statistics Samsung
27  cites in its motion about the large number of patents present in the database, and the allegedly
    impossible task of reviewing them all, are misleading.  *See Id*. p. 110.  As Dr. Jackson explains in his
28  report, patents were grouped into families and reviewed on a family basis, resulting in a much
    smaller set of patents that were reviewed.

Kakaes database, which was developed in connection with Huawei's arbitration with Ericsson, was produced to Samsung in discovery in this case on May 5, 2017, and Samsung does not identify any fault with it.  Dr. Jackson's inability to recall these two details during a 7-hour deposition provides no basis to exclude his report.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, LLC, 716 F. Supp. 2d 220, 227 n.45 (S.D.N.Y. 2010) ("lapses in memory are traditionally challenged through cross-examination and do not render his opinion testimony unreliable") (citing *Daubert*, 509 U.S. at 596).  Moreover, the information Dr. Jackson provided about how the database was prepared distinguishes this case from the *Eveler v. Ford Motor Co.* case Samsung cites, where an expert relied on tests conducted by another expert but did not know basic, crucial information about the tests.  No. 16-14776, 2017 WL 3382460, at *6-9 (E.D. La. Aug. 7, 2017).

Finally, the most on-point legal authority shows that Dr. Jackson's patent database is reliable and is exactly the type of information courts heavily rely upon for FRAND determinations.  In *TCL*, the court resolved FRAND claims and determined a FRAND royalty rate by relying, in large part, on a similar patent database (and related expert opinions) prepared by Concur IP under the supervision of Drs. Ding and Kakaes.  2017 WL 6611635, at *17-18.  The court rejected several challenges to the methodology of preparing the database, including challenges to Concur IP's qualifications and based on the large number of patents reviewed.  *Id.*  The *TCL* case thus strongly indicates that Dr. Jackson's opinions based on the patent database are relevant and admissible.[21]

### 3.   Samsung's request for relief with respect to Dr. Jackson overreaches.

Samsung requests that the Court exclude "Dr. Jackson's report," but fails to mention that the report contains many opinions not directed at the patent database.  Samsung also requests that the Court exclude any testimony proffered by Huawei's experts related to the patent database, but fails to mention that Samsung's own experts offer testimony based on the patent database as well.  *See* Stake Ex. 12 ¶ 4 n.3.  Though for the reasons stated above Samsung's requests to exclude Dr.

---

[21] Samsung cites *TCL* for the proposition that an expert's "limited involvement" with the creation of a patent database is "problematic."  Mot. 13 (citing *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2016 WL 6662727, at *2 (C.D. Cal. July 7, 2016)).  But the *TCL* court declined to strike the expert's opinion on that basis, and ultimately relied upon the expert's opinions based on the database in reaching its decision on the FRAND rate for Ericsson's patents.

1    Jackson's database should be denied, if the Court excludes any opinions based on Dr. Jackson's

2    database, it should also exclude Samsung's expert's opinions that rely upon that database.

3    **F.    Mr. Lasinski's "Indicators of Portfolio Strength" Are Reliable And His Analysis
         Using Those Indicators Is Admissible.**

4    Samsung seeks to exclude Mr. Lasinski's analysis of whether the parties' offers complied

5    with FRAND principles, and his opinion concerning the FRAND terms and conditions of a United

6    States SEP cross-license, on the grounds that the measures of patent portfolio strength Mr. Lasinski

7    used are unreliable. Mot. 14-20. Samsung's motion rests on a misperception of Mr. Lasinski's use

8    of the challenged portfolio strength indicators, and its criticisms of Mr. Lasinski's analysis are

9    unfounded. Samsung's assertions, at best, go to the weight of this testimony, not its admissibility.

10   *GPNE Corp. v. Apple, Inc.,* No. 12-CV-02885-LHK, 2014 WL 1494247, at *7 (N.D. Cal. April 16,

11   2014) (admitting SEP damages analysis based on challenged patent counting methodology and

12   concluding that such testimony can be "attacked by cross examination, contrary evidence, and

13   attention to the burden of proof, not exclusion.") (citing *Daubert*).

14          **1.    Mr. Lasinksi's approach to assessing relative portfolio strength.**

15   In assessing whether the parties' offers were consistent with FRAND, Mr. Lasinski

16   performed two central analyses. First, he identified the most comparable of the parties' license

17   agreements, which provide the best indication of FRAND terms for a license to the parties'

18   portfolios. Because these agreements are generally cross-licenses in which one party made a lump-

19   sum payment (or series of payments) to the other, Mr. Lasinski "unpacked" them to determine the

20   implicit one-way royalty rates each party paid the other. The basic formula used in such

21   "unpacking" is well-recognized. Stake Ex. 1 ¶¶ 105-07; *TCL*, 2017 WL 6611635, at *34 (describing

22   methodology for unpacking cross-license agreements). In order to unpack a cross-license agreement

23   using this formula, it is necessary to estimate the relative strength of the two parties' licensed patent

24   portfolios. Stake Ex. 1 ¶ 107. Mr. Lasinski refers to the measure of relative portfolio value as the

25   "Portfolio Strength Ratio." *Id.* ¶ 106.

26   Second, Mr. Lasinski estimated the FRAND royalty rates to which Huawei and Samsung

27   would be entitled using a "top down" methodology. A "top down" approach begins with an

28

16

assumption regarding the aggregate industry-wide royalty rate that should be paid to all patent holders to implement the standard and then divides that rate among the different patent holders based on relative portfolio strength.  There is little disagreement among the experts in this case as to the appropriate aggregate rate that should be used for this purpose; Dr. Leonard opines that the appropriate aggregate royalty rate to be paid to all holders of LTE SEPs should be 5% whereas Mr. Lasinski opines that the aggregate royalty rate should be 6% in keeping with the lower bound of the range used in *TCL* and Dr. Leonard's prior testimony.  Stake Ex. 1 ¶¶ 93-100; Stake Ex. 4 ¶¶ 44-49.

        As an input into both of these analyses, Mr. Lasinski constructed an index that assigned each patent holder a relative shares of the value of the relevant standards based on two metrics:  (1) the number of patent families the firm holds that were judged to be essential to the relevant standard in Dr. Jackson's patent study and that contain at least one issued patent in all three of the U.S., Europe, and China ("Global Deemed SEPs"); and (2) the number of technical contributions the firm made during the 3GPP standard setting process that were approved for incorporation into the standard ("Approved Contributions").  Mr. Lasinski carefully evaluated the extent to which these metrics could be used to reliably interpret the parties' licensing agreements and he performed a statistical analysis to determine what weighting they should each be given in the index in order to produce the most coherent results.  Stake Ex. 1 ¶¶ 82-92.  This statistical analysis, which is set forth in Appendix D to Mr. Lasinski's initial report, shows that a combination of Global Deemed SEPs and Approved Contributions produces more coherent results in unpacking the parties' license agreements than either metric alone, and further that the most coherent results (as measured by the lowest standard deviation among the implied industry-wide aggregate rates derived from unpacking the relevant agreements of interest) are obtained by weighting the number of Global Deemed SEPs at 75% and the number of Approved Contributions at 25% in constructing the index.[22]  Stake Ex. 1 App. D.

---

[22] In his rebuttal report, Dr. Leonard, suggested two alternative approaches to assessing relative portfolio strength, one in which he calculates regional weighted "family shares" and another in which he calculates  "citation weighted"  shares purporting to account for the number of forward citations each of the firm's U.S. patents received.  Ex. 12 ¶¶ 50-61.  He separately suggested that, rather than evaluate the consistency of the results obtained using the different proposed approaches to portfolio strength by evaluating the standard deviation among the implied aggregate rates derived using those metrics to unpack the parties' license agreements, a better approach would be to compare the average implied aggregate royalty rate across all of the license agreements examined to the

1    As explained below, Samsung's criticisms of Mr. Lasinski's use of Approved Contributions

2    and Global Deemed SEPs in measuring relative portfolio strength are baseless.

3          **2.**      **Mr. Lasinski's use of "Approved Contributions" is reliable.**

4    Mr. Lasinski's incorporation of Approved Contributions as one factor in his portfolio

5    strength index is based on the recognition (as explained by Dr. Jackson) that the standards in

6    question are developed through a process of members of 3GPP submitting technical contributions in

7    response to problems identified by 3GPP working groups and that the firms investing to develop

8    such technical contributions frequently seek patent protection for them.  Stake Ex. 7 pp. 87-93; Ex.

9    11 pp. 33-46.  There is thus a strong logical and intuitive connection between the number of a firm's

10   technical contributions approved for incorporation into a standard and its number of SEPs, a

11   connection which has been recognized in the academic literature.  Ex. 17 (Barron, J. and Gupta, K.

12   "Unpacking 3GPP Standards," *Journal J. of Economics and Management Strategy*) ("Data on SEPs

13   … can be related to technical contributions, which are covered by the data described in this paper.

14   Technical contributions are the unique technical solutions to … the technical challenges that an SSO

15   faces.  Many of these solutions are patented, as an outcome of the R&D that led to these potential

16   solutions.").[23] This relationship has also been borne out by empirical analysis. ████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ██████████████████  Ex. 18 pp. 2-3.  Likewise, a study conducted by the Taiwan Patent Office

21   ████████████████████████████████████  found that "for most manufacturers, their

22   number of major standards proposals has a clear relevance to their number of SEPs (relevance score

23

24   _____

appropriate aggregate royalty rate used in connection with the "top down" analysis.  In his
25   supplemental report, Mr. Lasinski showed that his portfolio strength index based on Global Deemed
SEPs and Approved Contributions produces substantially more coherent results using Dr. Leonard's
26   proposed criteria than do either of Dr. Leonard's alternative measures of portfolio strength, which
produce individual results that are facially unreasonable. ████████████████████████████
27   ████████████████████████████████████████  and a greater dispersion of results and
higher standard error rates.  Stake Ex. 5 ¶¶ 4-10.
28   [23] It has also been recognized by industry analysts.  *See* Ex. 21 (2016 report on LTE contributions by
ABI Research); Ex. 22 (2010 report on LTE contributions by Signals Research Group).

as high as 0.52)." Ex. 19 p. 125. These results are consistent with other studies finding (1) a robust relationship exists between the level of inventors' participation in standard setting and their success obtaining SEPs and (2) that the SEPs of inventors that participate in the standard-setting process are more valuable, on average, that the SEPs of non-participants. Ex. 11 pp. 36-37, 40-41 (discussing Kang, B. & Kazuyuki, M. "Determinants of essential intellectual property rights for wireless communications:  Manufacturing firms v. non-manufacturing patentees" (2012) and Kang, B. & Bekkers, R. "Just-in-time patents and the development of standards," *Research Policy* 44 (2015)).

The relevance of Approved Contributions is further confirmed by the fact that many industry firms—██████████████—have used them to assess portfolio strength in licensing negotiations. Stake Ex. 1 ¶¶ 89-90. For example, in addition to Huawei, Ericsson (with whom both Samsung and Huawei have relevant license agreements) relies on approved contributions to measure relative portfolio strength in its license negotiations. *Id.* ¶ 89 n. 204 (quoting Ericsson employee regarding superiority of approved contributions relative to other portfolio strength metrics). Indeed, in its negotiations with Huawei, ████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████ Ex. 20 p. 2 (HW_Samsung_00692900). ███████████████ █████████████████████████████████████████████████ ███████████████████████████████ *Id.* p. 6 (HW_Samsung_00692901) & HW_Samsung_00692908; Ex. 3 at 185:12-186:2. ████████████████████ ██████████████████████████████████████████ use of contributions to unpack and interpret the resulting license agreement is entirely sensible.

None of Samsung's attacks on Mr. Lasinski's use of Approved Contributions has any merit. For example, Samsung's claims that "[a] party that dominates in standard-setting bodies, but has no SEPs, would nonetheless be deemed by Mr. Lasinski's measure to have a strong patent portfolio" and that "a party that [has] a robust SEP portfolio but declined to participate in standard-setting bodies would get zero credit under Mr. Lasinski's proposed measure" (Mot. 15) reflect Samsung's fundamental misunderstanding of Mr. Lasinski's approach. Because Mr. Lasinski adjusts each company's share downward to account for patent expirations, a firm that has no active SEPs would

19

be assigned no portfolio strength even if had made a large number of contributions.  Stake Ex. 1 ¶ 91 n. 213 & Sched. 21.2. Conversely, because Mr. Lasinski uses an index that combines deemed essential patent counts with Approved Contributions, a firm with a robust portfolio of SEPs but no contributions would still be assigned significant patent value.[24]

Samsung's claim that considering Approved Contributions adds nothing when one already has counts of deemed essential patents (Mot. 18) is also demonstrably wrong.  Mr. Lasinski's analysis shows that using a portfolio strength metric that combines both counts of deemed essential patents (which are necessarily extrapolations given the number of patents involved) and Approved Contributions produces more coherent and consistent results than either metric yields on its own (and than either of the alternative portfolio strength metrics suggested by Dr. Leonard).  Stake Ex. 1 ¶ 91 & App. D; Stake Ex. 4 ¶ 64; Stake Ex. 5 ¶¶ 6-10.  Indeed, Samsung's observation of the disparities between the numbers of different firm's contributions and their deemed SEPs (Mot. 18) explains why considering both patents and contributions yields more robust, reliable results.  For example, although Mr. Lasinski found that Ericsson's 4G SEP portfolio was only twice the size of InterDigital's based on the number of deemed essential patents they hold, he found that ██████████
████████████████████████████████████████████████████████████████████████
██████████  Stake Ex. 1 Scheds. 21.2, 6.1, 10.1.   This supports the conclusion that, on average, Ericsson's patents were more valuable than InterDigital's, which is correlated with Ericsson's outsized involvement in standard-setting relative to InterDigital.  *Id.* Sched. 21.2.  This conclusion is also consistent with study results indicating that SSO participants' SEPs are, on average, more valuable than the SEPs of non-participants.  Ex. 11 pp. 40-41.

Finally, neither the decision in *TCL v. Ericsson* nor Dr. Padilla's deposition testimony supports rejecting Mr. Lasinski's use Approved Contributions.  In *TCL,* the court did not rule that analyses based on Approved Contributions were inadmissible[25], but concluded as a finder of fact that

---

[24] For example, a party with 10% of the deemed essential patents to a given standard but no contributions would be found under Mr. Lasinski's analysis to have 7.5% of the overall value of the standard—i.e., (10% of deemed essential patents  x 75% patent weighting factor) + (0% of contributions x 25% contribution weighting factor) = 7.5% portfolio strength metric.
[25] The *TCL* court relied on contributions to unpack at least one agreement.  2017 WL 6611635 at *45.

there were two "flaws" with the use of approved contributions advanced in that case: (1) the absence of any evidence that it correlates contributions with SEP portfolio value; and (2) the "inability" to address transferred or expired patents using Approved Contributions. *TCL*, 2017 WL 6611635, *41. Mr. Lasinski specifically addressed each of these concerns in his analysis. As to the correlation between Approved Contributions with value, Mr. Lasinski's analysis demonstrates that his blended index of Approved Contributions and deemed essential patents produces the most consistent results in analyzing the parties' historical license agreements which directly reflect the value of their portfolios. Stake Ex. 1 ¶¶ 88-91 and App. D. Mr. Lasinski likewise addressed the impact of expirations and transfers on each company's portfolio in the construction of his portfolio strength index. The effect of transfers are picked up in Dr. Jackson's patent study (the results of which are given 75% of the weight in Mr. Lasinski's analysis) and Mr. Lasinski made explicit adjustments to the weights assigned on the basis of Approved Contributions to account for patent expirations. Stake Ex. 1 ¶ 91 n.213, Scheds. 21.3-5. Thus the *TCL* court's concerns with Approved Contribution analysis presented there do not justify excluding Mr. Lasinski's opinions here.

Nor does Dr. Padilla's deposition testimony warrant exclusion of Mr. Lasinski's use of Approved Contributions. To the contrary, while Dr. Padilla acknowledged that there is no peer-reviewed, published study establishing a specific correlation between Approved Contributions and portfolio value, Dr. Padilla did not single out approved contributions as uniquely needing to be "taken with pinch of salt" as Samsung incorrectly suggests.[26] Mot. 19. Instead, Dr. Padilla testified that there is dissatisfaction among economists with all of the available measures used to assess portfolio value, including those proposed by Dr. Leonard. He thus testified:

> [M]y view at this stage is that since there no perfect proxy, all of these [methods for assessing portfolio value] are useful and potentially

---

[26] The absence of a published, peer-reviewed study supporting Mr. Lasinski's specific approach, which has been developed to address the issues unique to this case, is no impediment to its admissibility given the detailed description of his methodology that Mr. Lasinski has provided and given the acknowledged reliance on approved contributions in SEP licensing by at least a minority of firms in the field and the general academic support for the relationship between contributions, SEPs, and portfolio value set forth in Dr. Jackson's reports. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) (holding that opinions developed expressly for litigation and not subject to peer-review and publication are admissible so long as the expert explains precisely how they went about reaching their conclusions and there is some objective source to show that they have followed a method recognized by at least a minority of experts in their field).

1    informative, but *all of them* should be taken with a pinch of salt.

2    Ex. 9 at 34:18-23 (emphasis added).  In his rebuttal report, Dr. Padilla specifically recognizes that

3    "contribution counting has been considered by several authors and companies to be a useful tool to

4    assess the relative strength of patent portfolios" and noted that it "has the virtue of being based on

5    publicly-available and verifiable information."  Stake Ex. 3 ¶ 4.2(c).  As discussed above, Dr. Padilla

6    ultimately concludes that an approach of "combining the essentiality study of Dr. Jackson with the

7    contribution data" is consistent with economic research showing "that several of these different

8    approaches [to measuring portfolio strength] can be used simultaneously and in combination to more

9    effectively measure patent value." *Id.* ¶ 4.5.[27]

10           **3.      Mr. Lasinski's use of "Global Deemed SEPs" is reliable.**

11           Samsung's objections to Mr. Lasinski's use of Global Deemed SEPs in constructing his

12   portfolio strength index are without merit.  Mr. Lasinski conclusion that, in assessing the relative

13   value of two (or more) SEP portfolios, it is more informative to look at the number of patent families

14   in the portfolio with active members in the U.S., Europe, and China than it is to look simply at the

15   total number of patents in each portfolio, rests on two well-established propositions:  (1) most of the

16   value of any patent portfolio is associated with a relatively small number of inventions; and (2) one

17   way to identify the most valuable inventions in a portfolio is to look for those for which the patentee

18   sought and obtained patent protection in multiple jurisdictions.  Stake Ex. 1 ¶¶ 86, 88.  Indeed, Dr.

19   Leonard recognizes both of these points.  *E.g.*, Stake Ex. 12 ¶ 188 (analysis predicated on the view

20   that approximately 80% of the value of a given patent portfolio is captured by just the top 20% of

21   patents in the portfolio); Stake Ex. 8 ¶ 180 (opining that, because "filing patents in multiple

22   jurisdictions involves additional costs and risk of rejections," it "makes economic sense for the

23   patent owner to apply in multiple jurisdictions *only for its more valuable patents*.") (emphasis

24   _____

25   [27] Samsung's citation to an excerpt of the testimony of Apostolos Kakaes in the *TCL* matter (Mot. 18
     n.15 & Ex. 4) does not warrant rejection of Mr. Lasinski's reliance on Approved Contributions in
26   this case.  It is unclear from the excerpt of Dr. Kakaes's testimony what data and methodology he
     employed in an attempt to assess the correlation between Ericsson's technical contributions and the
27   subset of Ericsson's patents he considered, but his results do not undermine the results of Samsung's
     own study showing a high correlation between firms' technical contributions and their most highly
28   rated patents and the additional support for using Approved Contributions discussed by Dr. Jackson.

added).[28]  Applying these principles to the case at hand, Mr. Lasinski finds that he obtains a more

consistent and coherent set of results in analyzing the parties' comparable license agreements

(accounting for the degree of variation in the results and their consistency with accepted estimates of

the appropriate aggregate royalty rate for the industry) when using an index accounting for the

number of the firms' multi-jurisdictional Global Deemed SEPs and Approved Contributions than he

does by looking at other measures, including the alternative portfolio strength measures not focused

on multi-jurisdictional patents proposed by Dr. Leonard.  Stake Ex. 1 ¶¶ 82-87 & App. D; Stake Ex.

5 ¶¶ 5-10.  This statistical analysis demonstrates the reliability of Mr. Lasinski's use of Global

Deemed SEPs to measure relative portfolio strength.

Mr. Lasinski's use of Global Deemed SEPs does not suggest, as Samsung claims, that "any

patents without corresponding family members in the U.S., Europe, and China" are "worthless."

Mot. 19.  As Mr. Lasinski explained in his opening report, his use of Global Deemed SEPs is as an

indicator of *relative* portfolio value:

> Such an application does not require the conclusion that all other
> declared and/or deemed SEPs have no value whatsoever, but simply
> that a company's share of Global Deemed SEP Families is more
> indicative of relative portfolio strength when assessing a global license
> than its share of declared SEPs families and/or deemed SEP families
> with issued members in any one jurisdiction anywhere in the world
> would be.[29]

Nor is Mr. Lasinski's focus on patent coverage in the U.S., Europe, and China arbitrary or

unfairly biased in Huawei's favor.  Indeed, Mr. Lasinski's focus on these three jurisdictions is based

on the fact that they collectively represent a very significant portion of both party's smartphone

sales— ███████████  and over ███████████ . *Id.* ¶ 83 & Fig. 32.  Moreover, considering

the degree of patent coverage in China is particularly important because both Huawei and Samsung

(like most of the industry) manufacture a very substantial portion of their smartphones there.  *Id.* ¶

---

[28] In support of this proposition, Dr. Leonard cites Harhoff, D., et al., "Citations, Family Size,
Opposition and the Value of Patent Rights," *Research Policy*, Vol. 32 (2003) ("measures of family
size … contribute to an approximation of the patent right's value") and Fischer, T. & J. Leidinger,
"Testing Patent Value Indicators on Directly Observed Patent Value – An Empirical Analysis of
Ocean Tomo Patent Auctions," *Research Policy,* Vol. 43 (2014) ("The expansion of patent
protection [to multiple jurisdictions] involves additional costs—*e.g.,* translation, patent attorneys'
filing fees, examination fees—for every jurisdiction.  If the applicant chooses to spend additional
money, the exclusion right should be worth the extra costs.").
[29] Stake Ex. 1 ¶ 87.

1   84 n.195; Stake Ex. 8 (at Ex. 6a (███████████████████████████████████

2   ████████████████████████████)).  Contrary to Samsung's claim that his approach is

3   biased in Huawei's favor because it has "many Chinese patents as a Chinese company" (Mot. 19), by

4   counting as Global Deemed SEPs only those Chinese patent families with members in the U.S. and

5   Europe, Mr. Lasinski's approach actually *reduces* the advantage in total patent counts that Huawei

6   would have based on its large number of Chinese patents.  Stake Ex. 4 ¶ 56 & Fig. 13.  Thus, while

7   Dr. Leonard claims that Mr. Lasinski's measure of relative portfolio strength based on Deemed

8   Global SEPs excludes 79.4% of Samsung's presumably lower-value U.S. 4G smartphone patent

9   families for which it has not obtained patent coverage in Europe and China (Mot. 20), Mr. Lasinski's

10  approach likewise excludes 68% of Huawei's Chinese patent families for which it has not yet

11  obtained coverage in the U.S. and Europe.[30]  The net results show that Huawei has a somewhat

12  greater number of patent families than Samsung with active members in all three of the key global

13  jurisdictions than does Samsung.  Stake Ex. 4 ¶ 56.  That Samsung does not like that result—or Mr.

14  Lasinski's appropriate consideration of Approved Contributions of which Huawei has many, many

15  more than Samsung—in no way indicates that Mr. Lasinski's analysis is unreliable or inadmissible.

16          **G.      Dr. deLisle's Report Is Proper Rebuttal To The Positions Taken By Samsung's
                      Experts in their Opening Reports.**

17          Samsung moves to strike as improper rebuttal the report of Dr. Jacques deLisle, who opines

18  on the quality and integrity of the Chinese courts, specifically those that have heard (or will hear) the

19  patent infringement suits filed by Huawei and Samsung.  Mot. 20.  Samsung's motion fails.

20          Dr. deLisle's report is proper rebuttal.  In its opening expert reports, Samsung's experts

21  opined that Huawei's pursuit of injunctive relief against Samsung in Chinese courts for the

22  infringement of SEPs was improper, and particularly that it would allow Huawei to hold-up

23  Samsung in breached Huawei's FRAND obligations in violation of U.S. antitrust law.[31]  In response,

24  Huawei disclosed the report of Dr. deLisle, an expert on Chinese law and procedure, who

25  appropriately explained what actually happened procedurally and as a matter of law in the actions

26

---

27  [30] Stake Ex. 7, Table 11 (showing that Huawei has 345 deemed essential patent families in China,
    but only 108 families with coverage in the U.S., Europe, and China—(345-108)/345 = 68.7%).
28  [31] *See* Stake Ex. 8 §§ VI, VI.D & ¶¶ 141-144; Ex. 10 ¶¶ 18, 56.

before the Shenzhen Intermediate People's Court—the only Chinese court to have issued a decision

in Huawei and Samsung's myriad SEP infringement lawsuits.  Stake Ex. 15 ¶¶ 16-17.  Dr. deLisle

explained that the actions in Shenzhen—before one of the highest quality courts in China—appeared

to have been decided fairly and consistently with Chinese procedure, did not indicate any bias

toward Huawei or against Samsung, and indicated that the Shenzhen Court had thoroughly assessed

the parties' compliance with FRAND obligations prior to issuing injunctive relief. *Id.* ¶ 23.  Such

opinions are directly responsive to, and intended to defuse, the claims in Samsung's opening expert

reports regarding Chinese injunctions.[32]  *See Matthew Enter., Inc. v. Chrysler Grp., LLC*, No. 13-cv-

04236-BLF, 2016 WL 4272430, at *1 (N.D. Cal. Aug. 3, 2016) ("The proper function of rebuttal

evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse

party.").  Even if Dr. deLisle's opinions were not proper rebuttal, there would be no basis to strike

them because Samsung has suffered no harm from the timing of disclosure. *Id.* at *2.  The only

harm Samsung has articulated is that it "did not have an opportunity to submit an expert report

regarding the issues in Dr. deLisle's report," but that is simply false.  Mot. 21.  Shortly after the

submission of rebuttal reports, Huawei and Samsung discussed opinions each party contended had

been inappropriately introduced in rebuttal expert reports, including Dr. deLisle's report.  Ex. 13.  To

resolve the dispute, Samsung proposed—and Huawei agreed—that Huawei would be able to submit

supplemental reports by Dr. Jackson, Dr. Padilla, and Mr. Lasinski, and Samsung would, at its

option, have the opportunity to submit a supplemental report responding to Dr. deLisle. *Id.*

Samsung elected not to do so.  Having bypassed its opportunity to submit a response to Dr. deLisle's

report, Samsung cannot now claim it has been prejudiced by the sequence of events here.

## IV.    CONCLUSION

Huawei respectfully requests this Court grant deny Samsung's motion to exclude.

---

[32] Samsung contends Dr. deLisle's report is not rebuttal because he had not reviewed any of
Samsung's expert reports.  Mot. 21.  However, Samsung offers no authority for a requirement that an
expert directly review or cite to the opposing party's expert reports in order to properly rebut them.
To the contrary, it is entirely appropriate for an expert to rely upon understandings from counsel
regarding its assignment, particularly where the rebuttal expert is responding to expert reports that
have been marked highly confidential and the expert does not need to be cleared under the protective
order in order to provide his opinions.  Such is precisely the case with respect to Dr. deLisle's
opinions on Chinese law, procedure, and the public decisions by the Shenzhen court.

Dated: July 17, 2018

David T. Pritikin (*Pro Hac Vice*)
dpritikin@sidley.com
David C. Giardina (*Pro Hac Vice*)
dgiardina@sidley.com
Douglas I. Lewis (*Pro Hac Vice*)
dilewis@sidley.com
John W. McBride (*Pro Hac Vice*)
jwmcbride@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
(312) 853-7000 – Telephone
(312) 853-7036 – Facsimile

Respectfully submitted,

SIDLEY AUSTIN LLP

*/s/ Michael J. Bettinger*
Michael J. Bettinger (SBN 122196)
mbettinger@sidley.com
Irene Yang (SBN 245464)
irene.yang@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California  94104
(415) 772-1200 – Telephone
(415) 772-7400 – Facsimile

*Attorneys for Huawei Technologies Co., Ltd.,*
*Huawei Device USA, Inc., Huawei Technologies*
*USA, Inc., and HiSilicon Technologies Co. Ltd.*