# EXHIBIT 14

**DECLARATION OF LEIF PETERSON IN SUPPORT OF HUAWEI'S OPPOSITION TO SAMSUNG'S MOTION TO PARTIALLY EXCLUDE AND STRIKE**



EUROPEAN COMMISSION

# CASE AT.39939 - SAMSUNG - ENFORCEMENT OF UMTS STANDARD ESSENTIAL PATENTS

(Only the English text is authentic)

## ANTITRUST PROCEDURE

## Council Regulation (EC) 1/2003

Article 9 Regulation (EC) 1/2003

Date: 29/04/2014

This text is made available for information purposes only. A summary of this decision will be published in all EU languages in the Official Journal of the European Union.

Parts of this text have been edited to ensure that confidential information is not disclosed. Those parts are replaced by a non-confidential summary in square brackets or are shown as [...].



EUROPEAN
COMMISSION

Brussels, 29.4.2014
C(2014) 2891 final

PUBLIC VERSION

**COMMISSION DECISION**

**of 29.4.2014**

**addressed to:**

**- Samsung Electronics Co., Ltd.,**
**- Samsung Electronics France,**
**- Samsung Electronics GmbH,**
**- Samsung Electronics Holding GmbH,**
**- Samsung Electronics Italia s.p.a.**
**relating to proceedings under Article 102 of the Treaty on the Functioning of the**
**European Union and Article 54 of the EEA Agreement**

**Case AT.39939 - Samsung - Enforcement of UMTS standard essential patents**

**(Only the English text is authentic)**

**EN**          **EN**

# TABLE OF CONTENTS

1.        Subject matter ................................................................................................... 5

2.        The undertakings concerned ............................................................................. 6

2.1.     Samsung.............................................................................................................. 6

2.2.     Apple .................................................................................................................. 7

3.        Procedural steps under Regulation (EC) No 1/2003 ........................................ 7

4.        Preliminary assessment .................................................................................... 8

4.1.     Background......................................................................................................... 8

4.1.1.   Standards ............................................................................................................ 8

4.1.2.   Standard-setting organisations .......................................................................... 8

4.1.3.   Standard essential patents ................................................................................. 8

4.1.4.   The European Telecommunication Standards Institute...................................... 9

4.1.4.1. The ETSI IPR Policy ........................................................................................... 9

4.1.4.2. ETSI and standard essential patents ................................................................ 10

4.1.4.3. ETSI's role in the UMTS standardisation process ........................................... 10

4.1.5.   Standardisation and Union competition law.................................................... 11

4.2.     Relevant markets .............................................................................................. 11

4.2.1.   Product markets................................................................................................ 11

4.2.2.   Geographic markets.......................................................................................... 12

4.3.     Dominance ....................................................................................................... 12

4.4.     Practices raising concerns ............................................................................... 13

4.4.1.   The exceptional circumstances ........................................................................ 14

4.4.1.1. The UMTS standard-setting process ................................................................ 14

4.4.1.2. Samsung's commitment to ETSI to license its UMTS SEPs on FRAND terms
         and conditions ................................................................................................. 14

4.4.2.   Anti-competitive effects ................................................................................... 15

4.4.3.   Potential objective justification for Samsung's conduct ................................. 15

4.4.4.   The Union's international obligations and the balancing of fundamental rights ....... 16

4.5.     Effect on trade between Member States and between the Contracting Parties to
         the EEA Agreement .......................................................................................... 17

5.        The Initial Commitments.................................................................................. 17

6.      Commission Notice Pursuant to Article 27(4) of Regulation (EC) 1/2003............... 18

6.1.    Default venue for FRAND determination ............................................................... 18

6.2.    Burden of proof .................................................................................................... 19

6.3.    Upfront licensing terms ........................................................................................ 19

6.4.    Continuation of third-party FRAND determinations after the expiry of the
        commitments ....................................................................................................... 19

6.5.    Conditioning of SEPs licences on access to a potential licensee's non-SEPs .......... 19

6.6.    Publication of FRAND determinations by arbitration tribunals ............................... 20

6.7.    Composition of arbitration tribunals ..................................................................... 20

6.8.    Geographic scope of the commitments .................................................................. 20

6.9.    Product scope of the commitments ....................................................................... 20

6.10.   Duration of the commitments ............................................................................... 20

6.11.   Escrow payments pending the outcome of the FRAND determination .................... 20

6.12.   Additional venues for FRAND determination ......................................................... 20

7.      Final Commitments .............................................................................................. 20

8.      Assessment of the Final Commitments in light of the issues raised by interested
        third parties ......................................................................................................... 21

9.      Proportionality of the Final Commitments ............................................................. 23

9.1.    Principles ............................................................................................................. 23

9.2.    Application in the present case ............................................................................. 24

10.     Conclusion ........................................................................................................... 24

**EN**                                          3                                          **EN**

**COMMISSION DECISION**

**of 29.4.2014**

**addressed to:**

**- Samsung Electronics Co., Ltd.,**
**- Samsung Electronics France,**
**- Samsung Electronics GmbH,**
**- Samsung Electronics Holding GmbH,**
**- Samsung Electronics Italia s.p.a.**
**relating to proceedings under Article 102 of the Treaty on the Functioning of the**
**European Union and Article 54 of the EEA Agreement**

**Case AT.39939 - Samsung - Enforcement of UMTS standard essential patents**

**(Only the English text is authentic)**

**EN**                                    4                                    **EN**

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union ("TFEU"),

Having regard to the Agreement on the European Economic Area,

Having regard to Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty[1], in particular Article 9(1) thereof,

Having regard to the Decision of 30 January 2012 to initiate proceedings in this case,

Having expressed concerns in the Statement of Objections of 21 December 2012,

Having given interested third parties the opportunity to submit their observations pursuant to Article 27(4) of Regulation (EC) No 1/2003 on the commitments offered to meet those concerns,

After consulting the Advisory Committee on Restrictive Practices and Dominant Positions,

Having regard to the final report of the Hearing Officer,

Whereas:

## 1.   SUBJECT MATTER

(1)     The Decision is addressed to Samsung Electronics Co., Ltd., Samsung Electronics France, Samsung Electronics GmbH, Samsung Electronics Holding GmbH and Samsung Electronics Italia s.p.a. (collectively "Samsung").

(2)     It concerns Samsung's seeking of preliminary (interlocutory) and permanent injunctions against Apple Inc. ("Apple") before the courts of various Member States on the basis of certain of its standard essential patents ("SEPs") covering Universal Mobile Telecommunications Service ("UMTS") technology[2]. Samsung committed to license these SEPs on fair, reasonable and non-discriminatory ("FRAND") terms and conditions during the standard-setting process in the European Telecommunications Standards Institute ("ETSI").

(3)     In a Statement of Objections of 21 December 2012, the Commission came to the preliminary conclusion that Samsung's seeking of preliminary and permanent

---

[1]     OJ L 1, 4.1.2003, p. 1. With effect from 1 December 2009, Articles 81 and 82 of the EC Treaty have become Articles 101 and 102, respectively, of the Treaty on the Functioning of the European Union ("TFEU"). The two sets of provisions are, in substance, identical. For the purposes of this Decision, references to Articles 101 and 102 of the TFEU should be understood as references to Articles 81 and 82, respectively, of the EC Treaty where appropriate. The TFEU also introduced certain changes in terminology, such as the replacement of "Community" by "Union" and "common market" by "internal market". The terminology of the TFEU will be used throughout this Decision.

[2]     Samsung asserted nine of its UMTS SEPs against Apple before national courts in the EEA. These patents cover the air interface of the UMTS standard (the so-called W-CDMA technology), which is an integral part of UMTS.

injunctions against Apple on the basis of its UMTS SEPs, in the exceptional circumstances of this case and in the absence of any objective justification, raised concerns as to the compatibility of the seeking of such injunctions with Article 102 TFEU.

(4)     The exceptional circumstances in this case are the UMTS standard-setting process and Samsung's commitment to license its UMTS SEPs on FRAND terms and conditions[3].

(5)     The absence of objective justification relates in particular to the fact that the potential licensee, Apple, was not unwilling to enter into a licence agreement for Samsung's UMTS SEPs on FRAND terms and conditions[4].

(6)     Samsung disagrees with the Commission's assessment set out in the Statement of Objections. It nevertheless has offered commitments under Article 9(1) of Regulation (EC) No 1/2003 to meet the concerns expressed to it by the Commission. The present Decision makes these commitments binding on Samsung.

## 2.     THE UNDERTAKINGS CONCERNED

### 2.1.     Samsung

(7)     Samsung is a company with its headquarters in Seoul, Republic of Korea. Its worldwide turnover was EUR 146.14 billion in 2012[5]. Samsung is present in most countries within the European Economic Area ("EEA") and its European headquarters are in Chertsey, Surrey, UK.

(8)     Samsung designs, develops, manufactures and sells a wide range of products in the area of electronics and information technology, including smartphones and multimedia devices, telecommunications systems, PCs, MP3 players and set-top boxes. Samsung also produces semiconductors (such as memory and storage chips), LCD display panels and digital media.

(9)     Samsung entered the mobile telecommunication sector in 1983 and launched its first smartphone, Samsung Galaxy, in 2009.

(10)    Samsung participates in various Standard-Setting Organisations ("SSOs") and consortia including ETSI, 3rd Generation Partnership Project ("3GPP"), the Institute of Electrical and Electronics Engineers ("IEEE"), Open Mobile Alliance ("OMA") and Digital Video Broadcasting consortium ("DVB").

(11)    Samsung holds a worldwide portfolio of SEPs, which includes, in particular, patents which Samsung has declared to ETSI to be essential to the UMTS standard[6].

---

3     See recitals (55) - (61) below.
4     See recital (68) below.
5     The figures in EUR correspond to USD 187.75 billion. Exchange rate: 2012 average (1 EUR = 1.2848 USD). Source: 2012 Samsung Electronics Annual Report.
6     Samsung's reply to Questions 6 and 8 of the Commission's request for information ("RFI") of 13 October 2011.

### 2.2. Apple

(12)   Apple is a company with its headquarters in Cupertino, California, USA. It designs, manufactures and markets a range of personal computers, mobile communication and media devices, and portable digital music players and sells a variety of related software, services, networking solutions, and third party digital content and applications. Its worldwide turnover was EUR 121.82 billion in 2012[7]. Apple is present in most countries within the EEA and its European headquarters are in Cork, Ireland.

(13)   Apple entered the mobile telecommunication sector in 2007 when it launched its first smartphone, the iPhone. Apple sells various tablet computers and smartphones which implement the UMTS standard.

### 3.   PROCEDURAL STEPS UNDER REGULATION (EC) NO 1/2003

(14)   On 30 January 2012, the Commission opened proceedings with a view to adopting a decision under Chapter III of Regulation (EC) No 1/2003.

(15)   On 21 December 2012 the Commission adopted a Statement of Objections setting out its competition concerns. The Statement of Objections constitutes a preliminary assessment for the purposes of Article 9(1) of Regulation (EC) No 1/2003. By letter of 24 December 2012, the Commission notified the Statement of Objections to Samsung.

(16)   On 22 March 2013, Samsung submitted its reply to the Statement of Objections.

(17)   On 27 September 2013, Samsung offered commitments to meet the concerns expressed to it by the Commission (the "Initial Commitments"), while continuing to dispute the Commission's preliminary findings as set out in the Statement of Objections.

(18)   On 18 October 2013, a notice was published in the Official Journal of the European Union pursuant to Article 27(4) of Regulation (EC) No 1/2003[8] ("the Notice"), summarising the case and the Initial Commitments, and inviting interested third parties to submit their observations on those commitments within one month from the date of publication of the Notice.

(19)   The Commission received 18 observations from interested third parties. On 17 December 2013, it informed Samsung of these observations.

(20)   On 3 February 2014, Samsung offered revised commitments (the "Final Commitments").

(21)   On 28 April 2014, the Advisory Committee on Restrictive Practices and Dominant Positions was consulted. On the same day, the Hearing Officer issued his final report.

---

[7]   The figures in EUR correspond to USD 156.51 billion. Exchange rate: 2012 average (1 EUR = 1.2848 USD). Source: 2012 Apple Annual Report.

[8]   OJ C 302, 18.10.2013, p. 14–15.

**4.**     PRELIMINARY ASSESSMENT

**4.1.**     **Background**

*4.1.1.*     *Standards*

(22)     Standards ensure interoperability and compatibility between related products. This has many benefits[9]. Standards can encourage innovation and lower costs by increasing the volume of manufactured products. Standards can strengthen competition by enabling consumers to switch more easily between products from different manufacturers. Standards may also further the Treaty objective of achieving the integration of national markets through the establishment of an internal market. The European Union has accordingly promoted standardisation as a tool for European competitiveness[10].

*4.1.2.*     *Standard-setting organisations (SSOs)*

(23)     SSOs are organisations one of the primary activities of which is to develop and maintain standards by bringing together industry participants and relevant stakeholders to evaluate competing technologies for inclusion in standards.

(24)     SSOs also seek to ensure that industry participants contribute technology that will create valuable standards and that these standards are widely adopted. The broader the implementation of a standard, the greater the interoperability benefits.

(25)     Participants in a standard-setting process can obtain significant benefits if their technology becomes part of a standard. These include potential royalties from licensees, a large base of licensees, increased demand for their products and improved interoperability and compatibility with the other products using the standard.

*4.1.3.*     *Standard essential patents*

(26)     Standards frequently make reference to technologies that are protected by patents, especially in industries such as telecommunications. Hundreds or even thousands of patents may read on a single standard. Thus, when a user of a standard (also known

---

[9]     Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements ("the Horizontal Guidelines"), OJ C 11, 14.1.2011, pp. 1–72, paragraph 263.

[10]     See Communication from the Commission to the Council, the European Parliament and the European Economic and Social Committee, Towards an increased contribution from standardisation to innovation in Europe, COM(2008) 133 final; and Communication from the Commission to the European Parliament and the European Economic and Social Committee: A strategic vision for European standards: Moving forward to enhance and accelerate the sustainable growth of the European economy by 2020, COM(2011) 311 final. See also Regulation (EU) No 1025/2012 of the European Parliament and of the Council of 25 October 2012 on European standardisation, amending Council Directives 89/686/EEC and 93/15/EEC and Directives 94/9/EC, 94/25/EC, 95/16/EC, 97/23/EC, 98/34/EC, 2004/22/EC, 2007/23/EC, 2009/23/EC and 2009/105/EC of the European Parliament and of the Council and repealing Council Decision 87/95/EEC and Decision No 1673/2006/EC of the European Parliament and of the Council, OJ L 316, 14.11.2012, pp. 12–33.

**EN**                                                    8                                                    **EN**

as an "implementer") manufactures standard-compliant products, it cannot avoid that its products use technologies that are covered by one or more patents.

(27)     Patents that are essential to a standard are those that cover technology to which a standard makes reference and that implementers of the standard cannot avoid using in standard-compliant products. These patents are known as SEPs. SEPs are different from patents that are not essential to a standard ("non-SEPs"). This is because it is normally technically possible for an implementer to design around a non-SEP without sacrificing key functionality. By contrast, an implementer has to use the technology protected by a SEP when manufacturing a standard-compliant product.

(28)     SEPs can therefore be of great value to their holders. A SEP holder can expect a substantial revenue stream, in particular for SEPs covering standards that are destined to be implemented in numerous products sold to millions of consumers. Once a particular technology has been chosen and incorporated into a widespread standard, alternative competing technologies may disappear from the market.

*4.1.4.     The European Telecommunication Standards Institute*

(29)     ETSI is one of the three European Standardisation Organisations. ETSI is officially responsible for producing standards and specifications supporting EU and EFTA policies and enabling an internal market in telecommunications[11]. The rules followed by ETSI are set out in the ETSI Directives[12], which comprise, among others, the ETSI Statutes, to which ETSI's intellectual property rights ("IPR") Policy is annexed, and the ETSI Guide on Intellectual Property Rights, which provides guidance on the application of the ETSI IPR Policy.

4.1.4.1.  The ETSI IPR Policy

(30)     ETSI members are required to comply with the ETSI IPR Policy. The ETSI IPR Policy was incorporated in the ETSI Rules of Procedures in 1994 in order to allow Technical Committees, the entities carrying out ETSI's standardising activities, to move forward with decisions on standards without spending excessive time on IPR issues and related commercial considerations.

(31)     The ETSI IPR Policy "*seeks to reduce the risk to ETSI, members, and others applying ETSI standards and technical specifications, that investments in the preparation, adoption and application of standards could be wasted as a result of an essential IPR for a standard or technical specification being unavailable*"[13]. As such, it seeks to prevent so-called patent hold-up and to provide a balance between the public benefits of standardisation in the field of telecommunications and the rights of SEP holders.

---

[11]     See http://www.etsi.org/WebSite/AboutETSI/RoleinEurope/Publicpolicy.aspx.
[12]     The ETSI Directives are contained in a single file available at
         http://portal.etsi.org/directives/32_directives_oct_2013r.pdf.
[13]     Section 3.1, ETSI Intellectual Property Rights Policy – 20 March 2013.

4.1.4.2.  ETSI and standard essential patents

(32)   The ETSI IPR Policy defines SEPs as follows: "*'essential' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standard without infringing that IP right*"[14].

(33)   It is not within ETSI's mandate to check the validity of declared SEPs or their relevance to an ETSI standard[15]. Only a court can decide on the validity and the issue of whether a standard-compliant product infringes a patent that has been declared essential to a standard and therefore whether the patent is essential as declared by its owner to the SSO. Until a court decides otherwise, a SEP is thus presumed valid, like any other patent[16], and essential to the standard as declared by its owner to the SSO.

(34)   Under the ETSI IPR Policy[17], ETSI members have an obligation to inform ETSI about all IPR they may hold in a future standard[18]. They are also requested to make their SEPs available to all interested third parties on FRAND terms and conditions. To this end, pursuant to clause 6.1 of the ETSI IPR Policy:

    "*[T]he Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent: manufacture, including the right to make or have made customized components and sub-systems to the licensee's own design for use in manufacture; sell, lease, or otherwise dispose of equipment so manufactured; repair, use or operate equipment; and use methods. The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.*[19]"

4.1.4.3.  ETSI's role in the UMTS standardisation process

(35)   Pursuant to Decision 128/1999/EC[20], ETSI was appointed to approve or develop the European standards needed to deploy UMTS services, including a common, open and internationally competitive air-interface standard, i.e. a radio technology connecting handsets and base stations throughout the mobile network. UMTS is a third generation ("3G") mobile and wireless communications system capable of

---

[14]   ETSI Intellectual Property Rights Policy, Annex 6 to ETSI Rules of Procedure, 20 March 2013, available at: http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf.

[15]   ETSI's reply to Question 1 of the RFI of 30 April 2012.

[16]   Case T-321/05 *AstraZeneca v Commission* [2010] ECR II-2805, paragraph 362.

[17]   ETSI Intellectual Property Rights Policy, Annex 6 to ETSI Rules of Procedure, 30 November 2011, available at:
      http://www.etsi.org/WebSite/document/Legal/ETSI%20IPR%20Policy%20November%202011.pdf.

[18]   Section 4.1 ETSI Intellectual Property Rights Policy - 30 November 2011.

[19]   Section 6.1 of the ETSI IPR Policy - 30 November 2011.

[20]   Decision No 128/1999/EC of the European Parliament and of the Council of 14 December 1998 on the coordinated introduction of a third-generation mobile and wireless communications system (UMTS) in the Community (OJ L 17, 22.1.1999, page 1), (hereafter, "Decision 128/1999/EC").

**EN**                              10                              **EN**

supporting in particular innovative multimedia services, beyond the capability of second generation systems such as GSM ("2G"), and capable of combining the use of terrestrial and satellite components.

(36)     Decision 128/1999/EC required Member States to take all actions necessary in order to allow the coordinated and progressive introduction of UMTS services on their territory by 1 January 2002[21]. In line with the requirements of Decision 128/1999/EC, the UMTS standard was implemented in most Member States by that date.

### 4.1.5.     Standardisation and Union competition law

(37)     Standardisation is generally achieved by means of an agreement between undertakings, often competing on the same market.

(38)     Standardisation agreements usually produce significant positive economic effects[22]. Subject to certain conditions, standardisation agreements therefore normally do not restrict competition within the meaning of Article 101(1) TFEU[23].

(39)     Once, however, a standard is implemented, holders of SEPs included in that standard may behave in anti-competitive ways, "*for example by 'holding-up' users after the adoption of the standard either by refusing to license the necessary IPR or by extracting excess rents by way of excessive royalty fees thereby preventing effective access to the standard*"[24].

(40)     Commitments to license on FRAND terms and conditions can prevent such competition concerns from arising[25]. FRAND commitments are also designed to strike a fair balance between the interests of technology owners to be compensated for their essential IPR and those of implementers of standardised technology to have access to such essential IPR.

## 4.2.     Relevant markets

### 4.2.1.     Product markets

(41)     In the Statement of Objections, the Commission reached the preliminary conclusion that the relevant product markets encompass the licensing of the technologies as specified in the UMTS standard technical specifications, on which each of Samsung's UMTS SEPs reads.

(42)     The Commission preliminarily concluded that for manufacturers of UMTS standard-compliant mobile devices in the EEA, there are no substitutes to the technologies as specified in the UMTS standard technical specifications, on which each of Samsung's UMTS SEPs reads. This preliminary conclusion was based on the fact that: (i) UMTS, which is the standard for 3G mobile telecommunication technology in the

---

[21]     Article 3(1) of Decision 128/1999/EC.
[22]     Horizontal Guidelines, paragraph 263.
[23]     *Ibid*, paragraph 280.
[24]     *Ibid*, paragraph 269.
[25]     *Ibid*, paragraph 287.

EEA, cannot be substituted by mobile standards of other generations, such as GSM[26] (2G technology) or LTE[27] (4G technology); (ii) UMTS cannot be substituted by other 3G standards (including CDMA2000, used in the US, and TD-SCDMA, used in China); and (iii) UMTS cannot be implemented without having access to each of Samsung's UTMS SEPs reading on the UMTS standard.

(43)    The Commission also preliminarily concluded that there is no supply-side substitutability because each of the technologies on which each of Samsung's UMTS SEPs reads is part of the UMTS standard. It is impossible for another technology owner to provide customers with alternatives to the technologies as specified in the UMTS standard technical specifications, on which each of Samsung's UMTS SEPs reads.

*4.2.2.    Geographic markets*

(44)    The Commission preliminarily concluded that each of the relevant product markets, i.e. the licensing of the technologies as specified in the UMTS standard technical specifications, on which each of Samsung's UMTS SEPs reads, is at least EEA-wide in scope. It arrived at this preliminary conclusion, *inter alia*, in light of the widespread adoption of the UMTS standard in the EEA, and [...].

## 4.3.    Dominance

(45)    The Commission reached the preliminary conclusion that Samsung holds a dominant position in the markets for the licensing of the technologies as specified in the UMTS standard technical specifications, on which each of its UMTS SEPs reads. The Commission reached this preliminary conclusion on the basis of a number of factors.

(46)    First, Samsung holds a 100% market share in each of the relevant markets. While ownership of a SEP does not, on its own, confer a dominant position, UMTS is de facto the only 3G standard in the EEA. Due to its wide adoption, it is indispensable for manufacturers of mobile devices to comply with the UMTS standard.

(47)    Second, the widespread adoption of the UMTS standard in the EEA is due, to a significant extent, to Decision 128/1999/EC (see recitals (35) and (36) above).

(48)    Third, the commitments to license on FRAND terms and conditions given by the owners of UMTS SEPs, including Samsung, encouraged network operators and device manufacturers to adopt the UMTS standard. These commitments guarantee the availability of the necessary licences for the implementation of the UMTS standard.

(49)    Fourth, industry players have invested heavily in UMTS infrastructure and have incurred other sunk costs[28]. For instance, European network operators paid over EUR 100 billion for 3G radio spectrum licences reserved for W-CDMA. Industry players

---

[26]   Global System for Mobile communications.
[27]   Long Term Evolution.
[28]   OECD, Infrastructure to 2030, 2006, page 92, available at:
       http://books.google.com.mx/books?id=FwNXkhSbJNAC&printsec=frontcover&hl=fr&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false .

are thus "locked-in" to the UMTS standard and its air-interface, W-CDMA technology, on which Samsung's UMTS SEPs relevant for this case, read.

(50)     Fifth, 4G standards, such as LTE, that are currently being deployed throughout the EEA, do not constrain Samsung's dominant position, because, at least in the medium-term, these technologies are likely to be complementary rather than substitutes[29]. They build on top of UMTS and, for technical reasons, mobile device manufacturers need to ensure full backward compatibility with UMTS[30].

(51)     Sixth, the alleged countervailing power of certain potential licensees of Samsung's UMTS SEPs is not an effective constraint on Samsung's dominance. Companies wishing to implement the UMTS standard cannot switch to other suppliers. There are no substitutes to the technology, as specified in the UMTS standard technical specifications, on which each of Samsung's UMTS SEPs reads. There are also no viable substitutes to the UMTS standard in the EEA (see recital (42) above).

## 4.4.   Practices raising concerns

(52)     In the Statement of Objections, the Commission expressed the concern that in the exceptional circumstances of this case and in the absence of any objective justification, Samsung had infringed Article 102 TFEU by seeking preliminary (interlocutory) and permanent injunctions against Apple on the basis of certain of its UMTS SEPs. Apple's alleged unwillingness to enter into a licence agreement for Samsung's UMTS SEPs on FRAND terms and conditions was taken into account as a potential objective justification (see recital (68)), the analysis of which formed an integral part of the preliminary assessment of whether Samsung's conduct may constitute an abuse of a dominant position.

(53)     In July 2010, Apple informed Samsung that it considered certain of Samsung's Galaxy products to be infringing certain of its non-SEPs[31]. On 15 April 2011, Apple sued Samsung in the Northern District of California for infringement of those non-SEPs[32].

(54)     From 21 April 2011 onwards, Samsung sought preliminary and permanent injunctions against Apple before courts in France, Germany, Italy, the Netherlands and the United Kingdom, on the basis of certain of its UMTS SEPs. Samsung maintained these injunction actions until December 2012 when it announced unilaterally the withdrawal of these actions[33]. The withdrawal does not, however, prevent Samsung from seeking injunctions based on SEPs in the future.

---

[29]     See UMTS Forum Report 42: LTE Mobile Ecosystem – the Global Opportunity.
[30]     LTE will support handover and roaming to existing WCDMA mobile networks, see UMTS Forum, A White Paper: Mobile Broadband: Evolution from HSPA to LTE, section 5, page 34, available at: http://www.lteportal.com/Files/MarketSpace/Download/_UMTS_Forum_MBB_LTE_White_Paper_February_2009_v2.pdf?PHPSESSID=0feed623e099c7c74a2483ebe0caef30.
[31]     Apple's reply to Question 11 of the Commission's RFI of 13 October 2011.
[32]     Samsung's reply to Question 7 of the Commission's RFI of 11 July 2012 and Apple's reply to Question 6 of the Commission's RFI of 28 June 2012.
[33]     See Samsung's press statement of 18 December 2012: "[…] Samsung has decided to withdraw our injunction requests against Apple on the basis of our standard essential patents pending in European courts, in the interest of protecting consumer choice."

### 4.4.1.  *The exceptional circumstances*

(55)    A patent holder, including a holder of SEPs, is generally entitled to seek injunctions as part of the exercise of its IP rights. The seeking of injunctions cannot therefore, in itself, constitute an abuse of a dominant position.

(56)    The exercise of an exclusive right by its owner may, however, in exceptional circumstances and in the absence of any objective justification involve abusive conduct[34]. The list of such exceptional circumstances is not exhaustive[35]. The Commission preliminarily concluded that the exceptional circumstances in this case are: (i) the UMTS standard-setting process; and (ii) Samsung's commitment to ETSI to license its UMTS SEPs on FRAND terms and conditions.

#### 4.4.1.1.  The UMTS standard-setting process

(57)    As set out in recital (36) above, the UMTS standard has been widely implemented in the EEA.

(58)    The industry is thus locked-in, with the risk that each holder of UMTS SEPs may be able to behave in anti-competitive ways, for example by holding-up implementers after the adoption of the standard either by refusing to license the necessary IP or by demanding excessive royalty fees[36].

#### 4.4.1.2.  Samsung's commitment to ETSI to license its UMTS SEPs on FRAND terms and conditions

(59)    In order to ensure effective access to the UMTS standard, ETSI requires that, as a *quid pro quo* for patents being included in the UMTS standard, SEPs holders commit to licensing their relevant UMTS patents on FRAND terms and conditions (see recital (34) above). Such a commitment seeks to ensure that essential IPR protected technology incorporated in a standard is accessible to the users of that standard on FRAND terms and conditions[37]. The commitment to license on FRAND terms and conditions also allows SEP holders to obtain FRAND royalties as remuneration for making their standardised technology available to third parties.

(60)    In December 1998, Samsung committed to license its UMTS patents on FRAND terms and conditions. In line with Article 6.1 of ETSI IPR policy, it committed expressly to grant irrevocable licences.

(61)    When contributing its technology to the UMTS standard, Samsung therefore agreed to: (i) license its UMTS SEPs; and (ii) license them on FRAND terms and

---

[34]    Case 238/87 *Volvo v Veng* [1988] ECR 6211, paragraph 9; Joined Cases C-241/91 P and C-242/91 P *RTE and ITP* v *Commission* ("*Magill*") [1995] ECR I-743, paragraph 50; Case C-7/97 *Bronner* [1998] ECR I-7791, paragraph 39; Case C-418/01 *IMS Health* [2004] ECR I-5039, paragraph 35; Case T-201/04 *Microsoft v Commission* [2007] ECR II-3601, paragraph 331.

[35]    Case 238/87 *Volvo v Veng* [1988] ECR 6211, paragraph 9; Case C-7/97 *Bronner* [1998] ECR I-7791, paragraph 40; Case C-418/01 *IMS Health* [2004] ECR I-5039, paragraphs 36-38; Case T-201/04 *Microsoft v Commission* [2007] ECR II-3601, paragraph 332.

[36]    Horizontal Guidelines, paragraph 269.

[37]    *Ibid*, paragraph 287.

conditions. It follows that Samsung expects to obtain remuneration for its SEPs by means of licensing revenue rather than using these patents to seek to exclude others.

### 4.4.2.   Anti-competitive effects

(62)   The Commission preliminarily concluded that Samsung's seeking of preliminary and permanent injunctions against Apple on the basis of its UMTS SEPs was capable of: (i) excluding Apple, a rival manufacturer of UMTS-compliant mobile devices from the market; and (ii) inducing Apple to accept disadvantageous licensing terms, compared to those which Apple may have accepted in the absence of injunctions being sought.

(63)   The Commission also preliminarily concluded that the abusive nature of Samsung's conduct was not affected by the fact that an act by an autonomous judicial body (i.e. the grant of an injunction by a court) was a precondition for certain of the anti-competitive effects to be capable of materialising. Samsung had discretion to decide whether to seek preliminary and permanent injunctions against Apple on the basis of its UMTS SEPs. Samsung had to ensure that the conduct it elected to pursue within such discretion was consistent with its obligations under Article 102 TFEU[38].

(64)   The Commission also preliminarily concluded that the abusive nature of Samsung's conduct was not affected by the fact that the desired result was not ultimately achieved[39].

### 4.4.3.   Potential objective justification for Samsung's conduct

(65)   The Commission preliminarily concluded that Samsung's seeking of preliminary and permanent injunctions against Apple on the basis of UMTS SEPs could not be justified by: (i) the need to protect Samsung's IPR; or (ii) the need to protect Samsung's commercial interests; (iii) the public interest in an effective standardisation process; or (iv) possible advantages in terms of efficiencies that also benefit consumers.

(66)   Regarding the need to protect Samsung's IPR, the mere holding of IPR cannot, in itself, constitute an objective justification for the seeking of an injunction by a SEP holder against a potential licensee that is not unwilling to enter into a licence agreement on FRAND terms and conditions[40]. Any other conclusion would be inconsistent with the purpose of the exception with regard to the exercise of IPR which the case-law recognises in favour of free competition. If the mere fact of holding IPR could constitute an objective justification for the seeking and enforcement of an injunction by a SEP holder against a potential licensee that is not unwilling to enter into a licence agreement on FRAND terms and conditions, the exception established by the case-law could never apply.

---

[38]   Case C-280/08 P *Deutsche Telekom v Commission* [2008] ECR II-477, paragraphs 84-85.

[39]   See, to that effect, Case C-52/09 *TeliaSonera*, [2011] ECR I-527, paragraph 62 et seq.; Case C-280/08 P *Deutsche Telekom v Commission* [2010] ECR I-9555, paragraphs 177 et seq. and 253 et seq.; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, judgment of 27 March 2012, not yet reported, paragraphs 26, 42 and 44; and Case C-457/10 P *AstraZeneca v Commission*, judgment of 6 December 2012, not yet reported, paragraphs 109 and 111.

[40]   Case T-201/04 *Microsoft v Commission* [2007] ECR II-3601, paragraph 690.

(67)    Regarding the protection of Samsung's commercial interests, a SEP holder is entitled to take reasonable steps to protect its interests by seeking preliminary and permanent injunctions against a potential licensee in, for example, the following scenarios:

    (1)    a potential licensee is in financial distress and unable to pay its debts;

    (2)    a potential licensee's assets are located in jurisdictions that do not provide for adequate means of enforcement of damages; or

    (3)    a potential licensee is unwilling to enter into a licence agreement on FRAND terms and conditions, with the result that the SEP holder will not receive FRAND compensation for the use of its SEPs. The corollary of a patent holder committing, in the standardisation context, to license its SEPs on FRAND terms and conditions is that a potential licensee should not be unwilling to enter into a FRAND licence agreement for the SEPs in question.

(68)    The Commission's preliminary assessment focused on the third scenario, namely Apple's alleged unwillingness to enter into a licence agreement for Samsung's UMTS SEPs on FRAND terms and conditions. The Commission reached the preliminary conclusion that, at the time of Samsung's conduct, Apple could not be said to be unwilling to enter into a licence agreement for Samsung's UMTS SEPs on FRAND terms and conditions.

(69)    Regarding the public interest in an effective standardisation process, the Commission reached the preliminary conclusion that ensuring that preliminary and permanent injunctions are not sought against potential licensees that are not unwilling to enter into licence agreements on FRAND terms and conditions safeguards the accessibility of the intellectual property included in the standard and thereby promotes the proper functioning of standard-setting.

(70)    Regarding possible advantages in terms of efficiencies that also benefit consumers[41], the Commission preliminarily concluded that it was unlikely that the anti-competitive effects of Samsung's conduct could be counterbalanced by any such advantages.

### 4.4.4.    *The Union's international obligations and the balancing of fundamental rights*

(71)    The Commission preliminarily concluded that a finding that Samsung has abused its dominant position by seeking preliminary and permanent injunctions against Apple on the basis of its UMTS SEPs would be consistent with the Union's international obligations, in particular those under the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS)[42].

(72)    The Commission also preliminarily concluded that a finding that Samsung has abused its dominant position by seeking preliminary and permanent injunctions on the basis of its UMTS SEPs against Apple would, whilst taking into account the

---

[41]    Case C-209/10 *Post Danmark A/S v Konkurrenceradet*, judgment of 27 March 2012, not yet reported, paragraph 41.

[42]    Case T-201/04 *Microsoft v Commission* [2007] ECR II-3601, paragraph 1192.

**EN**                                          16                                          **EN**

public interest in maintaining effective competition[43], fully respect the requirement that a fair balance be struck between the fundamental rights and freedoms at stake, namely the rights linked to intellectual property enshrined in Article 17(2) of the Charter of Fundamental Rights of the European Union ("the Charter"); the right of access to a tribunal, enshrined in Article 47 of the Charter; and the freedom to conduct a business, enshrined in Article 16 of the Charter[44].

(73)     The Commission conducted such a balancing exercise in line with Article 52(1) of the Charter[45].

### 4.5.    Effect on trade between Member States and between the Contracting Parties to the EEA Agreement

(74)     The Commission preliminarily concluded that Samsung's conduct may have an effect on trade between Member States and between the Contracting Parties to the EEA Agreement.

### 5.    THE INITIAL COMMITMENTS

(75)     The key elements of the Initial Commitments offered by Samsung on 27 September 2013 were as follows.

(76)     Samsung committed not to seek injunctive relief before any court or tribunal in the EEA for infringement of its SEPs (including all existing and future SEPs) reading on a standard ("Mobile Standard") implemented in smartphones and tablets ("Mobile SEPs") against a potential licensee that, within 30 days of receipt of an invitation to negotiate, agrees to, and complies with, a certain licensing framework ("Licensing Framework") for the determination of FRAND terms and conditions.

(77)     The Licensing Framework encompassed either a unilateral licensing agreement covering Samsung's Mobile SEPs or, if either Samsung or the potential licensee so requested, a cross-licensing agreement covering both Samsung's Mobile SEPs and certain of the potential licensee's SEPs covered by the reciprocity rules of SSOs. The possibility for Samsung to demand a cross-licence from a potential licensee preserves Samsung's existing right to make its offer conditional on the potential licensee

---

[43]     See Protocol No 27 on the internal market and competition, annexed to the Treaty of Lisbon, OJ C 83, 30.3.2010, page 309. See also Case C-52/09 *TeliaSonera* [2011] ECR I-527, paragraphs 20 and 21.

[44]     Regarding the rights linked to IP, see Cases C-70/10 *Scarlet Extended* [2011] ECR I-11959, paragraph 45 and C-360/10 *SABAM*, judgment of 16 February 2012, not yet reported, paragraph 43. Regarding the right of access to a tribunal, see Case C-279/09 *DEB* [2010] ECR I-13849, paragraph 56. Regarding the freedom to conduct a business, see Case C-283/11 *Sky Österreich*, judgment of 22 January 2013, not yet reported, paragraph 60.

[45]     Regarding the rights linked to intellectual property, see Case C-416/10 *Jozef Križan and Others*, judgment of 15 January 2013, not yet reported, paragraph 113. Regarding the right of access to a tribunal, see Joined Cases C-317/08 to C-320/08 *Alassini and others* [2010] ECR I-2213, paragraph 63 and Case C-334/12 RX-II *Arango Jaramillo and Others* v *EIB*, judgment of 28 February 2013, not yet reported, paragraph 43. Regarding the freedom to conduct a business, see Cases C-544/10 *Deutsches Weintor eG*, judgment of 6 September 2012, not yet reported, paragraph 54 and C-348/12 P *Council v Manufacturing Support & Procurement Kala Naft*, judgment of 28 November 2013, not yet reported, paragraph 122.

reciprocating in respect of its own SEPs, as provided for by the SSOs' reciprocity rules.

(78)     The Licensing Framework included:

(a)     a negotiation period of up to 12 months; and

(b)     a third-party determination of FRAND terms and conditions, in the event no licensing agreement or alternative process for determining FRAND terms and conditions was agreed upon at the end of the negotiation period. The third-party determination of FRAND terms and conditions consisted of the submission of the dispute to arbitration or to court adjudication in order to determine the FRAND terms and conditions of either a unilateral licensing or cross-licensing agreement. In case of disagreement between Samsung and a potential licensee about the venue for the determination of FRAND terms and conditions, the dispute would be submitted to arbitration.

(79)     As an exception, Samsung could seek an injunction against a potential licensee on the basis of Samsung's Mobile SEPs where two cumulative conditions were met: (i) a potential licensee has sought an injunction against Samsung on the basis of certain of its Mobile SEPs; and (ii) Samsung has agreed to be bound by the Licensing Framework for its own Mobile SEPs and certain of the Mobile SEPs of the potential licensee as covered by the reciprocity rules of SSOs[46].

(80)     The commitments would be binding for five years from the date on which Samsung receives formal notification of any decision pursuant to Article 9(1) of Regulation (EC) No 1/2003.

(81)     A trustee would be appointed to monitor Samsung's compliance with the commitments.

### 6.     COMMISSION NOTICE PURSUANT TO ARTICLE 27(4) OF REGULATION (EC) 1/2003

(82)     In response to the publication of the Notice on 18 October 2013, the Commission received 18 observations from interested third parties. The main issues raised by third parties in response to the Notice were as follows.

### 6.1.     Default venue for FRAND determination

(83)     Several respondents noted that Samsung could withhold its agreement to submit the dispute to a court and force potential licensees into arbitration. This would deprive

---

[46]     This exception would apply in scenarios where Samsung is faced with a request for injunctive relief by a potential licensee on the basis of Mobile SEPs with respect to which Samsung will not be able to claim "Reciprocity", as defined in the commitments. Before being entitled to seek an injunction, Samsung would still first need to send an invitation to negotiate for these Mobile SEPs pursuant to Annex B of the commitments. For Mobile SEPs for which Samsung will be able to claim reciprocity, the commitments already provide that Samsung is protected by the standard mechanism of the commitments because Samsung is bound only vis-à-vis potential licensees that sign up to and abide by the Licensing Framework, which, *inter alia*, provides that the potential licensee and Samsung must withdraw any requests for injunctive relief (Annex A to the commitments).

potential licensees of the right to have the dispute decided by a court, which, in the view of respondents, is a more transparent venue for determining FRAND terms and conditions because proceedings before a court are subject to public scrutiny and produce judgments with precedent value.

(84)   Some respondents emphasised that arbitration as a default solution would also compel potential licensees to give up their right to make non-infringement, invalidity or non-essentiality claims with regard to Samsung's Mobile SEPs before national courts, which are better placed to evaluate such claims.

## 6.2.   Burden of proof

(85)   Several respondents expressed the concern that the commitments could affect the burden of proof for finding infringement, validity and essentiality of the SEPs in question during the third-party determination of FRAND terms and conditions. They contended that Samsung would no longer need to prove that its patents are infringed.

(86)   Certain respondents also argued that the commitments would prevent potential licensees from raising non-infringement and invalidity defences during the third-party determination of FRAND terms and conditions. This is because the commitments did not contain any provision obliging the court or arbitration tribunal making the determination of FRAND terms and conditions to examine and conclude on such arguments.

## 6.3.   Upfront licensing terms

(87)   Certain respondents emphasised that Samsung ought to provide, with its invitation to negotiate, details of its proposed licensing terms and conditions in order to allow potential licensees to assess whether to sign up to the Licensing Framework. Such details should include information about: (i) the relevant Mobile Standards; (ii) the Mobile SEPs that Samsung claims are infringed; (iii) the value these Mobile SEPs contribute to the Mobile Standards; and (iv) the requested royalty rate, including the underlying calculation method used by Samsung.

## 6.4.   Continuation of third-party FRAND determinations after the expiry of the commitments

(88)   A number of respondents claimed that Samsung could terminate FRAND determination proceedings initiated during the term of the commitments and that would still be ongoing when the five-year term of Samsung's commitments elapses. This lacuna would have a negative impact upon the effectiveness of the commitments because potential licensees may not want to sign up to the Licensing Framework if FRAND determination proceedings that have begun during the five-year term of the commitments have not concluded.

## 6.5.   Conditioning of SEPs licences on access to a potential licensee's non-SEPs

(89)   Certain respondents argued that Samsung would be able to condition access to its Mobile SEPs on the cross-licensing of a potential licensee's non-SEPs or the cross-licensing of SEPs that are not covered by the reciprocity rules of SSOs.

**EN**                                       19                                       **EN**

**6.6.     Publication of FRAND determinations by arbitration tribunals**

(90)   Certain respondents argued that as FRAND determinations by arbitration tribunals would be confidential, this could prevent the development of a body of past determinations upon which future FRAND determinations could draw.

**6.7.     Composition of arbitration tribunals**

(91)   One respondent expressed the concern that the composition of the arbitration tribunal would not be properly balanced. Only individuals with experience in the telecommunications industry would be eligible to act as arbitrators, despite the fact that mobile devices contain many IT standards.

**6.8.     Geographic scope of the commitments**

(92)   Certain respondents suggested that the commitments should be worldwide in scope. They argued that this would be a more effective solution as it would prevent Samsung from using SEP-based injunctions outside the EEA as leverage for negotiations that have an impact within the EEA.

**6.9.     Product scope of the commitments**

(93)   Certain respondents suggested that in order to constrain fully Samsung's ability to seek preliminary and permanent injunctions, the commitments should cover all products on which Samsung's SEPs read and not just Mobile Devices.

**6.10.    Duration of the commitments**

(94)   Certain respondents suggested that the five-year duration of the commitments was too short. A duration of ten years would be more appropriate, in particular in light of the potential length of a FRAND determination.

**6.11.    Escrow payments pending the outcome of the FRAND determination**

(95)   Certain respondents indicated that the commitments should include an explicit provision that a court or arbitration tribunal may request that payments be made in escrow pending the outcome of a FRAND determination.

**6.12.    Additional venues for FRAND determination**

(96)   Certain respondents called for an extension of the list of the courts and arbitration tribunals that can be used for third-party FRAND determination purposes. They also suggested the inclusion of specific additional arbitration bodies.

**7.     FINAL COMMITMENTS**

(97)   In light of the issues raised by interested third parties in their observations, Samsung modified its Initial Commitments and submitted the Final Commitments on 3 February 2014. The main changes made by Samsung in the Final Commitments are as follows.

**EN**                                   20                                   **EN**

(98)     First, if Samsung and a potential licensee do not agree on the venue for a third-party determination of FRAND terms and conditions, the default option will be court adjudication, either by the Patents Court, High Court of England and Wales or the Unified Patent Court. Arbitration by either the International Chamber of Commerce or the arbitration centre as established under Article 35(1) of the Agreement on a Unified Patent Court remains an option in two scenarios: (i) both parties agree to submit the dispute to arbitration; or (ii) the Patents Court, High Court of England and Wales or the Unified Patent Court declines jurisdiction.

(99)     Second, Samsung has clarified that the commitments will not alter in any way the burden of proof under applicable law with respect to validity, infringement, and essentiality of the Mobile SEPs in question. In addition, Samsung and the potential licensee will be required to request the court or the arbitration tribunal to take into account issues of infringement, validity and essentiality raised by the parties when determining FRAND terms and conditions. Finally, the arbitration tribunal will be required to take these issues into account when making a FRAND determination.

(100)    Third, Samsung will include with its invitation to negotiate: (i) a "proud list" i.e. a reasonable number of representative Mobile SEPs, together with claim charts; (ii) a list of the Mobile Standards that Samsung believes are implemented by the potential licensee; and (iii) a proposed duration for the licensing agreement which will not be less than five years. In addition, in order to allow a potential licensee to assess fully the details provided by Samsung with the invitation to negotiate, a potential licensee will have 60, instead of 30 days, to sign the invitation to negotiate, which constitutes the contractual basis of the Licensing Framework.

(101)    Fourth after the expiry of the commitments, Samsung will remain subject to all contractual obligations entered into during the term of the commitments.

(102)    Fifth, Samsung cannot condition the licensing of its Mobile SEPs on the cross-licensing of a potential licensee's non-SEPs or SEPs not covered by the reciprocity rules of SSOs.

(103)    Sixth, non-confidential versions of FRAND determinations by arbitration tribunals will be made public in accordance with the applicable rules of the tribunal, in particular the method applied to calculate the FRAND rate.

(104)    Seventh, arbitrators from a broader field of specialisation, including from the IT industry, will be eligible to be selected as arbitrators.

## 8.   ASSESSMENT OF THE FINAL COMMITMENTS IN LIGHT OF THE ISSUES RAISED BY INTERESTED THIRD PARTIES

(105)    The Commission's position regarding the main changes in the Final Commitments, as set out in recitals (98)-(104), is as follows.

(106)    First, the default court option addresses in a number of ways the concern of several respondents that Samsung could prevent potential licensees from bringing the dispute before a court. In the first place, court judgments are public, including the FRAND rate, and create precedents. In the second place, court findings on invalidity have an

*erga omnes* effect, thereby contributing to the public interest of eliminating any obstacle to economic activity which may arise where a patent is granted in error[47].

(107)   Second, the Final Commitments confirm that the applicable rules on burden of proof in patent litigation will not be altered. Furthermore, the court will be requested by the parties, and the arbitration tribunal shall take into account issues of validity, infringement and essentiality. Such an assessment can be done in different ways, such as sampling, if this is appropriate and efficient in view of the number of patents at stake[48].

(108)   Third, the Final Commitments ensure that Samsung will provide, with its invitation to negotiate, sufficient details of its proposed licensing terms and conditions in order to allow potential licensees to assess whether to sign up to the Licensing Framework (see recitals (87) and (100) above). To the extent that the Final Commitments do not require Samsung to provide, with its invitation to negotiate, specific information on possible royalty rates, the Commission considers that this is not necessary for the effectiveness of the commitments, because the rate will, in any event, be the focus of the initial 12-month negotiation period and the ensuing FRAND determination. In addition, nothing in the Final Commitments prevents Samsung from providing such information to potential licensees on a case-by-case basis.

(109)   Fourth, the Final Commitments clarify that FRAND determination proceedings that have begun during the five-year term of the commitments cannot be unilaterally terminated by Samsung once the five-year term of the commitments lapses. This will contribute to the effectiveness of the commitments by encouraging potential licensees to sign up to the Licensing Framework.

(110)   Fifth, the Final Commitments make clear that Samsung cannot make access to its SEPs conditional on the cross-licensing of either non-SEPs or SEPs that are not covered by the reciprocity rules of SSOs. This addresses the concern that the commitments would allow Samsung to force a potential licensee to (cross-) licence such patents.

(111)   Sixth, the publication of a non-confidential version of arbitration awards will contribute to the creation of a body of case-law upon which future FRAND determinations could draw. This should contribute to a principled and efficient solution of future FRAND disputes by arbitration tribunals.

(112)   Seventh, the fact that arbitrators can now also be chosen from the IT field of specialisation ensures expertise from a broader field and avoids any possible bias in favour of parties from the telecommunications industry.

(113)   Regarding the other suggestions put forward by respondents to the market test, as set out in recitals (92)-(96) above, the Commission's position is as follows.

---

[47]   Case 193/83 *Windsurfing International* [1986] ECR 611, paragraph 92.

[48]   When determining FRAND terms and conditions, the court or arbitration tribunal could draw on the methods outlined in paragraphs 289 and 290 of the Horizontal Guidelines.

**EN**

**EN**

(114)   Regarding the geographic scope of the commitments, there is currently no evidence that Samsung's seeking of injunctions in jurisdictions outside the EEA on the basis of its Mobile SEPs has had an appreciable anti-competitive effect in the internal market. In any event, any such conduct remains subject to Article 102 TFEU as the commitments do not address Samsung's seeking of injunctions in jurisdictions outside the EEA on the basis of its Mobile SEPs.

(115)   Regarding the product scope of the commitments, the competition concerns expressed in the Statement of Objections were limited to the seeking by Samsung of injunctions on the basis of its UMTS SEPs. Further broadening the scope of the commitments would therefore go beyond what is necessary to remedy the competition concerns. In addition, any seeking by Samsung of injunctions within the EEA on the basis of its non-Mobile SEPs remains subject to Article 102 TFEU.

(116)   Regarding the duration of the commitments given the fast-moving nature of the mobile device sector[49], five years is an adequate duration. For example, Apple entered the market for mobile devices only in 2007 and other major players recently changed their business models[50]. The mobile devices industry may therefore continue to undergo important changes in the short to medium term that may alter the competitive dynamics.

(117)   Regarding the need for a potential licensee to make escrow payments during the FRAND determination process, while the commitments do not specifically provide for such a possibility, the court or arbitration tribunal making the FRAND determination may require a reasonable security in accordance with the applicable rules during the FRAND determination process, where it considers this is necessary to safeguard the rights of the SEP holder to be adequately compensated for its SEPs.

(118)   Regarding additional possible venues for the FRAND determination, the venues provided for by the commitments are sufficient to ensure the effectiveness of the commitments.

## 9.    PROPORTIONALITY OF THE FINAL COMMITMENTS

### 9.1.    Principles

(119)   The principle of proportionality requires that the measures adopted by institutions of the Union must be suitable and not exceed what is appropriate and necessary for attaining the objective pursued[51]. Where there is a choice between several

---

[49]   See Case COMP/M.6381 – Google/Motorola Mobility, Commission decision of 13 February 2012, recital 107.

[50]   See for instance, Case COMP/M.7047 – Microsoft/Nokia, Commission decision of 4 December 2013.

[51]   See for instance, Case T-260/94 *Air Inter v Commission* [1997] ECR II-997, paragraph 144 and Case T-65/98 *Van den Bergh Foods v Commission* [2003] ECR II-4653, paragraph 201.

**EN**                                              23                                              **EN**

appropriate measures, recourse must be had to the least onerous, and the disadvantages caused must not be disproportionate to the aims pursued[52].

(120)     In the context of Article 9 of Regulation No 1/2003, application of the principle of proportionality requires the Commission to assess that the commitments in question address the concerns expressed by the Commission in its Preliminary Assessment and that the undertakings concerned have not offered less onerous commitments that also address those concerns adequately[53]. When carrying out that assessment, the Commission must take into consideration the interests of third parties[54].

## 9.2.     Application in the present case

(121)     The Final Commitments offered by Samsung address the competition concerns expressed in the Statement of Objections adequately.

(122)     The commitments ensure that Samsung will not be able to seek injunctions on the basis of its Mobile SEPs against any potential licensee willing to enter into a licence agreement on FRAND terms and conditions. They thus provide for a "safe-harbour" available to all potential licensees of Samsung's Mobile SEPs that submit to the Licensing Framework provided for by the commitments.

(123)     A potential licensee can also choose not to sign up to the Licensing Framework. In such a case, the potential licensee cannot be automatically regarded as unwilling to enter into a licence agreement on FRAND terms and conditions. Rather, the court or tribunal called upon by Samsung to grant injunctive relief would need to evaluate all the circumstances of the case at hand in order to decide whether a potential licensee is indeed unwilling to enter into a licence agreement on FRAND terms and conditions. This is without prejudice to Samsung being able to seek injunctions against a potential licensee pursuant to Clause 2 of the commitments.

(124)     Samsung has not offered less onerous commitments in response to the Statement of Objections that also address the Commission's concerns adequately. In particular, for the reasons set out in recitals (106)-(112) above, the Initial Commitments of 27 September 2013 did not address the Commission's concerns adequately.

(125)     Finally, the Commission has taken into consideration the interests of third parties, including those that responded to the Notice[55].

## 10.     CONCLUSION

(126)     By adopting a decision pursuant to Article 9(1) of Regulation (EC) No 1/2003, the Commission makes binding the Final Commitments offered by Samsung to meet the Commission's concerns expressed in its Statement of Objections. Recital 13 of

---

[52]     Case 265/87 *Schräder* [1989] ECR 2237, paragraph 21; Case C-174/05 *Zuid-Hollandse Milieufederatie and Natuur en Milieu* [2006] ECR I-2243, paragraph 28.

[53]     Case C-441/07 P *Commission v Alrosa* [2010] ECR I-5949, paragraph 41.

[54]     *Ibid.*

[55]     As mentioned in recital (72) above, the Commission has struck a balance between the fundamental rights and freedoms at stake as well as the public interest in maintaining effective competition.

Regulation (EC) No 1/2003 states that such a decision should not conclude whether or not there has been or still is an infringement.

(127)   The Commission's assessment of whether the Final Commitments offered by Samsung are adequate to meet the concerns expressed in the Statement of Objections represents the view of the Commission based on its underlying investigation and analysis, and the observations received from third parties following the publication of the Notice. In the light of the Final Commitments offered by Samsung, the Commission considers that there are no longer grounds for action on its part and, without prejudice to Article 9(2) of Regulation (EC) No 1/2003, the proceedings in this case should therefore be brought to an end.

(128)   The Commission retains full discretion to investigate and open proceedings under Article 102 of the Treaty and Article 54 of the EEA Agreement as regards practices that are not the subject matter of this Decision.

HAS ADOPTED THIS DECISION:

*Article 1*

The Commitments as listed in the Annex shall be binding on Samsung Electronics Co., Ltd. and any legal entity directly or indirectly controlled by it as defined by Council Regulation (EC) No 139/2004, including Samsung Electronics France, Samsung Electronics GmbH, Samsung Electronics Holding GmbH and Samsung Electronics Italia s.p.a., for a period of five years from the date of adoption of this Decision.

*Article 2*

It is hereby concluded that there are no longer grounds for action in this case.

*Article 3*

This Decision is addressed to:

Samsung Electronics Co., Ltd.
Samsung Electronics Bldg., 1320-10
Seocho 2-dong, Seocho-gu
Seoul 137-965
South Korea

Samsung Electronics France
270, Av. du Président Wilson
93458 La Plaine Saint-Denis Cedex
France

Samsung Electronics GmbH
Samsung House
Am Kronberger Hang 6
65824 Schwalbach / Ts.

**EN**                                    25                                    **EN**

Germany

Samsung Electronics Holding GmbH
Samsung House
Am Kronberger Hang 6
65824 Schwalbach / Ts.
Germany

Samsung Electronics Italia s.p.a.
Via C. Donat Cattin 5
20063 Cernusco sul Naviglio (MI)
Italy

Done at Brussels,

*For the Commission*
*Joaquín ALMUNIA*
*Vice-President*

**EN**                                                      **EN**