# EXHIBIT 15

**DECLARATION OF LEIF PETERSON IN SUPPORT OF HUAWEI'S OPPOSITION TO SAMSUNG'S MOTION TO PARTIALLY EXCLUDE AND STRIKE**

**ANALYSIS OF PROPOSED CONSENT ORDER**
**TO AID PUBLIC COMMENT**

*In the Matter of Motorola Mobility LLC and Google Inc., File No. 121-0120*

The Federal Trade Commission ("Commission") has accepted, subject to final approval, an Agreement Containing Consent Order ("Agreement") with Motorola Mobility LLC (formerly Motorola Mobility, Inc. ("Motorola"), a wholly-owned subsidiary of Respondent Google Inc.), and Google Inc. ("Google"), which is designed to settle allegations that Motorola and Google violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, by engaging in unfair methods of competition and unfair acts or practices relating to the licensing of standard essential patents ("SEPs") for cellular, video codec, and wireless LAN standards. The Complaint alleges that, after committing to license the SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms Motorola sought injunctions and exclusion orders against willing licensees, undermining the procompetitive standard-setting process. After purchasing Motorola for $12.5 billion in June 2012, Google continued Motorola's anticompetitive behavior.

The Proposed Consent Order has been placed on the public record for thirty (30) days for comments by interested persons. Comments received during this period will become part of the public record. After thirty (30) days, the Commission will again review the Agreement and the comments received and will decide whether it should withdraw from the Agreement or make final the Agreement's Proposed Consent Order.

The purpose of this analysis is to facilitate comments on the Proposed Consent Order. This analysis does not constitute an official interpretation of the Proposed Consent Order, and does not modify its terms in any way. The Agreement has been entered into for settlement purposes only and does not constitute an admission by Motorola or Google that the law has been violated as alleged or that the facts alleged, other than jurisdictional facts, are true.

**Background**

American consumers rely on standardized technology for the interoperability of consumer electronics and other products. Manufacturers of these products participate in standard-setting organizations ("SSOs") such as the European Telecommunications Standards Institute ("ETSI"), the Institute of Electrical and Electronics Engineers ("IEEE"), and the International Telecommunication Union ("ITU") that agree upon and develop standards based on shared technologies that incorporate patents. SSOs and the standards they promulgate have procompetitive benefits; they encourage common technological platforms that many different manufacturers ultimately incorporate into their respective products.[1] Standards foster competition among these manufacturers' products and facilitate the entry of related products. Overall, standards benefit the market by encouraging compatibility among all products,

---

[1] As the Supreme Court has recognized, when properly formulated standards "can have significant procompetitive advantages." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988).

promoting interoperability of competing devices, and lowering the costs of products for consumers.

Many SSOs require that a firm make a licensing commitment, such as a FRAND commitment, in order for its patented technology to be included in a standard.  SSOs have this policy because the incorporation of patented technology into a standard induces market reliance on that patent and increases its value.  After manufacturers implement a standard, they can become "locked-in" to the standard and face substantial switching costs if they must abandon initial designs and substitute different technologies.  This allows SEP holders to demand terms that reflect not only "the value conferred by the patent itself," but also "the additional value—the hold-up value—conferred by the patent's being designated as standard-essential."[2]  The FRAND commitment is a promise intended to mitigate the potential for patent hold-up.[3]  In other words, it restrains the exercise of market power gained by a firm when its patent is included in a standard and the standard is widely adopted in the market.[4]

Despite the significant procompetitive benefits of standard setting, particularly the interoperability of technology that arises from efficient and effective standards, standard setting is a collaborative process among competitors that often displaces free market competition in technology platforms.  FRAND commitments by SSO members are critical to offsetting the potential anticompetitive effects of such agreements while preserving the procompetitive aspects of standard setting.

Seeking and threatening injunctions against willing licensees of FRAND-encumbered SEPs undermines the integrity and efficiency of the standard-setting process and decreases the incentives to participate in the process and implement published standards.  Such conduct reduces the value of standard setting, as firms will be less likely to rely on the standard-setting process.  Implementers wary of the risk of patent hold-up may diminish or abandon entirely their participation in the standard-setting process and their reliance on standards.  If firms forego participation in the standard-setting process, consumers will no longer enjoy the benefits of interoperability that arise from standard setting, manufacturers have less incentive to innovate

---

[2] *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913 (N.D. Ill. 2012) (Posner, J., sitting by designation).

[3] As the Commission explained in its unanimous filing before the United States International Trade Commission ("ITC"), incorporating patented technologies into standards without safeguards risks distorting competition because it enables SEP owners to negotiate high royalty rates and other favorable terms, after a standard is adopted, that they could not credibly demand beforehand.  The exercise of this leverage is known as patent hold-up. See Third Party United States Federal Trade Commission's Statement on the Public Interest filed on June 6, 2012 in *In re Certain Wireless Communication Devices, Portable Music & Data Processing Devices, Computers and Components Thereof*, Inv. No. 337-TA-745, available at www.ftc.gov/os/2012/06/1206ftcwirelesscom.pdf ; *In re Certain Gaming and Entertainment\ Consoles, Related Software, and Components Thereof*, Inv. No. 337-TA-752, available at http://www.ftc.gov/os/2012/06/1206ftcgamingconsole.pdf.

[4] As the Ninth Circuit recently stated, a FRAND commitment is "a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012) (citing *Apple,* 869 F. Supp. 2d at 914).

and differentiate product offerings, and new manufacturers will be deterred from entering the market.

**The Proposed Complaint**

Motorola sought to exploit the market power that it acquired through the standard-setting process by breaching its promises to license its SEPs on FRAND terms. ETSI, ITU, and IEEE require that firms disclose whether they will commit to license their SEPs on FRAND terms in order for the SSO to decide if the patents should be included in the relevant cellular, video codec, or wireless LAN standards. Motorola promised to license its patents essential to these standards on FRAND terms, inducing ETSI, ITU, and IEEE to include its patents in cellular, video codec, and wireless LAN standards. These commitments created express and implied contracts with the SSOs and their members. In acquiring Motorola and its patent portfolio, Google affirmatively declared that it would honor Motorola's FRAND commitments.[5]

Relying on Motorola's promise to license its SEPs on FRAND terms, electronic device manufacturers implemented the relevant standards and were locked-in to using Motorola's patents. Motorola then violated the FRAND commitments made to ETSI, ITU, and IEEE by seeking, or threatening, to enjoin certain competitors from marketing and selling products compliant with the relevant standards, like the iPhone and the Xbox, from the market unless the competitor paid higher royalty rates or made other concessions. At all times relevant to the allegations in the Proposed Complaint, these competitors – Microsoft and Apple – were willing to license Motorola's SEPs on FRAND terms.

Specifically, Motorola threatened exclusion orders and injunctions in various forums against these willing licensees. Motorola filed patent infringement claims at the ITC where the only remedy for patent infringement is an exclusion order. Because of the ITC's remedial structure, filing for an exclusion order before the ITC on a FRAND-encumbered SEP significantly raises the risk of patent hold-up in concurrent licensing negotiations because an exclusion order may be entered by the ITC before a FRAND rate is reached. Motorola also filed for injunctive relief in various federal district courts, which also raises the risk of patent hold-up.

Had Google been successful in obtaining either an injunction or exclusion order against its competitors' products, it could have imposed a wide variety of costs to consumers and competition. These products could have been kept off the market entirely, diminishing competition and denying consumers access to products they wish to purchase, such as the iPhone and Xbox. Alternatively, Google's conduct might have increased prices because manufacturers, when faced with the threat of an injunction, are likely to surrender to higher royalty rates for SEPs. Other manufacturers, deterred by increased licensing fees, might exit the market altogether, or limit their product lines. In the end, prices would likely rise both because of higher

---

[5] *See* Letter from Allen Lo, Deputy General Counsel, Google, to Luis Jorge Romero Saro, Director-General, ETSI (Feb. 8, 2012); Letter from Allen Lo, Deputy General Counsel, Google, to Gordon Day, President, IEEE (Feb. 8, 2012) *available at* http://static.googleusercontent.com/external_content/untrusted_dlcp/www.google.com/en/us/press/motorola/pdf/sso-letter.pdf; Letter from Allen Lo, Deputy General Counsel, Google, to Hamadoun Toure, Secretary-General, ITU (Feb. 8, 2012).

royalties and because of less product-market competition.  Ultimately, end consumers may bear some share of these higher costs, either in the form of higher prices or lower quality products.

Consumers would also suffer to the extent that Google's conduct impaired the efficacy of the standard-setting process or diminished the willingness of firms to participate in standard-setting processes.  Relatedly, such FRAND violations may diminish the interest of SSOs in using new patented technologies – a step that could reduce the technical merit of those standards as well as their ultimate value to consumers.  This could result in increased costs or inferior standards.  Innovation by implementers would suffer and consumers would lose the benefits of lower costs, interoperability, and rapid technological development that efficient standard-setting enables.

The Proposed Complaint alleges that Motorola and Google's conduct violates Section 5 of the FTC Act, both as an unfair method of competition and an unfair act or practice.

1.  **Unfair Method of Competition**

Google and Motorola's conduct constitute an unfair method of competition and harms competition by threatening to undermine the integrity and efficiency of the standard-setting process.  FRAND commitments help ensure the efficacy of the standard-setting process and that the outcome of that process is procompetitive.  Conversely, that process is undermined when those promises are reneged.  Motorola's conduct threatens to increase prices and reduce the quality of products on the market and to deter firms from entering the market.  Moreover, Motorola's conduct threatens to deny consumers the many procompetitive benefits that standard setting makes possible.  Motorola's conduct may deter manufacturers from participating in the standard setting process and relying on standards, and SSOs from adopting standards that incorporate patented technologies.

Consistent with these principles, courts have found that patent holders may injure competition by breaching FRAND commitments they made to induce SSOs to standardize their patented technologies.[6]  Each of these cases, brought under Section 2 of the Sherman Act, involved allegations of bad faith or deceptive conduct by the patent holder before the standard was adopted.  However, under its stand-alone Section 5 authority, the Commission can reach opportunistic conduct that takes place after a standard is adopted that tends to harm consumers and undermine the standard-setting process."[7]  For example, in *Negotiated Data Solutions, LLC*

---

[6] *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 313-15 (3d Cir. 2007); *In re Rambus, Inc.*, No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006), available at
http://www.ftc.gov/os/adjpro/d9302/060802commissionopinion.pdf, *rev'd on other grounds Rambus v. F.T.C.*, 522 F.3d 456 (D.C. Cir. 2008); *Research in Motion, Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796-97 (N.D. Tex. 2008); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 U.S. Dist. LEXIS 67102, at *27-28 (N.D. Cal. May 14, 2012).

[7] The Commission's investigation did not give it reason to believe that Motorola acted with bad faith or an intent to deceive at the time it first made these FRAND commitments to IEEE, ETSI, and ITU.

("*N-Data*"),[8] the Commission condemned similar conduct as "inherently 'coercive' and 'oppressive.'"[9]  The respondent, N-Data, acquired SEPs from a patent holder that had committed to license them to any requesting party for a one-time flat fee of $1,000.  After it acquired these SEPs, N-Data reneged on this licensing commitment.  "Instead, N-Data threatened to initiate, and in some cases prosecuted, legal actions against companies refusing to pay its royalty demands, which [were] far in excess of [the $1,000 one-time flat fee]."[10]  The Commission found that N-Data's "efforts to exploit the power it enjoy[ed] over those practicing the [relevant] standard and lacking any practical alternatives" were inherently "coercive" and "oppressive" as these firms were, "as a practical matter, locked into [the] standard."[11]  As here, the Commission found that N-Data's opportunistic breach of its licensing commitment had the tendency of leading to higher prices for consumers and undermining the standard-setting process.

      Google and MMI's opportunistic violations of their FRAND commitments have the potential to harm consumers by excluding products from the market as a result of an injunction or by leading to higher prices because manufacturers are forced, by the threat of an injunction, to pay higher royalty rates.  As explained in *N-Data*, courts have traditionally viewed opportunistic breaches as conduct devoid of countervailing benefits.[12]  As Judge Posner has explained, when a promisor breaches opportunistically, "we might as well throw the book at the promisor. . . . Such conduct has no economic justification and ought simply to be deterred."[13]  As in *N-Data*, "the context here is in standard-setting," and "[a] mere departure from a previous licensing commitment is unlikely to constitute an unfair method of competition under Section 5."[14]

---

[8] *In re Negotiated Data Solutions LLC* (*N-Data*), File No. 051-0094, 2008 WL 258308 (FTC Jan. 22, 2008).

[9] *N-Data*, 2008 WL 258308, at *37 (analysis to aid public comment).

[10] *Id.* at *34–36.

[11] *Id.* at *37.  Both Section 5 and common law precedents support the conclusion that parties engage in coercive and oppressive conduct when they breach commitments after those commitments have induced others to make relationship-specific investments and forego otherwise available alternatives.  In *Holland Furnace Co. v. FTC*, 295 F.2d 302 (7th Cir. 1961), the Commission found a Section 5 violation when furnace salesmen dismantled furnaces for cleaning and inspection and refused to reassemble them until customers agreed to buy additional parts or services.  *Id.* at 305.  In *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902), the Ninth Circuit likewise found that seamen acted coercively by threatening to strike unless the owners of a fishing vessel agreed to pay them wages higher than those they had negotiated before the vessel set sail.  *Id.* at 102–03.  In each case, the victims could have turned to alternatives *ex ante* (before their furnaces had been dismantled or their vessel had set sail for remote waters), but were "locked in," and therefore vulnerable to exploitation, *ex post*.  *Id.* at 102 (explaining that, "at a time when it was impossible for the [vessel owners] to secure other men in their places," the seamen "refused to continue the services they were under contract to perform unless the [owners] would consent to pay them more money"); Neil W. Averitt, *The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act*, 70 Geo. L.J. 225, 253 (1981) (observing that the consumers in *Holland Furnace*, because they "could not escape the need to restore their units to service, . . . willingly or not, . . . often had to purchase replacements from the respondent").

[12] *N-Data*, 2008 WL 258308, at *38 (Analysis to Aid Public Comment).

[13] Richard A. Posner, Economic Analysis of Law 130 (5th ed. 1998).

[14] *N-Data*, 2008 WL 258308, at *37 (Analysis to Aid Public Comment).

2. **Unfair Act or Practice**

Google and Motorola's violations of their FRAND commitments also constitute unfair acts or practices under Section 5 because they are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." [15]  If these practices continue, consumers will likely pay higher prices because many consumer electronics manufacturers will pass on some portion of unreasonable or discriminatory royalties they agree to pay to avoid an injunction or exclusion order.  Consumers will not be able to avoid this injury, due to the industry-wide lock-in induced by Motorola's FRAND commitments.  Moreover, this practice has no apparent "countervailing benefits," either to those upon whom demands have been made, or to ultimate consumers, or to competition. [16]

**The Proposed Consent**

The Proposed Consent Order is tailored to prevent Google – through its wholly owned subsidiary, Motorola – from using injunctions or threats of injunctions against current or future potential licensees who are willing to accept a license on FRAND terms.  Under this Order, before seeking an injunction on FRAND-encumbered SEPs, Google must:  (1) provide a potential licensee with a written offer containing all of the material license terms necessary to license its SEPs, and (2) provide a potential licensee with an offer of binding arbitration to determine the terms of a license that are not agreed upon.  Furthermore, if a potential licensee seeks judicial relief for a FRAND determination, Google must not seek an injunction during the pendency of the proceeding, including appeals.  Nothing in the Order limits Google or a potential licensee from challenging the validity, essentiality, claim of infringement or value of the patents at issue, and either party may object to a court action on jurisdictional or justiciability grounds, or on the ground that an alternative forum would be more appropriate.  The Proposed Consent Order also does not prevent Google from pursuing legal claims regarding its FRAND-encumbered SEPs other than a claim for injunctive relief, such as an action seeking damages for patent infringement.  The Order does not define FRAND but requires Google to offer, and follow, specific procedures that will lead to that determination.

The Proposed Consent Order prohibits Google from revoking or rescinding any FRAND commitment that it has made or assumed unless the relevant standard no longer exists, Google no longer owns the SEPs encumbered by the FRAND commitment, or such SEPs are no longer enforceable.  Motorola made FRAND commitments on the understanding that they were irrevocable, and Google, in acquiring Motorola's FRAND-encumbered SEPs, must continue to honor those agreements.

---

[15] 15 U.S.C. § 45(n) (1992).  Section 45(n) codified limiting principles set forth in the 1980 FTC Policy Statement on Unfairness.  *See* Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), *reprinted in* H.R. Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33-40 (1983), *available at* http://www.ftc.gov/bcp/policystmt/ad-unfair.htm, appended to the Commission's decision in *International Harvester*, 104 F.T.C. at 949, 1061 (1984).

[16] *N-Data*, 2008 WL 258308, at *38 (Analysis to Aid Public Comment).

The Proposed Consent Order further prohibits Google and Motorola from continuing or enforcing existing claims for injunctive relief based on FRAND-encumbered SEPs. Google and Motorola are similarly prohibited from bringing future claims for injunctive relief based on FRAND-encumbered SEPs. For both current and future claims for injunctive relief, Google and Motorola must follow specific negotiation procedures, described below, that are intended to protect the interests of potential willing licensees while allowing Google and Motorola to seek injunctions only after the licensee refuses to engage in the negotiation process. However, if a potential licensee indisputably demonstrates that it is not willing to pay Google a reasonable fee for use of Google's FRAND-encumbered SEPs, Google is permitted by this Order to seek injunctive relief.

Outside the processes outlined in the Order, Google is permitted to seek injunctive relief only in the following four narrowly-defined circumstances: (1) the potential licensee is not subject to United States jurisdiction; (2) the potential licensee has stated in writing or in sworn testimony that it will not accept a license for Google's FRAND-encumbered SEPs on any terms; (3) the potential licensee refuses to enter a license agreement for Google's FRAND-encumbered SEPs on terms set for the parties by a court or through binding arbitration; or (4) the potential licensee fails to assure Google that it is willing to accept a license on FRAND terms. The Proposed Consent Order provides Google with a form letter, attached to the Proposed Consent Order as Exhibit B, for requesting a potential licensee to affirm that it is willing to pay a FRAND rate for Google's FRAND-encumbered SEPs, and Google must provide a copy of the Proposed Consent Order along with the form letter. Google may not, however, seek an injunction simply because the potential licensee challenges the validity, value, infringement or essentiality of Google's FRAND-encumbered patents.

The Proposed Consent Order provides potential licensees with two avenues for resolving licensing disputes that involve Google's FRAND-encumbered SEPs. The first is a framework for resolution that a potential licensee may voluntarily elect. Under this path, Google and the potential licensee agree to negotiate the terms of the license for at least six (6) months (unless a license agreement is reached sooner); after the negotiation period concludes, Google may offer a license agreement, or, if the potential licensee requests a license after this negotiation period, Google must provide a proposed license within two months of the request. Google's proposed license agreement must be a binding, written offer that contains all material terms and limitations. Under this procedure, the potential licensee either accepts the proposed license or informs Google of the terms that it accept and the terms that it believes are inconsistent with Google's FRAND commitments; for each term that it disagrees with, the potential licensee must provide an alternative term that it believes is consistent with Google's FRAND commitment. The potential licensee may then go to court for a FRAND determination or propose binding arbitration to resolve the disputed provisions of Google's proposed license agreement. If a court decides that it cannot resolve the disputed terms, the parties are to go to binding arbitration to finalize the terms of the license agreement.

In the event that the potential licensee does not choose to pursue the path set forth above for resolving the licensing dispute, Google is nevertheless prohibited from seeking injunctive relief unless it takes the following steps. At least six months before seeking an injunction,

Google must provide the potential licensee with the Proposed Consent Order and an offer to license Google's FRAND-encumbered patents containing all material terms; Google's offer may require that the potential licensee in turn offer Google a license for the potential licensee's FRAND-encumbered SEPs within the same standard.  If no agreement is reached, at least sixty days before initiating a claim for injunctive relief, Google must offer the potential licensee the option to enter binding arbitration to determine the terms of a license agreement between the parties.  The Proposed Consent Order describes the terms and conditions that Google must follow should the potential licensee accept the offer for binding arbitration, although the parties are free to agree to their own terms.  Google's license offers will be irrevocable until it makes the offer to arbitrate, and Google's offers to arbitrate will be irrevocable until thirty (30) days after Google files for injunctive relief.

       Under these provisions, if the potential licensee seeks a court's determination of a FRAND-license-rate between the parties instead of accepting Google's offer to arbitrate, Google may not file for injunctive relief as long as the potential licensee goes to court within seven (7) months of Google providing a license offer, or within three months of Google's offer to arbitrate.  But the potential licensee must, in connection with its court action, provide Google with assurances that it will abide by the license terms set by the court and pay royalties based on a final court determination or Google will be free to seek injunctive relief.  The Proposed Consent Order provides Google with a form letter, attached as Exhibit A, for requesting that the potential licensee agree to be bound by the court's FRAND determination.

       Under the terms of the Proposed Consent Order, Google retains the option to file for injunctive relief against a potential licensee that itself files a claim for injunctive relief against Google based on the potential licensee's FRAND-encumbered SEPs, unless that potential licensee has followed the procedures similar to those set out by the Proposed Consent Order for Google.

       Finally, the Proposed Consent Order prohibits Google from selling or assigning its FRAND-encumbered SEPs to third parties unless those parties agree to assume Google's FRAND commitments, abide by the terms of the Proposed Consent Order, and condition any further sale or assignment of Google's FRAND-encumbered SEPs on the same.

       In sum, the Proposed Consent Order improves upon the commitments made by Google in February 2012 to ETSI, IEEE, and ITU to honor Motorola's prior FRAND assurances and limit its pursuit of injunctive relief in connection with Motorola's SEPs by providing clear mechanisms for Google to do so.  The Order also clarifies and defines Google's FRAND commitments by prohibiting Google from seeking injunctive relief against implementers who are willing to license Google's SEPs.  The Proposed Consent Order also contains standard reporting, notification, and access provisions designed to allow the Commission to monitor compliance.  It terminates ten (10) years after the date the Order becomes final.