1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   David A. Perlson (Bar No. 209502)
3  davidperlson@quinnemanuel.com
   50 California Street, 22nd Floor
4  San Francisco, California 94111
   Telephone:  (415) 875-6600
5  Facsimile:  (415) 875-6700

6  Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
7  Victoria F. Maroulis (Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
8  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California  94065
9  Telephone:  (650) 801-5000
   Facsimile:  (650) 801-5100
10

11 Attorneys for Samsung Electronics Co., Ltd.,
   Samsung Electronics America, Inc., and
   Samsung Research America, Inc.
12

                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                     SAN FRANCISCO DIVISION
15

16 | HUAWEI TECHNOLOGIES CO., LTD., et al., | CASE NO.  16-cv-02787-WHO |

17             Plaintiffs,                    **SAMSUNG'S OPPOSITION TO
                                              HUAWEI'S MOTION FOR
18        v.                                  SUMMARY JUDGMENT**

19 SAMSUNG ELECTRONICS CO., LTD., et al.,     **Hearing Date: August 8, 2018
                                              Time: 2:00 p.m.**
20            Defendants.                     **Place: Courtroom 2, 17th Floor
                                              Judge: Hon. William H. Orrick**
21 SAMSUNG ELECTRONICS CO., LTD. &
   SAMSUNG ELECTRONICS AMERICA, INC.          **REDACTED VERSION OF
22                                            DOCUMENT SOUGHT TO BE
                Counterclaim-Plaintiffs,      SEALED**
23
          v.
24
   HUAWEI TECHNOLOGIES CO., LTD.,
25 HUAWEI DEVICE USA, INC., HUAWEI
   TECHNOLOGIES USA, INC., & HISILICON
26 TECHNOLOGIES CO., LTD.

27              Counterclaim-Defendants.

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARD ...........................................................................................1

III. HUAWEI IS NOT ENTITLED TO SUMMARY JUDGMENT ON SAMSUNG'S
     ANTITRUST CLAIM ...........................................................................................2

     A.   BACKGROUND AND PERTINENT FACTS ...........................................2

     B.   APPLICABLE LAW ..................................................................................3

     C.   ARGUMENT ..............................................................................................4

          1.   Huawei's Breaches Of Its ETSI FRAND Commitments Constitute
               Exclusionary Conduct, Even When Improperly Viewed Without
               Reference To Huawei's Entire Course Of Anticompetitive Conduct ...........4

          2.   Huawei's Course Of Exclusionary Conduct Also Precludes
               Summary Judgment Under *Broadcom* ...........................................................6

          3.   Samsung Has Demonstrated Antitrust Injury .................................................9

          4.   The "Act of State" Doctrine Does Not Apply ..............................................10

IV.  HUAWEI IS NOT ENTITLED TO SUMMARY JUDGMENT ON TECHNICAL
     ISSUES .................................................................................................................12

          1.   Huawei's MSJ of Non-Infringement as to the '350 Patent Should be
               Denied ..........................................................................................................12

          2.   Huawei's MSJ of Non-Infringement as to the '130 Patent Should be
               Denied ..........................................................................................................14

          3.   Huawei's MSJ of Non-Infringement as to the '105 Patent Should be
               Denied ..........................................................................................................19

          4.   Huawei's MSJ of Non-Infringement as to the '825 Patent Should be
               Denied ..........................................................................................................22

V.   CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amgen Inc. v. Sandoz Inc.*,
    295 F. Supp. 3d 1062 (N.D. Cal. 2017) ............................................................... 22

*Apple Inc. v. Samsung Elecs. Co.*,
    2012 WL 1672493, at *8 (N.D. Cal. May 14, 2012) ......................................... 3, 10, 15, 19

*Apple, Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) .............................................................. 10

*ASM Am., Inc. v. Genus, Inc.*,
    2002 WL 1892200 (N.D. Cal. Aug. 15, 2002) ..................................................... 15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ........................................................................................... 5

*Brilliant Instruments., Inc. v. Guide Tech, LLC*,
    707 F.3d 1346 (Fed. Cir. 2013) .......................................................................... 22

*Broadcom Corp. v. Qualcomm, Inc.*,
    501 F.3d 297 (3d Cir. 2007) ............................................................................ 3, 6

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
    780 F.3d 1364 (Fed. Cir. 2015) .......................................................................... 18

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ............................................................................. 3

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ............................................................................ 8

*Cohesive Tech., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008) .......................................................................... 20

*Comaper Corp. v. Antec, Inc.*,
    596 F.3d 1343 (Fed. Cir. 2010) .......................................................................... 21

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001) .......................................................................... 20

*Ericsson, Inc. v. D-Link Systems, Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .......................................................................... 24

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    2017 WL 2774406 (N.D. Cal. June 26, 2017) .................................................. 3, 5

*Fujifilm Corp. v. Motorola Mobility LLC*,
    No. 12-cv-03587-WHO, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015) .................. 15, 19, 22

*Gutierrez v. Wells Fargo & Co.*,
    622 F. Supp. 2d 946 (N.D. Cal. 2009) ................................................................ 6

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ..................................................................... 24

*Huawei Technology Co., Ltd., vs. Samsung China, Huizhou Samsung, Tianjin Samsung
    and Shenzhen Nanfang*,
    (May 25, 2016) Yue 03 Min Chu No. 815; (May 25, 2016) ........................... 2, 7

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    527 F.Supp.2d 1084 (N.D. Cal. 2007) ..................................................... 3, 5, 10

*In re Philippine Nat'l. Bank*,
    397 F.3d 768 (9th Cir. 2005) ........................................................................ 11

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
    790 F.3d 1298 (Fed. Cir. 2015) ..................................................................... 16

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) ........................................................................................ 9

*Liu v. Republic of China*,
    892 F.2d 1419 (9th Cir. 1989) ...................................................................... 12

*MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*,
    2004 WL 5363616 (N.D. Cal. Mar. 2, 2004) ................................................ 14

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
    2016 WL 1464545 (D. Del. Apr. 13, 2016) ............................................... 3, 10

*Morton & Bassett, LLC v. Organic Spices, Inc.*,
    2017 WL 1425908 (N.D. Cal. Apr. 21, 2017) .................................................. 8

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
    909 F.2d 1245 (9th Cir. 1990) ........................................................................ 6

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ..................................................................... 20

*OptimumPath, LLC v. Belkin Int'l, Inc.*,
    2011 WL 1399257 (N.D. Cal. Apr. 12, 2011) ............................................... 14

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
    604 F. 3d 1291 (11th Cir. 2010) ..................................................................... 9

*Pause Tech., LLC v. TiVo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) ..................................................................... 16

*PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*,
    2017 WL 2180980 (N.D. Cal. May 18, 2017) ............................................... 14

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ........................................................................ 6

*Rambus Inc. v. F.T.C.*,
    522 F.3d 456 (D.C. Cir. 2008) ................................................................ 6

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    2008 WL 5411564 (N.D. Cal. Dec. 29, 2008) ...................................... 14

*Research In Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ............................................. 3, 9

*Serpa Corp. v. McWane, Inc.*,
    199 F.3d 6 (1st Cir. 1999) .................................................................... 9

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
    806 F.3d 1356 (Fed. Cir. 2015) .......................................................... 24

*Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) .......................................................... 24

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
    2013 WL 12174144 (N.D. Cal. Oct. 17, 2013) .................................. 23

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l.*,
    493 U.S. 400 (1990) ............................................................................ 11

### Statutes

15 U.S.C. § 2 ................................................................................................ 3

15 U.S.C. § 26 ............................................................................................ 10

Fed. R. Civ. P. 26(a)(2)(B)(i) .................................................................... 18

### Other Authorities

Antitrust and Patent Actions,
    10B Fed. Prac. & Proc. Civ. § 2732.1 (4th ed.) ................................. 6

Areeda & Hovenkamp, *Antitrust Law*
    (4th ed. 2017) ¶ 1506 ........................................................................... 3

Mark A. Lemley & Carl Shapiro, "Patent Holdup and Royalty Stacking,"
    85 Tex. L. Rev. 1991, 1993 (2007) ..................................................... 9

# I.     INTRODUCTION

Huawei's motion for summary judgment on Samsung's antitrust claim should be denied. The evidence shows that Huawei convinced the industry to adopt its technology into the relevant standards over available alternatives, committed to license its technology at FRAND rates without ever intending to do so, ███████████████████████████, and has implemented a litigation strategy specifically aimed at extracting those rates from Samsung. Huawei's position that the record lacks any evidence that Huawei intended to pursue this hold-up strategy at the time it promised to license its technology on FRAND terms is untenable.  A jury could easily find such intent from the evidence of Huawei's concerted, multi-pronged course of anticompetitive conduct (including ████████████████████████████, Huawei's complaint in this case, Huawei's pursuit of injunction-only relief in China, etc.) combined ████████████████████████████████████████ ███████████████████████ Huawei's argument that Samsung cannot demonstrate antitrust injury fails as a matter of law because Samsung is a direct purchaser in the relevant market.  And Huawei's contention that Samsung's antitrust claim is barred by the "act of state" doctrine fails as a matter of law because it is Huawei's conduct – not the Chinese government's conduct – that is at issue here.  Samsung's antitrust claim should be tried to a jury. Huawei's motion should be denied.

Moreover, Huawei's motion for summary judgment of non-infringement relies on incorrect applications of the plain and ordinary meaning of claim terms across all of patents at issue, thereby improperly and belatedly raising claim construction disputes at the summary judgment stage.  Regardless, the evidence shows infringement even under Huawei's flawed claim constructions and, thus, there is at least a genuine dispute of material fact for each one of the Samsung patents at issue.  Huawei's motion should therefore be denied.

# II.    LEGAL STANDARD

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  *First Mercury Ins. Co. v. Great Divide Ins. Co.*, 241 F. Supp. 3d 1028, 1034 (N.D.

Cal. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Id.*

### III.   HUAWEI IS NOT ENTITLED TO SUMMARY JUDGMENT ON SAMSUNG'S ANTITRUST CLAIM

#### A.   BACKGROUND AND PERTINENT FACTS

At the very same time that Huawei was supposedly committing to license its SEPs on FRAND terms,



Indeed,

What is more, at the same time it asked this Court to preclude Samsung from obtaining injunctive relief anywhere in the world with respect to Huawei's infringement of Samsung's SEPs, Huawei filed infringement actions on Huawei's SEPs in China seeking only injunctive relief against Samsung.[1] Ex. 6, ¶ 32.  Huawei executive Jason Ding explained his company's strategy:

> Perhaps judges are quite reluctant to hear injunction cases because of its staggering impact on the market. . . Even if injunction order were to be enforced, does Huawei really want to kick Samsung out of China? Is it possible? Of course not. . . .  At the end of the day, **your purpose is to get the royalties in return**, while using legal action as a **bargaining chip**."

---

[1] *See Huawei Technology Co., Ltd., vs. Samsung China, Huizhou Samsung, Tianjin Samsung and Shenzhen Nanfang*, (May 25, 2016) Yue 03 Min Chu No. 815; (May 25, 2016) Yue 03 Min Chu No. 816; (May 25, 2016) Yue 03 Min Chu No. 817; (May 25, 2016) Yue 03 Min Chu No. 838; (May 25, 2016) Yue 03 Min Chu No. 839; (May 25, 2016) Yue 03 Min Chu No. 840; (May 25, 2016) Yue 03 Min Chu No. 841; (May 25, 2016) Yue 03 Min Chu No. 842.

1   *See* Dkt. 235-7 (Translation of "Talk of Huawei's Jianxin Ding S-817 Samsung China"). ▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   This course of conduct violates the antitrust laws.

7   **B.     APPLICABLE LAW**

8   Section 2 of the Sherman Act makes it illegal for any person to "monopolize, or attempt to

9   monopolize . . . trade or commerce[.]"  15 U.S.C. § 2.  The offense of monopolization has two

10  elements: (1) the possession of monopoly power in the relevant market; and (2) the acquisition or

11  maintenance of that power through exclusionary conduct.  *Fed. Trade Comm'n v. Qualcomm Inc.*,

12  2017 WL 2774406, at *9 (N.D. Cal. June 26, 2017).  An antitrust plaintiff must also demonstrate

13  antitrust injury—"injury of the type the antitrust laws were intended to prevent and that flows from

14  that which makes defendants' acts unlawful." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

15  902 (9th Cir. 2008) (citations and quotations omitted).  Intent is <u>not</u> an element of a Section 2 claim;

16  bad intent is not required to establish anticompetitive conduct, just as "good intent will not save

17  conduct that [is] unreasonably anticompetitive."  *See* Areeda & Hovenkamp, *Antitrust Law* (4th ed.

18  2017) ¶ 1506.

19  Notably, Huawei has not cited a single case in which any court has granted summary

20  judgment rejecting a FRAND-related antitrust claim.  The great weight of authority favors the

21  resolution of such claims by a jury. *See Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1672493, at *8

22  (N.D. Cal. May 14, 2012) (denying motion to dismiss antitrust claim); *Hynix Semiconductor Inc. v.*

23  *Rambus Inc.*, 527 F.Supp.2d 1084 (N.D. Cal. 2007) (finding right to jury for antitrust claim);

24  *Broadcom Corp. v. Qualcomm, Inc.,* 501 F.3d 297, 319 (3d Cir. 2007) (reversing lower court's

25  dismissal of antitrust claim); *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at *3-4

26  (D. Del. Apr. 13, 2016) (denying motion to dismiss antitrust claim); *Research In Motion Ltd. v.*

27  *Motorola, Inc.*, 644 F. Supp. 2d 788, 796–97 (N.D. Tex. 2008) (denying motion to dismiss antitrust

28  claim).

C.     ARGUMENT

Huawei's assertion that, despite its market power in the relevant markets, no "actionable exclusionary conduct" occurred (Mot. Part II(C)) misstates the law and ignores the full scope and course of Huawei's anticompetitive conduct – which began when ██████████████████ ████████████████████████████████████████████████████████████████████████████████ and which continues to this day as Huawei pursues injunctions in China to force Samsung to accept non-FRAND rates.   Huawei's other arguments for summary judgment of Samsung's antitrust claims – namely, that there is no fact suggesting harm to competition and that Samsung's claim is barred by the act of state doctrine – are also meritless.   Huawei's motion for summary judgment should be denied.

> 1.     Huawei's Breaches Of Its ETSI FRAND Commitments Constitute Exclusionary Conduct, Even When Improperly Viewed Without Reference To Huawei's Entire Course Of Anticompetitive Conduct

Huawei argues that the portions of its patent hold-up scheme that occurred <u>after</u> Huawei's technology was declared standard-essential cannot constitute an antitrust violation "in and of themselves." Mot. 4-6. By definition, however, Huawei's analysis improperly ignores the full scope of Huawei's anticompetitive conduct (*supra* Part III.A.), all of which must be considered in evaluating a Section 2 antitrust claim.   Moreover, triable issues of fact exist regarding whether Huawei's conduct was (and continues to be) exclusionary even with respect to the time period delimited by Huawei.

As an initial matter, Huawei intentionally excludes from its analysis Huawei's conduct leading up to – and at the time of – the adoption of its technology as SEPs. Huawei achieved its monopoly status by inducing ETSI to incorporate its technology into the relevant standards, thereby eliminating technological alternatives. Ex. 6, ¶¶ 42-55.   Huawei did that ███████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████   In other words, Huawei's anticompetitive course of conduct spans from the standard-setting process to present day. And that entire course of conduct has fundamentally altered the "structure of the alleged relevant technology markets." Mot. 5.

1    That said, Huawei's later conduct – even "in and of [itself]" – is sufficient to support an

2    antitrust claim as a matter of law.  There is an "antitrust duty to deal" on FRAND terms once a

3    patentee's technology is adopted into a standard.  *Fed. Trade Comm'n*, 2017 WL 2774406, at *19

4    (finding SEP-holder's "refusal to license its SEPs to competing modem chips manufacturers and

5    [its] larger course of anticompetitive conduct constitute[s] a violation of an antitrust duty to deal,

6    and thus a violation of § 2 of the Sherman Act . . . ").  The "antitrust duty to deal" applies here,

7    because Huawei "voluntarily participated in the standards setting process and voluntarily committed

8    to license its SEPs to its modem chips competitors" (*id.* at *21), Huawei "could obtain fair

9    compensation for its intellectual property by licensing its SEPs in accordance with FRAND" (*id.* at

10   *22) (quotations omitted), and "recognizing a duty to deal in this case would not require courts to

11   play a larger role in setting the terms of dealing than the role that courts already play in determining

12   appropriate royalties in patent cases" (*id.*) (emphasis in original).  And the facts (*supra* Part III.A.)

13   and expert opinions (████████) at issue here certainly support a jury finding that Huawei's conduct

14   following the standard-setting process – i████████████████████████████████████

15   ████████████████████████████ and its pursuit of injunction-only relief in China – amounts to a

16   refusal to deal with Samsung and consequently violates Section 2 of the Sherman Act.  *Fed. Trade*

17   *Comm'n*, 2017 WL 2774406, at *19-23; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472

18   U.S. 585, 605-11, (1985) (affirming Section 2 violation based on refusal to deal).

19   Indeed, as a policy matter, "[t]he antitrust laws" can and should be applied to "alleviate" the

20   market failures of "patent holdup."  *Hynix Semiconductor Inc.*, 527 F. Supp. 2d at 1098 (describing

21   a 2007 FTC/DOJ report titled "Antitrust Enforcement and Intellectual Property Rights: Promoting

22   Innovation and Competition").  A recent letter authored by "77 former government enforcement

23   officials and professors of law, economics, and business" wrote that "patentees that obtain or

24   maintain monopoly power as a result of breaching a FRAND commitment present a standard

25   monopolization case."  Ex. 7, 2.  The facts in this case only support the application of that policy

26   here.  Ex. 6, ¶¶ 55-57.

27   The facts in this case create at least a triable issue related to Huawei's exclusionary conduct

28   in the maintenance of its monopoly.  On this basis alone, summary judgment of Samsung's Section

Case No. 16-cv-02787-WHO
SAMSUNG'S OPPOSITION TO HUAWEI'S MSJ

2 claim should be denied.

2. <u>Huawei's Course Of Exclusionary Conduct Also Precludes Summary Judgment Under *Broadcom*</u>

In its summary judgment motion, Huawei relies heavily on *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007), which found that an antitrust violation lies when a plaintiff establishes the so-called *Broadcom* factors: (1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with an SDO's reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct. *Id.* at 314. Huawei does not dispute that it made promises to license essential proprietary technology on FRAND terms in a consensus-oriented, private standard-setting environment. Huawei does not dispute that ETSI relied on those promises when it incorporated Huawei's technology into the relevant standards.[2] And Huawei does not dispute that there is at least a triable issue of fact as to whether it breached its FRAND promises.

Instead, Huawei argues that there is "no evidence" from which a jury could find that Huawei *intended* to breach its obligations to license its patents on FRAND terms when it made its FRAND commitments. Mot. 7. But the issue of intent is nearly always "a fact question." *See Gutierrez v. Wells Fargo & Co.,* 622 F. Supp. 2d 946, 958 (N.D. Cal. 2009); *see also Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996); *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1248 (9th Cir. 1990) (noting "summary judgment is disfavored in complex antitrust litigation" because "motive and intent play leading roles") (internal citations omitted); Antitrust and Patent Actions, 10B Fed. Prac. & Proc. Civ. § 2732.1 (4th ed.). Here, the record is replete with evidence from which a jury could conclude that Huawei promised to license its technology on FRAND terms with no intention of doing so.

██████████████████████████████████████

---

[2]  For this reason, *Rambus Inc. v. F.T.C.*, 522 F.3d 456 (D.C. Cir. 2008), is not applicable here. In that case, the court found that the relevant technology would have been incorporated into the standard whether Rambus properly disclosed it or not (i.e., the SDO did not rely on Rambus' conduct). *Id.* at 464-68.



Huawei's litigation scheme will also be in evidence. At the same time Huawei was filing its Complaint requesting that this Court bar Samsung from pursuing injunctive relief with respect to any alleged infringement of patents essential to 3GPP standards (Dkt. 1, 46), Huawei was filing eight actions in China[5] on related SEPs seeking only injunctive relief.[6] Jason Ding, a Huawei executive, explained to the 2016 China Competition Policy Forum that Huawei's litigation strategy was pursued to gain a "bargaining chip" that would help Huawei "get the royalties." Dkt. 235-7 (Translation of "Talk of Huawei's Jianxin Ding S-817 Samsung China").

All of this evidence is more than enough to sustain a jury verdict finding that Huawei did

---

[3] On March 4, 2009, Huawei submitted a statement to ETSI which contained one of the patents at issue in the Chinese litigation. Dkt. 1, Ex. 2.6. On October 15, 2009, Huawei submitted another statement to ETSI containing patents at issue in the Chinese litigation. Dkt. 1, Ex. 2.10. The same is true for other patents asserted in the Chinese litigations. Dkt. 1, Ex. 2.15 (July 6, 2010); Dkt. 1, Ex. 2.24 (April 21, 2011); Dkt. 1, Ex. 2.37 (July 5, 2013).

[4]

[5] Samsung not only sells standardized products in China but also manufactures standardized products in China that are sold in the United States.

[6] *See Huawei Technology Co., Ltd., vs. Samsung China, Huizhou Samsung, Tianjin Samsung and Shenzhen Nanfang*, (May 25, 2016) Yue 03 Min Chu No. 815; (May 25, 2016) Yue 03 Min Chu No. 816; (May 25, 2016) Yue 03 Min Chu No. 817; (May 25, 2016) Yue 03 Min Chu No. 838; (May 25, 2016) Yue 03 Min Chu No. 839; (May 25, 2016) Yue 03 Min Chu No. 840; (May 25, 2016) Yue 03 Min Chu No. 841; (May 25, 2016) Yue 03 Min Chu No. 84.

1   not intend to license its proprietary technology at FRAND rates at the time it promised ETSI that it

2   would do so.   Because the court must "view the evidence in the light most favorable to the

3   nonmovant and draw all reasonable inferences in the nonmovant's favor," summary judgment must

4   be denied.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

5   Huawei purports to point to facts that "undermine any inference that Huawei intended to

6   violate its FRAND obligations."  Mot. 8.  But that just indicates that there are issues of disputed fact

7   to be tried to a jury, not that summary judgment is proper.  *Morton & Bassett, LLC v. Organic*

8   *Spices, Inc.*, 2017 WL 1425908, at *1 (N.D. Cal. Apr. 21, 2017).

9   For example, Huawei contends that it has "offered to resolve its licensing dispute with

10   Samsung via arbitration or court determination."  Mot. 8.  ██████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████  That is, Huawei had already obtained the

13   "bargaining chip" that would help Huawei "get the royalties."

14   As another example, Huawei cites to the fact that "Samsung did not depose any of the

15   Huawei employees that submitted the declarations to ETSI."  Mot. 7.  But Samsung did depose

16   Huawei's Chief Legal Officer and other Huawei executives, ████████████████████

17   ████████████████████████████████████████████

18   Huawei argues that it "entered into license agreements ████████████  with other

19   participants in the industry."  Mot. 8.  ████████████████████████████████████

20   ████████████████████████████████

21   Finally, Huawei contends that "the only basis that Samsung's 30(b)(6) designee had for

22   suggesting that Huawei's FRAND commitments were false was ████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████  the manner in which Huawei negotiated

25   with Samsung is probative of Huawei's intent[7]; and Huawei ignores the fact that Samsung witnesses

---

[7]  Huawei argues that "evidence of the subsequent breach of a contractual commitment is insufficient
as a matter of law to prove the contractual promise was fraudulent when it was made."  Mot. 7.
Huawei's cases all relate to claims of fraud, not antitrust.  Regardless, Samsung is not pointing to

1    do not have access to all of the relevant evidence described above (Section III.A, *supra*) (in light of

2    the protective order issued in this case).

3        In sum, issues of fact pervade the question whether Huawei ever intended to license its SEPs

4    on FRAND terms.  Summary judgment is thus inappropriate.

5                      3.    <u>Samsung Has Demonstrated Antitrust Injury.</u>

6        Huawei claims that Samsung has not shown "actionable harm to competition."  Mot. 9.  But

7    Huawei's conduct eliminated competition in the relevant technology markets and caused antitrust

8    injury to purchasers in those markets.  Ex. 6 ¶¶ 55-56.  Indeed, although Huawei implies that

9    Samsung brings its antitrust claim as a competitor, Mot. 9, Samsung is actually a direct purchaser

10   in the relevant markets.  Samsung is the purchaser intellectual property rights from Huawei and the

11   party who will pay overcharges and/or incur losses as a result of Huawei's monopolization.[8]  Ex. 6,

12   ¶ 14.  Direct purchasers in a relevant market have antitrust standing.  *Research In Motion Ltd.*, 644

13   F. Supp. 2d at 796 (finding that potential licensee could plead antitrust injury related to alleged

14   FRAND violations by SEP-holder); *see also Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir.

15   1999) (noting that "consumers in the market where trade is allegedly restrained are presumptively

16   the proper plaintiffs to allege antitrust injury"); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207

17   (1990) (utility company, rather than end users of electricity, had antitrust standing).[9]

18       Huawei asserts that its "proposed royalties" cannot cause "antitrust injury to Samsung."

19   Mot. 9.  But it is not necessary that Samsung establish it has actually *paid* overcharges to

20   _____

21   Huawei's breach as the only evidence of intent.  Samsung is pointing to Huawei's entire course of
     conduct (███████████████████████████████████████████████

22   ████████████████████████████, Huawei's global litigation strategy, etc.) ████████
     ████████████████████████████████████████████████████████████.  (*See* Section

23   III.A, *supra*.)

     [8] ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████
     ████████████████████████████  *See* Dkt. 235-14 (Mark A. Lemley & Carl Shapiro, "Patent Holdup and

26   Royalty Stacking," 85 Tex. L. Rev. 1991, 1993 (2007)); Ex. 9, ¶¶ 21-25.

     [9] Moreover, when a Plaintiff seeks injunctive relief as a remedy for its antitrust claim, as Samsung

27   has done here, the antitrust injury requirement is "less demanding."  *See Palmyra Park Hosp. Inc.*
     *v. Phoebe Putney Mem'l Hosp.*, 604 F. 3d 1291, 1299 (11th Cir. 2010).

28

1   demonstrate antitrust injury—a "threatened loss or damage" by a violation of the antitrust laws is

2   sufficient.  15 U.S.C. § 26.  And the threat here is obvious:  Huawei's hold-up campaign is designed

3   to force Samsung to pay an excessive royalty rate or to suffer lost profits.  Ex. 6, ¶ 14.

4        Huawei is also incorrect that Samsung cannot obtain damages for its litigation costs.  Costs

5   associated with patent litigation are cognizable antitrust damages provided there is a "causal

6   connection" between the patent litigation and the "anticompetitive harm."  *Hynix Semiconductor*

7   *Inc.*, 527 F. Supp. 2d at 1098.  That standard is met here.  A necessary ingredient of Huawei's hold-

8   up campaign is the threat of an injunction—it is that threat that allows Huawei to gain a "bargaining

9   chip" and demand excessive licensing fees from licensors.[10]  Huawei's citation to *Apple Inc. v.*

10  *Motorola Mobility, Inc.* is unavailing—there the plaintiff's antitrust claim was "necessarily based"

11  on patent litigation whereas here, like in *Hynix*, patent litigation is only one component of Huawei's

12  broader patent-holdup campaign.  *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1076

13  (W.D. Wis. 2012).  Moreover, even if Samsung could *not* obtain litigation costs as damages (which

14  it can), Samsung also seeks a permanent injunction as a remedy for its antitrust claim, precluding

15  summary judgment based on Huawei's no-damages argument.  *See* Dkt. 90-2, 114.

16              4.    The "Act of State" Doctrine Does Not Apply

17       Huawei argues that a U.S. court is barred "from passing on the legitimacy of the decision of

18  a Chinese court as to whether such an injunction was in the public interest."  Mot. 10.  But the

19  Shenzhen Court's judgment granting an injunction is not the conduct relevant to Huawei's holdup

20  campaign; the conduct at issue is *Huawei's* pursuit of injunctive relief.  Accordingly, Huawei's "act

21  of state" defense fails.

22       An act of state issue only arises "when a court must decide—that is, when the outcome of

---

[10] Other courts have agreed.  *See Microsoft Mobile Inc.,* 2016 WL 1464545, *3 ("IDC's suits to enforce its purported SEPs are part of the way in which IDC accomplishes its alleged anticompetitive scheme. The entire scheme is ineffective without the threat of litigation.") (internal citations omitted); *Apple, Inc. v. Samsung Elecs. Co.,* 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012) ("Thus, because Apple has alleged patent holdup stemming from Samsung's failure to disclose essential patents to ETSI and Samsung's failure to license on FRAND terms, and because Apple's litigation costs stem directly from Samsung's alleged anticompetitive behavior, these litigation costs are a sufficient basis for a potential award of antitrust damages").

Case No. 16-cv-02787-WHO
SAMSUNG'S OPPOSITION TO HUAWEI'S MSJ

the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l.*, 493 U.S. 400, 406 (1990); *see* Mot. 11 (citing only cases referencing an "official act of a foreign sovereign") (emphasis removed).  In this case, there is no "act of state" issue because Samsung's antitrust counterclaim does not rest on "the effect of official action by a foreign sovereign."  *Id.*  Samsung's antitrust claim centers on Huawei's entire course of anticompetitive conduct.  Even assuming Samsung's antitrust claim was based only on the filing of injunctive relief actions, it is *Huawei's* action—the decision to move for relief enjoining Samsung from selling or manufacturing products in China—that constitutes the antitrust violation.  As recognized by this Court, the actions of Huawei and the actions of the Shenzhen Court are distinct.  Dkt. 280, 20 ("the relief [Samsung] seeks would have no impact on the Chinese courts").  Huawei's contention that the Shenzhen Court's decision to grant injunctive relief "form[s] the basis for liability under U.S. antitrust law" is therefore inaccurate.  Mot. 10.  The requested relief does not require that "a court of the United States declare invalid the official act of a foreign performed within its own territory." *W.S. Kirkpatrick & Co.*, 493 U.S. at 405.

Huawei's reliance on *In re Philippine Bank* is misguided.  In that case, the Ninth Circuit held that the act of state doctrine applied to a forfeiture judgment from the Philippine Supreme Court because it was "an action *initiated by the Philippine government*" to recover property allegedly stolen from the government's treasury.  *In re Philippine Nat'l. Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (emphasis added).  The court consequently held that there was "no question" that the order of the Philippine Supreme Court gave effect to the public interest of the Philippine government.  *Id.* ("We have earlier characterized the collection efforts of the Republic to be governmental…. The subject matter of the forfeiture action thus qualifies for treatment as an act of state.").  Such facts are not present here.  Unlike the forfeiture action in Philippine National Bank, the antitrust claim between Samsung and Huawei is "a mere dispute between private parties" with no involvement from the Chinese government.  *Id.* at 773.  The Republic of China is not a party to this litigation between Samsung and Huawei, nor does the "subject matter" of the action qualify it for a treatment

as an act of state.[11]

Samsung's antitrust claim is not barred by "Act of State" doctrine.

## IV.    HUAWEI IS NOT ENTITLED TO SUMMARY JUDGMENT ON TECHNICAL ISSUES

1.    <u>Huawei's MSJ of Non-Infringement as to the '350 Patent Should be Denied</u>

Asserted claim 1 of the '350 patent requires "determining a cell-specific ratio…" Dkt. 328-24 at 14:31-36.  Fatal to Huawei's motion for non-infringement, documentary evidence and expert opinions show that ████████████████████████████████████████████████ ████████████████████████████ Mot. 13 (citing the infringement report of Samsung's expert, Dr. Prucnal).  For example, ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████and disclosed in the '350 patent (denoted as $\rho_B/\rho_A$).  *Compare* Ex. 11 at 20-21 (████████████████████████████████████████████████████████ ██████████████████████████████████████████████) *and* Ex. 12 at 14-16 (█████████████████████), *with* Ex. 13 at 15 (LTE Standard specifying in Table 5.2-1 the same $\rho_B/\rho_A$ values ████████████████████) *and* Dkt. 328-24, col. 12:19-38 (same).  Further, Samsung's expert provided a detailed technical analysis of documents, testimony, and source code to show that Huawei's accused products and Samsung's practicing products all determine a cell-specific ratio as required under the standard.  Ex. 14 ¶¶ 557-570, 701-705; *see also* Ex. 15 at 21-23 (██████ ██████████████████████████████████.  At deposition, Dr. Prucnal even provided a demonstrative illustrating the opinion in his report that █████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████. Ex. 16 at 89:23-90:9; Ex. 17 (██████████████████████ ████████████████████████████).

---

[11] *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989), is also distinguishable.  In that case, the Ninth Circuit never reached the question of whether a foreign court's decision was an act of state because the relevant act was purely domestic.  *Id.* 1434.

| Antennas | Received $P_B$ Parameter | | | | Corresponding Cell-Specific Ratio ($\rho_B/\rho_A$) |
|---|---|---|---|---|---|
| 1 | 0 | | | | 1 |
| | 1 | | | | 4/5 |
| | 2 | | | | 3/5 |
| | 3 | | | | 2/5 |
| 2 or 4 | 0 | | | | 5/4 |
| | 1 | | | | 1 |
| | 2 | | | | 3/4 |
| | 3 | | | | 1/2 |

*Id.*; *see also* Ex. 14 ¶¶ 309, 559, 563-67, 705.  Thus the overwhelming evidence actually shows infringement of the '350 patent, not non-infringement.

Huawei's motion, however, is based on a straw man argument that the same quantization coefficients are not selected by Huawei's and Samsung's respective phones.[12]  Mot. 13-14.  The asserted claim, however, does not require selecting the same quantization coefficients—it requires determining a cell-specific ratio.  As explained above, ███████████████████████████ ███████████████████████████████.  Moreover, Huawei strains credibility by arguing that "[t]he only evidence that purportedly shows this correspondence [between quantization coefficients and cell-specific ratios] is a handwritten table by Dr. Prucnal . . . ."  *Id.* at 14.  ████████████████████████████.  Ex. 11 at 20-21; Ex. 12 at 14-16.  Huawei also attacks an additional straw man by arguing there is no evidence "that the accused Huawei devices perform the additional calculations that Dr. Prucnal says can be used to convert the quantization coefficients into the claimed ratio."  Mot. 14.  But there is nothing in the claim that requires determining a cell-specific ratio by performing calculations.  Again, all that is required is determining a cell-specific ratio, ████████████████████████ ████████████████████████████████████.  That, itself, is a determination of the cell-specific ratio.  No "additional calculations" are needed.  Samsung has

---

[12]  Huawei's argument is also an improper non-infringement theory, which Samsung has moved to strike as untimely due to Huawei's failure to disclose it throughout discovery.  Dkt. 337 at 16.

shown that Huawei's products meet the "determining a cell-specific ratio…" limitation and, thus, there is at least a genuine factual dispute warranting denial of Huawei's request for summary judgment of non-infringement.

Huawei separately argues that Samsung's DOE contentions were "only a boilerplate reservation to assert infringement under DOE at a later date." Mot. 15. Samsung's contentions, however, identify DOE on a limitation-by-limitation basis and, more than reserving the right to allege DOE at a later date, allege "this ["determining a cell-specific ratio…"] limitation is practiced under the doctrine of equivalents, as any alleged differences are insubstantial." Ex. 18 at 4. Dr. Prucnal subsequently provided opinions detailing why there are at most only insubstantial differences between how the accused products determine a cell-specific ratio and the claim limitation. Dkt. 328-28 ¶ 590. Thus, Huawei's assertion that "the DOE analysis offered by Dr. Prucnal is directed to showing the purported equivalence of the entire claim, rather than the 'determining' element," Mot. 15, is readily verifiable as false.

Samsung's DOE theories are thus distinguishable from those excluded in Huawei's cited cases. *See PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*, 2017 WL 2180980, at *15 (N.D. Cal. May 18, 2017) (expert reports did not contain ***any*** DOE allegation and contentions did not assert DOE but, rather, "reserve[d] the right to contend that the Accused Instrumentalities still infringe under [DOE]"); *OptimumPath, LLC v. Belkin Int'l, Inc.*, 2011 WL 1399257, at *8 (N.D. Cal. Apr. 12, 2011) (contentions contained blanket DOE assertion directed to the patent and claims as a whole, not to each limitation); *Rambus Inc. v. Hynix Semiconductor Inc.*, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008) (same); *MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*, 2004 WL 5363616, at *5 (N.D. Cal. Mar. 2, 2004) (contentions did not contain DOE and expert report presented boilerplate DOE as to "any other element [of the claim] to the extent such element was deemed literally missing"). Moreover, Huawei never sought to strike DOE from Samsung's contentions or expert reports and, as such, Dr. Prucnal's DOE theories are in the case and represent another genuine issue of infringement of the '350 patent for the jury's determination.

　　　　　　　2.　　Huawei's MSJ of Non-Infringement as to the '130 Patent Should be Denied

With respect to the '130 Patent, Huawei's motion for summary judgment is predicated

entirely on this Court adopting its proposed construction of a claim term that it listed pursuant to the parties' P.L.R. 4-3 statement. *See* Dkt. 124-3 at 3; Mot. 16 ("[T]he second and third steps must be performed after the first."); Ex. 19 at 32 ("Applying Huawei's Interpretation of the Claimed 'Mapping' Terms Also Leads to Non-Infringement"). Critically, however, Huawei elected not to include this term in the parties' list of the ten claim terms deemed "most significant to resolution of the case." Dkt. 124 at 1. That choice forecloses Huawei from using its motion as a vehicle to seek eleventh-hour claim construction. When, as here, a claim construction argument is made for the first time "in summary judgment briefs," district courts are under no obligation to "rule on such arguments." *Fujifilm Corp. v. Motorola Mobility LLC,* No. 12-cv-03587-WHO, 2015 WL 757575, at *5 (N.D. Cal. Feb. 20, 2015). This is because the patent local rules require parties to "submit a joint claim construction statement identifying … no more than ten terms" before filing "claim construction briefs" that are assessed at a "claim construction hearing." *Id.* Huawei should not be permitted to "make additional arguments at the summary judgment phase untethered to those carefully structured rules." *Id.*[13]

Because Huawei's claim construction argument is "untimely," it should only be considered as "part of the infringement analysis." *Fujifilm*, 2015 WL 757575, at *6. The sole question is whether "there is no genuine issue of material fact that the accused products … do not meet the plain and ordinary meaning of the term …." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014). "[T]he goal . . . is not to complete the Sisyphean task of providing definitive guidance as to a term's plain and ordinary meaning. Instead, the Court must determine whether a jury … may . . . conclude that the accused devices infringe the asserted claims." *Fujifilm*, 2015 WL 757575, at *6. Huawei's motion should be denied because its proposed construction is far afield from the plain and ordinary meaning of the claim.[14]

*First*, Huawei only assesses the "ordinary meaning of 'remaining'" in isolation without

---

[13]   By contrast, indefiniteness is an issue of validity and does not need to be resolved "during the claim construction proceedings." *ASM Am., Inc. v. Genus, Inc.*, 2002 WL 1892200, at *15 (N.D. Cal. Aug. 15, 2002).
[14]   An overview of the '130 Patent and the technology it entails is set forth in Samsung's opening claim construction brief, Dkt. 140 at 3-7.

addressing the surrounding context.  Mot. 17.  The pertinent part of claim 13 describes: (1)"mapping a reference signal to a middle symbol in the slot," (2)"mapping the data information to remaining symbols in the slot that are not used to map the reference signal," and (3) "mapping the acknowledgement information [ACK/NAK] to first symbols among the remaining symbols."  *Id.* at 16.  Huawei's proposed construction transgresses the rule that "[p]roper claim construction …. demands interpretation of the entire claim in context, not a single element in isolation."  *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005).  Analyzing the word "remaining" in context, as required, reveals that the plain and ordinary meaning refers *only* to a spatial location for (1) mapping the reference signal and (2) mapping the data and acknowledgement information (as opposed to a temporal order in which those steps need to occur).  *See* Ex. 20 ¶¶ 174-77.  The term "remaining symbols" must be understood in connection with where (not when) the reference signal must be mapped: the middle symbol in the slot.  Ex. 21 ¶ 6.  The "remaining symbols" in this context therefore refers to each of the other symbols in the slot.  It is irrelevant whether the reference signal is mapped before or after the data information.  A reserved parking space is a useful analogy.  If a parking space is reserved, and the remaining parking spaces are open, it does not mean the individual with the reserved space must park before everyone else.  *Id.* ¶ 7.  Rather, the reserved space simply indicates that the space cannot be used by anyone except the owner.

*Second*, Huawei relies solely on a single dictionary definition for its proposed construction. *See* Mot. 17.  Huawei does not identify *any* intrinsic evidence to support its interpretation, even though such evidence trumps extrinsic evidence such as dictionary definitions.  *See Kaneka Corp. v. Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015).  Though Huawei portrays its dictionary definition of "remaining" as authoritative, multiple definitions support Samsung's interpretation even within the dictionary cited by Huawei.  *See* Dkt. 328-35 at 2 (defining "remaining" as "to be *reserved* or in store" (emphasis added)).  The only constraint on mapping the reference signal is reserving the middle symbol for it, while reserving the rest of the symbols for data information.  *See* Dkt. 328-34, Figs. 6-10.  Tellingly, the reference signal is not depicted in Figures 2 and 3 of the '130 patent because it has its own "independent processing flow," and nothing in the '130 patent limits the placement of the reference signal to any particular implementation.  Ex.

22 at 71:18; 73:13-14.

*Third*, Huawei attempts to make a false equivalence between the order in which ACK/NAK bits and data are mapped to imply there must similarly be an order in which the reference signal is mapped.  Mot. 17.  Huawei overlooks, however, that ACK/NAK and data are mapped to the *same* location—different from where the reference signal is mapped—and thus the specification specifies an order for mapping these two types of information.  Specifically, both data and ACK/NAK are mapped to the symbols directly adjacent to the middle symbol containing the reference signal ("first symbols"), which is a subset of the remaining symbols.  Dkt. 328-34 at 8:30-37.[15]  Recognizing this, Figure 2 of the '130 patent specifies that "data bits are punctured to accommodate ACK/NAK bits." *Id*. at 2:9-10.  But the '130 patent is devoid of any similar discussion of the order in which reference signals are mapped.  Ex. 21 ¶¶ 9-10.

Though Huawei baldly asserts in a footnote that it "does not perform the claimed functions either," Mot. n.12, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Accordingly, at a minimum, triable issues of material fact remain as to whether Huawei's products infringe the asserted claims.

Additionally, Huawei argues that Dr. Bambos's DOE opinion runs afoul of the "all limitations" rule and would "vitiate … claim terms."  Mot. 20.  Huawei is wrong.  This rule has no applicability where, as here, the asserted equivalence analyzes the order in which *multiple* limitations are performed.  Dr. Bambos properly assessed the applicable equivalence (*i.e.*, the order in which the relevant limitations are performed), and concluded that the order "is an insubstantial part of claims 13 and 16."  Dkt. 328-36 ¶ 793.  This is because regardless of the mapping order, a signal with "minimal distortion" ensues, as the acknowledgement information is placed in the

---

[15]   The phrase "first symbols not being used to map the reference signal" simply denotes that the first symbols—the symbols directly adjacent to the middle symbol—are reserved for ACK/NAK and data bits, nothing more.

1    symbols next to the reference signal.

2         The Federal Circuit addressed a similar DOE opinion in *Cadence Pharm. Inc. v. Exela*

3    *PharmSci Inc.*, 780 F.3d 1364, 1370-71 (Fed. Cir. 2015), where it affirmed a finding of infringement

4    under DOE based on expert testimony "that adding acetaminophen before or after the deoxygenation

5    step would have no impact on . . . the final product… the timing of the deoxygenation step was an

6    insubstantial difference."  The argument that equivalence "would 'vitiate' the claimed limitation"

7    was explicitly rejected: "'vitiation' is not an exception or threshold determination that forecloses

8    resort to the doctrine of equivalents, but is instead a legal conclusion of a lack of equivalence based

9    on the evidence presented and the *theory of equivalence* asserted."  *Id.* at 1371 (emphasis added).

10   "The determination of equivalence depends not on labels like 'vitiation' and 'antithesis' but on the

11   proper assessment of the language of the claimed limitation and the substantiality of whatever

12   relevant differences may exist in the accused structure."  *Id.* at 1372.

13        Likewise, Dr. Bambos opines that the "timing of the" placement of the reference signal is an

14   "insubstantial difference."  *Id.* at 1371.  The assertion that this opinion would "vitiate these claim

15   terms" because the "result of these missing limitations is very different" (Mot. 20) is not only legally

16   insignificant, but also lacks factual support.  To the contrary, each claim limitation at issue is given

17   full effect: the reference signal is still mapped to the middle symbol, data to each of the other

18   symbols, and acknowledgement information to the first symbols directly adjacent to the reference

19   signal.  The claim that Dr. Bambos's opinion is "perfunctory" (*id.* at 19) is not a valid basis for

20   summary judgment.  *See Cadence*, 780 F.3d at 1370 (affirming infringement despite assertion that

21   DOE opinion was "conclusory").  Dr. Mahon claims "there would be a substantial difference in the

22   result" (Dkt. 328-44 ¶ 36), but fails to identify any such difference.  The assertion that data will be

23   mapped "to every symbol" (*id.*) ignores the plain text of the claim, which requires mapping data to

24   every symbol *except for the middle symbol*, not *every* symbol.[16]

25

26   _____

     [16]  Moreover, Dr. Bambos's DOE opinion was presented in his opening report (Dkt. 328-36 ¶¶ 792-
27   95), yet Dr. Mahon provided no rebuttal (Ex. 19 ¶¶ 101-122).  Dr. Mahon's declaration on this point
     should thus be disregarded as an untimely expert opinion.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i).
28

3.      Huawei's MSJ of Non-Infringement as to the '105 Patent Should be Denied

Huawei's motion for summary judgment of non-infringement of the '105 patent is predicated on an argument that "[the claimed] 'FT pre-coded symbols' cannot contain control information." Mot. 21.  As with Huawei's other summary judgment arguments, this argument also derives from a proposed claim construction that Huawei failed to pursue during *Markman* proceedings or at any other time in this litigation.  *See* Dkt. 124-3 at 32 (proposing to construe "FT pre-coded symbols" as "modulated data symbols ***that do not contain signaling or control information* . . .**"); Dkt. 124 at 1-2 (failing to identify proposed construction as one "most significant to the resolution of the case"); *see also Fujifilm,* 2015 WL 757575, at *5 (finding no obligation to rule on claim construction arguments made for the first time "in summary judgment briefs.").  Therefore, the question is whether "there is no genuine issue of material fact that the accused products … meet the plain and ordinary meaning of the term."  *Apple*, 2014 WL 252045, at *4.

Here, there is at least such an issue of material fact as to whether the accused products generate "FT pre-coded symbols" under the plain meaning of that term.  In particular, on its face, "FT pre-coded symbols" are simply symbols that contain information that have been FT pre-coded. There is no dispute that Samsung's expert, Dr. Prucnal, has identified such symbols containing information that have been FT pre-coded.  Mot. 21-22.  Huawei's only dispute is that Dr. Prucnal identified symbols containing both data and control information that have been FT pre-coded, and that such symbols are not "FT pre-coded symbols."  *Id*.  Notwithstanding that Huawei's argument is premised on an incorrect and untimely claim construction,[17] Dr. Prucnal has nevertheless also identified symbols that do not contain control information.  Accordingly, even accepting Huawei's premise, Dr. Prucnal has still presented opinions and evidence of infringement.

*First*, Huawei's motion for summary judgment of non-infringement should be denied because it is predicated on a reading of "FT pre-coded symbols" that contradicts the plain and ordinary meaning of the term.  On its face, "FT pre-coded symbols" are simply symbols that contain

---

[17]  Huawei's argument is also an improper non-infringement theory, which Samsung has moved to strike as untimely due to Huawei's failure to disclose it throughout discovery.  Dkt. 337 at 15.

information that have been FT pre-coded.  Huawei, however, argues that "FT pre-coded symbols" cannot contain any control information, thereby improperly importing a negative limitation into the claim solely to support its own non-infringement argument.  *Cohesive Tech., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367-68 (Fed. Cir. 2008) ("[I]t is not appropriate for the court to construe a claim solely to exclude the accused device.").  In effect, Huawei reads the term as "[FT] pre-coding only the non-FT pre-coded modulation data symbols and not any control information to generate FT pre-coded symbols."  Dkt. 91-20 at 21 (annotations added to show Huawei's rewriting of the claim).  But there is nothing in the claim that excludes control information from "FT pre-coded symbols." Rather, the claim requires only that "non-FT pre-coded modulation data symbols" be FT pre-coded "to generate FT pre-coded symbols."  *Id.* at 13:49-51.  It is undisputed that this is what Dr. Prucnal identified in his opinions (*i.e.*, PUSCH symbols, which are FT pre-coded).  Mot. 21-22.  Since the asserted claim is a "comprising" claim, it "does not exclude additional, unrecited elements," such as also FT pre-coding control information in generating the FT pre-coded symbols.  *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).  All the claim requires is that data be included in the FT pre-coded symbols, but there is no restriction on what additional information could also be included.  Thus, Dr. Prucnal's identification of PUSCH symbols that can contain both data and control information does not result in non-infringement.

Huawei's proposal also fails because it improperly excludes embodiments of the '105 patent in which both data and some control information are FT pre-coded.  Dkt. 91-20 at Fig. 8, 9:14-17 ("In this embodiment, Size M FFT block 810 pre-codes not only the user data, but also FFT pre-codes some of the control and signaling information.").  It is well-settled that claim terms should not be interpreted "in a way that excludes embodiments disclosed in the specification."  *Oatey Co. v. IPS Corp*., 514 F.3d 1271, 1276 (Fed. Cir. 2008).  Moreover, it is undisputed that the claims themselves differentiate between different types of symbols.  Mot. 21.  Symbols that only contain data and no control are referred to as "***data*** symbols," and those that contain control and no data are

"*control* symbols." Dkt. 91-20 at 13:45-46, 14:20-21, 14:55-56, 15:26-27;[18] *id*. at 13:47-48, 14:22-23, 14:30, 14:56-57, 15:28-29, 16:10.  Thus the claim term "FT pre-coded *symbols*"—without the "data"/"control" modifier—indicates a different meaning than "FT pre-coded *data* symbols" or "FT pre-coded *control* symbols."  *See* Mot. 21 (quoting *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) to acknowledge that "two different terms used in a patent have different meanings").  The only conclusion supported by the specification and claim language is that "FT pre-coded symbols" can contain both data as well as control information.

*Second*, Huawei's motion fails even accepting its faulty premise that "'FT pre-coded symbols' cannot contain control information."  Mot. 21.  In particular, Dr. Prucnal testified that not every PUSCH symbol contains control information and, thus, there are PUSCH symbols that contain data and no control information.  Ex. 16 at 64:22-65:5, 65:22-66:6 ("What I know is that every symbol in the PUSCH does not necessarily include control information.").  Such symbols infringe even under Huawei's predicate, yet Huawei ignores this aspect of Dr. Prucnal's opinions in arguing that he only identified PUSCH symbols "that contain both control information and data information."  Mot. 21.  Indeed, even Huawei's expert, Dr. Mahon, admitted there are PUSCH symbols containing only data and no control information.  Ex. 23 at 238:2-13, 239:5-13 ("There's times at which when there's no CQI bits to be transmitted on the uplink [PUSCH], there's no CQI bits to be interleaved with the data *so it would only be data*.") (emphasis added), 239:14-240:11, 241:20-242:7, 242:19-244:19.[19]  Moreover, Huawei's out-of-context citation to Dr. Bambos's expert report for the proposition that "*every* symbol in the PUSCH except for the DMRS contains CQI [control information]" (Mot.22) is inapposite.  Dr. Bambos has explained that PUSCH symbols contain CQI only under certain circumstances—not that *all* PUSCH symbols *always* contain CQI.  Ex. 21 ¶ 16; Ex. 24 at 197:9-22.

---

[18] The '105 patent also consistently uses "FFT pre-coded *data*," "FFT pre-coded *data* symbols," and "FT pre-coded modulated *data* symbols" to refer to data that has been FT pre-coded, as well as "FT pre-coded modulated *control* symbols" to refer to control information that has been FT pre-coded. *See, e.g.*, Dkt. 91-20 at 6:57-61, 8:60-9:1, 9:54-62, 14:30, 16:10.

[19] Even if Huawei's expert impeaches himself by providing an opinion that all PUSCH symbols contain control information, a factual dispute for the jury would still exist, in view of Dr. Mahon's own contradictory deposition testimony and the opinions of Samsung's expert.

1    Accordingly, even if the Court were to entertain Huawei's improper construction of "FT pre-

2    coded symbols" as "modulated data symbols that do not contain signaling or control information…,"

3    there would still be infringement—or at least a genuine issue of material fact thereof—because there

4    are PUSCH symbols containing only data and no control information.

5            4.    Huawei's MSJ of Non-Infringement as to the '825 Patent Should be Denied

6    Huawei's motion for summary judgment on the '825 patent is predicated entirely on this

7    Court adopting its proposed construction of a claim term ("indicating") that it listed pursuant to the

8    parties' P.L.R. 4-3 statement.  *See* Dkt. 124-3 at 58; Mot. 23.  Huawei elected not to include this

9    term in the parties' list of the ten claim terms deemed "most significant to resolution of the case,"

10   foreclosing Huawei from using its motion as a vehicle to seek eleventh-hour claim construction.

11   *See Fujifilm*, 2015 WL 757575 at *5; *see also* Section IV.2, *supra*.

12   Considering Huawei's motion on the merits, it is well settled that application of the claim is

13   for the jury, as infringement, both literal and under the doctrine of equivalents, is a question of fact.

14   *Amgen Inc. v. Sandoz Inc.*, 295 F. Supp. 3d 1062, 1067 (N.D. Cal. 2017); *Brilliant Instruments., Inc.*

15   *v. Guide Tech, LLC*, 707 F.3d 1346, 1344 (Fed. Cir. 2013).  The Court should not grant Huawei's

16   request to assume the charge of the jury while there are material factual disputes related to whether

17   the accused products meet the "system information indicating a group of [IDs]" limitation.

18   Dr. La Porta contends that "system information" described in the 3GPP Standard practiced

19   by the accused Huawei products only provides data for the UE to determine the size of

20   PreambleGroupA and PreambleGroupB, (Dkt. 328-42 ¶ 122), and that selection of a group is

21   determined by the UE, not indicated by the network.  *Id.*  Based on these allegations, Dr. La Porta

22   and Huawei allege that this claim limitation is not met.  By contrast, Dr. Valenti opines that the

23   system information includes parameters such as numberOfRA-Preambles and sizeofRA-

24   PreamblesGroupA, which (i) explicitly reference PreambleGroupA, (ii) confirm whether

25   PreambleGroupB exists, and (iii) identify the specific numbers of preambles in each group;

26   moreover, the system information inherently selects a group of random access preambles by

27   indicating that one group is unavailable. Ex. 25 ¶¶ 371-75.  In other words, the system information

28   includes both group ID information, and specification information regarding the preamble and

1   corresponding preamble indexes within the group, from which the UE can select.

2       More particularly, as Dr. Valenti stated in his report, the "preambles in Random Access

3   Preamble group A are the preambles zero to sizeOfRA-PreamblesGroupA minus one" (with a

4   maximum of 64 total preambles, or preambles zero to 63).  Ex. 25 ¶ 624-25, *citing* TS 36.321 §

5   5.1.1.  This numeric designation of preamble "zero," (or preamble "1," "2," "3," and so on) is the

6   preamble index, *i.e.*, an ID within a group of IDs.  *See* Dkt. 328-41 ¶ 654; *see also id*. at 402.[20]  In

7   both the LTE standard and the accused Huawei products, the preamble index selected by the UE

8   (*i.e.*, the index from zero up to the maximum identified by system information), which is the "first

9   ID" of the claims, is later compared with the RAPID (the second ID of the claims), which like the

10  index is a "six bit number."[21]  *See* Ex. 25 ¶¶ 519-20 (citing TS 36.321 §6.2.2); *see also id*. at ¶¶ 385-

11  89, 396-97, 414-419, 428, 526-32, 542-43) (describing selection of first ID (preamble index), and

12  comparison of first ID and second ID).  Thus, by including the number of preambles in a group, the

13  system information necessarily includes the range of preamble indexes (the group of IDs).

14      Even under the narrowest view of Huawei's improper claim construction, Dr. Valenti opined

15  that the above described mechanism for indicating the group of IDs from which the UE is to

16  randomly select a particular ID, including through the inclusion of the number of preambles in each

17  group, meets this limitation under the doctrine of equivalents (discussed *infra*).  *Id*. at ¶ 399.

18  Consequently, Huawei is asking the Court to decide an issue not ripe for summary judgment.

19  *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 2013 WL 12174144, at *5 (N.D. Cal. Oct. 17,

20  2013) ("Where there is a material dispute as to the credibility and weight that should be afforded to

21  conflicting expert reports, summary judgment is usually inappropriate.").

22      Further, Huawei's proposed construction improperly seeks to import a limitation from the

23  specification into claims 1 and 4, by manufacturing a construction that the term "indicating" as used

24  therein must mean "including" as opposed to its plain and ordinary meaning.  However, since the

25

---

26  [20] This operation is in accord with exemplary descriptions of the pool of IDs in the '825 patent
    specification, in which "a temporary ID pool of the cell A has Short IDs 0-23." Dkt. 328-39 at 5:29-
27  37; *compare with* Ex. 25 ¶ 371 (*citing* TS 36.321 § 6.32, identifying possible range of preambles as
    0-23 (*i.e.*, n24)).

28  [21] In binary, a six bit number covers the range from 0 (*i.e.* "000000") to 63 (i.e. "111111").

ordinary meaning of "indicating" is readily understood by those of ordinary skill in the art (*see* Ex. 25 ¶¶ 163-66; Dkt. 328-42 ¶¶ 122-23), there is no need to distort the intention of the inventors by importing an additional "including" limitation, as Huawei proposes. *See Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("When claim language has as plain a meaning on an issue as the language does here … it is particularly difficult to conclude that the specification reasonably supports a different meaning."); *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1362-63 (Fed. Cir. 2016).

Indeed, the claim language itself recites no "including" limitation, and Huawei fails to point to any claim language that suggests a further requirement on the term "indicating" of inclusion of IDs in the system information.  Rather, evidencing Huawei's attempt to import limitations into the claim, Huawei ignores the claim language entirely and jumps directly into discussions of embodiments in the specification (*e.g.*, the embodiments of Figs. 4 and 9).  *See* Mot. 24.  In so doing, Huawei characterizes these embodiments as "describ[ing] the system information at issue as including the group of IDs."   Notably, Huawei never (i) contends that these embodiments are contrary to the plain and ordinary meaning of the term "indicating" (including under Samsung's proposed understanding), or (ii) identifies any words or expressions of manifest exclusion or restriction.  Accordingly, Huawei's transparent attempt at incorporating limitations into the claim should be rejected.  *See, e.g.*, *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1217-18 (Fed. Cir. 2014); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014) ("[T]the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").[22]

Moreover, Huawei's characterizations of these embodiments is, in fact, incorrect.  As described in connection with Fig. 4: "For example, a temporary ID pool of the cell A has Short IDs 0-23. . . . the UE 405 acquires system information . . . include[ing] the temporary ID pool of the cell

---

[22]   The Court already rejected a very similar argument made by Huawei during claim construction of "predetermined delay duration," in which the Court refused to adopt Huawei's proposed construction of "delay duration from a base station" precisely because it imported a limitation from the specification into the claims.  *See* Dkt 168 at 24.

A. . . . ***In the above example, the UE 405 detects that the temporary ID pool of the cell A is constructed with twenty-four (24) short IDs including Short IDs zero (0) to twenty-three (23)***. Dkt. 328-39 at 5:23-27 (emphasis added). Thus, even in this embodiment, by "including" the specification simply refers to the system information allowing the UE to detect that "the temporary ID pool is constructed with twenty-four (24) short IDs." *Id.* This is no different than the operation of the accused Huawei products in accordance with the 3GPP standard, where the UE detects that the group of IDs is comprised of preamble indexes from 0 to some maximum number up to 63. *See, e.g.,* Ex. 25 ¶ 624-25, *citing* TS 36.321 § 5.1.1; ¶ 654.

Finally, Huawei's contention that Samsung's DOE argument is boilerplate is incorrect. Mot. 25. Samsung's infringement contentions identify DOE on a limitation-by-limitation basis and allege that each limitation "is practiced under the doctrine of equivalents, as any alleged differences are insubstantial," Dkt. 328-43 at 6 (referring to the "receiving" step). As a result, Samsung's contentions are distinguishable from those found improper in Huawei's cited cases. *See* Section IV.1, *supra*. Here, Samsung's infringement contentions assert DOE as to the "receiving system information indicating a group of [IDs]" limitation, and Dr. Valenti subsequently provided opinions detailing why there are, at best, only insubstantial differences between how the accused products receive system information indicating a group of IDs and the claim limitation. Ex. 25 ¶¶ 399, 651; *see also* Ex. 25 ¶¶ 379-383, 392-397 (describing substantially same function of receiving information "indicating a group of ids"); ¶¶ 379-383, 394-396 (describing substantially same way of "receiving the system information from the base station"); ¶¶ 384-389, 395-397 describing substantially same result of "obtaining a group of identifications from which the UE can select").

## V.   CONCLUSION

For the foregoing reasons, Huawei's Motion for Summary Judgment should be denied.

DATED:  July 17, 2018

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By      */s/ Victoria F. Maroulis*
        Charles K. Verhoeven
        Kevin P.B. Johnson
        Victoria F. Maroulis
        Thomas D. Pease
        David A. Perlson

*Attorneys for Samsung Electronics Co., Ltd.,*
*Samsung Electronics America, Inc., and Samsung*
*Research America, Inc.*