Pages 1 - 89

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

HUAWEI TECHNOLOGIES CO., LTD., )
et al.,                        )
                               )
            Plaintiffs,        )
                               )
  VS.                          )      NO. C 16-02787 WHO
                               )
SAMSUNG ELECTRONICS CO., LTD., )
et al.,                        )
                               )
            Defendants.        )
_____)


                        San Francisco, California
                        Wednesday, August 15, 2018

                 **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                    SIDLEY AUSTIN LLP
                    555 California Street
                    San Francisco, California  94104
            BY:  **MICHAEL J. BETTINGER, ATTORNEY AT LAW**
                 **IRENE I. YANG, ATTORNEY AT LAW**


                    SIDLEY AUSTIN LLP
                    One South Dearborn
                    Chicago, Illinois  60603
            BY:  **DAVID C. GIARDINA, ATTORNEY AT LAW**
                 **DOUGLAS I. LEWIS, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                         SIDLEY AUSTIN LLP
 3                       1001 Page Mill Road - Building 1
                         Palo Alto, California  94304
 4               BY:   NATHAN A. GREENBLATT, ATTORNEY AT LAW

 5   For Defendants:
                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 6                       50 California Street - 22nd Floor
                         San Francisco, California  94111
 7               BY:   CHARLES K. VERHOEVEN, ATTORNEY AT LAW
                       IMAN LORDGOOEI, ATTORNEY AT LAW
 8                     BRIAN E. MACK, ATTORNEY AT LAW
                       MELISSA J. BAILY, ATTORNEY AT LAW
 9                     SAM STAKE, ATTORNEY AT LAW
                       CARL G. ANDERSON, Ph.D., ATTORNEY AT LAW
10
                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
11                       555 Twin Dolphin Dr. - 5th Floor
                         Redwood Shores, California  94065
12               BY:   VICTORIA F. MAROULIS, ATTORNEY AT LAW
                       RAY R. ZADO, ATTORNEY AT LAW
13
                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
14                       1300 I Street NW - Suite 900
                         Washington, D.C.  20005
15               BY:   ALAN WHITEHURST, ATTORNEY AT LAW
                       MARISSA R. DUCCA, ATTORNEY AT LAW
16
     Also Present:       Steven Geiszler, Huawei
17                       Emil Zhang, Huawei

18

19

20

21

22

23

24

25
```

1   <u>**Wednesday - August 15, 2018**</u>                    <u>**2:47 p.m.**</u>

2                    <u>**P R O C E E D I N G S**</u>

3                    ---oOo---

4       **THE CLERK:**  Calling Civil Matter 16-2787,

5   Huawei Technologies Company Limited, et al., versus Samsung

6   Electronics Limited, et al.

7       Counsel, please step forward and state your appearance.

8       **THE COURT:**  So I'm hoping you-all noticed and will

9   follow the direction of the prior six cases who were all

10  submitting to the tentatives.

11      Why don't you introduce yourself for the record.

12      **MR. BETTINGER:**  Thank you, Your Honor.  Mike Bettinger

13  along with my colleagues today Dave Giardina, Doug Lewis -- who

14  will all be presenting -- Nate Greenblatt, and Irene Yang.

15  Also with us today from Huawei Steven Geiszler and Emil Zhang.

16      **THE COURT:**  Welcome.

17      **MR. VERHOEVEN:**  Good afternoon, Your Honor.  Charles

18  Verhoeven on behalf of Samsung.  And with us today is Victoria

19  Maroulis, Alan Whitehurst, Melissa Baily, Carl Anderson, Ray

20  Zado, Marissa Ducca, Brian Mack, Sam Stake, and Iman Lordgooei.

21      And we have so many people just because we're not sure

22  exactly what issues are going to come up, and we wanted to have

23  the most knowledgeable people here for Your Honor.

24      **THE COURT:**  Well, that's so kind of you.  I think it's

25  also representative of how much paper and how many motions I

1    was dealing with, and I will be so interested at the time of

2    trial to see how you're going to present a case clearly and

3    effectively to a jury of your peers.

4         So I've given you the tentative rulings.  There is one

5    other thing I wanted to mention before you start out, because I

6    had one other question that occurred to me this morning.

7         You saw for the most part I addressed motions on what I

8    perceived the merits to be as opposed to not striking them on

9    the basis of timing and procedural arguments because I thought

10   they were plausible explanations given by the opposing party on

11   those grounds.

12        The one argument that I haven't -- that I didn't have a

13   response to concerns Samsung's motion for summary judgment on

14   the '105 patent that Huawei mentioned the Motorola simulations

15   as a reduction to practice for the first time in its opposition

16   brief.  And so at whatever point during the course of the

17   proceeding I'd like to hear what Huawei's response to that is

18   because that would make a difference in the way that I'm

19   thinking about that issue.

20        **MR. BETTINGER:**  Yes, Your Honor.

21        **THE COURT:**  So with that -- and you've seen the other

22   questions that I had, and I'd like you to argue anything that

23   you want to.  I am -- we're going to be out of here in two

24   hours unless we take a break.

25        So with that, we'll start, Mr. Bettinger, with you.

1    **MR. BETTINGER:**  Yes, and we'll start with your first

2  question on --

3         **THE COURT:**  Just a second.  Mr. Verhoeven?

4    **MR. VERHOEVEN:**  I'm sorry.  Just point of order.  So

5  we're going to take it issue by issue; correct?

6         **THE COURT:**  And if Mr. Bettinger groups, you know,

7  three things together, then you can respond to those three

8  things.

9         **MR. VERHOEVEN:**  Okay.

10        **THE COURT:**  And do it any way that makes --

11        **MR. VERHOEVEN:**  Right.

12        **THE COURT:**  -- the most sense to you, but you'll be

13  taking turns.

14    **MR. VERHOEVEN:**  Exactly.  I was thinking it would be

15  more useful for Your Honor if we join the issues together

16  rather than --

17        **THE COURT:**  Yes, absolutely.  Any way that works best

18  for you-all will work best for me.

19        **MR. VERHOEVEN:**  Thank you, Your Honor.

20    **MR. BETTINGER:**  So, Your Honor, thank you for the

21  time.  Thank you for the effort that went into it.  We know the

22  effort that went into the briefs, so that effort that went into

23  this.

24    So we thought we'd start with your first question on

25  divided infringement since you asked it first.

1          THE COURT:  Okay.

2          MR. BETTINGER:  We did prepare a handout with some

3    slides to follow along if need be.  We're not going to go

4    through all of these.  We have directed points, but there are

5    page numbers that we can refer to.

6          THE COURT:  All right.  I was expecting this and

7    that's great.

8          MR. BETTINGER:  Okay.

9                    (Pause in proceedings.)

10         MR. BETTINGER:  So, Your Honor, starting with your

11   first question on divided infringement, it comes up in two of

12   the patents, our patents, the '613 and the '587.  We've got

13   some slides on that at page 119 of our presentation.

14         And I think to set the stage for the discussion, if we

15   could go to Slide 121 and just take a look at the claims

16   because the issue here is these are what are called method and

17   product claims --

18                    (Pause in proceedings.)

19         MR. BETTINGER:  Oh, yeah.

20         I'm sorry.  A housekeeping matter.  Could we get the

21   screen turned on so we can post them?  Thank you, ma'am.  My

22   apologies.

23         THE COURT:  That's okay.  I'm looking at page number

24   121, so you don't have to stop.

25         MR. BETTINGER:  Okay.

1        So the claims on the '613, there's two claims, a method

2   claim, and it requires receiving by user equipment and

3   receiving by user equipment.  Those are the relevant claims.

4        Claim 5, which is an apparatus claim, user equipment is

5   what it's claiming.  So it's the UE.  In this case it's called

6   user equipment, the device, the phone.  So that's what it's

7   comprising.  It's just a single user equipment.

8        Similarly, if you look at page 122, for the '587 patent,

9   the method claim is receiving -- the UE receives a downlink

10  control information and then the UE feeds back the ACK/NACK

11  information based on what it's received.  In Claim 9 it's a

12  user equipment.  So it's just the product, the device itself.

13            **THE COURT:**  All right.

14            **MR. BETTINGER:**  We're not talking a situation where

15  you have to go outside anything.  It's just those

16  self-contained phones, and that's where the functionality lies.

17       And that *Uniloc versus Microsoft* case that we cited in our

18  papers and is restated there on Slide 123, that's the way

19  patentees can structure claims so that you capture infringement

20  by a single party.

21       In *Uniloc* I think it was an algorithm that incorporated

22  means for receiving e-mails, and so the e-mails had to be sent;

23  but the way the claims were written, it was just the receiving

24  of the e-mails and the court said -- the Federal Circuit said,

25  "Yeah.  That's fine.  That's the way you can draft a claim."

1    So that's the way these claims were drafted.

2        So you don't get into a divided infringement argument at

3    that point because it's all being done within this one device.

4    It's the phone.  It's the one phone here.  The claims don't

5    require the network.  They require a UE that is receiving

6    information perhaps from a network.  So they're written from

7    the perspective of the UE.

8        But if we were to get to the next issue, which is the

9    products themselves, which I think was what your question was

10   directed to, what if you have a product claim, can you even

11   have this direct infringement argument with a product claim as

12   opposed to a method claim where you can -- and I think you

13   wanted the most recent case law on that --

14        THE COURT:  I'm always happy with it.

15        MR. BETTINGER:  -- to help you with that.

16        So at Slide 124 what we've presented is there's a case out

17   of the Eastern District of Texas a couple of years ago that was

18   affirmed by the Federal Circuit citing *Akamai*.  *Akamai* is a

19   case that has had a number of lives up in the Federal Circuit.

20   But divided infringement applies only to method claims and

21   that's the teaching there.  It was affirmed by the

22   Federal Circuit.  That was a case by Judge Schroeder out of the

23   Eastern District of Texas.

24        We've also at Slide 124 cited the *Arcella* -- or

25   *Arcelormittal* case out of District of Delaware.  That was

1  Judge Robinson.  And there the issue was discovery related, and

2  she said given that the divided infringement only applies to

3  method claims -- again citing the Fed. Circuit's *Akamai*

4  decisions -- there's no need even for the discovery.

5     So when you're in a situation where you've got a product

6  claim and the product is all contained within a single device,

7  divided infringement doesn't even enter the picture.

8     There is one other body of law just to be complete,

9  Your Honor, and that you can have a system claim.  And there's

10  a case called *Centillion* out of the Federal Circuit where it

11  required a user -- the claims required that the user perform

12  some functions and that the back-end servers perform some

13  functions.

14     So there you have got a system.  It's not a contained

15  unit.  And the question is -- it was a claim of infringement by

16  use of the entire distributed system.  And so in that case,

17  which is a little bit out there, you could apply divided

18  infringement to a use situation with a system claim, but

19  there's never been one that we know of, and there's not been

20  one cited, that has been applied to an apparatus claim where

21  all the elements are contained within that particular

22  apparatus.

23     At Slide 125 we have set out the claim language in the

24  *Centillion* decision, and it shows you the elements there.

25     So I believe that answers the questions you had on that

1  particular issue.

2      There is the *Grecia* case out of the Federal Circuit just a

3  couple months ago, which I have a copy if Your Honor wants it,

4  which talks about how limited *Centillion* is on divided

5  infringement for a system claim when it's a claim of use, but

6  that's the only other decision we know of.  There's none that

7  we've been able to find or that have been cited to us where you

8  have that divided infringement for an apparatus claim.

9          **THE COURT:**  Okay.  All right.

10      Mr. Verhoeven?  Or who's going to respond to that?

11          **MR. VERHOEVEN:**  Ms. Ducca.

12          **MS. DUCCA:**  Good afternoon, Your Honor.  Marissa Ducca

13  on behalf of Samsung, and I'll try to make this very quick.

14      I'm going to start with your second question, which is:

15  If it is inapplicable as a matter of law, is an argument

16  properly presented in a *Daubert* motion?

17      I want to call attention to the actual opinions that our

18  expert rendered.  They're actually contingent opinions.  So his

19  opinions were entirely technical, and what he was saying is

20  that if the Court were to make a determination at some point in

21  the future that there is divided infringement, then here are my

22  technical opinions.

23      We're not asking you to make that determination, and

24  Huawei is not asking you to make that determination.  They're

25  just asking you to exclude those opinions.

1      Our expert just put that in there as a contingent

2  decision.  So if Your Honor does not want to make that decision

3  at this time, you don't have to; and our expert can't render

4  those opinions without that decision because it is an issue of

5  law, and we admit that it's an issue of law.

6          **THE COURT:**  Okay.

7          **MS. DUCCA:**  To briefly address the issue of product

8  versus apparatus versus system claim, we don't disagree with

9  any of the case law that Mr. Bettinger cited.  We do believe

10 *Centillion* is the leading case in this area.

11     There is a question of system claim versus product and

12 apparatus claim.  There's no magic language to whether a system

13 claim, if you say it is a system, it becomes a system claim; or

14 it is a product, it becomes a product.

15     The question is:  What does the claim language say?  So

16 you look at the claim language.  You see how the patent

17 prosecutor drafted it.  Did they draft it as an action term

18 where somebody has to actually do something, or did they draft

19 it from the perspective of a single product or device, as

20 Mr. Bettinger was speaking of?

21     And just to briefly -- I'm going to use your slides.  If

22 you can put 121 back up.

23     And if you notice for Claim 5, the first limitation says

24 (reading):

25          "... circuitry configured to receive a service sent by

```
 1          a base station."

 2          It's talking about particular circuitry.  It happens to be

 3    the circuitry that receives the service.

 4          But then the next sentence says (reading):

 5               "... the service being sent in one or more subframes."

 6          That's an action term.  It's saying that the service is

 7    sent from something:  The base station.  It doesn't say

 8    something, for example, "the service which is received from the

 9    base station."  It says it is being sent, an action verb.

10          So that's an example of claim language where the

11    prosecutor chose to frame the language from both sides.  Just

12    because it says "a user equipment" and not "a system" does not

13    make it not a system claim.

14               THE COURT:  Okay.

15               MS. DUCCA:  All right.

16               THE COURT:  I understand.

17               MS. DUCCA:  And that's all I have.

18               THE COURT:  Okay.  Thank you.

19               MS. DUCCA:  Thank you, Your Honor.

20               THE COURT:  All right.  Mr. Verhoeven.

21               MR. VERHOEVEN:  It's our turn.  Thank you, Your Honor.

22          I would like to address briefly the antitrust ruling or

23    tentative.

24               THE COURT:  Yes.

25               MR. VERHOEVEN:  And I also have some slides.
```

1          These are -- most of the meat of this issue has been

2     marked confidential by the parties, and so I may be just

3     referring to pages here so that we don't have it in the public

4     record.

5                    THE COURT:   That's fine.

6                         (Pause in proceedings.)

7               MR. VERHOEVEN:   So first, Your Honor, I'd like to

8     address the two bullets from your tentative, and in

9     particular -- and I'm not going to use any numbers here --

10                   THE COURT:   Okay.

11              MR. VERHOEVEN:   -- the issue about the starting rate

12    that was your first bullet.

13                   THE COURT:   Yes.

14              MR. VERHOEVEN:   It is Samsung's contention, we believe

15    the evidence shows, that the rate at issue that we're talking

16    about was maintained, it wasn't just a starting rate, but it

17    was maintained throughout the negotiations between the parties

18    all the way up to the filing of the complaint in this case.

19          And if you look at in Slides 3 and 4, Your Honor, and 5,

20    we have just a high-level summary.  The details are in the

21    record in evidence, but this rate we're talking about was

22    insisted upon by Huawei throughout all of the pre-compliant

23    negotiations.  And they have claimed that they lowered that

24    rate, but that is not correct.  There's a factual dispute about

25    that.

         And, for example, in August of 2000 -- well, let me say
this:  One of the things that was happening during these
negotiations was that each time the parties came together to
talk, the assumptions provided by Huawei changed.  So, for
example, SEP plus everything, not just SEP, changed to SEP
only, changed to Huawei only, not cross-license, changed back
to everything, cross-license.

         And this is just one example.  There was a lot of
different things changing all the time.  There was one thing
that didn't change and that's the rate.  The rate always stayed
the same.  It was always that rate.

         And so in August 2014, that was the rate.  In December,
there was a significant agreement reached between Huawei and
another party, which the rate -- in which the rate was not even
in the same solar system is what was demanded.

         If you go to Slide 4, after that, the same rate was
insisted upon by Huawei even after that.  It was expressed,
Your Honor, in a number and not a percentage, but the number
was separating out a -- can I say the difference in phones? --
it was a separating out the latest technology system from the
prior ones with respect to which the industry had already been
moving on, and the rate was applied to the difference.  So it
was effectively the rate -- the same rate applied to the
technology that is the later iteration that the parties are
actually going to be using in the future.  It was the same

     1    rate --

     2              THE COURT:  Okay.

     3              MR. VERHOEVEN:  -- and it was expressed as a number.

     4    But if you take the number -- if you take that number -- the

     5    way they got the number was they took the exact same rate and

     6    they applied it to the difference in price between a phone that

     7    had the latest and a phone that had the previous; and that

     8    represents, according to them, the value of the phone of that

     9    amount.

    10         So they're making all kinds of changes.  They were saying

    11    SEP only.  They're saying worldwide.  And so now they said,

    12    "Let's just do the latest technology," but they used the same

    13    rate throughout.  There was no going down on the rate.  That

    14    rate was applied to that difference, and that's how they got

    15    the number.

    16         And then they changed the number again in -- well, I don't

    17    know if I have it on the slide, but they changed the number

    18    again to a slightly lower number expressed as a monetary

    19    amount, not as a percentage.  And that was the same

    20    calculation.  They told us later that the way they came up with

    21    that was to take that exact same rate they've always been

    22    insisting on -- the prior rate was using a competitor's

    23    cellular telephone technology -- and they just switched it to

    24    Samsung's.  So it's the same calculation using different

    25    pricing.  The first one was -- would have been our technology.

1      So the point I'm making is -- and I'm not sure exactly

2  where Your Honor was coming from with the comment in the first

3  bullet -- this is not a situation where there's a headline rate

4  and then there was dramatic downward movement.  That's not the

5  case.

6          THE COURT:  Okay.  I understand what your point is.

7      How about the second point?

8          MR. VERHOEVEN:  The second point, if you go to -- this

9  is antitrust injury; correct, Your Honor?

10     And so I start --

11         THE COURT:  And it's really the concept of isn't this

12 just a fight between two companies?

13         MR. VERHOEVEN:  No, it's not.

14         THE COURT:  Okay.

15         MR. VERHOEVEN:  So --

16         THE COURT:  That's what I want to hear.

17         MR. VERHOEVEN:  All right.  So if you go to Slide 7 --

18 actually, I would rather just talk to you about it, but that's

19 where I am, Slide 7.  We've got to talk about what's the

20 relevant market.  That's the devil here.  What's the relevant

21 market?

22     We claim in our case that the relevant market is the

23 technology that gets incorporated into the standard.  So you've

24 got 10 SEPs, each of those -- that get accepted in.  Those are

25 technological functionality for which there's no alternative

1    anymore.  And so there's a monopoly on each of those things.

2    Okay?  SEP.  That's why they call it SEP; right?  But we're

3    talking now not about the patents but about the technology that

4    gets adopted into the standard that corresponds to those

5    patents, and that is the relevant market we claim.

6         Their summary judgment motion does not attack our relevant

7    market.  It doesn't say it's bad.  It doesn't say we can't

8    prove it.  It accepts it because it doesn't even challenge it.

9         So that's the relevant market we're dealing with,

10   Your Honor.  Samsung is a customer of that relevant market.

11   Samsung is a purchaser, is a purchaser of the right to use that

12   technology.

13        So we're not, Your Honor, a competitor at all in this

14   case.  We're competitors in the real world, of course; but this

15   is a very specific claim and it's talking about specific

16   technological marketplaces, and we're a purchaser of the rights

17   to use that -- the monopoly they have on that now because they

18   have a patent on something that's been incorporated into the

19   standard.

20        And so the injury is not just a competitor Samsung to

21   another competitor; it's an injury where we are the consumer

22   and we're being harmed.  And so all of their arguments about

23   competitor on competitor are misplaced in this particular

24   scenario, Your Honor.

25        And if I could go to Slide 9, Your Honor, what does Huawei

1    say in response to the fact that we are a direct purchaser and,

2    therefore, the law they're citing is inapplicable?   This is

3    what Huawei said on page 5.   It starts with the phrase

4    (reading):

5            "The issue is not whether Samsung, as a 'direct

6        purchaser' in the alleged relevant technological markets,

7        is presumptively a proper plaintiff with antitrust

8        standing, but rather whether the conduct Samsung complains

9        of will 'harm the competitive process and thereby harm

10       consumers,' rather than merely harming 'one or more

11       competitors'..."

12   They refuse to engage.   They just say we're competitors.

13   That's the issue.   The issue isn't that we're direct

14   purchasers.   The issue is we're competitors.   They don't

15   challenge the fact that we're a direct purchaser under our

16   definitions of relevant market.   They just said, "Look over

17   here, Your Honor."

18       So they have nothing to say about this.   And this does

19   constitute -- when you're a direct purchaser, it does

20   constitute cognizable antitrust injury.

21       In Slide 10 -- I'm not going to belabor this because in

22   the interest of time, Your Honor -- we cite Judge Koh's

23   decision -- and it's on the slide.   I'm not going to take the

24   time to read it, Your Honor -- finding antitrust injury in

25   basically the very similar factual scenario.

1          And where else?  There's also -- well, there's several

2    cases, Your Honor, and they're in our papers and they're in my

3    slides here.

4          I want to make one more point, though, quickly, before I

5    run out of time, and that is, you didn't address this in your

6    tentative, but their papers, we're talking about the antitrust

7    industry, they keep saying there's no industry because we

8    haven't paid anything yet.  And that's their primary argument,

9    nothing's happened yet.  The injunction hasn't issued in China

10   yet.  We haven't paid the exorbitant prices that we allege

11   they're demanding yet.  So there's no injury.

12         But that's contrary to law, Your Honor.  Threatened --

13   it's not whether it's actual or threatened.  Threatened is

14   covered under the law, and we cite to some stuff on Slide 11

15   here.

16         And they don't seriously contest that if they actually did

17   all this stuff, and our allegations are assumed to be true,

18   that there wouldn't be a massive effect on competition

19   generally.  All the way down, not just us as a direct

20   purchaser, but all the way down to the consumer there would be

21   massive injury.  If injunctions issued inappropriately killing

22   20 percent of one of the party's -- certain products of one of

23   the parties, that would be a massive injury.

24         If none of that happened but the exorbitant rates were

25   forced to be paid, that would get passed down to the ultimate

1  consumer.  And their expert admits that's injury to

2  competition, it's injury to the consumer.

3       So we believe we have shown antitrust injury.  I have

4  slides on other issues, but those are the two issues you raised

5  in your tentative and I'll ask if you have any question.

6            **THE COURT:**  Okay.  Great.  Thank you, Mr. Verhoeven.

7            **MR. VERHOEVEN:**  Okay.

8         **MR. GIARDINA:**  Good afternoon, Your Honor.  My name's

9  David Giardina on behalf of Huawei.  I've got the requisite

10 book.

11           **THE COURT:**  Good.

12        **MR. GIARDINA:**  So if I can hand that up to you.

13           **THE COURT:**  Thank you.

14                 (Pause in proceedings.)

15        **MR. GIARDINA:**  So, Your Honor, it won't come as any

16 surprise that we think you got this issue right in your

17 tentative, and I don't think anything that Mr. Verhoeven has

18 suggested this morning should -- or this afternoon should

19 change the outcome on this.

20      The starting point for analysis of the antitrust issue is

21 an issue that Mr. Verhoeven didn't join this afternoon, and

22 that is that it's incumbent on Samsung to have evidence that

23 Huawei's FRAND commitments were false at the time that they

24 were made.  And I think for the reasons that we've set forth in

25 the papers, that would be the prerequisite in order to

 1    establish that Huawei obtained, acquired, or maintained

 2    monopoly power in the alleged relevant markets by means of

 3    exclusionary conduct.

 4         None of the chronology about the parties' negotiations

 5    that Mr. Verhoeven went to -- or went through suggests that

 6    Huawei's FRAND commitments at the time that they were made were

 7    fraudulent and false and that Huawei had no intention of

 8    honoring those commitments.

 9         The proof of that, for lack of a better term, is the fact

10    that Huawei throughout the course of negotiations and, indeed,

11    in this court itself has sought to have a neutral determine

12    what the appropriate rate is.

13         Huawei, you know, can't be alleged to have intended from

14    the beginning to evade its FRAND commitments when it said to

15    Samsung the very time that it's making the offers that

16    Mr. Verhoeven says are so abhorrent, was saying to Samsung,

17    "Well, let's let an arbitrator decide this.  Let's let a court

18    decide this."  And, indeed, we came to this court and asked the

19    Court initially to take up that issue.

20         All of that conduct is utterly inconsistent with the

21    notion that Huawei intended to evade its FRAND commitments from

22    the very beginning, and there's no evidence in this record that

23    would permit a reasonable jury to decide otherwise.

24         **THE COURT:**  You'd agree with Mr. Verhoeven that

25    Huawei's offers have been consistent at that rate?  Is that

1    what you're telling me?

2         **MR. GIARDINA:**  I would not, Your Honor.  I think, you

3    know, that's not set forth in the papers here and had it been,

4    we would have demonstrated that the undisputed facts

5    demonstrated that Huawei's offers were declining consistently

6    over time.

7         But even if one accepted, you know, for the purpose of

8    argument that there was a disputed issue as to that fact, it

9    would be insufficient to find that there was adequate

10   exclusionary conduct; and that's, you know, the case law that

11   we cite that addresses whether one can establish that a

12   contractual commitment was false at the time it was made by

13   establishing that there was some subsequent, even willful,

14   breach of that.

15        And all the conduct that he's describing, which we believe

16   to be mischaracterized, would at most go to proving that there

17   was some subsequent breach of these commitments.  It wouldn't

18   demonstrate that they were false at the time that they were

19   made.  As a matter of law, one can't draw that inference from

20   them.  So I think that that addresses the exclusionary conduct

21   issue.

22        With respect to antitrust injury, I think there is some

23   level of confusion here, and this is always true because the

24   concept of antitrust injury is a confusing one.  In effect our

25   argument isn't one of standing.  It is that the -- it's really

1    another variant on the argument that there's no exclusionary

2    conduct.

3        What we're saying and the *Rambus* case that we cite is

4    really saying is that for something to be anticompetitive and

5    exclusionary, it has to affect more than an individual party,

6    and that's what here in the relevant markets it doesn't.  The

7    only person -- the only party that could be damaged as a result

8    of this in the relevant markets is Samsung and Samsung alone,

9    and that's not enough to establish that there's been harm to

10   the market overall; and, therefore, you can't establish

11   essentially that there's anticompetitive conduct leaving aside

12   whether or not they're a direct purchaser, which we, of course,

13   concede as they've defined the market.  We think there are

14   problems with that definition; but for the sake of summary

15   judgment, we've not challenged it.

16       You know, Mr. Verhoeven is absolutely correct that under

17   Section 26, you know, you can establish standing on the basis

18   of threatened injury.

19       One issue that Samsung doesn't join us on in the papers is

20   the fact that, you know, there's no plausible scenario in which

21   actual injury occurs here.  You know, we've represented to this

22   Court consistently from the outset of this case to today that

23   if Samsung would commit to a neutral determination, be it by

24   arbitration or in a judicial proceeding in some jurisdiction,

25   that Huawei would withdraw its injunction actions in China.

1          So, you know, ultimately what would happen here is if an

2     injunction ever came to be enforceable in China, Samsung would

3     have the option of getting a neutral determination of what it

4     should, in fact, pay, and their expert admitted that that would

5     not harm anyone.  That would not harm competition and,

6     therefore, you can't have harm to competition as the record

7     stands here.

8          Your Honor, if you don't have any other questions, I'll

9     save our time.

10               THE COURT:  Okay.

11               MR. GIARDINA:  Thank you.

12               MR. VERHOEVEN:  Just a couple minutes, Your Honor.

13               THE COURT:  Sure.

14               MR. VERHOEVEN:  On the issue of intent, if you read

15    the papers, that seems to be the main issue, that -- there's

16    many issues, but that seems to be a big issue that Huawei is

17    pointing to and they're saying, hey, we don't have any evidence

18    that's dated prior to the date of adoption of the standard and,

19    therefore -- of intent and, therefore, we lose as a matter of

20    law.  That's basically our argument.

21         And I have -- there was a multiprong response to that.

22    First, intent is not required in Section 2.  I'll go into that.

23         Second, their underlying theory that you can't prove bad

24    intent with postdated conduct related -- that goes to probative

25    of your pre-X date conduct is false.  It's just not true under

1    the law.

2        And perhaps the best argument or the easiest comeback to

3    that is they're relying on their offer to arbitrate showing

4    their good intent.  Well, that didn't happen before the

5    adoption of standards.

6        And what we have is a -- we have -- you're supposed to

7    look at the facts in toto when you're looking at intent.  So

8    even if it was required, Your Honor, you look at everything,

9    and so that's our second point, Your Honor.

10       So let me go really quickly to that.  And if you go to

11   Slide 15, the entire gist of their motion, based on the

12   *Broadcom* decision, Your Honor, is to say that's the only way

13   you can show an antitrust violation, is the *Broadcom* decision

14   from the Third Circuit, but that's not true.  There's a

15   refusal-to-deal doctrine that's completely irrelevant to that.

16       And here, we just quote the Sherman Act.  There's no

17   intent requirement.  The only thing that's -- the two elements

18   to show a violation of Section 2 is possession of monopoly

19   power in the relevant market -- this is Slide 16 -- and the

20   willful acquisition or maintenance of that power through

21   exclusionary conduct.

22       The *Broadcom* case itself, Slide 17, refers to the fact

23   that you could have a refusal-to-deal case.  That wasn't the

24   facts before it, but it even acknowledged you could have that

25   type of case too.

1          And then finally on Slide 18, invoking Judge Koh again,

2     Your Honor, in a highly fought case involving SEPs, an

3     antitrust claim, the Court found that there was a refusal to

4     deal or there was a cause of action to state it.  And so what

5     they're asking you to do is something that would be completely

6     inconsistent with what happened in that case.

7          Our case fits in with those fact circumstances, and we

8     pointed that out in our opposition.

9          And the reply, if you look at Slide 20, Your Honor, the

10    only place this is dealt with is in Footnote 2 of their reply.

11    It's a big footnote but basically I'll synthesize it for

12    Your Honor.  They're basically saying the refusal -- there is

13    no refusal to deal here as a matter of law because what

14    Judge Koh was talking about was refusal to provide any terms,

15    as though that was a requirement to establish a cause of action

16    for refusal to deal, but that's not true.

17         And the next page I'll cite you, Your Honor, page 21, to

18    some cases that expressly say that.  You can be refusing to

19    deal if you give exorbitant offers that can't reasonably be

20    accepted, and that's exactly what we have here.

21         So I'll give you an example.  Huawei itself has

22    consistently said, Your Honor, that -- well, let me take a step

23    back.

24         Your Honor is familiar with the concept of cumulative

25    royalty?

1        **THE COURT:**  Yeah.

2        **MR. VERHOEVEN:**  So that would be, say you don't have

3   any IP and you want to make a phone.  You had to have licenses

4   from everybody.  What's the cumulative stack, what's the

5   cumulative amount of that?  And there's a big concern in the

6   industry that that's going to get too high and it's going to

7   kill the industry because everything will get too expensive.

8        And Huawei's publicly taken the position repeatedly that

9   the entire cumulative royalty stack should be 5 to 6 percent

10   that's public, and later they've modified it to 5 percent.

11   Yet, look at the rate they've consistently demanded of us.  If

12   you just do the math, I can't talk about the math, but if you

13   just do the math, which is pretty easy to do, then the

14   percentage of the cumulative rate that would translate into

15   doesn't even arguably -- it's not even arguable it's so high.

16        And so that's a refusal to deal is what we're saying, and

17   it's a fact issue.  And so we cite these cases in response --

18   we didn't get a chance to cite anything because it was a reply

19   brief -- showing that, you know, if you're just ridiculous,

20   that's a refusal to deal.

21        So if Your Honor accepts all of that, their entire motion

22   is beside the point because there is no intent requirement for

23   us to survive and assert a Section 2 claim if we have a refusal

24   to deal as well as the *Broadcom* issue.

25        So moving really quickly to the *Broadcom* issue, here we

are at Slide 25, the *Broadcom* case, which they say is not
binding precedent, identified one way in which you could assert
an antitrust claim under Section 2.  Not the exclusive way, one
way.

     And they do say under prong two -- well, first of all,
Huawei concedes there's a triable issue of all of the elements
identified in *Broadcom* except number two, patent holder's
intentionally false promise to license essentially proprietary.

     And in the reply we said, look, this is a fact issue.
This isn't a summary judgment issue.  This is a fact issue.
Intent is a fact issue.  It's always been a fact issue.  It
goes to the jury.

     And in response they concede that.  So on Slide 26 here, I
cite you to page 2 of their reply where they say, quote,
(reading):

          "Samsung is correct that issues of intent are
          generally factual in nature."

     And so their position, Your Honor, is you should grant
summary judgment because no reasonable jury could ever find
that there was this requisite intent.  That's their summary
judgment motion.  And we have oodles of documents and
testimony -- I have some laid out in these slides; I don't have
time to go through it -- showing that there is inappropriate
intent.

     I'll let -- I'm going to just submit on these slides

because I don't have enough time, Your Honor; but just to hit a couple of highlights, on Slide 29 we lay out a timeline that shows that throughout the process in which Huawei was demanding this rate, they were making representations to the ETSI standards organization that they wouldn't do what they were doing.  That's evidence of bad intent.

We've got Slide 31, which Your Honor cited in the antisuit injunction order, evidence that their act conduct is just going to be used against -- is a bargaining chip to get more than they would otherwise be able to get through negotiations.

Next slide, Slide 32.  This is all under seal by Huawei, but I took Mr. Song's deposition, Your Honor.  He's the chief legal officer of Huawei.  Interestingly, he's not a lawyer.  But he testified under oath from the bottom of his heart, he testified that Huawei had a particular intent, which I'm not going to go into because it's under seal, that is completely inconsistent with the actions that they have taken seeking injunctive relief.  Very similar to what Mr. Ding publicly said.

And then, of course, we've got -- I've got a bunch of slides here just showing the negotiations themselves, which we rely on as showing inappropriate intent.

So we would submit, Your Honor, on that issue that, number one, it's undisputed it's a factual issue; number two, it's not even required, they can't come with any case law that says it's

1    required; and, number three, there's disputes of fact, and so

2    summary judgment should not be appropriate on that ground.

3        Unless Your Honor has any further questions --

4        **THE COURT:**  Thank you.

5        **MR. VERHOEVEN:**  -- I've gone over my time.

6        **THE COURT:**  No.

7        **MR. VERHOEVEN:**  My internal time.

8        **THE COURT:**  Your internal time.  I'm sure you went

9    over your internal time, Mr. Verhoeven.

10       All right.  Let's --

11       **MR. GIARDINA:**  May I?

12       **THE COURT:**  Sure.

13       **MR. GIARDINA:**  So, Your Honor, I'm just going to, you

14   know, try to do these serially, these arguments.

15       The first issue that they raise is that intent is not a

16   requirement under Section 2.  Of course, it is under an attempt

17   claim, and there's been a lot of ambiguity as to whether they

18   are pleading a monopolization claim or an attempt claim, but

19   it's an explicit requirement of an attempt claim.

20       More importantly, though, given the nature of the claim

21   that's pled in the complaint -- which, by the way, is a

22   *Broadcom* claim, *Broadcom v. Qualcomm*.  That's what this claim

23   is modeled after.  The complaint says explicitly Huawei made

24   false, you know, FRAND commitments and that's how it got its

25   patents incorporated into the standards, thereby obtaining

1    monopoly power.  That was the claim pled.

2        It's not the claim that's been developed in discovery.

3    It's not a claim as to which they have evidence to proceed, but

4    that claim is a claim that sounds in fraud.  And Judge Koh,

5    apparently their favorite authority at the moment, has said

6    that explicitly.

7              **THE COURT:**  It's one of mine too.  I'm a fan of

8    Judge Koh's.

9              **MR. GIARDINA:**  I agree with her wholeheartedly on this

10   point.  She says that the claim, the *Broadcom* claim, sounds in

11   fraud and, of course, fraud requires intent.  And given the

12   nature of the fraud that's alleged here, that Huawei made false

13   FRAND commitments, those commitments have to have been false at

14   the time they were made, and proof that Huawei thereafter

15   breached them is insufficient as a matter of law to reach a

16   jury on that issue.

17       And adding together all of the conduct that Mr. Verhoeven

18   has mentioned doesn't amount to anything other than an

19   allegation that somehow we've breached our FRAND commitment in

20   our negotiations with Samsung, and that alone would be an

21   insufficient basis on which to get to a jury to establish that

22   Huawei's series of FRAND declarations were false.

23       We too in the slides I've given you have a timeline, which

24   begins with an event that they introduced in their opposition

25   to our motion, which is that Huawei in 2008 declared publicly

1    that it would seek royalties of up to 1.5 percent for a license

2    to its LTE portfolio.

3         The conduct that he is finding so objectionable thereafter

4    is entirely consistent with what Huawei said long before its

5    patents were incorporated into the standard.  They can't

6    establish that had the world known that Huawei was going to

7    seek 1.5 percent, it would not have obtained the monopoly power

8    that it allegedly possesses today because Huawei told the world

9    it was going to do that.  It apparently has done it and, as a

10   consequence, they just don't have the ability to demonstrate

11   the causation element.  That's the *Townshend* case that's cited

12   in our reply brief.

13        Let me touch briefly on the refusal-to-deal issue,

14   Your Honor.  The doctrine is completely inapposite to this

15   case.  Refusal-to-deal doctrine, the rare instances in which

16   Section 2 imposes such an obligation on a monopolist, deal with

17   circumstances in which the monopolist has an input that its

18   competitors require in order to compete with it; and by

19   withholding that input, it can forestall competition from those

20   nascent competitors.

21        The *Aspen Skiing* case is the perfect example and it's the

22   outer boundary of Section 2 according to, you know, the

23   Supreme Court in the *Trinko* case.  In *Aspen Skiing* the, you

24   know, monopolist wouldn't sell lift tickets to its competitor.

25   A competitor without those lift tickets couldn't compete.  They

1    were able to prevent competition in the relevant market by

2    refusing to deal.

3        Now, they cite or suggest by having some quotations from

4    *Aspen Skiing* that it dealt with something other than an

5    absolute refusal.  It did not.  The alleged monopolist in that

6    case refused to sell the lift tickets even at a retail price to

7    its competitor.  It was an outright refusal.  It says nothing

8    about if you charge too much, it can be a *de facto* refusal to

9    deal.

10       The *Aerotek* case, which we cite in our long footnote, says

11   quite to the contrary; that in order for one to have a refusal

12   to deal, the doctrine doesn't apply in this case because we're

13   not preventing someone from getting an input they need to

14   compete with us in the relevant market.  We're a monopolist in

15   the market.  They can't license our patents.  The doctrine

16   itself has just absolutely no application here, but it clearly

17   requires something more than trying to charge too much, and

18   that's the *Aerotek* case that we cite in that footnote.

19       One last aside, which is just an irony to me, on a refusal

20   to deal, in order for a court to decide that it's appropriate

21   to impose that on a monopolist, the Court needs to conclude

22   that it has the ability to determine the appropriate terms that

23   should be -- that the input should be sold at.

24       Now, Samsung has been in this courtroom for two years

25   telling you you don't have the ability to do that.  It can't be

1  done judicially.  Just it's got to be left to private

2  negotiation.  It's the height of irony that they would suggest

3  that that's a judicially administrable remedy; and in the

4  absence of that being a judicially administrable remedy, you

5  can't have a refusal to deal.

6      The Koh case, you know, the FTC *Qualcomm* case completely

7  different, an absolute refusal on the part of Qualcomm to

8  license its competitors in not the relevant technology market,

9  the chipset market, such that they could not sell chips in

10  competition with Qualcomm.  The case, if one reads it, it's

11  clearly factually inapposite and the doctrine just has no

12  application to this case.

13      Finally, you know, with respect to, for example, the

14  deposition testimony that Mr. Verhoeven pointed you to, it

15  simply doesn't say what, you know, he wants to draw the

16  inference that it says.  That testimony does not suggest that

17  Huawei intends to use injunctions to get more than a FRAND

18  royalty.

19      Read the words on the page.  It says Huawei wants to get

20  Samsung to the bargaining table so that they can get a FRAND

21  royalty.  There is no reasonable inference from that that would

22  create a triable issue.

23      And, of course, the injunctions were sought four years

24  after the last of the relevant declarations.  That's not

25  evidence that they were false when they were made.

1          That's, I think, all I have unless you have any questions.

2               **THE COURT:**  I don't.  Thank you.

3               **MR. GIARDINA:**  Thanks.

4               **MR. VERHOEVEN:**  At the risk of raising the ire of my

5     colleagues, I have about 30 seconds, Your Honor, to just a

6     couple of things.

7               **THE COURT:**  Okay.

8               **MR. VERHOEVEN:**  The argument -- they're back to the

9     argument that you have to show evidence temporally before there

10    was -- before the standards were enacted, and they cite to

11    fraud in the inducement cases, and we point that out in our

12    opposition brief, not antitrust cases.  And they cite to no

13    antitrust cases for that proposition, and they cite to none of

14    these FRAND-related cases, just fraud in the inducement cases.

15         Now, if you go to Slide 28, Your Honor, we cite -- we

16    didn't have a chance to really address what they said in their

17    reply, so we cite *Williston on Contracts*.  Okay?  (reading)

18               "... a defendant's subsequent acts may be examined in

19          determining whether the requisite fraudulent intent was

20          present when the promising question was made."

21         It's hornbook law, and we have tons and tons of evidence

22    that raises a substantial issue of fact as to that.

23         They say, well, the only evidence we have is that our

24    allegation is a breach of FRAND.  Well, first of all, that's

25    not true.  And then they say, in simple, the breach is not

```
 1   enough.  You have to show evidence of intent.  And they make it
 2   sound like this big deal.
 3        But if you look at, for example, the Ensley versus Cody
 4   case, which we have here on Slide 28, Fifth Circuit 1999 case,
 5   171 F.3d 315, that case clarifies that the only thing that's
 6   required beyond the breach to make a claim survive in a fraud
 7   in the inducement case, Your Honor, not in an antitrust case,
 8   is, quote, "slight circumstantial evidence."  Well, we've got
 9   oodles of evidence here and that's all an issue of fact,
10   Your Honor.
11        I'd love to address the other points, but I don't have
12   time.  So thank you very much, Your Honor.
13             THE COURT:  Well, good enough.
14        You guys, you still have about 30 minutes.
15        All right.  What's next?
16             MR. LEWIS:  So, Your Honor, I'm sure you'll be happy
17   to get back to the patent issues.
18             THE COURT:  I was actually -- I would have been happy
19   with an hour of antitrust actually, but go ahead.
20             MR. LEWIS:  I figured as much, but I have to do the
21   patent stuff anyway.
22        So you asked in your tentative for the '239 patent, how
23   was the group number k allocated by the system.  You also on
24   page 3 indicated that so far you believe Huawei presents no
25   evidence that u+1 is allocated by the system.  And so I wanted
```

 1   to address those issues.

 2        So this came up in Samsung's reply brief.  They came in in

 3   response to our opposition and said, "Well, hey, there's these

 4   other words in the claim, 'allocated.'"  So, of course, we

 5   didn't have a chance to do anything about that.

 6        If we could go to Slide 43, Troy, please.

 7        So, Your Honor, I'm going to start on Slide 43 of our

 8   technical presentation, which Mr. Bettinger handed up a few

 9   moments ago.

10             **THE COURT:**  Okay.

11             **MR. LEWIS:**  So this just quotes Samsung's brief where

12   they brought up this issue; and then on 44, I'll take you

13   through the answer to your question.

14        The answer is that we presented evidence through the

15   opinion of our expert, Dr. Veeravalli, and his expert report is

16   attached to Samsung's motion for summary judgment as Exhibit B,

17   as in boy.  I have some call-outs from that in this

18   presentation, but the full report is in the record.

19        So basically there are -- well, as Your Honor knows from

20   the other parts of the motions that you've already decided, the

21   group number k is equal to u+1 in the standard.  u+1 is

22   calculated using parameters that come from the system from the

23   network.  First, obviously, u is calculated and then the very

24   advanced calculation of adding 1 to it is performed.

25        And so how does that happen?  Dr. Veeravalli explains,

1   first of all, that the system allocates the value for u and

2   then the 1 is added to obtain the group number k, and he

3   describes how that's done in paragraph 252 of his report.

4   There he shows that u is equal to these two parameters in LTE.

5   This is all from LTE so none of this is confidential.

6       On the next slide, we explain how these parameters are

7   found.  The first one, f sub gh, is found using in part N cell

8   ID, which comes from the network, and obviously this is

9   something that the expert will opine on at trial and I

10  obviously will not get into detail on today for all of our

11  sake.

12      The next slide talks about the other parameter in this

13  equation for u and that's f sub ss, which comes in two forms.

14  One is for PUCCH and the other for PUSCH.  The tricky part is

15  that the one for PUSCH actually uses the other one, and that's

16  shown here; but, in any event, the important part is that it

17  uses a parameter called delta sub ss, which, as it says right

18  here, is configured by higher layers, and the higher layers are

19  referred to the system, the network sending that information to

20  the UE.

21      Dr. Veeravalli then went on to conclude that the standard

22  indicates that the cell ID and the delta ss come from the

23  network.

24      So it's extremely clear that the group number k, u+1, is

25  allocated by the system, the network.  The parameters in order

1  to calculate that are sent down, first u is calculated, then 1

2  is added to it, and then that's the group number k that

3  Dr. Veeravalli very clearly alleges corresponds to the group

4  number k in the claim.

5       Continuing -- if Your Honor has any questions about that,

6  a couple more issues on this I'd like to cover.

7            THE COURT:  I think you ought to cover those issues

8  because my questions would last a lifetime.

9            MR. LEWIS:  Well, by then we'd be lucky and 5G would

10 come out and none of this would matter.

11           THE COURT:  The jury will decide it before I've

12 finished all my questions I'm sure.  Go ahead.

13           MR. LEWIS:  In addition, there was in your tentative

14 the statement that Huawei is not arguing that k equals u and

15 u+1, k always equals u+1, and that certainly is something

16 we agree with.

17      And then it says (reading):

18           "Real issue whether UE obtains group number k because

19      it only obtains u+1, not u."

20      So the UE obtains I guess both of them, u and u+1.  The

21 only one that's really relevant to the infringement case is

22 u+1.  U is sort of a path along the way.  So u+1 is

23 obtained by taking the parameters, calculating u, adding 1, and

24 then you've obtained u+1, and that corresponds to the group

25 number k.

 1        I was a little confused about what was written there so I

 2   wanted to clarify that.

 3             THE COURT:  Okay.

 4        MR. LEWIS:  And the other issue is also in your

 5   tentative on page 3, and this has to do with the DOE issue and

 6   whether there's a substantial difference between u and u+1

 7   and used a question mark on that, which maybe made me think I

 8   should talk about it.

 9             THE COURT:  Yes.

10        MR. LEWIS:  If we could go to 175, please, Troy.

11   Thank you.

12        In the slide deck, 175 is actually the second-to-the-last

13   page in the deck.

14        So the DOE was disclosed in the expert report in response

15   to a statement in Samsung's interrogatory responses that came

16   in at 11:00 p.m. on the last day of discovery where they put in

17   this very cryptic statement about of course u+1 is not the

18   group number that I've reproduced here on the slide.

19        We really didn't know what to do with that, frankly, so we

20   had our expert opine to direct infringement with u+1; and not

21   knowing what underlied Samsung's statement, we also had him

22   provide a doctrine-of-equivalents analysis in his report, which

23   is also on the slide here in summary.

24        Samsung and Dr. Madisetti responded to that and then

25   Dr. Veeravalli was able to respond in his reply report.  So the

1   issue has been fully joined.   I mean, I don't know that I would

2   consider -- I don't consider the DOE allegation late at all

3   because it responded to something that was provided at

4   11:00 p.m. on the last day of discovery and was so cryptic we

5   didn't really know what to make of it so we thought that

6   Dr. Veeravalli should try to cover that.

7       So hopefully that explains this issue of whether or not

8   it's disclosed.

9           THE COURT:   I guess the issue that I'm trying -- that

10  I was wrestling with, really, is:   Is there a substantial

11  difference between those two numbers?

12          MR. LEWIS:   Well, there isn't a --

13          THE COURT:   And how am I supposed to figure that out?

14          MR. LEWIS:   Well, it's a fact issue so fortunately you

15  don't have to.   The jury does.   But -- fortunately for you,

16  that is.   Either way, in my opinion.

17      But I think the issue is that is it a substantial

18  difference just to add 1 to something.   Samsung is focused on

19  whether you get a different result if you put u or u+1 into

20  the equation --

21          THE COURT:   Right.   But --

22          MR. LEWIS:   -- but I think that --

23          THE COURT:   -- does that matter?

24          MR. LEWIS:   I think that misses the point; right?   The

25  point is that you can add 1 to something and that's an

1  insubstantial difference and then you're putting u+1 into the

2  equation.  It's not that the equation would give you a

3  different result.  It's that essentially you could start

4  numbering u from 1 and you could get to 30 or you could start

5  numbering u from 0 and get to 29.  In both cases you have 30

6  group numbers, 0 through 29 or 1 through 30, and it isn't

7  really a substantial difference about, you know, where you

8  start counting.

9       And while the equation will give you different results if

10 you put in a 1 or a 0, what you're really saying is:  Oh, this

11 is the first group.  Okay.  So let's put in the value u+1,

12 which identifies the first group; and whether you take the

13 1 through 30 and you use 1 or whether you start with 0 and just

14 add 1 to it, it doesn't matter.  You're still counting 30

15 groups.

16      And I think that's the point of the doctrine-of-equivalent

17 analysis in two minutes or less.

18      Your Honor, I do not have any more on this point.  I'd

19 love to answer any questions you might have that don't require

20 a Ph.D.  I'll leave those for Dr. Veeravalli.

21           **THE COURT:**  Okay.  Thank you.

22           **MR. LEWIS:**  Thanks, Your Honor.

23           **MR. MACK:**  Your Honor, Brian Mack on behalf of

24 Samsung.

25      We have some slides as well.

1          (Pause in proceedings.)

2          **MR. MACK:**  So there was a little bit, I think, of hand

3     waving there so I wanted to start from the beginning.

4          If we could put up Slide 4 from the MSJ deck, or you could

5     turn to it.

6          The claim language is very clear.  The first step of

7     Claim 6 (reading):

8               "... obtaining, by a cell or base station or a user

9          equipment, a group number k of a sequence group allocated

10         by the system."

11         So if you go to the next slide, Slide Number 5, the Court

12    construed this as follows (reading):

13              "... a group number k allocated by the system where

14         the group number k identifies a sequence group and where

15         the value K is the same throughout the claim."

16         So there's two requirements:  The group number k has to

17    be, one, allocated by the system; and then the group number k

18    has to be the same throughout the claim.

19         And you'll note -- in the claim language, you'll note that

20    group number k that appears in the "obtaining" step but then k

21    also appears in the "wherein" step several times.

22         So the Court's question "How is group number k allocated

23    by the system," I saw a lot of evidence in slides from Huawei

24    of how the value u is allocated by the system but nothing on

25    how the value u+1, which is what Huawei alleges is a group

1   number k, is allocated by the system.

2        And so if we could -- could we put up Slide Number 7?

3             **THE COURT:**  I think you need to do the paper.

4        **MR. MACK:**  If you turn to Slide Number 7, it's easier

5   to see visually, but this is an excerpt from Dr. Veeravalli's

6   report.  He first -- in paragraph 251, he explains the claim

7   language and he explains the Court's construction; and then in

8   paragraph 252, he says that (reading):

9        "The Infringing Samsung Products perform steps

10        required by the LTE standard to obtain a value for 'u,'

11        which is allocated by the system."

12        It says "u."  It doesn't say "u+1."

13        And then he cites to Section 5.5.1.3, the group hopping

14   section of the LTE standard.  That's all the evidence he

15   provides for the value that's allocated by the system.

16        And the parties I think agree on what "allocated" means.

17   There were some dictionary definitions in the briefing.

18   "Allocated" means to reserve or assign -- reserve for use or to

19   assign to a particular UE.  It can allocate bandwidth.  It can

20   allocate frequency.  You're allocating, you're setting aside

21   something for a particular user equipment.

22        So if you now go to Slide 10, we have the actual evidence

23   that Dr. Veeravalli presented.  You can see nowhere does he or

24   Huawei allege that the value u+1 is allocated or obtained.

25   They only cite to this one section from the 3GPP technical

specification that says the sequence group number u is defined

by this equation.

And if we could flip back up to Huawei's Slide 45 that we

just saw, you see here it says there's an equation in the LTE

standard.  We don't dispute this.  But it says u equals this.

It doesn't say u+1.

So the value u is defined -- is defined in the LTE

standard, that if the sequence -- there's a sequence group

number u, but there is no u+1 that's allocated by the system

or allocated as described in the standard or obtained by the

user equipment.

So the reason why I think Huawei has to interchange this u

and u+1 is pretty simple.  Because all of the evidence that

you've seen, Slide 45, if you go to Slide 46, Huawei's

Slide 46, again, it says u equals this equation mod 30.  So u

is defined but there's no u+1 defined in the LTE standard.

So there's a lot of hand waving that's been going on here,

and there is the value u that's being used in the obtaining and

the allocating step, and then the value u+1 is being used in

all the subsequent steps in the claim.

And that's where I think Huawei's analysis isn't

consistent with the Court's constructions of the value for the

group number k has to remain the same throughout the claim.  If

they want to say it's u, that's fine; but if they want to say

it's u+1, that's also fine but they have to keep it the same

1    throughout the claim, but that's not what we see being done

2    here.

3         Moving on to the doctrine-of-equivalents argument, if we

4    could -- we also have a motion to strike slides...

5                        (Pause in proceedings.)

6         **MR. MACK:**  So we have some other slides here, but we

7    have cited in our brief at Docket 333-2, pages 3 to 4.

8    Obviously if you start with some value and you want to get to

9    another value, you can add or subtract some arbitrary value to

10   get there.  So we think there definitely is a substantial

11   difference between using u and using u+1 in the standard.

12        Dr. Madisetti, which is cited in our report, in our

13   briefing, Docket 333-2 at pages 3 and 4, Dr. Madisetti explains

14   that the value u is a very important value in this claim; that

15   the sequence number K or the value u+1 or u, it's used to

16   create the basic sequence index in the claim.

17        So that basic sequence index, that's used to generate

18   reference signals, and a reference signal is just a string of

19   ones and zeros that are sent from the user equipment to the

20   base station, and then the base station uses that to interpret

21   or decode all the subsequent information that's sent from the

22   UE.

23        So if you just increase the basic sequence index by one,

24   an arbitrary number, the base station is not going to be able

25   to understand or interpret any communications from the UE.  And

1    Dr. Madisetti, Samsung's expert, cites that, and we cite to

2    that on pages 3 to 4 at our opening brief.

3        So there certainly is a substantial difference between

4    using the value u and using the value u+1.  This is a highly

5    technical area.  The value 1 may seem like a small value but

6    it's an arbitrary value, and there would be no communication

7    between the UE and the base station if that basic sequence

8    index is just arbitrarily incremented by the value 1.

9        And regarding the timing, I think Mr. Lewis mentioned the

10   timing, we have -- the MSJ slides, Slide 77 -- so we have the

11   motion-to-strike slide deck and there's another slide deck, and

12   this is --

13            **THE COURT:**  77?

14        **MR. MACK:**  I have, yeah, Slide 77.

15        You'll see on October 25th, 2016, that's when Huawei's

16   initial infringement contentions were served, their initial

17   infringement contentions identified group number k equaling

18   u+1.  So they knew from the very beginning that they were

19   going to be relying on k equaling the u+1, and they also knew

20   from the very beginning that the claim had this plain language

21   that the group number k is allocated by the system.

22        So they knew that this allocation by the system of u+1,

23   they were going to need to show this from the very beginning,

24   but they never disclosed the doctrine-of-equivalents argument

25   until the opening expert reports.

1    So they really just backdoored that in with the opening

2    expert reports.  We were not aware of it.  We were not

3    expecting it, and we think that's not in compliance with the

4    local rules.

5    So I understand that Mr. Lewis thinks that there's a

6    factual issue between u and u+1 and, you know, how the jury

7    determine whether or not the doctrine of equivalents applies,

8    but we think that that's not an issue that should ever reach

9    the jury because it wasn't timely disclosed in conjunction --

10   in compliance with the local rules.

11   That's all I have.

12   **THE COURT:**  So would you agree that if I decided that

13   I didn't care about the local rules argument, that it's a

14   question of fact, then, that ought to go to the jury; or do you

15   think as a matter of law I can make that determination?

16   **MR. MACK:**  I mean, I know there are competing -- their

17   expert does express an opinion in his expert report that the

18   differences are insubstantial and our expert does say that

19   they're substantial, but we don't think you should ever reach

20   that issue because it wasn't timely disclosed.

21   And the reason why they're relying on this

22   doctrine-of-equivalents argument is so that they can do this

23   hand waving for the obtaining step and the allocation step.

24   They're relying on u+1 for every limitation except the first

25   limitation where they're relying on the value u and not u+1.

So we think they're going to try to backdoor in a doctrine-of-equivalents argument on this allocation and obtaining step that you've identified in your tentative order, and we completely concur with your tentative.

**THE COURT:** Okay. Thank you.

**MR. LEWIS:** Your Honor, I'd like to have just a very few three points on this.

**THE COURT:** Sure.

**MR. LEWIS:** First of all, I think their argument now is that u is allocated so I think their argument now is that all of a sudden it becomes u+1 is then not allocated. So the system can allocate u but if the system also then adds 1 to it, all of a sudden this allocation disappears.

I think that can't be right and it isn't right. It's part of the calculation process that Your Honor has already decided is okay for the obtaining step and certainly for the allocating step.

Second of all, they point to Dr. Veeravalli, and we talked about this in our brief. In section -- I'm sorry -- paragraph 252 of his report, and this is on page 7 of their slides here on summary judgment, he has a paragraph or a number of paragraphs where he talks about 2 because -- sorry -- he talks about u because in order to get to u+1, you first have to explain how you get u. So he does that. He explains how he gets to u, and then he says with no exception that the group

number k is u+1.  But in order to get there, you have to first figure out what u is, and then you can make the very advanced calculation of adding 1.

     And then my third point was -- is there's clearly a dispute about DOE, but I think Your Honor's last question just took care of that.

          **THE COURT:**  Okay.

          **MR. LEWIS:**  Nothing further.

          **THE COURT:**  Thank you.

          **MR. MACK:**  The only thing I just wanted to remind Your Honor, again, Slide 11 is the entire section of the LTE standard, 5.5.1.3 group hopping.  You'll only see the sequence group number u.  You won't -- you'll see that defined.  You won't see u+1 defined anywhere in the LTE standard.  So the fact that Mr. Lewis is saying that u+1 is somehow allocated, it's just not.  Only the value u is defined in the standard; u+1 is not.

          **THE COURT:**  Thank you.

          **MR. WHITEHURST:**  Good afternoon, Your Honor.  Alan Whitehurst for Samsung.

     And if possible, can we get Samsung's slides up on the screen?

          **THE COURT:**  Yes.  Hang on just a second.

                    (Pause in proceedings.)

          **MR. WHITEHURST:**  And in the interest of time, I'll be

1    starting with Slide 23.

2              **THE COURT:**  Okay.

3              **MR. WHITEHURST:**  I'm going to be addressing Huawei's

4    summary judgment motion for noninfringement of the '130 patent.

5    This is tentative C in your tentative ruling on the first page.

6         This motion turns on the claim language "mapping the data

7    information to remaining symbols in the slot that are not used

8    to map the reference signal."

9         As you can see here on the screen, I want to make four

10   quick points.

11        First, Huawei's motion is limiting the plain and ordinary

12   meaning of the claim term.  You've said before in other cases

13   that for summary judgment motions, claim terms should be given

14   the full range of their plain and ordinary meaning.

15        And in Claim 13, as I'm going to show, the word

16   "remaining" is saying where the data information should be

17   placed in the slot, not when the data information should be

18   placed in the slot.

19        Huawei is taking Claim 13 and turning it into something

20   that it was never meant to be.  What Huawei is doing is reading

21   in the limitation after into Claim 13, but this is not the case

22   where there's something in the intrinsic record that mandates

23   this limitation to be read into the claim.

24        There's nothing in the specification, nothing in the

25   prosecution history that says the data must be put into the

1 slot after the reference signal, and I'm going to go through

2 the '130 patent quickly and show you that.

3     And, third, Dr. Bambos in his expert report used the plain

4 and ordinary meaning of "remaining."  The application of the

5 plain and ordinary meaning to the accused products is a factual

6 question for the jury.

7     And, fourth, as you've indicated in your tentative, I'm

8 going to go through and show why the order of the steps is

9 insubstantial and it doesn't affect the final result.

10     If we could jump forward to Slide 27, please.

11     To put everything in proper context, it's helpful to look

12 at the invention itself.  We discussed this patent at the

13 *Markman* hearing about a year ago.  The '130 patent protects

14 acknowledgment information when it's transmitted from the phone

15 to the base station, and that's important.  What happens inside

16 the phone is not important.  It's what happens once it leaves

17 the phone to go to the base station.

18     And the way the '130 patent protects the acknowledgment

19 information is by using a particular slot structure.  Different

20 information is mapped or put in different symbols and it

21 doesn't matter what order the information is put in the slot as

22 long as it's put in the correct location before it leaves the

23 phone to go to the base station because the way it's organized

24 and put in the slot as it travels over the air is what protects

25 the information.

1        If we could turn to Slide 29.

2        In the '130 patent, the reference signal always goes in

3   the middle symbol, which is highlighted in yellow.  You can see

4   here the middle symbol is highlighted.

5        Data and acknowledgment information can't go in the middle

6   symbol.  The way the LTE standard works is, this middle symbol

7   is always reserved for the reference symbol.  It's not possible

8   to put data and acknowledgment information in there.  It's put

9   in the remaining, the other symbols.  And because this middle

10  symbol is reserved for the reference signal, this order doesn't

11  matter.

12        Now, I want to turn now to Slide 30 and Claim 13.  When we

13  look at the word "remaining" in the claim itself, it's

14  specifying where the data information goes, not when.  And I

15  think there's a helpful analogy that shows how the word

16  "remaining" is working in Claim 13.

17        If we can turn to Slide 31.

18        Claim 13 is like a parking lot where some spots are

19  reserved.  As you can see here, there's seven parking spots,

20  just like the seven symbols in the slot, and the middle parking

21  spot is reserved.  The driver can't park there.  And if you can

22  see there on the slide, you have a parking lot attendant that's

23  talking to the driver of the car, and the attendant tells the

24  driver, "You can't park in the reserved spot.  Please park in

25  any of the remaining spots."  And the driver responds, "Okay.

1    I'll park in one of the other spots."

2         Just like in this example I've given, it's just like in

3    Claim 13, the word "remaining" and the word "other" are

4    synonymous.  They can be used interchangeably.  Just when the

5    parking lot attendant says "You can park in any of the

6    remaining spots," the driver says, "You can park in any of the

7    other spots"; and that's exactly how it is in Claim 13.

8         Now, I'm going to speed up and try to go through this

9    quickly in Claim 32.  What Huawei has done is relied on a

10   dictionary definition.  They've relied on definition three.  If

11   you look there at the bottom of the slide, Claim 32, the same

12   dictionary definition that Huawei relies on, you'll see that

13   the fifth definition says "to be reserved or in store."  And

14   that's what "remaining" is talking about in Claim 13.  It's

15   reserved or in store for certain types of information.

16        This middle symbol is reserved for the reference signal.

17   The remaining symbols are reserved for the data.  Everything

18   has been preset and this information is being put in so that it

19   can be transmitted to the base station to protect it.

20        Slide 33.

21        When you look at Claim 13 in more detail, we can see how

22   there are three types of information, and there's a location

23   for each information because that's what's important in

24   Claim 13.  That's the information.  Where does this information

25   go?

1          And you see that when you look at Slide 34 and you talk
2     about the term "remaining," in this context the word
3     "remaining" means "other" or "reserved" or "in store for."  And
4     if you take the words "other" or "reserved" or "in store for"
5     and put it in for the word "remaining," that's what makes
6     sense.  That's what works.  That's what properly reflects the
7     '130 invention.  That's the invention that Samsung came up
8     with.
9          Samsung's invention wasn't putting the information in in a
10    particular order.  That's irrelevant.  What was important to
11    their invention was putting it in the correct location, and
12    that's what the word "remaining" is doing in Claim 13; it's
13    telling the reader where the information goes, not when.
14         When you look at Slide 35, you can see in Huawei's motion
15    that they've taken the claim and rewritten it as "remain after
16    mapping."
17         When you look at 36, you can see that what Huawei is
18    really doing here is changing the language of the claim from
19    "remaining symbols in the slot that are not used to map the
20    reference symbol" to say "symbols that remain after mapping."
21         But you don't read limitations into the claim unless
22    there's something in the patent that says you must narrow the
23    claim scope.
24         When you look at Figure 2 and Figure 3 of the patent,
25    which are in Slides 37 and 38, you'll see, if you look at

Slide 37, there's a processing flow where the data is added for the acknowledgment information.

But what's important in Figure 2 is, there's not a box for the reference signal.  The reference signal is handled by a completely different processing flow.  This means that the reference signal can be added before, at the same time, or after the data in the acknowledgment information.

If the inventors had said, "You know what, where and when you put the data in is important," they would have in Figure 2 shown boxes where the reference signal goes first, then the data, and then the acknowledgment information.  But when they were explaining their invention to the public, they didn't do that.  They left the reference signal out because that wasn't important.  It didn't matter what order the reference signal goes into the slot.

So the rest of my slides, which I'm not going to have time to go through, show why there are triable issues of material fact.  It goes through Dr. Bambos' report.  It shows how Dr. Bambos explains that in the LTE system, the middle symbol is always reserved for the reference signal; how in the LTE standard, the data is put in the remaining or the other symbols; and he also goes through in his report and explains why the order doesn't matter, it's an insubstantial difference that doesn't affect the result.

As we explain in our briefs, the *Cadence* case is directly

1    on point, a Federal Circuit case, looked at a similar situation

2    where even when the court looked at a method claim and said

3    they had to be done in a particular order, they said it still

4    infringes under the doctrine of equivalents.

5         Unless you have any other questions, I'm going --

6              **THE COURT:**  Can I ask any?  No.  Thank you.

7              **MR. WHITEHURST:**  Thank you, Your Honor.

8         **MR. LEWIS:**  Your Honor, I'm going to respond to this

9    and then I'm going to talk about one of the issues that we

10   would have on our side relating to the doctrine of equivalents

11   on this patent, which in the tentative you went the other way

12   on.

13             **THE COURT:**  Okay.

14        **MR. LEWIS:**  So, Troy, if I could have...

15                  (Pause in proceedings.)

16        **MR. LEWIS:**  So this is a claim on the screen.  And

17   this is Slide 6 of our presentation.  It's a method claim.  It

18   requires active steps.

19        Everything that was said by Samsung's counsel is static,

20   and perhaps an apparatus claim it might be pertinent to but

21   it's not pertinent to a method claim.  The method claim

22   requires actually performing the mapping or reference signal,

23   mapping the data information, mapping the acknowledgment

24   information.  And when you do that, it does matter what order

25   this is done because the claim clearly says you map a reference

1    signal, the middle symbol, map the data information to

2    remaining symbols in the slot that are not used to map the

3    reference signal.

4         If you did those in reverse order, you would hit mapping

5    the data information to remaining symbols in the slot that are

6    not used to map the reference signal.  What remaining symbols?

7    I haven't mapped the reference signals yet because that's out

8    of order, and that's not consistent with the claim language.

9         The claim does not talk about reserved parking spots.  It

10   does not talk about other or any of these other things.  It's

11   very specific.  It requires actions that need to be performed,

12   by its own language, in the order indicated.

13        I put this slide together to show what happens after the

14   mapping step.  You put the reference signal in and then you

15   have the remaining symbols in the slot.  That's everything else

16   and that's what the other steps of the claim exist to fill.

17        Again, method claims have orderings of steps because they

18   require performing certain steps.

19        And then let me also talk about a few other things that

20   counsel mentioned and referred when I do this to his

21   presentation.  He cites Figure 10 on Slide 27 of his slides.

22   Figure 10 is the slot with the symbols filled up.  That's the

23   end result of performing the steps in Claim 13, the method

24   claim.  It doesn't tell you one way or the other whether or not

25   you do this or that in one order or another.  You have to look

1    at the claim for that, and the claim is very clear.

2            THE COURT:  But if you're reserving the middle symbol

3    for the reference, why does it matter in what order the rest of

4    the slots get filled in?

5            MR. LEWIS:  Well, because the claim doesn't say that,

6    Your Honor.  It says that you map the reference signal, and

7    then it says --

8            THE COURT:  The middle.

9            MR. LEWIS:  The middle symbol.  And then it says --

10           THE COURT:  Right.  If you've reserved the middle

11   symbol, why does it matter what order you do it in?

12           MR. LEWIS:  Well, it actually does matter.  If you're

13   thinking about it from a doctrine of equivalents point of view

14   or from a claim construction point of view?

15           THE COURT:  Just you tell me.

16           MR. LEWIS:  Well, from a claim construction point of

17   view it matters because the claim language says it matters, and

18   the claim talks about the remaining symbols in the slot.  It

19   doesn't talk about reserved symbols, and it's a method claim.

20       So you have to be -- if you perform, as I said before,

21   either mapping the data information or mapping the

22   acknowledgment information steps and then you come across this

23   language that says "to the remaining symbols in the slot" -- it

24   doesn't say "reserve symbols," it says "remaining symbols" --

25   and you don't have remaining symbols in the slot because it

1  actually also says "that are not used to map the reference

2  signal" but you won't have mapped it because these are active

3  steps.

4      They're looking at it statically like the end result in

5  Figure 10.

6          **THE COURT:**  I understand what you're saying.

7          **MR. LEWIS:**  Okay.

8      In addition, I actually also think it's kind of telling

9  that counsel pointed on pages 37 and 38 to Figures 2 and 3 in

10  the '130 patent as, you know, supposedly not having this

11  ordering.  What's interesting is neither of those figures have

12  the reference signal at all.  It's completely absent.  So those

13  clearly can't be telling us anything about the order, which

14  again wouldn't matter because the claim language here is clear.

15      Now I'd like to spend a couple minutes on the DOE issue.

16  In your tentative, Your Honor, you indicated that there may

17  be -- maybe that the difference is insubstantial.  I don't even

18  think we get there.

19      And if I could bring up 793.

20      So in their briefs, the other side, Samsung, cites one

21  thing, paragraph 793 of their expert's report, which

22  unfortunately appears on two different pages so I've combined

23  it here.

24      That paragraph basically just cites the buzzwords from the

25  standard.  It says, oh, you know, it's insubstantially

1    different and it says it's substantially the same function,

2    substantially the same way to obtain substantially the same

3    result.  There's no analysis of why any of that is true, even

4    allegedly, even accepting everything true for Samsung here.

5    That's the sum total of what they cite in their papers on the

6    doctrine -- on our motion for summary judgment with respect to

7    the doctrine of equivalents.

8         I put forward, Your Honor, this is not sufficient to go to

9    a jury.  This is nothing more than boilerplate recitation of

10   the words that -- the standard of what DOE is supposed to show,

11   and so summary judgment should be issued, both because the

12   claim requires performing these steps in order -- there's no

13   evidence that's done -- and also that they don't even get to

14   DOE because this is not something that the jury can consider.

15   Those are just the buzzwords out of this legal standard.

16        And with that, Your Honor, unless you have any questions,

17   I'm going to sit down.

18             **THE COURT:**  Thank you, Mr. Lewis.

19             **MR. LEWIS:**  Thank you.

20             **MR. WHITEHURST:**  I'm told that I have to keep this

21   under a minute.

22        If we could put Slide 6 up on the screen, please.

23        Your Honor knows that the case law is very clear that in

24   method claims, you don't put an order in the claim unless

25   there's a reason, something mandating that limitation.

```
 1          When you look at -- can we get Slide 6, please?

 2               THE CLERK:  6 of your own or 6 of plaintiffs'?

 3               MR. WHITEHURST:  6 of Huawei's.

 4                    (Pause in proceedings.)

 5               MR. WHITEHURST:  What you're seeing here is a dispute

 6     over the plain and ordinary meaning of the term, and Huawei is

 7     trying to limit that plain and ordinary meaning.

 8          This is not a case where you don't know where the

 9     reference signal is going.  If you were in limbo and you had to

10     wait and see where maybe it would go, then maybe it would make

11     sense to wait and see where it goes before you put the data,

12     but that's not the case in the '130 patent.  '130 patent, it

13     makes it very clear as a starting point, as a starting premise

14     the reference signal always goes in that middle symbol.

15          So when you read this language, "mapping the data

16     information to remaining symbols in the slot that are not used

17     to map the reference signal," they're telling you where the

18     data goes.  Data goes everywhere that's not used to map the

19     reference signal.

20          And I think that's my minute.  Thank you, Your Honor.

21               THE COURT:  Okay.  Thank you.

22               MR. BETTINGER:  Your Honor, in your tentative ruling,

23     Huawei's motion for summary judgment B, noninfringement of the

24     '350 patent, we'd like to address that briefly.

25               THE COURT:  Okay.
```

1        **MR. BETTINGER:**  Your remark is that Prucnal, which is

2   their expert's opinion that the UE's determine cell-specific

3   ratio when they select quantization coefficients that

4   correspond to the cell-specific ratio demonstrates a genuine

5   issue of material fact.  It might on DOE; it does not for a

6   literal infringement case.

7        The parties agree here that that cell-specific

8   determination of a cell-specific ratio, it's not determined.

9   The best they can argue --

10       And if we could go to Slide 14.  So we have the one book.

11   It's a little bigger.

12       **THE COURT:**  I now have too many books in front of me,

13   so I'm going to need to see it on the slide.

14       **MR. BETTINGER:**  We tried to do one book and I don't

15   know if it helped.

16       But you have to determine a cell-specific ratio.

17   Slide 14.  You have to determine a cell-specific ratio.  The

18   experts agree in this case we don't.  The Huawei phones don't

19   determine a cell-specific ratio.

20       And at best what you have on Slide 16 is, well, you know

21   what, they can come up with this thing called a quantization

22   coefficient at Slide 16.  The experts agree that's not the

23   cell-specific ratio, but you could maybe figure out the

24   cell-specific ratio from it; hence, the term "correspond."

25       Well, that's fine.  That's corresponding.  But what's the

1   claim language?  If you go back to 14, the claim language says

2   "determine a cell-specific ratio."  And it's just not done

3   here.

4        So on this record, you just can't have a literal

5   infringement.  I will grant you, you could have a doctrine of

6   equivalents.  You could say, "Well, it's not determining it,

7   but it's something that maybe corresponds," and so under a DOE

8   analysis, perhaps you could get there; but on this record with

9   Prucnal's admissions, you can't have literal infringement.

10        **THE COURT:**  Okay.

11       **MR. BETTINGER:**  The analogy -- trying to keep it

12   simple, but if you go to Slide 17, the analogy is, say you have

13   a circle and you say, "Hey, let's determine the area of the

14   circle," and you know the radius.  You have not determined the

15   area of the circle even though that radius is going to

16   correspond.  You haven't done it.  So it's a different step.

17        So our position would be that with respect to -- with B,

18   under Huawei's MSJ, that the noninfringement of the '350

19   patent, specific of literal infringement, that should be denied

20   but that there would be an issue with respect to doctrine of

21   equivalents.

22        **THE COURT:**  Okay.  Thank you.

23       **MR. BETTINGER:**  Yeah, thank you.

24       **MR. LORDGOOEI:**  Your Honor, Iman Lordgooei for

25   Samsung.

1   I think the tentative got it exactly right.  The claim

2   language that we're looking at here -- and if we can put up our

3   opposition to Huawei's MSJ slides and if we could go to

4   Slide 18.

5        The claim language that we're dealing with is

6   "determining," and what Huawei is trying to do is limit

7   "determining" to calculate.  They're saying that you have to --

8             THE COURT:  You better slow down a little bit.

9             MR. LORDGOOEI:  So they're saying that you have to

10  calculate the cell-specific ratio.  "Determining" is not

11  limited to that.  It hasn't been construed and the full range

12  of the plain and ordinary meaning is you determine, you obtain

13  this value.

14       And as we've presented through our expert testimony,

15  through Huawei's documentation, we have several slides directed

16  to Huawei's documentation, which I won't put up, but if you

17  look through Slides 5 through 10, there's documents for

18  Huawei's own phones that show this is how you determine a

19  cell-specific ratio, the very same cell-specific ratio that's

20  in the standard and the same cell-specific ratio that's in our

21  patent.

22       And the way you do that -- because these are ratios,

23  they're fractions, processors can't handle fractions.  They

24  need a way to represent fractions.  The way they do that is

25  through these quantization coefficients.  And so by selecting a

 1  particular quantization coefficient, that's exactly what you're

 2  doing; you're determining a cell-specific ratio.  You're

 3  finding a value that corresponds to the cell-specific ratio,

 4  the claimed cell-specific ratio.

 5           **THE COURT:**  Okay.  Thank you.

 6           **MR. ZADO:**  Your Honor, Ray Zado from Quinn Emmanuel on

 7  behalf of Samsung.

 8       And I would like to address bullet point E from your

 9  tentative with respect to the motion for noninfringement with

10  respect to the '825 patent.

11           **THE COURT:**  Okay.

12           **MR. ZADO:**  And if we could turn to Slide 64 of the

13  presentation.

14       So I'd just like to make two high-level points,

15  Your Honor.  First, Huawei's motion on its face is premised

16  strictly on the construction of the term "indicating" in the

17  phrase "system information indicating a group of

18  identifications," identifications or IDs.

19       In connection with this construction, first, Huawei's

20  motion and its proposed construction completely ignore the

21  concept of the plain and ordinary meaning.  It's black letter

22  law that, for example, you don't turn to the specification to

23  narrow the plain and ordinary meaning unless there's either

24  been a clear disavowal of claim scope or the patentee has acted

25  as a lexicographer.

1        Huawei's motion makes no showing that either of those

2   circumstances apply here; therefore, the term "indicating"

3   should be afforded its plain and ordinary meaning, which is the

4   same meaning to one of ordinary skill in the art as it would be

5   to a layperson, just to indicate.

6        The second point that I'd like to make is that even if we

7   assume under the narrowest strictures of Huawei's proposed

8   construction, if you look at the details of the operation of

9   the accused products and in particular the LTE standard, those

10  products, there's at least a triable issue of fact as to

11  whether the system information includes the group of IDs or the

12  identifiers.

13       If we could turn to Slide 70, in the interest of time, to

14  move things along.

15       So as I referenced earlier, the term "indicating" is

16  something that's commonly understood.  It has a widely accepted

17  meaning, and there's no indication in the '825 patent of an

18  intent by the patentee to deviate from this plain and ordinary

19  meaning.

20       And the *Acumed* case, we would submit, is very instructive

21  on this point.  In that case the dispute was over the term

22  "curved" in the phrase "curved shank" and whether that claim --

23  how to interpret that claim term.

24       Now, the accused infringer in that case attempted to

25  provide limitations or strictures on the term "curve" based

upon the operation of specific embodiments in the
specification.

     Now, this is very similar to the approach that Huawei is
taking in connection with the term "indicating."  They're
referring strictly to operation of embodiments in the
specification and then trying to narrow -- improperly narrow
the scope of the term "indicating."

     And the court in *Acumed* rejected that approach, and they
said for terms that have these generally applicable meanings,
like "curved," that everyone would know that's not -- operation
of individual embodiments in the specification does not justify
deviating from that plain and ordinary meaning.

     Now, if I could turn to Slide 71, please.

     And here this just provides the dictionary definition and
the support for what the plain and ordinary meaning of
"indicating" is.  Now, this is a term that we as lawyers use;
that everyone out in the world knows what "indicate" means.
It's not something that needs a particular construction or
definition, but this provides some guidance as to what that
term might mean.

     If we could turn to Slide 72, please.

     And then this is the *Hill-Rom* case which specifically
stands for the proposition that if you're going to use a
specification to try and limit the scope of the plain and
ordinary meaning of a claim term, you need to have -- the

1    standard is exact and you need to have some kind of disavowal

2    or the patentee acting as its own lexicographer.

3        Huawei never addresses this case.  They never attempted to

4    distinguish it in their papers.  So we would submit that this

5    case is on all fours with the circumstance that we're facing

6    with here.

7        Now, the one case that they do cite in their papers is the

8    *Tap v. Owl* case, which is at 419 F.3d 1346, for the proposition

9    that you can use the specifications to try and narrow these

10   limitations.

11       Now, what Huawei ignores and doesn't mention in either its

12   papers or its presentation is that in the *Tap* case, the court

13   in looking at the specification found manifest phrases of

14   exclusion.  So, for example, it was with respect to the

15   contents of a solution and the specification stated that the

16   contents must include X.  Furthermore, the specification

17   included specific definitions of the present invention is X.

18       Those are manifest phrases of exclusion that justified

19   limiting the scope of the plain and ordinary meaning in that

20   case.  Those circumstances are not present here and are found

21   nowhere in the specification of the '825 patent.

22       If I could turn just quickly to Slide 73.

23       This just shows that every single passage that Huawei

24   cites in its papers with respect to the operation of the system

25   information are all identified explicitly as exemplary

1    embodiments.  Therefore, Huawei's reliance on the operation of

2    these to try and narrow the claim terms, it violates black

3    letter claim construction law.

4         If I could turn to Slide 74, please.

5         And this just points out that there are actually several

6    embodiments where the words include "with respect to system

7    information including IDs."  "System information including IDs"

8    is not present.  So that's specifically with respect to the

9    embodiments of Figures 7 and 11.

10        Turn to 78, please.

11        And then I'd like to just briefly address for one minute

12   that even if you adopt Huawei's proposed construction, there is

13   still a material dispute of fact.  And what you see in Huawei's

14   papers is kind of a glossing over the operation of the actual

15   systems and how system information -- what are the contents of

16   the system information and what those contents mean.

17        Slide 80, please.

18        So, in particular, the system information includes two

19   parameters:  The number of RA preambles and the size of RA

20   preambles.  Now, what Huawei never addresses is how by

21   including these parameters, this inherently includes the

22   preamble indices; and this is explained on Slides 81 through 83

23   of the presentation.

24        More particularly, for example, the example we provide is

25   if the size of preamble groups A is 32 and, likewise, the

 1   number of RA preambles is 32, in that circumstance the

 2   preambles are defined by the standard as being the preambles 0

 3   to 31.  And that's -- the cite to the specification is included

 4   here as well.

 5        So essentially the variable n32, when included in these

 6   parameters, means preambles indices 0 to 31.  That is including

 7   a range of preamble IDs, which is exactly the way the

 8   specification describes it.  If you can see the cite on page 84

 9   in column 5 in the specification.

10        Thank you.

11             **THE COURT:**  All right.  Thank you.

12             **MR. BETTINGER:**  Thank you, Your Honor.

13        So we're on Huawei's motion for summary judgment E where

14   you granted summary judgment as to literal and denied as to

15   doctrine of equivalents.  I think the remarks are addressed to

16   the literal on the grant.

17        And in our slide book, which is the big one, Slide 28.

18        In *Fujifilm versus Motorola*, you dealt with a lot of these

19   same issues, as I'm sure you recall.  In the February 20

20   opinion, I think you-all agree, "Hey, plain meaning sometimes

21   maybe you do have to go back to the spec because a term can

22   have different meanings.  And so how is it being used here?"

23        And that's what we did.  We followed that here, and on

24   Slide 29 and as indicated in our papers and as you indicate in

25   your ruling, that the specification does use the term

"includes."  It means, "Hey, 'indicate' here means 'includes.'"

So I think that's the way the law works.  That's how
Judge Koh did it in *Apple*, Judge Tigar did it in *Icon*,
Judge Gonzalez Rogers did it in *MediaTech*, and you did it, and
you go back to the spec and that's right.  So we would stand on
your ruling.  Thank you.

**THE COURT:**  So, good.

I think you're up again if you want to take anything else
on.

**MR. BETTINGER:**  Yes, we do.  Mr. Giardina will address
the next issue.

**THE COURT:**  I'll just say that you guys are in your
lightning rounds in responses.

**MR. GIARDINA:**  So, Your Honor, again, David Giardina
on behalf of Huawei.

I wanted to take up your rulings on Huawei's motion to
strike legal conclusions from their FRAND experts and then the
analog to that on their motion to exclude what they
characterized as opinions of French law by our experts
Mr. Lasinski and Dr. Padilla.

I don't -- I mean, to be clear, Your Honor, we're
obviously prepared to abide by the notion that the experts
oughtn't be offering legal conclusions insofar as we sought to
strike that from theirs, but I did have just some questions and
was looking for some clarification so that we could understand

1   the parameters of that and see if there was some issue that we

2   wanted to clarify in large part because their motion was

3   directed to a panoply of paragraphs in our experts' reports

4   many of which have either direct analogs in their, you know,

5   their expert reports, our guys are doing exactly the same

6   thing; and in other cases where we're responding, it's in the

7   rebuttal phase where we're responding directly, and they're

8   claiming those are objectionable.  But, obviously, you know, as

9   we stated in our papers, that oughtn't be the case.  Either

10  they're both out or they both get to do it.

11        And there's some asymmetry in the scope of our two motions

12  because we were more targeted in what we did and they were

13  broader, and we just want to make sure that whatever rule

14  applies applies equally to both sides' experts.

15        In particular, there were a few kind of variants in their

16  motion that I wanted to understand whether in your view it was

17  a legal conclusion.

18             **THE COURT:**  All right.

19        **MR. GIARDINA:**  The first was whether the experts would

20  be permitted to state their understanding of the meaning of the

21  terms "fair," "reasonable," and "nondiscriminatory."  You know,

22  I think all four experts do it.  They actually agree except

23  with respect to "nondiscrimination," I think.  There's not much

24  daylight between them on the other issues.

25        But I hate to ask Your Honor --

1          **THE COURT:**  You know, it's fair for you to ask.  I may

2    not answer.  But where in specific are you referring to in the

3    tentative?

4          **MR. GIARDINA:**  Sure.

5          **THE COURT:**  With which experts are you concerned

6    about?

7          **MR. GIARDINA:**  Yeah.  So I am specifically referring

8    to Samsung's motion to partially exclude, so this was page 3 of

9    the tentative --

10         **THE COURT:**  Yeah.

11         **MR. GIARDINA:**  -- subpart B; and the ruling, the

12   tentative ruling is grant in part, no legal conclusions,

13   including whether the parties acted in good faith.

14         **THE COURT:**  So I was really focused on the good faith

15   part of the opinions --

16         **MR. GIARDINA:**  I see.

17         **THE COURT:**  -- from the briefing, and it seemed to me

18   that experts can opine on specific terms but then to make --

19   draw the conclusion at the end of all that, "Oh, and so Huawei

20   was acting in good faith," that, I think, is something for the

21   jury I think in light of the specific information that the

22   expert would have a basis to opine on.

23         **MR. GIARDINA:**  All right.  That's very helpful to

24   understand, Your Honor.  Just a couple of questions in that

25   vein.

1          Our expert Dr. Padilla, as their experts do, analyzes the

2    parties' negotiations, not as a substitute for fact testimony

3    but he's got to, you know, take as a given the facts as he

4    understands them, and he expresses conclusions in sort of two

5    ways.

6          He says in one respect this conduct is consistent with a

7    party being a willing licensor or an unwilling licensor, and

8    that's one sort of way he expresses that view.  And that's, you

9    know, kind of derived from a literature in the standard

10   essential patent area where that is the language being used in

11   relation to deciding whether a party is entitled or not

12   entitled to injunctive relief.  So he's kind of applying that

13   framework, and he defines how he means it.

14         I don't take that to be equivalent to good faith or bad

15   faith.  He's not really expressing their state of mind.  He's

16   using it in an objective sense using criteria that he set

17   forth.  I don't know if that's consistent with your ruling or

18   not.

19         **THE COURT:**  Generally, and it may be that the best way

20   of dealing with those specifics, to the extent that I'm not

21   explicit enough in this order, is to deal with them in

22   *motions in limine*.  If there's a concern, you know, about going

23   too far, I would think about that.

24         **MR. GIARDINA:**  All right.  I think with that,

25   Your Honor, you know, we're fine.  I mean, we may -- because of

this asymmetry in the styling of the motions, we may come back

to you on this issue on *motions in limine*; but as long as

that's not going to be perceived to be improper, then we'll

take that issue up later.

            THE COURT:  Generally, no.  If I'm specific enough in

my order, then, yes.

            MR. GIARDINA:  All right.  Thank you, Your Honor.

            THE COURT:  All right, thank you.

            MS. MAROULIS:  Your Honor, this is Victoria Maroulis,

counsel for Samsung.

      I'll briefly address Mr. Giardina.  We agree with the

Court's ruling excluding opinions on French law from Huawei's

experts.  In particular, there's a whole section in

Mr. Padilla's report where he purports to rebut the French law

expert even though he's not French law expert himself.

      And I understand the Court to bar the experts from talking

about good faith, something the jury would opine on, as fact

finding.  For example, Mr. Padilla has a number of references

in his report to Samsung impermissibly delaying or protracting

the negotiations and other terms where he goes from being an

expert opining on something to being an advocate essentially or

fact finder.

            THE COURT:  Don't make assumptions.  You've maybe gone

a little too far in what you think I think with respect to

that.  So I'm really -- what I've been focused on are the very

 1   sort of big picture, end-of-the-day conclusions, the summing up

 2   of things for the jury.  I worry about experts doing that.

 3       But when they come to specific things that they're talking

 4   about, specific items, I don't -- there are things that experts

 5   do that can help a jury understand, and I think that that's

 6   fine.

 7       And with the French law business, a lot of what

 8   Mr. Padilla was saying didn't seem to me to have to do with

 9   French law.  He was talking about, you know, the general

10   understanding of those terms.

11       So just don't say, "Well, you said it's going to be X,"

12   because that's not -- X will be what I write, but I'm trying to

13   clarify this for you.

14       **MS. MAROULIS:**  Understood, Your Honor.

15       And with respect to Huawei's motion to strike Samsung's

16   experts, you know, experts routinely rely on legal principles

17   that are given to them in the infringement context and validity

18   context and damages.  So Dr. Hausman and others that were

19   addressed in the motion merely relied on the law that was

20   provided by counsel as is done in most cases.

21       I don't believe there were any other points raised in

22   Mr. Giardina's presentation that need to be addressed but I'm

23   happy to.

24       **THE COURT:**  Thank you.

25       **MR. BETTINGER:**  Given the time allocation,

1    Your Honor --

2          THE COURT:  Yeah, I think Samsung's down to two

3    minutes so I was really thinking you'd be responding at this

4    point to everything.  If there's -- but if you want to use your

5    two minutes another way, come on up.

6          MS. DUCCA:  Your Honor, I have 30 seconds --

7          THE COURT:  Come on up.

8          MS. DUCCA:  -- 30 seconds to address Huawei's *Daubert*

9    on Dr. Lyon with respect to position information.

10         Mr. Malmberg is giving you one more book.

11         I encourage you to look at Slides 16 and 17 that explain

12   why Dr. Lyon's interpretation is consistent with the

13   interpretation one of ordinary skill in the art would have in a

14   plain meaning of the term "position information."

15         But I also want to point out the paragraphs that

16   Your Honor identified in the tentative ruling are very

17   overinclusive, and there's quite a bit of opinions in there

18   that don't relate to position information.  It's more

19   background.

20         What we've done is prepared a highlighted version of the

21   expert reports with those paragraphs in there with the parts

22   that we believe relate to position information highlighted.  If

23   I may hand this up and to opposing counsel.

24         THE COURT:  You may definitely do that.

25         MS. DUCCA:  And we will also file this on ECF if it

1  would be helpful to you.  I'm sorry, on PACER.

2           **THE COURT:**  Thank you.

3           **MS. DUCCA:**  And that's all I have, Your Honor, unless

4  you have any questions.

5           **THE COURT:**  None.

6           **MS. DUCCA:**  Thank you, Your Honor.

7           **MR. BETTINGER:**  Nothing from us, Your Honor.  We agree

8  with your ruling.

9           **THE COURT:**  Okay.  Do you have any other matters that

10  you wanted to raise?

11           **MR. BETTINGER:**  Yes, Your Honor.

12           **THE COURT:**  Mr. Lewis, go ahead.

13           **MR. BETTINGER:**  We have the '105 you wanted to

14  address.  Mr. Lewis is going to do that, and we have one issue

15  on the '825 where you agreed with us but you didn't know what

16  to strike so we just wanted to touch on that.

17           **MR. LEWIS:**  We'll help you with that, Your Honor.

18      Let's go back to 88.

19      So you mentioned at the beginning of this hearing the '105

20  patent and whether we had disclosed the reduction to practice

21  via the simulations.

22           **THE COURT:**  Right.

23           **MR. LEWIS:**  So I just wanted to quickly show you that

24  we did.

25      So Slide 108 shows the part of the invalidity contentions

1  that we have filed with respect to this.  They're supplemental

2  but there was an agreed supplement, and this is Samsung's

3  motion for summary judgment reply Exhibit D.  And in there we

4  explained that Motorola conceived of the invention disclosed in

5  the document at least by the date there -- this, I think, might

6  be under seal so I won't repeat it.

7           THE COURT:  Okay.

8           MR. LEWIS:  -- and then also reduced it to practice.

9  And so we did disclose that.

10      If we could go to -- oops.  I have the clicker.

11      On 89 we actually disclosed in the claim chart the actual

12  part of the Motorola draft that shows the results of the

13  computer simulation, and that was in our claim chart as well.

14      I think both parties' claim charts had no analysis.  They

15  just, you know, said that the element was met and then quoted,

16  or copied in the case of these figures, material from the prior

17  art.  That's exactly what we did.  It shows what we're relying

18  on now, and so, Your Honor, it was disclosed.

19      If you have any more questions on that, I'm happy to

20  answer them, otherwise I have nothing more.

21           THE COURT:  Okay.  Thank you, Mr. Lewis.

22           MR. LEWIS:  Thank you.

23           MR. LORDGOOEI:  Your Honor, very briefly, so

24  counsel -- Iman Lordgooei for Samsung -- counsel for Huawei

25  just showed you an excerpt from their invalidity contentions

that showed the Motorola draft.  They didn't show the

simulations.  To this day, we don't have any evidence of these

purported simulations that have been run.

So, first of all, even if you find that they're timely in

bringing this new opinion forward, it still fails because the

only evidence that they've presented in their opposition brief

to our SJ was inventor testimony and a copy of the Motorola

draft, which is the inventor's own document.  There's zero

corroboration of any of these simulations, what the simulations

entailed.  There's only inventor testimony and these purported

results.  So that's that one issue.

The second issue is, despite them including a screen shot

from the Motorola draft document itself in their invalidity

contentions, there's zero indication of the reduction to

practice they intended to rely on being the simulations.

And I think if you look in our -- if you still have our

summary judgment slide deck, on Slide 64, this was a new

theory -- and let's not put this up because there may be some

confidential issues -- but this was a new theory that they

raised for the first time in their opposition, which I think

Your Honor recognized in your tentative.

We asked their expert during expert discovery (reading):

"What is your theory of reduction to practice?  It's

the fact that Motorola filed a provisional application;

correct?"

1   His testimony on our Slide 62 was (reading):

2        "Yes, I'm relying on the provisional patent."

3   We asked him (reading):

4        "What -- these other paragraphs in your report that

5        talk about these simulations, what do those relate to?

6        Those relate to the diligence between conception and

7        reduction to practice; correct?"

8   He says on our Slide 65 (reading):

9        "Yes, that's what it relates to, the diligence."

10  So we were on zero notice of this purported new theory

11  until we got their opposition brief.

12        **THE COURT:**  Okay.  Thank you.

13        **MR. LEWIS:**  Your Honor, he mentioned a new issue I'd

14  just like to deal with, corroboration.

15  If I could go to Slide 86.

16  It's not correct that the corroboration actually needs to

17  be prior art.  So the corroboration includes the Motorola draft

18  itself; the 3GPP submission itself, which is a public document,

19  I think the next day after the alleged invention date; and the

20  patent application.  And all of that can be corroboration.  It

21  doesn't have to be before the priority date to corroborate the

22  action that occurred before the priority date.

23  And that's all I have.

24        **THE COURT:**  Okay.  Thank you.

25        **MR. BETTINGER:**  I think, Your Honor, I'm happy to tell

```
 1   you the last issue.  This is Huawei's *Daubert* motions and it's
 2   G, the '825 patent, Huawei's *Daubert* motions on page 2, the G;
 3   and your tentative says (reading):
 4          "I agree with Huawei but see no basis for striking
 5       paragraphs."
 6      And just to orient us, again, in the big book, on 146 this
 7   issue is about "without checking the downlink channel" is the
 8   phrase.
 9          THE COURT:  Uh-huh.
10          MR. BETTINGER:  And what the testimony was throughout
11   the case was, there's this thing called the PDCCH, physical
12   downlink control channel, PDCCH, and there was one of them and
13   everybody agreed there was one of them.  On page 147 of the
14   slides, Valenti in his infringement report says, "Yeah, there's
15   one, the physical downlink control channel."
16      And then all of a sudden when we articulated a
17   noninfringement position, "Oh, but there's different portions
18   of the PDCCH," and this issue came up.  And it's, like, this is
19   new.  That wasn't your position going through.  There was one
20   PDCCH.  We all agreed on that, and you admit that you do check
21   that PDCCH so, okay, you can't change that.
22      So then I think you say, "I agree with Huawei but I don't
23   see what to strike," and so I was going to suggest to
24   Your Honor there are two paragraphs that should be stricken --
25          THE COURT:  Okay.  Good.
```

1          **MR. BETTINGER:**  -- and they're at ECF 327-20,

2     Exhibit 23, which is Valenti's infringement report.  And we can

3     put that up on the screen.  And it's paragraph 479.

4          Do you have that?

5          Paragraph 479 where he opines (reading):

6               "The HiSilicon documentation" -- and HiSilicon is one

7          of the Huawei chips -- "source code, and testimony support

8          my opinion that the HiSilicon-Based Accused

9          Instrumentalities" -- the Huawei phones -- "each perform

10         after transmitting of the first uplink signal, waiting for

11         a predetermined delay duration without checking a downlink

12         channel, and therefore... literally meet claim

13         limitation."

14         I submit to you that "without checking a downlink channel"

15    is not satisfied and that paragraph should be stricken.

16         **THE COURT:**  Okay.

17         **MR. BETTINGER:**  And then there's a similar one for the

18    Qualcomm chips at paragraph 486 of the same report and, again,

19    that's Exhibit 23 to ECF 327.20, and it's the same language

20    using the Qualcomm base.

21         But we agree with you agreeing with us, and we're just

22    trying to say, "Hey, we think those are the two paragraphs that

23    should be stricken as a result of that ruling."

24         **THE COURT:**  All right.  I'll look at that.  Thank you,

25    Mr. Bettinger.

 1          **MR. BETTINGER:**  With that, we don't have anything else

 2    but maybe a housekeeping order.

 3          **THE COURT:**  Yeah.  We'll do that, but I'm --

 4          **MR. BETTINGER:**  I'm sorry.

 5          **THE COURT:**  -- going to hear on the lightning round.

 6          **MR. ZADO:**  And if we could turn to the slides on the

 7    motion to strike.

 8          And this is really simply an issue of claim construction

 9    and courts have routinely found that parties, when there's

10    differences of claim construction, that's not a difference --

11    that's not a defect in methodology that supports excluding

12    opinions based on a *Daubert* challenge, for example.

13          And if we could turn to Slide s 112 to 113.

14          And this just explains -- these slides just provide

15    Dr. Valenti's testimony that explains and confirms his opinion

16    that there isn't a single channel, the PDCCH random access

17    channel, that is not checked for the messages that are carried

18    on that particular channel.  There's a -- he testified further

19    that there's a separate channel called the paging PDCCH, which

20    are two different channels.

21          Now, to correct counsel for Huawei's statement that there

22    was no reference or this is a surprise, there were separate

23    PDCCHs.  In particular, if you turn to the Valenti deck,

24    Exhibit H, which cites to the 36.213 3GPPC standard, it

25    specifically defines that there are multiple PDCCHs.

1          And if you notice that Huawei has not submitted any

2    testimony or evidence from its experts saying that there's only

3    one channel.  So they're relying on, first, a misstatement and,

4    second, there's no evidence to support that misstatement.

5          And with respect to the two paragraphs that they wish to

6    exclude, those two paragraphs simply state "without checking a

7    downlink channel."  There's nothing with respect to the

8    particular opinion as to whether there's one or more than one

9    channels that's set forth in those two paragraphs.  So we don't

10   see a basis for why those two paragraphs should be excluded.

11          **THE COURT:**  Okay.  Thank you.

12          All right.  First of all, thank you for your argument and

13   I'm sorry that I didn't let you argue as long as some of you

14   would have liked.  I let Mr. Verhoeven argue as long as he

15   wanted, but everybody else, so thank you for this and thanks

16   for all the homework that you've given me.

17          You know, there's a reason why there are page limits in

18   briefs.  It's not so that you can then exceed them with all of

19   these things, but I will say that I appreciate them.

20          So housekeeping?

21          **MR. BETTINGER:**  Housekeeping, yeah.  Your Honor, you

22   mentioned it at the beginning of, like, where are we going, you

23   know, what's the path here.  We think it would benefit the

24   parties to maybe have a status conference where we can discuss

25   that.

1      There's been, you know, some developments in the case.  I

2   think when you see some of the things that have happened and

3   the direction we're headed, we might be able to get some more

4   clarity for the parties as to how best to proceed here and

5   wondered if we could have a status conference in the near

6   future.

7          THE COURT:  Okay.

8          MR. VERHOEVEN:  I'm not sure I know what counsel is

9   talking about.  I think perhaps we should talk -- he should

10  talk to me first and --

11         THE COURT:  Well, I would encourage that.  I'm open to

12  having a status conference, and so if you --

13         MR. BETTINGER:  Mid-September?

14         THE COURT:  Yes.  So pick a Tuesday, any Tuesday, in

15  the next month as long as that -- and then give me a week to

16  digest whatever it is that you're looking at.

17         MR. BETTINGER:  All right.

18         THE COURT:  Just so that you know, I'm not going to be

19  around a lot in October.  I'm going to be in trial starting

20  October -- the last week in August for a few weeks so -- but if

21  you want to do that, I'm happy to do that.

22      Two things have come to my mind.  The first I was reminded

23  of by Mr. Verhoeven in almost the second sentence that he said

24  today.  There is an extraordinary amount of information that

25  the parties have been trying to keep confidential --

1    **MR. VERHOEVEN:**  Yes, uh-huh.

2        **THE COURT:**  -- in this case; and while I am

3    sympathetic to the desires of clients to keep important

4    information confidential, this is a court of public record and

5    I am not -- you're going to have to figure out how this case

6    will be tried in a way that preserves what I think is the most

7    important thing, which is that this is a court of public

8    record.

9        **MR. VERHOEVEN:**  Yes, Your Honor.  Understood.  And

10   having just tried a case in front of Judge Alsup, I have some

11   thoughts about how to do that.

12       **THE COURT:**  Okay.  And anything that works for him on

13   this topic, I have a hunch will work for me.

14       Okay.  So that's the first thing.

15       And then the second thing -- and this may or may not feed

16   into what you're thinking about, Mr. Bettinger -- is what are

17   you doing with respect to trying to resolve the case, and is

18   there anything that I can do to be of help to you?

19       **MR. VERHOEVEN:**  I think there's a mediation coming up.

20       What is the date?

21       **MS. MAROULIS:**  September 17th, Your Honor, we're

22   meeting with Judge Westmore.

23       **THE COURT:**  Okay.  All right.  So that's good.  That's

24   a good thing.

25       **MR. VERHOEVEN:**  Just so you know, so that's one event.

1          **THE COURT:**  That's one event.

2          **MR. VERHOEVEN:**  But we'll take that under

3    consideration.

4          **THE COURT:**  So that's -- so I'm glad -- thank you for

5    telling me that.

6        I just have wondered from your first appearance here what

7    this course for you titans of industry and wise counselors is,

8    and I know it can't be having a jury trial in my court.  I just

9    know that.  That doesn't -- it's entirely up to you and you can

10   play whatever games and strategies you want to play out, but

11   it's just not smart.  It's just not.  So help yourselves.

12         **MR. VERHOEVEN:**  We hear you, Your Honor.  I hear you.

13         **MR. BETTINGER:**  I don't want to get into the specifics

14   now, but there's some -- you know.

15         **THE COURT:**  So I'm here.

16         **MR. BETTINGER:**  Okay.  We'll find a Tuesday that

17   you're open.

18         **THE COURT:**  I'd be delighted to see you and anything I

19   can do, let me know.

20         **MR. BETTINGER:**  Thank you, Your Honor.

21         **MR. VERHOEVEN:**  Thank you, Your Honor.

22         **MR. BETTINGER:**  We appreciate all your time.

23         **THE COURT:**  Yes.  Thank you.

24              (Proceedings adjourned at 4:54 p.m.)

25                        ---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, August 24, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter