# DKT. 371-9
# PUBLIC REDACTED VERSION

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2      charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5    Kevin P.B. Johnson (Bar No. 177129
     kevinjohnson@quinnemanuel.com
6    Victoria F. Maroulis (Bar No. 202603)
     victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California 94065-2139
8  Telephone:    (650) 801-5000
   Facsimile:    (650) 801-5100
9
     Michael T. Zeller (Bar No. 196417)
10   michaelzeller@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
11 Los Angeles, California 90017
   Telephone: (213) 443-3000
12 Facsimile: (213) 443-3100

13 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
14 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
15
                     UNITED STATES DISTRICT COURT
16
        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
17

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | |
| vs. | **EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendant. | |

EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    SAMSUNG-HNDCA-000410118

1 arise over the possibility to seek injunctive relief for the infringement of essential patents (see
2 paragraphs 49 to 53 below).

3   B.   **"Is Samsung's royalty offer of ▓▓ on relevant end products to Apple for its
4   portfolio of W-CDMA essential patents within what I consider to be the
   normal FRAND range from my industry experience and within Samsung's
   commitments under clause 6.1 of the ETSI IPR Policy?"**

6   23.   I understand that on 25 July 2011, Samsung offered a worldwide license to its W-
7 CDMA essential patent portfolio for ▓▓ for each relevant end product to Apple. There is ample
8 evidence from a variety of sources that establishes that Samsung's ▓▓ royalty offer is FRAND.

9   1.   *Evidence Supporting A ▓▓ Headline Offer*

10   24.   Based on my own industry experience and other evidence in the public domain, I
11 believe that Samsung's offer is within the FRAND range for a patent portfolio such as that of
12 Samsung's.

13   25.   Samsung has a reputation for having a strong essential patent portfolio (see for
14 example the press reports in respect of Samsung's licensing deals with IBM and Ericsson –
15 Exhibits 5 and 6).

16   26.   In my experience, licensors of a portfolio of the reputation of Samsung's offer to
17 license their portfolios at rates between 1% and 2.75% as a starting point in bilateral negotiations.
18 In practice, parties almost always negotiate a license to the licensor's entire portfolio of
19 UMTS/WCDMA declared essential patents.

20   27.   The experience of other experts within the industry confirms that single digit
21 percentage royalties (as a headline demand) are the norm. In the book "Technology Patent
22 Licensing: An International Reference on 20th Century Patent Licensing, Patent Pools and Patent
23 Platforms" (see Exhibit 7) the authors, Kearsey and Goldstein, state that "individual patent owners
24 usually charge between 0.5 and 4 percent on essential patents."

25   28.   It is well understood in the mobile telephony industry that InterDigital typically
26 requires 1 to 3% for its W-CDMA essential patent portfolio (see page 10 of the report produced on
27 InterDigital by RBC Capital Markets in July 2003 – Exhibit 8).

28

-9-
EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    SAMSUNG-HNDCA-000410127

29. Further, some members of the Next Generation Mobile Networks IPR Plenary ("NGMN IPR Plenary") have made voluntary public announcements on what they would potentially charge for a royalty on handsets which use the LTE ("4G") standard. The royalty rates announced by each member range from 0.8% - 3.25% (the latter figure was publicly announced by Qualcomm in December 2008 (see Exhibit 9)). The average announced royalty rate is approximately 2.1% based on my own calculation set out in a paper I authored and published in 2010 (see Exhibit 9). There is no reason in my opinion why the LTE standard should command different levels of royalties than W-CDMA.

30. Indeed, Motorola has made the identical 2.25% offer with regard to a license to GPRS patents as it has announced for LTE. In July 2009, Motorola announced that it "will offer licenses under its LTE essential patents to willing licensees on FRAND terms, subject to reciprocity" and that it "expects its essential patent royalty rate for LTE systems and equipment (e.g., infrastructure and subscriber handsets) will be approximately 2.25%." (See Exhibit 11.) In October 2011, it was revealed in a letter from Apple's German counsel Bardhele Pagenberg that "one of the issues [in a dispute between Apple and Motorola over a GPRS patent] considered may be whether the royalty rate of 2.25% demanded by your client Motorola was a FRAND offer." (See Exhibit 12.) It is reasonable to expect that most other licensors will follow a similar practice offering the same headline royalty rate for GSM, GPRS, UMTS, and LTE.

31. Finally it is of significance to note that whilst I believe ▮ is within the range of royalties of FRAND terms and conditions, in this instance it was also the headline rate offered by Samsung at what I understand to be the start of negotiations with Apple, and not the final result of the parties' negotiations. In standard licensing practice, a preliminary offer by a licensor is usually counter-offered by a prospective licensee. The parties then, if capable of reaching an agreement and following a period of bi-lateral negotiation, agree on terms and conditions, including a running royalty somewhere between the headline rate and initial counter offer. Exactly where that royalty rate falls depends on various factors. The royalty rate agreed as a result of FRAND negotiations in which I have been involved has depended on factors such as the negotiating positions of the parties, the commercial relationship between them, the reputational

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    SAMSUNG-HNDCA-000410128

strength of the patent portfolios, and the willingness of the licensee to engage in good faith attempts to secure a license. The initial headline rate offered by licensors is made with this forthcoming negotiation fully in mind, and the end result of the negotiations may be quite different from the initial offer.

32. An important aspect of the ETSI FRAND Declaration is the "condition that those who seek licences agree to reciprocate" (see clause 6.1 of the ETSI IPR Policy, Exhibit 2). As a practical matter, 'reciprocity' refers not only to the offered terms and conditions, but to the willingness of licensees to engage in meaningful negotiations leading towards a license agreement. In my experience, it is well known that prospective licensees that co-operate and engage in meaningful negotiations and agree on FRAND terms and conditions early in the negotiating process may benefit from what might be called "most favorable terms and conditions." Prospective licensees who refuse to engage in meaningful negotiations and who instead choose a path of obfuscation, delay, and avoidance cannot expect a license under the same favorable terms. When a prospective licensee finally refuses to enter into any agreement, they can no longer be considered as prospective licensees, but rather are seen as infringers. Infringers are subjected to enforcement proceedings, face the fullest penalties allowed by the law, and any resulting license agreement constitutes a settlement conducted in the shadow of these legal proceedings. It cannot work any other way; if prospective licensees believe that there is no downside to not being a willing partner in a license negotiation, and that there is no penalty for being an infringer, every prospective licensee will logically select to roll the dice in litigation. Every license negotiation would therefore end up in the courts with judges and juries being the arbitrators of licensing terms and conditions which are intended by the ETSI IPR Policy to properly be the province of commercial, arms-length negotiations between parties (ETSI IPR FAQs, Answer 7 – see Exhibit 13).

33. With regard to Samsung's ▌ headline offer for a license to its W-CDMA essential patents, as someone who has been working more or less continuously with licensing of standard essential patents on GSM and UMTS since 1992, I therefore believe that Samsung has

-11-
EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    SAMSUNG-HNDCA-000410129

acted in a manner consistent with Clause 6.1 of the ETSI IPR Policy and standard industry practice and norms.

34. It is true that companies, such as Apple, who do not have the same established position on W-CDMA essential patents as Samsung, face a difficult challenge negotiating acceptable royalty rates that they find commercially acceptable. It is however also true that any new entrant into a successful market faces a challenge to overcome the sunk costs and prior investments made by competitors. GSM and W-CDMA are the result of enormous investments in R&D made by some companies over decades. It is fundamentally unfair that a company like Apple can enter into this market, free-ride on the investments and risks taken by others, and be unwilling to pay the cost of entry which every other industry participant has paid, including Samsung. That entry cost can take several forms, including taking licenses, investing in R&D, participating in the standardization process and purchasing technology portfolios of which there have been an increasing number on the Market as the industry reshapes itself.

35. There is no reason why a new market entrant, such as Apple, that is required to acquire necessary technology should be treated any differently from those acquiring or building manufacturing capabilities (e.g. chipset manufacturers are required to invest enormous costs in chip manufacturing plants, a pre-requisite for those who wish to compete in chip manufacture). For example, in 2008 RIM purchased approximately 100 or so patents from Ericsson including some standard essential ones (see RIM's Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended May 31, 2008 – see Exhibit 14). More recently in April 2011, HTC purchased 82 issued patents and 14 patent applications from ADC Telecommunications relevant to 4G technology at a cost of approximately US$75 million (see the Mobiledia press report 6 April 2011 – Exhibit 15).

36. Based on my extensive experience designing commercial solutions for companies involved in the telecommunications industry, it is my opinion that the proper commercial solution to Apple's apparent problem is to invest in the standardization process i.e. engage in R&D, buy or otherwise acquire essential patents to use in bi-lateral negotiations with others, or accept that it must pay license fees to those companies which own the technology that it is using.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    SAMSUNG-HNDCA-000410130

covering 90% of the world's population.  (See Exhibit 17 (http://www.gsma.com/gsm/).)  It would make no sense to grant a license under one essential patent or for one county when GSM/UMTS users are capable of roaming (that is using a GSM handset registered on one network in another network) across all of these networks.  Indeed, I am unaware of any license that includes such terms.

66.  In the public declarations made by a number of well-established companies in the telecoms industry for LTE (4G), one sees that assessing a percentage royalty on handsets, infrastructure, and other end-user products is the standard practice across the industry:

> *"Ericsson's fair royalty rate for LTE is therefore expected to be around 1.5% **for handsets**."*  (Ericsson Statement – see Exhibit 18)

> *"The rate shall be **based on value added by the technology in end-user products**, and competitive pressures in international markets will dictate such royalty rates. Huawei believes it will hold 15-20% of all essential patents relate to LTE standard, therefore, a royalty rate with some flexibility, but not to exceed 1.5%, is expected. And this rate is negotiable in bilateral negotiations, subject to reciprocity provided by other party."*  (Huawei Statement – see Exhibit 19)

> *"Motorola expects that its essential patent royalty rate for LTE systems and equipment (e.g. **infrastructure and subscriber handsets**) will be approximately 2.25%."*  (Motorola Statement – see Exhibit 20)

> *"To avoid unfavorable effects of royalty stacking, Nokia will not charge royalties higher than 2.0 percent from the sales price of **an end-user device** for IPR that is essential to wireless communication standards."*  (Nokia Statement – see Exhibit 21)

> *"Nortel has published a competitive handset royalty rate of about one percent subject to terms for its portfolio of LTE standards-essential patents."*  (Nortel Statement – see Exhibit 22)

> Qualcomm *"expects that it will charge royalties for a license under its standards essential LTE ... patent portfolio ... of approximately 3.25 percent of **the wholesale selling price**."*  (Qualcomm statement – see Exhibit 9)

> *"ZTE will license its LTE essential patents for mobile communication terminals with a maximum 1 % from the sales price of an **end-user device**."*  (ZTE Statement – see Exhibit 23)

(Emphasis added.)

67.  No such public declarations were made for GSM (2G) or UMTS (3G), but from what I have witnessed in my career to date the only substantial difference in the treatment of LTE

-21-
EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    SAMSUNG-HNDCA-000410139

## VIII. PREVIOUS TESTIMONY AND COMPENSATION

79. I have not testified at deposition or trial in the past four years.

80. I am compensated for my time at the rate of $520 for each hour of service that I provide in connection with this case. That compensation is not contingent upon my performance, the outcome of the case, or any issues involved in or related to this case.

## IX. SUPPLEMENTATION OF OPINION

81. I reserve the right to adjust or supplement my analysis in light of any critique of or comments on my report or alternative opinions advanced by or on behalf of Apple.

Date:       March 16, 2012

Place:      Stockholm, Sweden

Signature   /s Eric Stasik

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                SAMSUNG-HNDCA-000410144